**VENABLE LLP**
Adam M. Weg (SBN 269320)
*amweg@venable.com*
Max N. Wellman (SBN 291814)
*mwellman@venable.com*
Bryan J. Weintrop (SBN 307416)
*bjweintrop@venable.com*
2049 Century Park East, Suite 3400
Los Angeles, CA 90067
Telephone: (310) 229-9900
Facsimile: (310) 229-9901

MATTHEW A. LESNICK (SBN 177594)
matt@lesnickprince.com
LESNICK PRINCE PAPPAS & ALVERSON LLP
315 W. Ninth Street, Suite 705
Los Angeles, CA 90015
Telephone: (213) 493-6496
Facsimile: (213) 493-6596

*Attorneys for* 600 Spring, LLC, Glass Tunnel LLC, Scott Gillen, C64829 LLC, and Unvarnished, Inc.

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**NORTHERN DIVISION**

In re:

GLASS TUNNEL LLC,

Debtor and Debtor-in-Possession.

---

600 SPRING, LLC, a California limited liability company; GLASS TUNNEL LLC, a California limited liability company; SCOTT GILLEN, an individual, C64829 LLC, a California limited liability company; and UNVARNISHED, INC., a California corporation,

Plaintiffs,

v.

BOBS LLC, a California limited liability company; AMIT TIDHAR, as Trustee of the BR SHY IRREVOCABLE TRUST; and BARRY SHY, an individual,

Defendants.

Case No. 9:26-bk-11019-RC

Adv. No. ______________________

**VERIFIED COMPLAINT FOR:**

**(1) BREACH OF FIDUCIARY DUTY;**

**(2) BREACH OF CONTRACT; (OPERATING AGREEMENT);**

**(3) BREACH OF CONTRACT (BOBS LOAN AGREEMENT & DEED OF TRUST);**

**(4) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS (UNVARNISHED CONSTRUCTION AGREEMENT);**

**(5) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**

**(6) CANCELLATION OF INSTRUMENT (OPERATING AGREEMENT);**

**(7) CANCELLATION OF INSTRUMENT (DEED OF TRUST);**

**(8) QUIET TITLE;**

**(9) DECLARATORY RELIEF;**

**(10) VIOLATION OF CALIFORNIA USURY LAWS;**

**(11) ACCOUNTING (600 SPRING, LLC);**

**(12) ACCOUNTING (BOBS LLC);**

**(13) FRAUD;**

**(14) DETERMINATION OF VALIDITY, EXTENT, AND PRIORITY OF LIEN;**

**(15) AVOIDANCE OF LIEN AS INTENTIONAL FRAUDULENT TRANSFER;**

**(16) AVOIDANCE OF LIEN AS CONSTRUCTIVE FRAUDULENT TRANSFER;**

**(17) AVOIDANCE OF LIEN AS FRAUDULENT TRANSFER UNDER 11 U.S.C. § 544; AND**

**(18) EQUITABLE SUBORDINATION**

Debtor-Plaintiffs Glass Tunnel LLC ("Glass Tunnel") and 600 Spring, LLC ("600 Spring") (collectively, "Debtor-Plaintiffs"), and Non-Debtor-Plaintiffs Scott Gillen, C64829 LLC, and Unvarnished, Inc. (collectively, "Non-Debtor-Plaintiffs," and collectively with Debtor-Plaintiffs, "Plaintiffs") hereby file this complaint against Defendants Barry Shy, BOBS LLC, and Amit Tidhar, as Trustee of the BR Shy Irrevocable Trust (collectively, "Defendants"), and allege as follows:

## INTRODUCTION

1. This action arises from a joint venture gone wrong. Scott Gillen, a highly experienced Malibu home builder, partnered with financier Barry Shy in 2017 to develop ultra luxury residences through 600 Spring. Mr. Gillen conceived of the project and brought the opportunity to Barry Shy. As part of that opportunity, Mr. Gillen was and would be solely responsible for the construction project in its entirety, including acquisition, design, development, construction oversight, execution, direction, marketing strategy, and sales. Barry Shy's role was limited to contributing financing.

2. From the outset, Mr. Gillen was designated the sole Manager of 600 Spring, with the broadest powers to control, manage, protect, and sell the properties in his sole discretion. Mr. Gillen oversaw the construction and development of the properties for more than seven years.

3. But as alleged herein, Barry Shy engaged in a course of deception, fraud, deceit, forgery, and self-dealing in an attempt to seize control of the project and hoard all financial upside for himself. By way of example, he forged the 600 Spring Operating Agreement to try to make himself a Co-Manager of the entity and fraudulently represented himself as such to federal lending institutions; fraudulently doctored a deed of trust and loan agreement to remove express "No-Recordation" provisions and then proceeded to record the fraudulently altered deed of trust to undercut Mr. Gillen's financial interest in the project; and deliberately starved 600 Spring of funds to prevent construction progress while demanding millions per month from Mr. Gillen in accrued interest under a fraudulent and usurious loan agreement.

4. As a result of Barry Shy's fraudulent and deceitful conduct, Plaintiffs suffered and continue to suffer significant financial harm. Mr. Gillen has been systematically excluded from the

construction project despite being the sole Manager of 600 Spring. Moreover, as a result of Defendants' conduct, 600 Spring and Glass Tunnel owe millions of dollars in past-due bills to various creditors, are being sued by multiple vendors seeking payment for work already performed, and have no money to meet their contractual obligations or proceed with completing construction of the project.

**THE PARTIES**

5. Debtor-Plaintiff Glass Tunnel LLC is a limited liability company organized under the laws of the State of California and qualified to do business, and doing business, in the County of Los Angeles, State of California, and a debtor in possession in the above-referenced Chapter 11 bankruptcy proceeding.

6. Debtor-Plaintiff 600 Spring, LLC is a limited liability company organized under the laws of the State of California and qualified to do business, and doing business, in the County of Los Angeles, State of California, and a debtor in possession in a pending Chapter 11 bankruptcy case.

7. Non-Debtor-Plaintiff Scott Gillen is an individual and resident of the County of Los Angeles, State of California.

8. Non-Debtor-Plaintiff C64829 LLC is a limited liability company organized under the laws of the State of California and qualified to do business, and doing business, in the County of Los Angeles, State of California.

9. Non-Debtor-Plaintiff Unvarnished, Inc. is a corporation duly organized and existing under the laws of the State of California, and qualified to do business, and doing business, in the County of Los Angeles, State of California.

10. Defendant BOBS LLC is a California limited liability company. Plaintiffs are informed and believe, and based upon such information and belief allege, that BOBS LLC was formed as a Nevada entity.

11. Plaintiffs are informed and believe, and based upon such information and belief allege, that Defendant Amit Tidhar, as Trustee of the BR Shy Irrevocable Trust, is a trustee of a trust which Defendant Barry Shy holds a beneficial interest in, manages, and controls.

12. Plaintiffs are informed and believe, and based upon such information and belief allege, that Defendant Barry Shy is an individual whose domicile is in the State of California. Defendant Barry Shy incorrectly and fraudulently claims to be a manager of 600 Spring, LLC.

13. Plaintiffs are informed and believe, and thereon allege, that at all times material herein, each Defendant was the agent, servant, employee, representative and/or alter ego of the other Defendants, and that in so doing the things alleged herein, was acting within the course and scope of its/his/her authority as such agent, servant, employee, representative and/or alter ego, with permission and consent of the other Defendants, and is responsible in some manner for the acts alleged in this Complaint.

**THE CHAPTER 11 BANKRUPTCY FILINGS**

14. On July 16, 2026, 600 Spring filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, Case No. 9:26-bk-11018-RC (the "600 Spring Bankruptcy Case").

15. Also on July 16, 2026, Glass Tunnel filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, Case No. 9:26-bk-11019-RC (the "Glass Tunnel Bankruptcy Case," and together with the 600 Spring Bankruptcy Case, the "Bankruptcy Cases").

16. 600 Spring and Glass Tunnel continue to operate their businesses and manage their affairs as debtors and debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

17. The Bankruptcy Cases are not currently jointly administered.

**JURISDICTION AND VENUE**

18. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b), because this proceeding arises under title 11 of the United States Code, and/or arises in or is related to the Bankruptcy Cases pending before this Court.

19. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), including without limitation subparagraphs (A), (B), (C), (H), (K), and (O), as it involves, among other things, matters concerning the administration of the Bankruptcy Cases, proceedings to determine, avoid, or recover fraudulent conveyances, proceedings to determine the validity, extent, or priority of liens,

proceedings to disallow or determine the amount of certain claims against the bankruptcy estates, counterclaims against parties asserting claims against the bankruptcy estates, and other proceedings affecting the liquidation of the assets of the estates or the adjustment of the debtor-creditor relationship.

20. Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure, Plaintiffs consent to the entry of final orders or judgment by this Court in connection with this adversary proceeding.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1409(a) because this proceeding arises in and is related to the Bankruptcy Cases.

## GENERAL ALLEGATIONS

### A. Formation of 600 Spring, LLC and Development of The Case Properties

22. Mr. Gillen has more than 30 years of experience designing, developing, and building high-end residential properties in California, and specifically in Malibu, Santa Monica, and Pacific Palisades. During this time, Mr. Gillen successfully permitted and built numerous ultra-high-end luxury residential homes in the City of Malibu. His homes are well known for their top-notch quality and command top-of-market values.

23. Mr. Gillen was first introduced to Barry Shy in or around 2015. Barry Shy presented himself as a sophisticated lender who could provide financing for Mr. Gillen's high-end residential construction and development projects.

24. In or around 2017, Mr. Gillen and Barry Shy agreed to form 600 Spring, LLC ("600 Spring") to develop a luxury residential project known as "The Case," consisting of five ultra-high-end homes in Malibu. Mr. Gillen and Barry Shy initially agreed to be equal members of 600 Spring, with Mr. Gillen holding a 50% interest through his wholly owned entity C64829 LLC, and Barry Shy personally holding the other 50% interest. The parties further agreed that Mr. Gillen would serve as the sole Manager of 600 Spring and that he would be responsible, through his company, Unvarnished, Inc., for all day-to-day operations, including design, construction, and sales. The parties further agreed that Barry Shy was responsible for arranging for and/or providing necessary financing for the project.

25. On or about May 23, 2017, the parties executed a written Operating Agreement reflecting these terms (the "2017 Operating Agreement"). Mr. Gillen executed this 2017 Operating Agreement based on his understanding and the parties' agreement that he would be fully in charge of managing all aspects and operations of The Case project, with the broadest managerial powers possible, while Barry Shy would only be in charge of financing. Specifically, Paragraph 4 of the 2017 Operating Agreement provides: "Managers. Scott Gillen shall be the Manager until he resigns, dies or otherwise is removed from the office by the Member." And Paragraph 8 provides: "C64829 LLC and Scott Gillen will handle the day to day operations for the company, including but not limited to all aspects of developing and selling the property, they will receive no salary or compensation for this work." A true and correct copy of the 2017 Operating Agreement is attached hereto as **Exhibit A**.

26. The 600 Spring Articles of Organization filed with the California Secretary of State also identified 600 Spring as manager-managed by "One Manager" (Mr. Gillen). A true and correct copy of the 600 Spring Articles of Organization is attached hereto as **Exhibit B**.

27. Shortly after formation, Barry Shy informed Mr. Gillen that he was going through a divorce and expressed concern that his ownership interest could become subject to claims in those proceedings. He requested that the LLC membership structure be amended to remove his name from formal membership in order to limit exposure. Accordingly, at Barry Shy's request, Mr. Gillen's former attorney prepared an amendment to the Operating Agreement under which Mr. Gillen (through his entity C64829 LLC) would become the sole Member of 600 Spring on record, while also remaining the sole Manager. However, Mr. Gillen agreed that this modification would not impact the actual financial structure of 600 Spring, and that both Mr. Gillen and Barry Shy would retain 50/50 ownership interests in the entity. A copy of this "Amended and Restated Operating Agreement of 600 Spring LLC," which was prepared by Mr. Gillen's former attorney, is attached hereto as **Exhibit C**.

28. On or around June 29, 2017, Non-Debtor-Plaintiff Unvarnished, Inc. ("Unvarnished") entered into a written construction agreement with 600 Spring under which Unvarnished would serve as the general contractor for The Case project in exchange for a 12%

markup fee. A true and correct copy of the Construction Agreement between Unvarnished and 600 Spring is attached hereto as **Exhibit D**.

**B. The Parties Negotiate a Loan for The Case Project and Agree That the Accompanying Deed of Trust Would Not Be Recorded**

29. In 2020, Barry Shy wanted to negotiate a funding vehicle for his advances for expenses in developing The Case and five other construction projects for which Mr. Gillen managed construction.

30. The five other construction projects are:

- A luxury residential construction project at 23800 Malibu Crest Dr., Malibu, CA 90265;
- A multi-unit construction project in Oak Shores, Tract 2612, Lake Nacimiento, CA 93426 (APN 081-021-005 in San Luis Obispo County);
- A luxury residential construction project at 29215 Cliffside Dr., Malibu, CA 90265;
- A luxury residential construction project at 24266 Malibu Rd., Malibu, CA 90265; and
- A luxury residential construction project at 2685 Lynch Canyon Rd., Paso Robles, CA 93426.

31. The parties thereafter negotiated financing for The Case project and these five other construction projects through BOBS LLC, Barry Shy's wholly-owned/controlled entity. His son, Rommy Shy, is also a principal and/or employee of BOBS LLC. BOBS LLC offered the financing for these six projects through a $260 million promissory note to 600 Spring and five other entities (Mr. Gillen was/is also the sole manager of each of those other five entities). Unknown to Mr. Gillen at the time (due to misrepresentations and/or concealment by Defendants), the promissory note provided for an interest rate of twelve and one-half percent (12.5%), compounded daily. The effective annual percentage rate of interest under such a term exceeds the maximum permissible interest rate under California's usury laws, including California Constitution, article XV, section 1, and related statutes.

32. Upon information and belief, BOBS LLC is a private lender and is not subject to any exemption from California's usury restrictions. Specifically, upon information and belief, the licensed real estate broker exemption does not apply because Rommy Shy is an agent, principal, and/or employee of BOBS LLC and therefore was not acting as a neutral broker with respect to this transaction. Likewise, upon information and belief, the "preexisting business relationship" exemption under section 25118 of the California Corporations Code does not apply to this transaction because the BOBS Loan is backed by a personal guaranty from Mr. Gillen.

33. A key condition of Mr. Gillen's agreement to this $260 million financing arrangement was that the deed of trust accompanying the BOBS Loan **would <u>not</u> be recorded**, so as not to encumber title to The Case properties or any of the other properties Mr. Gillen was constructing. This is reflected in the loan agreement to which Mr. Gillen ultimately agreed and signed (the "BOBS Loan Agreement"), which includes a "No Recordation or Filing" provision that states: "Lender shall not record the Deed of Trust, the Note, the Membership Interest Pledge Agreements, or any other Related Documents, or file any UCC-1 Financing Statements naming any Borrower or any pledgor under the Membership Interest Pledge Agreement as a debtor." A true and correct copy of the BOBS Loan Agreement is attached hereto as **<u>Exhibit E</u>**.

34. Similarly, the deed of trust that Mr. Gillen was provided and executed ("Deed of Trust") contained an express "No-Recordation" disclaimer at the top of the signature page which states: **NO RECORDATION. This Deed of Trust shall not be recorded.**" A true and correct copy of the Deed of Trust is attached hereto as **<u>Exhibit F</u>**.

35. The Deed of Trust affects the following real property, which reflect the various business dealings and projects that were part of Mr. Gillen's and Barry Shy's overall partnership:

1) A FIRST (1ST) Position Deed of Trust on 23800 Malibu Crest Dr., Malibu, CA 90265 (APN 4458-024-038 in Los Angeles County).
2) A SECOND (2ND) Position Deed of Trust on the "Case Properties," comprising 24168 Case Court, Malibu, CA 90265; 24185 Case Court, Malibu, CA 90265; 24186 Case Court, Malibu, CA 90265; 24188 Case Court, Malibu, CA 90265; 24198 Case Court, Malibu, CA 90265; and 24199 Case Court, Malibu, CA

90265 (APNs 4458-018-039, 4458-018-037, 4458-018-038, 4458-018-906, 4458-018-035, 4458-018-041, 4458-018-036, 4458-018-907 in Los Angeles County).

3) A FIRST (1ST) Position Deed of Trust on the "Bu House Properties," Oak Shores, Tract 2612, Lake Nacimiento, CA 93426 (APN 081-021-005 in San Luis Obispo County).

4) A FIRST (1ST) Position Deed of Trust on 29215 Cliffside Dr., Malibu, CA 90265 (APN 4468-003-005).

5) A FIRST (1ST) Position Deed of Trust on 24266 Malibu Rd., Malibu, CA 90265 (comprising APNs 4458-011-010 and 4458-011-011).

6) A FIRST (1ST) Position Deed of Trust on the "Greenmilk Property," 2685 Lynch Canyon Rd., Paso Robles, CA 93426 (APN 080-021-005 in San Luis Obispo County).

36. Mr. Gillen agreed to sign these documents only because of the inclusion of the material No-Recordation provisions therein and because of Barry Shy's representation that the documents were merely a protective measure for both Mr. Gillen's and Barry Shy's families in the event either Mr. Gillen or Barry Shy passed away. Thus, the parties negotiated the terms of the BOBS Loan and Deed of Trust over the course of approximately eight months, including the "No Recordation or Filing" provisions specifically to address that concern.

37. Throughout the parties' negotiations, both Barry Shy and his son Rommy Shy repeatedly acknowledged that the documents were not to be recorded and agreed to versions of the documents that included the "No Recordation or Filing" provisions.

38. On August 23, 2020, Rommy Shy emailed Mr. Gillen (copying Barry Shy) confirming he had spoken directly with Barry and that Barry agreed that the Deed of Trust would not be recorded, stating: "As I understand you discussed with Barry, this new Deed of Trust will not be recorded." A true and correct copy of this August 23, 2020 email is attached hereto as **Exhibit G**.

39. The parties continued to negotiate the terms of the BOBS Loan in late 2020 and early 2021, and the parties' agreement that the Deed of Trust would not be recorded was reflected in **all** versions of drafts of the BOBS Loan Agreement and Deed of Trust that were transmitted between the parties. Both Rommy Shy and Barry Shy repeatedly demonstrated their assent to the No-Recordation provisions and approved drafts of the documents containing those provisions. Specifically, on February 20, 2021, Rommy Shy emailed Mr. Gillen in response to the latest round of changes to the BOBS Loan Agreement from Mr. Gillen and his counsel, which included the "No Recordation or Filing" provision as section 4.3 of the BOBS Loan Agreement. Rommy Shy stated: "We agree with all the proposed changes with the following modifications . . . ." Critically, none of the proposed modifications suggested by Rommy Shy pertained to the essential "No Recordation or Filing" provision contained in section 4.3. A true and correct copy of this February 20, 2021 email is attached hereto as **Exhibit H**. As such, as of February 20, 2021, Rommy Shy and Barry Shy represented their full agreement with the No-Recordation provision. There were never any subsequent discussions regarding omitting this provision or altering it, whether in writing or orally.

40. A few days later, on February 23, 2021, Rommy Shy emailed Barry Shy a copy of the BOBS Loan Agreement (which included the section 4.3 "No Recordation or Filing" provision) and other documents and requested permission to send the documents to Mr. Gillen. The following day, Barry Shy forwarded Rommy's email and the documents to Mr. Gillen and indicated that the documents, including the BOBS Loan Agreement and Deed of Trust (which both included the No-Recordation provisions), were final and ready to sign.

41. The documents, including the BOBS Loan Agreement and Deed of Trust, were sent to Malibu Escrow Corp. ("Malibu Escrow), and on March 15, 2021, Mr. Gillen signed the documents (which both included No-Recordation provisions) in person at Malibu Escrow in front of a notary.

42. On March 17 and March 18, 2021, Rommy Shy emailed Mr. Gillen a copy of the promissory note dated March 1, 2021, for BOBS LLC (allegedly with a principal sum of $260,000,000) and copies of the Interest Pledge Agreements for the various properties subject to the note and requested his notarized signature on the documents. He did not attach either the BOBS

Loan Agreement or Deed of Trust or request signatures on any versions of those documents. This further evidences that there was no agreement between the parties to remove the "No Recordation" provisions from those documents, and the versions of those documents that Mr. Gillen had signed a few days prior on March 15 (which contained the "No Recordation" provisions) were the versions of the documents that the parties intended to be controlling. Neither Rommy Shy nor Barry Shy ever requested that Mr. Gillen sign a different version of those documents that did not contain the "No Recordation" provisions.

**C. Barry Shy's Nefarious Conduct Comes to Light**

**i. Barry Shy Fraudulently Alters the 600 Spring Operating Agreement**

43. Between 2017 and 2024, Mr. Gillen, as the sole Manager of 600 Spring, remained responsible for all major aspects of The Case project's planning, construction, budgets, and execution (including non-day-to-day items). Indeed, Barry Shy had no involvement in development, construction management, design decisions, project execution, or sales execution for the project, and in the more than seven years before he initiated litigation pertaining to the project, he only visited the project site approximately six times. Barry Shy's role remained exclusively limited to serving as a financier of the project through his entity, BOBS LLC.

44. Mr. Gillen also managed financing for The Case project. Although the parties initially agreed that Barry Shy would arrange all financing for the project, he ultimately involved Mr. Gillen out of necessity because he needed Mr. Gillen, as the sole Manager of 600 Spring, to secure additional loans for 600 Spring. Specifically, Mr. Gillen worked directly with Bank Hapoalim Israel ("BHI") and CTBC Bank ("CTBC") as the principal point of contact to secure additional construction financing for the project. In connection with this financing, both BHI and CTBC reviewed 600 Spring's governing documents and thereafter dealt with Mr. Gillen directly as the authorized Manager of 600 Spring. Mr. Gillen also signed company and loan documents in that capacity, and Barry Shy was aware of these transactions and did not then contend that Mr. Gillen lacked authority to manage the finances of 600 Spring. Notably, where Defendants are mentioned in the BHI and CTBC documents commemorating these financing arrangements, Defendants are

only referenced as "guarantors" and not managers or members of 600 Spring. Indeed, only Mr. Gillen is expressly recognized in BHI's and CTBC's documents as the manager of 600 Spring.

45. The third-party lender record is significant because it reflects authority exercised in actual transactions rather than litigation positions developed years later. Specifically, BHI and CTBC repeatedly dealt with Mr. Gillen directly as 600 Spring's Manager and authorized signatory.

46. By 2024, Mr. Gillen had single-handedly managed and overseen a significant portion of the construction and development of The Case properties, and one of the properties (House 3) was completed and sold. As of that time, three of the four remaining properties had reached over 50% completion, and one property (House 5) was at approximately 50% completion.

47. The House 3 transaction provides direct evidence of the parties' actual course of performance. Gillen acted for 600 Spring in connection with the sale and escrow, including execution of the applicable transaction documents. The transaction closed, the applicable lender was paid through escrow, and the remaining escrow proceeds were wired directly into 600 Spring's Bank of America account. Gillen was the sole authorized signer on that 600 Spring account. Barry Shy did not contend in connection with the House 3 closing that Gillen lacked authority to sell a Case property or that Shy's separate approval or signature was required.

48. In or around July 2024, Barry and Rommy Shy sought additional financing for 600 Spring from JPMorgan Chase Bank ("JPMorgan"). Unbeknownst to Mr. Gillen, to secure this financing, Barry and Rommy Shy submitted an altered and fraudulent version of the 600 Spring Operating Agreement (the "Purported Amended Operating Agreement") to JPMorgan in connection with the loan application. **However, Mr. Gillen never signed or agreed to execute this Purported Amended Operating Agreement**. Nevertheless, Barry and Rommy Shy successfully obtained additional financing and/or refinancing for The Case project through JPMorgan using this altered and forged Purported Amended Operating Agreement. Plaintiffs are informed and believe, and based thereon allege, that Barry Shy obtained and benefitted from a much lower interest rate under the JPMorgan loan than the usurious rate he continued to charge and pass along to 600 Spring.

49. Despite that Mr. Gillen and Barry Shy created 600 Spring and entered into their partnership on The Case project with the agreement that Mr. Gillen would spearhead the actual development efforts and Barry Shy would remain in the background as a financier, it became evident in 2024 that Barry Shy's actual intent was to usurp control over the project and push Mr. Gillen out once significant progress had been made (under Mr. Gillen's management) and The Case Properties were close to completion and ready to be sold. For instance, in late 2024, Barry Shy, through his son Rommy, repeatedly demanded that Mr. Gillen transfer his ownership interest in 600 Spring to Barry Shy and/or his entities.

50. Specifically, on October 21, 2024, Rommy Shy emailed Mr. Gillen a proposed amendment to the 600 Spring Operating Agreement demanding that Mr. Gillen's entity, C64829 LLC, "convey, transfer and wholly assign all equity interest in 600 [Spring LLC] to Barry Shy," which would make Barry Shy "the sole owner" of the entity. Mr. Gillen declined.

51. On October 28, 2024, Rommy Shy emailed Mr. Gillen stating that a new loan opportunity required a single-member LLC structure and asking Mr. Gillen to sign a letter representing that Barry Shy was the sole member of 600 Spring, while assuring Mr. Gillen that his economic interest would remain 50/50. Mr. Gillen again declined.

52. On November 10, 2024, Rommy Shy again emailed Mr. Gillen stating that time was of the essence and urging Mr. Gillen to transfer his membership interest in 600 Spring to Barry Shy. Mr. Gillen again declined.

53. On June 20, 2025, Barry Shy and his entities sued Mr. Gillen and various entities in Los Angeles Superior Court (the "Superior Court Action").[1]

54. Defendants have since made numerous admissions demonstrating their forgery and/or unlawful alteration of the Purported Amended Operating Agreement. On June 25, 2025, five days after initiating the Superior Court Action, Barry Shy sent Mr. Gillen the following text:

> As the **only managing member of 600 spring LLC**, your responsibility and obligation is to track and manage the LLC accounting and financial, I'm sure that you comply with this

---

[1] *BOBS LLC, et al. v. Glass Tunnel LLC, et al.*, Los Angeles Superior Court Case No. 25SMCV03160 (2025).

> obligation, therefore, you know very well long time ago, that our partnership financial obligation is many many millions greater than the value of the homes, You cannot pretend that you didn't know that the partnership currently is in lost over 40 million.

A true and correct copy of this June 25, 2025 text message from Barry Shy to Mr. Gillen is attached hereto as **Exhibit I.**

55. However, despite this explicit admission that Mr. Gillen is the "only managing member" of 600 Spring, Mr. Gillen learned for the first time a few weeks later—in early July 2025—that in or around August 2024, in an attempt to secure a $51.7 million loan for The Case project from JPMorgan, Rommy Shy had submitted to JPMorgan the falsified and forged Purported Amended Operating Agreement which misrepresented both that Barry Shy was a co-manager of 600 Spring and that the BR Shy Irrevocable Trust was a 50% member of 600 Spring. And while the falsified Purported Amended Operating Agreement appears to include Mr. Gillen's signature, Mr. Gillen never signed or approved the document or any such amendment. Furthermore, an examination of the forged document reveals "white out" over the signature block. The font type of the added and changed language in the forged document indicates that the language was added later. The use of "white out" on the signature block suggests that Barry and/or Rommy Shy unilaterally altered the document to replace the title of Member—as it existed in the original 2017 Operating Agreement—with the replacement title of Manager inserted in the forged document above the white out removal of the word Member in the 2017 original. Additionally, Mr. Gillen's signature on the Purported Amended Operating Agreement appears to have been lifted from another document. A true and correct close-up copy of the altered and forged portion of the Purported Amended Operating Agreement is attached hereto as **Exhibit J**.

56. Significantly, in connection with attempting to obtain a preliminary injunction in the Superior Court Action, Barry Shy presented and attempted to authenticate the Purported Amended Operating Agreement as though Mr. Gillen himself signed it. However, upon being confronted with Mr. Gillen's contrary testimony, Barry Shy later changed his story and admitted, both to Mr. Gillen and in subsequent filings in the Superior Court Action (including discovery responses under penalty of perjury), that Mr. Gillen himself never signed the Purported Amended

Operating Agreement, and now contended that he allegedly orally instructed his son, Rommy Shy, to unilaterally alter the 2017 Operating Agreement to affix Mr. Gillen's signature after Mr. Gillen purportedly gave him verbal permission over the phone to do so. The judge in the Superior Court Action expressly acknowledged these conflicting stories in a September 3, 2025 Minute Order, noting that Barry Shy admitted he had his son (Rommy) affix Mr. Gillen's signature to a document that Mr. Gillen did not actually sign, and that this conduct potentially constitutes a felony because Barry Shy presented it to the court "under penalty of perjury as a valid and authentic document." Specifically, the Minute Order stated:

> **But it gets worse**. Shy contends that the original Operating Agreement for 600 Spring Street was amended so that Shy and Gillen would be co-managers. That is a distinction with a difference, in that Shy would lack the power to transfer Glass House out of 600 Spring Street on his own if Shy were a co-manager. Shy has presented an Amended Operating Agreement that purportedly so states. But Gillen says that the document is forged—he claims never to have signed it. When Shy's counsel was asked about that, **it appears that there is something to that story**. Shy contends (although counsel was not 100% sure about this) that Gillen had orally agreed to the change, but that it is true that Shy affixed a copy of Gillen's signature on the document and that in fact Gillen never did sign it. **That, depending on how the dominos fall, is a potential felony, as the Amended Operating Agreement was presented to the court under penalty of perjury as a valid and authentic document**.

September 3, 2025 Minute Order (emphasis added).

57. The purported change also was not presented to Gillen as a separately dated amendment identifying the original agreement, the provision being changed, the effective date, or the written consent of the Members. Defendants have since admitted that Gillen did not physically sign the Purported Amended Operating Agreement and have changed their story yet again. Specifically, Rommy Shy has now further deviated from the prior versions of events Defendants presented to the Superior Court by claiming in sworn discovery responses that he had supposedly simply grafted Mr. Gillen's signature onto the Purported Amended Operating Agreement after orally obtaining his permission – which is likewise completely false.

58. The physical characteristics of the Purported Amended Operating Agreement independently reinforce Plaintiffs' challenge as to the authenticity of the document. For instance, the document contains differences in font, type size, bolding, and formatting that are inconsistent

with the typography used in the surrounding original text. Additionally, Mr. Gillen's purported signature appears in substantially the same configuration and position as the original signature despite that the surrounding text differs from the original signed agreement, which suggests that the signature was lifted from the prior document. Indeed, Plaintiffs are informed and believe that it is impossible for separate live signatures to appear identical as the signature on this document appears in comparison to Mr. Gillen's signature on the original document.

59. On June 25, 2026, Barry Shy served interrogatory responses admitting that Mr. Gillen never actually signed the 600 Spring Purported Amended Operating Agreement which purported to add Barry Shy as a Co-Manager of 600 Spring, instead claiming that Mr. Gillen consented to the amendment over the phone, and that he then instructed Rommy Shy to affix Mr. Gillen's signature to the document. A true and correct copy of Barry Shy's June 25, 2026 Special Interrogatory Responses, in which his responses to Special Interrogatory Nos. 5 and 126 contain these admissions and statements relating to the Purported Amended Operating Agreement, is attached hereto as **Exhibit K**.

60. Plaintiffs are informed and believe, and based thereon allege, that Defendants submitted the forged Purported Amended Operating Agreement to other lending institutions for the specific intent of obtaining third party financing for the partial purpose of assisting in financing the construction of The Case Properties (and, at least in part, to abscond with those loan funds for Defendants' own benefit and/or pecuniary gain).

61. Moreover, Defendants have repeatedly continued to maintain—both in the Superior Court Action and to third parties like JPMorgan—that Barry Shy is a Co-Manager of 600 Spring and entitled to act in such capacity, even though Defendants admitted that they attempted to unilaterally modify the 600 Spring Operating Agreement without Mr. Gillen's consent, and despite the fact that Barry Shy admitted in a June 2025 text that Mr. Gillen is the "only managing member" of 600 Spring. This June 2025 admission from Barry Shy is particularly notable because it was sent to Mr. Gillen nearly one full year **after** Barry Shy submitted a doctored version of the 600 Spring Purported Amended Operating Agreement to JPMorgan in pursuit of a $51.7 million loan.

62. Indeed, Barry Shy's June 25, 2025 written statement identifying Gillen as the "only managing member" is irreconcilable with Defendants' contention that the Operating Agreement was validly amended to make Barry Shy a Co-Manager. If Barry Shy genuinely believed that the purported amendment was authorized and effective, there would have been no reason for him, nearly one year after the JPMorgan financing, to identify Gillen in writing as the only managing member of 600 Spring.

**ii. Defendants Record the Fraudulent Deed of Trust**

63. On June 20, 2025, Defendants recorded the Deed of Trust that accompanied the BOBS Loan Agreement **more than four years after the BOBS Loan Agreement was executed**. Defendants recorded the Deed of Trust despite the fact that the parties expressly agreed that it would not be recorded, and despite the fact that the versions of the BOBS Loan Agreement and the Deed of Trust that Mr. Gillen executed contained express No-Recordation provisions and disclaimers. Unbeknownst to Mr. Gillen at that time, Barry Shy unilaterally and secretly altered the BOBS Loan Agreement without Mr. Gillen's permission to remove the section 4.3 "No Recordation or Filing" clause, and unilaterally and secretly altered the Deed of Trust without Mr. Gillen's permission to remove the No-Recordation disclaimer on the signature page.

64. Defendants' recording of the Deed of Trust is also fraudulent because it purports to encumber properties that were already paid off by Mr. Gillen in response to payoff demands from BOBS LLC, including but not limited to the Cliffside Malibu property (29215 Cliffside Dr., Malibu, CA 90265) and the Malibu Road property (24266 Malibu Rd., Malibu, CA 90265).

65. On August 5, 2025, Barry Shy filed a declaration in the Superior Court Action in which he attached what he alleged to be the executed versions of the BOBS Loan Agreement and accompanying Deed of Trust. Critically, the Deed of Trust attached to Barry Shy's August 5 declaration contained the express No-Recordation disclaimer on the top of the signature page, which states: "**This Deed of Trust is not to be recorded**." Accordingly, by filing this declaration, Barry Shy affirmed under penalty of perjury that this version of the Deed of Trust—with the No-Recordation disclaimer—was the "true and correct" executed version of the Deed of Trust, even though he had recorded a different version of the Deed of Trust (without the No-Recordation

provision) approximately one and a half months earlier, on June 20, 2025. A true and correct copy of Barry Shy's August 5, 2025 Declaration in the Superior Court Action, to which he attached a version of the Deed of Trust that contains No-Recordation disclaimer on the signature page, is attached hereto as **Exhibit L**.

66. This was not merely the informal production of an obsolete draft. Barry Shy submitted the No-Recordation version to the Superior Court in support of his claims and authenticated it under penalty of perjury after Defendants had already caused a materially different version—one omitting the No-Recordation language—to be recorded against the properties. Defendants were therefore relying upon the legal consequences of one version in the public record while Barry Shy was authenticating a materially different purportedly executed version before the Superior Court.

67. On February 19, 2026, Rommy Shy filed a declaration in the Superior Court Action in which he claimed for the first time that the version of the BOBS Loan that Barry Shy submitted under penalty of perjury in his August 5, 2025 declaration was "not the final, executed version of the Loan Agreement" (even though the version Barry Shy previously submitted was fully executed) and was "mistakenly compiled from electronic files on [Rommy Shy's] computer[.]" Rommy Shy further asserted—again for the first time—that the purported "final" BOBS Loan documents have been "in his safe" over the past five years since the loan documents were executed. However, Rommy Shy provided no explanation as to why he did not recall the existence of this purported "final" BOBS Loan Agreement until then or why he and his father had previously submitted a different version but did not correct the record for six months.

68. Rommy Shy's later explanation that the purported "final" BOBS Loan documents were "in his safe" does not answer why Defendants possessed both materially different purportedly executed versions. Nor does it resolve the significance of Rommy Shy's acknowledgment that electronic drafts and standalone signature pages existed and could be combined. To the contrary, that explanation makes the provenance of every purportedly executed version—and the relationship between each substantive document, signature page, and notarial acknowledgment—a central factual issue.

69. On February 27, 2026, the judge in the Superior Court Action issued a Minute Order expressing concern about the various versions of the Deed of Trust and the forged Purported Amended Operating Agreement of 600 Spring. Specifically, the judge stated:

> [Gillen's] real argument is that he was defrauded. He claims that one important piece of the whole deal was that the deed of trust would not be recorded. **And there is evidence to that effect**: an email from Rommy Shy as well as earlier drafts of the contract. Fraud is a theory that can defeat a contract. Fraud in the inducement is a viable tort even if it flies in the face of the written signed agreement. Here, there was at least one version of the contract that Rommy sent to Gillen with the no recordation clause in it. That term obviously changed over time in the sense that it was taken out. The problem the court has is that drafts did go from Rommy to Gillen over time. In them, Rommy often said what was being changed—and some of the changes were pretty small. It is not unreasonable for Gillen to assume that if this clause were being deleted, Rommy would point that out. . . .
>
> **Plaintiffs started the case using a document to attain a TRO purportedly signed by Gillen saying that he and Shy were comanagers of the LLC. But later, plaintiffs had to concede that Gillen's signature was not real in the sense that Gillen never actually signed the document. (They contend that he authorized it, but that is something they stated only after the fact.)**

February 27, 2026 Minute Order (emphasis added).

70. On March 6, 2026, roughly one week after the above Minute Order was issued, Barry Shy's former counsel filed Substitutions of Attorney and withdrew from the case due to what they described were apparent ethical and/or professional responsibility issues. Upon information and belief, these ethical concerns stemmed from the fact that Barry and Rommy Shy submitted conflicting versions of the BOBS Loan Agreement and Deed of Trust in the Superior Court Action under penalty of perjury. After all, why would two executed yet different versions of the same document/agreement exist in the first place?

71. On March 12, 2026, the judge in the Superior Court Action issued another Minute Order in which he again expressed significant concern about the fraudulently altered Deed of Trust: "The court is **more than a little bit concerned that the version of the DOT [Deed of Trust] attached to the August 5 papers plaintiffs submitted expressly stated that there would be no recordation of the DOT**. That issue could have a significant effect on defendant's request here." March, 12 2026 Minute Order (emphasis added).

72. On May 7, 2026, the judge in the Superior Court Action issued another Minute Order in which he again expressed significant concern and doubt about the legitimacy of the fraudulently altered Deed of Trust, this time stating that the Barry and Rommy Shy's attempts to justify the inconsistencies in their declarations relating to the fraudulent Deed of Trust are "weak, to put it nicely." The judge further stated:

> The Bobs loan is secured by a Deed of Trust, sort of. **There is email correspondence between the parties in which the Shy parties agree that the DOT will not be recorded. And at least one version of the signed DOT says (right above the signatures) that it is not to be recorded. And it was not recorded. For a while**. In another version of the DOT, that phrase is missing. In the original 600 Spring Operating Agreement, Gillen was to be the sole manager. However, there is another version of the Operating Agreement where Shy and Gillen are both managers. **However, Gillen's signature on that document does not seem to be legitimate**, although there is a debate as to whether or not Gillen authorized it. . . .
>
> Bobs nonetheless questions why it should be in a worse position than other secured lenders. The reason is because it is far from clear to the court that Bobs is a secured lender. **Bobs' DOT is suspect. The court has seen a version of it where it says right above the signatures that it will not be recorded, and the court has also seen communications along those lines. Indeed, it was plaintiffs who presented that version of the DOT. Rommy Shy's later explanation—that the original was kept in a safe and that the signatures are a mistake or that the version Shy originally submitted to the court was a mistake because the physical copies were in the safe and he was taking the page from his computer or something (frankly, the court really does not understand it)—is weak, to put it nicely**.

May 7, 2026 Minute Order (emphasis added).

73. As of the date of filing this Complaint, and despite the fact that the parties and their pre-litigation counsel exchanged constant written communications via text messages and emails throughout their business relationship, neither Barry Shy nor Rommy Shy have produced any contemporaneous documents or communications showing that Mr. Gillen consented to the removal of the No-Recordation provisions in the BOBS Loan Agreement and the Deed of Trust (or that Mr. Gillen ever orally provided Rommy Shy with authorization to execute the Purported Amended Operating Agreement making Barry Shy a Co-Manager). Indeed, Mr. Gillen never consented to

any such amendments, and all versions of the loan documents exchanged between the parties prior to execution contain these No-Recordation provisions.

74. The absence of any contemporaneous writing authorizing removal of the No-Recordation language is particularly significant because the parties negotiated these documents over many months and routinely documented even comparatively minor changes by email and draft revisions. If the parties genuinely agreed before execution to delete such a material provision, Plaintiffs allege there would be a contemporaneous redline, email, text message, clean revised instrument, or other writing reflecting that agreement. None has been produced, and Plaintiffs are informed and believe, and based thereon allege, that no such writing exists.

**iii. <u>Barry Shy's Other Nefarious Conduct</u>**

75. Barry Shy engaged in additional nefarious conduct between 2020 and 2025 that only came to light much later. On several occasions, Barry Shy diverted substantial sums from 600 Spring for his personal benefit or to BOBS LLC. One such example was an $8,000,000 BHI "Loan Disbursement" not used for construction. Additionally, on the same day that 600 Spring received a $7,666,223.19 wire transfer (which were funds connected to 600 Spring's JPMorgan loan), Barry Shy directed Mr. Gillen to wire these funds to an account of BOBS LLC's which was outside of Mr. Gillen's control. BOBS LLC also received approximately $700,000 in unauthorized proceeds from the JPMorgan loan that Barry Shy fraudulently procured. Barry Shy also instructed Mr. Gillen to transfer $20 million of an approximately $29.5 million loan from CTBC Bank directly to BOBS LLC the day after the loan funds were received by 600 Spring. On information and belief, Barry Shy then improperly and unlawfully re-loaned the funds at higher rates to 600 Spring and pocketed the interest spread. Plaintiffs are further informed and believe, and based thereon allege that Defendants engaged in additional wrongful or fraudulent financial conduct, the full scope, extent, and nature of which will be revealed during discovery.

76. Starting in late 2024, and as part of his unlawful scheme to gain control of the project for his own benefit, Barry Shy started systematically refusing to fund legitimate draw requests, starving construction at the properties while compounding interest to balloon the alleged indebtedness of 600 Spring to BOBS LLC. This was especially egregious considering that Mr.

Gillen had been asked to personally sign for, and thus guarantee, some of the third-party funding intended for use on The Case project, thus exposing him in his personal capacity while ensuring that construction on the project would halt. And, as shown above, Barry Shy also began to engage, and continues to engage, in conduct detrimental to the project for his own benefit. Thus, in an effort to mitigate the ongoing harm to The Case project perpetrated by Barry Shy's own refusal to fund legitimate draw requests, Mr. Gillen sought to list House #2 of The Case with a leading Malibu agent. But Barry Shy refused, preventing the sale. Barry Shy later directed Mr. Gillen to stop work on House #5, again citing lack of funds, while continuing to accrue usurious interest under the BOBS LLC loan.

77. Barry Shy also interfered with project workers, handing out personal notes suggesting Mr. Gillen had fired them and offering to rehire them under Barry Shy's control.

78. In July and August 2025, Barry Shy continued to systematically refuse to fund legitimate draw requests for The Case project. On July 8 and July 30, 2025, Barry Shy declined to fund necessary construction draw requests of approximately $1,210,000 and $1,300,000, respectively. On August 1, 2025, Mr. Gillen delivered a further draw request for House 5 expenses; Barry Shy refused to advance funds, replying that the judge ordered the account frozen. Around this time, Rommy Shy directed JPMorgan to hold back approximately $700,000 of 600 Spring's loan funds. Mr. Gillen later learned from JPMorgan that the funds had been wired to a different account at Rommy Shy's direction.

79. Barry Shy also improperly interfered with the five other construction projects subject to the $260 million BOBS Loan for which Mr. Gillen managed construction. For instance, for projects that were completed, BOBS issued premature payoff demands to Mr. Gillen's entities in a transparent attempt to force the projects into default and then seize control of the underlying properties via the Deed of Trust.

80. In a related episode, for the luxury residential construction project at 23800 Malibu Drive, Mr. Gillen undertook the project and constructed the property with the understanding that the property would be developed and sold with profits split equally between him and Mr. Shy. Instead, in January 2025, Barry Shy unilaterally moved into the residence after the Palisades fire,

refused to pay any rent, and continues to occupy it without Mr. Gillen's consent, preventing its sale and depriving Mr. Gillen of his ownership interest. There is no written occupancy agreement for Barry Shy to reside in the 23800 Residence.

81. In another series of related episodes, for the "Bu House Properties" construction project in San Luis Obispo County, Barry Shy and his agents have repeatedly and improperly attempted to interfere with and negatively influence the project, including by repeatedly contacting and misrepresenting the Shy's roles in the construction project to the project expediter, engineer, and the city planner for the County of San Luis Obispo. Specifically, on February 2, 2026, Rommy Shy improperly represented to the city planner that he is "now taking over this project on the ownership side" despite the fact that the Bu Houses, LLC Operating Agreement provides that Mr. Gillen is the **sole** manager of this construction project as well (as he is for The Case project). A true and correct copy of Rommy Shy's February 2, 2026 email is attached hereto as **Exhibit M.**

82. In response, counsel for Plaintiffs sent a cease-and-desist letter demanding that the Shys stop misrepresenting their roles in the project. But the Shys never responded to or acknowledged this cease-and-desist letter. Instead, Plaintiffs later discovered that the Shys continued to repeatedly contact the city planner and project engineer regarding the status of the project, and even requested proposals for finishing work on the project without Mr. Gillen's consent as sole manager of the project. In response, in June 2026, counsel for Plaintiffs sent the Shys yet another cease-and-desist letter demanding that the Shys stop improperly contacting involved parties, but the Shys again ignored and did not respond to or acknowledge this letter.

83. In light of the Shys repeated overt acts to try to disrupt and/or usurp control over the properties subject to the BOBS Loan, as well as Barry Shy's overt acts to try to usurp control over The Case properties to the detriment of 600 Spring—specifically by refusing to fund legitimate draws, thus forcing construction to halt on the properties, and demanding that Mr. Gillen sign documents which would have stripped his sole control over and sole ability to manage the completion of construction on House 5—Mr. Gillen was left with no choice but to act to protect House 5. Specifically, Mr. Gillen formed Glass Tunnel LLC and, using his authority as the sole Manager of 600 Spring, sold House 5 to Glass Tunnel via a transaction that was fully disclosed to

Barry Shy and which provided 600 Spring with a $50 million promissory note payable upon the sale of House 5.

84. Mr. Gillen's sale of House 5 to Glass Tunnel was authorized by the 600 Spring Operating Agreement. Specifically, paragraph 8 of that agreement states that he and C64829 LLC "will handle…all aspects of developing and selling the property."

85. The Glass Tunnel transaction did not transfer House 5 for no consideration. 600 Spring received a $50 million promissory note. House 5 remains incomplete.

86. Mr. Gillen's decision to form Glass Tunnel and sell House 5 to it as a protective measure was required by Mr. Gillen's own fiduciary and other obligations in order to protect the interests of 600 Spring and himself due to Barry Shy's unlawful efforts to usurp control over the project and hoard all financial upside for himself.

**FIRST CLAIM FOR RELIEF**

**(Breach of Fiduciary Duty)**

**(By 600 Spring, LLC, C64829 LLC, and Scott Gillen Against Barry Shy)**

87. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

88. Barry Shy assumed and exercised substantial control over the financial operations of 600 Spring, including negotiating loans, directing the disposition of loan proceeds, and submitting documents to lenders on behalf of 600 Spring. By virtue of his active involvement in and exercise of control over 600 Spring's financial affairs, and by virtue of his role as a lender to 600 Spring (through his entity BOBS LLC) and other agreements with 600 Spring and Mr. Gillen, Barry Shy owed fiduciary duties of loyalty, candor, good faith, and fair dealing to 600 Spring as well as Plaintiffs C64829 LLC, the sole Member, and Mr. Gillen, the sole Manager.

89. Barry Shy breached his fiduciary duties to 600 Spring, C64829 LLC, and Mr. Gillen by engaging in the conduct herein alleged, including but not limited to forging and altering the 600 Spring Operating Agreement without Mr. Gillen's consent, submitting the forged version of the 600 Spring Operating Agreement to federal lending institutions, fraudulently altering the Deed of Trust and recording it despite being prohibited to do so by the loan documents and the parties'

agreement, deliberately starving 600 Spring of construction funds in an effort to seize sole control of The Case project, and diverting substantial sums from 600 Spring for his personal benefit or to BOBS LLC, including but not limited to an $8,000,000 BHI "Loan Disbursement" not used for construction, a $7,666,223 wire transfer which Barry Shy directed be wired to an account outside of Mr. Gillen's control, and an approximately $700,000 holdback from JPMorgan that Barry Shy fraudulently procured and Rommy Shy directed to be transferred to a non-600 Spring account. Additionally, Barry Shy instructed Mr. Gillen to transfer $20 million of CTBC funding directly to BOBS LLC the day after 600 Spring received the funds, and on information and belief, re-lent the funds to 600 Spring and pocketed the interest spread. Plaintiffs are further informed and believe, and based thereon allege that Defendants engaged in additional wrongful or fraudulent financial conduct, the full scope, extent, and nature of which will be revealed during discovery.

90. As a direct and proximate result of Barry Shy's breaches of his fiduciary duties, Plaintiffs have suffered damages in an amount to be proven at trial, including but not limited to (a) financial liability on improperly-obtained loans or credit; (b) damages in the form of the increased interest spread paid to BOBS LLC; (c) delays and increased expenses and prevention of the completion of the Project so that the homes could be marketed and sold; (d) impairment of 600 Spring's creditworthiness and business reputation; and (e) attorney's fees and costs incurred to remediate Barry Shy's breaches. Defendant Barry Shy further benefitted from the delay he created by causing continued interest payments to accrue on the usurious BOBS Loan.

91. As a direct and proximate result of the breaches of fiduciary duties described herein, Plaintiffs 600 Spring, C64829 LLC, and Mr. Gillen are also entitled to imposition of a constructive trust on any and all funds Defendant Barry Shy has received, either directly or indirectly, for The Case project, and the proceeds and results of their use of such funds, including, without limitation, any real property, other type of investment or any other assets obtained by such funds.

92. Defendant Barry Shy's conduct was fraudulent, intentional, and carried out with malice, oppression, and deceit, thereby entitling 600 Spring, C64829 LLC, and Mr. Gillen to an award of punitive damages under Civil Code section 3294.

**SECOND CLAIM FOR RELIEF**

**(Breach of Contract – 600 Spring Operating Agreement)**

**(By C64829 LLC and Scott Gillen Against Barry Shy and Amit Tidhar, as Trustee of the BR SHY IRREVOCABLE TRUST)**

93. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

94. On or around May 22, 2017, C64829 LLC, Mr. Gillen, and Barry Shy entered into the 2017 Operating Agreement. Under the 2017 Operating Agreement, Mr. Gillen was designated as the sole Manager of 600 Spring, with full authority over development, construction, and sales, while Shy's role was limited to providing financing.

95. Shortly after executing the 2017 Operating Agreement, Barry Shy and Mr. Gillen agreed to amend the 600 Spring Operating Agreement to remove Barry Shy as a co-Member of 600 Spring due to Barry Shy's ongoing divorce proceedings. As such, pursuant to the parties' agreement, Mr. Gillen executed the Amended and Restated Operating Agreement of 600 Spring LLC under which Mr. Gillen (through his entity C64829 LLC) would become the sole Member of 600 Spring on record, while also remaining the sole Manager. However, the parties agreed that this modification would not impact the actual financial structure of 600 Spring, and that both Mr. Gillen and Barry Shy would retain 50/50 ownership interests in the entity.

96. Accordingly, the Amended and Restated Operating Agreement of 600 Spring LLC is the valid and enforceable operating agreement of 600 Spring. ***However***, in the event the Court determines that the 2017 Operating Agreement is the valid and enforceable operating agreement of 600 Spring, Plaintiffs C64829 LLC and Mr. Gillen assert this breach of contract claim in the alternative.

97. Plaintiffs C64829 LLC and Mr. Gillen fully performed their obligations under the 2017 Operating Agreement, or performance was excused due to the conduct of Defendants Barry Shy and/or Amit Tidhar, as Trustee of the BR Shy Irrevocable Trust, as alleged herein.

98. Defendants Barry Shy and Amit Tidhar, as Trustee of the BR Shy Irrevocable Trust, breached the Operating Agreement by engaging in the conduct herein alleged, including but not

limited to forging and altering the 2017 Operating Agreement without Mr. Gillen's consent to add Barry Shy as a Co-Manager, in violation of Paragraph 10 of the Agreement which provides that all amendments must be made in writing and executed by all members, submitting the forged version of the 2017 Operating Agreement to federal lending institutions, and deliberately starving 600 Spring of necessary construction funds in an effort to seize sole control of the Project.

99. As a direct and proximate result of these breaches, Plaintiffs C64829 LLC and Mr. Gillen have suffered damages in an amount to be proven at trial, including but not limited to (a) financial liability on improperly-obtained loans or credit; (b) monetary damages caused by Defendants' unlawful conduct, including delays and increased expenses and prevention of the completion of the Project so that the homes could be marketed and sold; (c) impairment of 600 Spring's creditworthiness and business reputation; and (d) attorney's fees and costs incurred to remediate Defendants' breaches.

100. Plaintiffs C64829 LLC and Mr. Gillen also seek recovery of attorneys' fees, costs and any other damages as may be provided by contract, statute, or equity.

**THIRD CLAIM FOR RELIEF**

**(Breach of Contract – BOBS Loan Agreement and Deed of Trust)**

**(By 600 Spring, LLC and Scott Gillen Against BOBS LLC)**

101. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

102. On or around March 15, 2021, 600 Spring entered into a loan agreement with BOBS LLC, acting through Barry Shy, to provide financing for The Case (the "BOBS Loan Agreement") and five other construction projects for which Mr. Gillen managed construction. The BOBS Loan Agreement contained express terms, including that the deed of trust accompanying the loan would not be recorded. The BOBS Loan Agreement was secured by a personal guaranty from Mr. Gillen.

103. On or about March 15, 2021, 600 Spring also executed the deed of trust accompanying the BOBS Loan Agreement (the "Deed of Trust"). The Deed of Trust contained an express disclaimer on the signature page that it would not be recorded.

104. Plaintiffs Mr. Gillen and 600 Spring performed their duties and obligations under the BOBS Loan Agreement and Deed of Trust, or their performance was excused due to Defendants' fraudulent conduct as alleged herein.

105. Defendants breached the BOBS Loan Agreement and Deed of Trust by engaging in the conduct alleged herein, including but not limited to (a) unilaterally altering both the BOBS Loan Agreement and the Deed of Trust without Mr. Gillen's consent to remove the express "No-Recordation" provisions in both documents and then recording the Deed of Trust despite being prohibited from doing so by the loan documents and the parties' agreement; and (b) systematically refusing and/or failing to release loan funds for the construction of The Case properties, thus preventing 600 Spring and Mr. Gillen from completing construction as contemplated by the parties while simultaneously compounding interest to balloon the alleged indebtedness of 600 Spring to BOBS LLC.

106. Defendants also breached the BOBS Loan Agreement and Deed of Trust by recording the Deed of Trust to encumber properties that were already paid off by Mr. Gillen in response to payoff demands from BOBS LLC, including but not limited to the Cliffside Malibu property (29215 Cliffside Dr., Malibu, CA 90265) and the Malibu Road property (24266 Malibu Rd., Malibu, CA 90265).

107. As a direct and proximate result of these breaches, Plaintiffs Mr. Gillen and 600 Spring have suffered monetary damages in an amount to be proven at trial, including but not limited to actual and compensatory damages.

108. Plaintiffs Mr. Gillen and 600 Spring also seek recovery of attorneys' fees, costs, and any other damages as may be provided by contract, statute, or equity.

## FOURTH CLAIM FOR RELIEF

**(Intentional Interference with Contractual Relations – Unvarnished Construction Agreement)**

**(By Unvarnished, Inc. Against All Defendants)**

109. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

110. On or around June 29, 2017, Unvarnished entered into a valid and enforceable written Construction Agreement with 600 Spring under which Unvarnished was to perform construction services for The Case project in exchange for a 12% markup fee.

111. Unvarnished fully performed its obligations under the Construction Agreement, or performance was excused due to Defendants' conduct alleged herein, which caused 600 Spring to breach the Construction Agreement.

112. Defendants had knowledge of the existence of the Construction Agreement, including because Unvarnished performed construction services for The Case project pursuant to the Construction Agreement for more than seven years and Defendants were fully aware of Unvarnished's provision of such construction services for The Case project.

113. Defendants undertook intentional actions designed to interfere with and cause disruptions to the Construction Agreement as alleged herein, including refusing to fund necessary construction draws for 600 Spring to repay Unvarnished for its services, and refusing to compensate Unvarnished for the work it performed on The Case Properties.

114. Defendants knew that their conduct, as alleged herein, was certain or substantially certain to interfere with the Construction Agreement.

115. Defendants' conduct, as alleged herein, did interfere with and disrupt the Construction Agreement.

116. As a direct and proximate result of Defendants' conduct, Unvarnished has suffered monetary damages in an amount to be proven at trial, including but not limited to actual and compensatory damages.

117. Defendants' conduct was fraudulent, intentional, and carried out with malice, oppression, and deceit, thereby entitling Unvarnished to an award of punitive damages under Civil Code section 3294.

118. Unvarnished also seek recovery of attorneys' fees, costs and any other damages as may be provided by contract, statute, or equity.

//

//

**FIFTH CLAIM FOR RELIEF**

**(Intentional Interference with Prospective Economic Advantage)**

**(By Unvarnished, Inc. Against All Defendants)**

119. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

120. As alleged herein, an economic relationship exists between 600 Spring and Unvarnished. As a result of this economic relationship, there exists a probability of future economic benefit to Unvarnished.

121. Defendants are aware of the economic relationship between 600 Spring and Unvarnished, including because Unvarnished performed construction services for 600 Spring and The Case project for more than seven years, and Defendants were fully aware of Unvarnished's provision of such construction services for 600 Spring and The Case project.

122. Defendants undertook intentional actions designed to interfere with and cause disruptions to the economic relationship between 600 Spring and Unvarnished as alleged herein, including refusing to fund necessary construction draws for 600 Spring to repay Unvarnished for its services, and refusing to compensate Unvarnished for the work it performed on The Case Properties.

123. Defendants knew that their conduct, as alleged herein, was certain or substantially certain to interfere with the economic relationship between 600 Spring and Unvarnished.

124. Defendants' conduct, as alleged herein, did interfere with and disrupt the economic relationship between 600 Spring and Unvarnished.

125. As a direct and proximate result of Defendants' conduct, Unvarnished has suffered economic harm in an amount to be proven at trial, including but not limited to actual and compensatory damages.

126. Defendants' conduct was fraudulent, intentional, and carried out with malice, oppression, and deceit, thereby entitling Unvarnished to an award of punitive damages under Civil Code section 3294.

127. Unvarnished also seek recovery of attorneys' fees, costs and any other damages as may be provided by contract, statute, or equity.

**<u>SIXTH CLAIM FOR RELIEF</u>**

**(Cancellation of Instrument – "Amended" Operating Agreement)**

**(By 600 Spring, LLC, C64829 LLC, and Scott Gillen Against Barry Shy and Amit Tidhar, as Trustee of the BR Shy Irrevocable Trust)**

128. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

129. Barry Shy and/or his agents created a fraudulent purported "Amended Operating Agreement" of 600 Spring as alleged hereinabove, and submitted this purported "Amended Operating Agreement" to federal lending institutions, including JPMorgan Chase Bank, in pursuit of financing for The Case project.

130. As alleged herein, the instrument is void or voidable because it was forged and fraudulently altered without Mr. Gillen's consent.

131. There is a reasonable apprehension of serious injury if the instrument is left outstanding, including pecuniary loss and the prejudicial alteration of Mr. Gillen's rights as sole Manager of 600 Spring.

132. In accordance with Code of Civil Procedure section 3412, Plaintiffs seek cancellation of the purported "Amended Operating Agreement" and a judicial declaration that the May 2017 Operating Agreement (reflected in Exhibit A hereto), as later amended by the Amended and Restated Operating Agreement of 600 Spring (reflected in Exhibit C hereto), is the valid operating agreement of 600 Spring.

**<u>SEVENTH CLAIM FOR RELIEF</u>**

**(Cancellation of Instrument – Deed of Trust)**

**(By 600 Spring, LLC and Glass Tunnel LLC Against BOBS LLC)**

133. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

134. As alleged herein, Barry Shy and/or his agents unilaterally altered the Deed of Trust accompanying the BOBS Loan Agreement without Mr. Gillen's consent to remove the express "No-Recordation" provision at the top of the signature page of the Deed of Trust.

135. As alleged herein, Barry Shy and/or his agents also fraudulently recorded the Deed of Trust to encumber properties that were already paid off by Mr. Gillen in response to payoff demands from BOBS LLC, including but not limited to the Cliffside Malibu property (29215 Cliffside Dr., Malibu, CA 90265) and the Malibu Road property (24266 Malibu Rd., Malibu, CA 90265).

136. As alleged herein, the instrument is void or voidable because it was fraudulently altered and recorded by Barry Shy and/or his agents without Mr. Gillen's consent.

137. There is a reasonable apprehension of serious injury if the instrument is left outstanding, including pecuniary loss and loss of title to The Case properties and the other properties listed therein, because BOBS LLC recorded the Deed of Trust against these properties despite the fact that the parties expressly agreed that it would not be recorded, and despite the fact that the versions of the BOBS Loan Agreement and the Deed of Trust that Mr. Gillen executed contained express No-Recordation provisions and disclaimers.

138. In accordance with Code of Civil Procedure section 3412, Plaintiffs seek cancellation of the Deed of Trust and a judicial declaration that BOBS LLC cannot record the Deed of Trust against The Case properties or claim title to The Case properties by way of the fraudulently recorded Deed of Trust.

## EIGHTH CLAIM FOR RELIEF

**(Quiet Title)**

**(By 600 Spring, LLC, Glass Tunnel LLC, C64829 LLC, and Scott Gillen Against all Defendants)**

139. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

//

//

140. As alleged herein, Barry Shy and/or his agents unilaterally altered the Deed of Trust accompanying the BOBS Loan Agreement without Mr. Gillen's consent to remove the express "No-Recordation" provision at the top of the signature page of the Deed of Trust.

141. As alleged herein, Barry Shy and/or his agents also fraudulently recorded the Deed of Trust to encumber properties that were already paid off by Mr. Gillen in response to payoff demands from BOBS LLC, including but not limited to the Cliffside Malibu property (29215 Cliffside Dr., Malibu, CA 90265) and the Malibu Road property (24266 Malibu Rd., Malibu, CA 90265).

142. The Deed of Trust affects the following real property:

1) A FIRST (1ST) Position Deed of Trust on 23800 Malibu Crest Dr., Malibu, CA 90265 (APN 4458-024-038 in Los Angeles County).

2) A SECOND (2ND) Position Deed of Trust on the "Case Properties," comprising 24168 Case Court, Malibu, CA 90265; 24185 Case Court, Malibu, CA 90265; 24186 Case Court, Malibu, CA 90265; 24188 Case Court, Malibu, CA 90265; 24198 Case Court, Malibu, CA 90265; and 24199 Case Court, Malibu, CA 90265 (APNs 4458-018-039, 4458-018-037, 4458-018-038, 4458-018-906, 4458-018-035, 4458-018-041, 4458-018-036, 4458-018-907 in Los Angeles County).

3) A FIRST (1ST) Position Deed of Trust on the "Bu House Properties," Oak Shores, Tract 2612, Lake Nacimiento, CA 93426 (APN 081-021-005 in San Luis Obispo County).

4) A FIRST (1ST) Position Deed of Trust on 29215 Cliffside Dr., Malibu, CA 90265 (APN 4468-003-005).

5) A FIRST (1ST) Position Deed of Trust on 24266 Malibu Rd., Malibu, CA 90265 (comprising APNs 4458-011-010 and 4458-011-011).

6) A FIRST (1ST) Position Deed of Trust on the "Greenmilk Property," 2685 Lynch Canyon Rd., Paso Robles, CA 93426 (APN 080-021-005 in San Luis Obispo County).

143. A true and correct copy of the legal description of the real property subject to the Deed of Trust is attached hereto as **Exhibit N**.

144. As alleged herein, the Deed of Trust is void or voidable because it was fraudulently altered by Barry Shy and/or his agents without Mr. Gillen's consent and recorded despite that the true document expressly provided that it was not to be recorded, and despite that multiple properties subject to the Deed of Trust were already paid off by Mr. Gillen.

145. Plaintiffs seek to quiet title as to the properties encumbered by the fraudulent Deed of Trust as of June 20, 2025, which is the date on which Barry Shy and/or his agents fraudulently recorded the altered Deed of Trust.

146. Plaintiffs seek to quiet title as to Defendants' adverse claim to interest in The Case project properties through the altered and fraudulently recorded Deed of Trust.

## NINTH CLAIM FOR RELIEF

**(Declaratory Relief – 600 Spring Operating Agreement)**

**(By 600 Spring, LLC, C64829 LLC, and Scott Gillen Against Barry Shy and Amit Tidhar, as Trustee of the BR Shy Irrevocable Trust)**

147. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

148. An actual controversy exists between Plaintiffs and Defendants concerning their respective rights and obligations under the governing documents of 600 Spring.

149. Plaintiffs contend, and Defendants dispute, that the valid and enforceable operating agreement of 600 Spring is the Operating Agreement executed in May 2017 (reflected in Exhibit A hereto), as later amended by the Amended and Restated Operating Agreement of 600 Spring (reflected in Exhibit C hereto), which designates Mr. Gillen as the sole Manager of 600 Spring. Plaintiffs further contend that the Purported Amended Operating Agreement relied on by Defendants is void and of no effect.

150. In accordance with Code of Civil Procedure section 1060, Plaintiffs seek a judicial declaration confirming that (a) the May 2017 Operating Agreement (reflected in Exhibit A hereto), as later amended by the Amended and Restated Operating Agreement of 600 Spring (reflected in

Exhibit C hereto) which removed Barry Shy as a Member, is the valid operating agreement of 600 Spring; (b) the Purported Amended Operating Agreement is void and of no legal effect; and (c) regardless of whether the Court ultimately upholds the May 2017 Operating Agreement or the Amended and Restated Operating Agreement of 600 Spring as the valid and enforceable operating agreement of 600 Spring, both state that Scott Gillen is the sole Manager of 600 Spring, and thus Plaintiffs seeks a judicial declaration confirming same.

**TENTH CLAIM FOR RELIEF**

**(For Violation of Usury Laws)**

**(By 600 Spring, LLC, Glass Tunnel LLC, C64829 LLC, and Scott Gillen Against BOBS LLC and Barry Shy)**

151. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

152. As alleged herein, BOBS LLC, owned and operated by Barry Shy, purported to offer financing for the construction of The Case project, as well as five other construction projects for which Mr. Gillen managed construction, through a promissory note accompanied by a Deed of Trust that was not to be recorded. The interest rate offered by BOBS LLC, and set forth in the promissory note, was twelve and one-half percent (12.5%) compounded daily.

153. The effective annual percentage rate of interest under such a term exceeds the maximum permissible interest rate under California's usury laws, including California Constitution, article XV, section 1, and related statutes.

154. BOBS LLC is a private lender and is not subject to any exemption from California's usury restrictions.

155. Moreover, upon information and belief, the licensed real estate broker exemption does not apply to this transaction because Rommy Shy is an agent of BOBS LLC and therefore was not acting as a neutral broker with respect to this transaction. Likewise, upon information and belief, the "preexisting business relationship" exemption under section 25118 of the California Corporations Code does not apply to this transaction because the BOBS Loan is backed by a personal guaranty from Mr. Gillen.

156. By charging, reserving, and attempting to collect interest at a rate greater than that permitted by law, BOBS LLC and Barry Shy willfully violated California's usury laws.

157. As a direct and proximate result, Plaintiffs have suffered and continue to suffer damages in the form of unlawful interest charges, inflated indebtedness, and impairment of 600 Spring's financial position.

158. In accordance with Civil Code section 1916-3, Plaintiffs are entitled to recover all interest paid on the usurious loan, treble damages for willful usury, and such other relief as the Court deems just and proper.

159. Barry Shy's and BOBS LLC's conduct was fraudulent, intentional, and carried out with malice, oppression, and deceit, thereby entitling 600 Spring to an award of punitive damages under Civil Code section 3294.

**ELEVENTH CLAIM FOR RELIEF**

**(For an Accounting of 600 Spring, LLC)**

**(By All Plaintiffs Against All Defendants)**

160. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

161. A fiduciary and contractual relationship exists between Plaintiffs and Defendants arising out of their status, among other things, as parties to related financing agreements.

162. Defendants have exercised exclusive control over substantial funds belonging to or for the benefit of 600 Spring, including but not limited to loan proceeds, project revenues, and other monies advanced or diverted in connection with The Case project.

163. Plaintiffs are informed and believe, and on that basis allege, that a balance of funds is due to them from Defendants. The exact amount owed cannot be determined without a full accounting of all receipts, disbursements, transfers, and profits handled by Defendants.

164. Plaintiffs therefore seek an accounting of all financial transactions conducted by Defendants in connection with 600 Spring and related ventures, and entry of judgment for any balance found due. Specifically with respect to the $7,666,223 wire transfer which Barry Shy directed be wired to a BOBS LLC account outside of Mr. Gillen's control, Plaintiffs request an

accounting showing: (1) where the funds were deposited; (2) every subsequent transfer of the funds; (3) any commingling of the funds; (4) any investment(s) made with the funds; (5) any third-party loans made with the funds; (6) whether the funds supported a BOBS LLC credit facility; (7) any interest, fees, spreads, investment income, or other returns made from the funds; and (8) any portion of the funds that were transferred back to 600 Spring or otherwise reverted back to 600 Spring as a BOBS LLC "advance" carrying additional interest. With respect to the $700,000 in funds held back by JPMorgan and later transferred to a non-600 Spring account, Plaintiffs request an accounting showing: (1) the account from which the funds were released; (2) where the funds were sent; (3) who owned the account to which the funds were sent; (4) who authorized the transfer of the funds to the receiving account; (5) how the funds were used, if at all.

**TWELFTH CLAIM FOR RELIEF**

**(For an Accounting of BOBS LLC)**

**(By All Plaintiffs Against BOBS LLC)**

165. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

166. A fiduciary and contractual relationship exists between Plaintiffs and BOBS LLC arising out of their status, among other things, as parties to related financing agreements, including the BOBS Loan Agreement.

167. BOBS LLC has exercised exclusive control over substantial funds belonging to or for the benefit of 600 Spring, including but not limited to loan proceeds, project revenues, and other monies advanced or diverted in connection with The Case project.

168. Plaintiffs are informed and believe, and on that basis allege, that a balance of funds is due to them from BOBS LLC. The exact amount owed cannot be determined without a full accounting of all receipts, disbursements, transfers, and profits handled by BOBS LLC.

169. Plaintiffs therefore seek an accounting of all financial transactions conducted by BOBS LLC in connection with 600 Spring and related ventures, and entry of judgment for any balance found due. Specifically with respect to the $7,666,223 wire transfer which Barry Shy directed be wired to a BOBS LLC account outside of Mr. Gillen's control, Plaintiffs request an

accounting of BOBS LLC showing: (1) where the funds were deposited; (2) every subsequent transfer of the funds; (3) any commingling of the funds; (4) any investment(s) made with the funds; (5) any third-party loans made with the funds; (6) whether the funds supported a BOBS LLC credit facility; (7) any interest, fees, spreads, investment income, or other returns made from the funds; and (8) any portion of the funds that were transferred back to 600 Spring or otherwise reverted back to 600 Spring as a BOBS LLC "advance" carrying additional interest.

**THIRTEENTH CLAIM FOR RELIEF**

**(Fraud – Intentional Misrepresentation & Fraudulent Concealment)**

**(By All Plaintiffs Against All Defendants)**

170. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

171. Upon information and belief, Defendants made a series of intentional misrepresentations to Plaintiffs which materially damaged Plaintiffs, including repeatedly misrepresenting to Plaintiffs that the Deed of Trust accompanying the BOBS Loan would not be recorded as set forth herein.

172. Defendants made such misrepresentations knowing that they were false and/or recklessly and without regard for the truth of the statements.

173. Defendants intended for Plaintiffs to rely on their intentional misrepresentations, and Plaintiff indeed reasonably so relied. Specifically, as alleged herein, Plaintiffs reasonably relied on Defendants' representations relating to the Deed of Trust to execute the BOBS Loan Agreement.

174. Plaintiffs would not have executed the BOBS Loan Agreement if they had known Defendants' statements and representations relating to recording the Deed of Trust were false (which Defendants, and each of them, knew or should have known).

175. Plaintiffs reasonably relied on Defendants' representations relating to whether the Deed of Trust would be recorded, and had no reason to believe the statements were false at the time they were made.

176. Upon information and belief, Barry Shy and/or his agents also intentionally concealed and failed to disclose certain facts to Plaintiffs, including the existence and validity of the Purported Amended Operating Agreement of 600 Spring and Barry Shy's purposed role as co-Manager of 600 Spring. Defendants had a duty to disclose such facts to Plaintiffs by virtue of Barry Shy's active involvement in and exercise of control over 600 Spring's financial affairs, and by virtue of Barry Shy's role as a lender to 600 Spring (through his entity BOBS LLC).

177. Plaintiffs did not know of the concealed facts relating to the Purported Amended Operating Agreement or Barry Shy's purported role as co-Manager of 600 Spring.

178. Defendants intended to deceive Plaintiffs by concealing and failing to disclose such facts.

179. Plaintiffs would not have consented to submitting the forged and fraudulently altered Purported Amended Operating Agreement to JPMorgan and other third parties had they known of the existence of this document, or had they known that Barry Shy was holding himself out to third parties as a co-Manager of 600 Spring.

180. Barry Shy also fraudulently diverted substantial sums from 600 Spring for his personal benefit and/or to BOBS LLC, including but not limited to an $8,000,000 BHI "Loan Disbursement" not used for construction, a $7,666,223 wire transfer which Barry Shy directed be wired to an account outside of Mr. Gillen's control, and an approximately $700,000 holdback from JPMorgan that Barry Shy fraudulently procured and Rommy Shy directed to be transferred to a non-600 Spring account. Additionally, Barry Shy instructed Mr. Gillen to transfer $20 million of CTBC funding directly to BOBS LLC the day after 600 Spring received the funds, and on information and belief, re-lent the funds to 600 Spring and pocketed the interest spread. Plaintiffs are further informed and believe, and based thereon allege that Defendants engaged in additional fraudulent financial conduct, the full scope, extent, and nature of which will be revealed during discovery.

181. Defendants also fraudulently recorded the Deed of Trust to encumber properties that were already paid off by Mr. Gillen in response to payoff demands from BOBS LLC, including but

not limited to the Cliffside Malibu property (29215 Cliffside Dr., Malibu, CA 90265) and the Malibu Road property (24266 Malibu Rd., Malibu, CA 90265).

182. As a direct and proximate result of Defendants' misrepresentations, fraudulent financial misconduct, fraudulent recording of the Deed of Trust, and failure to disclose material facts as described herein, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial, including but not limited to accrued interest on the JPMorgan Loan, actual and consequential damages stemming from the recording of the Deed of Trust, and legal fees and costs to challenge the validity of the recording of the Deed of Trust, which exceed the jurisdictional minimum of this Court. Defendants, and each of them, were a substantial factor in causing Plaintiffs' aforementioned damages.

183. In committing the acts alleged herein, Defendants acted with oppression, fraud, malice, and in conscious disregard of Plaintiffs' rights and with the express intent of damaging Plaintiff. As such, Plaintiff is entitled to punitive damages in an amount according to proof at trial.

**FOURTEENTH CLAIM FOR RELIEF**

**(Determination of Validity, Extent, and Priority of Lien)**

**(By 600 Spring, LLC and Glass Tunnel LLC Against BOBS LLC and Barry Shy)**

184. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

185. Pursuant to 11 U.S.C. § 506(a), Plaintiffs seek a judicial determination of the validity, extent, and priority, if any, of the lien asserted by BOBS LLC against the properties encumbered by the Deed of Trust.

186. The Deed of Trust that BOBS LLC recorded against the properties on June 20, 2025 is not the true and enforceable Deed of Trust that Mr. Gillen executed on behalf of the Debtor-Plaintiffs.

187. As alleged herein, Barry Shy and/or his agents unilaterally altered the Deed of Trust accompanying the BOBS Loan Agreement without Mr. Gillen's consent to remove the express "No-Recordation" provision at the top of the signature page of the Deed of Trust.

188. As alleged herein, Barry Shy and/or his agents also fraudulently recorded the Deed of Trust to encumber properties that were already paid off by Mr. Gillen in response to payoff demands from BOBS LLC, including but not limited to the Cliffside Malibu property (29215 Cliffside Dr., Malibu, CA 90265) and the Malibu Road property (24266 Malibu Rd., Malibu, CA 90265).

189. As alleged herein, the instrument is void or voidable because it was fraudulently altered and recorded by Barry Shy and/or his agents without Mr. Gillen's consent.

190. Accordingly, the recorded Deed of Trust does not reflect any lien to which Mr. Gillen or the Debtor-Plaintiffs ever agreed or consented, and any lien purportedly created or perfected by its recordation is invalid and unenforceable in its entirety.

191. BOBS LLC's claim against the properties of the Debtor-Plaintiffs, to the extent any such claim exists, should therefore be determined to be wholly unsecured pursuant to 11 U.S.C. § 506(a), and BOBS LLC should be found to hold no valid, perfected lien or security interest in any of the properties purportedly encumbered by the Deed of Trust.

## <u>FIFTEENTH CLAIM FOR RELIEF</u>

### (Avoidance of Lien as an Intentional Fraudulent Transfer)

### (By 600 Spring, LLC and Glass Tunnel LLC Against BOBS LLC and Barry Shy)

192. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

193. To the extent that the Deed of Trust or any lien purportedly created or perfected thereby is determined to be valid, the recordation of the Deed of Trust, and the lien purportedly granted and perfected thereby, constitutes a "transfer" of an interest in the Debtor-Plaintiffs' properties which is avoidable and recoverable as set forth herein.

194. The recordation of the Deed of Trust was made with the actual intent to hinder, delay, or defraud the Debtor-Plaintiffs' creditors within the meaning of 11 U.S.C. § 548(a)(1)(A), as evidenced by, among other things: (a) the transfer was made to or for the benefit of Barry Shy and BOBS LLC, his wholly owned and controlled entity; (b) the transfer was concealed, in that it was accomplished through a secretly and unilaterally altered instrument that Mr. Gillen and the

Debtor-Plaintiffs did not know had been altered, and was recorded without the knowledge or consent of Mr. Gillen, the sole authorized Manager of 600 Spring; (c) the transfer occurred shortly after, and in connection with, Barry Shy's initiation of litigation against Mr. Gillen and the Debtor-Plaintiffs; and (d) the transfer purported to encumber substantially all of the real property associated with The Case project and related properties.

195. Pursuant to 11 U.S.C. § 550(a), the Debtor-Plaintiffs are entitled to avoid and recover the lien evidenced by the recorded Deed of Trust, and any interest of BOBS LLC or Barry Shy therein, for the benefit of the Debtor-Plaintiffs' bankruptcy estates.

196. Pursuant to 11 U.S.C. § 502(d), any claim of BOBS LLC against the Debtor-Plaintiffs should be disallowed unless and until BOBS LLC pays the amount, or turns over the property, for which it is liable under 11 U.S.C. §§ 548 or 550.

**SIXTEENTH CLAIM FOR RELIEF**

**(Avoidance of Lien as a Constructive Fraudulent Transfer)**

**(By 600 Spring, LLC and Glass Tunnel LLC Against BOBS LLC and Barry Shy)**

197. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

198. To the extent that the Deed of Trust or any lien purportedly created or perfected thereby is determined to be valid, the recordation of the Deed of Trust, and the lien purportedly granted and perfected thereby, constitutes a "transfer" of an interest in the Debtor-Plaintiffs' properties which is avoidable and recoverable as set forth herein.

199. The recordation of the Deed of Trust, and the lien purportedly granted and perfected thereby, is avoidable as a constructive fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B) because the Debtor-Plaintiffs did not receive reasonably equivalent value in exchange for such transfer, and at the time of the transfer, the Debtor-Plaintiffs (a) were insolvent or became insolvent as a result of the transfer; (b) were engaged in business for which their remaining property constituted unreasonably small capital; or (c) intended to incur, or believed they would incur, debts beyond their ability to pay as they matured.

200. Pursuant to 11 U.S.C. § 550(a), the Debtor-Plaintiffs are entitled to avoid and recover the lien evidenced by the recorded Deed of Trust, and any interest of BOBS LLC or Barry Shy therein, for the benefit of the Debtor-Plaintiffs' bankruptcy estates.

201. Pursuant to 11 U.S.C. § 502(d), any claim of BOBS LLC against the Debtor-Plaintiffs should be disallowed unless and until BOBS LLC pays the amount, or turns over the property, for which it is liable under 11 U.S.C. §§ 548 or 550.

**SEVENTEENTH CLAIM FOR RELIEF**

**(Avoidance of Lien as a Fraudulent Transfer Under 11 U.S.C. § 544)**

**(By 600 Spring, LLC and Glass Tunnel LLC Against BOBS LLC and Barry Shy)**

202. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

203. To the extent that the Deed of Trust or any lien purportedly created or perfected thereby is determined to be valid, the recordation of the Deed of Trust, and the lien purportedly granted and perfected thereby, constitutes a "transfer" of an interest in the Debtor-Plaintiffs' properties which is avoidable and recoverable as set forth herein.

204. Pursuant to 11 U.S.C. § 544(b)(1), the Debtor-Plaintiffs, as debtors vested with the rights and powers of a hypothetical unsecured creditor holding an allowable unsecured claim, may avoid the transfer of the lien evidenced by the recorded Deed of Trust under applicable non-bankruptcy law, including California's Uniform Voidable Transactions Act, Cal. Civ. Code §§ 3439.04(a) and 3439.05, because the transfer was made and the obligation was incurred with actual intent to hinder, delay, or defraud the Debtor-Plaintiffs' creditors, and/or because Debtor-Plaintiffs did not receive reasonably equivalent value in exchange for the transfer at a time when they were insolvent or became insolvent as a result thereof.

205. Pursuant to 11 U.S.C. § 550(a), the Debtor-Plaintiffs are entitled to avoid and recover the lien evidenced by the recorded Deed of Trust, and any interest of BOBS LLC or Barry Shy therein, for the benefit of the Debtor-Plaintiffs' bankruptcy estates.

//

//

206. Pursuant to 11 U.S.C. § 502(d), any claim of BOBS LLC against the Debtor-Plaintiffs should be disallowed unless and until BOBS LLC pays the amount, or turns over the property, for which it is liable under 11 U.S.C. §§ 544 or 550.

**EIGHTEENTH CLAIM FOR RELIEF**

**(Equitable Subordination)**

**(By 600 Spring, LLC and Glass Tunnel LLC Against BOBS LLC and Barry Shy)**

207. Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs of this Complaint as though set forth fully herein.

208. Debtor-Plaintiffs assert this cause of action pursuant to 11 U.S.C. 510(c) which authorizes the Court, based on equitable considerations, to subordinate for purposes of distribution all or part of an allowed claim or to order that any lien securing a subordinated claim be transferred to the estate.

209. At all relevant times, Barry Shy was an insider of 600 Spring within the meaning of 11 U.S.C. § 101(31), by virtue of his exercise of substantial control over the financial operations of 600 Spring, including negotiating loans, directing the disposition of loan proceeds, and submitting documents to lenders on behalf of 600 Spring.

210. BOBS LLC is a wholly owned and controlled entity of Barry Shy, and is therefore also an insider of 600 Spring within the meaning of 11 U.S.C. § 101(31).

211. As the holder of the BOBS Loan claim and the purported secured creditor under the Deed of Trust, BOBS LLC asserts claims against Debtor-Plaintiffs' bankruptcy estates. Barry Shy, as guarantor and/or alter ego of BOBS LLC, likewise asserts or benefits from such claims.

212. BOBS LLC and Barry Shy engaged in inequitable conduct in connection with their claims against Debtor-Plaintiffs, including but not limited to the following:

a. Barry Shy and/or his agents unilaterally and secretly altered the BOBS Loan Agreement to remove the section 4.3 "No Recordation or Filing" provision, and unilaterally altered the Deed of Trust to remove the No-Recordation disclaimer on the signature page, in each case without Mr. Gillen's knowledge or consent;

b. Barry Shy submitted conflicting versions of the BOBS Loan Agreement and Deed of Trust under penalty of perjury in the Superior Court Action, including a version of the Deed of Trust that contained the express No-Recordation disclaimer, which Barry Shy himself affirmed was the “true and correct” executed version;

c. The BOBS Loan imposed an interest rate of twelve and one-half percent (12.5%) compounded daily, which exceeds the maximum permissible interest rate under California’s usury laws, including California Constitution, article XV, section 1, and related statutes;

d. Barry Shy and/or his agents fraudulently recorded the Deed of Trust to encumber properties that were already paid off by Mr. Gillen in response to payoff demands from BOBS LLC, including but not limited to the Cliffside Malibu property (29215 Cliffside Dr., Malibu, CA 90265) and the Malibu Road property (24266 Malibu Rd., Malibu, CA 90265);

e. Barry Shy directed Mr. Gillen to transfer $20 million of an approximately $29.5 million loan from CTBC Bank directly to BOBS LLC the day after 600 Spring received the loan funds from CTBC Bank, allowing Barry Shy to re-lend the funds at higher rates to 600 Spring and pocket the interest spread, to the detriment of 600 Spring;

f. Barry Shy diverted substantial sums from 600 Spring for his personal benefit and/or to BOBS LLC, including but not limited to an $8,000,000 BHI “Loan Disbursement” not used for construction, a $7,666,223 wire transfer which Barry Shy directed be wired to an account outside of Mr. Gillen’s control, and an approximately $700,000 holdback from JPMorgan that Barry Shy fraudulently procured and Rommy Shy directed to be transferred to a non-600 Spring account;

g. Starting in late 2024, Barry Shy systematically refused to fund legitimate draw requests for The Case project, starving construction while continuing to compound interest to balloon 600 Spring’s alleged indebtedness to BOBS LLC, thereby benefiting BOBS LLC at the expense of 600 Spring and its creditors;

h. Barry Shy forged and fraudulently altered the 600 Spring Operating Agreement to make himself a Co-Manager of 600 Spring and submitted the forged document to federal lending institutions, including JPMorgan, to obtain third-party financing, in order to further consolidate control over 600 Spring's assets for his and BOBS LLC's benefit;

i. Barry Shy interfered with The Case project by, among other things, refusing to permit the listing and sale of completed properties, directing that work be stopped on certain properties, and interfering with project workers, all while continuing to accrue interest on the usurious BOBS Loan to inflate BOBS LLC's claim against the estate.

213. As an insider of 600 Spring, Barry Shy's conduct is subject to heightened scrutiny, and there is a presumption that BOBS LLC's claim against the estate resulted from inequitable conduct that injured Debtor-Plaintiffs' creditors. With respect to Glass Tunnel, equitable subordination is independently warranted due to the inequitable and egregious conduct described herein.

214. The inequitable conduct of BOBS LLC and Barry Shy has resulted in injury to the creditors of Debtor-Plaintiffs' estates and has conferred an unfair advantage on BOBS LLC and Barry Shy. Among other things:

a. Defendants' fraudulent recordation of the Deed of Trust purports to give BOBS LLC a secured claim against The Case properties that takes priority over the claims of Debtor-Plaintiffs' legitimate unsecured creditors, including vendors, contractors, and other parties who are owed millions of dollars for work already performed on The Case project;

b. By starving 600 Spring of construction funds and preventing the completion and sale of The Case properties, Barry Shy depressed the value of the estate's assets while simultaneously inflating the size of BOBS LLC's claim through compounding usurious interest;

c. By diverting funds from 600 Spring for his personal benefit and re-routing the CTBC Bank loan proceeds through BOBS LLC to charge higher interest, Barry Shy enriched himself and BOBS LLC at the direct expense of 600 Spring and its creditors;

d. But for Defendants' inequitable conduct, 600 Spring would not have been burdened by the usurious interest obligations, the fraudulently perfected lien, or the artificially inflated indebtedness that has rendered 600 Spring unable to pay its legitimate creditors.

215. Equitable subordination of the claims of BOBS LLC and Barry Shy is consistent with the provisions of the Bankruptcy Code. Allowing BOBS LLC and Barry Shy to assert their claims on parity with, or with priority over, the claims of Debtor-Plaintiffs' legitimate unsecured creditors would reward their fraudulent and inequitable conduct and would be contrary to the fundamental principles of fairness and equity that underlie the Bankruptcy Code.

216. Accordingly, pursuant to 11 U.S.C. § 510(c), Debtor-Plaintiffs respectfully request that this Court enter an order (a) subordinating any and all claims of BOBS LLC and Barry Shy against the bankruptcy estates of Debtor-Plaintiffs, including any secured claim based on the recorded Deed of Trust, to the claims of all other creditors of the estate; and (b) ordering that any lien securing a subordinated claim of BOBS LLC or Barry Shy be transferred to the estate for the benefit of all creditors.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief as follows:

On the First Claim for Relief:

1. For damages according to proof;

2. For an award of punitive damages under Civil Code section 3294;

3. For imposition of a constructive trust on any and all funds Defendants have received, either directly or indirectly on The Case project, and the proceeds and results of their use of such funds, including, without limitation, any real property, other type of investment or any other assets obtained by such funds.

On the Second Claim for Relief:

4. For damages according to proof.

On the Third Claim for Relief:

5. For damages according to proof.

On the Fourth Claim for Relief:

6. For damages according to proof;

7. For an award of punitive damages under Civil Code section 3294.

On the Fifth Claim for Relief:

8. For damages according to proof;

9. For an award of punitive damages under Civil Code section 3294.

On the Sixth Claim for Relief:

10. In accordance with Code of Civil Procedure section 3412, cancellation of the purported "Amended Operating Agreement" and a judicial declaration that the May 2017 Operating Agreement (reflected in Exhibit A hereto), as later amended by the Amended and Restated Operating Agreement of 600 Spring (reflected in Exhibit C hereto), is the valid operating agreement of 600 Spring.

On the Seventh Claim for Relief:

11. In accordance with Code of Civil Procedure section 3412, cancellation of the fraudulent Deed of Trust and a judicial declaration that it is not a valid document and was improperly recorded.

On the Eighth Claim for Relief:

12. For a judicial declaration confirming that (a) the fraudulent Deed of Trust recorded on the properties on June 20, 2025 was altered to omit the "No Recordation" language and thus is not a valid or enforceable document; and (b) Defendants do not have a claim to interest in The Case Properties through the altered and fraudulently recorded Deed of Trust.

On the Ninth Claim for Relief:

13. A judicial declaration confirming that (a) the May 2017 Operating Agreement (reflected in Exhibit A hereto), as later amended by the Amended and Restated Operating Agreement of 600 Spring (reflected in Exhibit C hereto), is the valid operating agreement of 600 Spring; (b) Scott Gillen is the sole Manager of 600 Spring; and (c) the Purported Amended Operating Agreement is void and of no legal effect.

On the Tenth Claim for Relief:

14. For damages according to proof;

15. Treble damages in accordance with Civil Code section 1916-3;

16. For an award of punitive damages under Civil Code section 3294.

On the Eleventh Claim for Relief:

17. An accounting of all financial transactions conducted by Defendants in connection with 600 Spring and related ventures, and entry of judgment for any balance found due.

On the Twelfth Claim for Relief:

18. An accounting of all financial transactions conducted by BOBS LLC in connection with 600 Spring and related ventures, and entry of judgment for any balance found due.

On the Thirteenth Claim for Relief:

19. For damages according to proof;

20. For an award of punitive damages under Civil Code section 3294.

On the Fourteenth Claim for Relief:

21. For a determination that the Deed of Trust and any lien purportedly created thereby is invalid, unenforceable, and of no force and effect, and that BOBS LLC's claim, if any, against the Debtor-Plaintiffs is wholly unsecured pursuant to 11 U.S.C. § 506(a).

On the Fifteenth Claim for Relief:

22. For a judgment avoiding the lien evidenced by the Deed of Trust as a fraudulent transfer pursuant to 11 U.S.C. §§ 548 and 550, and Cal. Civ. Code § 3439 *et seq.*;

23. For disallowance of any claim of BOBS LLC pursuant to 11 U.S.C. § 502(d) pending compliance with any judgment of avoidance and recovery.

On the Sixteenth Claim for Relief:

24. For a judgment avoiding the lien evidenced by the Deed of Trust as a fraudulent transfer pursuant to 11 U.S.C. §§ 548 and 550, and Cal. Civ. Code § 3439 *et seq.*;

25. For disallowance of any claim of BOBS LLC pursuant to 11 U.S.C. § 502(d) pending compliance with any judgment of avoidance and recovery.

<u>On the Seventeenth Claim for Relief</u>:

26. For a judgment avoiding the lien evidenced by the Deed of Trust as a fraudulent transfer pursuant to 11 U.S.C. §§ 544 and 550, and Cal. Civ. Code § 3439 *et seq*.;

27. For disallowance of any claim of BOBS LLC pursuant to 11 U.S.C. § 502(d) pending compliance with any judgment of avoidance and recovery.

<u>On the Eighteenth Claim for Relief</u>:

28. For an order, pursuant to 11 U.S.C. § 510(c): (a) subordinating any and all claims of BOBS LLC and Barry Shy against the bankruptcy estates of 600 Spring, LLC and Glass Tunnel LLC, including any secured claims based on the recorded Deed of Trust, to the claims of all other creditors of the estates; and (b) ordering that any lien securing a subordinated claim of BOBS LLC or Barry Shy be transferred to the estates for the benefit of all creditors.

<u>On All claims for relief</u>:

29. For pre-judgment interest;

30. For costs of suit incurred herein;

31. For reasonable attorneys' fees to the extent authorized by contract, statute, or law;

32. For any further relief the Court may deem proper.

Dated: September 1, 2026

LESNICK PRINCE PAPPAS & ALVERSON LLP

and

VENABLE LLP

By: /s/ Matthew A. Lesnick
Matthew A. Lesnick

Adam M. Weg
Max N. Wellman
Bryan J. Weintrop

*Attorneys for Plaintiffs* 600 Spring, LLC, Glass Tunnel LLC, Scott Gillen, C64829 LLC, and Unvarnished, Inc.

# VERIFICATION

I, Scott Gillen, am a party to this adversary proceeding and the Manager of Debtor-Plaintiffs Glass Tunnel LLC and 600 Spring, LLC. I have read the foregoing **VERIFIED COMPLAINT** and am familiar with its contents. I am informed and believe, and on that ground allege, that the matters stated in the foregoing document are true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 1st day of September, 2026.

Scott Gillen

# EXHIBIT A

OPERATING AGREEMENT AS OF 5/22/2017
OF
600 Spring LLC

THE UNDERSIGNED is executing this Operation Agreement **("Agreement")** for the purpose of forming a limited-liability company (the "Company") pursuant to the provisions of the Beverly-Killea Limited Liability Act codified if California Corporations Code Section 17000 et seq. (the "**California Act**"), and docs hereby certify and agree as follows:

1.Name: formation. The name of the Company shall be 600 Spring LLC.

2.Business and Affairs. The Affairs of the Company and the conduct of its business shall be governed by the California Act, as the same may be amended from time to time.

3.Members. The members of the company are as follows:
1) Barry Shy 50%
2) C64829 LLC 50%

4.Managers. Scott Gillen shall be the Manager until he resigns, dies or otherwise is removed from the office by the Member.

5.Capital Contribution. The Members shall contribute such capital as they deem necessary and advisable; provided however, the Members shall not be obligated to make any such capital contributions to the Company. For the Avoidance of doubt, the Member shall not be obligated to make any capital contributions if the balance is such Member's capital account is negative. The Members shall have a one hundred percent (100%) interest in the profits and losses of the Company.

6. Company Obligations. Except as otherwise required under the California Act, the member shall not be personally liable for and debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise.

7. Member Rights and Obligation. Except as otherwise provided herein or in the Articles of Organization of the Company to the contrary, all of the rights, obligations and duties of the Manager and the Member shall be set forth in the California Act.

8. C64829 LLC and Scott Gillen will handle the day to day operations for the company, including but not limited to all aspects of developing and selling the property, they will receive no salary or compensation for this work.

9. Upon selling the property the first portion of the proceeds will be used to pay-off any debt and/or liens against the property, after which the profits will be divided equally between the two partners.

10. Amendments. This Agreement may be amended or modified only by a writing duly executed by the Members.

11. LLC will resolve on December 31, 2027

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

Barry Shy, Member

Barry Shy

C64829 LLC, Member
by Scott Gillen it's Manager

Scott Gillen, Manager

05/23/17

# EXHIBIT B

**Secretary of State**
**Articles of Organization**
Limited Liability Company (LLC)

**LLC-1**

201712510140

**FILED** KM
**Secretary of State**
**State of California**
MAY 04 2017

**IMPORTANT — Read Instructions before completing this form.**

**Filing Fee – $70.00**

**Copy Fees** – First page $1.00; each attachment page $0.50; Certification Fee - $5.00

*Note:* LLCs may have to pay minimum $800 tax to the California Franchise Tax Board each year. For more information, go to *https://www.ftb.ca.gov*.

ICC

**This Space For Office Use Only**

1. **Limited Liability Company Name** (See Instructions – Must contain an LLC ending such as LLC or L.L.C. "LLC" will be added, if not included.)

600 Spring, LLC

2. **Business Addresses**

| a. Initial Street Address of Designated Office in California - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 600 S. Spring St. "office" | Los Angeles | CA | 90014 |
| b. Initial Mailing Address of LLC, if different than Item 2a | City (no abbreviations) | State | Zip Code |
| | | | |

3. **Service of Process** (Must provide either Individual **OR** Corporation.)

**INDIVIDUAL** – Complete Items 3a and 3b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Yaniv | | Aviner | |

| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 600 S. Spring St. unit "Office" | Los Angeles | CA | 90014 |

**CORPORATION** – Complete Item 3c. Only include the name of the registered agent Corporation.

c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 3a or 3b

4. **Management** (Select **only** one box)

The LLC will be managed by:

☑ One Manager ☐ More than One Manager ☐ All LLC Member(s)

5. **Purpose Statement** (Do not alter Purpose Statement)

The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

6. The Information contained herein, including in any attachments, is true and correct.

[signature]
Organizer sign here

Yaniv Aviner
Print your name here



2017 California Secretary of State
www.sos.ca.gov/business/be

# EXHIBIT C

# AMENDED AND RESTATED OPERATING AGREEMENT OF 600 SPRING LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT OF 600 SPRING LLC (this "**Agreement**") is made as of September __, 2017 by C64829 LLC, a California limited liability company ("**Member**"),and Scott Gillen ("**Manager**"), with reference to the following facts:

A. 600 Spring LLC, a California limited liability company (the "**Company**"), was formed under the laws of the State of California by the filing of Articles of Organization with the California Secretary of State on May 7, 2017.

B. One of the original members of the Company has withdrawn, and Member desires to amend and restate in its entirety the original Operating Agreement of the Company, dated as of May 22, 2017.

NOW, THEREFORE, the Member and the Manager agree as follows:

1. Name. The name of the Company shall be 600 Spring LLC. The Member or the Manager may change the name of the Company at any time and may operate under a fictitious business name as the Member or the Manager so decide.

2. Purpose. The Company's purpose is to own, develop, mortgage, finance, lease, operate, and sell real property and to engage in any and all general business activities related or incidental thereto permitted by law; provided that the Company shall not conduct any banking, insurance or trust company business.

3. Principal Office. The principal office of the Company shall be located at 3806 Cross Creek Road, Suite C, Malibu, CA 90265.

4. Management Decisions. The Company shall be managed by the Manager. The Manager shall be responsible for the management of the Company's business and shall have all rights and powers generally conferred by law or necessary, advisable or consistent in connection therewith, including the power to sell or finance Company assets. The Manager shall have the authority to execute all documents on behalf of the Company. If the Manager is unable to serve as the Manager for any reason, the Member may select a successor Manager. The Manager may be, but shall not be required to be, a Member.

5. Sole Member. The Member shall own one hundred percent (100%) of the membership interests in the Company.

6. Capital Contributions. The Member shall make capital contributions to the Company in amounts determined by the Manager.

7. Allocations of Profits and Losses. All profits and losses shall be allocated to the Member.

8. Distributions. Distributable cash (as determined by the Manager) shall be distributed to the Member.

9. Dissolution. The Company shall dissolve upon the written consent of the Member.

10. New Members. New Members shall be admitted upon the consent of the Member and the Manager.

11. Agent For Service of Process. Scott Gillen, 3806 Cross Creek Road, Suite C, Malibu, CA 90265 is designated as the agent for service of process of the Company.

12. Miscellaneous.

a. Applicable Law. This Agreement shall, in all respects, be governed by the laws of the State of California.

b. Severability. Nothing contained herein shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provisions contained herein and any present or future statute, law, ordinance or regulation, the latter shall prevail; but the provision of this Agreement which is affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law.

c. Further Assurances. Each of the parties hereto shall execute and deliver any and all additional papers, documents and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of their obligations hereunder to carry out the intent of the parties hereto.

d. Modifications or Amendments. No amendment, change or modification of this Agreement shall be valid, unless in writing and signed by the Member.

e. Entire Agreement. This Agreement contains the sole and entire agreement and understanding of the parties with respect to the entire subject matter hereof, and any and all prior discussions, negotiations, commitments or understandings related hereto, if any, are hereby merged herein. No representations, oral or otherwise, express or implied, other than those specifically referred to in this Agreement or any exhibits contemplated thereby, have been made by any party hereto. No other agreements not specifically contained herein, oral or otherwise, shall be deemed to exist or to bind any of the parties hereto.

f. Non-Waiver. No waiver by any party hereto of a breach of any provision of this Agreement shall constitute a waiver of any preceding or succeeding breach of the same or any other provision hereof.

g. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

h. Number and Gender. In this Agreement, the masculine, feminine or neuter gender, and the singular or plural number, shall each be deemed to include the others whenever the context so requires.

i. Captions. The captions appearing at the commencement of the sections hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the section at the head of which it appears, the section and not such caption shall control and govern in the construction of this Agreement.

[Signatures on Next Page]

IN WITNESS WHEREOF, the parties have executed this Amended and Restated Operating Agreement of 600 Spring LLC as of the date and at the place first above written.

**MEMBER:**

C64829 LLC, a California limited liability company

By:
Name: Scott Gillen
Title: Manager/Member

**MANAGER:**

Scott Gillen

# EXHIBIT D

# CONSTRUCTION AGREEMENT

## COST PLUS A PERCENTAGE FEE

**BETWEEN**

**UNVARNISHED, INC.,**

**as Contractor**

**AND**

**600 Spring, LLC.,**

**as Owner**

**FOR PROJECT LOCATED AT The CASE**

**Vacant land (24108 PCH) June 29, 2017**

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| 1. | DEFINITIONS | 1 |
| 2. | CONTRACT INTERPRETATION | 2 |
| 3. | CONTRACT DOCUMENTS | 3 |
| 4. | SCOPE OF WORK | 3 |
| 5. | COMMENCEMENT AND PROSECUTION OF THE WORK | 4 |
| 6. | INSPECTION AND TESTING | 5 |
| 7. | COST OF THE WORK | 5 |
| 8. | CHANGES IN THE WORK | 6 |
| 9. | UNFORESEEN CONDITIONS | 7 |
| 10. | TERMS OF PAYMENT | 7 |
| 11. | INDEMNIFICATION | 8 |
| 12. | SAFETY | 8 |
| 13. | COORDINATION | 8 |
| 14. | CERTIFICATE OF FINAL ACCEPTANCE | 9 |
| 15. | WARRANTY | 9 |
| 16. | TIME FOR COMPLETION | 9 |
| 17. | SUSPENSION / TERMINATION | 10 |
| 18. | NOTICES | 11 |
| 19. | INSURANCE | 12 |
| 20. | CLAIMS/DISPUTE RESOLUTION | 12 |
| 21. | SOLE AGREEMENT | 14 |
| 22. | MISCELLANEOUS | 14 |
| 23. | GOVERNING LAW | 14 |

# CONSTRUCTION AGREEMENT
# COST PLUS A PERCENTAGE FEE

THIS CONSTRUCTION AGREEMENT (this "**Agreement**") is entered into as of June 29, 2017, by and between 600 Spring LLC, a California limited liability company, whose principal place of business is at 3806 Cross Creek Road, Suite C, Malibu, CA 90265 ("**Owner**"), and UNVARNISHED, INC., a California corporation, whose principal place of business is at 3806 Cross Creek Road, Suite C, Malibu, CA 90265 (License No. 975002) ("**Contractor**").

A. Owner desires to engage Contractor to provide pre-construction and construction services (the "**Work**") at *[location of project]* (the "**Project**") as set forth on **Appendix 1** attached hereto and incorporated herein (the "**Scope of Work**");

B. Owner has developed preliminary conceptual designs for the Work. The intent of the parties is that Contractor will, as part of the pre-construction phase of the Work, prepare and develop plans and specifications to allow the construction of the Work as contemplated herein.

C. Owner wishes to retain Contractor to perform the Work, and Contractor desires to perform the Work subject to the terms and conditions herein.

D. Owner and Contractor have agreed that Contractor will be compensated for the Work on the basis of the Cost of the Work plus a Fee. 12% Due and payable upon sale to Contractor.

NOW, THEREFORE, Owner and Contractor agree as follows:

## 1. DEFINITIONS

In this Agreement the following words and expression shall have the meanings hereby assigned to them except where the context otherwise requires:

"**Agreement**" means this Agreement, including appendices and fully executed amendments hereto.

"**Change Order**" means an order, issued pursuant to **Section 8**, for changes in the scope, nature, quantity, timing and/or price of the Work.

"**Commencement Date**" means the date for commencement of the Work as set forth in a Notice to Proceed.

"**Contract Documents**" means the documents described in **Section 3**.

"**Contract Price**" means the total of the actual Cost of the Work, plus the Fee.

"**Cost of the Work**" means the reimbursable costs of the Work as set forth in **Section 6**, payable to Contractor based upon actual quantities of Work performed as demonstrated by Contractor's invoices and supporting documentation.

"**Fee**" means the percentage fee payable to Contractor to cover Contractor's overhead and profit in connection with the Work, calculated as *[percentage of cost]*% of the Cost of the Work. The total of the Cost of the Work and the Fee is the Contract Price.

"**Final Completion**" means final completion of the entirety of the Work, including punch list work, submission of final unconditional lien releases, and submission of close-out documentation such as as-built drawings, operations and maintenance manuals and warranties.

"**Final Acceptance Certificate**" means the certificate to be issued by Owner to Contractor pursuant to **Section 14** upon Final Completion of the Work.

"**Indemnified Parties**" means Owner and its officers, directors, shareholders, agents and employees.

"**Insurance**" means the insurance coverage required of Contractor by **Section 19.1**.

"**Notice to Proceed**" means a notice to commence the Work issued by Owner in accordance with **Section 5**.

"**Owner**" means Owner as defined in the preamble.

"**Project**" means the construction of *[description of project]* in accordance with the Contract Documents.

"**Project Schedule**" means the Project Schedule for completion of the Work as defined in **Section 16** and as amended from time to time in schedule updates prepared by Contractor.

"**Substantial Completion**" means completion of the Work such that Owner may have full and beneficial use of the Project for its intended purpose, notwithstanding that Work of a minor nature that may remain incomplete.

"**Subcontractor**" means any person or entity with whom Contractor has entered into any subcontract and any other person or entity with whom any subcontractor has further subcontracted any part of the Work, at any tier, including subconsultants and suppliers of material and equipment.

"**Unforeseen Conditions**" means any of the following conditions on the Project site not indicated in the Contract Documents: (a) material containing hazardous waste requiring removal to a Class I, Class II or Class III disposal site, (b) subsurface or latent physical conditions encountered at the Project Site differing materially from those indicated in the Contract Documents; or (c) physical conditions of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in the type of work provided for in the Contract Documents. The existence of asbestos on the Project site shall not be deemed an Unforeseen Condition.

"**Warranty Period**" means the twelve (12) month period, commencing on the date of Final Acceptance, during which Contractor shall have an obligation to repair defects or deficiencies in the Work.

"**Work**" shall have the meaning set forth in the recitals above.

## 2. CONTRACT INTERPRETATION

Headings are inserted solely for convenience and shall not be taken into consideration in the interpretation or construction of this Agreement. Words importing the singular only also include the plural and vice versa where the context requires. Wherever in this Agreement provision is made for giving of notice, consent or approval by any person, such notice, consent or approval shall, unless otherwise specified, be in writing and the word "**notify**" and "**notice**" shall be construed accordingly. The terms

"**approved**" and "**directed**" wherever used in this Agreement means approved or directed in writing and "**approval**" or "**directions**" means approval or direction in writing. This Agreement shall not be construed as if it was prepared by Owner but rather as if both parties had prepared it. The Contract Documents shall not be construed to create a contractual relationship of any kind (1) between Owner and a Subcontractor; or (2) between any persons or entities other than Owner and Contractor.

## 3. CONTRACT DOCUMENTS

3.1. The following documents are the Contract Documents for the Work:

3.1.1. Fully executed Amendments to this Agreement;

3.1.2. Change Orders;

3.1.3. The Appendices to this Agreement; and

3.1.4. This Agreement.

3.2. The documents listed above shall be taken as mutually explanatory of one another, but in case of any discrepancy among them, the order of precedence shall be the order in which the Contract Documents are listed in **Section 3.1**. If and to the extent subsequently prepared and agreed upon by the parties, plans, working drawings, standard plans, and calculated dimensions shall take precedence over scaled dimensions, while detailed plans, drawings and specifications shall take precedence over general drawings and specifications.

3.3. As of the execution date of this Agreement, only preliminary conceptual designs are complete. Where necessary or desirable, design documents will be prepared and developed by Contractor simultaneously and in conjunction with Contractor's performance of the Work (the "**Design Documents**"). Contractor. Notwithstanding the foregoing, the Design Documents shall indicate all dimensions, locations, and details reasonably necessary for the performance of the Work.

3.4. Owner shall promptly supply Contractor with all data in its possession relating to the Project site including, if available, as-built information indicating the location of utilities. The information so supplied is provided for reference purposes only. Owner takes no responsibility for, and makes no warranty with respect to, the completeness or accuracy of the site information provided pursuant to this Section.

3.5. Execution of this Agreement by Contractor is a representation that Contractor has visited the Project site, became generally familiar with local conditions under which the Work it to be performed, and correlated personal observations with requirements of the Contract Documents.

## 4. SCOPE OF WORK

4.1. Contractor shall perform construction services, including supply of all necessary labor, materials, equipment, temporary facilities, tools, implements, and appliances required to perform the Work in accordance with the Contract Documents. In performing the construction services, Contractor shall be solely responsible for and have control over:

4.1.1. Construction means, methods, techniques, sequences and procedures;

4.1.2. Construction quality;

4.1.3. Project site safety, including implementing, maintaining and supervising a project safety plan;

4.1.4. Coordinating all portions of the Project in accordance with the Contract Documents;

4.1.5. Implementation of all reasonable measures and precautions to prevent damage, injury or loss to: (i) all persons who are on the Project site or who could foreseeably be affected by construction of the Project; (ii) the Project and materials and equipment to be incorporated therein; and (iii) other property at or adjacent to the Project site.

4.1.6. Provision of appropriate security for the Project site; and

4.1.7. Continuous clean-up of the Project site; and.

4.1.8. Perform post-construction services such as the preparation and submission of as-built drawings, operating and maintenance manuals and warranties and the obtaining of certificates of occupancy.

4.2. Contractor shall secure, at Owner's expense (and not as a Cost of the Work), the building permit and other permits and governmental fees, licenses, and inspection necessary for the proper execution and completion of the Work, including any fees or assessments set by public agencies and utility companies for construction of, or connection to, sewers, storm drains, water lines, gas lines, and other utilities.

4.3. Contractor shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities applicable to performance of the Work.

4.4. Subject to Owner's obligation to pay undisputed payment applications for the Work, Contractor shall ensure that the Project remains free and clear of any and all liens and claims of Subcontractors and their respective laborers, artisans, engineers, and design professionals.

## 5. COMMENCEMENT AND PROSECUTION OF THE WORK

5.1. Contractor shall commence the Work within ten (10) business days after receipt from Owner of a written Notice to Proceed. Owner shall issue a Notice to Proceed only after:

5.1.1. Contractor and Owner have executed this Agreement;

5.1.2. The responsible party under the Contract Documents has secured all Project entitlements, including applicable building permits, from the appropriate governmental agency as required to commence performance of the Work;

5.1.3. Contractor has provided Owner with evidence of insurance as respects the insurance coverage that Contractor is required to procure under **Section 19**.

5.2. Contractor shall maintain records of the progress of Project construction, including written progress reports and photographs reflecting the status of Project construction and percentage completion. Contractor shall maintain daily records during Project construction including a daily log showing weather conditions, identifying all Subcontractors at the Project site, work accomplished under each subcontract, problems encountered and other matters materially affecting the Project.

## 6. INSPECTION AND TESTING

6.1. Contractor shall arrange and pay for, as a Cost of the Work, all independent inspections, sampling and testing required by Owner or applicable governmental authorities. At all points during performance of the Work at which specific inspections or approvals by Owner or third parties are required, Contractor shall not proceed beyond that point until such inspection or approval has been made or waived in writing.

6.2. All materials and each discrete aspect of the Project shall be subject to inspection and testing by Owner in its sole and absolute discretion. Contractor consents to such inspection and testing. Upon notice from Owner of its intent to inspect any materials or portion of the Project, Contractor shall permit the persons designated in such notice access to the Project site and shall cooperate in good faith with the designated person by, among other things, providing requested documentation or information regarding the Work or materials under inspection.

6.3. At all times before Final Acceptance of the Work, Contractor shall remove or uncover such portions of the finished construction work as directed by Owner. After examination by Owner, Contractor shall restore the work to the standard required by the Contract Documents. If the work exposed or examined is not in conformance with the requirements of the Contract Documents, then uncovering, removing and restoring the work and recovery of any project delay occasioned thereby shall be at Contractor's cost.

6.4. If Contractor fails to carry out the work in accordance with the Contract Documents, and fails within a seven-day period after receipt of a written notice from Owner to commence and continue correction of deficiencies arising from such failure, Owner may, without prejudice to any other remedies Owner may have, correct the deficiencies. In such case, an appropriate deductive Change Order shall be issued covering Owner's costs and expenses arising from Contractor's default.

## 7. COST OF THE WORK

7.1. The term "Cost of the Work" shall mean and include the following:

7.1.1. Wages or salaries, including such standard fringe benefits as employee group insurance coverage, employer payroll taxes, vacation time, and other similar costs, of Contractor's personnel, but only for that portion of their time required for the Work;

7.1.2. Fees and assessments for inspections that Contractor is required by the Contract Documents to arrange and pay for;

7.1.3. Miscellaneous expenses such as telegrams, telephone services, blueprints, express mail, and similar petty cash items related to the Project and customarily incurred in projects of this nature;

7.1.4. Costs of all materials, supplies, and equipment used in connection with or incorporated into the Project, including costs of transportation and storage thereof whether purchased from Contractor or from an outside vendor and specifically excluding any rebates, returned deposits, trade discounts, refunds, or sales of surplus materials and equipment;

7.1.5. Rental charges paid to bona fide third parties of all machinery and equipment, exclusive of hand tools, used for the performance of the Project, including the cost of installation, dismantling, removal, and cost of lubrication, transportation and delivery thereof;

7.1.6. A pro rata portion of premiums on all insurance policies that Contractor is required to furnish under this Agreement, calculated on the period of time Contractor actually performs the Work;

7.1.7. Amounts due to all Subcontractors under subcontracts related to the construction of the Project, excluding any rebates, returned deposits, trade discounts, refunds, or sales of surplus materials and equipment;

7.1.8. Costs incurred in connection with job safety requirements for the construction of the Project such as handrails, ramps, barricades, warning lights, and required scaffolding;

7.1.9. Costs incurred due to an emergency affecting the safety of persons or property, except where the occurrence of such emergency is due to a failure of Contractor to comply with the requirements and obligations of the Contract Documents;

7.1.10. Costs of removal of debris and the final building clean up;

7.1.11. Costs to provide security for the Project site beyond Owner's site and property specific security systems and contracted personnel;

7.1.12. Fees for foundation and engineering reports identified by Owner as necessary for the construction of the Project including, if applicable, a topographic survey;

7.1.13. Costs related to maintaining a temporary field office and providing temporary utilities to the Project.

7.2. The following items are not reimbursable Costs of the Work:

7.2.1. Salaries and other compensation of Contractor's personnel stationed at Contractor's principal office or offices other than the Project site office, except for the reasonable prorata share of the cost of those personnel to the extent such personnel are working on Owner's projects directly;

7.2.2. Personnel relocation and temporary living allowances of personnel assigned to the Project, unless such expenses are approved in advance and in writing by Owner;

7.2.3. The cost of employee bonuses;

7.2.4. Expenses of Contractor's principal office and offices other than the Project site office;

7.2.5. Overhead and general expenses, except as may be expressly included in **Section 7.1**; and

7.2.6. Costs due to the negligence of Contractor or its subcontractors of any tier.

7.3. Items covered by allowances shall be supplied for such amounts and by such persons or entities as Owner may direct. Allowances will be applied towards the cost to Contractor of materials and equipment delivered to the Project site and all required taxes, less trade discounts, rebates, or refunds. Depending on the final cost of Allowance items, a deductive or additive change order may be agreed to by Owner and Contractor.

**8. CHANGES IN THE WORK**

8.1. Owner may, without affecting the validity of this Agreement, order changes, modifications, deletions, and extra work by notifying Contractor in writing of its proposed changes or additional work. Such changes may include modifications or addition to the Work required by a governmental authority. As soon as practicable after its receipt of such notice from Owner, Contractor shall promptly prepare a detailed cost estimate and Project Schedule update. The detailed cost estimate shall be calculated as provided for in this Section. Owner shall notify Contractor of its decision whether to proceed with the proposed Change Order work within [number of days] days after the receipt from Contractor of the detailed estimate and Project Schedule update.

8.2. Disputes related to Change Order valuation shall be resolved in accordance with the Dispute Resolution provisions of this Agreement as contained in **Section 20**. Notwithstanding any such dispute, Contractor shall promptly proceed with affected Change Order work.

**9. UNFORESEEN CONDITIONS**

9.1. If during the course of the Work, Contractor becomes aware of any Unforeseen Condition, then Contractor shall immediately notify Owner thereof. Upon such discovery, Contractor shall immediately cease its activities in the affected area pending further instructions, except such further investigation as it deems appropriate to properly and adequately advise Owner of the situation. Owner shall use reasonable efforts to determine within ten (10) business days after receipt of notification under this Section whether the material or condition constitutes an Unforeseen Condition, and shall immediately notify Contractor of its determination once it is made. Owner shall at that time also provide written notice to Contractor of any action required of Contractor to address the situation. If Hazardous Materials are involved, the notice shall describe the type of remediation measures, if any, that Contractor is to undertake with respect thereto.

**10. TERMS OF PAYMENT**

10.1. Owner will pay Contractor for Contractor's performance under this Agreement the Contract Price.

10.2. Work under Change Orders shall be including in Contractor's payment applications as such work is performed.

10.3. Owner will pay Contractor the Contract Price in installments, as follows:

10.3.1. On or before the 10th day of each month, Contractor shall deliver to Owner a payment application showing, as of the end of the month covered by the application, the percentage of the Work performed, the value of the completed work, and the amount of costs and fees due and owing to Contractor under the terms of this Agreement, including amounts due under any Change Orders. The Application shall be submitted on a form approved by Owner and shall contain such supporting data as Owner may reasonably require. Materials and equipment not yet incorporated in the Project, but delivered and stored at the Project site or secure location agreed to by Owner, shall be considered completed items of Work for purposes of a payment application. Contractor, upon request, will furnish Owner bills of sale or other documentation satisfactory to establish Owner's title to such stored materials and equipment.

10.3.2. Within twenty-five (25) days following receipt by Owner of Contractor's payment application, Owner shall pay to Contractor, the amount approved by Owner based on its good faith review of Contractor's payment application less, in all cases other than the final payment, a retention determined by Owner of up to ten percent (10%) f the Fee claimed in such payment application. The retention shall be released upon Final Acceptance of the Work.

10.3.3. If Owner disputes any item on a payment application, Owner shall promptly notify Contractor in writing of such dispute, who shall respond with verification or an explanation of the disputed item, or a revised payment application. If Owner and Contractor are unable to resolve a disputed item in the Payment Application, the undisputed amount shall be paid to Contractor and any disputed amounts shall be submitted for dispute resolution in accordance with Section 20.

10.3.4. Owner may withhold from any amounts otherwise due to Contractor an amount not exceeding one and one-half (1½) times the amount of any mechanic's lien filed against the Project property.

**11. INDEMNIFICATION**

11.1. To the fullest extent permitted by law, Contractor shall defend, indemnify and hold the Indemnified Parties harmless from and against any and all claims, damages, losses and expenses arising out of or resulting from the negligence of Contractor in the performance of the Work, to the extent covered by the insurance required to be maintained by Contractor, excepting only such injury or harm as may be caused solely and exclusively by the fault or negligence of, or by the willful misconduct of, one or more of the Indemnified Parties. Such indemnity shall extend to claims, demands, or liability for injuries occurring after completion of the Project, as well as during the construction of the Project.

11.2. To the fullest extent permitted by law, Owner shall defend, indemnify and hold Contractor harmless from and against any and all claims, damages, losses and expenses arising out of or resulting from the negligence of one or more of the Indemnified Parties.

**12. SAFETY**

12.1. Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs among its employees in connection with the performance of the Work.

12.2. In performing the Work, Contractor shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent their respective employees from causing damage, injury or loss to:

12.2.1. Employees on the job site and other persons who may be affected thereby;

12.2.2. The Work and materials and equipment to be incorporated therein, whether in storage on or off the site; and

12.2.3. Other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

**13. COORDINATION**

13.1. Contractor acknowledges that if Owner seeks to carry out other works on the Project site concurrently with the Work, it is of paramount importance that all such work be coordinated as appropriate under the circumstances. Accordingly, Contractor shall:

13.1.1. Take all reasonable steps to ensure that the Work is coordinated with the construction of such other works including, if necessary, the preparation of reasonable coordination drawings and specifications;

13.1.2. Shall afford reasonable access to Owner, any public or private utilities, governmental authorities, and others who may be engaged on the Project site.

## 14. CERTIFICATE OF FINAL ACCEPTANCE

14.1. Owner shall issue a Final Acceptance Certificate to Contractor immediately after its confirmation that:

14.1.1. Punch list and other work of a minor nature has been satisfactorily completed;

14.1.2. All final lien releases from Contractor and Subcontractors have been obtained and submitted;

14.1.3. Complete operations and maintenance manuals have been submitted for applicable materials, machinery and equipment incorporated into the Work;

14.1.4. All warranties from Subcontractors, materials suppliers and manufacturers have been submitted;

14.1.5. The final as-built drawings in CAD format have been submitted.

14.2. The issuance of the Final Acceptance Certificate shall commence the Warranty Period.

## 15. WARRANTY

15.1. Contractor warrants that materials and equipment furnished in connection with the Work will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free of defects, and that the Work will conform to the requirements of the Contract Documents, accepted industry standards, and applicable governmental rules. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. Contractor shall be responsible and liable for the correction of any portion of the Work that is not in conformity with the requirements of the Contract Documents. Contractor shall also promptly take all action necessary to prevent similar deficiencies from occurring in the future. If Contractor fails to correct any nonconforming Work within five days of receipt of notice from Owner requesting correction, then Owner may cause the nonconforming Work to be remedied or removed and replaced and may deduct the cost of doing so from any moneys due or to become due Contractor and/or obtain reimbursement from Contractor for such cost.

15.2. For a period of twelve (12) months following issuance of the Final Completion Certificate, Contractor shall, promptly repair any defective or deficient Work. Such repair work shall proceed within five (5) days after written notice from Owner of a defect in the Work. Contractor hereby warrants that the Work will be constructed in accordance with the Design Documents and will be free from defects in workmanship and materials for a period of twelve (12) months from the date of issuance of the Final Acceptance Certificate.

15.3. The obligations of Contractor under this Section are in addition to, and not in lieu of, the rights and remedies available to Owner under applicable law. This Section shall not be deemed a waiver of any statutes of limitation applicable to patent or latent defects in the Work.

## 16. TIME FOR COMPLETION

16.1. Contractor shall undertake and complete the Work in accordance with a Project Schedule to be prepared by Contractor and approved by Owner (the "**Project Schedule**"). The Project Schedule shall be used by the parties for planning and monitoring the progress of the Work. The Project Schedule shall be prepared with the most recent edition of commercially available software designed specifically for the scheduling of construction projects and which utilizes the critical path method of scheduling. Contractor may update the Project Schedule from time to time as needed. Anything to the contrary contained in this Agreement or in any other Contract Documents notwithstanding, this Agreement is not subject to any rigid timetable. The Project Schedule shall only constitute Contractor's good faith estimate of the duration from the date of commencement of construction until the date of completion. The parties acknowledge and agree that the Project Schedule may change as the Work progresses. Upon Owner's reasonable request , Contractor shall update the Project Schedule to reflect Contractor's then good faith estimate of the duration from the date of commencement of construction until the date of completion. Contractor shall perform its obligations as expeditiously as possible, consistent with reasonable skill and care and the orderly progress of the Work.

**17. SUSPENSION / TERMINATION**

17.1. Owner may, at any time and for any reason, order Contractor to suspend all or any part of the Work for the period of time that Owner deems appropriate for the convenience of Owner. Contractor shall promptly recommence all suspended work upon receipt of written notice from Owner directing Contractor to resume work.

17.2. Owner may, at any time and for any reason, terminate this Agreement for Owner's convenience. Upon receipt of a notice from Owner of such termination for convenience, Contractor shall cease performance of the Work, take such action as Owner may direct for the protection and preservation of the Work, and terminate all existing Subcontracts. In case of such termination for convenience, Contractor shall be entitled to payment for the Cost of the Work executed, plus the Fee on such work, and costs reasonably incurred by reason of such termination.

17.3. Contractor may suspend the performance under this Agreement if Owner shall fail to make payment to Contractor within thirty (30) days after the due date of such payment. Such suspension shall continue until payment is made in full, or until this Agreement is terminated pursuant to **Section 17.4**. Contractor shall be entitled to a compensable time extension for the period of suspension, plus any costs or expenses incurred as the direct result of the delay in payment.

17.4. Contractor may, upon ten (10) days written notice, terminate this Agreement, in the following cases:

17.4.1. If Owner fails to make payment to Contractor within thirty (30) days after the due date of such payment, whetherContractor suspended its work pursuant to **Section 17.3**; or

17.4.2. In the event of any material breach of this Agreement by Owner, and a failure to cure such breach within fourteen (14) days after written notice from Contractor; or

17.4.3. If the Work is suspended at Owner's direction for a continuous period in excess of sixty (60) days, unless such suspension is occasioned by Contractor's failure to comply with its obligations under the Contract Documents.

17.4.4. In the event of the bankruptcy or insolvency of Owner.

17.5. Owner may, upon ten (10) days written notice, terminate Contractor's services hereunder in the following cases:

17.5.1. In the event of any material breach of this Agreement by Contractor; and a failure to cure such breach within fourteen (14) days after written notice from Owner to do so; or

17.5.2. In the event of the bankruptcy or insolvency of Contractor.

17.6. Upon receipt of written notice from Owner of such termination for Owner's convenience, Contractor shall:

17.6.1. Cease operations as directed by Owner in the notice;

17.6.2. Take actions necessary, or that Owner may direct, for the protection and preservation of the Work;

17.6.3. Except for Work directed to be performed prior to the effective date of termination stated in the notice, assign to Owner all existing subcontracts and purchase orders and enter into no further subcontracts and purchase orders; and

17.6.4. Promptly prepare a plan of maintenance, security and protection of elements of the Work affected by the termination notice and protection of persons and other properties from damages reasonably likely to arise as a consequence of the termination, which plan shall be submitted to Owner (the "**Protection Plan**"). Items to be included in the Protection Plan shall include, but not be limited to structural elements, water proofing building envelope, life safety issues and site security.

17.7. In case of such termination for Owner's convenience, Contractor shall be entitled to receive (i) payment for Work completed prior to such termination, (ii) costs directly incurred with third parties by reason of such termination, (iii) costs of implementing the Protection Plan and (iv) the Termination Payment.

17.8. Payments due to Contractor under this **Section 17** will be made only after the Project is complete. If the costs and damages incurred by Owner as described in this Section exceed the amounts otherwise due to Contractor, Contractor shall pay the amount of such excess within fifteen days of written demand by Owner.

17.9. In the event of termination by Contractor, Owner shall be obligated to pay Contractor the Cost of the Work completed as of the date of such termination, plus the Fee, reasonable demobilization costs and other costs associated with or necessarily resulting from such termination.

**18. NOTICES**

18.1. Any notice required or permitted under this Agreement shall if communicated by e-mail shall be deemed given on the date sent, or if mailed, three (3) days following deposit in the United States mail, first class postage prepaid and addressed as follows:

CONTRACTOR:

Unvarnished, Inc.
3806 Cross Creek Road, Suite C
Malibu, CA 90265
Attention: Scott Gillen
E-mail: scott@directorsla.com

OWNER: 600 Spring LLC
3806 Cross Creek Unit C
Malibu, CA 90265
Attention: Scott Gillen
E-mail: scott@directorsla.com

Any party may change the address to which notice is to be given to them by written notice to the other party, as necessary.

**19. INSURANCE**

19.1. Contractor will procure, or cause to be procured, before commencement of physical work of construction on the Project, the following Insurance:

19.1.1. Statutory Worker's Compensation and Employer's Liability Insurance covering all Contractor's employees. .

19.1.2. Automobile Liability Insurance coverage with combined single limits of no less than $1,000,000.00 per accident for bodily injury, death, and property damage.

19.1.3. Commercial General Liability Insurance with limits of liability no less than $1,000,000.00 per occurrence, $2,000,000 in the aggregate.

19.2. Contractor shall provide Owner with evidence of the Insurance required of them by this **Section 19**, which evidence shall name Owner, Owner's Employees, Contractor and Contractor's employees and Subcontractors as additional insureds, and to the extent available from Contractor's insurers, shall provide that the policy may only be canceled, reduced, or modified by the insurer upon ten (10) days prior written notice to Owner. Contractor assumes the risk and liability of all casualty losses with respect to the risks described above which are within loss deductible clauses or are not otherwise covered by Insurance.

19.3. Owner and Contractor waive all rights against each other, against each of their agents and employees and against Subcontractors and their respective members, directors, officers, employees, agents and consultants for any claims to the extent covered by Insurance obtained pursuant to this Section 19, except such rights as they may have to the proceeds of such Insurance. Contractor shall require all Subcontractors to provide similar waivers in writing each in favor of all other parties enumerated above. Each policy, including workers' compensation, shall include a waiver of any right of subrogation against the additional insureds (and their respective members, directors, officers, employees, agents and consultants).

**20. CLAIMS/DISPUTE RESOLUTION**

20.1. Claims by Contractor shall be by written notice submitted after Owner's rejection of a Change Order request submitted by Contractor. Such notice shall include all relevant explanatory and back-up documentation, and an explanation regarding the contractual and factual basis for the adjustment, with reference to specific provisions of the Contract Documents. Failure to submit a claim within the time frame described in this **Section 20.1** shall be deemed a waiver of Contractor's rights with respect to such claim.

20.2. Upon submission of a written request for dispute resolution, the parties shall first attempt to resolve through negotiations between Owner and Contractor. Those two individuals shall meet in good

faith within a reasonable time to attempt to resolve the dispute. There shall be at least one meeting to attempt project-level negotiation.

20.3. If the dispute remains unresolved after the passage of thirty days from the submission of a written request for dispute resolution under **Section 20.2**, either party may demand arbitration. Such demand shall be filed and served within fifteen (15) days after the initial submission of a request for dispute resolution. Failure to file and serve a demand for arbitration within this time period shall be deemed a waiver of all rights with respect to such dispute. Despite the filing of a demand for arbitration, the parties shall endeavor to resolve their disputes by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation may be made concurrently with the filing of a demand for arbitration as provided for in this **Section 20**; in such event, mediation shall proceed in advance of arbitration, and the arbitration shall be stayed pending mediation for a period of sixty (60) days from the date of filing, unless the parties agree to a longer period. During such sixty (60)-day period, the parties shall use their reasonable and good faith efforts to meet and to engage in the mediation process. Neither party shall have any obligation to continue mediation beyond the 60-day period described in this Section.

20.4. The mediation shall take place at a location chosen by the mediator which shall be convenient for all parties involved. Any evidence presented during the course of the mediation shall not be admissible in any subsequent judicial proceeding, except to the extent that such evidence is otherwise discoverable.

20.5. Subject to **Sections 20.1** through **20.3**, any controversy arising out of or relating to the performance or interpretation of this Agreement, or the work performed under this Agreement, shall be subject to arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. The arbitrator shall apply California substantive law. The arbitrator shall permit the parties to conduct discovery to the full extent provided by California law, and shall decide any disputes related thereto. The arbitrator(s) shall have the power to grant legal and equitable remedies and award compensatory damages provided by California law, not including punitive damages. The arbitrator(s) shall prepare in writing and provide to the parties an award including factual findings, conclusions of law and the reasons on which the decision is based. The arbitrator(s) shall not have the power to commit errors of law.

20.6. The decision of the arbitrator(s) shall be final but shall be subject to judicial confirmation, correction, or vacation, including the right to request vacation due to the arbitrator's commission of errors of law.

20.7. The prevailing party in any arbitration or subsequent proceeding between the parties hereto seeking enforcement of or to resolve a dispute under the Contract Documents (including appeals) shall be entitled to recover from the losing party reasonable costs and court costs, including reasonable attorney's fees, expert witness fees and the reasonable cost of the arbitrator, as determined by the person(s) resolving the dispute.

20.8. Contractor shall continue to prosecute construction of the Project during the pendency of any arbitration proceedings, provided that Owner continues to make progress payments to Contractor in accordance with the terms of this Agreement.

20.9. Notwithstanding anything to the contrary contained in this **Section 20**, the parties agree that any arbitration arising out of or relating to the Contract Documents shall include, by consolidation, joinder or in any other manner, any additional Person not a party to the Contract Documents if:

20.9.1. Either party requests the addition of such Person;

20.9.2. The requesting party reasonably believes the addition of such Person to be necessary to the resolution of the dispute between the parties; and

20.9.3. The additional Person is a party to a contract with one of the parties hereto, which contract contains the agreement of such additional party to be bound by the arbitration provisions of such contract.

20.10. Contractor agrees to incorporate a dispute resolution provision in each Subcontract requiring the Subcontractor to participate in dispute resolution proceedings hereunder. The expectation is that all disputes subject to alternative dispute resolution under this **Section 20** will be resolved in a single proceeding in which all affected Subcontractors will participate and be bound.

## 21. SOLE AGREEMENT

21.1. The Contract Documents contain the entire agreement between the parties with respect to the subject matter hereof and supersede any and all prior representations, understandings, correspondence or agreements (oral or written) between the parties.

21.2. No amendment of this Agreement or deletion of or addition to its contents shall be valid or binding upon the parties unless such amendment, deletion or addition is contained in a written amendment signed by a duly authorized representative on behalf of each party.

## 22. MISCELLANEOUS

22.1. Contractor declares that it is engaged in an independent business, and agrees to perform the work described in this Agreement as an independent Contractor, and not as an agent, employee, or servant of Owner. Contractor has, and hereby retains, the right to exercise full control and supervision of the work, and full control over the employment, direction, compensation, and discharge of all persons assisting in the work. Contractor agrees to be solely responsible for all matters relating to payment of its employees, including compliance with social security, withholding, and all other regulations governing such matters. Contractor agrees to be responsible for its own acts and those of its subordinates, employees, and Subcontractors during the life of this Agreement.

22.2. Neither Owner nor Contractor may assign their rights and/or obligations under this Agreement, or payments due under this Agreement, without prior written consent of the other party.

22.3. On completion of the Project, Contractor will remove debris and surplus material from the Project site, and will thoroughly clean the Project, leaving it in a neat and broom-clean condition.

22.4. This Agreement shall be executed in duplicate. Each duplicate original copy of this Agreement shall be deemed an original.

22.5. If any provision or Section contained herein shall be found to be invalid or unenforceable, the presence of such invalid or unenforceable provision shall not affect the validity or enforceability of any other provision or Section contained herein.

## 23. GOVERNING LAW

23.1. This Agreement shall be governed by and construed in accordance with the laws of California.

**24. CONTRACTOR'S LICENSE NOTICE.**

Contractors are required by law to be licensed and regulated by the Contractors' State License Board, which has jurisdiction to investigate complaints against contractors if a complaint regarding a patent act or omission is filed within 4 years after the date of the alleged violation. A complaint regarding a latent act or omission pertaining to structural defects must be filed within 10 years after the date of the alleged violation. Any questions about a contractor may be referred to: The Registrar, Contractors' State License Board, P.O. Box 26000, Sacramento, CA 95826.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the date first written above.

**CONTRACTOR:**

**UNVARNISHED, INC.**

By: ______________________
Scott Gillen, President

**OWNER:**

**600 Spring LLC**

By:_______________________________________
Scott Gillen, Manager

# APPENDIX 1

Scope of Work

# EXHIBIT E

# LOAN AGREEMENT

**$260,000,000.00**

A. This Loan Agreement is made in Los Angeles, CA on February 23, 2021 by and between BOBS LLC, a Nevada Limited Liability Company (Lender) on the one hand, and the undersigned, **23800 MALIBU LLC**, a California Limited Liability Company, **600 SPRING LLC**, a California Limited Liability Company, **THE BU HOUSES LLC**, a California Limited Liability Company, **CLIFFSIDE DUME** LLC, a California Limited Liability Company, **Malibu Road #3**, a California Limited Liability Company and **Paradise Cove Malibu LLC** (all LLC's above shall be jointly and collectively referred to as "Borrower") with reference to the following facts:

B. Lender is the current holder of the notes described on **Exhibit A** evidencing loan advances ("Existing Loans") made to certain of the entities comprising Borrower by Lender, Spring Loft 7 LLC, and Royal Equity Lending LLC, each of which has matured. Lender and Borrower are entering into this Agreement and the other Loan Documents (defined below) to extend the maturity date of the Existing Loans and amend, restate, and consolidate the notes evidencing the Existing Loans and provide for additional loan advances to be made by Lender to Borrower on the terms and conditions of this Agreement.

C. Borrower has requested Lender to lend to the Borrower additional money as the proceeds of which Borrower presently intends will be used solely and exclusively by Borrower for commercial and/or investment purposes.

D. Lender has agreed to make additional loan advances (together with the Existing Loans, hereinafter called "Loan") to Borrower, which together with the principal amounts of the Existing Loans, will be in the aggregate principal amount of up to **Two Hundred Sixty Million ($260,000,000)** (hereinafter called "Loan Amount"). The Existing Loans and the additional loan advances will be evidenced by a new Secured Promissory Note executed concurrently herewith (hereinafter called "Note"), and any notes evidencing the Existing Loans will be cancelled.

E. The Note will be secured by a Deed of Trust providing **1)** A First (1st) Priority lien on land and improvements located at 23800 Malibu Crest Dr. Malibu, CA 90265 (APN 4458-024-038 in Los Angeles County) **2)** A Second (2nd) Priority lien junior only to Bank Hapoalim loan on land and improvements located at APNs 4458-018-039, 4458-018-037, 4458-018-038, 4458-018-906, 4458-018-035, 4458-018-041, 4458-018-036, 4458-018-907 in Los Angeles County **3)** A First (1st) Priority lien on APN 081-021-005 in San Luis Obispo County and any other land and improvements in the vicinity owned by The BU Houses LLC **4)** A Second (2nd) Priority lien on land and improvements located at 24689 Pacific Coast Highway, Malibu, CA 90265 (APN 4458-041-004) **5)** A First (1st) Priority lien on land and improvements located at 29215 Cliffside Dr. Malibu, CA 90265, and **6)** A First (1st) Priority lien on Borrower's interest in the land and improvements located at 24266 Malibu Rd. Malibu, CA 90265 (APNs 4458-011-010 and 4458-011-011) and the parcels owned by Greenmilk LLC which shall be further described in the Legal Description attached to the Deed of Trust securing this Loan.

Documents evidencing or securing the Loan will be hereinafter referred to as the "Loan Documents." Any capitalized term not specifically defined herein shall have the meaning assigned to it in the Deed of Trust.

This Loan shall be further secured by a Continuing Guaranty executed and delivered to Lender concurrent with loan documents and executed by Scott Gillen, an Individual.

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration receipt of which is hereby acknowledged, the parties hereto, hereby agree as follows:

**ARTICLE 1 – COVENANTS OF BORROWER.**

1.1 **Title to Properties**. Borrower warrants and covenants that they hold title to the properties at the close of escrow with no liens or encumbrances against the Properties except as disclosed in the Preliminary Title Report.

1.2 **Delinquent Property Taxes**. Borrowers warrant and covenant that they shall pay all delinquent property taxes, due or past due, including penalties and interest on the Properties from the proceeds of this Loan.

1.3 **Maintenance and Preservation of the Properties**. Borrower agrees (a) to keep the Properties in good condition and repair; (b) not to commit or permit any waste or deterioration of the Properties; (c) not to commit or permit any removal, demolition or substantial alteration of those Properties except for such alterations as may be required by any law, ordinance, rule, regulation or order of any governmental authority having jurisdiction over the Properties and except for new construction, alterations, and renovations intended to increase values, which are now or hereafter approved by applicable governmental authorities;(d) to complete in good and workman like manner any construction or restoration which may be performed on the Properties; (e) to promptly restore any portion of the Properties which may be damaged or destroyed, to the extent insurance proceeds to pay for the restoration are received; (f) not to permit any mechanics' or material men's liens against the Properties, unless they are being contested by Borrower; (g)not to initiate or acquiesce in any change of zoning or other land classification which affects the Properties without Lender's prior written consent, except as necessary in connection with the permitted new construction, alterations, and renovations described (c) above; and (h) to perform each of the obligations set forth in the Note.

1.4 **No Violation**. Borrower shall not commit, permit or allow to exist any violation of any law, ordinance, rule, regulation or order of any governmental authority having jurisdiction over the Properties or the Collateral or any other matter of record affecting the Property or the Collateral.

1.5 **Insurance.**

**Insurance Policies.** Borrower shall, at all times, provide, maintain and keep in force insurance against fire, lightning and windstorm, vandalism, malicious mischief and such other hazards commonly covered by "extended coverage" or "all risks" policies for Borrower, the Properties, the Improvements and the collateral. All policies shall provide full replacement cost coverage, without coinsurance, but in no event less than the aggregate for the Improvements on the Land and shall be with such companies and on such forms as have been approved by Lender. Lender shall be named as an additional insured mortgagee/loss payee on all such policies. Borrower shall also provide, maintain, and keep in force earthquake insurance in an amount equal to the

replacement value of the Property, the Improvements, and the collateral, and with a deductible no greater than five percent (5.00%), on which policy Lender shall be named as the mortgagee/ loss payee/ additional insured.

**Evidence of Coverage**. Borrower shall furnish to Lender an original certificate of each insurance policy as to the Properties and Borrower, and, at least thirty (30) days prior to expiration of any such policy, proof of issuance of a policy continuing in force the coverage provided by the expiring policy. If Borrower shall fail to maintain the insurance coverage required by the Loan Documents, Lender may (but shall be under no obligation to) take out the required policies of insurance and pay the premiums on the same and provide for payment thereof; and all amounts so advanced therefore by Lender shall become an additional obligation of Borrower to Lender, which amount , together with interest thereon from the date of payment at the Interest Rate then in effect t(as defined and provided for in the Note). Borrower agrees to pay all such amounts within five (5) days of demand by Lender.

**Casualty Notice.** After the happening of any casualty or event insured against as required by the Deed of Trust, Borrower shall give prompt written notice thereof to Lender.

**Assignment of Proceeds.** Borrower hereby absolutely and unconditionally assigns to Lender all insurance proceeds which Borrower may be entitled to receive. All such proceeds shall be delivered to and held by Lender to be applied to Lender's expenses in settling, prosecuting or defending any insurance claim, and then, subject to the satisfaction of all of the conditions set forth below, to the restoration of any portion of the Properties and/or the Collateral that has been damaged or destroyed to the same condition, character and value as existed prior to such damage or destruction. The conditions to such use are: (a) an event which is, or with notice or the passage of time or both would constitute, an Event of Default shall not have occurred; (b) Lender’s security is not materially impaired, as determined by Lender; (c) all income from the Properties (from sales, leases, insurance or otherwise) required to pay all debt service and operating expenses of the Properties after such restoration will be equal to or greater than the income which was required to pay such debt service and operating expenses prior to the casualty; (d) Borrower provides evidence satisfactory to Lender that the insurance required to be maintained hereunder will be available to Borrower during restoration and thereafter; (e) Lender shall have approved the plans and specifications for such restoration; and (f) if, in Lender's sole judgment, the insurance proceeds are not sufficient to accomplish restoration,: Borrower deposits with Lender, within five days of demand by Lender, the additional amounts necessary to accomplish restoration. Proceeds disbursed for restoration will be released to Borrower under the procedures of Lender's then current customary disbursement procedures . If any of the conditions set forth above are not satisfied or if Borrower fails to commence restoration of the Properties within thirty (30) days after receipt of such proceeds by Lender, or if Borrower fails to diligently pursue such restoration *to* completion, then Lender shall have the option to either apply the insurance proceeds upon any indebtedness secured hereby in such order as Lender may determine or release such proceeds to Borrower without such release being deemed a payment of any indebtedness secured hereby, rather than to apply such proceeds *to* the restoration of the Properties and/or the Collateral. Such application or release shall not cure or waive any Default or Event of Default or notice of default hereunder or invalidate any act done pursuant to such notice. If the Properties and/or the Collateral is restored at a cost less than the available insurance proceeds, if there are then no amounts due and payable under the Loan Documents, and if Borrower is not then in

Default under the Loan Documents, then such excess proceeds shall be paid over to Borrower. Lender may commence, appear in, defend or prosecute any assigned claim or action, and may adjust, compromise, settle and collect all claims, proceeds and awards assigned to Lender, but shall not be responsible for any failure to collect any claim, proceeds or award, regardless of the cause of the failure. As used in this Section, the term "Lender" shall be deemed to include any parent company of Lender and/or its affiliates or subsidiaries.

(a) **Transfer of Policy.** In the event of the foreclosure of the Deed of Trust or other transfer of the title to the Properties in extinguishment, in whole or in part, of the indebtedness secured by the Deed of Trust, all right, title and interest of Borrower in and to any insurance policy then in force shall pass to the purchaser or grantee.

1.6 **Use of Proceeds.** Loan proceeds are intended to be used primarily for business and commercial purposes and are not intended to be used for personal, family, or household purposes or in any manner which may result in the loan transaction not being exempt from Truth in Lending Act (TIL A). 15 U.S.C.A. § 1602(h) or any similar or applicable consumer lending laws.

**ARTICLE 2 - IMPOUNDS, REIMBURSEMENTS AND MISCELLANEOUS.**

2.1 **Impounds.** Upon demand by Lender, Borrower shall pay to Lender on the first day of each month, together with and in addition to the regular installments of principal and interest due under the Note, until the indebtedness secured hereby is paid in full, an amount equal to one-twelfth (1/12) of the yearly taxes and assessments, insurance premiums, ground lease rentals and other similar charges as estimated by Lender tobe sufficient to enable Lender to pay at least thirty (30) days before they become due, all taxes,assessments, insurance premiums, ground lease rentals and other similar charges against the Properties.Lender shall not be obligated to pay interest on any such sums. Upon demand of Lender, Borrower shall deliver to Lender such additional sums as-are necessary to enable Lender to pay such taxes, assessments, insurance premiums and similar charges.

2.2 **Reimbursement**. Borrower shall pay immediately, without demand, after expenditure, all sums expended or expenses incurred by Trustee and/or Lender in acting under any of the terms of this Loan Agreement, the Deed of Trust or any other Loan Document, including, without limitation, any fees and expenses (including reasonable attorneys, fees) incurred in connection with any reconveyance of the : Properties or any portion thereof, or to compel payment of the Note or any portion of the indebtedness evidence there by or in connection-with any default thereunder, including without limitation attorneys, fees incurred in any bankruptcy or judicial or nonjudicial foreclosure proceeding, with interest from date of expenditure at the default rate provided for in the Note, and said sums shall be secured by the Deed of Trust.

2.3 **Lender's Statement Fee:** Borrower shall pay the amount demanded by Lender or its authorized Servicing agent for any statement-regarding the obligations secured by the Deed of Trust; provided, however, that such amount may not exceed the maximum amount allowed by law at the time request for the statement is made.

## ARTICLE 3 - CONDEMNATION.

3.1 **Condemnation.** If the Properties, the Collateral or any part thereof, is taken or damaged by reason of any public improvement or condemnation proceeding, or in any other manner, Lender shall be entitled to all compensation, awards and other payment or relief therefore to which Borrower shall be entitled, and shall be entitled at its option to commence, appear in and prosecute in its own name any action or proceeding or to make any compromise or settlement in connection with such taking or damage to the extent of the interests of Borrower therein, but Lender shall not be responsible for any failure to collect any claim or award, regardless of the cause of the failure. Borrower hereby absolutely and unconditionally assigns to Lender all such compensation, awards, damages, rights of action and proceeds to which Borrower shall been titled (the "Condemnation Proceeds"), and Lender shall, after deducting therefrom all its reasonable expenses, including attorneys' fees, apply or release the Condemnation Proceeds with the same effect and as provided in Section 1.5(d) above, with respect to disposition of insurance proceeds; provided, however, that if there are any excess Condemnation Proceeds after application thereof to the restoration of the Properties or the Collateral, as applicable, Lender shall be entitled to apply such excess to the reduction of the principal balance due under the Note without any adjustment in the dollar amount of the regular installments due under the Note. Borrower agrees to execute such further assignments of the Condemnation Proceeds as Lender or Trustee may require. Nothing herein contained shall prevent the accrual of interest as provided in the Note on any portion of the Condemnation Proceeds to be applied to the principal balance due under the Note until the Condemnation Proceeds are received by Lender.

## ARTICLE 4 - PROTECTION OF PROPERTIES.

4.1 **Preservation of Lien:** Borrower shall do any and all acts which, from the character or use of the Properties or the Collateral, maybe reasonably necessary to protect and preserve the lien, the priority of the lien and the security of Lender granted by the Deed of Trust, the specific enumerations herein not excluding the general. All equipment and personal property, fixtures and other property subject to the lien of the Deed of Trust shall be fully paid for by Borrower and no security interest, Lien or other encumbrance other than the permitted exceptions, shall exist thereon.

4.2 **Compliance with Properties Restrictions.** Borrower will faithfully perform each and every covenant to be performed by Borrower under any lien or encumbrance upon or affecting the Properties or the Collateral, including, without limiting the generality hereof, mortgages, deeds of trust, Leases, declarations of covenants, easements, conditions and/or Restrictions (as defined below) and other agreements which affect the Properties, in law or inequity. A breach of or a default under any such lien or encumbrance shall constitute a default under the Deed of Trust.

4.3 **No Recordation or Filing**. Lender shall not record the Deed of Trust, the Note, Membership Interest Pledge Agreements, or any other Related Documents or file any UCC-1 Financing Statements naming any Borrower or any pledgor under the Membership Interest Pledge Agreement as a debtor..

## ARTICLE 5 - RESTRICTIONS ON TRANSFER.

**INTENTIONALLY OMITTED ARTICLE 5**

## ARTICLE 6 - EVENTS OF DEFAULT.

6.1 **Payment** Borrower fails to make any payment when due under the Note; including, but not limited to all principal, extension fees and the payment due on Maturity Date, which is not cured within five (5) days after Lender delivers notice of the failure to Borrower.

6.2 **Other Defaults in Obligations to the Lender.** Borrower fails to perform any other term, obligation, covenant, or condition contained in the Note or in any of the related documents or in any other agreement between Lender and Borrower, which is not cured within the cure period provided in the Note, which is not cured within thirty (30) days after Lender delivers notice of the default or event of default to Borrower, or if the default or Event of Default cannot reasonably be cured within thirty (30) days, then such longer period as may be necessary to cure it as long as Borrower is proceeding with due diligence to cure.

6.3 **Event of Default Under Related Documents.** An Event of Default occurs under the terms of any promissory note, deed of trust, loan agreement, pledge agreement, security agreement or other agreement ("Related Documents"), which is not cured within thirty (30) days after Lender delivers notice of the default or event of default to Borrower, or if the default or Event of Default cannot reasonably be cured within thirty (30) days, then such longer period as may be necessary to cure it as long as Borrower is proceeding with due diligence to cure.

6.4 False Statement. Any statement, representation, or warranty which Borrower makes to Lender or is made on Borrower's behalf with respect to this Note or the Loan Documents as defined in the Trust Deed of even date as "Related Documents" is false or misleading in any material respect either when made or at any time thereafter. Borrower shall promptly disclose circumstances which make the statement false or misleading

6.5 **Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any of the secured property including, for example, a garnishment of any of Borrower's accounts with Lender or others. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and Borrower gives Lender written notice of the proceeding and deposits with Lender monies or a surety bond in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

6.6 **Death or Insolvency.** The death of Borrower or, if Borrower is an entity, the dissolution or the termination of its right to do business or the cessation of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout or the commencement by Borrower of any proceeding under any bankruptcy or insolvency laws or the commencement of such proceedings by a creditor not dismissed within thirty (30) days.

Should an Event of Default occur, the compounded interest rate shall increase to fifteen percent (15%) per year, compounded daily.

## ARTICLE 7 - REPRESENTATIONS AND WARRANTIES.

7.1 **Restrictions and Contracts.** Borrower is familiar with all zoning matters, covenants, conditions, restrictions, easements, and all other matters affecting the title or use of the Properties (collectively the "Restrictions") that affect the Properties and the contemplated us of the Properties. Borrower has obtained, or will be able to obtain, all permits, approvals, consents and other authorizations necessary under the Restrictions for such use. There is no violation or asserted violation of any Restrictions concerning any of the Properties or the existing or

contemplated use thereof. Borrower is not aware of any action or proceeding pending or threatened before any court or governmental agency with respect to the validity of any such Restrictions or any of such authorizations or permits.

7.2 **Non-Foreign Entity:** Tax Identification Number. Section 1445 of the Internal Revenue Code of 1986, as amended (the "Code"),provides that a transferee of a real property interest in the United States must withhold tax if the transfer or is a foreign person. To inform Lender that the withholding of tax will not be required in the event of a disposition of the Properties pursuant to the terms of this Agreement and the Deed of Trust, Borrower hereby certifies that Borrower is not a foreign person, foreign corporation, foreign partnership, foreign trust or foreign estate (as such terms are defined in the Code and the regulations promulgated thereunder) and that its principal place of business is at the address set forth for notices to Borrower below. Lender may disclose the contents of this certification to the Internal Revenue Service.

7.3 **Commercial Purpose.** Borrower intends to use the Loan proceeds solely for business or commercial proposes and does not presently intend to use any *portion* of the loan proceeds for personal, family or household purposes. The Properties are not occupied by the Borrower as the Borrower's principal residence. The extension of the loan contemplated by this Loan Agreement does not constitute *"Consumer credit"* as said terms defined in 12 CFR Ch.II PART226— TRUTH IN LENDING (REGULATIONZ).

**ARTICLE 8 – MISCELLANEOUS.**

8.1 **Loan Fees, Costs and Prepaid Interest**. Interest rate shall be 12% (Twelve Percent) per year compounded daily. Compounded interest is the addition of interest to the principal sum of a loan or deposit, or in other words, interest on interest. It is the result of reinvesting interest, rather than paying it out, so that interest in the next period is then earned on the principal sum plus previously accumulated interest. As Borrower will be making periodic draw requests, Borrower shall only be responsible for paying interest on actual money borrowed. Lender reserves the right to deny draw if draw does not match draw schedule.

8.2 **Successors in Interest and Interpretation**. This Loan Agreement applies to, inures to the benefit of, and binds all parties here to, their heirs, legatees, devisees administrators, executors, successors and assigns. The term "Lender" shall mean the owner and holder, including pledgees, of the Note, now or hereafter and whether or not named as Lender herein. In this Loan Agreement, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural the word " person" shall include corporation, partnership or other form of association. Any reference in this Loan Agreement to any document, instrument or agreement creating or evidencing an obligation secured hereby shall include such document, instrument or agreement both as originally executed and as it may from time to time be modified.

8.3 **Severability.** If any provision hereof should be held unenforceable or void, then such provision shall be deemed separable from the remaining provisions and shall in no way affect the validity of this Loan Agreement.

8.4 **Notices.** All notices and demands expressly provided hereunder to be given by Lender to Borrower and all notices, demands and other communications of any kind or nature whatever which Borrower may be required or may desire to give to or serve on Lender shall be in writing, shall be addressed to the appropriate address set forth in this section, or at such other place as Borrower, Lender or Trustee, as the case may be, may from time to time designate in writing by ten (10) days prior written notice and shall be (a) hand- delivered, effective upon receipt, (b) sent by United States Express Mail or by private Overnight courier, effective upon receipt, or (c) served by certified mail, return receipt requested, deposited in the United States mail, with postage thereon fully prepaid and addressed to the party so to be served and shall be deemed effective on the day of actual delivery as shown by the addressee's return receipt or the

expiration of three(3)business days after the date of mailing, whichever is the earlier in time. The addresses of the parties are as follows:

To Borrower: c/o Scott Gillen
Unvarnished
3806 Cross Creek Road, Suite C
Malibu, CA 90265

To Lender: BOBS LLC
600 S. Spring St. #106
Los Angeles, CA 90014

8.5 **Obligations of Borrower Joint and Several**. If more than one person or entity has executed this Loan Agreement as "Borrower", the obligations of all such persons/entities hereunder shall be joint and several.

8.6 **Representative Capacity**. If Borrower is an entity other than an individual, the person signing on behalf of the entity warrants and represents that they have the full authority to execute the Loan Documents on behalf of the entity and that no other consent or permission is required from any other person or entity to bind the Borrower. The signator hereby agrees to defend, indemnify, and hold harmless the Lender from any and all claims, demands, costs or expenses, including attorney's fees, which may be incurred as the result of a claim by a third party that the signator lacked the authority to sign the Loan Documents on behalf of the Borrower.

8.7 **Further Assurances and further Execution and Delivery of Documents**. Borrower agrees to execute, acknowledge and deliver such documents and take such action as Lender shall determine at any time to be necessary or desirable to further evidence, perfect or continue the perfection and/or the priority of any lien or security interest granted by Borrower or to carry out the intent of any of the provisions of the Loan Documents.

8.8 **Title Exceptions:** Borrower shall not impose any restrictive covenants, easements, rights of way or encumbrances upon the Properties without the prior written consent of Lender.

**8.9 Provide Notices**

**(a) Injunction Defense and Notice:** If any proceedings are filed seeking to enjoin or otherwise prevent or declare invalid or unlawful the construction of any Improvements or the occupancy, maintenance or operation of the Properties or the Improvements or any portion thereof, Borrower will give prompt written notice thereof to Lender and will cause such proceedings to be vigorously contested in good faith and, in the event of any adverse ruling or decision, prosecute **all** allowable appeals.

**(b) Notices Received:** Borrower shall comply with and promptly furnish to Lender true and complete copies of any notices by any Governmental Agency which exercises jurisdiction over Borrower or the Properties which notices, or the conditions described therein could adversely affect the Properties or Improvements. Borrower shall promptly notify Lender of any fire or other casualty causing a loss of $10,000 or more or any notice of taking or eminent domain proceeding. affecting any Properties. Borrower shall promptly notify Lender of any action, proceeding or investigation of the nature described in Section 8.8 (a) above of which it acquires notice.

**(c) Permits and Warranties:** Promptly upon request by Lender, Borrower shall furnish Lender with true and complete copies of all licenses, permits, approvals, exemptions and other authorizations required in connection with any Properties and (b) all warranties and guaranties

received from any party furnishing labor, materials, equipment, fixtures or furnishings in connection with any Properties.

8.10 **Attorneys' Fees**. Upon election of either Lender or Trustee so to do, employment of an attorney is authorized, and payment by Borrower of all attorneys' fees, costs and expenses in connection with any action or actions (including the cost of evidence or search of title) which maybe brought for the foreclosure of the Deed of Trust, for possession of the Properties covered hereby, for the appointment of a receiver, and/or for the enforcement of any covenant or right in the Deed of Trust or any other Loan Document contained as hereinafter provided, shall be the obligation of Borrower and shall be secured by the Deed of Trust.

8.11 **Headings.** The headings of each paragraph are for convenience only and shall be disregarded in construing this Loan Agreement

8.12 **No Partnership: Indemnity.** Lender shall not be deemed *to* be a partner, joint venturer,. alter-ego, manager, controlling person or other business associate or participant of any kind of or with Borrower or any other Partnership in connection with the Loan or any action taken under this Loan Agreement. Lender's activities in connection with the Loan shall not be "outside the scope of the activities of a lender of money" within the meaning of California Civil Code section 3434, as modified or recodified from time to time, and Lender does not intend to ever assume any responsibility to any person for the quality or safety of the Properties or the Improvements. Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of Borrower. Borrower shall indemnify, hold Lender harmless and defend Lender from and against any and all loss, cost, damage, expense or liability, including reasonable attorneys' fees, arising out of or resulting from the Properties or Improvements The provisions of this Sections shall survive payment of the Loan.

8.13 **Governing Law.** This Loan Agreement shall be construed and enforced in accordance with the laws of the State of California. Any and all disputes between the parties which may arise pursuant to this Loan Agreement shall be heard and determined pursuant to the Arbitration Agreement being executed by the parties concurrently with this Loan Agreement. The parties hereto acknowledge that the Arbitrator bas the jurisdiction to interpret and enforce the provisions of *this* Loan Agreement, and the parties waive any and all objections that they may have as to jurisdiction or venue.

8.14 **Waiver of Jury Trial.** In the event of a dispute between the Parties hereto or their representatives concerning any provision of this Agreement or the rights and duties of any person or entity hereunder, the Parties knowing and intentionally waive their right to a jury trial to the extent permissible under California law.

8.15 **Entire Agreement** This Loan Agreement, together with the other Loan Documents constitute the parties' entire agreement with respect to· the subject matter hereof and supersede all agreements, representations, warranties, statements, promises, and understandings, whether oral or written, with respect to the subject matter herewith. None of the Loan Documents may be amended, altered, or modified except by a writing signed by Lender, or its assigns, and then only to the extent therein specially set forth.

8.16 **Representation by Counsel.** Borrower acknowledges and represents that they have been advised to seek the advice of counsel of their choosing to advise them and/or represent them with regard to this transaction and any decision not to seek counsel is being made of their own personal volition.

8.17 **Execution of Further Documentation** Borrower acknowledges and agrees, upon reasonable notice from Lender, to execute and deliver any and all additional documents reasonably required by Lender relating in any way to the Loan and the Loan Documents at any time throughout the term of this Loan and at any time while balances remain due and outstanding under the Loan and the Loan Documents.

8.18 **Accounting of Unpaid Balance**. Within ten (10) days after delivery of a request of Borrower, Lender shall deliver to Borrower a detailed accounting of the outstanding amount of the Loan, including the amount of each advance of principal of the Loan and the amount of accrued interest thereon. Such accountings shall not be binding on Borrower as to the amount due and shall be subject to confirmation by Borrower of the amount due.

8.19 **Only Guaranty**. The Guaranty being execute being executed by Scott Gillen concurrently with this Agreement shall be the only guaranty of the Loan, and any guarantees previously given by Scott Gillen or anyone else of all or any part of the indebtedness being consolidated into the Loan are terminated and shall be of no further force or effect.

**ARTICLE *9*- LENDER'S FURTHER CONDITIONS PRECEDENT TO FUNDING.**

9.1 **Conditions.** The effectiveness of this Agreement shall be subject to the following conditions precedent being met to Lender's satisfaction, or Lender's waiver in writing of any such conditions precedent that remain unsatisfied, time being of the essence. Each condition is for the exclusive benefit of Lender, and only may be waived by Lender, but any waiver must be in writing and signed by Lender in order to be effective. The "effective date" of this Agreement shall be the date all of the conditions set forth in this paragraph are met to Lender's satisfaction or waived in writing by Lender.

(a) The Loan Documents shall have been duly executed by Borrower and delivered to Lender.

(b) Borrower's delivery of written verification satisfactory to Lender that they are noting default of any of the notes and loan documents relative to loans which are secured by liens against the Properties superior to the Lender's lien.

(c) Lender shall have received satisfactory confirmation that it has been named mortgage holder/loss payee on Borrower's property and casualty policy.

**IN WITNESS WHEREOF, Borrower and Lender have executed this Loan Agreement as of the day and year first written above.**

**BORROWER:**

______________________________________

600 Spring LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

______________________________________

Cliffside Dume LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

______________________________________________
The BU Houses LLC by Scott Gillen (C64829 LLC) who holds an undivided 40% beneficial ownership interest

______________________________________________
Green Milk LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial interest

______________________________________________

The Malibu Road #3 LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

______________________________________________

23800 Malibu Crest LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial interest

# EXHIBIT F

# DEED OF TRUST

This Deed of Trust, made this 23rd day of February 2021, among the Trustor, **23800 MALIBU CREST LLC**, a California Limited Liability Company, **600 SPRING LLC**, a California Limited Liability Company, **THE BU HOUSES LLC**, a California Limited Liability Company, **CLIFFSIDE DUME** LLC, a California Limited Liability Company, **Malibu Road #3 LLC**, a California Limited Liability Company and **GREENMILK LLC** (herein jointly and collectively referred to as "Borrower"), BOBS, LLC, a Nevada Limited Liability Company as to an undivided 100.000% Interest (herein "Lender") and BOBS, LLC, a Nevada Limited Liability Company (herein "Trustee").

The beneficiaries (or assignees) of this deed of trust have agreed in writing to be governed by the desires of the holders of more than 50% of the record beneficial interest therein with respect to actions to be taken on behalf of all holders in the event of default or foreclosure or for matters that require direction or approval of the holders, including designation of the broker, servicing agent, or other person acting on their behalf, and the sale, encumbrance or lease of real property owned by the holders resulting from foreclosure or receipt of a deed in lieu of foreclosure.

**GRANT IN TRUST**

BORROWER, in consideration of the indebtedness herein recited and the trust herein created as evidenced by Promissory Note of even date as this Deed of Trist, irrevocably grants, transfers, conveys and assigns to Trustee, in trust, with power of sale, a Deed with security that is cross-collateralized by:

1) A FIRST (1ST) Position Deed of Trust on 23800 Malibu Crest Dr. Malibu, CA 90265 (APN 4458-024-038 in Los Angeles County).

2) A SECOND (2ND) Position Deed of Trust on the "Case Properties" comprising APNs 4458-018-039, 4458-018-037, 4458-018-038, 4458-018-906, 4458-018-035, 4458-018-041, 4458-018-036, 4458-018-907 in Los Angeles County.

3) A FIRST (1ST) Position Deed of Trust on the "Bu House Properties" (APN 081-021-005) in San Luis Obispo County.

4) A FIRST (1ST) Position Deed of Trust on 29215 Cliffside Dr. Malibu, CA 90265 (APN 4468-003-005)

5) A FIRST (1ST) Position Deed of Trust on 24266 Malibu Rd. Malibu, CA 90265 comprising APNs 4458-011-010 and 4458-011-011

6) A FIRST (1ST) Position Deed of Trust on the "Greenmilk Property" (APN 080-021-005) in San Luis Obispo County.

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents (subject however to the rights and authorities given herein to Lender to collect and apply such rents), royalties, mineral, oil and gas rights and profits, water, and water rights, and water stock, and all fixtures now or hereafter attached to the property, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the property covered by this Deed of Trust; and all of the foregoing, together with said property (or the leasehold estate if this Deed of Trust is on a leasehold) are herein referred to as the "Property". **THIS DEED OF TRUST IS MADE TO SECURE TO LENDER:** a) the repayment of the indebtedness evidenced by Borrower's note (herein "Note") dated February 23, 2021, in the principal sum of U.S. **Two Hundred Sixty Million Dollars ($260,000,000.00),** with payment of interest thereon, the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Deed of Trust: the performance of the covenants and agreements of Borrower herein contained: and (b) repayment of any future advances, with interest thereon, made to the Borrower by Lender pursuant to paragraph 19 hereof (herein "Future Advances"); and in addition (c) this Deed of Trust shall provide the same security on behalf of the Lender, to cover extensions, modifications or renewals, including without limitation, extensions, modifications or renewals of the Note at a different rate of interest; and the performance of the covenants and assessments, if any) which may attain priority over this Deed of Trust, and ground rents on the Property, if any, , all as reasonably estimated initially and from time to time by Lender on the basis of assessments and bills and

reasonable estimates thereof. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional Lender.

If Borrower pays Funds to Lender, the Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a Federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay said taxes, assessments, insurance premiums and ground rents. Lender may not charge for so holding and applying the Funds, analyzing said account or verifying and compiling said assessments and bills, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing at the time of execution of this Deed of Trust that interest on the Funds shall be paid to Borrower, and unless such an agreement is made or applicable law requires such interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Deed of Trust.

If the amount of Funds held by Lender, together with the future monthly installments of Funds payable prior to the due dates of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents, such excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly installments of Funds. If the amount of the Funds held by Lender shall not be sufficient to pay taxes, assessments, insurance premiums and ground rents as they fall due, Borrower shall pay to Lender any amount necessary to make up the: deficiency in one or more payments as Lender may require.

Upon payment in full of all sums secured by this Deed of Trust, Lender shall promptly refund to Borrower any Funds held by Lender. If under Paragraph 18 hereof the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Deed of Trust.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs I and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, if applicable, then to interest payable on the Note, then to the principal of the Note, and then to interest and principal on any Future Advances.

**4. Prior Mortgages and Deeds of Trust; Liens.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid, at least 10 days before delinquency, all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Deed of Trust, and leasehold payments or ground rents, if any.

**5. Hazard Insurance.** Borrower agrees to provide, maintain and deliver to Lender fire insurance satisfactory and with loss payable to Lender. The amount collected under any fire or other insurance policy may be applied by Lender upon any indebtedness secured hereby and in such order as Lender may determine, or at option of Lender the entire amount so collect, or any part thereof may be released to the Borrower. Such application or release shall not cure or waive any Default or Notice of Default hereunder or invalidate any act done pursuant to such notice.

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust.

In the event of a loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is abandoned by Borrower, or if Borrower rails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply their insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Deed of Trust.

If Borrower obtains earthquake, flood or any other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by the Lender, then such insurance shall: (i) name the Lender as loss payee thereunder, and (ii) be subject to all of the provisions of this paragraph *5*.

**6. Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Deed of Trust is on a leasehold. If this Deed of Trust is on a unit in a condominium or a planned unit development,

Borrower shall perform all of Borrower's obligations under the declaration of covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

**7. Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Deed of Trust, or if any action or proceeding is commenced which affects Lender's interest in the Property, including but not limited to proceedings by the Lender to obtain relief from stay in any bankruptcy proceeding which would prohibit Lender enforcing its rights under she Deed of Trust, then Lender, at Lender's option, may make such appearances, disburse such sums, including reasonable attorney's fees, and take such action as is necessary to protect Lender's interest. If Lender required mortgage insurance as a condition of making the loan secured by this Deed of Trust, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with the Borrower's and Lender's written agreement or applicable law.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, including but not limited to payment of delinquent taxes and assessments, insurance premiums due, and delinquent amounts owed to prior lien holders, shall become additional indebtedness of Borrower secured by this Deed of Trust. Such amounts as are disbursed by Lender shall be payable, upon notice from Lender to Borrower requesting payment thereof, and shall bear interest from the date of disbursement at the rate payable on the Note. Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.

**8. Inspection.** Lender may make or cause to be made reasonable entries upon and inspection of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefore related to Lender's interest in the Property.

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in conjunction with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust.

**10. Borrower Not Released.** At any time or from time to time, without liability therefore and without notice upon written request of Lender and presentation of this Deed and said Note for endorsement, and without affecting the personal liability of any person for payment of the indebtedness secured hereby, Trustee may: reconvey any part of said property; consent to the making of any map or plat thereof, join in granting any easement thereon; or join in any extension agreement or any agreement subordinating the lien or charge thereof. Trustee may, but shall be under no obligation or duty to, appear in or defend any action or proceeding purporting to affect said property or the title thereto, or purporting to affect the security heretofore the rights or powers of Lender or Trustee.

**11. Forbearance by Lender Not a Waiver.** Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not **be a** waiver of or preclude the exercise of any such right or remedy. The procurement of insurance or the payment of taxes or other liens or charges by Lender shall not **be a** waiver of Lender's right to accelerate the maturity of the indebtedness secured by this Deed of Trust.

**12. Remedies Cumulative.** All remedies provided in this Deed of Trust are distinct and cumulative to any other or remedy under this Deed of Trust or afforded by law or equity, and may be exercised concurrently, independently or successively.

**13. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 18 hereof. All covenants and agreements of Borrower shall be joint and several.

**14. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Deed of Trust shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower or the Property at 3806 Cross Creek Road, Suite C, Malibu, CA 90265 or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail to Lender, in care of Lender's Servicing Agent ("Agent"), BOBS LLC, LLC located at 600 S. Spring St. Unit Office Los Angeles CA 90014 or to such other address as Lender or Agent may designate by notice to Borrower as provided herein. Any notice provided for in this Deed of Trust shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**15. This Deed of Trust shall be governed by the Laws of the State or California.** In the event that any provision or clause of this Deed of Trust or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Deed of Trust or the Note which can be given effect without the conflicting provision, and to this end the provisions of the Deed of Trust are declared to be severable.

**16. Intentionally Deleted.**

**BORROWER AND LENDER FURTHER COVENANT AND AGREE AS FOLLOWS:**

**17. Assignment of Rents; Appointment of Receiver; Lender in Possession.** As additional security hereunder, and without regard to the adequacy of any security for the indebtedness hereby secured, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under

paragraph 18 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 18 hereof or abandonment of the Property, Lender, in person, by Agent or by judicially appointed receiver shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorney's fees, and then to the sums secured by this Deed of Trust. Lender and the receiver shall be liable to account only for those rents actually received.

**18. Default.** Upon an Event of Default under the Loan Agreement of even date between Borrower and Lender, Lender may declare all sums secured hereby immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written Notice of Default and of election to cause to be sold said property, which notice Trustee shall cause to be filed for record. Trustee shall be entitled to rely upon the correctness of such notice. Lender also shall deposit with Trustee this Deed, said Note and all documents evidencing expenditures secured hereby. After the lapse of such time as then may be required by law following the recordation of said Notice of Default and Notice of Sale having been given as then required by law, Trustee, without demand on Trustor, shall sell said property at the time and place fixed by it in said Notice of Sale, either as a whole or in separate parcels and in such order as it may determine (but subject to any statutory right of Trustor to direct the order in which said property, if consisting of several lots or parcels, shall be sold), at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of said property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement. Trustee shall deliver to such purchaser its deed conveying the property to sold, but without any covenant or warranty, expressed or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person including Trustor, Trustee, or Beneficiary as hereinafter defined, may purchase at such sale.

After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of, all sums expended under the terms hereof, not then repaid, with accrued interest at the rate prescribed in the Note; all other sums then secured thereby; and the remainder, if any, to the person or persons legally entitled thereto.

**19. Future Advances.** Upon request of Borrower, Lender, at Lender's option prior to full reconveyance of the Property by Trustee to Borrower, may make Future Advances to Borrower. Such advances with interest thereon shall be secured by this Deed of Trust when evidenced by promissory notes stating that said notes are secured hereby.

**20. Reconveyance.** Upon written request of Lender stating that all sums secured hereby have been paid, and upon surrender of this Deed and said Note to Trustee for cancellation and retention and upon payment of its fees, Trustee shall reconvey, without warranty, the property then held hereunder. The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof. The grantee in such reconveyance may be described as "the person or persons legally entitled thereto." The Trustee may destroy said Note, this Deed of Trust (and any other documents related thereto) upon the first to occur of the following: 5 years after issuance of a full reconveyance; or, recordation of the Note and Deed of Trust in a form or medium which permits their reproduction for 5 years following issuance of a full reconveyance.

**21. Substitution of Trustee.** Lender, at Lender's option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon the Trustee herein and by applicable law.

**22. Request for Notices.** Borrower requests that copies of the notice of sale and notice of default be sent to Borrower's address which is the Property Address.

**23. Statement of Obligation.** Lender may collect a fee, not to exceed the maximum amount permitted by law, for furnishing the statement of obligations as provided by Section 2943 of the Civil Code of California.

**24. MISCELLANEOUS PROVISIONS:**

**0.** **Construction or Home Improvement Loan.** If the loan secured by this Deed of Trust is a construction or home improvement loan, Borrower is required to perform according to the terms and conditions of each agreement contained in any building, home improvement or similar agreement between the Borrower and Lender.

**1.** **Acceptance by Lender or a Partial Payment After Notice of Default.** By accepting partial payment (payments which do not satisfy a default or delinquency in full) of any sums secured by this Deed of Trust after a Notice of Default has been recorded, or by accepting late performance of any obligation secured by this Deed of Trust, or by adding any payment so made to the loan secured by this Deed of Trust, whether or not such payments are made pursuant to a court order, the Lender does not waive its right either to require prompt payment when due of all other sums so secured or to declare default for failure to make any such prompt payment or to perform any such act. No exercise of any right or remedy of the Lender or Trustee under this Deed of Trust shall constitute a waiver of any other right or remedy contained in this Deed of Trust or provided by law.

**2.** **Partial Reconveyance. Borrower shall have the right to sell or refinance each collateralized property separately and receive partial reconveyance by Lender of those properties.**

**3. NO RECORDATION. This Deed of Trust shall not be recorded**

IN WITNESS WHEREOF, BORROWER HAS EXECUTED THIS DEED OF TRUST

BORROWER:

_____________________________
23800 Malibu Crest LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

_____________________________
600 Spring LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

_____________________________
Cliffside Dume LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial interest

_____________________________
The Malibu Road #3 LLC by Scott Gillen (C64829 LLC) who holds an undivided 25% beneficial ownership interest

_____________________________
The BU Houses LLC by Scott Gillen (C64829 LLC) who holds an undivided 40% beneficial ownership interest

_____________________________

Green Milk LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial interest

# EXHIBIT G

From: **Rommy Shy** <rshy.realty@gmail.com>
Date: Sun, Aug 23, 2020 at 10:21 AM
Subject: Unified Note and Deed of Trust
To: Scott Gillen <scott@directorsla.com>, Scott Gillen <scottgillen@unvarnishedco.com>, Barry Shy <barry90014@gmail.com>

Hello Scott,

I hope all is well.

Please see attached Note, Deed of Trust and other loan documents that cross-collateralize all the Malibu properties as security for each Loan. This will consolidate all the balances accrued including interest for each project into 1 unified Note reflecting a total balance. Using the ledgers that we audited together, the current debt including interest is approximately $250M so we would like to sign a Note in that amount; although more debt will continue to accrue until the projects' completion.

As I understand you discussed with Barry, this new Deed of Trust will not be recorded.

Please review and advise if you have any questions.

Best Regards,

Rommy Shy
Royalty Realty
President
Broker/ BRE #01874848
600 S. Spring St. Suite 106
Los Angeles, CA 90014

Tel: (818) 274-2655
Fax: (213) 891-1953

Email: rshy@royaltyrealty.co
http://www.royaltyrealty.co/

The information contained in this e-mail message and any attachment is privileged, confidential and intended only for the use of the individual or entity to whom it was directed. If this e-mail is received by any other individual or entity, you are hereby notified that any unauthorized dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and destroy the original message.
Thank you.

--
Thank You,

Scott Gillen
Cell: (310) 980-5665

Unvarnished
Office: (310) 263-1111

Unvarnished, Inc.
PO Box 2833, Malibu CA 90265

**Confidentiality Notice**
This email message and any attached or accompanying files are intended for the sole use of the addressee only and may contain information that is privileged and/or confidential. If the reader of this message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited.

**Disclaimer**
Any views or comments expressed within this message are not representable by this company. If you have received this email in error, please notify the sender by replying to the email message and deleting it from your computer immediately.

**Confidentiality Notice**
This email message and any attached or accompanying files are intended for the sole use of the addressee only and may contain information that is privileged and/or confidential. If the reader of this message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited.

**Disclaimer**
Any views or comments expressed within this message are not representable by this company. If you have received this email in error, please notify the sender by replying to the email message and deleting it from your computer immediately.

# EXHIBIT H

| | |
|---|---|
| **From:** | Barry Shy <barry90014@gmail.com> |
| **Sent:** | Sat 2/20/2021 3:45:45 PM (UTC-08:00) |
| **To:** | Scott Gillen <scottgillen@unvarnishedco.com> |
| **Subject:** | Fwd: Revised drafts of Loan Agreement, Note and Interest Pledge Agreements, and Deed of Trust for $250 million loan from Bobs LLC |
| **Attachment:** | REDLINE_68790581v1_Loan Agreement for $250 million loan from Bobs LLC - 68790581v2_Loan Agreement for $250 million loan from Bobs LLC.pdf |
| **Attachment:** | REDLINE_68659673v1_Note and 7 Interest Pledge Agreements for $250 million loan from Bobs - 68659673v2_Note and 6 Interest Pledge Agreements f~1.pdf |

---------- Forwarded message ---------
From: **Rommy Shy** <rshy.realty@gmail.com>
Date: Sat, Feb 20, 2021 at 1:56 PM
Subject: Re: Revised drafts of Loan Agreement, Note and Interest Pledge Agreements, and Deed of Trust for $250 million loan from Bobs LLC
To:
CC: Barry Shy <barry90014@gmail.com>

Scott,
I hope all is well. Thanks for sending these changes. We agree with all proposed changes with the following modifications:

1) The personal guaranty will remain in the Agreement as per your conversation with Barry.
2) I have omitted all mention of Royalty Equity lending in the documents as they were never a lender and I propose elimination of the existing Exhibit A as it mentions previous Notes which will be extinguished and are irrelevant. Instead, I would like to attach the ledgers for each account and call those ledgers collectively Exhibit A and reference Exhibit A as necessary in the Note/Loan Agreement.
3) I propose the elimination of Paradise Cove from this Master Note since the partnership structure of that entity is different than the other entities. Concurrent with the execution of these Master Loan docs, we will execute a separate Note/DOT, loan agreement and PG for Paradise cove.
4) I am ok with the elimination of MLR however I will attach the ledger evidencing the deficiency as part of Exhibit A and insert one sentence in the Note mentioning that the deficient debt will be consolidated into the total owed as of 3/1/21; which is $237,270,542. This amount reflects the sum total of all accounts minus paradise cove.
5) The note amount will be $260M to allow for the accrual of interest and any further advances (about $23M). Disregard my mention of $290M on the attached redline, should be $260M.

Additionally I added some minor language which tightens up the Loan Agreement and Note. See my comments on the attached and advise if ok with you.

Best Regards,

Rommy Shy
Royalty Realty
President
Broker/ BRE #01874848
600 S. Spring St. Suite 106
Los Angeles, CA 90014

Tel: (818) 274-2655
Fax: (213) 891-1953
Email: rshy@royaltyrealty.co
http://www.royaltyrealty.co/

The information contained in this e-mail message and any attachment is privileged, confidential and intended only for the use of the individual or entity to whom it was directed. If this e-mail is received by any other individual or entity, you are hereby notified that any unauthorized dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and destroy the original message.
Thank you.

On Fri, Feb 19, 2021 at 6:45 PM Scott Gillen <scottgillen@unvarnishedco.com> wrote:

Subject: Revised drafts of Loan Agreement, Note and Interest Pledge Agreements, and Deed of Trust for $250 million loan from Bobs LLC
To: Scott Gillen <scottgillen@unvarnishedco.com>

If you send these documents to me in a word doc I am happy to make those changes and then sign

***Attached are revised drafts of $250 million Loan Agreement and Note and Interest Pledge Agreements and Deed of Trust, which upon completion of Exhibit A of the Loan Agreement, I am prepared to sign.***

***The following are the key changes made that I would like to bring to your attention:***

***1. <u>Loan Agreement</u>.***

***a. Deletion of MLR Malibu, LLC as a borrower;***

*b. Addition of Recitals and an Exhibit A regarding the loans being consolidated into the $250 million loan;*

*c. An indication that the deed of trust will cover the borrower interest in 24266 Malibu Road, because of the tenant in common interest held by Harpro;*

*d. Deletion of the requirement of the Scott Gillen guaranty and all references to it;*

*e. Recognition that properties will be renovated or that there will be new construction;*

*f. Addition of cure periods for defaults;*

*g. Addition of provision for accountings of the loan balance upon request;*

*h. Addition of restriction on recording and filing.*

*2. Note and Interest Pledge Agreements.*

*a. Deletion of MLR Malibu, LLC as a borrower and the pledge of interests in it;*

*b. Addition of cure periods in the Note;*

*c. The right to prepay when a default is pending;*

*d. Provision for release of membership interest pledge for an entity when its property is released from the Deed of Trust upon sale or refinancing;*

*3. Deed of Trust.*

*a. Deletion of MLR Malibu, LLC as a trustor;*

*b. Deletion of statement that there will be 8 deeds of trust recorded, as there is only 1 deed of trust;*

*c. Deletion of due on transfer provision consistent with its deletion from the Loan Agreement;*

*d. Adoption of Event of Default provision from Loan Agreement;*

*e. Addition of a restriction on recording.*

*Please forward copies with the completed Exhibit A for execution.*

--
Thank You,

Scott Gillen
Cell: (310) 980-5665

Unvarnished
DRE#02014153
Office: (310) 263-1111

https://unvarnishedco.com/

Unvarnished, Inc.
PO Box 2833, Malibu CA 90265

**Confidentiality Notice**

This email message and any attached or accompanying files are intended for the sole use of the addressee only and may contain information that is privileged and/or confidential. If the reader of this message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited.

**Disclaimer**

Any views or comments expressed within this message are not representable by this company. If you have received this email in error, please notify the sender by replying to the email message and deleting it from your computer immediately.

**Confidentiality Notice**

This email message and any attached or accompanying files are intended for the sole use of the addressee only and may contain information that is privileged and/or confidential. If the reader of this message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited.

**Disclaimer**

Any views or comments expressed within this message are not representable by this company. If you have received this email in error, please notify the sender by replying to the email message and deleting it from your computer immediately.

# LOAN AGREEMENT

**$250,000,000.00**

A. A. This Loan Agreement is made in Los Angeles, CA on August 25, 2020 by and between BOBS LLC, a Nevada Limited Liability Company (Lender') on the one hand, and the undersigned, **MLR MALIBU, LLC**, an Oregon Limited Liability Company, **23800 MALIBU LLC**, a California Limited Liability Company, **600 SPRING LLC**, a California Limited Liability Company, **THE BU HOUSES LLC**, a California Limited Liability Company, **CLIFFSIDE DUME** LLC, a California Limited Liability Company, **Malibu Road #3**, a California Limited Liability Company and **Paradise Cove Malibu LLC** (all LLC's above shall be jointly and collectively referred to as "Borrower") with reference to the following facts:

B. Lender is the current holder of the notes described on **Exhibit A** evidencing loan advances ("Existing Loans") made to certain of the entities comprising Borrower by Lender, Spring Loft 7 LLC, and Royal Equity Lending LLC, each of which has matured. Lender and Borrower are entering into this Agreement and the other Loan Documents (defined below) to extend the maturity date of the Existing Loans and amend, restate, and consolidate the notes evidencing the Existing Loans and provide for additional loan advances to be made by Lender to Borrower on the terms and conditions of this Agreement.

C. B. Borrower has requested Lender to lend to the Borrower additional money as the proceeds of which Borrower presently intends will be used solely and exclusively by Borrower for commercial and/or investment purposes.

D. C. Lender has agreed to make a additional loan (advances (together with the Existing Loans, hereinafter called "Loan") to Borrower, which together with the principal amounts of the Existing Loans, will be in the aggregate principal amount of **Two Hundred Fifty Million ($ 250,000,000)**, (hereinafter called "Loan Amount"), which Loan. The Existing Loans and the additional loan advances will be evidenced by a Secured Promissory Note executed concurrently herewith (hereinafter called "Note"), and any notes evidencing the Existing Loans will be cancelled.

E. D. The Note will be secured by a Deed of Trust providing **1)** A First (1st) Priority Deed of Trust lien on land and improvements located at 23800 Malibu Crest Dr. Malibu, CA 90265 (APN 4458-024-038 in Los Angeles County) **2)** A Second (2nd) Priority Deed Of Trust lien junior only to Bank Hapoalim loan on land and improvements located at APNs 4458-018-039, 4458-018-037, 4458-018-038, 4458-018-906, 4458-018-035, 4458-018-041, 4458-018-036, 4458-018-907 in Los Angeles County **3)** A First (1st) Priority Deed of Trust lien on APN 081-021-005 in San Luis Obispo County and any other land and improvements in the vicinity owned by The BU Houses LLC **4)** A First Second (1st 2nd) Priority Deed of Trust lien on land and improvements located at 24689 Pacific Coast Highway, Malibu, CA 90265 (APN 4458-041-004) **5)** A Second (2nd) Priority Deed of Trust lien on land and improvements located at 27724 Pacific Coast Highway, Malibu, CA 90265 (APN 4460-031-012) **6)** A First (1st) Priority Deed of Trust lien on land and improvements located at 29215 Cliffside Dr. Malibu, CA 90265, and **7)** A First (1st) Priority Deed of Trust lien on Borrower's interest in the land and improvements located at 24266 Malibu Rd. Malibu, CA 90265 (APNs 4458-011-010 and 4458-011-011).

Documents evidencing or securing the Loan will be hereinafter referred to as the "Loan Documents." Any capitalized term notspecifically defined herein shall have the meaning assignedto it in the ~~Deeds~~Deed of Trust.

~~The Note shall be further secured by a Continuing Guaranty executed and delivered to Lender concurrent with loan documents and executed by Scott Gillen, an Individual; per the terms and conditions contained therein.~~

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration receipt of which is hereby acknowledged, the parties hereto, hereby agree as follows:

**ARTICLE 1 – COVENANTS OF BORROWER.**

1.1 **Title to Properties**. Borrower warrants and covenants that they hold title to the properties at the close of escrow with no liens or encumbrances against the Properties except as disclosed in the Preliminary Title Report.

1.2 **Delinquent Property Taxes**. Borrowers warrant and covenant that they shall pay all delinquent property taxes, due or past due, including penalties and interest on the Properties from the proceeds of this Loan.

1.3 **Maintenance and Preservation of the Properties**. Borrower agrees (a) to keep the Properties in good condition and repair; (b) not to commit or permit any waste or deterioration of the Properties; (c) not to commit or permit any removal, demolition or substantial alteration of those Properties except for such alterations as ~~maybe~~may be required by any law, ordinance, rule, regulation or order of any governmental authority having jurisdiction over the Properties and except for new construction, alterations, and renovations intended to increase values, which are now or hereafter approved by applicable governmental authorities; (d) to complete in good and workman like manner any construction or restoration which may be performed on the Properties; (e) to promptly restore any portion of the Properties which may be damaged or destroyed, to the extent insurance proceeds to pay for the restoration are received; (f) not to permit any mechanics' or material men's liens against the Properties, unless they are being contested by Borrower; (g) not to initiate or acquiesce in any change of zoning or other land classification which affects the Properties without Lender's prior written consent, except as necessary in connection with the permitted new construction, alterations, and renovations described (c) above; and (h) to perform each of the obligations set forth in the Note.

1.4 **No Violation**. Borrower shall not commit, permit or allow to exist any violation of any law, ordinance, rule, regulation or order of any governmental authority having jurisdiction over the Properties or the Collateral or any other matter of record affecting the Property or the Collateral.

1.5 **Insurance.**

**Insurance Policies.** Borrower shall, at all times, provide, maintain and keep in force insurance against fire, lightning and windstorm, vandalism, malicious mischief and such other hazards commonly covered by "extended coverage" or "all risks" policies for Borrower, ~~The~~the Properties, the Improvements and the collateral. All policies shall provide full replacement cost coverage, without coinsurance, but in no event less than the aggregate for the Improvements on the Land and shall be with such companies and on such forms as have been approved by Lender. Lender shall be named as an additional insured mortgagee/loss payee on all such policies. Borrower shall also provide, maintain, and keep in force earthquake insurance in an amount equal to the replacement value of the Property, the Improvements, and the collateral, and with a deductible no greater than five percent (5.00%), on which policy Lender shall be named as the mortgagee/ loss payee/ additional insured.

**Evidence of Coverage**. Borrower shall furnish to Lender an original certificate of each insurance policy as to the Properties and Borrower, and, at least thirty (30) days prior to expiration of any such policy, proof of issuance of a policy continuing in force the coverage provided by the expiring policy. If Borrower shall fail to maintain the insurance coverage required by the Loan Documents, Lender may (but shall be under no obligation to) take out the required policies of

insurance and pay the premiums on the same and provide for payment thereof; and all amounts so advanced therefore by Lender shall become an additional obligation of Borrower to Lender, which amount , together with interest thereon from the date of payment at the Interest Rate then in effect t(as defined and provided for in the Note). Borrower agrees to pay all such amounts within five (5) days of demand by Lender.

**Casualty Notice.** After the happening of any casualty or event insured against as required by the Deed of Trust, Borrower shall give prompt written notice thereof to Lender.

**Assignment of Proceeds.** Borrower hereby absolutely and unconditionally assigns to Lender all insurance proceeds which Borrower may be entitled to receive. All such proceeds shall be delivered to and held by Lender to be applied to Lender's expenses in settling, prosecuting or defending any insurance claim, and then, subject to the satisfaction of all of the conditions set forth below, to the restoration of any portion of the Properties and/or the Collateral that has been damaged or destroyed to the same condition, character and value as existed prior to such damage or destruction. The conditions to such use are: (a) an event which is, or with notice or the passage of time or both would constitute, an Event of Default shall not have occurred; (b) Lender's security is not materially impaired, as determined by Lender; (c) all income from the Properties (from sales, leases, insurance or otherwise) required to pay all debt service and operating expenses of the Properties after such restoration will be equal to or greater than the income which was required to pay such debt service and operating expenses prior to the casualty; (d) Borrower provides evidence satisfactory to Lender that the insurance required to be maintained hereunder will be available to Borrower during restoration and thereafter; (e) Lender shall have approved the plans and specifications for such restoration; and (f) if, in Lender's sole judgment, the insurance proceeds are not sufficient to accomplish restoration,: Borrower deposits with Lender, within five days of demand by Lender, the additional amounts necessary to accomplish restoration. Proceeds disbursed for restoration will be released to Borrower under the procedures of Lender's then current customary disbursement procedures . If any of the conditions set forth above are not satisfied or if Borrower fails to commence restoration of the Properties within thirty (30) days after receipt of such proceeds by Lender, or if Borrower fails to diligently pursue such restoration *to* completion, then Lender shall have the option to either apply the insurance proceeds upon any indebtedness secured hereby in such order as Lender may determine or release such proceeds to Borrower without such release being deemed a payment of any indebtedness secured hereby, rather than to apply such proceeds *to* the restoration of the Properties and/or the Collateral. Such application or release shall not cure or waive any Default or Event of Default or notice of default hereunder or invalidate any act done pursuant to such notice. If the Properties and/or the Collateral is restored at a cost less than the available insurance proceeds, if there are then no amounts due and payable under the Loan Documents, and if Borrower is not then in Default under the Loan Documents, then such excess proceeds shall be paid over to Borrower. Lender may commence, appear in, defend or prosecute any assigned claim or action, and may adjust, compromise, settle and collect all claims, proceeds and awards assigned to Lender, but shall not be responsible for any failure to collect any claim, proceeds or award, regardless of the cause of the failure. As used in this Section, the term "Lender" shall be deemed to include any parent company of Lender and/or its affiliates or subsidiaries.

(a) **Transfer of Policy.** In the event of the foreclosure of the Deed of Trust or other transfer of the title to the Properties in extinguishment, in whole or in part, of the indebtedness secured by the Deed of

Trust, all right, title and interest of Borrower in and to any insurance policy then in force shall pass to the purchaser or grantee.

1.6 **Use of Proceeds.** Loan proceeds are intended to be used primarily for business and commercial purposes and are not intended to be used for personal, family, or household purposes or in any manner which may result in the loan transaction not being exempt from Truth in Lending Act (TIL A). 15 U.S.C.A. § 1602(h) or any similar or applicable consumer lending laws.

## ARTICLE 2 - IMPOUNDS, REIMBURSEMENTS AND MISCELLANEOUS.

2.1 **Impounds.** Upon demand by Lender, Borrower shall pay to Lender on the first day of each month, together with and in addition to the regular installments of principal and interest due under the Note, until the indebtedness secured hereby is paid in full, an amount equal to one-twelfth (1/12) of the yearly taxes and assessments, insurance premiums, ground lease rentals and other similar charges as estimated by Lender to be sufficient to enable Lender to pay at least thirty (30) days before they become due, all taxes, assessments, insurance premiums, ground lease rentals and other similar charges against the Properties. Lender shall not be obligated to pay interest on any such sums. Upon demand of Lender, Borrower shall deliver to Lender such additional sums as-are necessary to enable Lender to pay such taxes, assessments, insurance premiums and similar charges.

2.2 **Reimbursement**. Borrower shall pay immediately, without demand, after expenditure, all sums expended or expenses incurred by Trustee and/or Lender in acting under any of the terms of this Loan Agreement, the Deed of Trust or any other Loan Document, including, without limitation, any fees and expenses (including reasonable attorneys, fees) incurred in connection with any reconveyance of the : Properties or any portion thereof, or to compel payment of the Note or any portion of the indebtedness evidence there by or in connection-with any default thereunder, including without limitation attorneys, fees incurred in any bankruptcy or judicial or nonjudicial foreclosure proceeding, with interest from date of expenditure at the default rate provided for in the Note, and said sums shall be secured by the Deed of Trust.

2.3 **Lender's Statement Fee:** Borrower shall pay the amount demanded by Lender or its authorized Servicing agent for any statement-regarding the obligations secured by the Deed of Trust; provided, however, that such amount may not exceed the maximum amount allowed by law at the time request for the statement is made.

## ARTICLE 3 - CONDEMNATION.

3.1 **Condemnation.** If the Properties, the Collateral or any part thereof, is taken or damaged by reason of any public improvement or condemnation proceeding, or in any other manner, Lender shall be entitled to all compensation, awards and other payment or relief therefore to which Borrower shall be entitled, and shall be entitled at its option to commence, appear in and prosecute in its own name any action or proceeding or to make any compromise or settlement in connection with such taking or damage to the extent of the interests of Borrower therein, but Lender shall not be responsible for any failure to collect any claim or award, regardless

of the cause of the failure. Borrower hereby absolutely and unconditionally assigns to Lender all such compensation, awards, damages, rights of action and proceeds to which Borrower shall be entitled (the "Condemnation Proceeds"), and Lender shall, after deducting therefrom all its reasonable expenses, including attorneys' fees, apply or release the Condemnation Proceeds with the same effect and as provided in Section 1.5(d) above, with respect to disposition of insurance proceeds; provided, however, that if there are any excess Condemnation Proceeds after application thereof to the restoration of the Properties or the Collateral, as applicable, Lender shall be entitled to apply such excess to the reduction of the principal balance due under the Note without any adjustment in the dollar amount of the regular installments due under the Note.

Borrower agrees to execute such further assignments of the Condemnation Proceeds as Lender or Trustee may require. Nothing hereincontained shall prevent the accrual of interest as provided in the Note on any portion of the Condemnation Proceeds to be applied to the principal balance due under the Note until the Condemnation Proceeds are received by Lender.

## ARTICLE 4 - PROTECTION OF PROPERTIES.

4.1 **Preservation of Lien:** Borrower shall do any and all acts which, from the character or use of the Properties or the Collateral, maybe reasonably necessary to protect and preserve the lien, the priority of the lien and the security of Lender granted by the Deed of Trust, the specific enumerations herein not excluding the general. All equipment and personal property, fixtures and other property subject to the lien of the Deed of Trust shall be fully paid for by Borrower and no security interest, Lien or other encumbrance other than the permitted exceptions, shall exist thereon.

4.2 **Compliance w ith P roperties R estrictions.** Borrower w ill f aithfully p erform e ach a nd e very covenant to be performed by Borrower under any lien or encumbrance upon or affecting the Properties or the Collateral, including, without limiting the generality hereof, mortgages, deeds of trust, Leases, declarations of covenants, easements, conditions and/or Restrictions (as defined below) and other agreements which affect the Properties, in law or inequity. A breach of or a default under any such lien or encumbrance shall constitute a default under the Deedof Trust.

4.3 **No Recordation or Filing.** Lender shall not record the Deed of Trust, the Note, Membership Interest Pledge Agreements, or any other Related Documents or file any UCC-1 Financing Statements naming any Borrower or any pledgor under the Membership Interest Pledge Agreement as a debtor..

## ARTICLE 5 - RESTRICTIONS ON TRANSFER.

**INTENTIONALLY OMITTED ARTICLE 5**

## ARTICLE 6 - EVENTS OF DEFAULT.

6.1 **Payment** Borrower fails to make any payment when due under ~~this~~the Note; including, but not limited to all principal, extension fees and the payment due on Maturity Date, which is not cured within five (5) days after Lender delivers notice of the failure to Borrower.

6.2 **Other Defaults in Obligations to the Lender.** Borrower fails to perform any other term, obligation, covenant, or condition contained in ~~this~~the Note or in any of the related documents or in any other agreement between Lender and Borrower, which is not cured within the cure period provided in the Note, which is not cured within thirty (30) days after Lender delivers notice of the default or event of default to Borrower, or if the default or Event of Default cannot reasonably be cured within thirty (30) days, then such longer period as may be necessary to cure it as long as Borrower is proceeding with due diligence to cure.

6.3 **Event of Default Under Related Documents.** ~~A default or event~~An Event of ~~default~~Default occurs under the terms

of any promissory note, deed of trust, loan agreement, ~~Personal Guaranty,~~ pledge agreement, security agreement or other agreement ("Related Documents"), which is not cured within thirty (30) days after Lender delivers notice of the default or event of default to Borrower, or if the default or Event of Default cannot reasonably be cured within thirty (30) days, then such longer period as may be necessary to cure it as long as Borrower is proceeding with due diligence to cure.

6.4 False Statement. Any statement, representation, or warranty which Borrower makes to Lender or is made on Borrower's behalf with respect to this Note or the Loan Documents as defined in the Trust Deed of even date as "Related Documents" is false or misleading in any material respect either when made or at any time thereafter. Borrower shall promptly disclose circumstances which make the statement false or misleading~~.~~

6.5 **Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any of the secured property including, for example, a garnishment of any of Borrower's accounts with Lender or others. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and Borrower gives Lender written notice of the proceeding and deposits with Lender monies or a surety bond in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

6.6 ~~**Events Affecting Guarantor.** Any of the preceding events of default occur with respect to any guarantor, endorser, surety or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.~~

~~6.7~~ **Death or Insolvency.** The death of Borrower or, if Borrower is an entity, the dissolution or the termination of its right to do business or the cessation of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout or the commencement by Borrower of any proceeding under any bankruptcy or insolvency laws or the commencement of such proceedings by a creditor not dismissed within thirty (30) days.

Should an Event of Default occur, the compounded interest rate shall increase to fifteen percent (15%) per year, compounded daily.

**ARTICLE 7 - REPRESENTATIONS AND WARRANTIES.**

7.1 **Restrictions and Contracts.** Borrower is familiar with all zoning matters, covenants, conditions, restrictions, easements, and all other matters affecting the title or use of the Properties (collectively the " Restrictions") that affect the Properties and the contemplated us of the Properties. Borrower has obtained, or will be able to obtain, all permits, approvals, consents and other authorizations necessary under the Restrictions for such use. There is no violation or asserted violation of any Restrictions concerning any of the Properties or the existing or contemplated use thereof. Borrower is not aware of any action or proceeding pending or threatened before any court or governmental agency with respect to the validity of any such Restrictions or any of such authorizations or permits.

7.2 **Non-Foreign Entity:** Tax Identification Number. Section 1445 of the Internal Revenue Code of 1986, as amended (the "Code"),provides that a transferee of a real property interest in the United States must withhold tax if the transfer or is a foreign person. To inform Lender that the withholding of tax will not be required in the event of a disposition of the Properties pursuant to the terms of this Agreement and the Deed of Trust, Borrower hereby certifies that Borrower is not a foreign person,

foreign corporation, foreign partnership, foreign trust or foreign estate (as such terms are defined in the Code and the regulations promulgated thereunder) and that its principal place of business is at the address set forth for notices to Borrower below. Lender may disclose the contents of this certification to the Internal Revenue Service.

7.3 **Commercial Purpose.** Borrower intends to use the Loan proceeds solely for business or commercial proposes and does not presently intend to use any *portion* of the loan proceeds for personal, family or household purposes. The Properties are not occupied by the Borrower as the Borrower's principal residence. The extension of the loan contemplated by this Loan Agreement does not constitute *"Consumer credit"* as said terms defined in 12 CFR Ch.II PART226—TRUTH IN LENDING (REGULATIONZ).

**ARTICLE 8 – MISCELLANEOUS.**

8.1 **Loan Fees, Costs and Prepaid Interest**. Interest rate shall be 12% (Twelve Percent) per year compounded daily. Compounded interest is the addition of interest to the principal sum of a loan or deposit, or in other words, interest on interest. It is the result of reinvesting interest, rather than paying it out, so that interest in the next period is then earned on the principal sum plus previously accumulated interest. As Borrower will be making periodic draw requests, Borrower shall only be responsible for paying interest on actual money borrowed. Lender reserves the right to deny draw if draw does not match draw schedule.

8.2 **Successors in Interest and Interpretation**. This Loan Agreement applies to, inures to the benefit of, and binds all parties here to, their heirs, legatees, devisees administrators, executors, successors and assigns. The term "Lender" shall mean the owner and holder, including pledgees, of the Note, now or hereafter and whether or not named as Lender herein. In this Loan Agreement, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural the word " person" shall include corporation, partnership or other form of association. Any reference in this Loan Agreement to any document, instrument or agreement creating or evidencing an obligation secured hereby shall include such document, instrument or agreement both as originally executed and as it may from time to time be modified.

8.3 **Severability.** If any provision hereof should be held unenforceable or void, then such provision shall be deemed separable from the remaining provisions and shall in no way affect the validity of this Loan Agreement.

8.4 **Notices.** All notices and demands expressly provided hereunder to be given by Lender to Borrower

and all notices, demands and other communications of any kind or nature whatever which Borrower may be required or may desire to give to or serve on Lender shall be in writing, shall be addressed to the appropriate address set forth in this section, or at such other place as Borrower, Lender or Trustee, as the case may be, may from time to time designate in writing by ten (10) days prior written notice and shall be (a) hand- delivered, effective upon receipt, (b) sent by United States Express Mail or by private Overnight courier, effective upon receipt, or (c) served by certified mail, return receipt requested, deposited in the United States mail, with postage thereon fully prepaid and addressed to the party so to be served and shall be deemed effective on the day of actual delivery as shown by the addressee's return receipt or the expiration of three(3)business days

after the date of mailing, whichever is the earlier in time. The addresses of the parties are as follows:

To Borrower: c/o Scott Gillen
Unvarnished
3806 Cross Creek Road, Suite C
Malibu, CA 90265

To Lender: BOBS LLC
600 S. Spring St. #106
Los Angeles, CA 90014

8.5 **Obligations of Borrower Joint and Several**. If more than one person or entity has executed this Loan Agreement as "Borrower", the obligations of all such persons/entities hereunder shall be joint and several.

8.6 **Representative Capacity**. If Borrower is an entity other than an individual, the person signing on behalf of the entity warrants and represents that they have the full authority to execute the Loan Documents on behalf of the entity and that no other consent or permission is required from any other person or entity to bind the Borrower. The signator hereby agrees to defend, indemnify, and hold harmless the Lender from any and all claims, demands, costs or expenses, including attorney's fees, which may be incurred as the result of a claim by a third party that the signator lacked the authority to sign the Loan Documents on behalf of the Borrower.

8.7 **Further Assurances and further Execution and Delivery of Documents**. Borrower agrees to execute, acknowledge and deliver such documents and take such action as Lender shall determine at any time to be necessary or desirable to further evidence, perfect or continue the perfection and/or the priority of any lien or security interest granted by Borrower or to carry out the intent of any of the provisions of the Loan Documents.

8.8 **Title Exceptions:** Borrower shall not impose any restrictive covenants, easements, rights of way or encumbrances upon the Properties without the prior written consent of Lender.

**8.9 Provide Notices**

**(a) Injunction Defense and Notice:** If any proceedings are filed seeking to enjoin or otherwise prevent or declare invalid or unlawful the construction of any Improvements or the occupancy, maintenance or operation of the Properties or the Improvements or any portion thereof, Borrower will give prompt written notice thereof to Lender and will cause such proceedings to be vigorously contested in good faith and, in the event of any adverse ruling or decision, prosecute **all** allowable appeals.

**(b) Notices Received:** Borrower shall comply with and promptly furnish to Lender true and complete copies of any notices by any Governmental Agency which exercises jurisdiction over Borrower or the Properties which notices, or the conditions described therein could adversely affect the Properties or Improvements. Borrower shall promptly notify Lender of any fire or other

casualty causing a loss of $10,000 or more or any notice of taking or eminent domain proceeding. affecting any Properties. Borrower shall promptly notify Lender of any action, proceeding or investigation of the nature described in Section 8.8 (a) above of which it acquires notice.

(c)

**Permits and Warranties:** Promptly upon request by Lender, Borrower shall furnish Lender with true and complete copies of all licenses, permits, approvals, exemptions and other authorizations required in connection with any Properties and (b) all warranties and guaranties received from any party furnishing labor, materials, equipment, fixtures or furnishings in connection with any Properties.

8.10 **Attorneys' Fees**. Upon election of either Lender or Trustee so to do, employment of an attorney is authorized, and payment by Borrower of all attorneys' fees, costs and expenses in connection with any action or actions (including the cost of evidence or search of title) which maybe brought for the foreclosure of the Deed of Trust, for possession of the Properties covered hereby, for the appointment of a receiver, and/or for the enforcement of any covenant or right in the Deed of Trust or any other Loan Document contained as hereinafter provided, shall be the obligation of Borrower and shall be secured by the Deed of Trust.

8.11 **Headings.** The headings of each paragraph are for convenience only and shall be disregarded in construing this Loan Agreement

8.12 **No Partnership: Indemnity.** Lender shall not be deemed *to* be a partner, joint venturer,. alter-ego, manager, controlling person or other business associate or participant of any kind of or with Borrower or any other Partnership in connection with the Loan or any action taken under this Loan Agreement. Lender's activities in connection with the Loan shall not be "outside the scope of the activities of a lender of money" within the meaning of California Civil Code section 3434, as modified or recodified from time to time, and Lender does not intend to ever assume any responsibility to any person for the quality or safety of the Properties or the Improvements. Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of Borrower. Borrower shall indemnify, hold Lender harmless and defend Lender from and against any and all loss, cost, damage, expense or liability, including reasonable attorneys' fees, arising out of or resulting from the Properties or Improvements The provisions of this Sections shall survive payment of the Loan.

8.13 **Governing Law.** This Loan Agreement shall be construed and enforced in accordance with the laws of the State of California. Any and all disputes between the parties which may arise pursuant to this Loan Agreement shall be heard and determined pursuant to the Arbitration Agreement being executed by the parties concurrently with this Loan Agreement. The parties hereto acknowledge that the Arbitrator bas the jurisdiction to interpret and enforce the provisions of *this* Loan Agreement, and the parties waive any and all objections that they may have as to jurisdiction or venue.

8.14 **Waiver of Jury Trial.** In the event of a dispute between the Parties hereto or their representatives concerning any provision of this Agreement or the rights and duties of any person or entity hereunder, the Parties knowing and intentionally waive their right to a jury trial to the extent permissible under California law.

8.15 **Entire Agreement** This Loan Agreement, together with the other Loan Documents constitute the parties' entire agreement with respect to· the subject matter hereof and supersede all agreements, representations, warranties, statements, promises, and understandings, whether oral or written, with respect to the subject matter herewith. None of the Loan Documents may be amended, altered, or modified except by a writing signed by Lender, or its assigns, and then only to the extent therein specially set forth.

8.16 **Representation by Counsel.** Borrower acknowledges and represents that they have been advised to seek the advice of counsel of their choosing to advise them and/or represent them with regard to this transaction and any decision not to seek counsel is being made of their own personal volition.

8.17 **Execution of Further Documentation** Borrower acknowledges and agrees, upon reasonable notice from Lender, to execute and deliver any and all additional documents reasonably required by Lender relating in any way to the Loan and the Loan Documents at any time throughout the term of this Loan and at any time while balances remain due and outstanding under the Loan and the Loan Documents.

8.18 **No Guarantees**. Borrower's obligations are not guaranteed, and any guarantees of all or any part of the indebtedness owing by any Borrower to Lender that may have previously been executed and delivered are hereby terminated.

8.19 **Accounting of Unpaid Balance**. Within ten (10) days after delivery of a request of Borrower, Lender shall deliver to Borrower a detailed accounting of the outstanding amount of the Loan, including the amount of each advance of principal of the Loan and the amount of accrued interest thereon. Such accountings shall not be binding on Borrower as to the amount due and shall be subject to confirmation by Borrower of the amount due.

**ARTICLE 9- LENDER'S FURTHER CONDITIONS PRECEDENT TO FUNDING.**

9.1 **Conditions.** The effectiveness of this Agreement shall be subject to the following conditions precedent being met to Lender's satisfaction, or Lender's waiver in writing of any such conditions precedent that remain unsatisfied, time being of the essence. Each condition is for the exclusive benefit of Lender, and only may be waived by Lender, but any waiver must be in writing and signed by Lender in order to be effective. The "effective date" of this Agreement shall be the date all of the conditions set forth in this paragraph are met to Lender's satisfaction or waived in writing by Lender.

(a) The Loan Documents shall have been duly executed by Borrower and delivered to Lender.

~~(b) The Continuing Guaranty shall have been executed by Guarantors and delivered to Lender.~~

(b) ~~(c)~~ Borrower's delivery of written verification satisfactory to Lender that they are noting default of any of the notes and loan documents relative to loans which are secured by liens against the Properties superior to the Lender's lien.

(c) ~~(d)~~ Lender shall have received satisfactory confirmation that it has been named mortgage holder/loss payee on Borrower's property and casualty policy.

**IN WITNESS WHEREOF, Borrower and Lender have executed this Loan Agreement as of the day and year first written above.**

**BORROWER:**

~~MLR Malibu LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest~~

~~23800 Malibu Crest LLC by Scott Gillen (C64829~~ LLC) who holds an undivided 50% beneficial ownership interest

______________________________________

600 Spring LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

_______________________________________

Cliffside Dume LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

Paradise Cove Malibu LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

The Malibu Road #3 LLC by Scott Gillen (C64829 LLC) who holds an undivided 25% beneficial ownership interest

The BU Houses LLC by Scott Gillen (C64829 LLC) who holds an undivided 40% beneficial ownership interest

Green Milk LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial interest

EXHIBIT A

Note in the original principal amount of up to $80,000,000 made by 600 Spring LLC in favor of Royal Equity Lending LLC, dated 10/27/18. The amount of the Note includes advances made by Spring Loft 7 LLC, Royal Equity Lending LLC, and Bobs LLC. The original maturity date was December 31, 2019, which has been extended.

Note in the original principal amount of up to $40,000,000 made by 23800 Malibu Crest, LLC in favor of Royal Equity Lending LLC, dated 10/24/18. The amount of the Note includes advances made by Spring Loft 7 LLC, Royal Equity Lending LLC, and Bobs LLC. The original maturity date was December 31, 2019, which has been extended.

Note in the original principal amount of up to $8,350,000 made by The Cliffside Dume, LLC, in favor of Spring 7 Loft, LLC, dated 2/25/16. The original maturity date was _____________, 20__, which has been extended.

[Others?]

# PROMISSORY NOTE

**Loan Amount: $250,000,000.00 (Two Hundred Fifty Million Dollars)**

**August 25, 2020**
**Los Angeles, California**

FOR VALUE RECEIVED, the undersigned, MLR23800 **MALIBU**, LLC, an Oregon Limited Liability Company, 23800 MALIBU **CREST LLC**, a California Limited Liability Company, **600 SPRING LLC**, a California Limited Liability Company, **THE BU HOUSES LLC**, a California Limited Liability Company, **CLIFFSIDE DUME** LLC, a California Limited Liability Company, **Malibu Road #3**, a California Limited Liability Company, **GREENMILK LLC** and **Paradise Cove Malibu LLC** (all LLC's above shall be jointly and collectively referred to as "Borrower") Borrower promises to pay all indebtedness as hereinafter provided to BOBS, LLC, a Nevada Limited Liability Company ("Lender"), in lawful money of the United States of America, the aggregate principal sum of **TWO HUNDRED FIFTY MILLION DOLLARS ($250,000,000.00);** this amount hereinafter referred to as ("Loan") in accordance with the terms described below. All 87 entities above shall be jointly and severally liable and as security for this debt shall pledge the properties referred to below and in the Deed of Trust and its attached Legal Description which are dated the same date as this Note. These real properties shall be cross-collateralized to secure indebtedness to Lender and a UCC-1 shall be filed for each entity above to secure all personal property at each of the real property locations that are collateralized in connection with this Note, so that if one of the above entities cannot pay its debt in full then all the other entities shall be jointly and severally liable for it. Over the last several years, Lender (or its predecessors) has funded the above entities and now desires to consolidate all outstanding balances into one Note and extend the maturity date of all outstanding balances. This Note shall re-affirm Borrower's commitment to cross-collateralize all secured properties referenced below and in the deed of trust accompanying this Note and furthermore to secure the indebtedness, all beneficial interest of Scott Gillen, an ultimate beneficiary of Borrower, who will sign a Personal Guaranty affirming such.

Now, to secure the indebtedness Borrower shall sign a Deed of Trust granting Lender the following security interests:

- A First (1st) Priority Deed of Trust on land and improvements known as "Malibu Castle" located at 23800 Malibu Crest Dr. Malibu, CA 90265 (APN 4458-024-038 in Los Angeles County)

- A Second (2nd) Priority Deed Of Trust junior only to Bank Hapoalim loan on land and improvements located at APNs 4458-018-039, 4458-018-037, 4458-018-038, 4458-018-906, 4458-018-035, 4458-018-041, 4458-018-036, 4458-018-907 in Los Angeles County.

- A First (1st) Priority Deed of Trust on APN 081-021-005 in San Luis Obispo County and any other land and improvements in the vicinity owned by The BU Houses LLC

- A First (1st) Priority Deed of Trust on land and improvements known as "Malibu Road 3" located at 24266 Pacific Coast Highway Malibu, CA 90265 (APNs 4458-011-010 and 4458-011-011)

- A Second (2nd) Priority Deed of Trust on land and improvements known as "Paradise Cove" located at 27724 Pacific Coast Highway, Malibu, CA 90265 (APN 4460-031-012).

- A First (1st) Priority Deed of Trust on land and improvements known as "Cliffside Dume" located

at 29215 Cliffside Dr. Malibu, CA 90265 (APN #4468-003-005)

~~-~~A First (1st~~) Priority Deed of Trust on land and improvements located at 24689 Malibu Rd. Malibu, CA 90265 (APN 4458-041-004) known as "MLR Malibu" reaffirming the Deed of Trust already securing Lender 's position which was recorded at the Los Angeles County Recorder on 5/21/2020 as Instrument #20200560367. That deed shall be reconveyed and this new deed of trust recorded in its stead.~~

~~A FIRST (1ST~~) Position Deed of Trust on the "Greenmilk Property" (APN 080-021-005) in San Luis Obispo County.

This Note is drafted in consideration of the funds Borrower has already received from Lender or its predecessors. This Note consolidates the previous notes given for such funds, which are cancelled. Original ~~lender~~lenders **Spring7 Loft LLC** and Royalty Equity Lending, LLC assigned ~~its~~their loan receivables due from Borrower to ~~its~~their successor entity BOBS LLC, the current Lender. Borrower warrants, acknowledges and agrees that any funds from entities other than BOBS that have been advanced to any of the ~~7~~8 entities comprising Borrower have since been assigned to BOBS. ~~These entities~~ include but are not limited to Spring 7 Loft LLC and **Royalty Equity Lending LLC.**

1. Maturity Date: As used herein, Maturity Date shall mean the earlier to occur of: (i) the date Borrower prepays the entire Note pursuant to Section 3, below; (ii) the date the Note is accelerated, pursuant to its terms; OR (iii) on August 25, 2022.

2. Payment:

2.01 Principal: The Principal Amount due shall be defined as the sum of ~~**TWO HUNDRED FIFTY MILLION DOLLARS ($250,000,000.00)**~~ ~~or so much thereof has been advanced or accrued~~, ~~and shall be due and payable on or before the Maturity Date, as provided herein. This amount reflects an amount that has been accrued by Borrower until this date, including compounded interest.~~

Interest: The term Interest shall mean a sum accruing on the outstanding Principal balance at the rate of twelve percent (12%) per year which shall be compounded daily. Borrower acknowledges and agrees that this rate has been calculated from the date all entities comprising Borrower first received funds from Lender and interest shall be compounded daily at a rate of 12% per year for all funds Borrower has received from Lender and the compounded interest will continue to accrue at the same rate going forward until loan has totally been repaid in full. As has been the case since the commencement ~~of the Loan~~, all funds sent to Borrower will be subject to compounded interest which is the addition of **interest** to the principal sum of a loan or deposit, or in other words, **interest** on **interest**. It is the result of reinvesting **interest**, rather than paying it out, so that **interest** in the next period is then earned on the principal sum plus previously accumulated **interest**. The interest shall be compounded since Borrower is not required to make periodic interest or principal/interest Note payments at any point during the course of this loan term.

2.02 Payment: All Principal and Interest shall be due and payable by Borrower on the Maturity Date described above. All payments hereunder shall be made to Lender at 600 S. Spring St, #106, Los Angeles, CA 90014.

3. **Payment Dates.**

3.01 Generally. Except as otherwise provided in this Note, all Principal and all accrued, but unpaid Interest shall be paid on or before the Maturity Date.

3.02 Monthly Note Payments. There shall be no monthly Note payments due under this Note.

3.03 Optional Prepayment. ~~Provided the Borrower is not otherwise in default under this Note,~~ Borrower shall have the absolute and unilateral right, at any time from the date of this Note through the Maturity Date, to satisfy all, or any part of the entire indebtedness evidenced by this Note by payment of the entire Principal balance (including accrued interest added to principal), or any portion thereof, ~~plus all accrued and unpaid Interest to the date of the prepayment~~. Upon prepayment of the entire Principal balance, plus all accrued and unpaid Interest as provided above, ~~the~~this Note will be satisfied and paid in full and of no further force and effect.

3.04 Revolving Line of Credit: ~~This~~The loan evidenced by this Note shall be a revolving line of credit. As has been the case from the commencement of the Loan, from time to time, Lender will make advances to Borrower upon Borrower's written draw request. Lender reserves the right to approve/deny draw requests at Lender's sole discretion.

4. Application of Payments: Payments, including optional prepayments set forth in section 3.03 above, shall be credited and applied first against any costs, fees or expenses then due, costs of collection and enforcement including attorney fees; second against any default interest then due; and third against outstanding Principal (since the loan accrues compounded interest, any interest accrued compounds itself into the accrued loan principal balance).

4 Default/Acceleration: Upon the occurrence of any event of default or failure by Borrower to pay or perform any of its obligations under this Note, the entire Principal together with all accrued Interest and other charges, if any, due hereunder shall immediately become due and payable at the option of Lender. Borrower and Lender shall work together in good faith to effectuate such an assignment.

4.1 Events of Default:

**Each of the following shall constitute an event of default (Event of Default") under this Note:**

**Payment Default.** Borrower fails to make any payment when due under this Note; including, but not limited to all principal, extension fees and the payment due on Maturity Date, which is not cured within five (5) days after Lender delivers notice of the failure to Borrower.

a) **Other Defaults in Obligations to Lender.** Borrower fails to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or in any other agreement between Lender and Borrower, which is not cured within thirty (30) days after Lender delivers notice of the default or event of default to Borrower, or if the default or Event of Default cannot reasonably be cured within thirty (30) days, then such longer period as may be necessary to cure it as long as Borrower is proceeding with due diligence to cure.

b) **Event of Default Under Related Documents.** A default or event of default occurs under the terms of any promissory note, deed of trust, loan agreement, ~~Personal Guaranty,~~ pledge agreement, security agreement or other agreement ("Related Documents"), which is not cured within thirty (30) days after Lender delivers notice of the default or event of default to Borrower, or if the default or Event of Default cannot reasonably be cured within thirty (30) days, then such longer period as may be necessary to cure it as long as Borrower is proceeding with due diligence to cure.

c) **False Statement.** Any statement, representation or warranty which Borrower makes to Lender or is made on Borrower's behalf with respect to this Note or the Loan Documents as defined in the Trust Deed of even date as "Related Documents" is false or misleading in any material respect either when made or at any time thereafter. Borrower shall promptly disclose circumstances which make the statement false or misleading.

**d) Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any of the secured property including, for example, a garnishment of any of Borrower's accounts with Lender or others. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as

~~3~~

to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and Borrower gives Lender written notice of the proceeding and deposits with Lender monies or a surety bond in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

e) ~~**Events Affecting Guarantor.** Any of the preceding events of default occur with respect to any guarantor, endorser, surety or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.~~**Intentionally Omitted.**

f) **Death or Insolvency.** The death of Borrower or, if Borrower is an entity, the dissolution or the termination of its right to do business or the cessation of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout or the commencement by Borrower of any proceeding under any bankruptcy or insolvency laws or the commencement of such proceedings by a creditor not dismissed within thirty (30) days.

Should an Event of Default occur, from and after the date of notice by Lender to Borrower of the occurrence of the Event of Default until it is cured, the compounded interest rate shall increase to 15% (Fifteen percent) per annum compounded daily.

5 Waivers: Borrower waives all demands for payment, presentment, notice of intention to accelerate maturity, notice of acceleration of maturity, protests, and notices of protest, to the extent permitted by law. The pleading of any statute of limitations as a defense to the obligations evidenced by this Note is hereby waived by Borrower to the fullest extent permissible by law.

6 Severability: If any provision of this Note, or the application of such provision to any person or circumstance, shall at any time be held invalid, the remainder of this Note or the application of such provision to persons or circumstances other than those to which it is held invalid, shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

7 Security: This Note is secured by various pledge agreements listed on Schedule “A” attached hereto and made a part hereof by reference.

8 Assignment and Binding Effect: Except as otherwise provided, this Note is binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns. Notwithstanding the foregoing, Borrower shall at all times remain liable for the obligations contained herein.

9 Representations and Warranties of Maker. Borrower hereby unconditionally represents and warrants to Borrower and its heirs, successors, and assigns that (a) this Note is the legal, valid and binding obligation of Borrower, and (b) the execution, delivery and performance by Borrower under this Note does not and shall not violate any law, order, judgment, agreement, or undertaking affecting Borrower or its assets.

10 Heading: The section titles and subtitles contained herein are solely for convenience. 

11 No Waiver of Default: Failure by any party to this Note to enforce or demand performance of any provisions of this Note or to seek a remedy for breach thereof, shall not operate to waive or excuse any default of any other provisions nor any further or subsequent default of the same provisions, nor shall such failure be deemed a waiver of any such rights or remedies with respect to any other or subsequent defaults.

12 Attorneys Fees: Borrower agrees to pay immediately upon demand all costs, expenses, witness fees and attorneys fees paid or incurred by Lender or adjudged by a Court in connection with (a) the collection and/or enforcement of this Note, whether or not suit is filed; or (b) any action to enforce payment of this Note or any part of it.

13 Notices: Any request, notice, or demand which shall be required or permitted by law or any provision of this Note shall be in writing and if the same is to be served upon Lender, may be personally delivered to Lender or shall be deposited in the United States mail, certified, return receipt requested, postage prepaid, addressed to Lender at 600 S. Spring St, #106, Los Angeles, CA 90014. If such request, notice, or demand is to be served on Borrower, the same may be personally delivered to Borrower or shall be deposited in the United States mail, certified, return receipt requested, postage prepaid, addressed to Borrower at 3806 Cross Creek Road, Suite C, Malibu, CA 90265.

14 Construction: This Note shall be construed and enforced in accordance with the laws of the State of California. Any rule of construction to the effect that ambiguities are to be construed against the drafting party (including, without limitation, California Civil Code Section 1654) shall not apply in interpreting this Note.

15 Invalidity: In the event any one or more of the provisions contained in this Note, or the application thereof to any person or circumstance, shall to any extent be held to be invalid, illegal or unenforceable, the remainder of this Note, or the application of such term to persons or circumstances or to the extent other than to which it has been held invalid or unenforceable, shall not be affected thereby, shall be valid and enforceable to the fullest extent permitted by law.

16 Joint and Several Liability: This Note shall be the joint and several obligation of Borrower and any and all sureties, guarantors, and endorsers.

17 Time of the Essence: Time is of the essence of this Note and the performance of each of the covenants and agreements contained herein.

18 Waiver of Jury Trial: To the extent permitted by applicable law, Borrower hereby waives the right to a trial by jury in any proceeding or action relating to this Note.

19 Collateral and Pledge Agreements: A new deed of trust with the same date as this Note will be notarized by Borrower. As additional security for this loan and as material inducement to Lender, Managing Member of Borrower and ~~Guarantor~~ Scott Gillen have pledged their equity shares in several other partnerships which shall be evidenced by the Pledge Agreements detailed below and attached which shall collectively be referred to as "Exhibit B".

(a) the Membership Interest Pledge Agreement of even date herewith made by Scott Gillen to Lender of all Gillen's interest in 23800 Malibu Crest LLC (the "~~23000~~23800 **Malibu Crest Company Membership Pledge**").

(b) the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in 600 Spring LLC (the "**600 Spring LLC Membership Pledge**").

(c) the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in the BU Houses, LLC (the "**BU Houses LLC Membership Pledge**").

(d) the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in Greenmilk LLC (the "**Greenmilk Membership Pledge**").

(e) the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in Cliffside Dume LLC (the "**Cliffside Dume LLC"**).

(f) the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in The Malibu Road #3 LLC" (the "**Malibu Road #3 LLC"**).

~~(g) the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in MLR Malibu LLC" (the "**MLR MALIBU LLC"**).~~

(g) ~~(h)~~ the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in Paradise Cove Malibu LLC (the "**Paradise Cove Malibu LLC"**).

20 Loan Documents as a Whole : Included within the Loan Documents shall be this Note, Deed of Trust, Equity Pledge Agreements, ~~Personal Guaranty signed by Scott Gillen,~~ Loan Agreement and any other Exhibits referenced herein

**IN WITNESS WHEREOF,** the undersigned has executed this Note as of the date first written above and hereby agrees and acknowledges that all equity and real and personal ownership interests of the below companies shall serve as Lender's collateral for Loan mentioned above:

BORROWER:

~~MLR Malibu LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest~~

23800 Malibu Crest LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

600 Spring LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

________________________________________

Cliffside Dume LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

________________________________________

Paradise Cove Malibu LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

________________________________________

The Malibu Road #3 LLC by Scott Gillen (C64829 LLC) who holds an undivided 25% beneficial ownership interest

________________________________________

The BU Houses LLC by Scott Gillen (C64829 LLC) who holds an undivided 40% beneficial ownership interest

________________________________________

Green Milk LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial interest

This Note consists of 7 (SEVEN) pages total

EXHIBIT "A"

PLEDGE AGREEMENTS

The Note is secured by the following:

(a) the Membership Interest Pledge Agreement of even date herewith made by Scott Gillen to Lender of all Gillen's interest in 23800 Malibu Crest LLC (the "~~2300~~23800 **Malibu Crest Company Membership Pledge**").

(b) the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in 600 Spring LLC (the "**600 Spring LLC Membership Pledge**").

(c) ~~(a)~~ the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in the BU Houses, LLC" (the "**BU Houses LLC Membership Pledge**").

~~(b) the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in MLR MALIBU LLC" (the "**MLR MALIBU Membership Pledge**").~~

(d) ~~(b)~~ the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in Cliffside Dume LLC" (the "**Cliffside Dume LLC"**).

(e) ~~(c)~~ the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in Paradise Cove Malibu LLC" (the "**Paradise Cove LLC Membership Pledge**").

(f) ~~(d)~~ the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in Malibu Road 3 LLC" (the "**Malibu Road 3 LLC Membership Pledge**").

**INTEREST PLEDGE AGREEMENT**
**[23800 Malibu Crest , LLC]**

THIS INTEREST PLEDGE AGREEMENT ("**Agreement**") dated as of August 25, 2020 is made by and between SCOTT GILLEN ("**Pledgor**") on behalf of **23800 Malibu Crest, LLC**, a California Limited Liability Company, **600 SPRING LLC**, a California Limited Liability Company, **THE BU HOUSES LLC**, a California Limited Liability Company, **CLIFFSIDE DUME** LLC, a California Limited Liability Company, **Malibu Road #3**, a California Limited Liability Company~~, MLR MALIBU, LLC, an Oregon Limited Liability Company~~ and **Paradise Cove Malibu LLC** (all LLC's above shall be jointly and collectively referred to as"Borrower") and BOBS, LLC ("**Secured Party**"), who agree as follows:

**1.** **Background and Purpose.** Pursuant to that certain (i) Promissory Note between Borrower and Secured Party ("BOBS, LLC") dated August 25, 2020; Secured Party consolidated all outstanding debt by Borrower into One Promissory Note affirming amounts owed by Borrower including interest which has compounded daily at a 12% interest rate Pledgor holds a membership interest in 23800 Malibu Crest LLC and, pursuant to the terms of the Promissory Note and as a condition to the Loan, Pledgor agreed to secure the Loan with the pledge of security contained herein

**2.** **Grant of Security Interest.** To secure Borrower's Obligations (as defined in section 3 below), from and after the funding of the Loan pursuant to the Promissory Note, Pledgor hereby grants to Secured Party a security interest in the Collateral (as defined in Section 4 below).

**3.** **Obligations**. For purposes of this Agreement, "**Obligations**" means any and all obligations and liabilities of Pledgor to Secured Party arising out of the Promissory Note and any associated documents.

**4.** **Collateral**. For purposes of this Agreement, "**Collateral**" means:

**4.1** All of Pledgor's right, title and interest in the Pledgor's membership interest in a California limited liability company called "23800 Malibu Crest, LLC' ("23800 Malibu"), said interest being referred to herein as the 23800 Malibu Crest Membership Interest; and

**4.2** All preferred return, return of capital, dividends, interest payments or other distribution in any form ("**Distributions")** by the Company related to the 23800 Malibu Crest Membership Interest.

**5.** **Representations and Warranties**. As a material inducement to Secured Party hereunder, Pledgor represents and warrants that the following are and shall remain true and correct:

**5.1.** **Title.** Pledgor is the owner of all right, title and interest in the Collateral free and clear of all liens, encumbrances and security interests, except the security interest created by this Agreement.

**5.2.** **No Conflict.** The execution, delivery and performance of this Agreement by Pledgor is not in violation of any applicable law or regulation or contractual obligation of Pledgor.

**5.3.** **First Priority Lien.** The liens granted to Secured Party under this Agreement will constitute a first priority lien on the Collateral and Pledgor's grant of such lien to Secured Party does not constitute a fraudulent conveyance under any applicable law. Pledgor warrants that Pledgor will not

change Pledgor's residence or state of formation during the term of this Agreement without providing thirty (30) days prior written notice to Secured Party.

**5.4. Continued Performance.** That Pledger shall fully and timely perform and comply with all obligations applicable to the Interest, whether under the Company Operating Agreement or otherwise.

**6. Covenants and Agreements of Pledgor.**

**6.1. Obligations Unconditional**. The Obligations of the Pledgor shall be continuing, irrevocable, primary, absolute and unconditional irrespective of the value, genuineness, validity, regularity or enforceability of this Agreement, the Assignment Agreement, and the Promissory Note, or any other agreement or instrument referred to therein, or any substitution, release or exchange of any guarantee of or security for any of the Obligations and, to the fullest extent permitted by any applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, other than the occurrence of the indefeasible payment in full of the Obligations.

**6.2** ~~**Protection of Security Interest.** Contemporaneously with the execution of this Agreement, at~~**No UCC-1 Financing Statements.** Secured Party~~'s election, Pledgor authorizes Secured Party to~~ shall not file any UCC-1 financing statements covering ~~all~~any of the Collateral or naming Pledgor as a debtor. to enable Secured Party to perfect Secured Party's security interest in the Collateral. ~~Pledgor agrees also to execute, file and record such other statements, notices and agreements, take such action and obtain such certificates and documents, in accordance with all applicable laws, statutes and regulations as requested by Secured Party to perfect, evidence and continue Secured Party's security interest in the Collateral.~~

**6.3. Transactions Involving Collateral.** Pledgor shall not, without the prior written consent of Secured Party, (i) assign, sell, offer to sell, or otherwise transfer the Collateral or (ii) pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest or charge, other than the security interest created by this Agreement.

**6.4. Compliance with Laws.** Pledgor shall comply with all laws, statutes and regulations pertaining to the Collateral.

**6.5. Taxes, Assessments and Liens.** Pledgor shall pay when due all Company capital calls, taxes, assessments and liens with regard to the Collateral. Pledgor may withhold any such payment or may elect to contest any lien if Pledgor is conducting appropriate proceedings in good faith to contest the obligation to pay and so long as Secured Party's interest is not jeopardized.

**7. Authorized Action by Secured Party.** Pledgor irrevocably appoints Secured Party as Pledgor's attorney in fact to exercise such rights and powers as Pledgor might exercise with respect to the Collateral following an Event of Default, as defined below. These powers shall include without limitation the right to (i) collect by legal proceedings or otherwise and endorse, receive and receipt all Distributions, dividends, interest, payments, proceeds, and other sums and property now or hereafter payable on account of the Collateral, (ii) if Secured Party acquires the Collateral in accordance with the California Uniform Commercial Code, transfer the Collateral to its own or its nominee's name, (iii) make any compromise or settlement and take any action Secured Party deems advisable with respect to the Collateral, and (iv) exercise all rights under the applicable Uniform Commercial Code with respect to the Collateral. Pledgor agrees to reimburse Secured Party upon demand for any costs and expenses, including without limitation attorneys' fees, which Secured Party may incur while acting as Pledgor's attorney in fact hereunder, all of which costs and expenses are included in the Obligations secured hereby. Secured Party shall have no obligation to act pursuant to this section and shall not be required to make any presentment, demand or

protest, or give any notice or take any action to preserve any rights against any other person in connection with the Collateral.

8. **Defaults and Remedies.**

8.1. **Event of Default.** Any "**Event of Default**" as defined by the Promissory Note shall constitute an Event of Default under this Agreement.

8.2. **Remedies.** Upon the occurrence of an Event of Default, Secured Party shall have the right, at its election, but not the obligation, to do any of the following:

(a) vote or exercise any and all of the Pledgor's rights or powers incident to its ownership of the Interests, including any rights or powers to manage or control the Company and receive dividends or Distributions;

(b) exercise all rights and remedies accorded to Secured Party by California law, including, but not limited to the California Uniform Commercial Code;

(c) if Secured Party acquires the Collateral in accordance with the California Uniform Commercial Code, transfer the Collateral, or any part thereof, to the name of Secured Party or to the name of any nominee of Secured Party;

(d) declare all unperformed Obligations, in whole or in part, of Pledgor immediately due and payable without demand or notice;

(e) exercise all rights and remedies under the Promissory Note;

(f) take any other lawful action that Secured Party deems necessary or desirable to protect or realize upon its security interest in the Collateral or any part thereof; and

(g) require Pledgor to take any and all action necessary to make the Collateral available to Secured Party.

8.3. **Remedies Cumulative.** All of Secured Party's rights and remedies, whether evidenced hereby or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Secured Party to pursue any remedy shall not exclude pursuit of any other remedy.

9. **Rights Absent Default.** During the term of this Agreement and until an Event of Default has occurred, Pledgor shall retain the right to vote the Interests and to exercise any other rights of a Member of the Company not otherwise disallowed by or inconsistent with the terms of this Agreement.

10. **Waiver.** Secured Party shall not be deemed to have waived any rights under this Agreement unless such waiver is in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any right shall operate as a waiver of such right or any other right.

11. **Additional Documentation; Cooperation.** Each party shall, upon the request of the other, execute, acknowledge and deliver to the other any instrument that may be required to accomplish the intent of this Agreement. Each party agrees to cooperate to effectuate the intent of this Agreement and shall take all appropriate action necessary or useful in doing so.

12. **Non-Responsibility of Secured Party.** Secured Party is not responsible for the preservation or exercise of any rights to, or granted by any Collateral in Secured Party's possession or

depreciation of Collateral in Secured Party's possession unless caused willfully or by the gross negligence of Secured Party.

**13. Miscellaneous.**

**13.1. Successors and Assigns**. Subject to the provisions otherwise contained in this Agreement, this Agreement shall inure to the benefit of and be binding on the successors and assigns of the respective parties.

**13.2. Notices.** Any notice under this Agreement shall be in writing, and any written notice or other document shall be deemed to have been duly given (i) on the date of personal service on the parties, (ii) on the third business day after mailing, if the document is mailed by registered or certified mail, (iii) one day after being sent by overnight service guaranteeing one-day delivery, with receipt confirmed by the courier, or (iv) on the date of transmission if sent by email, facsimile or other means of electronic transmission resulting in written copies, with receipt confirmed. Any such notice shall be delivered or addressed to the parties at the addresses set forth in the Purchase Agreement or at the most recent address specified by the addressee through written notice under this provision. Failure to conform to the requirement that mailings be done by registered or certified mail shall not defeat the effectiveness of notice actually received by the addressee.

**13.3. Amendment**. The provisions of this Agreement may be modified at any time by written agreement of the parties. Any such agreement hereafter made shall be ineffective to modify this Agreement in any respect unless in writing and signed by Pledgor and Secured Party.

**13.4. Attorneys' Fees; Prejudgment Interest.** If the services of an attorney are required by Secured Party to secure the performance of this Agreement or otherwise upon the breach or default of this Agreement, or if any judicial remedy or arbitration is necessary to enforce or interpret any provision of this Agreement or the rights and duties of any person in relation thereto, Secured Party shall be entitled to reasonable attorneys' fees, costs and other expenses, in addition to any other relief to which such party may be entitled. Any award of damages following judicial remedy or arbitration as a result of the breach of this Agreement or any of its provisions shall include an award of prejudgment interest from the date of the breach at the maximum amount of interest allowed by law.

**13.6. Captions**. All section captions are for reference only and shall not be considered in construing this Agreement.

**13.7. Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the Agreement which can be given effect without the invalid provision shall continue in full force and effect and shall in no way be impaired or invalidated.

**13.8. Governing Law.** The rights and obligations of the parties and the interpretation and performance of this Agreement shall be governed by the law of California, excluding its conflict of laws rules. Any legal action to enforce the provisions of this Agreement may be commenced only in the Superior Court of Sacramento County, California.

**13.9. Entire Agreement**. This document and its exhibits, together with the Promissory Note, constitute the entire agreement between the parties.

**13.10 Counterparts**. This Agreement may be executed in two or more counterparts, each of which will be considered an original but all of which together will constitute one agreement. Facsimile or PDF signatures shall be deemed to have the same effect as original signatures.

**13.11 R elease**. I f a nd w hen t he l ien o f t he d eed o f t rust i n f avor o f L ender, a s beneficiary, securing the Borrower Obligations is reconveyed, whether by a partial or full reconveyance, from all of the real property owned by the limited liability company described in Section 4.1, the lien and security in the Collateral shall be released, and this Agreement shall terminate

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**SECURED PARTY**:

BOBS, LLC

By:______________________________

Its: ______________________________

**PLEDGOR**:

__________________________
Scott Gillen

**INTEREST PLEDGE AGREEMENT**
**[600 Spring, LLC]**

THIS INTEREST PLEDGE AGREEMENT ("**Agreement**") dated as of August 25, 2020 is made by and between SCOTT GILLEN ("**Pledgor"**) on behalf of **600 Spring, LLC**, a California Limited Liability Company, **23800 MALIBU LLC**, a California Limited Liability Company, **THE BU HOUSES LLC**, a California Limited Liability Company, **CLIFFSIDE DUME** LLC, a California Limited Liability Company, **Malibu Road #3**, a California Limited Liability Company, ~~**MLR MALIBU, LLC**, an Oregon Limited Liability Company~~ and **Paradise Cove Malibu LLC** (all LLC's above shall be jointly and collectively referred to as "Borrower") and BOBS, LLC ("**Secured Party**"), who agree as follows:

1. **Background and Purpose.** Pursuant to that certain (i) Promissory Note between Borrower and Secured Party ("BOBS, LLC") dated August 25, 2020; Secured Party consolidated all outstanding debt by Borrower into One Promissory Note affirming amounts owed by Borrower including interest which has compounded daily at a 12% interest rate Pledgor holds a membership interest in 600 Spring LLC and, pursuant to the terms of the Promissory Note and as a condition to the Loan, Pledgor agreed to secure the Loan with the pledge of security contained herein

2. **Grant of Security Interest.** To secure 600 Spring LLC's Obligations (as defined in section 3 below), from and after the funding of the Loan pursuant to the Promissory Note, Pledgor hereby grants to Secured Party a security interest in the Collateral (as defined in Section 4 below).

3. **Obligations**. For purposes of this Agreement, "**Obligations**" means any and all obligations and liabilities of Pledgor to Secured Party arising out of the Promissory Note.

4. **Collateral**. For purposes of this Agreement, "**Collateral**" means:

**4.1** All of Pledgor's right, title and interest in the Pledgor's membership interest in a California limited liability company called "600 Spring, LLC" ("600 Spring"), said interest being referred to herein as the 600 Spring Membership Interest; and

**4.2** All preferred return, return of capital, dividends, interest payments or other distribution in any form ("**Distributions")** by the Company related to the 600 Spring Membership Interest.

5. **Representations and Warranties**. As a material inducement to Secured Party hereunder, Pledgor represents and warrants that the following are and shall remain true and correct:

**5.1.** **Title.** Pledgor is the owner of all right, title and interest in the Collateral free and clear of all liens, encumbrances and security interests, except the security interest created by this Agreement.

**5.2.** **No Conflict.** The execution, delivery and performance of this Agreement by Pledgor is not in violation of any applicable law or regulation or contractual obligation of Pledgor.

**5.3.** **First Priority Lien.** The liens granted to Secured Party under this Agreement will constitute a first priority lien on the Collateral subject to any existing senior liens if any and Pledgor's grant of such lien to Secured Party does not constitute a fraudulent conveyance under any applicable law. Pledgor warrants that Pledgor will not change Pledgor's residence or state of formation during the term of this Agreement without providing thirty (30) days prior written notice to Secured Party.

**5.4. Continued Performance.** That Pledger shall fully and timely perform and comply with all obligations applicable to the Interest, whether under the Company Operating Agreement or otherwise.

**6. Covenants and Agreements of Pledgor.**

**6.1. Obligations Unconditional.** The Obligations of the Pledgor shall be continuing, irrevocable, primary, absolute and unconditional irrespective of the value, genuineness, validity, regularity or enforceability of this Agreement, the Assignment Agreement, and the Promissory Note, or any other agreement or instrument referred to therein, or any substitution, release or exchange of any guarantee of or security for any of the Obligations and, to the fullest extent permitted by any applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, other than the occurrence of the indefeasible payment in full of the Obligations.

6.2 ~~**Protection of Security Interest.** Contemporaneously with the execution of this Agreement, at~~**No UCC-1 Financing Statements.** Secured Party~~'s election, Pledgor authorizes Secured Party to~~ shall not file any UCC-1 financing statements covering ~~all~~any of the Collateral or naming Pledgor as a debtor. to enable Secured Party to perfect Secured Party's security interest in the Collateral. ~~Pledgor agrees also to execute, file and record such other statements, notices and agreements, take such action and obtain such certificates and documents, in accordance with all applicable laws, statutes and regulations as requested by Secured Party to perfect, evidence and continue Secured Party's security interest in the Collateral.~~

**6.3. Transactions Involving Collateral.** Pledgor shall not, without the prior written consent of Secured Party, (i) assign, sell, offer to sell, or otherwise transfer the Collateral or (ii) pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest or charge, other than the security interest created by this Agreement.

**6.4. Compliance with Laws.** Pledgor shall comply with all laws, statutes and regulations pertaining to the Collateral.

**6.5. Taxes, Assessments and Liens.** Pledgor shall pay when due all Company capital calls, taxes, assessments and liens with regard to the Collateral. Pledgor may withhold any such payment or may elect to contest any lien if Pledgor is conducting appropriate proceedings in good faith to contest the obligation to pay and so long as Secured Party's interest is not jeopardized.

**7. Authorized Action by Secured Party.** Pledgor irrevocably appoints Secured Party as Pledgor's attorney in fact to exercise such rights and powers as Pledgor might exercise with respect to the Collateral following an Event of Default, as defined below. These powers shall include without limitation the right to (i) collect by legal proceedings or otherwise and endorse, receive and receipt all Distributions, dividends, interest, payments, proceeds, and other sums and property now or hereafter payable on account of the Collateral, (ii) if Secured Party acquires the Collateral in accordance with the California Uniform Commercial Code, transfer the Collateral to its own or its nominee's name, (iii) make any compromise or settlement and take any action Secured Party deems advisable with respect to the Collateral, and (iv) exercise all rights under the applicable Uniform Commercial Code with respect to the Collateral. Pledgor agrees to reimburse Secured Party upon demand for any costs and expenses, including without limitation attorneys' fees, which Secured Party may incur while acting as Pledgor's attorney in fact hereunder, all of which costs and expenses are included in the Obligations secured hereby. Secured Party shall have no obligation to act pursuant to this section and shall not be required to make any presentment, demand or

protest, or give any notice or take any action to preserve any rights against any other person in connection with the Collateral.

**8. Defaults and Remedies.**

**8.1. Event of Default.** Any "**Event of Default**" as defined by the Promissory Note shall constitute an Event of Default under this Agreement.

**8.2. Remedies.** Upon the occurrence of an Event of Default, Secured Party shall have the right, at its election, but not the obligation, to do any of the following:

(a) vote or exercise any and all of the Pledgor's rights or powers incident to its ownership of the Interests, including any rights or powers to manage or control the Company and receive dividends or Distributions;

(b) exercise all rights and remedies accorded to Secured Party by California law, including, but not limited to the California Uniform Commercial Code;

(c) if Secured Party acquires the Collateral in accordance with the California Uniform Commercial Code, transfer the Collateral, or any part thereof, to the name of Secured Party or to the name of any nominee of Secured Party;

(d) declare all unperformed Obligations, in whole or in part, of Pledgor immediately due and payable without demand or notice;

(e) exercise all rights and remedies under the Promissory Note;

(f) take any other lawful action that Secured Party deems necessary or desirable to protect or realize upon its security interest in the Collateral or any part thereof; and

(g) require Pledgor to take any and all action necessary to make the Collateral available to Secured Party.

**8.3. Remedies Cumulative.** All of Secured Party's rights and remedies, whether evidenced hereby or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Secured Party to pursue any remedy shall not exclude pursuit of any other remedy.

**9. Rights Absent Default.** During the term of this Agreement and until an Event of Default has occurred, Pledgor shall retain the right to vote the Interests and to exercise any other rights of a Member of the Company not otherwise disallowed by or inconsistent with the terms of this Agreement.

**10. Waiver.** Secured Party shall not be deemed to have waived any rights under this Agreement unless such waiver is in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any right shall operate as a waiver of such right or any other right.

**11. Additional Documentation; Cooperation.** Each party shall, upon the request of the other, execute, acknowledge and deliver to the other any instrument that may be required to accomplish the intent of this Agreement. Each party agrees to cooperate to effectuate the intent of this Agreement and shall take all appropriate action necessary or useful in doing so.

**12. Non-Responsibility of Secured Party.** Secured Party is not responsible for the preservation or exercise of any rights to, or granted by any Collateral in Secured Party's possession or

depreciation of Collateral in Secured Party’s possession unless caused willfully or by the gross negligence of Secured Party.

**13. Miscellaneous.**

**13.1. Successors and Assigns**. Subject to the provisions otherwise contained in this Agreement, this Agreement shall inure to the benefit of and be binding on the successors and assigns of the respective parties.

**13.2. Notices.** Any notice under this Agreement shall be in writing, and any written notice or other document shall be deemed to have been duly given (i) on the date of personal service on the parties, (ii) on the third business day after mailing, if the document is mailed by registered or certified mail, (iii) one day after being sent by overnight service guaranteeing one-day delivery, with receipt confirmed by the courier, or (iv) on the date of transmission if sent by email, facsimile or other means of electronic transmission resulting in written copies, with receipt confirmed. Any such notice shall be delivered or addressed to the parties at the addresses set forth in the Purchase Agreement or at the most recent address specified by the addressee through written notice under this provision. Failure to conform to the requirement that mailings be done by registered or certified mail shall not defeat the effectiveness of notice actually received by the addressee.

**13.3. Amendment**. The provisions of this Agreement may be modified at any time by written agreement of the parties. Any such agreement hereafter made shall be ineffective to modify this Agreement in any respect unless in writing and signed by Pledgor and Secured Party.

**13.4. Attorneys' Fees; Prejudgment Interest.** If the services of an attorney are required by Secured Party to secure the performance of this Agreement or otherwise upon the breach or default of this Agreement, or if any judicial remedy or arbitration is necessary to enforce or interpret any provision of this Agreement or the rights and duties of any person in relation thereto, Secured Party shall be entitled to reasonable attorneys' fees, costs and other expenses, in addition to any other relief to which such party may be entitled. Any award of damages following judicial remedy or arbitration as a result of the breach of this Agreement or any of its provisions shall include an award of prejudgment interest from the date of the breach at the maximum amount of interest allowed by law.

**13.6. Captions**. All section captions are for reference only and shall not be considered in construing this Agreement.

**13.7. Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the Agreement which can be given effect without the invalid provision shall continue in full force and effect and shall in no way be impaired or invalidated.

**13.8. Governing Law.** The rights and obligations of the parties and the interpretation and performance of this Agreement shall be governed by the law of California, excluding its conflict of laws rules. Any legal action to enforce the provisions of this Agreement may be commenced only in the Superior Court of Sacramento County, California.

**13.9. Entire Agreement**. This document and its exhibits, together with the Promissory Note, constitute the entire agreement between the parties.

**13.10 Counterparts**. This Agreement may be executed in two or more counterparts, each of which will be considered an original but all of which together will constitute one agreement. Facsimile or PDF signatures shall be deemed to have the same effect as original signatures.

**13.11 R elease**. I f a nd w hen t he l ien o f t he d eed o f t rust i n f avor o f L ender, a s beneficiary, securing the Borrower Obligations is reconveyed, whether by a partial or full reconveyance, from all of the real property owned by the limited liability company described in Section 4.1, the lien and security in the Collateral shall be released, and this Agreement shall terminate

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**SECURED PARTY**:

BOBS, LLC

By:______________________________

Its: ______________________________

**PLEDGOR**:

__________________________
Scott Gillen

**INTEREST PLEDGE AGREEMENT**
**[BU HOUSES LLC]**

THIS INTEREST PLEDGE AGREEMENT ("**Agreement**") dated as of August 25, 2020 is made by and between SCOTT GILLEN ("**Pledgor**") on behalf of **BU HOUSES, LLC**, a California Limited Liability Company, **23800 MALIBU LLC**, a California Limited Liability Company, **600 SPRING LLC**, a California Limited Liability Company, **CLIFFSIDE DUME** LLC, a California Limited Liability Company, **Malibu Road #3**, a California Limited Liability Company, ~~**MLR MALIBU, LLC**, an Oregon Limited Liability Company~~ and **Paradise Cove Malibu LLC** (all LLC's above shall be jointly and collectively referred to as "Borrower") and BOBS, LLC ("**Secured Party**"), who agree as follows:

**Background and Purpose.** Pursuant to that certain (i) Promissory Note between Borrower and Secured Party ("BOBS, LLC") dated August 25,

2020; Secured Party consolidated all outstanding debt by Borrower into One Promissory Note affirming amounts owed by Borrower including interest which has compounded daily at a 12% interest rate. Pledgor holds a membership interest in The BU Houses LLC and, pursuant to the terms of the Promissory Note and as a condition to the Loan, Pledgor agreed to secure the Loan with the pledge of security contained herein.

1. **Grant of Security Interest.** To secure ~~MLR~~Bu House's Obligations (as defined in section 3 below), from and after the funding of the Loan pursuant to the Promissory Note, Pledgor hereby grants to Secured Party a security interest in the Collateral (as defined in Section 4 below).

2. **Obligations**. For purposes of this Agreement, "**Obligations**" means any and all obligations and liabilities of Pledgor to Secured Party arising out of the Promissory Note.

3. ~~2.~~ **Collateral**. For purposes of this Agreement, "**Collateral**" means:

a. All of Pledgor's right, title and interest in the Pledgor's membership interest in a California limited liability company called "BU Houses, LLC" ("BU Houses"), said interest being referred to herein as the BU Houses LLC Membership Interest; and

b. All preferred return, return of capital, dividends, interest payments, or other distributions in any form ("**Distributions")** by the company related to the BU Houses LLC Membership Interest.

4. ~~3.~~ **Representations and Warranties**. As a material inducement to Secured Party hereunder, Pledgor represents and warrants that the following are and shall remain true and correct:

~~3.1~~4.1 **Title.** Pledgor is the owner of all right, title and interest in the Collateral free and clear of all liens, encumbrances and security interests, except the security interest created by this Agreement.

~~3.2~~4.2 **No Conflict.** The execution, delivery and performance of this Agreement by Pledgor is not in violation of any applicable law or regulation or contractual obligation of Pledgor.

~~3.3~~4.3 **First Priority Lien.** The liens granted to Secured Party under this Agreement will constitute a first priority lien subject to any existing senior liens on the Collateral and Pledgor's grant of such lien to Secured Party does not constitute a fraudulent conveyance under any applicable law. Pledgor warrants that Pledgor will not change Pledgor's residence or state of formation during the term of this Agreement without providing thirty (30) days prior written notice to Secured Party.

3.4 4.4 **Continued Performance.** That Pledger shall fully and timely perform and comply with all obligations applicable to the Interest, whether under the Company Operating Agreement or otherwise.

**5. 4. Covenants and Agreements of Pledgor.**

**4.1. Obligations Unconditional**. The Obligations of the Pledgor shall be continuing, irrevocable, primary, absolute and unconditional irrespective of the value, genuineness, validity, regularity or enforceability of this Agreement, the Assignment Agreement, and the Promissory Note, or any other agreement or instrument referred to therein, or any substitution, release or exchange of any guarantee of or security for any of the Obligations and, to the fullest extent permitted by any applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, other than the occurrence of the indefeasible payment in full of the Obligations.

**4.2** ~~**Protection of Security Interest.** Contemporaneously with the execution of this Agreement, a t~~**No UCC-1 Financing Statements.** Secured Party~~'s election and if available to Secured Party, Pledgor authorizes Secured Party to~~ shall not file any UCC-1 financing statements covering ~~all~~any of the Collateral or naming Pledgor as a debtor. to enable Secured Party to perfect Secured Party's security interest in the Collateral. ~~Pledgor agrees also to execute, file and record such other statements, notices and agreements, take such action and obtain such certificates and documents, in accordance with all applicable laws, statutes and regulations as requested by Secured Party to perfect, evidence and continue Secured Party's security interest in the Collateral.~~

**4.3 Transactions Involving Collateral.** Pledgor shall not, without the prior written consent of Secured Party, (i) assign, sell, offer to sell, or otherwise transfer the Collateral or (ii) pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest or charge, other than the security interest created by this Agreement.

**4.4 Compliance with Laws.** Pledgor shall comply with all laws, statutes and regulations pertaining to the Collateral.

**4.5 Taxes, Assessments and Liens.** Pledgor shall pay when due all Company capital calls, taxes, assessments and liens with regard to the Collateral. Pledgor may withhold any such payment or may elect to contest any lien if Pledgor is conducting appropriate proceedings in good faith to contest the obligation to pay and so long as Secured Party's interest is not jeopardized.

6. ~~5.~~ **Authorized Action by Secured Party** Pledgor irrevocably appoints Secured Party as Pledgor's attorney in fact to exercise such rights and powers as Pledgor might exercise with respect to the Collateral following an Event of Default, as defined below. These powers shall include without limitation the right to (i) collect by legal proceedings or otherwise and endorse, receive and receipt all Distributions, dividends, interest, payments, proceeds, and other sums and

property now or hereafter payable on account of the Collateral, (ii) if Secured Party acquires the Collateral in accordance with the California Uniform Commercial Code, transfer the Collateral to its own or its nominee's name, (iii) make any compromise or settlement and take any action Secured Party deems advisable with respect to the Collateral, and (iv) exercise all rights under the applicable Uniform Commercial Code with respect to the Collateral. Pledgor agrees to reimburse Secured Party upon demand for any costs and expenses, including without limitation attorneys' fees, which Secured Party may incur while acting as Pledgor's attorney in fact hereunder, all of which costs and expenses are included in the Obligations secured hereby. Secured Party shall have no obligation to act pursuant to this section and shall not be required to make any presentment, demand or protest, or give any notice or take any action to preserve any rights against any other person in connection with the Collateral.

**7.**

~~6.~~ **Defaults and Remedies.**

**6.1 Event of Default.** Any "**Event of Default**" as defined by the Promissory Note shall constitute an Event of Default under this Agreement.

**6.2 Remedies.** Upon the occurrence of an Event of Default, Secured Party shall have the right, at its election, but not the obligation, to do any of the following:

(a) vote or exercise any and all of the Pledgor's rights or powers incident to its ownership of the Interests, including any rights or powers to manage or control the Company and receive dividends or Distributions;

(b) exercise all rights and remedies accorded to Secured Party by California law, including, but not limited to the California Uniform Commercial Code;

(c) if Secured Party acquires the Collateral in accordance with the California Uniform Commercial Code, transfer the Collateral, or any part thereof, to the name of Secured Party or to the name of any nominee of Secured Party;

(d) declare all unperformed Obligations, in whole or in part, of Pledgor immediately due and payable without demand or notice;

(e) exercise all rights and remedies under the Promissory Note;

(f) take any other lawful action that Secured Party deems necessary or desirable to protect or realize upon its security interest in the Collateral or any part thereof; and

(g) require Pledgor to take any and all action necessary to make the Collateral available to Secured Party.

**6.3 Remedies Cumulative.** All of Secured Party's rights and remedies, whether evidenced hereby or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Secured Party to pursue any remedy shall not exclude pursuit of any other remedy.

8. ~~7.~~ **Rights Absent Default.** During the term of this Agreement and until an Event of Default has occurred, Pledgor shall retain the right to vote the Interests and to exercise any other rights of a Member of the Company not otherwise disallowed by or inconsistent with the terms of this Agreement.

9. ~~8.~~ **Waiver.** Secured Party shall not be deemed to have waived any rights under this Agreement unless such waiver is in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any right shall operate as a waiver of such right or any other right.

10. ~~9.~~ **Additional Documentation; Cooperation.** Each party shall, upon the request of the other, execute, acknowledge and deliver to the other any instrument that may be required to accomplish the intent of this Agreement. Each party agrees to cooperate to effectuate the intent of this Agreement and shall take all appropriate action necessary or useful in doing so.

11.

**0. Non-Responsibility o f S ecured P arty.** Secured P arty i s n ot responsible for the preservation or exercise of any rights to, or granted by any Collateral in Secured Party's

possession or depreciation of Collateral in Secured Party's possession unless caused willfully or by the gross negligence of Secured Party.

**12. ~~11.~~ Miscellaneous.**

**11.1 Successors and Assigns**. Subject to the provisions otherwise contained in this Agreement, this Agreement shall inure to the benefit of and be binding on the successors and assigns of the respective parties.

**11.2 Notices.** Any notice under this Agreement shall be in writing, and any written notice or other document shall be deemed to have been duly given (i) on the date of personal service on the parties, (ii) on the third business day after mailing, if the document is mailed by registered or certified mail, (iii) one day after being sent by overnight service guaranteeing one-day delivery, with receipt confirmed by the courier, or (iv) on the date of transmission if sent by email, facsimile or other means of electronic transmission resulting in written copies, with receipt confirmed. Any such notice shall be delivered or addressed to the parties at the addresses set

forth in the Purchase Agreement or at the most recent address specified by the addressee through written notice under this provision. Failure to conform to the requirement that mailings be done by registered or certified mail shall not defeat the effectiveness of notice actually received by the addressee.

**11.3** **Amendment**. The provisions of this Agreement may be modified at any time by written agreement of the parties. Any such agreement hereafter made shall be ineffective to modify this Agreement in any respect unless in writing and signed by Pledgor and Secured Party.

**11.4** **Attorneys' Fees; Prejudgment Interest** If the services of an attorney are requiredby Secured Party to secure the performance of this Agreement or otherwise upon the breach or default of this Agreement, or if any judicial remedy or arbitration is necessary to enforce or interpret any provision of this Agreement or the rights and duties of any person in relation thereto, Secured Party shall be entitled to reasonable attorneys' fees, costs and other

expenses, in addition to any other relief to which such party may be entitled. Any award of damages following judicial remedy or arbitration as a result of the breach of this Agreement or any of its provisions shall include an award of prejudgment interest from the date of the breach at the maximum amount of interest allowed by law.

**11.5 Captions**. All section captions are for reference only and shall not be considered in construing this Agreement.

**11.6 Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the Agreement which can be given effect without the invalid provision shall continue in full force and effect and shall in no way be impaired or invalidated.

**11.7 Governing Law.** The rights and obligations of the parties and the interpretation and performance of this Agreement shall be governed by the law

of California, excluding its conflict of laws rules. Any legal action to enforce the provisions of this Agreement may be commenced only in the Superior Court of Sacramento County, California.

**11.8 Entire Agreement**. This document and its exhibits, together with the Promissory Note, constitute the entire agreement between the parties.

**11.9 Counterparts**. This Agreement may be executed in two or more counterparts, each of which will be considered an original but all of which together will constitute one agreement. Facsimile or PDF signatures shall be deemed to have the same effect as original signatures.

**11.10 Release**. If and when the lien of the deed of trust in favor of Lender, as beneficiary, securing the Borrower Obligations is reconveyed, whether by a partial or full reconveyance, from all of the real property owned by the limited liability

company described in Section 4.1, the lien and security in the Collateral shall be released, and this Agreement shall terminate

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**SECURED PARTY**:

BOBS, LLC

By:______________________________

Its: ______________________________

**PLEDGOR**:

______________________________
Scott Gillen

**INTEREST PLEDGE AGREEMENT**
**[Cliffside Dume, LLC]**

THIS INTEREST PLEDGE AGREEMENT ("**Agreement**") dated as of August 25, 2020 is made by and between SCOTT GILLEN ("**Pledgor"**) on behalf of **Cliffside Dume, LLC**, a California Limited Liability Company, **23800 MALIBU LLC**, a California Limited Liability Company, **600 SPRING LLC,** a California Limited Liability Company, **THE BUHOUSES LLC**, a California Limited Liability Company, ~~**MLR MALIBU, LLC**, an Oregon Limited Liability Company,~~ **Malibu Road #3**, a California Limited Liability Company and **Paradise Cove Malibu LLC** (all LLC's above shall be jointly and collectively referred to as "Borrower") and BOBS, LLC ("**Secured Party**"), who agree as follows:

**Background and Purpose.** Pursuant to that certain (i) Promissory Note between Borrower and Secured Party ("BOBS, LLC") dated August 25, 2020; Secured Party consolidated all outstanding debt by Borrower into One Promissory Note affirming amounts owed by Borrower including interest which has compounded daily at a 12% interest rate Pledgor holds a membership interest in Cliffside Dume LLC and, pursuant to the terms of the Promissory Note and as a condition to the Loan, Pledgor agreed to secure the Loan with the pledge of security contained herein.

**1. Grant of Security Interest.** To secure ~~MLR~~Cliffside Dume's Obligations (as defined in section 3 below), from and after the funding of the Loan pursuant to the Loan Agreement, Pledgor hereby grants to Secured Party a security interest in the Collateral (as defined in Section 4 below).

**2. Obligations**. For purposes of this Agreement, "**Obligations**" means any and all obligations and liabilities of Pledgor to Secured Party arising out of the Promissory Note.

**3. Collateral**. For purposes of this Agreement, "**Collateral**" means:

**3.1** All of Pledgor's right, title and interest in the Pledgor's membership interest in a California limited liability company called "Cliffside Dume, LLC" ("Cliffside"), said interest being referred to herein as the Cliffside Dume Membership Interest; and

**3.2** All preferred return, return of capital, dividends, interest payments or other distribution in any form ("**Distributions")** by the Company related to the Cliffside Dume Membership Interest.

**4. Representations and Warranties**. As a material inducement to Secured Party hereunder, Pledgor represents and warrants that the following are and shall remain true and correct:

**4.1** **Title.** Pledgor is the owner of all right, title and interest in the Collateral free and clear of all liens, encumbrances and security interests, except the security interest created by this Agreement.

**4.2** **No Conflict.** The execution, delivery and performance of this Agreement by Pledgor is not in violation of any applicable law or regulation or contractual obligation of Pledgor.

**4.3** **First Priority Lien.** The liens granted to Secured Party under this Agreement will constitute a first priority lien subject to any existing senior liens on the Collateral and Pledgor's grant of such lien to Secured Party does not constitute a fraudulent conveyance under any applicable law. Pledgor warrants that Pledgor will not change Pledgor's residence or state of formation during the term of this Agreement without providing thirty (30) days prior written notice to Secured Party.

**4.4** **Continued Performance.** That Pledger shall fully and timely perform and comply

with all obligations applicable to the Interest, whether under the Company Operating Agreement or otherwise.

5. **Covenants and Agreements of Pledgor.**

5.1. **Obligations Unconditional**. The Obligations of the Pledgor shall be continuing, irrevocable, primary, absolute and unconditional irrespective of the value, genuineness, validity, regularity or enforceability of this Agreement, the Assignment Agreement, and the Promissory Note, or any other agreement or instrument referred to therein, or any substitution, release or exchange of any guarantee of or security for any of the Obligations and, to the fullest extent permitted by any applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, other than the occurrence of the indefeasible payment in full of the Obligations.

5.2 ~~**Protection of Security Interest.** Contemporaneously with the execution of this Agreement, at~~**No UCC-1 Financing Statements.** Secured Party~~'s election, Pledgor authorizes Secured Party to~~ shall not file any UCC-1 financing statements covering ~~all~~any of the Collateral or naming Pledgor as a debtor. to enable Secured Party to perfect Secured Party's security interest in the Collateral. ~~Pledgor agrees also to execute, file and record such other statements, notices and agreements, take such action and obtain such certificates and documents, in accordance with all applicable laws, statutes and regulations as requested by Secured Party to perfect, evidence and continue Secured Party's security interest in the Collateral.~~

**5.3 Transactions Involving Collateral.** Pledgor shall not, without the prior written consent of Secured Party, (i) assign, sell, offer to sell, or otherwise transfer the Collateral or (ii) pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest or charge, other than the security interest created by this Agreement.

**5.4 Compliance with Laws.** Pledgor shall comply with all laws, statutes and regulations pertaining to the Collateral.

**5.5 Taxes, Assessments and Liens.** Pledgor shall pay when due all Company capital calls, taxes, assessments and liens with regard to the Collateral. Pledgor may withhold any such payment or may elect to contest any lien if Pledgor is conducting appropriate proceedings in good faith to contest the obligation to pay and so long as Secured Party's interest is not jeopardized.

6 **Authorized Action by Secured Party.** Pledgor irrevocably appoints Secured Party as Pledgor's attorney in fact to exercise such rights and powers as Pledgor might exercise with respect to the Collateral following an Event of Default, as defined below. These powers shall include without limitation the right to (i) collect by legal proceedings or otherwise and endorse, receive and receipt all Distributions, dividends, interest, payments, proceeds, and other sums and property now or hereafter payable on account of the Collateral, (ii) if Secured Party acquires the Collateral in accordance with the California Uniform Commercial Code, transfer the Collateral to its own or its nominee's name, (iii) make any compromise or settlement and take any action Secured Party deems advisable with respect to the Collateral, and (iv) exercise all rights under the applicable Uniform Commercial Code with respect to the Collateral. Pledgor agrees to reimburse Secured Party upon demand for any costs and expenses, including without limitation attorneys' fees, which Secured Party may incur while acting as Pledgor's attorney in fact hereunder, all of which costs and expenses are included in the Obligations secured hereby. Secured Party shall have no obligation to act pursuant to this section and shall not be required to make any presentment, demand or protest, or give any notice or take any action to preserve any rights against any other person in connection with the Collateral.

8 **Defaults and Remedies.**

**8.1. Event of Default.** Any "**Event of Default**" as defined by the Promissory Note shall constitute an Event of Default under this Agreement.

**8.2. Remedies.** Upon the occurrence of an Event of Default, Secured Party shall have the right, at its election, but not the obligation, to do any of the following:

(a) vote or exercise any and all of the Pledgor's rights or powers incident to its ownership of the Interests, including any rights or powers to manage or control the Company and receive dividends or Distributions;

(b) exercise all rights and remedies accorded to Secured Party by California law, including, but not limited to the California Uniform Commercial Code;

(c) if Secured Party acquires the Collateral in accordance with the California Uniform Commercial Code, transfer the Collateral, or any part thereof, to the name of Secured Party or to the name of any nominee of Secured Party;

(d) declare all unperformed Obligations, in whole or in part, of Pledgor immediately due and payable without demand or notice;

(e) exercise all rights and remedies under the Promissory Note;

(f) take any other lawful action that Secured Party deems necessary or desirable to protect or realize upon its security interest in the Collateral or any part thereof; and

(g) require Pledgor to take any and all action necessary to make the Collateral available to Secured Party.

**8.3. Remedies Cumulative.** All of Secured Party's rights and remedies, whether evidenced hereby or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Secured Party to pursue any remedy shall not exclude pursuit of any other remedy.

9. **Rights Absent Default.** During the term of this Agreement and until an Event of Default has occurred, Pledgor shall retain the right to vote the Interests and to exercise any other rights of a Member of the Company not otherwise disallowed by or inconsistent with the terms of this Agreement.

**10. Waiver.** Secured Party shall not be deemed to have waived any rights under this Agreement unless such waiver is in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any right shall operate as a waiver of such right or any other right.

**11. Additional Documentation; Cooperation.** Each party shall, upon the request of the other, execute, acknowledge and deliver to the other any instrument that may be required to accomplish the intent of this Agreement. Each party agrees to cooperate to effectuate the intent of this Agreement and shall take all appropriate action necessary or useful in doing so.

**12. Non-Responsibility of Secured Party.** Secured Party is not responsible for the preservation or exercise of any rights to, or granted by any Collateral in Secured Party's possession or depreciation of Collateral in Secured Party's possession unless caused willfully or by the gross negligence of Secured Party.

**13. Miscellaneous.**

**13.1. Successors and Assigns**. Subject to the provisions otherwise contained in this Agreement, this Agreement shall inure to the benefit of and be binding on the successors and assigns of the respective parties.

**13.2. Notices.** Any notice under this Agreement shall be in writing, and any written notice or other document shall be deemed to have been duly given (i) on the date of personal service on the parties, (ii) on the third business day after mailing, if the document is mailed by registered or certified mail, (iii) one day after being sent by overnight service guaranteeing one-day delivery, with receipt confirmed by the courier, or (iv) on the date of transmission if sent by email, facsimile or other means of electronic transmission resulting in written copies, with receipt confirmed. Any such notice shall be delivered or addressed to the parties at the addresses set forth in the Purchase Agreement or at the most recent address specified by the addressee through written notice under this provision. Failure to conform to the requirement that mailings be done by registered or certified mail shall not defeat the effectiveness of notice actually received by the addressee.

**13.3. Amendment**. The provisions of this Agreement may be modified at any time by written agreement of the parties. Any such agreement hereafter made shall be ineffective to modify this Agreement in any respect unless in writing and signed by Pledgor and Secured Party.

**13.4. Attorneys' Fees; Prejudgment Interest.** If the services of an attorney are required by Secured Party to secure the performance of this Agreement or otherwise upon the breach or default of this Agreement, or if any judicial remedy or arbitration is necessary to enforce or interpret any provision of this Agreement or the rights and duties of any person in relation thereto, Secured Party shall be entitled to reasonable attorneys' fees, costs and other expenses, in addition to any other relief to which such party may be entitled. Any award of damages following judicial remedy or arbitration as a result of the breach of this Agreement or any of its provisions shall include an award of prejudgment interest from the date of the breach at the maximum amount of interest allowed by law.

**13.6. Captions**. All section captions are for reference only and shall not be considered in construing this Agreement.

**13.7. Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the Agreement which can be given effect without the invalid provision shall continue in full force and effect and shall in no way be impaired or invalidated.

**13.8. Governing Law.** The rights and obligations of the parties and the interpretation and performance of this Agreement shall be governed by the law of California, excluding its conflict of laws rules. Any legal action to enforce the provisions of this Agreement may be commenced only in the Superior Court of Sacramento County, California.

**13.9. Entire Agreement**. This document and its exhibits, together with the Promissory Note, constitute the entire agreement between the parties.

**13.10 Counterparts**. This Agreement may be executed in two or more counterparts, each of which will be considered an original but all of which together will constitute one agreement. Facsimile or PDF signatures shall be deemed to have the same effect as original signatures.

**13.11 Release**. If and when the lien of the deed of trust in favor of Lender, as beneficiary, securing the Borrower Obligations is reconveyed, whether by a partial or full reconveyance, from all of the real property owned by the limited liability company described in Section 4.1, the lien and security in the Collateral shall be released, and this Agreement shall terminate

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**SECURED PARTY**:

BOBS, LLC

By:______________________________

Its: ______________________________

**PLEDGOR**:

__________________________
Scott Gillen

**INTEREST PLEDGE AGREEMENT**
**[Paradise Cove Malibu, LLC]**

THIS INTEREST PLEDGE AGREEMENT ("**Agreement**") dated as of August 25, 2020 is made by and between SCOTT GILLEN ("**Pledgor**") on behalf of **Paradise Cove Malibu, LLC**, a California Limited Liability Company, **23800 MALIBU LLC**, a California Limited Liability Company, **600 SPRING LLC**, a California Limited Liability Company, **THE BU HOUSES LLC**, a California Limited Liability Company, **CLIFFSIDE DUME LLC**, a California Limited Liability Company, and **Malibu Road # 3**, a California Limited Liability Company ~~and **MLR MALIBU, LLC**, an Oregon Limited Liability Company~~ (all LLC's above shall be jointly and collectively referred to as "Borrower") and BOBS, LLC ("**Secured Party**"), who agree as follows:

1 **Background and Purpose.** Pursuant to that certain (i) Promissory Note between Borrower and Secured Party ("BOBS, LLC") dated August 25, 2020; Secured Party consolidated all outstanding debt by Borrower into One Promissory Note affirming amounts owed by Borrower including interest which has compounded daily at a 12% interest rate Pledgor holds a membership interest in The Paradise Cove LLC and, pursuant to the terms of the Promissory Note and as a condition to the Loan, Pledgor agreed to secure the Loan with the pledge of security contained herein

2 **Grant of Security Interest.** To secure Borrower's Obligations (as defined in section 3 below), from and after the funding of the Loan pursuant to the Promissory Note, Pledgor hereby grants to Secured Party a security interest in the Collateral (as defined in Section 4 below).

3 **Obligations**. For purposes of this Agreement, "**Obligations**" means any and all obligations and liabilities of Pledgor to Secured Party arising out of the Promissory Note and any associated documents.

4 **Collateral**. For purposes of this Agreement, "**Collateral**" means:

a. All of Pledgor's right, title and interest in the Pledgor's membership interest in a California limited liability company called Paradise Cove Malibu LLC, said interest being referred to herein as the 23800 Malibu Crest Membership Interest; and

b. All preferred return, return of capital, dividends, interest payments or other distribution in any form ("**Distributions"**) by the Company related to the Paradise Cove Malibu LLC Membership Interest.

5 **Representations and Warranties**. As a material inducement to Secured Party hereunder, Pledgor represents and warrants that the following are and shall remain true and correct:

5.1 **Title.** Pledgor is the owner of all right, title and interest in the Collateral free and clear of all liens, encumbrances and security interests, except the security interest created by this Agreement.

5.2 **No Conflict.** The execution, delivery and performance of this Agreement by Pledgor is not in violation of any applicable law or regulation or contractual obligation of Pledgor.

5.3 **First Priority Lien.** The liens granted to Secured Party under this Agreement will constitute a first priority lien on the Collateral and Pledgor's grant of such lien to Secured Party does not constitute a fraudulent conveyance under any applicable law. Pledgor warrants that Pledgor will not change Pledgor's residence or state of formation during the term of this Agreement without providing thirty (30) days prior written notice to Secured Party.

**5.4 Continued Performance.** That Pledger shall fully and timely perform and comply with all obligations applicable to the Interest, whether under the Company Operating Agreement or otherwise.

**6 Covenants and Agreements of Pledgor.**

**6.1. Obligations Unconditional**. The Obligations of the Pledgor shall be continuing, irrevocable, primary, absolute and unconditional irrespective of the value, genuineness, validity, regularity or enforceability of this Agreement, the Assignment Agreement, and the Promissory Note, or any other agreement or instrument referred to therein, or any substitution, release or exchange of any guarantee of or security for any of the Obligations and, to the fullest extent permitted by any applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, other than the occurrence of the indefeasible payment in full of the Obligations.

**6.2** ~~**Protection of Security Interest.** Contemporaneously with the execution of this Agreement, at~~**No UCC-1 Financing Statements.** Secured Party~~'s election, Pledgor authorizes Secured Party to~~ shall not file any UCC-1 financing statements covering ~~all~~any of the Collateral or naming Pledgor as a debtor. to enable Secured Party to perfect Secured Party's security interest in the Collateral. ~~Pledgor agrees also to execute, file and record such other statements, notices and agreements, take such action and obtain such certificates and documents, in accordance with all applicable laws, statutes and regulations as requested by Secured Party to perfect, evidence and continue Secured Party's security interest in the Collateral.~~

**6.3 Transactions Involving Collateral.** Pledgor shall not, without the prior written consent of Secured Party, (i) assign, sell, offer to sell, or otherwise transfer the Collateral or (ii) pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest or charge, other than the security interest created by this Agreement.

**6.4 Compliance with Laws.** Pledgor shall comply with all laws, statutes and regulations pertaining to the Collateral.

**6.5 Taxes, Assessments and Liens.** Pledgor shall pay when due all Company capital calls, taxes, assessments and liens with regard to the Collateral. Pledgor may withhold any such payment or may elect to contest any lien if Pledgor is conducting appropriate proceedings in good faith to contest the obligation to pay and so long as Secured Party's interest is not jeopardized.

**7. Authorized Action by Secured Party.** Pledgor irrevocably appoints Secured Party as Pledgor's attorney in fact to exercise such rights and powers as Pledgor might exercise with respect to the Collateral following an Event of Default, as defined below. These powers shall include without limitation the right to (i) collect by legal proceedings or otherwise and endorse, receive and receipt all Distributions, dividends, interest, payments, proceeds, and other sums and property now or hereafter payable on account of the Collateral, (ii) if Secured Party acquires the Collateral in accordance with the California Uniform Commercial Code, transfer the Collateral to its own or its nominee's name, (iii) make any compromise or settlement and take any action Secured Party deems advisable with respect to the Collateral, and (iv) exercise all rights under the applicable Uniform Commercial Code with respect to the Collateral. Pledgor agrees to reimburse Secured Party upon demand for any costs and expenses, including without limitation attorneys' fees, which Secured Party may incur while acting as Pledgor's attorney in fact hereunder, all of which costs and expenses are included in the Obligations secured hereby. Secured Party shall have no obligation to act pursuant to this section and shall not be required to make any presentment, demand or protest, or give any notice or take any action to preserve any rights against any other person in connection with the Collateral.

**8. Defaults and Remedies .**

**8.1 Event of Default.** Any "**Event of Default**" as defined by the Promissory Note shall constitute an Event of Default under this Agreement.

**8.2 Remedies.** Upon the occurrence of an Event of Default, Secured Party shall have the right, at its election, but not the obligation, to do any of the following:

a) vote or exercise any and all of the Pledgor's rights or powers incident to its ownership of the Interests, including any rights or powers to manage or control the Company and receive dividends or Distributions;

b) exercise all rights and remedies accorded to Secured Party by California law, including, but not limited to the California Uniform Commercial Code;

c) if Secured Party acquires the Collateral in accordance with the California Uniform Commercial Code, transfer the Collateral, or any part thereof, to the name of Secured Party or to the name of any nominee of Secured Party;

d) declare all unperformed Obligations, in whole or in part, of Pledgor immediately due and payable without demand or notice;

\`) exercise all rights and remedies under the Promissory Note;

\`) take any other lawful action that Secured Party deems necessary or desirable to protect or realize upon its security interest in the Collateral or any part thereof; and

a) require Pledgor to take any and all action necessary to make the Collateral available to Secured Party.

**8.3 Remedies Cumulative.** All of Secured Party's rights and remedies, whether evidenced hereby or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Secured Party to pursue any remedy shall not exclude pursuit of any other remedy.

**9. Rights Absent Default.** During the term of this Agreement and until an Event of Default has occurred, Pledgor shall retain the right to vote the Interests and to exercise any other rights of a Member of the Company not otherwise disallowed by or inconsistent with the terms of this Agreement.

**10. Waiver.** Secured Party shall not be deemed to have waived any rights under this Agreement unless such waiver is in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any right shall operate as a waiver of such right or any other right.

**11. Additional Documentation; Cooperation.** Each party shall, upon the request of the other, execute, acknowledge and deliver to the other any instrument that may be required to accomplish the intent of this Agreement. Each party agrees to cooperate to effectuate the intent of this Agreement and shall take all appropriate action necessary or useful in doing so.

**12. Non-Responsibility of Secured Party.** Secured Party is not responsible for the preservation or exercise of any rights to, or granted by any Collateral in Secured Party's possession or depreciation of Collateral in Secured Party's possession unless caused willfully or by the gross negligence of Secured Party.

**13. Miscellaneous.**

**13.1 Successors and Assigns**. Subject to the provisions otherwise contained in this Agreement, this Agreement shall inure to the benefit of and be binding on the successors and assigns of the respective parties.

**13.2 Notices.** Any notice under this Agreement shall be in writing, and any written notice or other document shall be deemed to have been duly given (i) on the date of personal service on the parties, (ii) on the third business day after mailing, if the document is mailed by registered or certified mail, (iii) one day after being sent by overnight service guaranteeing one-day delivery, with receipt confirmed by the courier, or (iv) on the date of transmission if sent by e mail, facsimile or other means of electronic transmission resulting in written copies, with receipt confirmed. Any such notice shall be delivered or addressed to the parties at the addresses set forth in the Purchase Agreement or at the most recent address specified by the addressee through written notice under this provision. Failure to conform to the requirement that mailings be done by registered or certified mail shall not defeat the effectiveness of notice actually received by the addressee.

**13.3 Amendment**. The provisions of this Agreement may be modified at any time by written agreement of the parties. Any such agreement hereafter made shall be ineffective to modify this Agreement in any respect unless in writing and signed by Pledgor and Secured Party.

**13.4 Attorneys' Fees; Prejudgment Interest.** If the services of an attorney are required by Secured Party to secure the performance of this Agreement or otherwise upon the breach or default of this Agreement, or if any judicial remedy or arbitration is necessary to enforce or interpret any provision of this Agreement or the rights and duties of any person in relation thereto, Secured Party shall be entitled to reasonable attorneys' fees, costs and other expenses, in addition to any other relief to which such party may be entitled. Any award of damages following judicial remedy or arbitration as a result of the breach of this Agreement or any of its provisions shall include an award of prejudgment interest from the date of the breach at the maximum amount of interest allowed by law.

**13.5 Captions**. All section captions are for reference only and shall not be considered in construing this Agreement.

**13.6 Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the Agreement which can be given effect without the invalid provision shall continue in full force and effect and shall in no way be impaired or invalidated.

**13.7 Governing Law.** The rights and obligations of the parties and the interpretation and performance of this Agreement shall be governed by the law of California, excluding its conflict of laws rules. Any legal action to enforce the provisions of this Agreement may be commenced only in the Superior Court of Sacramento County, California.

**13.8 Entire Agreement**. This document and its exhibits, together with the Promissory Note, constitute the entire agreement between the parties.

**13.9 Counterparts**. This Agreement may be executed in two or more counterparts, each of which will be considered an original but all of which together will constitute one agreement. Facsimile or PDF signatures shall be deemed to have the same effect as original signatures.

**13.10 R elease**. I f a nd w hen t he l ien o f t he d eed o f t rust i n f avor o f L ender, a s beneficiary, securing the Borrower Obligations is reconveyed, whether by a partial or full reconveyance, from all of the real property owned by the limited liability company described in Section 4.1, the lien and security in the Collateral shall be released, and this Agreement shall terminate

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**SECURED PARTY**: **PLEDGOR**:

BOBS, LLC

By:______________________________

~~Scott Gillen~~

~~Its:~~

**INTEREST PLEDGE AGREEMENT**
**[MLR MALIBU, LLC]**

THIS INTEREST PLEDGE AGREEMENT ("**Agreement**") dated as of August 25, 2020 is made by and between SCOTT GILLEN ("**Pledgor**") on behalf of **MLR MALIBU, LLC**, an Oregon Limited Liability Company, **23800 MALIBU LLC**, a California Limited Liability Company, **600 SPRING LLC**, a California Limited Liability Company, **THE BU HOUSES LLC**, a California Limited Liability Company, **CLIFFSIDE DUME** LLC, a California Limited Liability Company, **Malibu Road #3**, a California Limited Liability Company and **Paradise Cove Malibu LLC** (all LLC's above shall be jointly and collectively referred to as "Borrower") and BOBS, LLC ("**Secured Party**"), who agree as follows:

1 **Background and Purpose.** Pursuant to that certain (i) Promissory Note between Borrower and Secured Party ("BOBS, LLC") dated August 25, 2020; Secured Party consolidated all outstanding debt by Borrower into One Promissory Note affirming amounts owed by

~~Borrower including interest which has compounded daily at a 12% interest rate Pledgor holds a membership interest in 23800 Malibu Crest LLC and, pursuant to the terms of the Promissory Note and as a condition to the Loan, Pledgor agreed to secure the Loan with the pledge of security contained herein~~

~~2 **Grant of Security Interest.** To secure Borrower's Obligations (as defined in section 3 below), from and after the funding of the Loan pursuant to the Promissory Note, Pledgor hereby grants to Secured Party a security interest in the Collateral (as defined in Section 4 below).~~

~~3 **Obligations**. For purposes of this Agreement, "**Obligations**" means any and all obligations and liabilities of Pledgor to Secured Party arising out of the Promissory Note and any associated documents.~~

~~4 **Collateral**. For purposes of this Agreement, "**Collateral**" means:~~

a. All of Pledgor's right, title and interest in the Pledgor's membership interest in a California limited liability company called "MLR Malibu, LLC' ("MLR Malibu"), said interest being referred to herein as the MLR Malibu Membership Interest; and

b. All preferred return, return of capital, dividends, interest payments or other distribution in any form (**"Distributions")** by the Company related to the 23800 Malibu Crest Membership Interest.

5. **Representations and Warranties**. As a material inducement to Secured Party hereunder, Pledgor represents and warrants that the following are and shall remain true and correct:

~~**5.1 Title.** Pledgor is the owner of all right, title and interest in the Collateral free and clear o f a ll l iens, e ncumbrances a nd s ecurity i nterests, e xcept t he s ecurity interest created by this Agreement.~~

~~**5.2 N o C onflict.** The e xecution, d elivery a nd p erformance o f t his A greement b y Pledgor i s n ot i n v iolation o f a ny a pplicable l aw o r r egulation o r c ontractual obligation of Pledgor.~~

~~**5.3 First Priority Lien.** The liens granted to Secured Party under this Agreement will constitute a first priority lien on the Collateral and Pledgor's grant of such lien to Secured Party does not constitute a fraudulent conveyance under~~

any applicable law. Pledgor warrants that Pledgor will not change Pledgor's residence or state of formation during the term of this Agreement without providing thirty (30) days prior written notice to Secured Party.

**5.4 Continued Performance.** That Pledger shall fully and timely perform and comply with all obligations applicable to the Interest, whether under the Company Operating Agreement or otherwise.

**6 Covenants and Agreements of Pledgor.**

**6.1. Obligations Unconditional**. The Obligations of the Pledgor shall be continuing, irrevocable, primary, absolute and unconditional irrespective of the value, genuineness, validity, regularity or enforceability of this Agreement, the Assignment Agreement, and the Promissory Note, or any other agreement or instrument referred to therein, or any substitution, release or exchange of any guarantee of or security for any of the Obligations and, to the fullest extent permitted by any applicable law, irrespective of any other

~~circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, other than the occurrence of the indefeasible payment in full of the Obligations.~~

~~**6.2 Protection of Security Interest.** Contemporaneously with the execution of this Agreement, at Secured Party's election, Pledgor authorizes Secured Party to file UCC-1 financing statements covering all the Collateral to enable Secured Party to perfect Secured Party's security interest in the Collateral. Pledgor agrees also to execute, file and record such other statements, notices and agreements, take such action and obtain such certificates and documents, in accordance with all applicable laws, statutes and regulations as requested by Secured Party to perfect, evidence and continue Secured Party's security interest in the Collateral.~~

~~**6.3 Transactions Involving Collateral.** Pledgor shall not, without the prior written consent of Secured Party, (i) assign, sell, offer to sell, or otherwise transfer the Collateral or (ii) pledge,~~

~~mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest or charge, other than the security interest created by this Agreement.~~

~~**6.4 Compliance with Laws.** Pledgor shall comply with all laws, statutes and regulations pertaining to the Collateral.~~

~~**6.5 Taxes, Assessments and Liens.** Pledgor shall pay when due all Company capital calls, taxes, assessments and liens with regard to the Collateral. Pledgor may withhold any such payment or may elect to contest any lien if Pledgor is conducting appropriate proceedings in good faith to contest the obligation to pay and so long as Secured Party's interest is not jeopardized.~~

~~7 **Authorized Action by Secured Party.** Pledgor irrevocably appoints Secured Party as Pledgor's attorney in fact to exercise such rights and powers as Pledgor might exercise with respect to the Collateral following an Event of Default, as defined below. These powers shall include without limitation the right to (i) collect by legal proceedings or~~

otherwise and endorse, receive and receipt all Distributions, dividends, interest, payments, proceeds, and other sums and property now or hereafter payable on account of the Collateral, (ii) transfer the Collateral to its own or its nominee's name, (iii) make any compromise or settlement and take any action Secured Party deems advisable with respect to the Collateral, and (iv) exercise all rights under the applicable Uniform Commercial Code with respect to the Collateral. Pledgor agrees to reimburse Secured Party upon demand for any costs and expenses, including without limitation attorneys' fees, which Secured Party may incur while acting as Pledgor's attorney in fact hereunder, all of which costs and expenses are included in the Obligations secured

~~hereby. Secured Party shall have no obligation to act pursuant to this section and shall not be required to make any presentment, demand or protest, or give any notice or take any action to preserve any rights against any other person in connection with the Collateral.~~

~~**8 Defaults and Remedies.**~~

~~**8.1 Event of Default.** Any "**Event of Default**" as defined by the Promissory Note shall constitute an Event of Default under this Agreement.~~

~~**8.2 Remedies.** Upon the occurrence of an Event of Default, Secured Party shall have the right, at its election, but not the obligation, to do any of the following:~~

~~(A) vote or exercise any and all of the Pledgor's rights or powers incident to its ownership of the Interests, including any rights or powers to manage or control the Company and receive dividends or Distributions;~~

~~(B) exercise all rights and remedies accorded to Secured Party by California law, including, but not limited to the California Uniform Commercial Code;~~

~~(C) transfer the Collateral, or any part thereof, to the name of Secured Party or to the name of any nominee of Secured Party;~~

~~(D) declare all unperformed Obligations, in whole or in part, of Pledgor immediately due and payable without demand or notice;~~

~~exercise all rights and remedies under the Promissory Note;~~

take any other lawful action that Secured Party deems necessary or desirable to protect or realize upon its security interest in the Collateral or any part thereof; and

(A) require Pledgor to take any and all action necessary to make the Collateral available to Secured Party.

8.3 **Remedies Cumulative.** All of Secured Party's rights and remedies, whether evidenced hereby or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Secured Party to pursue any remedy shall not exclude pursuit of any other remedy.

9 **Rights Absent Default.** During the term of this Agreement and until an Event of Default has occurred, Pledgor shall retain the right to vote the Interests and to exercise any other

~~rights of a Member of the Company not otherwise disallowed by or inconsistent with the terms of this Agreement.~~

~~**10 Waiver.** Secured Party shall not be deemed to have waived any rights under this Agreement unless such waiver is in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any right shall operate as a waiver of such right or any other right.~~

~~**11 Additional Documentation; Cooperation.** Each party shall, upon the request of the other, execute, acknowledge and deliver to the other any instrument that may be required to accomplish the intent of this Agreement. Each party agrees to cooperate to effectuate the intent of this Agreement and shall take all appropriate action necessary or useful in doing so.~~

**12 Non-Responsibility of Secured Party.** Secured Party is not responsible for the preservation or exercise of any rights to, or granted by any Collateral in Secured Party's possession or depreciation of Collateral in Secured Party's possession unless caused willfully or by the gross negligence of Secured Party.

**13 Miscellaneous.**

**13.1 Successors and Assigns**. Subject to the provisions otherwise contained in this Agreement, this Agreement shall inure to the benefit of and be binding on the successors and assigns of the respective parties.

**13.2 Notices.** Any notice under this Agreement shall be in writing, and any written notice or other document shall be deemed to have been duly given (i) on the date of personal service on the parties, (ii) on the third business day after mailing, if

the document is mailed by registered or certified mail, (iii) one day after being sent by overnight service guaranteeing one-day delivery, with receipt confirmed by the courier, or (iv) on the date of transmission if sent by email, facsimile or other means of electronic transmission resulting in written copies, with receipt confirmed. Any such notice shall be delivered or addressed to the parties at the addresses set forth in the Purchase Agreement or at the most recent address specified by the addressee through written notice under this provision. Failure to conform to the requirement that mailings be done by registered or certified mail shall not defeat the effectiveness of notice actually received by the addressee.

**13.3 Amendment**. The provisions of this Agreement may be modified at any time by written agreement of the parties. Any such agreement hereafter made shall be ineffective to modify this Agreement in any respect unless in writing and signed by Pledgor and Secured Party.

~~**13.4 Attorneys' Fees; Prejudgment Interest.** If the services of an attorney are required by Secured Party to secure the performance of this Agreement or otherwise upon the breach or default of this Agreement, or if any judicial remedy or arbitration is necessary to enforce or interpret any provision of this Agreement or the rights and duties of any person in relation thereto, Secured Party shall be entitled to reasonable attorneys' fees, costs and other expenses, in addition to any other relief to which such party may be entitled. Any award of damages following judicial remedy or arbitration as a result of the breach of this Agreement or any of its provisions shall include an award of prejudgment interest from the date of the breach at the maximum amount of interest allowed by law.~~

~~**13.5 Captions**. All section captions are for reference only and shall not be considered in construing this Agreement.~~

~~**13.6 Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the Agreement which can be given effect without the invalid provision shall continue in full force and effect and shall in no way be impaired or invalidated.~~

~~**13.7 Governing Law.** The rights and obligations of the parties and the interpretation and performance of this Agreement shall be governed by the law of California,~~

~~excluding its conflict of laws rules. Any legal action to enforce the provisions of this Agreement may be commenced only in the Superior Court of Sacramento County, California.~~

~~**13.8** **Entire Agreement**. This document and its exhibits, together with the Promissory Note, constitute the entire agreement between the parties.~~

~~**13.9 Counterparts**. This Agreement may be executed in two or more counterparts, each of which will be considered an original but all of which together will constitute one agreement. Facsimile or PDF signatures shall be deemed to have the same effect as original signatures.~~

~~IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.~~

~~**SECURED PARTY:**~~ ~~**PLEDGOR:**~~

~~BOBS, LLC~~

~~By: ______________________________~~

Scott Gillen

Its: ______________________________

______________________________

**INTEREST PLEDGE AGREEMENT**
**[MALIBU ROAD #3, LLC]**

THIS INTEREST PLEDGE AGREEMENT ("**Agreement**") dated as of August 25, 2020 is made by and between SCOTT GILLEN ("**Pledgor**") on behalf of **MALIBU ROAD #3, LLC**, a California Limited Liability Company, **23800 MALIBU LLC**, a California Limited Liability Company, **600 SPRING LLC**, a California Limited Liability Company, **THE BU HOUSES LLC**, a California Limited Liability Company, **CLIFFSIDE D UME** L LC, a C alifornia L imited L iability C ompany, ~~**MLR M ALIBU L LC** a n O regon Limited L iability C ompany~~ a nd **Paradise C ove M alibu L LC** ( all L LC's a bove s hall b e j ointly a nd collectively referred to as"Borrower") and BOBS, LLC ("**Secured Party**"), who agree as follows:

1 **Background a nd P urpose.** Pursuant to that certain (i) Promissory Note between Borrower and Secured Party ("BOBS, LLC") dated August 25, 2020; Secured Party consolidated all outstanding debt by Borrower into One Promissory Note affirming amounts owed by Borrower including interest which has compounded daily at a 12% interest rate Pledgor holds a membership interest in Malibu Road #3 LLC and, pursuant to the terms of the Promissory Note and as a condition to the Loan, Pledgor agreed to secure the Loan with the pledge of security contained herein

2 **Grant of Security Interest.** To secure Borrower's Obligations (as defined in section 3 below), from and after the funding of the Loan pursuant to the Promissory Note, Pledgor hereby grants to Secured Party a security interest in the Collateral (as defined in Section 4 below).

3 **Obligations**. For purposes of this Agreement, "**Obligations**" means any and all obligations and liabilities of Pledgor to Secured Party arising out of the Promissory Note and any associated documents.

4 **Collateral**. For purposes of this Agreement, "**Collateral**" means:

a. All of Pledgor's right, title and interest in the Pledgor's membership interest in a California limited liability company called "Malibu Road #3, LLC' ("Malibu Road #3"), said interest being referred to herein as the ~~MLR~~ Malibu Road #3 Membership Interest; and

b. All preferred return, return of capital, dividends, interest payments or other distribution in any form ("**Distributions"**) by the Company related to the Malibu Road #3 Membership Interest.

5 **Representations and Warranties**. As a material inducement to Secured Party hereunder, Pledgor represents and warrants that the following are and shall remain true and correct:

**5.1 Title.** Pledgor is the owner of all right, title and interest in the Collateral free and clear of all liens, encumbrances and security interests, except the security interest created by this Agreement.

**5.2 No Conflict.** The execution, delivery and performance of this Agreement by Pledgor is not in violation of any applicable law or regulation or contractual obligation of Pledgor.

**5.3 First Priority Lien .** The liens granted to Secured Party under this Agreement will

constitute a first priority lien on the Collateral and Pledgor's grant of such lien to Secured Party does not constitute a fraudulent conveyance under any applicable law. Pledgor warrants that Pledgor will not change Pledgor's residence or state of formation during the term of this Agreement without providing thirty (30) days prior written notice to Secured Party.

**5.4 Continued Performance.** That Pledger shall fully and timely perform and comply with all obligations applicable to the Interest, whether under the Company Operating Agreement or otherwise.

**6 Covenants and Agreements of Pledgor.**

**6.1. Obligations Unconditional**. The Obligations of the Pledgor shall be continuing, irrevocable, primary, absolute and unconditional irrespective of the value, genuineness, validity, regularity or enforceability of this Agreement, the Assignment Agreement, and the Promissory Note, or any other agreement or instrument referred to therein, or any substitution, release or exchange of any guarantee of or security for any of the Obligations and, to the fullest extent permitted by any applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, other than the occurrence of the indefeasible payment in full of the Obligations.

**6.2** ~~**Protection of Security Interest.** Contemporaneously with the execution of this Agreement, at~~**No UCC-1 Financing Statements.** Secured Party~~'s election, Pledgor authorizes Secured Party to~~ shall not file any UCC-1 financing statements covering ~~all~~any of the Collateral or naming Pledgor as a debtor. to enable Secured Party to perfect Secured Party's security interest in the Collateral. ~~Pledgor agrees also to execute, file and record such other statements, notices and agreements, take such action and obtain such certificates and documents, in accordance with all applicable laws, statutes and regulations as requested by Secured Party to perfect, evidence and continue Secured Party's security interest in the Collateral.~~

**6.3 Transactions Involving Collateral.** Pledgor shall not, without the prior written consent of Secured Party, (i) assign, sell, offer to sell, or otherwise transfer the Collateral or (ii) pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest or charge, other than the security interest created by this Agreement.

a. **Compliance with Laws.** Pledgor shall comply with all laws, statutes and regulations pertaining to the Collateral.

b. **Taxes, Assessments and Liens.** Pledgor shall pay when due all Company capital calls, taxes, assessments and liens with regard to the Collateral. Pledgor may withhold any such payment or may elect to contest any lien if Pledgor is conducting appropriate proceedings in good faith to contest the obligation to pay and so long as Secured Party's interest is not jeopardized.

**7. Authorized Action by Secured Party.** Pledgor irrevocably appoints Secured Party as Pledgor's attorney in fact to exercise such rights and powers as Pledgor might exercise with respect to the Collateral following an Event of Default, as defined below. These powers shall include without limitation the right to (i) collect by legal proceedings or otherwise and endorse, receive and receipt all Distributions, dividends, interest, payments, proceeds, and other sums and property now or hereafter payable on account of the Collateral, (ii) if Secured Party acquires the Collateral in accordance with the California Uniform Commercial Code, transfer the Collateral to its own or its nominee's name, (iii) make any compromise or settlement and take any action Secured Party deems advisable with respect to the Collateral, and (iv) exercise all rights under the applicable Uniform Commercial Code with respect to the Collateral. Pledgor agrees to reimburse Secured Party upon demand for any costs and expenses, including without limitation attorneys' fees, which Secured Party may incur while acting as Pledgor's attorney in fact hereunder, all of which costs and expenses are included in the

Obligations secured hereby. Secured Party shall have no obligation to act pursuant to this section and shall not be required to make any presentment, demand or protest, or give any notice or take any action to preserve any rights against any other person in connection with the Collateral.

## 8. Defaults and Remedies.

**8.1 Event of Default.** Any "**Event of Default**" as defined by the Promissory Note shall constitute an Event of Default under this Agreement.

**8.2 Remedies.** Upon the occurrence of an Event of Default, Secured Party shall have the right, at its election, but not the obligation, to do any of the following:

a) vote or exercise any and all of the Pledgor's rights or powers incident to its ownership of the Interests, including any rights or powers to manage or control the Company and receive dividends or Distributions;

b) exercise all rights and remedies accorded to Secured Party by California law, including, but not limited to the California Uniform Commercial Code;

c) if Secured Party acquires the Collateral in accordance with the California Uniform Commercial Code, transfer the Collateral, or any part thereof, to the name of Secured Party or to the name of any nominee of Secured Party;

d) declare all unperformed Obligations, in whole or in part, of Pledgor immediately due and payable without demand or notice;

e) exercise all rights and remedies under the Promissory Note;

f) take any other lawful action that Secured Party deems necessary or desirable to protect or realize upon its security interest in the Collateral or any part thereof; and

g) require Pledgor to take any and all action necessary to make the Collateral available to Secured Party.

**8.3 Remedies Cumulative.** All of Secured Party's rights and remedies, whether evidenced hereby or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Secured Party to pursue any remedy shall not exclude pursuit of any other remedy.

9 **Rights Absent Default.** During the term of this Agreement and until an Event of Default has occurred, Pledgor shall retain the right to vote the Interests and to exercise any other rights of a Member of the Company not otherwise disallowed by or inconsistent with the terms of this Agreement.

**10 Waiver.** Secured Party shall not be deemed to have waived any rights under this Agreement unless such waiver is in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any right shall operate as a waiver of such right or any other right.

11 **Additional Documentation; Cooperation.** Each party shall, upon the request of the other, execute, acknowledge and deliver to the other any instrument that may be required to accomplish the intent of this Agreement. Each party agrees to cooperate to effectuate the intent of this Agreement and shall take all appropriate action necessary or useful in doing so.

**12 Non-Responsibility of Secured Party.** Secured Party is not responsible for the preservation or exercise of any rights to, or granted by any Collateral in Secured Party's possession or depreciation of Collateral in Secured Party's possession unless caused willfully or by the gross negligence of Secured Party.

**13 Miscellaneous.**

**13.1 Successors and Assigns**. Subject to the provisions otherwise contained in this Agreement, this Agreement shall inure to the benefit of and be binding on the successors and assigns of the respective parties.

**13.2 Notices.** Any notice under this Agreement shall be in writing, and any written notice or other document shall be deemed to have been duly given (i) on the date of personal service on the parties, (ii) on the third business day after mailing, if the document is mailed by registered or certified mail, (iii) one day after being sent by overnight service guaranteeing one-day delivery, with receipt confirmed by the courier, or (iv) on the date of transmission if sent by email, facsimile or other means of electronic transmission resulting in written copies, with receipt confirmed. Any such notice shall be delivered or addressed to the parties at the addresses set forth in the Purchase Agreement or at the most recent address specified by the addressee through written notice under this provision. Failure to conform to the requirement that mailings be done by registered or certified mail shall not defeat the effectiveness of notice actually received by the addressee.

**13.3 Amendment**. The provisions of this Agreement may be modified at any time by written agreement of the parties. Any such agreement hereafter made shall be ineffective to modify this Agreement in any respect unless in writing and signed by Pledgor and Secured Party.

**13.4 Attorneys' Fees; Prejudgment Interest.** If the services of an attorney are required by Secured Party to secure the performance of this Agreement or otherwise upon the breach or default of this Agreement, or if any judicial remedy or arbitration is necessary to enforce or interpret any provision of this Agreement or the rights and duties of any person in relation thereto, Secured Party shall be entitled to reasonable attorneys' fees, costs and other expenses, in addition to any other relief to which such party may be entitled. Any award of damages following judicial remedy or arbitration as a result of the breach of this Agreement or any of its provisions shall include an award of prejudgment interest from the date of the breach at the maximum amount of interest allowed by law.

**13.5 Captions**. All section captions are for reference only and shall not be considered in construing this Agreement.

**13.6 Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the Agreement which can be given effect without the invalid provision shall continue in full force and effect and shall in no way be impaired or invalidated.

**13.7 Governing Law.** The rights and obligations of the parties and the interpretation and performance of this Agreement shall be governed by the law of California, excluding its conflict of laws rules. Any legal action to enforce the provisions of this Agreement may be commenced only in the Superior Court of Sacramento County, California.

**13.8 Entire Agreement**. This document and its exhibits, together with the Promissory Note, constitute the entire agreement between the parties.

**13.9 Counterparts**. This Agreement may be executed in two or more counterparts, each of which will be considered an original but all of which together will constitute one agreement. Facsimile or PDF signatures shall be deemed to have the same effect as original signatures.

**13.10 Release**. If and when the lien of the deed of trust in favor of Lender, as beneficiary, securing the Borrower Obligations is reconveyed, whether by a partial or full reconveyance, from all of the real property owned by the limited liability company described in Section 4.1, the lien and security in the Collateral shall be released, and this Agreement shall terminate

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**SECURED PARTY**:

BOBS, LLC

**PLEDGOR**:

By:______________________________

Scott Gillen

Its: ______________________________

______________________________

# EXHIBIT I

4:56

I will call you at the end of my day and we have talked ma...

B

Barry

not gonna make any money so just give up now and that is not an option from me.

You don't need to respond to this text,
It is just for your information.
As the only managing member of 600 spring LLC, your responsibility and obligation is to track and manage the LLC accounting and financial, I'm sure that you comply with this obligation, therefore, you know very well long time ago, that our partnership financial obligation is many many millions greater then the value of the homes,
You cannot pretend that you didn't know that the partnership currently is in lost of over 40 million,

all the loan installment request has been sent to bank account that under your control, you know the interest rate that Bobs charging the partnership, it is obvious that you know well that the partnership is at a lost

I understand that you refuse to accept the fact that you won't generate profit on this project, therefore you ignore your morality (you know I always been very good to you) and risking civil and criminal liability by stealing from me many millions, this is the bottom line

Wed, Jun 25 at 6:09 PM

# EXHIBIT J

# OPERATING AGREEMENT AS OF 5/22/2017
# OF
# 600 Spring LLC

THE UNDERSIGNED is executing this Operation Agreement **("Agreement")** for the purpose of forming a limited-liability company (the "Company") pursuant to the provisions of the Beverly-Killea Limited Liability Act codified if California Corporations Code Section 17000 et seq. (the "**California Act**"), and docs hereby certify and agree as follows:

1.Name: formation. The name of the Company shall be 600 Spring LLC.

2.Business and Affairs._ The Affairs of the Company and the conduct of its business shall be governed by the California Act, as the same may be amended from time to time.

3.Members. The members of the company are as follows:
1) BR Shy Irrevocable Trust 50%
2) C64829 LLC 50%

4.Managers. Scott Gillen and Barry Shy shall be the Managers until they resign, die or otherwise are removed from the office by the Member.

5.Capital Contribution. The Members shall contribute such capital as they deem necessary and advisable; provided however, the Members shall not be obligated to make any such capital contributions to the Company. For the Avoidance of doubt, the Member shall not be obligated to make any capital contributions if the balance is such Member's capital account is negative. The Members shall have a one hundred percent (100%) interest in the profits and losses of the Company.

6.Company Obligations. Except as otherwise required under the California Act, the member shall not be personally liable for and debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise.

7.Member Rights and Obligation. Except as otherwise provided herein or in the Articles of Organization of the Company to the contrary, all of the rights, obligations and duties of the Manager and the Member shall be set forth in the California Act.

8.C64829 LLC and Scott Gillen will handle the day to day operations for the company, including but not limited to all aspects of developing and selling the property, they will receive no salary or compensation for this work.

9. Upon selling the property the first portion of the proceeds will be used to pay-off any debt and/or liens against the property, after which the profits will be divided equally between the two partners.

10. Amendments. This Agreement may be amended or modified only by a writing duly executed by the Members.

11. LLC will resolve on December 31, 2027

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

Amit Tidhar, Trustee of
the BR Shy Irrevocable Trust

Barry Shy, Manager

Amit Tidhar

C64829 LLC, Member
by Scott Gillen it's Manager

Scott Gillen, Manager

# EXHIBIT K

Christopher S. Reeder, Bar No. 193041
chris@reederllp.com
Marcus L. Tippens, Bar No. 328667
marcus@reederllp.com
**REEDER LLP**
11766 Wilshire Blvd., Suite 1470
Los Angeles, CA 90025
Telephone: 310-861-2470

Attorneys for Plaintiffs BOBS LLC, Barry Shy, and Amit Tidhar, as Trustee of the BR Shy Irrevocable Trust

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES – WEST DISTRICT**

BOBS LLC, a Nevada limited liability company; AMIT TIDHAR, as Trustee of the BR SHY IRREVOCABLE TRUST and derivatively on behalf of 600 Spring LLC, and BARRY SHY, as Manager of 600 Spring LLC,

Plaintiffs,

v.

GLASS TUNNEL LLC, a California limited liability company; SCOTT GILLEN, an individual; C64829 LLC; UNVARNISHED, INC., a California Corporation; PMF CA REIT, L.L.C.; "ALL PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE, ESTATE, LIEN, OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT ADVERSE TO PLAINTIFF'S TITLE, OR ANY CLOUD UPON PLAINTIFF'S TITLE THERETO"; and DOES 1 through 10, inclusive,

Defendants, and

600 Spring LLC,

Nominal Defendant.

Case No. 25SMCV03160

**PLAINTIFF AND CROSS-DEFENDANT BARRY SHY'S SUPPLEMENTAL RESPONSES TO DEFENDANT AND CROSS-COMPLAINANT SCOTT GILLEN'S SPECIAL INTERROGATORIES, SET ONE**

[Assigned for all purposes to: Honorable Mark H. Epstein, Dept. I]

Action Filed: June 20, 2025
Trial Date: September 13, 2027

**PROPOUNDING PARTY**: Defendant and Cross-Complainant Scott Gillen

**RESPONDING PARTY**: Plaintiff and Cross-Defendant Barry Shy

**SET NO.**: One

Pursuant to California Code of Civil Procedure section 2030.210 et seq., Plaintiff and Cross-Defendant Barry Shy ("Responding Party") hereby answers Defendant and Cross-Complainant Scott Gillen's Special Interrogatories, Set One, as follows:

**SUPPLEMENTAL RESPONSES TO SPECIAL INTERROGATORIES**

**SPECIAL INTERROGATORY NO. 1:**

IDENTIFY all PERSON(S) who searched for materials responsive to GILLEN's Requests for Production, Set One, to YOU, served concurrently herewith. As used herein, the term "IDENTIFY" shall mean: (a) when used with respect to a natural PERSON, to state the PERSON's full name, present or last known address, present or last known telephone number(s), and present or last known email address(es); and/or (b) when used with respect to a firm, association, organization, partnership, trust, corporation, limited liability company, or public entity, to state such non-natural PERSON's full name, present or last known address, and present or last known telephone number. As used herein, "PERSON(S)" shall be defined as and include a natural person, firm, association, organization, partnership, trust, corporation, limited liability company, or public entity. As used herein, the term "GILLEN" shall mean and refer to Defendant and Cross-Complainant Scott Gillen, an individual. As used herein, the terms "YOU" or "YOUR" or "BOBS" shall mean and refer to Plaintiff and Cross-Defendant BOBS LLC, its agents, representatives, accountants, principals, owners, shareholders, directors, officers, executives, employees, contractors, predecessors, successors, affiliates, or any other PERSON(S) or entities acting or purporting to act on BOBS' behalf.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege, attorney work-product doctrine, and any other applicable privilege or protection, including counsel's discovery strategy, mental impressions, custodian selection, search methodology, and litigation work product. Responding Party further

objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks information equally or more available to Propounding Party; seeks information outside Responding Party's present knowledge, possession, custody, or control; and is premature because discovery, investigation, collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or attorney work-product doctrine, including counsel's mental impressions, custodian selection, search methodology, and discovery strategy. Responding Party further objects to the extent the interrogatory seeks information outside Responding Party's possession, custody, or control.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

After a reasonable search and diligent inquiry, Responding Party identifies Barry Shy and Rommy Shy as persons who searched or assisted in searching for nonprivileged materials responsive to Gillen's Requests for Production, Set One, to Barry Shy. Responding Party's counsel also assisted with collection, review, and production in a privileged and work-product capacity. Barry Shy and Rommy Shy may be contacted through counsel of record.

**SPECIAL INTERROGATORY NO. 2:**

Describe all LOCATIONS that were searched for materials responsive to GILLEN's Requests for Production, Set One, to YOU, served concurrently herewith. As used herein, the term "LOCATIONS" shall mean and refer to electronic devices (e.g., laptops, personal computers, cellular phones, tablets, etc.), email addresses, social media accounts, instant message accounts, and any other platform or device through which documents or communications can be exchanged electronically.



R E E D E R LLP

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege, attorney work-product doctrine, and any other applicable privilege or protection, including counsel's discovery strategy, search methodology, custodial analysis, collection decisions, and litigation mental impressions. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks information equally or more available to Propounding Party; seeks information outside Responding Party's present knowledge, possession, custody, or control; and is premature because discovery, investigation, collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or attorney work-product doctrine, including counsel's mental impressions, custodian selection, search methodology, and discovery strategy. Responding Party further objects to the extent the interrogatory is overbroad or seeks information outside Responding Party's possession, custody, or control.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

After a reasonable search and diligent inquiry, Responding Party searched or caused to be searched nonprivileged locations reasonably likely to contain responsive materials, including Barry Shy's computer and phone, Rommy Shy's computer and phone, available email accounts, electronic files, hard-copy files, and records maintained by or for Barry Shy and Rommy Shy relating to 600 Spring, the Case Project, the BOBS Loan Agreement, the Amended Operating Agreement, JPMorgan Chase, the Glass Tunnel Transaction, PMF, and the claims and defenses in this action. Responding Party's investigation and collection are continuing.

**SPECIAL INTERROGATORY NO. 3:**

State all search terms used to search for materials responsive to GILLEN's Requests for Production, Set One, to YOU, served concurrently herewith.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks attorney work product, including counsel's discovery strategy, search terms, search methodology, document-review strategy, and mental impressions. Responding Party further objects that the interrogatory assumes keyword searches are the only or required method for identifying responsive materials; is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks information equally or more available to Propounding Party; seeks information outside Responding Party's present knowledge, possession, custody, or control; and is premature because discovery, investigation, collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks attorney work product, including counsel's search terms, search methodology, document-review strategy, and mental impressions. Responding Party further objects to the extent the interrogatory assumes keyword searches are the only required method for identifying responsive materials or seeks information outside Responding Party's possession, custody, or control.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party has used and may continue to use targeted searches, custodian review, document review, and search terms reasonably designed to locate nonprivileged responsive materials. Search terms used or to be used include, without limitation: "Scott Gillen," "Case Court," "The Case," and "Unvarnished."

**SPECIAL INTERROGATORY NO. 4:**

State all facts supporting YOUR contention in Paragraph 5 of PLAINTIFFS' SECOND AMENDED COMPLAINT that BARRY SHY is "a manager of 600 SPRING." As used herein,

the term "PLAINTIFFS" shall mean and refer to Plaintiffs and Cross-Defendants BOBS LLC, Amit Tidhar, as Trustee of the BR Shy Irrevocable Trust and derivatively on behalf of 600 Spring LLC, and Barry Shy, individually and as purported Co-Manager of 600 Spring LLC. As used herein, the term "SECOND AMENDED COMPLAINT" shall mean and refer to Plaintiffs' Verified Second Amended Complaint, filed in the above-captioned matter on November 26, 2025. As used herein, the term "BARRY SHY" shall mean and refer to Plaintiff and Cross-Defendant Barry Shy, an individual. As used herein, the term "600 SPRING" shall mean and refer to 600 Spring, LLC, a California Limited Liability Company.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; assumes disputed facts; is vague and ambiguous as to "manager" and "600 SPRING"; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions or seeks information protected by the attorney-client privilege or attorney work-product doctrine, including counsel's mental impressions, legal theories, and discovery strategy. Responding Party further objects to the extent the interrogatory is vague and ambiguous as to "manager" or seeks information outside Responding Party's possession, custody, or control.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

After a reasonable search and diligent inquiry, Responding Party states that Barry Shy is a manager of 600 Spring LLC under the Amended Operating Agreement. The Amended Operating Agreement amended the original Operating Agreement to reflect that the BR Shy Irrevocable

Trust holds a 50% membership interest in 600 Spring LLC instead of Barry Shy and that Barry Shy is a manager of 600 Spring LLC in addition to Scott Gillen. Responding Party further states that the Amended Operating Agreement was submitted to JPMorgan Chase in connection with potential financing, and that Barry Shy and Scott Gillen signed documents reflecting both Gillen and Shy as managers of 600 Spring LLC. Responding Party also relies on the Amended Operating Agreement, writings, communications, executed documents, JPMorgan Chase materials, and other documents produced or to be produced in this action. Responding Party's investigation is continuing.

**SPECIAL INTERROGATORY NO. 5:**

State all facts supporting YOUR contention that GILLEN executed and approved the PURPORTED AMENDED OPERATING AGREEMENT, including, but not limited to, by identifying with specificity the date and location where YOU contend GILLEN executed the PURPORTED AMENDED OPERATING AGREEMENT and the manner and time he transmitted the executed copy to YOU. As used herein, the term "PURPORTED AMENDED OPERATING AGREEMENT" shall mean and refer to the document PLAINTIFFS allege to be an amendment to the May 22, 2017 Operating Agreement of 600 Spring LLC, as identified and described in Paragraph 4 of Plaintiffs' Verified Second Amended Complaint.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is compound, overbroad, unduly burdensome, and not proportional to the needs of the case; assumes disputed facts; is vague and ambiguous as to "executed," "approved," "transmitted," and "PURPORTED AMENDED OPERATING AGREEMENT"; seeks information in Propounding Party's possession, custody, or control; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions or seeks information protected by the attorney-client privilege or attorney work-product doctrine, including counsel's mental impressions, legal theories, and discovery strategy. Responding Party further objects to the extent the interrogatory is compound, vague and ambiguous as to "executed," "approved," "transmitted," or "PURPORTED AMENDED OPERATING AGREEMENT," or seeks information outside Responding Party's possession, custody, or control.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen approved the Amended Operating Agreement. Facts supporting this contention include that Gillen gave Rommy Shy permission by telephone to amend the original Operating Agreement, the Amended Operating Agreement, Gillen's execution or approval of documents reflecting both Gillen and Shy as managers of 600 Spring LLC, submission of the Amended Operating Agreement to JPMorgan Chase in connection with potential financing, related communications, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 6:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 5. As used herein, the terms "DOCUMENT" or "DOCUMENTS" shall mean and refer to those items set forth in California Code of Civil Procedure section 2031.010 et seq., as well as any "Writing" as that term is defined in California Evidence Code section 250, and any "Original" or "Duplicate" as those terms are defined in California Evidence Code sections 255 and 260, respectively, of any DOCUMENTS, including, but not limited to, all forms of reduction of information or data to tangible form, e.g., emails, computer or magnetic memory or storage, and any written, recorded, or filmed graphic matter of any kind or nature, however produced or reproduced, including originals, drafts, or non-identical copies (e.g., copies with annotations,

handwritten or typed notes, etc.), wherever located. For the avoidance of doubt, DOCUMENTS shall also expressly include "Electronically Stored Information" or "ESI" as that term is defined in California Code of Civil Procedure section 2016.020(e) and expressly including all such materials in native, searchable form, with all original and/or underlying metadata intact, and including any information created, manipulated, communicated, maintained, or utilized, in connection with a technology having electrical, digital, magnetic wireless, optical, electromagnetic, or similar capacities. DOCUMENTS shall be interpreted to the broadest extent possible, and includes those materials reflecting COMMUNICATIONS, and further includes, without limitation, the following: agreements or contracts, letters, notes, notes of conversations, summaries of meetings or personal conversations or interviews, desk or online calendars, telegrams, cables, memoranda, reports, investigations, summaries or analysis of investigations, factual compilations, timelines, graphics, opinions, checks or cancelled checks (front and back), check ledgers, wire transfers, ACH payments, photographs, videos, bids, schedules, and any other written, recorded, transcribed, punched, taped, filmed, graphic or tangible matter.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks attorney-client communications, attorney work product, privileged materials, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents; seeks documents or information in the possession, custody, or control of Propounding Party or third parties; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney-client communications, attorney work product, or counsel's mental impressions, legal theories, and discovery strategy. Responding Party further objects to the extent the interrogatory

is overbroad, unduly burdensome, or seeks documents outside Responding Party's possession, custody, or control.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 5 include the Amended Operating Agreement, documents submitted to JPMorgan Chase, communications with JPMorgan Chase, documents reflecting both Gillen and Shy as managers of 600 Spring LLC, the Verified Second Amended Complaint, and related execution and transmission documents.

**SPECIAL INTERROGATORY NO. 7:**

IDENTIFY all PERSONS involved in drafting, editing, executing, transmitting, or circulating the PURPORTED AMENDED OPERATING AGREEMENT.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, compound, unduly burdensome, and not proportional to the needs of the case; assumes disputed facts; is vague and ambiguous as to "involved," "drafting," "editing," "executing," "transmitting," "circulating," and "PURPORTED AMENDED OPERATING AGREEMENT"; seeks information in the possession, custody, or control of Propounding Party or third parties; seeks premature disclosure of trial evidence, witnesses, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks attorney-client communications, attorney work product, privileged information, or counsel's mental impressions, legal theories, and discovery strategy. Responding Party further objects to the extent the interrogatory is compound, overbroad, vague and ambiguous as to "involved," "drafting,"





REEDER LLP

"editing," "executing," "transmitting," "circulating," or "PURPORTED AMENDED OPERATING AGREEMENT," or seeks information outside Responding Party's possession, custody, or control.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Persons involved in drafting, editing, executing, transmitting, or circulating the Amended Operating Agreement include Barry Shy, Rommy Shy, Scott Gillen, and persons involved with submission to JPMorgan Chase. Counsel may also have been involved in privileged capacities. Barry Shy and Rommy Shy may be contacted through counsel of record, and Scott Gillen may be contacted through his counsel of record.

**SPECIAL INTERROGATORY NO. 8:**

Describe with specificity the process by which the PURPORTED AMENDED OPERATING AGREEMENT was transmitted to JPMorgan Chase Bank, including by identifying the date, time, location, and participants with respect to each such transmission.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it assumes disputed facts; is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks information in the possession, custody, or control of JPMorgan Chase Bank, Propounding Party, or other third parties; is vague and ambiguous as to "process," "transmitted," "participants," and "PURPORTED AMENDED OPERATING AGREEMENT"; calls for speculation; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it assumes disputed facts, is vague and ambiguous as to "process," "transmitted," "participants," or "PURPORTED AMENDED OPERATING AGREEMENT," or seeks privileged information, attorney-client communications,

attorney work product, or counsel's mental impressions, legal theories, and discovery strategy. Responding Party further objects to the extent it seeks information outside Responding Party's possession, custody, or control, including information in the possession of JPMorgan Chase, Propounding Party, or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Amended Operating Agreement was transmitted to JPMorgan Chase because JPMorgan Chase requested it in connection with loan-related dealings and underwriting concerning 600 Spring LLC and the Case Project. Rommy Shy sent the Amended Operating Agreement to JPMorgan Chase. Shy and Gillen also signed documents reflecting both Gillen and Shy as managers of 600 Spring LLC.

**SPECIAL INTERROGATORY NO. 9:**

If YOU contend that the PURPORTED AMENDED OPERATING AGREEMENT is a valid and enforceable contract, state all facts that support that contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning validity, enforceability, contract formation, consent, approval, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "valid," "enforceable," and "PURPORTED AMENDED OPERATING AGREEMENT"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning validity, enforceability, contract formation, consent, approval, or legal effect, or seeks

information protected by the attorney-client privilege or attorney work-product doctrine. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "valid," "enforceable," or "PURPORTED AMENDED OPERATING AGREEMENT," or seeks information outside Responding Party's possession, custody, or control.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Amended Operating Agreement is valid and enforceable. Facts supporting this contention include Gillen's consent to the amendment, the Amended Operating Agreement, the change reflecting the BR Shy Irrevocable Trust's 50% membership interest, Barry Shy's status as a manager in addition to Gillen, submission of the Amended Operating Agreement to JPMorgan Chase, documents signed by Gillen and Shy reflecting both as managers, and related writings, communications, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 10:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 9.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks attorney-client communications, attorney work product, privileged materials, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents; seeks documents or information in the possession, custody, or control of Propounding Party or third parties; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.



REEDER LLP

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks attorney-client communications, attorney work product, privileged materials, or counsel's mental impressions, legal theories, and discovery strategy. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, or seeks documents outside Responding Party's possession, custody, or control.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 9 include the Operating Agreement, the Amended Operating Agreement, JPMorgan Chase submissions and communications, documents reflecting both Gillen and Shy as managers of 600 Spring LLC, the Verified Second Amended Complaint, and related execution and transmission documents.

**SPECIAL INTERROGATORY NO. 11:**

State all facts supporting YOUR contention in Paragraph 5 of the SECOND AMENDED COMPLAINT that "SHY and GILLEN submitted the Amended Operating Agreement to JPMorgan Chase."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections, and seeks information in the possession, custody, or control of JPMorgan Chase Bank, Propounding Party, or other third parties. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, not proportional to the needs of the case, vague and ambiguous as to "submitted" and "Amended Operating Agreement," assumes disputed facts, calls for speculation, seeks premature disclosure of trial evidence, contentions, legal theories, and strategy, and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it assumes disputed facts, is vague and ambiguous as to "submitted" or "Amended Operating Agreement," or seeks privileged information, attorney-client communications, attorney work product, or counsel's mental impressions, legal theories, and discovery strategy. Responding Party further objects to the extent it seeks information outside Responding Party's possession, custody, or control, including information in the possession of JPMorgan Chase, Propounding Party, or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Amended Operating Agreement was submitted to JPMorgan Chase because JPMorgan Chase requested it in connection with underwriting for a new loan. Rommy Shy sent the Amended Operating Agreement to JPMorgan Chase, Gillen was copied on communications concerning the submission, and documents reflect both Gillen and Shy as managers of 600 Spring LLC.

**SPECIAL INTERROGATORY NO. 12:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 11.

**RESPONSE:**

**Responding Party objects to this interrogatory on the grounds that it seeks attorney-client communications,** attorney work product, privileged materials, and information protected by applicable privileges or protections. Responding Party further objects that responsive documents or information may be in the possession, custody, or control of JPMorgan Chase Bank, Propounding Party, or third parties; is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks attorney-client communications, attorney work product, privileged materials, or counsel's mental impressions, legal theories, and discovery strategy. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, or seeks documents outside Responding Party's possession, custody, or control, including documents in the possession of JPMorgan Chase, Propounding Party, or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 11 include emails and other communications with JPMorgan Chase, JPMorgan Chase submissions, the Amended Operating Agreement, documents reflecting both Gillen and Shy as managers of 600 Spring LLC, related loan or banking documents, and the Verified Second Amended Complaint.

**SPECIAL INTERROGATORY NO. 13:**

State all facts supporting YOUR contention in Paragraph 5 of the SECOND AMENDED COMPLAINT that SHY and GILLEN "signed various documents reflecting both GILLEN and SHY as the managers of 600 SPRING."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "signed," "various documents," "reflecting," and "managers"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions or seeks information protected by the attorney-client privilege or attorney work-product doctrine, including counsel's mental impressions, legal theories, and discovery strategy. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "signed," "various documents," "reflecting," or "managers," or seeks information outside Responding Party's possession, custody, or control.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Shy and Gillen signed documents reflecting both Gillen and Shy as managers of 600 Spring LLC. Facts supporting this contention include that Gillen signed the first version of the Operating Agreement, Barry Shy signed the first and second versions of the Operating Agreement, Gillen allowed Rommy Shy to modify the Operating Agreement without Gillen re-signing it, the Amended Operating Agreement, JPMorgan Chase submissions, and other documents executed or submitted in connection with loan-related dealings concerning 600 Spring LLC and the Case Project.

**SPECIAL INTERROGATORY NO. 14:**

If YOU contend that, before this litigation, GILLEN was aware that PLAINTIFFS submitted the PURPORTED AMENDED OPERATING AGREEMENT to JPMorgan Chase Bank, state all facts that support this contention.

**RESPONSE:**

**Responding Party objects to this interrogatory on the grounds that it assumes disputed facts,** calls for speculation about Propounding Party's knowledge, and seeks information in Propounding Party's possession, custody, or control. Responding Party further objects that the interrogatory is vague and ambiguous as to "aware," "submitted," "PURPORTED AMENDED OPERATING AGREEMENT," and "JPMorgan Chase Bank"; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or

protections; is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for speculation concerning Propounding Party's knowledge, assumes disputed facts, is vague and ambiguous as to "aware," "submitted," "PURPORTED AMENDED OPERATING AGREEMENT," or "JPMorgan Chase Bank," or seeks privileged information, attorney-client communications, attorney work product, or counsel's mental impressions, legal theories, and discovery strategy. Responding Party further objects to the extent it seeks information outside Responding Party's possession, custody, or control.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that before this litigation Gillen was aware that the Amended Operating Agreement had been submitted to JPMorgan Chase because Gillen was copied on communications concerning the submission and executed or approved related documents reflecting both Gillen and Shy as managers of 600 Spring LLC.

**SPECIAL INTERROGATORY NO. 15:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 14.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that responsive documents or information may be in the possession, custody, or control of Propounding Party, JPMorgan Chase Bank, or other third parties; is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy;

and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or counsel's mental impressions, legal theories, and discovery strategy. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, or seeks documents outside Responding Party's possession, custody, or control, including documents in the possession of Propounding Party, JPMorgan Chase, or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 14 include JPMorgan Chase submissions and communications, the Amended Operating Agreement, documents reflecting Gillen's execution or approval, documents reflecting both Gillen and Shy as managers of 600 Spring LLC, related loan or banking documents, and documents produced in response to Requests for Production.

**SPECIAL INTERROGATORY NO. 16:**

Describe YOUR process for determining the interest rate and compounding method for the BOBS LOAN AGREEMENT. As used herein, "BOBS LOAN AGREEMENT" shall mean and refer to the $260 Million Loan Agreement between BOBS and 600 SPRING, executed on or around March 1, 2021, as identified in Paragraphs 2 and 18 of Plaintiffs' Verified Second Amended Complaint.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections, and calls for legal conclusions concerning enforceability, usury, lending laws, licensing laws, contract interpretation, and damages. Responding Party further objects that the

interrogatory is vague and ambiguous as to "process," "determining," "interest rate," and "compounding method"; is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks premature disclosure of expert opinion, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks attorney-client communications, attorney work product, privileged information, or legal conclusions concerning enforceability, usury, lending laws, licensing laws, contract interpretation, or damages. Responding Party further objects to the extent the interrogatory is vague and ambiguous as to "process," "determining," "interest rate," or "compounding method," or seeks premature expert opinion.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

The interest rate and compounding method for the BOBS Loan Agreement are reflected in the BOBS Loan Agreement and Promissory Note. Responding Party contends the interest rate was negotiated, agreed upon, and memorialized in the loan documents, and that Scott Gillen reviewed the interest calculations and methodology before signing the loan documents. Responding Party further contends the loan was a commercial loan made by BOBS to 600 Spring LLC, secured by a Deed of Trust, and that the loan terms were disclosed in the operative loan documents.

**SPECIAL INTERROGATORY NO. 17:**

IDENTIFY all PERSONS who were involved in determining and setting the interest rate and compounding method for the BOBS LOAN AGREEMENT.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks attorney-client communications, attorney work product, privileged information, and information protected by

applicable privileges or protections. Responding Party further objects that the interrogatory is vague and ambiguous as to "involved," "determining," "setting," "interest rate," and "compounding method"; is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks premature disclosure of trial evidence, witnesses, expert opinion, and strategy; seeks information equally or more available to Propounding Party; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks attorney-client communications, attorney work product, privileged information, or counsel's mental impressions, legal theories, and discovery strategy. Responding Party further objects to the extent the interrogatory is vague and ambiguous as to "involved," "determining," "setting," "interest rate," or "compounding method," or seeks premature expert opinion or witness disclosures.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Persons involved in determining and setting the interest rate and compounding method for the BOBS Loan Agreement include Barry Shy and Scott Gillen. Barry Shy may be contacted through counsel of record, and Scott Gillen may be contacted through his counsel of record.

**SPECIAL INTERROGATORY NO. 18:**

State all facts supporting YOUR contention, if any, that YOU informed GILLEN of the interest rate and compounding method for the BOBS LOAN AGREEMENT before it was executed.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections, and calls for legal conclusions concerning notice, disclosure, contract interpretation, enforceability, loan terms, and legal effect. Responding Party further objects that the interrogatory assumes disputed facts, calls for speculation concerning Propounding Party's knowledge, is vague and ambiguous as to "informed," "interest rate," "compounding method," and "before it was

executed," is overbroad, unduly burdensome, and not proportional to the needs of the case, seeks information equally or more available to Propounding Party, and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks attorney-client communications, attorney work product, privileged information, or legal conclusions concerning notice, disclosure, contract interpretation, enforceability, loan terms, or legal effect. Responding Party further objects to the extent it assumes disputed facts, calls for speculation concerning Propounding Party's knowledge, or is vague and ambiguous as to "informed," "interest rate," "compounding method," or "before it was executed."

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen was informed of the interest rate and compounding method for the BOBS Loan Agreement before execution because the parties signed a memorandum of understanding stating those terms, email communications evidenced those terms, the Loan Agreement, Promissory Note, and related loan documents disclosed those terms, and Gillen was involved in 600 Spring LLC's loan and draw process.

**SPECIAL INTERROGATORY NO. 19:**

IDENTIFY all PERSONS who can support YOUR contention, if any, that YOU informed GILLEN of the interest rate and compounding method for the BOBS LOAN AGREEMENT before it was executed.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory assumes disputed facts, calls for speculation concerning Propounding Party's knowledge, is vague and ambiguous as to "support," "informed," "interest rate," and "compounding method," is

overbroad, unduly burdensome, and not proportional to the needs of the case, seeks premature disclosure of trial evidence, witnesses, expert opinion, and strategy, seeks information equally or more available to Propounding Party, and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or counsel's mental impressions, legal theories, and discovery strategy. Responding Party further objects to the extent it assumes disputed facts, calls for speculation concerning Propounding Party's knowledge, is vague and ambiguous as to "support," "informed," "interest rate," or "compounding method," or seeks premature witness or expert disclosures.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Persons who can support Responding Party's contention that Gillen was informed of the interest rate and compounding method before execution include Barry Shy, Rommy Shy, and Scott Gillen. Barry Shy and Rommy Shy may be contacted through counsel of record, and Scott Gillen may be contacted through his counsel of record.

**SPECIAL INTERROGATORY NO. 20:**

When was the BOBS LOAN AGREEMENT executed by all the parties thereto?

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it assumes disputed facts concerning the timing and completion of execution by all parties, calls for a legal conclusion concerning execution and enforceability, and seeks information that may be in the possession, custody, or control of Propounding Party, 600 Spring LLC, BOBS LLC, or other third parties. Responding Party further objects that the interrogatory is vague and ambiguous as to "executed by all the parties thereto," is overbroad, unduly burdensome, and not proportional to the needs of

the case, seeks information equally or more available to Propounding Party, and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it assumes disputed facts concerning the timing and completion of execution by all parties, calls for a legal conclusion concerning execution or enforceability, or seeks information outside Responding Party's possession, custody, or control. Responding Party further objects to the extent the interrogatory is vague and ambiguous as to "executed by all the parties thereto."

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

The BOBS Loan Agreement was executed in or about the beginning of 2021.

**SPECIAL INTERROGATORY NO. 21:**

IDENTIFY all PERSONS who can testify as to when the BOBS LOAN AGREEMENT was executed by all parties thereto.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks attorney-client communications, attorney work product, premature expert or witness disclosures, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory assumes disputed facts concerning execution, calls for a legal conclusion, is vague and ambiguous as to "testify" and "executed by all parties," is overbroad, unduly burdensome, and not proportional to the needs of the case, seeks premature disclosure of trial evidence and strategy, seeks information equally or more available to Propounding Party, and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks attorney-client communications, attorney work product, premature expert or witness disclosures, or information protected by applicable privileges or protections. Responding Party further objects to the extent

the interrogatory assumes disputed facts concerning execution, calls for a legal conclusion, is vague and ambiguous as to "testify" or "executed by all parties," or seeks information outside Responding Party's possession, custody, or control.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Persons who can testify as to when the BOBS Loan Agreement was executed include Barry Shy, Rommy Shy, and Scott Gillen.

**SPECIAL INTERROGATORY NO. 22:**

What method did GILLEN use to execute the BOBS LOAN AGREEMENT (i.e., wet signature, DocuSign, facsimile signature, giving another party authorization to sign on his behalf, etc.)?

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks information concerning Propounding Party's own conduct and execution method that is uniquely or more readily within Propounding Party's possession, custody, or control. Responding Party further objects that the interrogatory assumes disputed facts, calls for a legal conclusion concerning execution and authorization, is vague and ambiguous as to "method," "execute," and "BOBS LOAN AGREEMENT," is overbroad, unduly burdensome, and not proportional to the needs of the case, seeks information protected by applicable privileges or protections, and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks information concerning Propounding Party's own conduct and execution method that is uniquely or more readily within Propounding Party's possession, custody, or control. Responding Party further objects to the extent the interrogatory assumes disputed facts, calls for a legal conclusion concerning execution or authorization, is vague and ambiguous as to "method," "execute," or "BOBS LOAN AGREEMENT," or seeks information protected by applicable privileges or protections.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party understands that Gillen executed the BOBS Loan Agreement by wet signature.

**SPECIAL INTERROGATORY NO. 23:**

What method did YOU use to execute the BOBS LOAN AGREEMENT (i.e., wet signature, DocuSign, facsimile signature, giving another party authorization to sign on YOUR behalf, etc.)?

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it assumes facts not established by the record, calls for a legal conclusion concerning execution and authorization, and is vague and ambiguous as to “method,” “execute,” and “BOBS LOAN AGREEMENT.” Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case, seeks information protected by attorney-client privilege, attorney work product, or other applicable privileges or protections, seeks premature disclosure of trial evidence and strategy, and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it assumes facts not established by the record, calls for a legal conclusion concerning execution or authorization, is vague and ambiguous as to “method,” “execute,” or “BOBS LOAN AGREEMENT,” or seeks information protected by attorney-client privilege, attorney work product, or other applicable privileges or protections.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party understands that BOBS executed the BOBS Loan Agreement by wet signature.

**SPECIAL INTERROGATORY NO. 24:**

State all facts describing how YOU calculated (and continue to calculate) the interest allegedly due and owing under the BOBS LOAN AGREEMENT, including specifying how YOU calculated the amounts loaned, when those amounts were loaned, and how YOU calculated all interest thereon.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for expert opinion, attorney-client communications, attorney work product, and legal conclusions concerning enforceability, damages, interest, usury, lending laws, loan characterization, and calculation methodology. Responding Party further objects that the interrogatory is compound, overbroad, unduly burdensome, and not proportional to the needs of the case, seeks premature disclosure of expert analysis, damages analysis, trial evidence, contentions, legal theories, and strategy, is vague and ambiguous as to "calculated," "continue to calculate," "amounts loaned," and "interest allegedly due and owing," seeks information equally or more available to Propounding Party, and is premature because discovery and damages analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for expert opinion, attorney-client communications, attorney work product, or legal conclusions concerning enforceability, damages, interest, usury, lending laws, loan characterization, or calculation methodology. Responding Party further objects to the extent the interrogatory is compound, overbroad, unduly burdensome, vague and ambiguous as to "calculated," "continue to calculate," "amounts loaned," or "interest allegedly due and owing," or seeks premature expert or damages analysis.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party calculates interest allegedly due and owing under the BOBS Loan Agreement by applying the interest rate and compounding method set forth in the BOBS Loan Agreement and Promissory Note to principal amounts advanced or otherwise owing under the operative loan documents, subject to credits, offsets, and further accounting. Responding Party

contends that the ledger compounds 12% interest daily as specified in the loan documents and that BOBS's outstanding principal and accrued interest exceeded $257 million as of April 1, 2026, subject to continuing accrual and proof.

**SPECIAL INTERROGATORY NO. 25:**

State all facts describing how YOU informed GILLEN, if at all, of the ongoing alleged interest accruing throughout the pendency of the BOBS LOAN AGREEMENT.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections, and seeks information equally or more available to Propounding Party. Responding Party further objects that the interrogatory assumes disputed facts, calls for speculation concerning Propounding Party's knowledge, is vague and ambiguous as to "informed," "ongoing alleged interest," "accruing," and "throughout the pendency," calls for legal conclusions concerning loan terms, interest, enforceability, and notice, is overbroad, unduly burdensome, and not proportional to the needs of the case, and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks attorney-client communications, attorney work product, information protected by applicable privileges or protections, or information equally or more available to Propounding Party. Responding Party further objects to the extent the interrogatory assumes disputed facts, calls for speculation concerning Propounding Party's knowledge, is vague and ambiguous as to "informed," "ongoing alleged interest," "accruing," or "throughout the pendency," or calls for legal conclusions concerning loan terms, interest, enforceability, or notice.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen was informed of ongoing interest accruing under the BOBS Loan Agreement through email communications, the memorandum of understanding, the Loan Agreement, Promissory Note, related loan documents, communications concerning funding and draws, and Gillen's involvement in 600 Spring LLC's loan and draw process.

**SPECIAL INTERROGATORY NO. 26:**

State all facts describing how YOU informed 600 SPRING, if at all, of the ongoing alleged interest accruing throughout the pendency of the BOBS LOAN AGREEMENT.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections, and seeks information equally or more available to 600 Spring LLC, its managers, representatives, or Propounding Party. Responding Party further objects that the interrogatory assumes disputed facts, is vague and ambiguous as to "informed," "ongoing alleged interest," "accruing," and "throughout the pendency," calls for legal conclusions concerning loan terms, interest, enforceability, and notice, is overbroad, unduly burdensome, and not proportional to the needs of the case, and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks attorney-client communications, attorney work product, information protected by applicable privileges or protections, or information equally or more available to 600 Spring LLC, its managers, representatives, or Propounding Party. Responding Party further objects to the extent the interrogatory assumes disputed facts, is vague and ambiguous as to "informed," "ongoing alleged interest," "accruing," or "throughout the pendency," or calls for legal conclusions concerning loan terms, interest, enforceability, or notice.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that 600 Spring LLC was informed of ongoing interest accruing under the BOBS Loan Agreement through the initial memorandum of understanding, periodic updates sent to Scott Gillen concerning outstanding balances, the ledger, the Loan Agreement, Promissory Note, related loan documents, funding and draw records, and communications involving 600 Spring LLC's managers and representatives. Responding Party further contends that Gillen reviewed and approved the accrued amounts and signed the loan documents acknowledging those amounts.

**SPECIAL INTERROGATORY NO. 27:**

Did YOU provide GILLEN or 600 SPRING with any interest calculations or other accounting during the term of the BOBS LOAN AGREEMENT and before this litigation was filed?

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is vague and ambiguous as to "interest calculations or other accounting" and "during the term." Responding Party further objects that the interrogatory assumes disputed facts, seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections, seeks information equally or more available to Propounding Party or third parties, is overbroad, unduly burdensome, and not proportional to the needs of the case, calls for legal conclusions concerning accounting and loan obligations, and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is vague and ambiguous as to "interest calculations or other accounting" or "during the term," assumes disputed facts, seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, seeks information equally or more available to Propounding Party or third parties, or calls for legal conclusions concerning accounting or loan obligations.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the BOBS Loan Agreement, Promissory Note, and related loan documents disclosed the applicable interest terms. Responding Party further contends that interest calculations or other accounting information were provided to Gillen or 600 Spring LLC numerous times before this litigation was filed.

**SPECIAL INTERROGATORY NO. 28:**

If YOUR answer to Special Interrogatory No. 27 immediately above was in the affirmative, please state all facts regarding how and when YOU provided GILLEN or 600 SPRING with any interest calculations or other accounting during the term of the BOBS LOAN AGREEMENT and before this litigation was filed.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is premature, assumes an affirmative answer to Special Interrogatory No. 27, and depends on continuing investigation of documents and communications. Responding Party further objects that the interrogatory is vague and ambiguous as to “interest calculations or other accounting,” “during the term,” and “before this litigation was filed,” seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections, seeks information equally or more available to Propounding Party or third parties, is overbroad, unduly burdensome, and not proportional to the needs of the case, and calls for legal conclusions concerning accounting and loan obligations.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it assumes an affirmative answer to Special Interrogatory No. 27, depends on continuing investigation of documents and communications, is vague and ambiguous as to “interest calculations or other accounting,” “during the term,” or “before this litigation was filed,” seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, seeks information equally or more available to Propounding Party or third parties, or calls for legal conclusions concerning accounting or loan obligations.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party refers to its response to Special Interrogatory No. 27. Responding Party contends that pre-litigation interest calculations or accountings were provided in various emails and also shortly before the loan documents were signed in 2021, and that those amounts were explained in the loan documents.

**SPECIAL INTERROGATORY NO. 29:**

State all facts supporting YOUR contention in Paragraph 2 of the SECOND AMENDED COMPLAINT that the BOBS LOAN AGREEMENT is "secured by a Deed of Trust."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning validity, priority, enforceability, security interests, title, recordation, and legal effect of the Deed of Trust and BOBS Loan Agreement. Responding Party further objects that the interrogatory assumes disputed facts, is vague and ambiguous as to "secured by a Deed of Trust," seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections, is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all facts," seeks premature disclosure of trial evidence, expert opinion, contentions, legal theories, and strategy, and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning validity, priority, enforceability, security interests, title, recordation, or legal effect of the Deed of Trust and BOBS Loan Agreement. Responding Party further objects to the extent the interrogatory assumes disputed facts, is vague and ambiguous as to "secured by a Deed of Trust," seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, or seeks premature expert opinion or title analysis.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

The BOBS Loan Agreement is secured by a Deed of Trust. Facts supporting this contention include that Gillen executed a Deed of Trust on behalf of 600 Spring LLC in 2021, the BOBS Loan Agreement, Promissory Note, Deed of Trust, recorded Deed of Trust, Barry Shy declaration authenticating those loan documents, and related loan records. Responding Party contends the Deed of Trust secures obligations owed under the BOBS Loan Agreement and Promissory Note.

**SPECIAL INTERROGATORY NO. 30:**

If YOU contend that recording a Deed of Trust pursuant to the BOBS LOAN AGREEMENT was contractually authorized, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning contract interpretation, authorization, enforceability, recordation, security interests, title, priority, and legal effect of the BOBS Loan Agreement and related security documents. Responding Party further objects that the interrogatory assumes disputed facts, is vague and ambiguous as to "contractually authorized" and "recording a Deed of Trust," seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections, is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all facts," seeks premature disclosure of trial evidence, expert opinion, contentions, legal theories, and strategy, and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning contract interpretation, authorization, enforceability, recordation, security interests, title, priority, or legal effect of the BOBS Loan Agreement and related security documents. Responding Party further objects to the extent the interrogatory assumes disputed facts, is vague

and ambiguous as to "contractually authorized" or "recording a Deed of Trust," seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, or seeks premature expert opinion or title analysis.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that recording the Deed of Trust pursuant to the BOBS Loan Agreement was contractually authorized. Facts supporting this contention include that it was negotiated and agreed with Gillen that there would be no provision barring recordation of the Deed of Trust, the Loan Agreement, Promissory Note, Deed of Trust, related security documents, and the absence of any operative prohibition against recordation in the final loan documents. Responding Party further contends that Defendants' alleged no-recordation theory is unsupported by the operative loan documents.

**SPECIAL INTERROGATORY NO. 31:**

If YOU contend that GILLEN consented to the recording of a Deed of Trust pursuant to the BOBS LOAN AGREEMENT, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for speculation regarding Propounding Party's knowledge, intent, and consent, and seeks information in Propounding Party's possession, custody, or control. Responding Party further objects that the interrogatory calls for legal conclusions concerning consent, authorization, enforceability, recordation, security interests, title, priority, and legal effect; assumes disputed facts; is vague and ambiguous as to "consented" and "recording of a Deed of Trust"; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks premature disclosure of trial evidence and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for speculation concerning Propounding Party's knowledge, intent, or consent, seeks information in Propounding Party's possession, custody, or control, or calls for legal conclusions concerning consent, authorization, enforceability, recordation, security interests, title, priority, or legal effect. Responding Party further objects to the extent the interrogatory assumes disputed facts, is vague and ambiguous as to "consented" or "recording of a Deed of Trust," or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen consented to or was aware of the recording of the Deed of Trust because Gillen was involved in 600 Spring LLC's loan and draw process, the loan documents disclosed that the loan was secured by a Deed of Trust, the operative loan documents do not prohibit recordation, and Gillen did not oppose recordation.

**SPECIAL INTERROGATORY NO. 32:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 31.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks attorney-client communications, attorney work product, privileged materials, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks documents or information in the possession, custody, or control of Propounding Party or third parties; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks attorney-client communications, attorney work product, privileged materials, or counsel's mental impressions, legal theories, and discovery strategy. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, or seeks documents outside Responding Party's possession, custody, or control.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 31 include the BOBS Loan Agreement, Promissory Note, Deed of Trust, recorded Deed of Trust, related loan and draw documents, communications concerning the loan and security documents, and documents reflecting Gillen's involvement in 600 Spring LLC's loan and draw process.

**SPECIAL INTERROGATORY NO. 33:**

IDENTIFY all PERSONS who approved the recording of a Deed of Trust pursuant to the BOBS LOAN AGREEMENT.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning approval, authorization, agency, recordation, security interests, and legal effect, and seeks privileged information, attorney-client communications, attorney work product, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is vague and ambiguous as to "approved," "recording," and "pursuant to the BOBS LOAN AGREEMENT," assumes disputed facts, is overbroad, unduly burdensome, and not proportional to the needs of the case, seeks premature disclosure of witnesses, trial evidence, contentions, legal theories, and strategy, seeks information equally or more available to Propounding Party, and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning approval, authorization, agency, recordation, security interests, or legal effect, or seeks privileged information, attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is vague and ambiguous as to “approved,” “recording,” or “pursuant to the BOBS LOAN AGREEMENT,” assumes disputed facts, seeks premature witness disclosures, or seeks information equally or more available to Propounding Party.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Persons who approved the recording of the Deed of Trust pursuant to the BOBS Loan Agreement include Rommy Shy and Barry Shy. Barry Shy and Rommy Shy may be contacted through counsel of record.

**SPECIAL INTERROGATORY NO. 34:**

IDENTIFY all PERSONS who can support YOUR contention, if any, that GILLEN agreed to the recording of a Deed of Trust pursuant to the BOBS LOAN AGREEMENT.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections, and calls for speculation concerning Propounding Party’s knowledge, agreement, intent, and state of mind. Responding Party further objects that the interrogatory is vague and ambiguous as to “support,” “agreed,” “recording,” and “pursuant to the BOBS LOAN AGREEMENT,” assumes disputed facts, calls for legal conclusions, is overbroad, unduly burdensome, and not proportional to the needs of the case, seeks premature disclosure of witnesses, trial evidence, contentions, legal theories, and strategy, seeks information equally or

more available to Propounding Party, and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections, or calls for speculation concerning Propounding Party's knowledge, agreement, intent, or state of mind. Responding Party further objects to the extent the interrogatory is vague and ambiguous as to "support," "agreed," "recording," or "pursuant to the BOBS LOAN AGREEMENT," assumes disputed facts, calls for legal conclusions, seeks premature witness disclosures, or seeks information equally or more available to Propounding Party.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Persons who can support Responding Party's contention that Gillen agreed to or was aware of the recording of the Deed of Trust include Barry Shy, Rommy Shy, and Scott Gillen. Responding Party contends that Gillen did not specifically agree to record the Deed of Trust, but did not oppose recordation and the restriction was not included in the Deed of Trust. Barry Shy and Rommy Shy may be contacted through counsel of record, and Scott Gillen may be contacted through his counsel of record.

**SPECIAL INTERROGATORY NO. 35:**

State all facts supporting YOUR contention in Paragraph 22 of the SECOND AMENDED COMPLAINT that GILLEN and/or the GILLEN DEFENDANTS diverted a "substantial portion" of loan proceeds intended for THE CASE PROJECT to himself and/or his companies. As used herein, "GILLEN DEFENDANTS" shall mean and refer to Defendants and Cross-Complainants Scott Gillen, Glass Tunnel LLC, C64829 LLC, and Unvarnished, Inc. As used herein, "THE CASE PROJECT" shall mean and refer to the construction project located at 24198 Case Court;

24168 Case Court; 24185 Case Court; 24188 Case Court; and 24186 Case Court in Malibu, California 90265.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for attorney-client communications, attorney work product, and legal conclusions concerning diversion, ownership, control, use of funds, damages, and fiduciary obligations. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "diverted," "substantial portion," "loan proceeds," "intended for THE CASE PROJECT," "himself," and "his companies"; seeks financial and banking information protected by privacy rights; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for attorney-client communications, attorney work product, or legal conclusions concerning diversion, ownership, control, use of funds, damages, or fiduciary obligations. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "diverted," "substantial portion," "loan proceeds," "intended for THE CASE PROJECT," "himself," or "his companies," seeks financial and banking information protected by privacy rights, seeks premature expert analysis, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen and/or the Gillen Defendants diverted a substantial portion of loan proceeds intended for the Case Project to himself and/or his companies. Facts supporting this contention include that Gillen personally informed Barry Shy that Gillen transferred $5 million to Gillen's mother; when Barry Shy strongly contested that action, Gillen promised Barry Shy that Gillen would return that money to 600 Spring LLC; when Barry Shy

requested to review all bank statements, Gillen confessed to the diversion; Gillen refused to provide a complete accounting of 600 Spring LLC; and financial records, forensic accounting materials, draw records, bank statements, and transaction records support Plaintiffs' diversion allegations.

**SPECIAL INTERROGATORY NO. 36:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 35.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents; seeks financial, banking, and private information; seeks documents or information in the possession, custody, or control of Propounding Party or third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, or private information, seeks documents or information in the possession, custody, or control of Propounding Party or third parties, or seeks premature expert analysis.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 35 include 600 Spring LLC bank statements, BOBS funding records, draw requests, bank records, accounting records, forensic accounting materials, Sheppard declaration and exhibits, Verified Second Amended Complaint, Receiver reports, and documents reflecting transfers to Gillen, his companies, his mother, or third parties.

**SPECIAL INTERROGATORY NO. 37:**

State all facts supporting YOUR contention in Paragraph 22 of the SECOND AMENDED COMPLAINT that GILLEN diverted a "substantial portion" of construction loan proceeds intended for THE CASE PROJECT to third parties in an attempt to conceal the money that was meant for the construction and development of THE CASE PROJECT.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for attorney-client communications, attorney work product, and legal conclusions concerning intent, concealment, diversion, use of funds, damages, and fiduciary obligations. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "diverted," "substantial portion," "construction loan proceeds," "third parties," "conceal," and "money that was meant for the construction and development"; seeks financial and banking information protected by privacy rights; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for attorney-client communications, attorney work product, or legal conclusions concerning intent, concealment, diversion, use of funds, damages, or fiduciary obligations. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "diverted," "substantial

portion," "construction loan proceeds," "third parties," "conceal," or "money that was meant for the construction and development," seeks financial and banking information protected by privacy rights, seeks premature expert analysis, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen diverted a substantial portion of construction loan proceeds intended for the Case Project to third parties in an attempt to conceal money intended for construction and development. Facts supporting this contention include the facts stated in response to Special Interrogatory No. 35, including Gillen's admission that he transferred $5 million to his mother, as well as funding records, draw requests, bank and accounting records, forensic accounting materials, and Plaintiffs' allegations that Gillen refused to provide an accounting and diverted funds away from the intended project purposes.

**SPECIAL INTERROGATORY NO. 38:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 37.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, and private information; seeks documents or information in the possession, custody, or control of Propounding Party or third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable

privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, or private information, seeks documents or information in the possession, custody, or control of Propounding Party or third parties, or seeks premature expert analysis.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 37 include 600 Spring LLC bank records, BOBS funding records, draw requests, bank statements, accounting records, forensic accounting materials, Sheppard declaration and exhibits, Verified Second Amended Complaint, Receiver reports, and documents reflecting transfers to third parties.

**SPECIAL INTERROGATORY NO. 39:**

State all facts supporting YOUR contention in Paragraph 22 of the SECOND AMENDED COMPLAINT that GILLEN diverted a "substantial portion" of construction loan proceeds intended for THE CASE PROJECT in an attempt to "steal from 600 SPRING."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions, attorney-client communications, attorney work product, and conclusions concerning intent, theft, diversion, use of funds, damages, and fiduciary obligations. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "diverted," "substantial portion," "construction loan proceeds," "intended for THE CASE PROJECT," and "steal from 600 SPRING"; is argumentative and inflammatory; seeks financial and banking information protected by privacy rights; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions, attorney-client communications, attorney work product, or conclusions concerning intent, theft, diversion, use of funds, damages, or fiduciary obligations. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "diverted," "substantial portion," "construction loan proceeds," "intended for THE CASE PROJECT," or "steal from 600 SPRING," is argumentative and inflammatory, seeks financial and banking information protected by privacy rights, seeks premature expert analysis, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen diverted a substantial portion of construction loan proceeds intended for the Case Project in an attempt to steal from 600 Spring LLC. Facts supporting this contention include that Gillen acted without authorization or notification, Gillen confessed to the diversion after Barry Shy requested to examine financials, Gillen diverted loan proceeds to himself, his entities, his mother, and/or third parties, Gillen failed and refused to provide an accounting, and financial and banking records, draw records, forensic accounting materials, and the allegations and evidence identified in Plaintiffs' pleadings and declarations support this contention.

**SPECIAL INTERROGATORY NO. 40:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 39.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, and private information; seeks documents or information in the possession, custody, or

control of Propounding Party or third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, or private information, seeks documents or information in the possession, custody, or control of Propounding Party or third parties, or seeks premature expert analysis.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 39 include bank statements, BOBS funding records, draw requests, bank records, accounting records, forensic accounting materials, Sheppard declaration and exhibits, Verified Second Amended Complaint, Receiver reports, and documents reflecting transfers to Gillen, his companies, his mother, or third parties.

**SPECIAL INTERROGATORY NO. 41:**

State all facts supporting YOUR contention in Paragraph 14 of the SECOND AMENDED COMPLAINT that GILLEN is an alter ego of GLASS TUNNEL. As used herein, "GLASS TUNNEL" shall mean and refer to Glass Tunnel LLC, a California limited liability company whose principal address is 23838 Pacific Coast Highway #2833 Malibu, CA 90265.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity

form, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; assumes disputed facts; is vague and ambiguous as to "alter ego" and "GLASS TUNNEL"; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory assumes disputed facts, is vague and ambiguous as to "alter ego" or "GLASS TUNNEL," seeks premature disclosure of trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen is an alter ego of Glass Tunnel. Facts supporting this contention include that bank statements and financial records indicate that Gillen used the same accounts for Gillen's personal accounts, other ventures, and Glass Tunnel; Gillen's formation, ownership, domination, and control of Glass Tunnel; Glass Tunnel's role as Gillen's newly formed acquisition vehicle in the Glass Tunnel Transaction; the alleged use of Glass Tunnel to acquire the Subject Property from 600 Spring LLC through an unauthorized self-interested transaction; and the shared interests, control, commingling, and conduct alleged in the Verified Second Amended Complaint.

**SPECIAL INTERROGATORY NO. 42:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 41.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents; calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, and legal effect; seeks documents or information in the possession, custody, or control of Propounding Party, Glass Tunnel LLC, PMF, escrow holders, title companies, or other third parties; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, or legal effect, seeks documents or information in the possession, custody, or control of Propounding Party, Glass Tunnel LLC, PMF, escrow holders, title companies, or other third parties, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 41 include bank statements for Gillen, his other ventures, and Glass Tunnel; Glass Tunnel formation and governance records; transaction documents; communications concerning the Glass Tunnel Transaction; PMF financing documents; title and escrow documents; financial records; Verified Second Amended Complaint; and related discovery.

**SPECIAL INTERROGATORY NO. 43:**

State all facts supporting YOUR contention in Paragraph 14 of the SECOND AMENDED COMPLAINT that GILLEN is an alter ego of C64829. As used herein, "C64829" shall mean and refer to C64829 LLC, a California limited liability company whose principal address is 23838 Pacific Coast Highway #2833 Malibu, CA 90265.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, membership interests, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; assumes disputed facts; is vague and ambiguous as to "alter ego" and "C64829"; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, membership interests, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory assumes disputed facts, is vague and ambiguous as to "alter ego" or "C64829," seeks premature disclosure of trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen is an alter ego of C64829. Facts supporting this contention include Gillen's ownership, domination, and control of C64829; C64829's role in 600

Spring LLC and the Case Project; Gillen's alleged use of C64829 to engage in the challenged transactions and conduct; bank statements and financial records indicating commingling of funds; and the shared interests, control, and conduct alleged in the Verified Second Amended Complaint.

**SPECIAL INTERROGATORY NO. 44:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 43.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents; calls for legal conclusions concerning alter ego, agency, ownership, control, domination, membership interests, and legal effect; seeks documents or information in the possession, custody, or control of Propounding Party, C64829 LLC, 600 Spring LLC, escrow holders, title companies, lenders, or other third parties; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, calls for legal conclusions concerning alter ego, agency, ownership, control, domination, membership interests, or legal effect, seeks documents or information in the possession, custody, or control of Propounding Party, C64829 LLC, 600 Spring LLC, escrow holders, title companies, lenders, or other third parties, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 43 include bank statements, C64829 formation and governance records, Operating Agreement documents, Glass Tunnel Transaction documents, PMF financing documents, title and escrow documents, financial records, Verified Second Amended Complaint, and related discovery.

**SPECIAL INTERROGATORY NO. 45:**

State all facts supporting YOUR contention in Paragraph 14 of the SECOND AMENDED COMPLAINT that GILLEN is an alter ego of UNVARNISHED. As used herein, "UNVARNISHED" shall mean and refer to Unvarnished, Inc., a California corporation with its principal place of business located at 23838 Pacific Coast Highway #2833 Malibu, CA 90265.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; assumes disputed facts; is vague and ambiguous as to "alter ego" and "UNVARNISHED"; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory assumes disputed facts, is vague and ambiguous as to "alter ego" or

"UNVARNISHED," seeks premature disclosure of trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen is an alter ego of Unvarnished. Facts supporting this contention include Gillen's ownership, domination, and control of Unvarnished; Unvarnished's involvement in the Case Project and related transactions; bank statements and financial records indicating commingling of funds; and the shared interests, control, and conduct alleged in the Verified Second Amended Complaint.

**SPECIAL INTERROGATORY NO. 46:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 45.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents; calls for legal conclusions concerning alter ego, agency, ownership, control, domination, and legal effect; seeks documents or information in the possession, custody, or control of Propounding Party, Unvarnished, Inc., Glass Tunnel LLC, C64829 LLC, escrow holders, title companies, lenders, or other third parties; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, calls for legal conclusions concerning alter ego, agency,

ownership, control, domination, or legal effect, seeks documents or information in the possession, custody, or control of Propounding Party, Unvarnished, Inc., Glass Tunnel LLC, C64829 LLC, escrow holders, title companies, lenders, or other third parties, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 45 include bank statements, Unvarnished formation and governance records, communications, transaction documents, financial records, Verified Second Amended Complaint, and related discovery.

**SPECIAL INTERROGATORY NO. 47:**

State all facts supporting YOUR contention in Paragraph 14 of the SECOND AMENDED COMPLAINT that C64829 is an alter ego of UNVARNISHED, or vice versa.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; assumes disputed facts; is vague and ambiguous as to "alter ego," "or vice versa," "C64829," and "UNVARNISHED"; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, or legal effect, or seeks attorney-client communications, attorney work product, or

information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory assumes disputed facts, is vague and ambiguous as to "alter ego," "or vice versa," "C64829," or "UNVARNISHED," seeks premature disclosure of trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that C64829 and Unvarnished are alter egos of one another, or that one is operated as an instrumentality of the other, to the extent shown by common ownership, management, control, shared resources, shared address, common business purpose, commingling, undercapitalization, bank statements and financial records indicating commingling of funds, or the other facts alleged in the Verified Second Amended Complaint and developed in discovery.

**SPECIAL INTERROGATORY NO. 48:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 47.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents; calls for legal conclusions concerning alter ego, agency, ownership, control, domination, and legal effect; seeks financial, banking, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, C64829 LLC, Unvarnished, Inc., escrow holders, title companies, lenders, or other third parties; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, calls for legal conclusions concerning alter ego, agency, ownership, control, domination, or legal effect, seeks financial, banking, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, C64829 LLC, Unvarnished, Inc., escrow holders, title companies, lenders, or other third parties, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 47 include bank statements, C64829 and Unvarnished formation and governance records, communications, transaction documents, financial records, Verified Second Amended Complaint, and related discovery.

**SPECIAL INTERROGATORY NO. 49:**

State all facts supporting YOUR contention in Paragraph 14 of the SECOND AMENDED COMPLAINT that C64829 is an alter ego of GLASS TUNNEL, or vice versa.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; assumes disputed facts; is vague and ambiguous as to "alter ego," "or vice versa," "C64829," and "GLASS TUNNEL"; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory assumes disputed facts, is vague and ambiguous as to "alter ego," "or vice versa," "C64829," or "GLASS TUNNEL," seeks premature disclosure of trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that C64829 and Glass Tunnel are alter egos of one another, or that one is operated as an instrumentality of the other, to the extent shown by common ownership, management, control, shared resources, shared address, common business purpose, commingling, undercapitalization, bank statements and financial records indicating commingling of funds, and their roles in the Glass Tunnel Transaction.

**SPECIAL INTERROGATORY NO. 50:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 49.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents; calls for legal conclusions concerning alter ego, agency, ownership, control, domination, and legal effect; seeks financial, banking, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, C64829 LLC, Glass Tunnel LLC, escrow holders, title companies, lenders, or other third parties; seeks premature

disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, calls for legal conclusions concerning alter ego, agency, ownership, control, domination, or legal effect, seeks financial, banking, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, C64829 LLC, Glass Tunnel LLC, escrow holders, title companies, lenders, or other third parties, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 49 include bank statements, C64829 and Glass Tunnel formation and governance records, communications, transaction documents, financial records, Verified Second Amended Complaint, and related discovery.

**SPECIAL INTERROGATORY NO. 51:**

State all facts supporting YOUR contention in Paragraph 14 of the SECOND AMENDED COMPLAINT that UNVARNISHED is an alter ego of GLASS TUNNEL, or vice versa.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; assumes disputed facts; is vague and ambiguous as to "alter ego," "or vice versa," "UNVARNISHED," and "GLASS TUNNEL"; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks

"all facts"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory assumes disputed facts, is vague and ambiguous as to "alter ego," "or vice versa," "UNVARNISHED," or "GLASS TUNNEL," seeks premature disclosure of trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Unvarnished and Glass Tunnel are alter egos of one another, or that one is operated as an instrumentality of the other, to the extent shown by common ownership, management, control, shared resources, shared address, common business purpose, commingling, undercapitalization, bank statements and financial records indicating commingling of funds, and the conduct alleged in the Verified Second Amended Complaint.

**SPECIAL INTERROGATORY NO. 52:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 51.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents; calls for legal conclusions concerning alter ego, agency, ownership, control,





REEDER LLP

domination, and legal effect; seeks financial, banking, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, Unvarnished, Inc., Glass Tunnel LLC, escrow holders, title companies, lenders, or other third parties; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, calls for legal conclusions concerning alter ego, agency, ownership, control, domination, or legal effect, seeks financial, banking, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, Unvarnished, Inc., Glass Tunnel LLC, escrow holders, title companies, lenders, or other third parties, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 51 include bank statements, Unvarnished and Glass Tunnel formation and governance records, communications, transaction documents, financial records, Verified Second Amended Complaint, and related discovery.

**SPECIAL INTERROGATORY NO. 53:**

State all facts supporting YOUR contention in Paragraph 14 of the SECOND AMENDED COMPLAINT that GILLEN is an alter ego of PMF. As used herein, "PMF" shall mean and refer to PMF CA REIT, L.L.C., a limited liability company with its principal place of business located at 23586 Calabasas Road, Suite 100, Calabasas, CA 91302.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions

concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; mischaracterizes Responding Party's present contentions to the extent it assumes Responding Party currently contends that PMF is Gillen's alter ego; assumes disputed facts; is vague and ambiguous as to "alter ego" and "PMF"; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, or legal effect, seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, or mischaracterizes Responding Party's present contentions to the extent it assumes Responding Party currently contends that PMF is Gillen's alter ego. Responding Party further objects to the extent the interrogatory assumes disputed facts, is vague and ambiguous as to "alter ego" or "PMF," seeks premature disclosure of trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party does not presently contend, based on its current investigation, that Gillen is an alter ego of PMF. Responding Party's investigation and discovery concerning PMF's role in the Glass Tunnel Transaction, related financing, title and escrow documents, communications, and relationship with the Gillen Defendants are ongoing. Responding Party reserves the right to supplement this response based on additional discovery.

**SPECIAL INTERROGATORY NO. 54:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 53.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents; calls for legal conclusions concerning alter ego, agency, ownership, control, domination, and legal effect; seeks documents or information in the possession, custody, or control of Propounding Party, PMF, Glass Tunnel LLC, escrow holders, title companies, lenders, or other third parties; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, calls for legal conclusions concerning alter ego, agency, ownership, control, domination, or legal effect, seeks documents or information in the possession, custody, or control of Propounding Party, PMF, Glass Tunnel LLC, escrow holders, title companies, lenders, or other third parties, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party refers to its response to Special Interrogatory No. 53. Documents relating to PMF's role in the Glass Tunnel Transaction include PMF financing documents, communications concerning the Glass Tunnel Transaction, escrow and title documents, Verified Second Amended Complaint, and related discovery.

**SPECIAL INTERROGATORY NO. 55:**

State all facts supporting YOUR contention in Paragraph 14 of the SECOND AMENDED COMPLAINT that UNVARNISHED is an alter ego of PMF, or vice versa.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; mischaracterizes Responding Party's present contentions to the extent it assumes Responding Party currently contends that PMF and Unvarnished, Inc. are alter egos of one another; assumes disputed facts; is vague and ambiguous as to "alter ego," "or vice versa," "UNVARNISHED," and "PMF"; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, or legal effect, seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, or mischaracterizes Responding Party's present contentions to the extent it assumes Responding Party currently contends that PMF and Unvarnished, Inc. are alter egos of one another. Responding Party further objects to the extent the interrogatory assumes disputed facts, is vague and ambiguous as to "alter ego," "or vice versa," "UNVARNISHED," or "PMF," seeks premature disclosure of trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party does not presently contend, based on its current investigation, that Unvarnished and PMF are alter egos of one another. Responding Party's investigation and discovery concerning PMF's role in the Glass Tunnel Transaction, related financing, title and escrow documents, communications, and relationship with the Gillen Defendants are ongoing. Responding Party reserves the right to supplement this response based on additional discovery.

**SPECIAL INTERROGATORY NO. 56:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 55.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents; calls for legal conclusions concerning alter ego, agency, ownership, control, domination, and legal effect; seeks documents or information in the possession, custody, or control of Propounding Party, PMF, Unvarnished, Inc., escrow holders, title companies, lenders, or other third parties; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, calls for legal conclusions concerning alter ego, agency, ownership, control, domination, or legal effect, seeks documents or information in the possession,

custody, or control of Propounding Party, PMF, Unvarnished, Inc., escrow holders, title companies, lenders, or other third parties, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party refers to its response to Special Interrogatory No. 55. Documents relating to PMF's role in the Glass Tunnel Transaction include PMF financing documents, communications concerning the Glass Tunnel Transaction, escrow and title documents, Verified Second Amended Complaint, and related discovery.

**SPECIAL INTERROGATORY NO. 57:**

State all facts supporting YOUR contention in Paragraph 14 of the SECOND AMENDED COMPLAINT that C64829 is an alter ego of PMF, or vice versa.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; mischaracterizes Responding Party's present contentions to the extent it assumes Responding Party currently contends that PMF and C64829 LLC are alter egos of one another; assumes disputed facts; is vague and ambiguous as to "alter ego," "or vice versa," "C64829," and "PMF"; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity

form, or legal effect, seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, or mischaracterizes Responding Party's present contentions to the extent it assumes Responding Party currently contends that PMF and C64829 LLC are alter egos of one another. Responding Party further objects to the extent the interrogatory assumes disputed facts, is vague and ambiguous as to "alter ego," "or vice versa," "C64829," or "PMF," seeks premature disclosure of trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party does not presently contend, based on its current investigation, that C64829 and PMF are alter egos of one another. Responding Party's investigation and discovery concerning PMF's role in the Glass Tunnel Transaction, related financing, title and escrow documents, communications, and relationship with the Gillen Defendants are ongoing. Responding Party reserves the right to supplement this response based on additional discovery.

**SPECIAL INTERROGATORY NO. 58:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 57.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents; calls for legal conclusions concerning alter ego, agency, ownership, control, domination, and legal effect; seeks documents or information in the possession, custody, or control of Propounding Party, PMF, C64829 LLC, escrow holders, title companies, lenders, or other third parties; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, calls for legal conclusions concerning alter ego, agency, ownership, control, domination, or legal effect, seeks documents or information in the possession, custody, or control of Propounding Party, PMF, C64829 LLC, escrow holders, title companies, lenders, or other third parties, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party refers to its response to Special Interrogatory No. 57. Documents relating to PMF's role in the Glass Tunnel Transaction include PMF financing documents, communications concerning the Glass Tunnel Transaction, escrow and title documents, Verified Second Amended Complaint, and related discovery.

**SPECIAL INTERROGATORY NO. 59:**

State all facts supporting YOUR contention in Paragraph 14 of the SECOND AMENDED COMPLAINT that GLASS TUNNEL is an alter ego of PMF, or vice versa.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; mischaracterizes Responding Party's present contentions to the extent it assumes Responding Party currently contends that PMF and Glass Tunnel LLC are alter egos of one another; assumes disputed facts; is vague and ambiguous as to "alter ego," "or vice versa," "GLASS TUNNEL," and "PMF"; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts";

seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning alter ego, agency, ownership, control, domination, instrumentality, misuse of entity form, or legal effect, seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, or mischaracterizes Responding Party's present contentions to the extent it assumes Responding Party currently contends that PMF and Glass Tunnel LLC are alter egos of one another. Responding Party further objects to the extent the interrogatory assumes disputed facts, is vague and ambiguous as to "alter ego," "or vice versa," "GLASS TUNNEL," or "PMF," seeks premature disclosure of trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party does not presently contend, based on its current investigation, that Glass Tunnel and PMF are alter egos of one another. Responding Party's investigation and discovery concerning PMF's role in the Glass Tunnel Transaction, related financing, title and escrow documents, communications, and relationship with the Gillen Defendants are ongoing. Responding Party reserves the right to supplement this response based on additional discovery.

**SPECIAL INTERROGATORY NO. 60:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 59.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable

privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents; calls for legal conclusions concerning alter ego, agency, ownership, control, domination, and legal effect; seeks documents or information in the possession, custody, or control of Propounding Party, PMF, Glass Tunnel LLC, escrow holders, title companies, lenders, or other third parties; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, calls for legal conclusions concerning alter ego, agency, ownership, control, domination, or legal effect, seeks documents or information in the possession, custody, or control of Propounding Party, PMF, Glass Tunnel LLC, escrow holders, title companies, lenders, or other third parties, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party refers to its response to Special Interrogatory No. 59. Documents relating to PMF's role in the Glass Tunnel Transaction include PMF financing documents, communications concerning the Glass Tunnel Transaction, escrow and title documents, Verified Second Amended Complaint, and related discovery.

**SPECIAL INTERROGATORY NO. 61:**

State all facts supporting YOUR contention in Paragraph 19 of the SECOND AMENDED COMPLAINT that GILLEN and/or C64829 will "very likely not profit from the further development of THE CASE PROJECT."

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for speculation, expert opinion, legal conclusions, attorney-client communications, and attorney work product. Responding Party further objects that the interrogatory is vague and ambiguous as to "very likely not profit" and "further development," assumes disputed facts, seeks premature disclosure of expert analysis, valuation opinions, financial analysis, trial evidence, contentions, legal theories, and strategy, is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts," seeks financial and private information, seeks information equally or more available to Propounding Party or third parties, and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for speculation, expert opinion, legal conclusions, attorney-client communications, or attorney work product. Responding Party further objects to the extent the interrogatory is vague and ambiguous as to "very likely not profit" or "further development," assumes disputed facts, seeks premature expert, valuation, or financial analysis, seeks financial or private information, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen and/or C64829 will very likely not profit from further development of the Case Project because, according to the interest accrual specified in the loan documents, the ledger will show that 600 Spring LLC currently owes BOBS over $250 million in principal and interest. After JPMorgan Chase and PMF are paid, BOBS will be paid. Responding Party contends that after BOBS is paid, there will be no funds remaining for Gillen or C64829.

**SPECIAL INTERROGATORY NO. 62:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 61.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, premature expert analysis, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, valuation, and private information; seeks documents or information in the possession, custody, or control of Propounding Party or third parties; seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, premature expert analysis, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, valuation, or private information, seeks documents or information in the possession, custody, or control of Propounding Party or third parties, or seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 61 include the ledger, loan documents, funding records, draw records, project budgets, appraisals, receiver reports, Sheppard declaration and exhibits, Stern declaration, financial records, accounting records, Verified Second Amended Complaint, and related discovery.

**SPECIAL INTERROGATORY NO. 63:**

State all facts supporting YOUR contention in Paragraph 20 of the SECOND AMENDED COMPLAINT that YOU "never failed to fund the needed amounts" for the development of THE CASE PROJECT.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for attorney-client communications, attorney work product, and legal conclusions concerning funding obligations, contract interpretation, loan terms, performance, breach, and damages. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "never failed," "fund," "needed amounts," and "development of THE CASE PROJECT"; seeks financial and banking information protected by privacy rights; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for attorney-client communications, attorney work product, or legal conclusions concerning funding obligations, contract interpretation, loan terms, performance, breach, or damages. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "never failed," "fund," "needed amounts," or "development of THE CASE PROJECT," seeks financial or banking information protected by privacy rights, seeks premature expert analysis, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that BOBS did not fail to fund needed amounts for development of the Case Project. Facts supporting this contention include that BOBS never failed to send Scott Gillen a requested draw, BOBS's funding of substantial amounts for the project, the BOBS Loan Agreement, Promissory Note, funding and draw records, Plaintiffs' continued willingness to fund legitimate construction needs, and Plaintiffs' funding proposals made in connection with the receivership proceedings.

**SPECIAL INTERROGATORY NO. 64:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 63.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, and private information; seeks documents or information in the possession, custody, or control of Propounding Party or third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, or private information, seeks documents or information in the possession, custody, or control of Propounding Party or third parties, or seeks premature expert analysis.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 63 include the BOBS Loan Agreement, Promissory Note, funding records, draw requests, bank records, accounting records, communications concerning funding and draws, Plaintiffs' funding proposals, receiver filings and reports, and related discovery. Responding Party contends that draw requests will match amounts ultimately wired.

**SPECIAL INTERROGATORY NO. 65:**

State all facts supporting YOUR contention in Paragraph 20 of the SECOND AMENDED COMPLAINT that "[n]either Barry Shy, Rommy Shy or BOBS ever told GILLEN that they are unwilling or unable to continue the draw releases as needed until the project would be completed and sold."

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks information about statements by Barry Shy or Rommy Shy beyond Responding Party's personal knowledge, calls for speculation, and seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory assumes disputed facts, is vague and ambiguous as to "unwilling or unable," "continue the draw releases," "as needed," and "completed and sold," calls for legal conclusions concerning funding obligations, contract interpretation, and project financing, is overbroad, unduly burdensome, and not proportional to the needs of the case, seeks information equally or more available to Propounding Party or third parties, and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks information about statements by Barry Shy or Rommy Shy beyond Responding Party's personal knowledge, calls for speculation, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory assumes disputed facts, is vague and ambiguous as to "unwilling or unable," "continue the draw releases," "as needed," or "completed and sold," calls for legal conclusions concerning funding obligations, contract interpretation, or project financing, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that neither Barry Shy, Rommy Shy, nor BOBS told Gillen that they were unwilling or unable to continue draw releases as needed until the project would be completed and sold. Facts supporting this contention include that no one told Gillen that, Plaintiffs' continued funding position, communications concerning project funding and draws, funding records, and Plaintiffs' receivership funding proposals.

**SPECIAL INTERROGATORY NO. 66:**

State all facts supporting YOUR contention in Paragraph 21 of the SECOND AMENDED COMPLAINT that GILLEN has "withdrawn from BOBS and other third-party construction lenders more than $200 million to develop five properties," including, but not limited to, a description of the date, amount of, and lender for each such withdrawal.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for attorney-client communications, attorney work product, expert analysis, and a complete accounting before discovery is complete. Responding Party further objects that the interrogatory is compound, overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial and banking information protected by privacy rights; is vague and ambiguous as to "withdrawn," "more than $200 million," "develop five properties," and "each such withdrawal"; seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, BOBS, lenders, banks, 600 Spring LLC, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for attorney-client communications, attorney work product, expert analysis, or a complete accounting before discovery is complete. Responding Party further objects to the extent the interrogatory is compound, overbroad, unduly burdensome, vague and ambiguous as to "withdrawn," "more than $200 million," "develop five properties," or "each such withdrawal," seeks financial or banking

information protected by privacy rights, or seeks information equally or more available to Propounding Party, BOBS, lenders, banks, 600 Spring LLC, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen withdrew or caused to be withdrawn more than $200 million from BOBS and other third-party lenders for development of the five properties. Facts supporting this contention include the ledger, bank statements, forensic auditing, BOBS funding records, loan documents, draw requests, bank records, accounting records, forensic accounting materials, and documents reflecting funds advanced for or through 600 Spring LLC and related borrower entities. Over $125 million in principal has been advanced by BOBS, and the balance due to BOBS is currently over $250 million with interest accrual.

**SPECIAL INTERROGATORY NO. 67:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 66.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, BOBS, lenders, banks, 600 Spring LLC, or other third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is

overbroad, unduly burdensome, seeks financial, banking, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, BOBS, lenders, banks, 600 Spring LLC, or other third parties, or seeks premature expert analysis.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 66 include forensically reviewed ledger, BOBS bank statements, BOBS funding records, loan documents from BHI, CTBC, and JPMorgan Chase, draw requests, bank records, accounting records, forensic accounting materials, Sheppard declaration and exhibits, Receiver reports, and related discovery.

**SPECIAL INTERROGATORY NO. 68:**

State all facts supporting YOUR contention in Paragraph 22 of the SECOND AMENDED COMPLAINT that GILLEN has "obtained over $200 million from BOBS and other third-party lenders for the construction and development of the five properties," including, but not limited to, a description of the date, amount of, and lender for each such transaction.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for attorney-client communications, attorney work product, expert analysis, and a complete accounting before discovery is complete. Responding Party further objects that the interrogatory is compound, overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial and banking information protected by privacy rights; is vague and ambiguous as to "obtained," "over $200 million," "construction and development," and "each such transaction"; seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, BOBS, lenders, banks, 600 Spring LLC, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for attorney-client communications, attorney work product, expert analysis, or a complete accounting before discovery is complete. Responding Party further objects to the extent the interrogatory is compound, overbroad, unduly burdensome, vague and ambiguous as to "obtained," "over $200 million," "construction and development," or "each such transaction," seeks financial or banking information protected by privacy rights, or seeks information equally or more available to Propounding Party, BOBS, lenders, banks, 600 Spring LLC, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen obtained over $200 million from BOBS and other third-party lenders for construction and development of the five properties. Facts supporting this contention include a $25 million loan from BHI in 2017 that was later increased to $38 million, a $62 million loan from CTBC, a $48 million loan from JPMorgan Chase in 2024, loan documents, funding records, draw requests, bank records, accounting records, forensic accounting materials, and documents reflecting funds advanced for or through 600 Spring LLC and related borrower entities.

**SPECIAL INTERROGATORY NO. 69:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 68.

**RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information or attorney work product.

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, and private information; seeks documents or information in the possession, custody, or

control of Propounding Party, BOBS, lenders, banks, 600 Spring LLC, or other third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, BOBS, lenders, banks, 600 Spring LLC, or other third parties, or seeks premature expert analysis.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 68 include BOBS funding records, BOBS loan documents and ledger, loan documents from BHI, CTBC, and JPMorgan Chase, draw requests, bank records, accounting records, forensic accounting materials, Sheppard declaration and exhibits, Receiver reports, and related discovery.

**SPECIAL INTERROGATORY NO. 70:**

State all facts supporting YOUR contention in Paragraph 22 of the SECOND AMENDED COMPLAINT that GILLEN "refused to provide" an accounting of 600 SPRING.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks attorney-client communications, attorney work product, and legal conclusions concerning accounting obligations, fiduciary obligations, loan obligations, and damages. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "refused to provide" and "accounting"; seeks financial and banking information protected by

privacy rights; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, 600 Spring LLC, accountants, banks, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks attorney-client communications, attorney work product, or legal conclusions concerning accounting obligations, fiduciary obligations, loan obligations, or damages. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to “refused to provide” or “accounting,” seeks financial or banking information protected by privacy rights, seeks premature expert analysis, or seeks information equally or more available to Propounding Party, 600 Spring LLC, accountants, banks, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen refused to provide an accounting of 600 Spring LLC. Facts supporting this contention include Gillen's failure to comply with numerous requests to provide accounting, requests for accounting information, Gillen’s failure or refusal to provide complete accounting records, financial records produced or to be produced in this action, forensic accounting materials, and allegations and evidence identified in Plaintiffs’ pleadings and declarations.

**SPECIAL INTERROGATORY NO. 71:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 70.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, and

private information; seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, accountants, banks, lenders, or other third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, accountants, banks, lenders, or other third parties, or seeks premature expert analysis.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 70 include text messages, verbal communications, requests for accounting information, communications concerning accounting records, financial records, bank records, accounting records, forensic accounting materials, Verified Second Amended Complaint, declarations and exhibits filed in this action, Receiver reports, and related discovery.

**SPECIAL INTERROGATORY NO. 72:**

State all facts supporting YOUR contention in Paragraph 24 of the SECOND AMENDED COMPLAINT that the GILLEN DEFENDANTS and PMF "engaged in acts to circumvent SHY's refusal to encumber the Subject Property," including, but not limited to, a description of each such act.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for attorney-client communications, attorney work product, legal conclusions, and speculation concerning

Defendants' internal intent. Responding Party further objects that the interrogatory is overbroad, compound, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts" and "each such act"; assumes disputed facts; is vague and ambiguous as to "engaged," "acts," "circumvent," "refusal," and "encumber"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information in the possession, custody, or control of Propounding Party, PMF, escrow holders, title companies, lenders, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for attorney-client communications, attorney work product, legal conclusions, or speculation concerning Defendants' internal intent. Responding Party further objects to the extent the interrogatory is overbroad, compound, vague and ambiguous as to "engaged," "acts," "circumvent," "refusal," or "encumber," seeks information in the possession, custody, or control of Propounding Party, PMF, escrow holders, title companies, lenders, or other third parties, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Gillen Defendants and PMF engaged in acts to circumvent Shy's refusal to encumber the Subject Property. Facts supporting this contention include that PMF was aware of Shy's refusal to encumber the property yet proceeded without notifying Shy, the negotiation and execution of the Glass Tunnel Transaction, the associated PMF financing transaction, title and escrow documents, communications concerning the transaction, the Grant Deed to Purchaser, the Deed of Trust and related security documents, and allegations that the transaction was structured without Shy's required consent or authorization.

**SPECIAL INTERROGATORY NO. 73:**

State all facts supporting YOUR contention in Paragraphs 24 and 25 of the SECOND AMENDED COMPLAINT that the GILLEN DEFENDANTS and PMF "engaged in acts to

circumvent SHY's refusal to encumber the Subject Property" at the "advice of attorneys at Jeffer Mangels Butler & Mitchell LLP, including at least Kevin McDonnell."

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks attorney-client communications, attorney work product, privileged information, attorney impressions, attorney advice, and information in the possession, custody, or control of Defendants or their counsel. Responding Party further objects that the interrogatory calls for legal conclusions, speculation concerning Defendants' internal intent and advice of counsel, and premature disclosure of trial evidence, contentions, legal theories, and strategy; is overbroad, compound, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "engaged," "acts," "circumvent," "advice," and "including at least"; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks attorney-client communications, attorney work product, privileged information, attorney impressions, attorney advice, or information in the possession, custody, or control of Defendants or their counsel. Responding Party further objects to the extent it calls for legal conclusions or speculation concerning Defendants' internal intent or advice of counsel, is overbroad, compound, vague and ambiguous as to "engaged," "acts," "circumvent," "advice," or "including at least," or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Gillen Defendants and PMF engaged in acts to circumvent Shy's refusal to encumber the Subject Property at the advice of attorneys at Jeffer Mangels Butler & Mitchell LLP, including at least Kevin McDonnell, based on communications indicating that Kevin McDonnell was aware of the transaction before it occurred and chose to hide it from Shy, transaction documents, title and escrow materials, and allegations in the

Verified Second Amended Complaint concerning counsel's role in the Glass Tunnel Transaction and related financing.

**SPECIAL INTERROGATORY NO. 74:**

State all facts supporting YOUR contention in Paragraph 27 of the SECOND AMENDED COMPLAINT that the GLASS TUNNEL TRANSACTION was "unconsented to, unauthorized, ineffective, and illegal." As used herein, "GLASS TUNNEL TRANSACTION" shall mean and refer to the June 5, 2025 transaction between 600 SPRING and GLASS TUNNEL, pursuant to which 600 SPRING exercised its right to sell House #5 to GLASS TUNNEL, as identified and described in Paragraph 26 of Plaintiffs' Verified Second Amended Complaint.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning consent, authorization, validity, effectiveness, illegality, title, ownership, and remedies; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "unconsented to," "unauthorized," "ineffective," "illegal," and "GLASS TUNNEL TRANSACTION"; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning consent, authorization, validity, effectiveness, illegality, title, ownership, or remedies, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent it is overbroad, vague and ambiguous as to "unconsented to," "unauthorized," "ineffective," "illegal," or "GLASS TUNNEL TRANSACTION," seeks premature expert analysis, trial evidence,

contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Glass Tunnel Transaction was unconsented to, unauthorized, ineffective, and illegal because Gillen fraudulently transferred title to 24198 Case Court without the consent or knowledge of BR Shy Irrevocable Trust, the 50% owner of 600 Spring LLC. The transfer was from 600 Spring LLC to Glass Tunnel LLC, an entity owned 100% by Gillen. Responding Party contends that this deprived BR Shy Irrevocable Trust of its equity stake in the property and BOBS of the collateral for its loan, which encumbered that property.

**SPECIAL INTERROGATORY NO. 75:**

State all facts supporting YOUR contention in Paragraph 27 of the SECOND AMENDED COMPLAINT that the GLASS TUNNEL TRANSACTION was a "self-interested transaction."

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning self-interest, conflicts of interest, fiduciary duties, authorization, validity, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "self-interested transaction" and "GLASS TUNNEL TRANSACTION"; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning self-interest, conflicts of interest, fiduciary duties, authorization, validity, or legal effect, or seeks attorney-client communications, attorney work product, or information protected

by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "self-interested transaction" or "GLASS TUNNEL TRANSACTION," seeks premature expert analysis, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Glass Tunnel Transaction was a self-interested transaction because Gillen fraudulently transferred title to 24198 Case Court without the consent or knowledge of BR Shy Irrevocable Trust, the 50% owner of 600 Spring LLC. The transfer was from 600 Spring LLC to Glass Tunnel LLC, an entity owned 100% by Gillen. Responding Party contends that this deprived BR Shy Irrevocable Trust of its equity stake in the property and BOBS of the collateral for its loan, which encumbered that property.

**SPECIAL INTERROGATORY NO. 76:**

State all facts supporting YOUR contention in Paragraph 27 of the SECOND AMENDED COMPLAINT that the GLASS TUNNEL TRANSACTION was "the product of a breach of fiduciary duty."

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning fiduciary duties, breach, causation, damages, authorization, consent, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "product of a breach of fiduciary duty" and "GLASS TUNNEL TRANSACTION"; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy;

seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning fiduciary duties, breach, causation, damages, authorization, consent, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "product of a breach of fiduciary duty" or "GLASS TUNNEL TRANSACTION," seeks premature expert analysis, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Glass Tunnel Transaction was the product of a breach of fiduciary duty because Gillen had a fiduciary duty as manager of 600 Spring LLC not to abrogate the loan agreements with BOBS in a manner that would subject 600 Spring LLC to liability, and he had a duty to safeguard the interests of BR Shy Irrevocable Trust as a member. Responding Party contends that Gillen breached those duties by negotiating for and engaging in the Glass Tunnel Transaction and associated PMF financing for the benefit of himself and entities he owned or controlled, without required consent, in a manner that impaired 600 Spring LLC's property interests and BOBS's lending rights.

**SPECIAL INTERROGATORY NO. 77:**

State all facts supporting YOUR contention in Paragraph 27 of the SECOND AMENDED COMPLAINT that the GLASS TUNNEL TRANSACTION was "an abdication of the terms of the Operating Agreement and Amended Operating Agreement."

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions

concerning contract interpretation, governance, consent, authority, breach, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "abdication," "terms," "Operating Agreement," "Amended Operating Agreement," and "GLASS TUNNEL TRANSACTION"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning contract interpretation, governance, consent, authority, breach, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "abdication," "terms," "Operating Agreement," "Amended Operating Agreement," or "GLASS TUNNEL TRANSACTION," seeks premature disclosure of trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Glass Tunnel Transaction was an abdication of the terms of the Operating Agreement and Amended Operating Agreement for the reasons stated in response to Special Interrogatory No. 76, including that the transaction was undertaken without required consent or authorization, disregarded Barry Shy's management rights, involved a self-interested transfer of 600 Spring LLC property, and bypassed governance and approval requirements applicable to 600 Spring LLC.

**<u>SPECIAL INTERROGATORY NO.</u> 78:**

State all facts supporting YOUR contention in Paragraph 27 of the SECOND AMENDED COMPLAINT that the GLASS TUNNEL TRANSACTION was "in derogation of the rights of BOBS LLC under the operative lending documents."

**<u>RESPONSE</u>**:

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning contract interpretation, lending rights, security rights, impairment, authorization, causation, damages, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "in derogation," "rights," "operative lending documents," and "GLASS TUNNEL TRANSACTION"; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks financial, banking, and private information; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**<u>SUPPLEMENTAL RESPONSE:</u>**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning contract interpretation, lending rights, security rights, impairment, authorization, causation, damages, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent it is overbroad, vague and ambiguous as to "in derogation," "rights," "operative lending documents," or "GLASS TUNNEL TRANSACTION," seeks financial, banking, or private information, or seeks premature expert analysis, trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Glass Tunnel Transaction was in derogation of BOBS LLC's rights under the operative lending documents because the property was held as collateral

by BOBS as security for its loan. By subordinating BOBS's lien to PMF without BOBS's knowledge or consent, Gillen caused BOBS to suffer substantial financial losses and impaired collateral and rights securing obligations under the BOBS Loan Agreement, Promissory Note, Deed of Trust, and related loan documents.

**SPECIAL INTERROGATORY NO. 79:**

State all facts supporting YOUR contention in Paragraph 27 of the SECOND AMENDED COMPLAINT that the GLASS TUNNEL TRANSACTION "constituted a breach of the covenant of good faith and fair dealing."

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning contract interpretation, covenant of good faith and fair dealing, breach, causation, damages, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "constituted," "breach," "covenant of good faith and fair dealing," and "GLASS TUNNEL TRANSACTION"; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning contract interpretation, covenant of good faith and fair dealing, breach, causation, damages, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent it is overbroad, vague and ambiguous as to "constituted," "breach," "covenant of good faith and fair dealing," or "GLASS TUNNEL TRANSACTION," seeks premature expert

analysis, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Glass Tunnel Transaction constituted a breach of the covenant of good faith and fair dealing because Gillen fraudulently transferred title to 24198 Case Court without the consent or knowledge of BR Shy Irrevocable Trust, the 50% owner of 600 Spring LLC. The transfer was from 600 Spring LLC to Glass Tunnel LLC, an entity owned 100% by Gillen. Responding Party contends that this deprived BR Shy Irrevocable Trust of its equity stake in the property and BOBS of the collateral for its loan, which encumbered that property.

**SPECIAL INTERROGATORY NO. 80:**

State all facts supporting YOUR contention in Paragraph 27 of the SECOND AMENDED COMPLAINT that the GLASS TUNNEL TRANSACTION was "intended to interfere" with "the performance of the Operating Agreement, the Amended Operating Agreement, and BOBS' Promissory Note."

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning contract interpretation, interference, intent, causation, damages, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; calls for speculation regarding intent; is overbroad, compound, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "intended to interfere," "performance," "Operating Agreement," "Amended Operating Agreement," "BOBS' Promissory Note," and "GLASS TUNNEL TRANSACTION"; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning contract interpretation, interference, intent, causation, damages, or legal effect, seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, or calls for speculation regarding intent. Responding Party further objects to the extent it is overbroad, compound, vague and ambiguous as to "intended to interfere," "performance," "Operating Agreement," "Amended Operating Agreement," "BOBS' Promissory Note," or "GLASS TUNNEL TRANSACTION," or seeks premature expert analysis, trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Glass Tunnel Transaction was intended to interfere with performance of the Operating Agreement, the Amended Operating Agreement, and BOBS' Promissory Note for the reasons stated in response to Special Interrogatory No. 74, including that the transaction purported to transfer and encumber 600 Spring LLC property without required consent, displaced Shy's management and ownership rights, and impaired BOBS's rights as lender and secured creditor.

**SPECIAL INTERROGATORY NO. 81:**

State all facts supporting YOUR contention in Paragraph 27 of the SECOND AMENDED COMPLAINT that the GLASS TUNNEL TRANSACTION "did interfere with the performance of the Operating Agreement, the Amended Operating Agreement, and BOBS' Promissory Note."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning contract interpretation, interference, performance, causation, damages, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, compound, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague

and ambiguous as to "did interfere," "performance," "Operating Agreement," "Amended Operating Agreement," "BOBS' Promissory Note," and "GLASS TUNNEL TRANSACTION"; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning contract interpretation, interference, performance, causation, damages, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent it is overbroad, compound, vague and ambiguous as to "did interfere," "performance," "Operating Agreement," "Amended Operating Agreement," "BOBS' Promissory Note," or "GLASS TUNNEL TRANSACTION," or seeks premature expert analysis, trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Glass Tunnel Transaction did interfere with performance of the Operating Agreement, the Amended Operating Agreement, and BOBS' Promissory Note because, with the unauthorized and illegal transfer of the property to Glass Tunnel LLC, BOBS was deprived of security for its loan and BR Shy Irrevocable Trust was deprived of the equity it had in that property. Responding Party further contends that the transaction displaced or impaired Shy's management and ownership rights and clouded title to the Subject Property.

**SPECIAL INTERROGATORY NO. 82:**

State all facts supporting YOUR contention in Paragraph 28 of the SECOND AMENDED COMPLAINT that the GLASS TUNNEL TRANSACTION "was the product of a conspiratorial scheme to deprive SHY and BOBS of their interests in the property."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for attorney-client communications, attorney work product, legal conclusions, and speculation concerning conspiracy, scheme, intent, causation, damages, and legal effect. Responding Party further objects that the interrogatory is overbroad, compound, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "product," "conspiratorial scheme," "deprive," "interests in the property," and "GLASS TUNNEL TRANSACTION"; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, PMF, escrow holders, title companies, lenders, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for attorney-client communications, attorney work product, legal conclusions, or speculation concerning conspiracy, scheme, intent, causation, damages, or legal effect. Responding Party further objects to the extent the interrogatory is overbroad, compound, vague and ambiguous as to "product," "conspiratorial scheme," "deprive," "interests in the property," or "GLASS TUNNEL TRANSACTION," seeks premature expert analysis, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party, PMF, escrow holders, title companies, lenders, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Glass Tunnel Transaction was the product of a conspiratorial scheme to deprive Shy and BOBS of their interests in the property. Responding Party is still awaiting discovery on this issue that Gillen has failed to provide. Facts supporting this contention include the negotiation and execution of the Glass Tunnel Transaction, the associated PMF financing, title and escrow documents, communications concerning the

transaction, the alleged absence of required consent or authority, and the alleged use of the transaction to impair Shy's rights and BOBS's security and lending rights.

**SPECIAL INTERROGATORY NO. 83:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 82.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks documents or information in the possession, custody, or control of Propounding Party, PMF, Glass Tunnel LLC, escrow holders, title companies, lenders, or other third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks documents or information in the possession, custody, or control of Propounding Party, PMF, Glass Tunnel LLC, escrow holders, title companies, lenders, or other third parties, or seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 82 include the fraudulent operating agreement Gillen produced to obtain the PMF loan, the Grant Deed from 600 Spring LLC to Glass Tunnel LLC, PMF's recorded Deed of Trust, Glass Tunnel Transaction documents, PMF financing documents, title and escrow documents, communications

concerning the transaction, Operating Agreement documents, BOBS loan documents, Verified Second Amended Complaint, declarations and exhibits filed in this action, Receiver reports, and related discovery.

**SPECIAL INTERROGATORY NO. 84:**

State all facts supporting YOUR contention in Paragraph 29 of the SECOND AMENDED COMPLAINT that the Grant Deed to Purchaser, executed as part of the GLASS TUNNEL TRANSACTION, "was unconsented to, unauthorized, ineffective, and illegal."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning consent, authorization, validity, effectiveness, illegality, title, ownership, and remedies; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "Grant Deed to Purchaser," "executed as part of," "unconsented to," "unauthorized," "ineffective," and "illegal"; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning consent, authorization, validity, effectiveness, illegality, title, ownership, or remedies, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent it is overbroad, vague and ambiguous as to "Grant Deed to Purchaser," "executed as part of," "unconsented to," "unauthorized," "ineffective," or "illegal," seeks premature expert analysis, title opinions, trial

evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Grant Deed to Purchaser executed as part of the Glass Tunnel Transaction was unconsented to, unauthorized, ineffective, and illegal because it was never authorized by BR Shy Irrevocable Trust, as member, or BOBS, as lender, and the transfer of the deed was done by Gillen providing escrow and title with a fraudulent operating agreement.

**SPECIAL INTERROGATORY NO. 85:**

State all facts supporting YOUR contention in Paragraph 29 of the SECOND AMENDED COMPLAINT that the Grant Deed to Purchaser and the Deed of Trusts, executed as part of the GLASS TUNNEL TRANSACTION, "will continue to impair the title to the Subject Property unless canceled by a judgment quieting title in 600 SPRING."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning title, priority, cloud on title, marketability, cancellation, quiet title, remedies, causation, damages, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, compound, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "will continue to impair," "title," "Subject Property," "canceled," and "judgment quieting title"; seeks premature disclosure of expert analysis, title opinions, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, title companies, escrow holders, PMF, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning title, priority, cloud on title, marketability, cancellation, quiet title, remedies,

causation, damages, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, compound, vague and ambiguous as to "will continue to impair," "title," "Subject Property," "canceled," or "judgment quieting title," seeks premature expert analysis, title opinions, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party, title companies, escrow holders, PMF, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Grant Deed to Purchaser and Deed of Trusts executed as part of the Glass Tunnel Transaction impair and will continue to impair title to the Subject Property unless canceled by a judgment quieting title in 600 Spring LLC because BR Shy Irrevocable Trust has a legitimate claim as owner to the property and BOBS has a claim as a lienholder, both of which are now impaired. If title is restored, the prior status quo will be re-established.

**SPECIAL INTERROGATORY NO. 86:**

State all facts supporting YOUR contention in Paragraph 29 of the SECOND AMENDED COMPLAINT that the Grant Deed to Purchaser and the Deed of Trusts, executed as part of the GLASS TUNNEL TRANSACTION, "have already caused damage, and will continue to cause damage, directly and proximately, to both BOBS and SHY."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for expert opinion, legal conclusions, attorney-client communications, attorney work product, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, compound, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "have already caused damage," "will continue to cause damage," "directly and proximately," and "both BOBS and

SHY"; seeks premature disclosure of expert analysis, damages analysis, valuation opinions, title opinions, trial evidence, contentions, legal theories, and strategy; seeks financial, banking, title, valuation, and private information; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery, expert analysis, and damages analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for expert opinion, legal conclusions, attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, compound, vague and ambiguous as to "have already caused damage," "will continue to cause damage," "directly and proximately," or "both BOBS and SHY," seeks premature expert analysis, damages analysis, valuation opinions, title opinions, trial evidence, contentions, legal theories, or strategy, seeks financial, banking, title, valuation, or private information, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Grant Deed to Purchaser and Deed of Trusts executed as part of the Glass Tunnel Transaction have caused and will continue to cause damage to BOBS and Shy because Shy and BOBS were unable to sell House 5 and benefit from financial gain, and because those documents cloud title, impair Plaintiffs' asserted ownership, management, lending, and security rights, interfere with project financing and disposition, and create litigation, receivership, title, and transaction-related harm.

**SPECIAL INTERROGATORY NO. 87:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 86.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, premature expert analysis, and information protected by applicable

privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks title, valuation, financial, banking, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, PMF, title companies, escrow holders, lenders, valuation professionals, or other third parties; seeks premature disclosure of expert analysis, damages analysis, trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, premature expert analysis, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks title, valuation, financial, banking, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, PMF, title companies, escrow holders, lenders, valuation professionals, or other third parties, or seeks premature disclosure of expert analysis, damages analysis, trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 86 include the Grant Deed showing title having been transferred from 600 Spring LLC to Glass Tunnel LLC, Grant Deed and Deed of Trust records, title and escrow documents, PMF financing documents, BOBS loan documents, receiver filings and reports, valuation materials, financial records, communications concerning the Glass Tunnel Transaction, Verified Second Amended Complaint, and related discovery.

**SPECIAL INTERROGATORY NO. 88:**

State all facts supporting YOUR contention in Paragraph 30 of the SECOND AMENDED COMPLAINT that it was "understood" that GILLEN and C64829 "would receive compensation only from the sale of the properties."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for attorney-client communications, attorney work product, and legal conclusions concerning agreements, compensation rights, ownership rights, course of conduct, contract interpretation, and legal effect. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "understood," "compensation," "only," and "sale of the properties"; seeks financial and private information; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for attorney-client communications, attorney work product, or legal conclusions concerning agreements, compensation rights, ownership rights, course of conduct, contract interpretation, or legal effect. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "understood," "compensation," "only," or "sale of the properties," seeks financial or private information, seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that it was understood that Gillen and C64829 would receive compensation only from the sale of the properties because that was specified in the Operating

Agreement, based on the Operating Agreement documents, the parties' course of dealing, communications concerning the Case Project, and Plaintiffs' allegations that Gillen and C64829 were not authorized to receive separate compensation from project funds or through Unvarnished for work relating to 600 Spring LLC.

**SPECIAL INTERROGATORY NO. 89:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 88.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial and private information; seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, C64829 LLC, lenders, accountants, or other third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial or private information, seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, C64829 LLC, lenders, accountants, or other third parties, or seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 88 include the documents identified in response to Special Interrogatory No. 88, Operating Agreement documents, communications concerning compensation, project funding and draw records, financial and accounting records, documents concerning payments to Gillen, C64829, Unvarnished, or related entities, Verified Second Amended Complaint, and related discovery.

**SPECIAL INTERROGATORY NO. 90:**

State all facts supporting YOUR contention in Paragraph 31 of the SECOND AMENDED COMPLAINT that "[i]t would be a futile and useless act for BR SHY IRREVOCABLE TRUST to make a demand on 600 SPRING to institute this action."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning demand futility, derivative standing, corporate governance, control, authority, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "futile and useless act," "demand," and "institute this action"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning demand futility, derivative standing, corporate governance, control, authority, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "futile and useless act," "demand," or "institute this action," seeks premature disclosure of trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.



REEDER LLP

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that it would be futile and useless for BR Shy Irrevocable Trust to make a demand on 600 Spring LLC to institute this action because Gillen controlled or purported to control 600 Spring LLC, the challenged conduct involved Gillen and entities he owned or controlled, Gillen disputed Shy's management authority, and the alleged wrongdoing concerned transactions and conduct that Plaintiffs contend were undertaken by Gillen or for his benefit.

**SPECIAL INTERROGATORY NO. 91:**

State all facts supporting YOUR contention in Paragraph 34 of the SECOND AMENDED COMPLAINT that "600 SPRING remains the true, rightful and sole owner of the Subject Property, subject only to such security instruments as predated the June 5, 2025 transaction."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning title, ownership, validity, quiet title, remedies, security instruments, priority, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "true, rightful and sole owner," "Subject Property," and "security instruments"; seeks premature disclosure of expert analysis, title opinions, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, title companies, escrow holders, PMF, lenders, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning title, ownership, validity, quiet title, remedies, security instruments, priority, or legal effect, or seeks attorney-client communications, attorney work product, or information protected

by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "true, rightful and sole owner," "Subject Property," or "security instruments," seeks premature expert analysis, title opinions, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party, title companies, escrow holders, PMF, lenders, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that 600 Spring LLC remains the true, rightful, and sole owner of the Subject Property, subject only to security instruments that predated the June 5, 2025 transaction. Facts supporting this contention include that 600 Spring LLC purchased, developed, and held title to the project at all times as the rightful owner before Gillen's fraudulent transfer on June 5, 2025, the alleged lack of required consent or authority for the Glass Tunnel Transaction, the Grant Deed to Purchaser and Deed of Trusts executed as part of that transaction, title records, transaction documents, and Plaintiffs' allegations that the Glass Tunnel Transaction is void or voidable.

**SPECIAL INTERROGATORY NO. 92:**

State all facts supporting YOUR contention in Paragraph 37 of the SECOND AMENDED COMPLAINT that "Plaintiffs are entitled to a judicial declaration that 600 SPRING is the 100% owner of the Subject Property."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning declaratory relief, title, ownership, validity, quiet title, standing, remedies, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "entitled," "judicial declaration," "100% owner," and "Subject Property"; seeks premature disclosure of expert analysis, title opinions, trial evidence, contentions, legal theories, and

strategy; seeks information equally or more available to Propounding Party, title companies, escrow holders, PMF, lenders, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning declaratory relief, title, ownership, validity, quiet title, standing, remedies, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "entitled," "judicial declaration," "100% owner," or "Subject Property," seeks premature expert analysis, title opinions, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party, title companies, escrow holders, PMF, lenders, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Plaintiffs are entitled to a judicial declaration that 600 Spring LLC is the 100% owner of the Subject Property because BR Shy Irrevocable Trust and BOBS seek the Court's determination that BR Shy Irrevocable Trust is a rightful owner and a restoration of BOBS's prior lien position, and because the Glass Tunnel Transaction, Grant Deed to Purchaser, and related Deed of Trusts were allegedly undertaken without required consent or authority and purport to transfer, encumber, or affect title to property that should remain owned by 600 Spring LLC. Responding Party relies on the Operating Agreement documents, title records, transaction documents, communications, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 93:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 92.

**RESPONSE:**

**Responding Party objects to this interrogatory on the grounds that it seeks privileged**

**information, attorney work product,** attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks title, ownership, governance, financial, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, PMF, title companies, escrow holders, lenders, 600 Spring LLC, or other third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks title, ownership, governance, financial, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, PMF, title companies, escrow holders, lenders, 600 Spring LLC, or other third parties, or seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 92 include Operating Agreement documents, the Amended Operating Agreement, Glass Tunnel Transaction documents, Grant Deed and Deed of Trust records, title and escrow documents, PMF financing documents, communications concerning the transaction, Verified Second Amended Complaint, declarations and exhibits filed in this action, Receiver reports, and related discovery.

**SPECIAL INTERROGATORY NO. 94:**

State all facts supporting YOUR contention in Paragraph 40 of the SECOND AMENDED COMPLAINT that "the June 5, 2025 Transaction, the June 3, 2025 Grant Deed to Purchaser and

the June 2, 2025 Deed of Trust, Assignment of rents, Security Agreement and Fixture Filing relating to the Subject Property are all void and voidable."

**<u>RESPONSE</u>:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning voidness, voidability, title, priority, validity, enforceability, remedies, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, compound, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "void and voidable," "Transaction," "Grant Deed to Purchaser," "Deed of Trust," "Assignment of rents," "Security Agreement," and "Fixture Filing"; seeks premature disclosure of expert analysis, title opinions, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, PMF, title companies, escrow holders, lenders, or other third parties; and is premature because discovery and investigation are ongoing.

**<u>SUPPLEMENTAL RESPONSE:</u>**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning voidness, voidability, title, priority, validity, enforceability, remedies, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, compound, vague and ambiguous as to "void and voidable," "Transaction," "Grant Deed to Purchaser," "Deed of Trust," "Assignment of rents," "Security Agreement," or "Fixture Filing," seeks premature expert analysis, title opinions, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party, PMF, title companies, escrow holders, lenders, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the June 5, 2025 Transaction, the June 3, 2025 Grant Deed to Purchaser, and the June 2, 2025 Deed of Trust, Assignment of Rents, Security Agreement

and Fixture Filing relating to the Subject Property are void and voidable because they were consummated as a result of fraud, were executed without required consent or authority, arose from a self-interested transaction, impaired Plaintiffs' asserted rights, and created instruments affecting title that Plaintiffs contend should be invalidated or canceled.

**SPECIAL INTERROGATORY NO. 95:**

State all facts supporting YOUR contention in Paragraph 42 of the SECOND AMENDED COMPLAINT that "Plaintiffs have been and will remain irreparably injured if" the GLASS TUNNEL TRANSACTION documents are "not adjudged invalid and cancelled by the Court."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions, expert opinion, attorney-client communications, attorney work product, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, compound, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "irreparably injured," "adjudged invalid," "cancelled," and "GLASS TUNNEL TRANSACTION documents"; seeks premature disclosure of expert analysis, damages analysis, valuation opinions, title opinions, trial evidence, contentions, legal theories, and strategy; seeks financial, banking, title, valuation, and private information; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery, expert analysis, and damages analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions, expert opinion, attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, compound, vague and ambiguous as to "irreparably injured," "adjudged invalid," "cancelled," or "GLASS TUNNEL TRANSACTION documents," seeks premature expert analysis, damages analysis, valuation opinions, title opinions, trial evidence,

contentions, legal theories, or strategy, seeks financial, banking, title, valuation, or private information, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Plaintiffs have been and will remain irreparably injured if the Glass Tunnel Transaction documents are not adjudged invalid and canceled because Plaintiffs will not receive the benefit of the gain from selling House 5, and because those documents cloud title, impair Plaintiffs' asserted ownership, management, lending, and security rights, interfere with financing and disposition of the Subject Property, and create continuing title, receivership, litigation, and transaction-related harm.

**SPECIAL INTERROGATORY NO. 96:**

State all facts supporting YOUR contention in Paragraph 46 of the SECOND AMENDED COMPLAINT that GILLEN "repeatedly breached his fiduciary duties."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning fiduciary duties, breach, causation, damages, authorization, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "repeatedly breached" and "fiduciary duties"; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning fiduciary duties, breach, causation, damages, authorization, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable

privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "repeatedly breached" or "fiduciary duties," seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen repeatedly breached his fiduciary duties because Gillen had a fiduciary duty as manager of 600 Spring LLC not to abrogate the loan agreement with BOBS in a manner that would subject 600 Spring LLC to liability, and he had a duty to safeguard the interests of BR Shy Irrevocable Trust as a member. Responding Party contends Gillen failed to do so and instead deprived BR Shy Irrevocable Trust of its rightful title, negotiated for and engaged in the Glass Tunnel Transaction and associated PMF financing for the benefit of himself or entities he owned or controlled, diverted or caused diversion of loan proceeds, failed or refused to provide accounting information, and engaged in conduct that impaired 600 Spring LLC's property interests and Plaintiffs' rights.

**SPECIAL INTERROGATORY NO. 97:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 96.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, title, governance, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, PMF, title companies, escrow holders, lenders, banks, accountants, or other third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, title, governance, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, PMF, title companies, escrow holders, lenders, banks, accountants, or other third parties, or seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 96 include BOBS loan documents, the Grant Deed from 600 Spring LLC to Glass Tunnel LLC, the fraudulent operating agreement excluding BR Shy Irrevocable Trust as member, PMF's note and Deed of Trust, Operating Agreement documents, Glass Tunnel Transaction documents, PMF financing documents, Grant Deed and Deed of Trust records, title and escrow documents, BOBS funding records, draw requests, bank records, accounting records, forensic accounting materials, Verified Second Amended Complaint, declarations and exhibits filed in this action, Receiver reports, and related discovery.

**SPECIAL INTERROGATORY NO. 98:**

State all facts supporting YOUR contention in Paragraph 47 of the SECOND AMENDED COMPLAINT that GILLEN "breached his fiduciary duty by, individually and through his companies, negotiating for and engaging in the June 5 transaction and the associated financing transaction with PMF."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning fiduciary duties, breach, causation, damages, authorization, self-interest, financing, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "breached," "individually and through his companies," "negotiating for," "engaging in," "June 5 transaction," and "associated financing transaction with PMF"; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, PMF, escrow holders, lenders, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning fiduciary duties, breach, causation, damages, authorization, self-interest, financing, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "breached," "individually and through his companies," "negotiating for," "engaging in," "June 5 transaction," or "associated financing transaction with PMF," seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party, PMF, escrow holders, lenders, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen breached his fiduciary duty by, individually and through his companies, negotiating for and engaging in the June 5 transaction and associated PMF financing transaction because he was not authorized to do so under the Operating Agreement and loan documents, acted while manager of 600 Spring LLC for the benefit of

himself or entities he owned or controlled, acted without required consent, and impaired 600 Spring LLC's property interests and Plaintiffs' asserted rights.

**SPECIAL INTERROGATORY NO. 99:**

State all facts supporting YOUR contention in Paragraph 48 of the SECOND AMENDED COMPLAINT that GILLEN "further breached his fiduciary duty by diverting a substantial portion of the approximately $200 million that 600 SPRING received from BOBS and other third-party lenders for the construction and development of five properties to himself, to his various companies, or to third parties."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions, attorney-client communications, attorney work product, expert analysis, and a complete accounting before discovery is complete. Responding Party further objects that the interrogatory is overbroad, compound, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "diverting," "substantial portion," "approximately $200 million," "received," "construction and development," and "to himself, to his various companies, or to third parties"; seeks financial, banking, and private information; seeks premature disclosure of expert analysis, damages analysis, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, BOBS, banks, lenders, accountants, 600 Spring LLC, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions, attorney-client communications, attorney work product, expert analysis, or a complete accounting before discovery is complete. Responding Party further objects to the extent the interrogatory is overbroad, compound, vague and ambiguous as to "diverting," "substantial portion,"

"approximately $200 million," "received," "construction and development," or "to himself, to his various companies, or to third parties," seeks financial, banking, or private information, seeks premature disclosure of expert analysis, damages analysis, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party, BOBS, banks, lenders, accountants, 600 Spring LLC, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen further breached his fiduciary duty by diverting a substantial portion of the approximately $200 million that 600 Spring LLC received from BOBS and other third-party lenders for construction and development of five properties to himself, his various companies, or third parties. Facts supporting this contention include that the diversion was an act of embezzlement that contradicted Gillen's fiduciary duty under the Operating Agreement and loan documents, funding records, draw requests, bank records, accounting records, forensic accounting materials, Plaintiffs' allegations that funds were not used for intended project purposes, and Gillen's alleged failure or refusal to provide an accounting.

**SPECIAL INTERROGATORY NO. 100:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 99.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, BOBS, banks, lenders, accountants, 600 Spring LLC, or other third parties; seeks premature disclosure of expert analysis, damages analysis, trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, BOBS, banks, lenders, accountants, 600 Spring LLC, or other third parties, or seeks premature disclosure of expert analysis, damages analysis, trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 99 include the Operating Agreement, loan documents, BOBS funding records, draw requests, bank records, accounting records, forensic accounting materials, Sheppard declaration and exhibits, Receiver reports, Verified Second Amended Complaint, declarations and exhibits filed in this action, and related discovery.

**SPECIAL INTERROGATORY NO. 101:**

State all facts supporting YOUR contention in Paragraph 49 of the SECOND AMENDED COMPLAINT that GILLEN, "in his position as manager of 600 SPRING, violated his fiduciary duty by engaging in tortious and illegal acts."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning fiduciary duties, breach, tortious acts, illegal acts, causation, damages, authorization, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "tortious," "illegal acts," and "violated his fiduciary duty"; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks

information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning fiduciary duties, breach, tortious acts, illegal acts, causation, damages, authorization, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to “tortious,” “illegal acts,” or “violated his fiduciary duty,” seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen, in his position as manager of 600 Spring LLC, violated his fiduciary duty by engaging in tortious and illegal acts, including that he was not authorized to transfer title, did not provide accounting, diverted funds from the partnership to his mother, provided the title company with a fraudulent operating agreement, negotiated for and engaged in the Glass Tunnel Transaction and associated PMF financing, and engaged in conduct that impaired 600 Spring LLC's property interests and Plaintiffs’ rights.

**SPECIAL INTERROGATORY NO. 102:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 101.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, title, governance, and private information; seeks documents or information in the possession, custody,

or control of Propounding Party, 600 Spring LLC, PMF, title companies, escrow holders, lenders, banks, accountants, or other third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, title, governance, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, PMF, title companies, escrow holders, lenders, banks, accountants, or other third parties, or seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 101 include text message communications, loan documents, Operating Agreement documents, Glass Tunnel Transaction documents, PMF financing documents, Grant Deed and Deed of Trust records, title and escrow documents, BOBS funding records, draw requests, bank records, accounting records, forensic accounting materials, Verified Second Amended Complaint, declarations and exhibits filed in this action, Receiver reports, and related discovery.

**SPECIAL INTERROGATORY NO. 103:**

State all facts supporting YOUR contention in Paragraph 50 of the SECOND AMENDED COMPLAINT that GILLEN's conduct was "fraudulent, oppressive, and malicious."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions, attorney-client communications, attorney work product, and conclusions concerning fraud,

oppression, malice, intent, punitive damages, causation, and legal effect. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "fraudulent," "oppressive," and "malicious"; seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions, attorney-client communications, attorney work product, or conclusions concerning fraud, oppression, malice, intent, punitive damages, causation, or legal effect. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "fraudulent," "oppressive," or "malicious," seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen's conduct was fraudulent, oppressive, and malicious because Gillen acted contrary to the Operating Agreement and loan documents and without the permission or knowledge of the LLC member or lender to accomplish personal financial gain. Responding Party also relies on the alleged self-interested Glass Tunnel Transaction, the associated PMF financing, the alleged lack of required consent or authority, the alleged diversion of loan proceeds, the alleged refusal to provide accounting information, and the alleged impairment of Plaintiffs' property, management, lending, and security rights.

**SPECIAL INTERROGATORY NO. 104:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 103.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, title, governance, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, PMF, title companies, escrow holders, lenders, banks, accountants, or other third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, title, governance, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, PMF, title companies, escrow holders, lenders, banks, accountants, or other third parties, or seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 103 include text message communications, loan documents, Operating Agreement documents, Glass Tunnel Transaction documents, PMF financing documents, Grant Deed and Deed of Trust records, title and escrow documents, BOBS funding records, draw requests, bank records, accounting records, forensic accounting materials, Verified Second Amended Complaint, declarations and exhibits filed in this action, Receiver reports, communications concerning the transaction and project, and related discovery.

**SPECIAL INTERROGATORY NO. 105:**

State all facts supporting YOUR contention in Paragraph 50 of the SECOND AMENDED COMPLAINT that GILLEN "engaged in intentional misrepresentation, deceit, and/or concealment with the intention of depriving SHY, BR SHY IRREVOCABLE TRUST, 600 SPRING, and BOBS of property or legal rights."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions, attorney-client communications, attorney work product, and conclusions concerning intentional misrepresentation, deceit, concealment, intent, deprivation of rights, causation, damages, punitive damages, and legal effect. Responding Party further objects that the interrogatory is overbroad, compound, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "intentional misrepresentation," "deceit," "concealment," "intention," "depriving," "property," and "legal rights"; seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions, attorney-client communications, attorney work product, or conclusions concerning intentional misrepresentation, deceit, concealment, intent, deprivation of rights, causation, damages, punitive damages, or legal effect. Responding Party further objects to the extent the interrogatory is overbroad, compound, vague and ambiguous as to "intentional misrepresentation," "deceit," "concealment," "intention," "depriving," "property," or "legal rights," seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen engaged in intentional misrepresentation, deceit, and/or concealment with the intention of depriving Shy, BR Shy Irrevocable Trust, 600 Spring LLC, and BOBS of property or legal rights because Gillen was not authorized to transfer title, did not provide accounting, diverted funds from the partnership to his mother, provided the title company with a fraudulent operating agreement, transferred title fraudulently, and has consistently refused to provide discovery.

**SPECIAL INTERROGATORY NO. 106:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 105.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, title, governance, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, PMF, title companies, escrow holders, lenders, banks, accountants, or other third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, title, governance, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, PMF, title companies, escrow holders, lenders, banks,

accountants, or other third parties, or seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 105 include text message communications, loan documents, Operating Agreement documents, Glass Tunnel Transaction documents, PMF financing documents, title and escrow documents, communications concerning the Glass Tunnel Transaction, the fraudulent operating agreement, BOBS loan documents, Grant Deed and Deed of Trust records, Verified Second Amended Complaint, declarations and exhibits filed in this action, Receiver reports, and related discovery.

**SPECIAL INTERROGATORY NO. 107:**

State all facts supporting YOUR contention in Paragraph 50 of the SECOND AMENDED COMPLAINT that GILLEN "intended to cause harm and engaged in such despicable conduct with willful and conscious disregard of Plaintiffs' rights."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions, attorney-client communications, attorney work product, and conclusions concerning intent, harm, despicable conduct, willful and conscious disregard, causation, damages, punitive damages, and legal effect. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "intended to cause harm," "despicable conduct," "willful," and "conscious disregard"; seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions, attorney-client communications, attorney work product, or conclusions concerning intent, harm, despicable conduct, willful and conscious disregard, causation, damages, punitive damages, or legal effect. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "intended to cause harm," "despicable conduct," "willful," or "conscious disregard," seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen intended to cause harm and engaged in despicable conduct with willful and conscious disregard of Plaintiffs' rights because Gillen calculated and planned his actions to transfer title without authorization, did not provide accounting, diverted funds from the partnership to his mother, provided the title company with a fraudulent operating agreement, transferred title fraudulently, and has consistently refused to provide discovery.

**SPECIAL INTERROGATORY NO. 108:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 107.

**RESPONSE**:

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, title, governance, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, PMF, title companies, escrow holders, lenders, banks, accountants, or other third parties; seeks premature disclosure of trial evidence, expert

analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, title, governance, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, PMF, title companies, escrow holders, lenders, banks, accountants, or other third parties, or seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 107 include text message communications, loan documents, Operating Agreement documents, Glass Tunnel Transaction documents, PMF financing documents, title and escrow documents, communications concerning the Glass Tunnel Transaction, the fraudulent operating agreement, BOBS loan documents, Grant Deed and Deed of Trust records, financial records, accounting records, Verified Second Amended Complaint, declarations and exhibits filed in this action, Receiver reports, and related discovery.

**SPECIAL INTERROGATORY NO. 109:**

State all facts supporting YOUR contention in Paragraph 50 of the SECOND AMENDED COMPLAINT that GILLEN "intentionally subjected Plaintiffs to cruel and unjust hardship."

**RESPONSE:**

**Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions,** attorney-client communications, attorney work product, and conclusions concerning intent, hardship, causation, damages, punitive damages, and legal effect. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs



REEDER LLP

of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "intentionally subjected," "cruel," and "unjust hardship"; seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions, attorney-client communications, attorney work product, or conclusions concerning intent, hardship, causation, damages, punitive damages, or legal effect. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "intentionally subjected," "cruel," or "unjust hardship," seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen intentionally subjected Plaintiffs to cruel and unjust hardship because Gillen calculated and planned his actions to transfer title without authorization, did not provide accounting, diverted funds from the partnership to his mother, provided the title company with a fraudulent operating agreement, transferred title fraudulently, and has consistently refused to provide discovery.

**SPECIAL INTERROGATORY NO. 110:**

State all facts supporting YOUR contention in Paragraph 54 of the SECOND AMENDED COMPLAINT that the GILLEN DEFENDANTS and/or 600 SPRING were "already insolvent or were rendered insolvent as a result of" the GLASS TUNNEL TRANSACTION.

**RESPONSE:**

**Responding Party objects to this interrogatory on the grounds that it calls for expert opinion,** legal conclusions, attorney-client communications, attorney work product, and financial

information in Defendants' possession, custody, or control. Responding Party further objects that the interrogatory is overbroad, compound, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "already insolvent," "rendered insolvent," "as a result of," "GILLEN DEFENDANTS," and "GLASS TUNNEL TRANSACTION"; seeks financial, banking, valuation, and private information; seeks premature disclosure of expert analysis, insolvency analysis, valuation opinions, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, PMF, lenders, banks, accountants, valuation professionals, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for expert opinion, legal conclusions, attorney-client communications, attorney work product, or financial information in Defendants' possession, custody, or control. Responding Party further objects to the extent the interrogatory is overbroad, compound, vague and ambiguous as to "already insolvent," "rendered insolvent," "as a result of," "GILLEN DEFENDANTS," or "GLASS TUNNEL TRANSACTION," seeks financial, banking, valuation, or private information, seeks premature expert, insolvency, or valuation analysis, or seeks information equally or more available to Propounding Party, PMF, lenders, banks, accountants, valuation professionals, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Gillen Defendants and/or 600 Spring LLC were already insolvent or were rendered insolvent as a result of the Glass Tunnel Transaction because the combined loan amounts exceeded the value of the properties, and based on the project's existing debt load, unpaid obligations, alleged diversion of loan proceeds, encumbrances created or purportedly created through the Glass Tunnel Transaction, receivership expenses, and financial, accounting, valuation, and receiver materials produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 111:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 110.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, premature expert analysis, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, valuation, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, PMF, banks, lenders, accountants, valuation professionals, or other third parties; seeks premature disclosure of expert analysis, insolvency analysis, valuation opinions, trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, premature expert analysis, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, valuation, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, PMF, banks, lenders, accountants, valuation professionals, or other third parties, or seeks premature disclosure of expert analysis, insolvency analysis, valuation opinions, trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 110 include all financial documents, ledgers, bank statements, all loan documents, funding records, draw records, valuation materials, appraisals, receiver filings and reports, PMF financing documents, Glass Tunnel Transaction documents, title and escrow documents, Sheppard

declaration and exhibits, Stern declaration, Verified Second Amended Complaint, and related discovery.

**SPECIAL INTERROGATORY NO. 112:**

State all facts supporting YOUR contention in Paragraph 54 of the SECOND AMENDED COMPLAINT that "[n]o reasonably equivalent value was received by 600 SPRING or BOBS or SHY for" the GLASS TUNNEL TRANSACTION.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions, expert opinion, attorney-client communications, attorney work product, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, compound, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "reasonably equivalent value," "received," "for," and "GLASS TUNNEL TRANSACTION"; seeks financial, banking, valuation, title, and private information; seeks premature disclosure of expert analysis, valuation opinions, damages analysis, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, PMF, lenders, banks, accountants, valuation professionals, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions, expert opinion, attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, compound, vague and ambiguous as to "reasonably equivalent value," "received," "for," or "GLASS TUNNEL TRANSACTION," seeks financial, banking, valuation, title, or private information, seeks premature expert analysis, valuation opinions, damages analysis, trial evidence, contentions, legal theories, or strategy, or seeks information equally or

more available to Propounding Party, PMF, lenders, banks, accountants, valuation professionals, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that no reasonably equivalent value was received by 600 Spring LLC, BOBS, or Shy for the Glass Tunnel Transaction because no value was received by any party in exchange for this transaction, the transaction purported to transfer or encumber interests in the Subject Property without required consent or authority, impaired Plaintiffs' asserted property, management, lending, and security rights, and was allegedly structured for the benefit of Gillen, the Gillen Defendants, and/or PMF. Responding Party relies on the Glass Tunnel Transaction documents, PMF financing documents, title and escrow records, valuation materials, receiver materials, financial records, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 113:**

State all facts supporting YOUR contention in Paragraph 55 of the SECOND AMENDED COMPLAINT that the GLASS TUNNEL TRANSACTION was executed with "actual intent to hinder, delay and defraud Plaintiffs."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions, attorney-client communications, attorney work product, and conclusions concerning actual intent, fraudulent transfer, hinder, delay, defraud, causation, damages, and legal effect. Responding Party further objects that the interrogatory is overbroad, compound, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "actual intent," "hinder," "delay," "defraud," and "GLASS TUNNEL TRANSACTION"; seeks financial, banking, valuation, title, and private information; seeks

premature disclosure of expert analysis, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, PMF, lenders, banks, escrow holders, title companies, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions, attorney-client communications, attorney work product, or conclusions concerning actual intent, fraudulent transfer, hinder, delay, defraud, causation, damages, or legal effect. Responding Party further objects to the extent the interrogatory is overbroad, compound, vague and ambiguous as to "actual intent," "hinder," "delay," "defraud," or "GLASS TUNNEL TRANSACTION," seeks financial, banking, valuation, title, or private information, seeks premature expert analysis, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party, PMF, lenders, banks, escrow holders, title companies, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Glass Tunnel Transaction was executed with actual intent to hinder, delay, and defraud Plaintiffs based on the fact that Gillen received a property worth over $60 million for no value, the alleged lack of required consent or authority, the self-interested nature of the transaction, the associated PMF financing, the timing and structure of the transaction, the alleged impairment of Plaintiffs' property, management, lending, and security rights, and the allegations and evidence identified in Plaintiffs' pleadings and declarations.

**SPECIAL INTERROGATORY NO. 114:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 113.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable

privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, valuation, title, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, PMF, banks, lenders, accountants, escrow holders, title companies, valuation professionals, or other third parties; seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, valuation, title, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, PMF, banks, lenders, accountants, escrow holders, title companies, valuation professionals, or other third parties, or seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 113 include loan documents, financial documents, Operating Agreement documents, Glass Tunnel Transaction documents, the fraudulent operating agreement, PMF financing documents, Grant Deed and Deed of Trust records, title and escrow documents, communications concerning the transaction, BOBS loan documents, financial records, accounting records, valuation materials, Verified Second Amended Complaint, declarations and exhibits filed in this action, Receiver reports, and related discovery.

**SPECIAL INTERROGATORY NO. 115:**

State all facts supporting YOUR contention in Paragraph 55 of the SECOND AMENDED COMPLAINT that the GILLEN DEFENDANTS "structured" the GLASS TUNNEL TRANSACTION to "avoid satisfying" debt obligations to PLAINTIFFS.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions, attorney-client communications, attorney work product, and conclusions concerning structure, intent, debt obligations, avoidance, fraudulent transfer, causation, damages, and legal effect. Responding Party further objects that the interrogatory is overbroad, compound, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "structured," "avoid satisfying," "debt obligations," "PLAINTIFFS," "GILLEN DEFENDANTS," and "GLASS TUNNEL TRANSACTION"; seeks financial, banking, valuation, title, and private information; seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, PMF, lenders, banks, escrow holders, title companies, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions, attorney-client communications, attorney work product, or conclusions concerning structure, intent, debt obligations, avoidance, fraudulent transfer, causation, damages, or legal effect. Responding Party further objects to the extent the interrogatory is overbroad, compound, vague and ambiguous as to "structured," "avoid satisfying," "debt obligations," "PLAINTIFFS," "GILLEN DEFENDANTS," or "GLASS TUNNEL TRANSACTION," seeks financial, banking, valuation, title, or private information, seeks premature expert analysis, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party, PMF, lenders, banks, escrow holders, title companies, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Gillen Defendants structured the Glass Tunnel Transaction to avoid satisfying debt obligations to Plaintiffs because Gillen ignored and did not pay the money owed to BOBS, the lender on the property, and based on the alleged transfer and encumbrance of the Subject Property through the Glass Tunnel Transaction and associated PMF financing, the alleged lack of required consent or authority, the project's debt load and unpaid obligations, the alleged impairment of BOBS's lending and security rights, and the allegations and evidence identified in Plaintiffs' pleadings and declarations.

**SPECIAL INTERROGATORY NO. 116:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 115.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, valuation, title, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, PMF, banks, lenders, accountants, escrow holders, title companies, valuation professionals, or other third parties; seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, valuation, title, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, PMF, banks, lenders, accountants, escrow holders, title companies, valuation professionals, or

other third parties, or seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 115 include loan documents, financial documents, Operating Agreement documents, Glass Tunnel Transaction documents, the fraudulent operating agreement, PMF financing documents, Grant Deed and Deed of Trust records, title and escrow documents, communications concerning the transaction, BOBS loan documents, financial records, accounting records, valuation materials, Verified Second Amended Complaint, declarations and exhibits filed in this action, Receiver reports, and related discovery.

**SPECIAL INTERROGATORY NO. 117:**

State all facts supporting YOUR contention in Paragraph 70 of the SECOND AMENDED COMPLAINT that the GILLEN DEFENDANTS and PMF "intentionally and willfully interfered with Plaintiffs' rights" under PLAINTIFFS' contracts with 600 SPRING and other GILLEN DEFENDANTS.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning intentional interference, willfulness, contract rights, causation, damages, intent, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, compound, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "intentionally and willfully interfered," "Plaintiffs' rights," "contracts," "600 SPRING," and "other GILLEN DEFENDANTS"; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, PMF, lenders, escrow holders, title companies, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning intentional interference, willfulness, contract rights, causation, damages, intent, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, compound, vague and ambiguous as to "intentionally and willfully interfered," "Plaintiffs' rights," "contracts," "600 SPRING," or "other GILLEN DEFENDANTS," seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party, PMF, lenders, escrow holders, title companies, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Gillen Defendants and/or PMF intentionally and willfully interfered with Plaintiffs' rights under Plaintiffs' contracts with 600 Spring LLC and other Gillen Defendants by negotiating, structuring, and executing the Glass Tunnel Transaction and associated PMF financing without required consent or authority, impairing Plaintiffs' asserted ownership, management, lending, and security rights, and interfering with performance of the Operating Agreement, Amended Operating Agreement, BOBS Loan Agreement, Promissory Note, Deed of Trust, and related documents. Responding Party is still awaiting Defendants' discovery on this issue.

**SPECIAL INTERROGATORY NO. 118:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 117.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, title,

governance, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, PMF, banks, lenders, escrow holders, title companies, 600 Spring LLC, or other third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, title, governance, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, PMF, banks, lenders, escrow holders, title companies, 600 Spring LLC, or other third parties, or seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 117 include Operating Agreement documents, the Amended Operating Agreement, BOBS Loan Agreement, Promissory Note, Deed of Trust records, Glass Tunnel Transaction documents, PMF financing documents, title and escrow documents, communications concerning the transaction, financial records, Verified Second Amended Complaint, declarations and exhibits filed in this action, Receiver reports, and related discovery. Responding Party is still awaiting Defendants' discovery on this issue.

**SPECIAL INTERROGATORY NO. 119:**

State all facts supporting YOUR contention in Paragraph 73 of the SECOND AMENDED COMPLAINT that GILLEN and C64829 "breached the Operating Agreement and the Amended Operating Agreement by negotiating for and engaging in the June 5 Transaction."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning contract interpretation, breach, authority, governance, consent, causation, damages, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, compound, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "breached," "negotiating for," "engaging in," and "June 5 Transaction"; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning contract interpretation, breach, authority, governance, consent, causation, damages, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, compound, vague and ambiguous as to "breached," "negotiating for," "engaging in," or "June 5 Transaction," seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen and C64829 breached the Operating Agreement and Amended Operating Agreement by negotiating for and engaging in the June 5 Transaction because the Operating Agreement and loan documents did not allow for Gillen's conduct in the June 5 Transaction, the transaction was allegedly undertaken without required consent or authority, disregarded Barry Shy's management rights, involved a self-interested transfer or encumbrance of 600 Spring LLC property, and bypassed governance and approval requirements applicable to 600 Spring LLC.

**SPECIAL INTERROGATORY NO. 120:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 119.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, title, governance, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, PMF, title companies, escrow holders, lenders, banks, accountants, or other third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, title, governance, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, PMF, title companies, escrow holders, lenders, banks, accountants, or other third parties, or seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 119 include Operating Agreement documents, the Amended Operating Agreement, BOBS loan documents, Glass Tunnel Transaction documents, Grant Deed and Deed of Trust records, title and escrow documents, PMF financing documents, communications concerning the transaction,

Verified Second Amended Complaint, declarations and exhibits filed in this action, Receiver reports, and related discovery.

**SPECIAL INTERROGATORY NO. 121:**

State all facts supporting YOUR contention in Paragraph 74 of the SECOND AMENDED COMPLAINT that GILLEN and C64829 "further breached the Operating Agreement and Amended Operating Agreement by failing to handle the day-to-day operations of 600 SPRING."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning contract interpretation, breach, management duties, day-to-day operations, authority, governance, causation, damages, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; is vague and ambiguous as to "failing to handle" and "day-to-day operations"; seeks financial, banking, accounting, and private information; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, 600 Spring LLC, accountants, banks, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning contract interpretation, breach, management duties, day-to-day operations, authority, governance, causation, damages, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, vague and ambiguous as to "failing to handle" or "day-to-day operations," seeks financial, banking, accounting, or private information, seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party, 600 Spring LLC, accountants, banks, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Gillen and C64829 breached the Operating Agreement and Amended Operating Agreement by failing to handle the day-to-day operations of 600 Spring LLC. Facts supporting this contention include that Gillen stopped work on the property, delayed work on the property over the last two years, diverted partnership funds away from the partnership for his personal benefit, failed to provide accounting, diverted a substantial portion of money loaned to or belonging to 600 Spring LLC to himself, his companies, or third parties, and the funding records, draw requests, bank records, accounting records, forensic accounting materials, and Plaintiffs' allegations that funds were not used for intended project purposes.

**SPECIAL INTERROGATORY NO. 122:**

IDENTIFY all DOCUMENTS supporting YOUR response to Special Interrogatory No. 121.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, accounting, governance, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, banks, accountants, lenders, title companies, escrow holders, or other third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, accounting, governance, or private

information, seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, banks, accountants, lenders, title companies, escrow holders, or other third parties, or seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's response to Special Interrogatory No. 121 include Operating Agreement documents, BOBS loan documents, funding records, draw requests, bank records, accounting records, forensic accounting materials, communications concerning 600 Spring LLC operations, Glass Tunnel Transaction documents, PMF financing documents, Receiver reports, Verified Second Amended Complaint, declarations and exhibits filed in this action, and related discovery.

**SPECIAL INTERROGATORY NO. 123:**

State all facts supporting YOUR contention in Paragraph 77 of the SECOND AMENDED COMPLAINT that the "consideration for" the GLASS TUNNEL TRANSACTION "was non-existent."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions, expert opinion, attorney-client communications, attorney work product, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is vague and ambiguous as to "consideration," "non-existent," and "GLASS TUNNEL TRANSACTION"; assumes disputed facts; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks financial, valuation, title, and private information; seeks premature disclosure of expert analysis, valuation opinions, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, PMF, lenders, banks, escrow holders, title companies, valuation

professionals, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions, expert opinion, attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is vague and ambiguous as to "consideration," "non-existent," or "GLASS TUNNEL TRANSACTION," assumes disputed facts, is overbroad, seeks financial, valuation, title, or private information, seeks premature disclosure of expert analysis, valuation opinions, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party, PMF, lenders, banks, escrow holders, title companies, valuation professionals, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the consideration for the Glass Tunnel Transaction was non-existent because there was no consideration or benefit received by anyone except Gillen, the transaction purported to transfer or encumber interests in the Subject Property without required consent or authority, impaired Plaintiffs' asserted property, management, lending, and security rights, and did not provide reasonably equivalent value to 600 Spring LLC, BOBS, or Shy. Responding Party relies on the Glass Tunnel Transaction documents, PMF financing documents, title and escrow records, valuation materials, receiver materials, financial records, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 124:**

State all facts supporting YOU R contention in Paragraph 84 of the SECOND AMENDED COMPLAINT that the GLASS TUNNEL TRANSACTION was "concealed from Plaintiffs."

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions,

attorney-client communications, attorney work product, and conclusions concerning intent, concealment, disclosure, notice, causation, damages, and legal effect. Responding Party further objects that the interrogatory is vague and ambiguous as to "concealed" and "GLASS TUNNEL TRANSACTION"; assumes disputed facts; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, PMF, escrow holders, title companies, lenders, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions, attorney-client communications, attorney work product, or conclusions concerning intent, concealment, disclosure, notice, causation, damages, or legal effect. Responding Party further objects to the extent the interrogatory is vague and ambiguous as to "concealed" or "GLASS TUNNEL TRANSACTION," assumes disputed facts, is overbroad, seeks premature disclosure of trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party, PMF, escrow holders, title companies, lenders, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the Glass Tunnel Transaction was concealed from Plaintiffs because Gillen accomplished the transaction without informing or receiving authorization from his partner in 600 Spring LLC or lender BOBS LLC, and based on the lack of advance disclosure, notice, required consent, or authorization to Shy, BOBS, and/or BR Shy Irrevocable Trust, communications, transaction documents, title and escrow materials, and allegations in the Verified Second Amended Complaint concerning the timing, structure, and execution of the Glass Tunnel Transaction and associated PMF financing.

**SPECIAL INTERROGATORY NO. 125:**

If YOU contend that, in or around 2017, BARRY SHY and GILLEN did not agree that GILLEN would serve as the sole manager of 600 SPRING, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it assumes disputed facts, calls for legal conclusions concerning agreement, management, authority, consent, contract interpretation, and legal effect, and seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is vague and ambiguous as to "in or around 2017," "agree," "sole manager," and "600 SPRING"; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it assumes disputed facts, calls for legal conclusions concerning agreement, management, authority, consent, contract interpretation, or legal effect, or seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is vague and ambiguous as to "in or around 2017," "agree," "sole manager," or "600 SPRING," is overbroad, seeks premature disclosure of trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Barry Shy and Gillen did not agree that Gillen would serve as the sole manager of 600 Spring LLC to the exclusion of Barry Shy's rights under the Amended Operating Agreement. Facts supporting this contention include that the Amended Operating Agreement indicates Barry Shy's manager status, the Amended Operating Agreement,

documents reflecting both Gillen and Shy as managers of 600 Spring LLC, JPMorgan Chase submissions and communications, course of dealing, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 126:**

If YOU contend that BARRY SHY did not instruct ROMMY SHY to create the PURPORTED AMENDED OPERATING AGREEMENT by altering the original 600 SPRING Operating Agreement, state all facts that support this contention. As used herein, "ROMMY SHY" shall mean and refer to Rommy Shy, an individual and the son of Plaintiff and Cross-Defendant Barry Shy.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is argumentative, assumes disputed facts, and uses the loaded term "altering." Responding Party further objects that the interrogatory seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; calls for legal conclusions concerning instruction, authorization, alteration, falsity, validity, and legal effect; seeks information about a nonparty; calls for speculation; is vague and ambiguous as to "instruct," "create," "altering," and "PURPORTED AMENDED OPERATING AGREEMENT"; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is argumentative, assumes disputed facts, uses the loaded term "altering," seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, calls for legal conclusions concerning instruction, authorization, alteration, falsity, validity, or legal effect, seeks information about a nonparty, calls for speculation, is vague and ambiguous as to "instruct,"

"create," "altering," or "PURPORTED AMENDED OPERATING AGREEMENT," or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Barry Shy did not instruct Rommy Shy to create the Amended Operating Agreement by improperly altering the original 600 Spring Operating Agreement. Barry Shy instructed Rommy Shy to contact Gillen to execute an amended Operating Agreement that established Barry Shy as manager and the BR Shy Irrevocable Trust as member. Rommy Shy requested that Gillen meet to execute an amended agreement. Gillen asked if there was a way to do it without meeting, and Rommy Shy suggested adding the relevant amendments to the original executed Operating Agreement. Gillen responded that he preferred to do it that way. Responding Party contends that the Amended Operating Agreement was prepared and used to reflect the parties' agreement that BR Shy Irrevocable Trust holds a 50% membership interest in 600 Spring LLC instead of Barry Shy and that Barry Shy is a manager of 600 Spring LLC in addition to Gillen. Responding Party relies on the Amended Operating Agreement, related communications, JPMorgan Chase submissions, documents reflecting both Gillen and Shy as managers, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 127:**

If YOU contend that PLAINTIFFS did not submit the PURPORTED AMENDED OPERATING AGREEMENT to federal lending institutions for the specific purpose of obtaining third party financing, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is vague and ambiguous as to "federal lending institutions," "submit," "specific purpose," and "PURPORTED AMENDED OPERATING AGREEMENT"; assumes disputed facts; improperly groups Plaintiffs; seeks information in the possession, custody, or control of lenders or third parties; calls for speculation; seeks attorney-client communications, attorney work product, and information protected by

applicable privileges or protections; calls for legal conclusions concerning purpose, authority, falsity, authorization, and legal effect; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks financial and banking information protected by privacy rights; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is vague and ambiguous as to "federal lending institutions," "submit," "specific purpose," or "PURPORTED AMENDED OPERATING AGREEMENT," assumes disputed facts, improperly groups Plaintiffs, seeks information in the possession, custody, or control of lenders or third parties, calls for speculation, seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, calls for legal conclusions concerning purpose, authority, falsity, authorization, or legal effect, seeks financial or banking information protected by privacy rights, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party does not contend that Plaintiffs did not submit the Amended Operating Agreement to federal lending institutions. Responding Party contends that the Amended Operating Agreement was submitted to JPMorgan Chase in connection with loan-related dealings concerning 600 Spring LLC and the Case Project, and that documents reflected both Gillen and Shy as managers of 600 Spring LLC.

**SPECIAL INTERROGATORY NO. 128:**

If YOU contend that PLAINTIFFS believed it was permissible to execute a Deed of Trust pursuant to the BOBS LOAN AGREEMENT, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning permissibility, authorization, enforceability, security interests, recordation, contract

interpretation, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; seeks information concerning the beliefs of other Plaintiffs; calls for speculation; assumes disputed facts; is vague and ambiguous as to "believed," "permissible," "execute," and "pursuant to the BOBS LOAN AGREEMENT"; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning permissibility, authorization, enforceability, security interests, recordation, contract interpretation, or legal effect, seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, seeks information concerning the beliefs of other Plaintiffs, calls for speculation, assumes disputed facts, is vague and ambiguous as to "believed," "permissible," "execute," or "pursuant to the BOBS LOAN AGREEMENT," or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Plaintiffs believed it was permissible to execute a Deed of Trust pursuant to the BOBS Loan Agreement because the Deed of Trust and other loan documents were executed by Gillen and are proper, valid, and legal, and based on the BOBS Loan Agreement, Promissory Note, Deed of Trust, related security documents, the commercial nature of the loan, and the absence of any operative prohibition against recordation in the final loan documents. Responding Party further contends that Defendants' alleged no-recordation theory is unsupported by the operative loan documents.

**SPECIAL INTERROGATORY NO. 129:**

IDENTIFY all DOCUMENTS supporting YOUR contention that PLAINTIFFS believed it was permissible to execute a Deed of Trust pursuant to the BOBS LOAN AGREEMENT.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks attorney-client communications, attorney work product, privileged materials, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, recording, and private information; seeks documents or information in the possession, custody, or control of BOBS, 600 Spring LLC, lenders, financial institutions, title companies, escrow holders, or other third parties; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks attorney-client communications, attorney work product, privileged materials, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, recording, or private information, seeks documents or information in the possession, custody, or control of BOBS, 600 Spring LLC, lenders, financial institutions, title companies, escrow holders, or other third parties, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's contention that Plaintiffs believed it was permissible to execute a Deed of Trust pursuant to the BOBS Loan Agreement include all loan documents executed by Gillen, the BOBS Loan Agreement, Promissory Note, Deed of Trust, recorded Deed of Trust, related security documents, loan records, communications concerning the loan and security documents, Barry Shy declaration and exhibits, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 130:**

If YOU contend that the no recordation disclaimer at the top of the signature page of the Deed of Trust pursuant to the BOBS LOAN AGREEMENT was permissibly deleted, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it assumes disputed facts, is vague and ambiguous as to "no recordation disclaimer," "top of the signature page," "permissibly deleted," and "pursuant to the BOBS LOAN AGREEMENT," and calls for legal conclusions concerning authorization, deletion, enforceability, recordation, document history, and legal effect. Responding Party further objects that the interrogatory seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it assumes disputed facts, is vague and ambiguous as to "no recordation disclaimer," "top of the signature page," "permissibly deleted," or "pursuant to the BOBS LOAN AGREEMENT," and calls for legal conclusions concerning authorization, deletion, enforceability, recordation, document history, or legal effect. Responding Party further objects to the extent the interrogatory seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, is overbroad, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the final executed BOBS Loan Agreement and related operative loan documents did not contain an enforceable prohibition against recordation of the Deed of Trust. Responding Party further contends that any alleged no-recordation disclaimer

appeared in a prior draft, was not part of the operative final loan documents, and does not bar the recordation of the Deed of Trust.

**SPECIAL INTERROGATORY NO. 131:**

IDENTIFY all DOCUMENTS supporting YOUR contention that no recordation disclaimer at the top of the signature page of the Deed of Trust pursuant to the BOBS LOAN AGREEMENT was permissibly deleted.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney-client communications, attorney work product, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks drafts, version history, financial, banking, recording, and private information; seeks documents or information in the possession, custody, or control of BOBS, 600 Spring LLC, lenders, financial institutions, title companies, escrow holders, or other third parties; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney-client communications, attorney work product, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks drafts, version history, financial, banking, recording, or private information, seeks documents or information in the possession, custody, or control of BOBS, 600 Spring LLC, lenders, financial institutions, title companies, escrow holders, or other third parties, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's contention concerning the alleged no-recordation disclaimer include all loan documents with Scott Gillen's original notarized signature that do not prevent recordation, the BOBS Loan Agreement, Promissory Note, Deed of Trust, recorded Deed of Trust, related security documents, final loan documents, available drafts and version history, communications concerning the loan and security documents, Barry Shy declaration and exhibits, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 132:**

If YOU contend that the final executed BOBS LOAN AGREEMENT, executed in March 2021, did not contain a clause expressly prohibiting the recordation of a Deed of Trust pursuant to the BOBS LOAN AGREEMENT, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning interpretation, finality, execution, prohibition, enforceability, recordation, security rights, and legal effect of the BOBS Loan Agreement, and assumes disputed facts regarding the final executed version. Responding Party further objects that the interrogatory is vague and ambiguous as to "final executed," "clause expressly prohibiting," "recordation," and "pursuant to the BOBS LOAN AGREEMENT"; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning interpretation, finality, execution, prohibition, enforceability, recordation, security rights, or legal effect of the BOBS Loan Agreement, or assumes disputed facts regarding the final executed version. Responding Party further objects to the extent the interrogatory is vague and ambiguous as to "final executed," "clause expressly prohibiting," "recordation," or "pursuant to

the BOBS LOAN AGREEMENT," is overbroad, seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that the final executed BOBS Loan Agreement, executed in March 2021, did not contain a clause expressly prohibiting recordation of the Deed of Trust pursuant to the BOBS Loan Agreement. Facts supporting this contention include the facts stated in response to Special Interrogatory Nos. 130 and 131, the final executed BOBS Loan Agreement, Promissory Note, Deed of Trust, recorded Deed of Trust, related security documents, the absence of an operative no-recordation prohibition in the final loan documents, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 133:**

If YOU contend that PLAINTIFFS did not unilaterally alter the BOBS LOAN AGREEMENT after it was executed by removing the no-recordation clause, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is argumentative, assumes disputed facts, improperly groups Plaintiffs, and calls for legal conclusions concerning alteration, finality, execution, authorization, enforceability, document history, recordation, and legal effect. Responding Party further objects that the interrogatory seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is vague and ambiguous as to "unilaterally alter," "after it was executed," and "no-recordation clause"; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is argumentative, assumes disputed facts, improperly groups Plaintiffs, or calls for legal conclusions concerning alteration, finality, execution, authorization, enforceability, document history, recordation, or legal effect. Responding Party further objects to the extent the interrogatory seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, is vague and ambiguous as to "unilaterally alter," "after it was executed," or "no-recordation clause," is overbroad, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Plaintiffs did not unilaterally alter the BOBS Loan Agreement after execution by removing a no-recordation clause. Responding Party contends that the operative final loan documents did not contain an enforceable prohibition against recordation of the Deed of Trust, and that the recorded Deed of Trust was authorized by the operative loan and security documents. Responding Party relies on the facts stated in response to Special Interrogatory Nos. 130 through 132, the final executed BOBS Loan Agreement, Promissory Note, Deed of Trust, recorded Deed of Trust, related security documents, document history, communications, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 134:**

If YOU contend that PLAINTIFFS did not divert substantial sums from 600 SPRING for YOUR personal benefit, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is argumentative, assumes disputed facts, and uses the vague and loaded phrase "divert substantial sums." Responding Party further objects that the interrogatory calls for legal conclusions concerning diversion, personal benefit, transfers, payments, loans, reimbursements, funding, and legal effect; seeks attorney-

client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks financial, banking, and private information; seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, BOBS, banks, lenders, accountants, 600 Spring LLC, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is argumentative, assumes disputed facts, or uses the vague and loaded phrase "divert substantial sums." Responding Party further objects to the extent the interrogatory calls for legal conclusions concerning diversion, personal benefit, transfers, payments, loans, reimbursements, funding, or legal effect, seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, is overbroad, seeks financial, banking, or private information, seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party, BOBS, banks, lenders, accountants, 600 Spring LLC, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Plaintiffs did not divert substantial sums from 600 Spring LLC for Responding Party's personal benefit. Plaintiffs never diverted funds for their benefit. Responding Party contends that transfers involving Plaintiffs, BOBS, Barry Shy, or related entities were authorized, reflected in loan, funding, accounting, reimbursement, or project records, or otherwise were not improper diversions from 600 Spring LLC. Responding Party relies on loan documents, funding records, draw records, bank records, accounting records, communications, forensic accounting materials, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 135:**

If YOU contend that PLAINTIFFS did not instruct GILLEN to wire an $8,000,000 "Loan Disbursement" from 600 SPRING to an account outside GILLEN's control, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is vague and ambiguous as to "instruct," "Loan Disbursement," and "outside GILLEN's control," assumes disputed facts, improperly groups Plaintiffs, and lacks sufficient detail to identify the transaction. Responding Party further objects that the interrogatory calls for legal conclusions concerning instruction, authorization, transfer, diversion, account control, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks financial, banking, and private information; seeks information equally or more available to Propounding Party, banks, 600 Spring LLC, BOBS, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is vague and ambiguous as to "instruct," "Loan Disbursement," or "outside GILLEN's control," assumes disputed facts, improperly groups Plaintiffs, or lacks sufficient detail to identify the transaction. Responding Party further objects to the extent the interrogatory calls for legal conclusions concerning instruction, authorization, transfer, diversion, account control, or legal effect, seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, is overbroad, seeks financial, banking, or private information, or seeks information equally or more available to Propounding Party, banks, 600 Spring LLC, BOBS, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Plaintiffs instructed Gillen to pay down the BOBS loan in the amount of $8,000,000 that 600 Spring LLC received from other lenders. Responding Party does not admit that Plaintiffs improperly instructed Gillen to wire an $8,000,000 loan disbursement from 600 Spring LLC to an account outside Gillen's control. Responding Party relies on bank records, wire records, loan documents, draw records, communications, accounting records, forensic accounting materials, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 136:**

If YOU contend that PLAINTIFFS did not instruct GILLEN to wire $666,223 from 600 SPRING to an account outside GILLEN's control in or around August 2025, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is vague and ambiguous as to "instruct" and "outside GILLEN's control," assumes disputed facts, improperly groups Plaintiffs, and lacks sufficient detail to identify the transaction. Responding Party further objects that the interrogatory calls for legal conclusions concerning instruction, authorization, transfer, diversion, account control, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks financial, banking, and private information; seeks information equally or more available to Propounding Party, banks, 600 Spring LLC, BOBS, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is vague and ambiguous as to "instruct" or "outside GILLEN's control," assumes disputed facts, improperly groups Plaintiffs, or lacks sufficient detail to identify the transaction. Responding Party further objects to the extent the interrogatory calls for legal conclusions concerning instruction, authorization, transfer, diversion, account control, or legal effect, seeks attorney-client communications, attorney work

product, or information protected by applicable privileges or protections, is overbroad, seeks financial, banking, or private information, or seeks information equally or more available to Propounding Party, banks, 600 Spring LLC, BOBS, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party is not aware that Plaintiffs instructed Gillen to wire $666,223 from 600 Spring LLC to an account outside Gillen's control in or around August 2025. Responding Party does not admit that Plaintiffs improperly instructed Gillen to wire $666,223 from 600 Spring LLC to an account outside Gillen's control in or around August 2025. Responding Party relies on bank records, wire records, loan documents, draw records, communications, accounting records, forensic accounting materials, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 137:**

If YOU contend that PLAINTIFFS did not instruct GILLEN to wire transfer $20 million of a $30 million loan from CTBC Bank to YOU, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is vague and ambiguous as to "instruct," "$20 million of a $30 million loan," and "from CTBC Bank," assumes disputed facts, improperly groups Plaintiffs, and lacks sufficient detail to identify the transaction. Responding Party further objects that the interrogatory calls for legal conclusions concerning instruction, authorization, transfer, loan proceeds, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks financial, banking, and private information; seeks information equally or more available to Propounding Party, CTBC Bank, banks, 600 Spring LLC, BOBS, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is vague and ambiguous as to "instruct," "$20 million of a $30 million loan," or "from CTBC Bank," assumes disputed facts, improperly groups Plaintiffs, or lacks sufficient detail to identify the transaction. Responding Party further objects to the extent the interrogatory calls for legal conclusions concerning instruction, authorization, transfer, loan proceeds, or legal effect, seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, is overbroad, seeks financial, banking, or private information, or seeks information equally or more available to Propounding Party, CTBC Bank, banks, 600 Spring LLC, BOBS, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Plaintiffs instructed Gillen to make a partial paydown of the BOBS loan. Responding Party does not admit that Plaintiffs improperly instructed Gillen to wire transfer $20 million of a $30 million loan from CTBC Bank to Responding Party. Responding Party relies on CTBC Bank loan records, bank records, wire records, draw records, communications, accounting records, forensic accounting materials, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 138:**

If YOU contend that PLAINTIFFS did not re-lend the funds from the CTBC Bank loan at higher interest rates to 600 SPRING, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous, argumentative, and assumes disputed facts, including through the phrase "re-lend the funds." Responding Party further objects that it improperly groups Plaintiffs and calls for legal conclusions concerning loan characterization, interest, usury, lending laws, licensing laws, enforceability, and legal effect; seeks attorney-client communications, attorney work product, and

information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks financial, banking, and private information; seeks information equally or more available to Propounding Party, CTBC Bank, banks, lenders, 600 Spring LLC, BOBS, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is vague, ambiguous, argumentative, or assumes disputed facts, including through the phrase "re-lend the funds." Responding Party further objects to the extent it improperly groups Plaintiffs, calls for legal conclusions concerning loan characterization, interest, usury, lending laws, licensing laws, enforceability, or legal effect, seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, is overbroad, seeks financial, banking, or private information, or seeks information equally or more available to Propounding Party, CTBC Bank, banks, lenders, 600 Spring LLC, BOBS, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Plaintiffs did not re-lend funds from the CTBC Bank loan at higher interest rates to 600 Spring LLC. Responding Party contends that the BOBS Loan Agreement, Promissory Note, and related loan documents govern the loan terms between BOBS and 600 Spring LLC and that the loan was a commercial loan disclosed in the operative loan documents. Responding Party relies on CTBC Bank loan records, BOBS loan documents, funding records, draw records, bank records, accounting records, communications, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 139:**

If YOU contend that PLAINTIFFS have not refused to fund legitimate construction draw requests, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is vague and ambiguous as to "refused," "fund," and "legitimate construction draw requests," and calls for legal conclusions concerning funding obligations, contract interpretation, loan obligations, breach, and legal effect. Responding Party further objects that the interrogatory assumes disputed facts; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks financial, banking, construction, and private information; seeks information equally or more available to Propounding Party, 600 Spring LLC, BOBS, banks, lenders, contractors, or other third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is vague and ambiguous as to "refused," "fund," or "legitimate construction draw requests," or calls for legal conclusions concerning funding obligations, contract interpretation, loan obligations, breach, or legal effect. Responding Party further objects to the extent the interrogatory assumes disputed facts, is overbroad, seeks financial, banking, construction, or private information, seeks information equally or more available to Propounding Party, 600 Spring LLC, BOBS, banks, lenders, contractors, or other third parties, or seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Plaintiffs have never refused to fund legitimate construction draw requests. Facts supporting this contention include BOBS's funding of substantial amounts for the Case Project, the BOBS Loan Agreement, Promissory Note, funding and draw records, communications concerning funding and draws, Plaintiffs' continued willingness to fund legitimate construction needs, and Plaintiffs' funding proposals made in connection with the receivership proceedings.

**SPECIAL INTERROGATORY NO. 140:**

IDENTIFY all DOCUMENTS supporting YOUR contention that PLAINTIFFS have not refused to fund legitimate construction draw requests.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information, attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, construction, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, BOBS, banks, lenders, contractors, accountants, or other third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, construction, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, BOBS, banks, lenders, contractors, accountants, or other third parties, or seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that no documents exist showing that Plaintiffs refused to fund legitimate construction draw requests. Documents supporting Responding Party's contention that Plaintiffs have not refused to fund legitimate construction draw requests include the BOBS Loan Agreement, Promissory Note, funding records, draw requests, bank records, accounting records,

communications concerning funding and draws, Plaintiffs' funding proposals, receiver filings and reports, and related discovery.

**SPECIAL INTERROGATORY NO. 141:**

If YOU contend that PLAINTIFFS did not refuse to list House 2 with a Malibu real estate agent, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is vague and ambiguous as to "refuse," "list," "House 2," and "Malibu real estate agent," assumes disputed facts, improperly groups Plaintiffs, calls for speculation, and seeks information equally or more available to Propounding Party or third parties. Responding Party further objects that the interrogatory calls for legal conclusions concerning authority, project management, sale/listing authority, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks real estate, valuation, financial, and private information; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is vague and ambiguous as to "refuse," "list," "House 2," or "Malibu real estate agent," assumes disputed facts, improperly groups Plaintiffs, calls for speculation, or seeks information equally or more available to Propounding Party or third parties. Responding Party further objects to the extent the interrogatory calls for legal conclusions concerning authority, project management, sale/listing authority, or legal effect, seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, is overbroad, seeks real estate, valuation, financial, or private information, or seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party does not contend that Plaintiffs refused to list House 2 with a Malibu real estate agent. Responding Party contends that Plaintiffs did not improperly refuse to list House 2 with a Malibu real estate agent. Responding Party further contends that decisions concerning listing, marketing, sale, and disposition of House 2 were subject to 600 Spring LLC's governance documents, the receivership proceedings, Court orders, the Receiver's authority, market conditions, project completion considerations, and Plaintiffs' rights and interests in preserving value.

**SPECIAL INTERROGATORY NO. 142:**

State all reasons why PLAINTIFFS refused to list House 2 with a Malibu real estate agent.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it assumes disputed facts, improperly groups Plaintiffs, and is vague and ambiguous as to "refused," "list," "House 2," "Malibu real estate agent," and "reasons." Responding Party further objects that the interrogatory calls for legal conclusions concerning authority, project management, sale/listing authority, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks real estate, valuation, financial, and private information; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it assumes disputed facts, improperly groups Plaintiffs, and is vague and ambiguous as to "refused," "list," "House 2," "Malibu real estate agent," or "reasons." Responding Party further objects to the extent the interrogatory calls for legal conclusions concerning authority, project management, sale/listing authority, or legal

effect, seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, is overbroad, seeks real estate, valuation, financial, or private information, seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party does not admit the premise that Plaintiffs refused to list House 2 with a Malibu real estate agent. Plaintiffs did not refuse to list House 2 with a Malibu real estate agent. Responding Party contends that any position taken concerning listing House 2 was based on preserving value, avoiding an unmarketed or undervalued sale, complying with applicable governance and receivership requirements, considering project completion and funding alternatives, and protecting Plaintiffs' asserted ownership, lending, and security rights.

**SPECIAL INTERROGATORY NO. 143:**

If YOU contend that PLAINTIFFS did not instruct GILLEN to stop work on House 5 while continuing to accrue interest under the BOBS LOAN AGREEMENT, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it assumes disputed facts, is vague and ambiguous as to "instruct," "stop work," "House 5," "while continuing to accrue interest," and "BOBS LOAN AGREEMENT," and calls for legal conclusions concerning interest, loan terms, project management, authority, causation, and legal effect. Responding Party further objects that the interrogatory seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks construction, funding, financial, and private information; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to

Propounding Party, contractors, 600 Spring LLC, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it assumes disputed facts, is vague and ambiguous as to "instruct," "stop work," "House 5," "while continuing to accrue interest," or "BOBS LOAN AGREEMENT," and calls for legal conclusions concerning interest, loan terms, project management, authority, causation, or legal effect. Responding Party further objects to the extent the interrogatory seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, is overbroad, seeks construction, funding, financial, or private information, seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party, contractors, 600 Spring LLC, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Plaintiffs did not instruct Gillen to stop work on House 5 while continuing to accrue interest under the BOBS Loan Agreement. Responding Party contends that, until the relevant incident, Plaintiffs continued providing funding for the four houses. Responding Party further contends that any communications concerning work on House 5 must be understood in the context of project funding, draw requests, construction status, receivership proceedings, governance disputes, and Plaintiffs' continuing willingness to fund legitimate construction needs.

**SPECIAL INTERROGATORY NO. 144:**

IDENTIFY all DOCUMENTS supporting YOUR contention that PLAINTIFFS did not instruct GILLEN to stop work on House 5 while continuing to accrue interest under the BOBS LOAN AGREEMENT.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks privileged information,

attorney work product, attorney-client communications, and information protected by applicable privileges or protections. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks construction, funding, financial, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, contractors, 600 Spring LLC, BOBS, lenders, accountants, or other third parties; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks privileged information, attorney work product, attorney-client communications, or information protected by applicable privileges or protections. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks construction, funding, financial, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, contractors, 600 Spring LLC, BOBS, lenders, accountants, or other third parties, or seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Documents supporting Responding Party's contention that Plaintiffs did not instruct Gillen to stop work on House 5 while continuing to accrue interest under the BOBS Loan Agreement include all withdrawal requests Plaintiffs approved to fund construction, corresponding ledger entries and bank statements, the BOBS Loan Agreement, Promissory Note, funding records, draw requests, communications concerning funding and construction, construction records, receiver filings and reports, Plaintiffs' funding proposals, and related discovery.

**SPECIAL INTERROGATORY NO. 145:**

State all reasons why PLAINTIFFS instructed GILLEN to stop work on House 5 while continuing to accrue interest under the BOBS LOAN AGREEMENT.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it assumes disputed facts, improperly groups Plaintiffs, is vague and ambiguous as to “instructed,” “stop work,” “House 5,” “while continuing to accrue interest,” “reasons,” and “BOBS LOAN AGREEMENT,” and calls for legal conclusions concerning interest, loan terms, project management, authority, causation, and legal effect. Responding Party further objects that the interrogatory seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks construction, funding, financial, and private information; seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, contractors, 600 Spring LLC, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it assumes disputed facts, improperly groups Plaintiffs, is vague and ambiguous as to “instructed,” “stop work,” “House 5,” “while continuing to accrue interest,” “reasons,” or “BOBS LOAN AGREEMENT,” and calls for legal conclusions concerning interest, loan terms, project management, authority, causation, or legal effect. Responding Party further objects to the extent the interrogatory seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, is overbroad, seeks construction, funding, financial, or private information, seeks premature disclosure of trial evidence, expert analysis, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party, contractors, 600 Spring LLC, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party does not admit the premise that Plaintiffs instructed Gillen to stop work on House 5 while continuing to accrue interest under the BOBS Loan Agreement. Plaintiffs did not instruct Gillen to stop work on House 5 while continuing to accrue interest under the BOBS Loan Agreement. Responding Party contends that any communications concerning work on House 5 were based on project funding, draw requests, construction status, governance disputes, receivership proceedings, and Plaintiffs' efforts to preserve the value of the Case Project and protect their asserted rights.

**SPECIAL INTERROGATORY NO. 146:**

If YOU contend that BARRY SHY did not hand out notes to project workers suggesting GILLEN had fired them, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is vague and ambiguous as to "hand out notes," "project workers," "suggesting," and "fired," assumes disputed facts, lacks sufficient detail to identify the incident, and calls for speculation. Responding Party further objects that the interrogatory seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; seeks information equally or more available to Propounding Party, project workers, contractors, or other third parties; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is vague and ambiguous as to "hand out notes," "project workers," "suggesting," or "fired," assumes disputed facts, lacks sufficient detail to identify the incident, or calls for speculation. Responding Party further objects to the extent the interrogatory seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, is overbroad, seeks information

equally or more available to Propounding Party, project workers, contractors, or other third parties, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Barry Shy did not hand out notices to project workers suggesting Gillen had fired them. Responding Party does not admit that Barry Shy improperly handed out notes to project workers suggesting Gillen had fired them. Responding Party relies on communications with project workers, contractor communications, project records, witness testimony, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 147:**

If YOU contend that BARRY SHY did not offer to rehire project workers under YOUR control, state all facts that support this contention.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is vague and ambiguous as to “offer to rehire,” “project workers,” and “under YOUR control,” assumes disputed facts, lacks sufficient detail to identify the alleged communications or workers, and calls for speculation. Responding Party further objects that the interrogatory calls for legal conclusions concerning authority, employment, contractor relationships, project control, and legal effect; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks “all facts”; seeks employment, contractor, financial, and private information; seeks information equally or more available to Propounding Party, project workers, contractors, or other third parties; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is vague and ambiguous as to “offer to rehire,” “project workers,” or “under YOUR control,” assumes disputed facts, lacks sufficient

detail to identify the alleged communications or workers, or calls for speculation. Responding Party further objects to the extent the interrogatory calls for legal conclusions concerning authority, employment, contractor relationships, project control, or legal effect, seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, is overbroad, seeks employment, contractor, financial, or private information, seeks information equally or more available to Propounding Party, project workers, contractors, or other third parties, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Barry Shy suggested to a few essential maintenance workers that they continue working on site even if Gillen would fire them. Responding Party does not admit that Barry Shy improperly offered to rehire project workers under Responding Party's control. Responding Party relies on project records, contractor communications, communications with project workers, receiver materials, witness testimony, and documents produced or to be produced in this action.

**SPECIAL INTERROGATORY NO. 148:**

State all facts supporting each of YOUR affirmative defenses to the GILLEN DEFENDANTS' AMENDED CROSS-COMPLAINT. As used herein, "AMENDED CROSS-COMPLAINT" shall mean and refer to Defendants and Cross-Complainants' Amended Cross-Complaint, filed in the above-captioned matter on December 31, 2025.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for attorney-client communications, attorney work product, legal conclusions, and premature disclosure of trial strategy. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts" supporting each affirmative defense; is compound; seeks information protected by applicable privileges or

protections; seeks premature disclosure of expert analysis, trial evidence, witnesses, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for attorney-client communications, attorney work product, legal conclusions, or premature disclosure of trial strategy. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, compound, seeks information protected by applicable privileges or protections, seeks premature disclosure of expert analysis, trial evidence, witnesses, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party objects to this interrogatory to the extent it calls for legal conclusions. Subject to and without waiving the foregoing objections, Responding Party responds that his affirmative defenses are supported by the facts stated in Responding Party's pleadings, responses to written discovery, documents produced or to be produced in this action, and evidence concerning the Amended Operating Agreement, the BOBS Loan Agreement, the Deed of Trust, funding and draw records, the Glass Tunnel Transaction, PMF financing, title and escrow records, accounting records, receiver materials, communications among the parties, and Propounding Party's conduct. Responding Party's investigation and discovery are ongoing.

**SPECIAL INTERROGATORY NO. 149:**

IDENTIFY all DOCUMENTS and COMMUNICATIONS supporting each of YOUR affirmative defenses to the GILLEN DEFENDANTS' AMENDED CROSS-COMPLAINT.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks attorney-client communications, attorney work product, privileged materials, and premature disclosure of trial

strategy. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks all documents and communications supporting each affirmative defense; is compound; seeks documents and communications protected by applicable privileges or protections; seeks financial, banking, title, governance, and private information; seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, BOBS, PMF, title companies, escrow holders, lenders, banks, accountants, or other third parties; seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, and strategy; and is premature because discovery, investigation, document collection, review, and privilege analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks attorney-client communications, attorney work product, privileged materials, or premature disclosure of trial strategy. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, compound, seeks documents and communications protected by applicable privileges or protections, seeks financial, banking, title, governance, or private information, seeks documents or information in the possession, custody, or control of Propounding Party, 600 Spring LLC, BOBS, PMF, title companies, escrow holders, lenders, banks, accountants, or other third parties, or seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party objects to this interrogatory to the extent it calls for legal conclusions. Subject to and without waiving the foregoing objections, Responding Party responds that documents and communications supporting Responding Party's affirmative defenses include the Operating Agreement documents, the Amended Operating Agreement, BOBS Loan Agreement, Promissory Note, Deed of Trust records, funding records, draw requests, bank records, accounting records, forensic accounting materials, Glass Tunnel Transaction documents, PMF financing documents, title and escrow documents, communications concerning the Case Project,

receiver filings and reports, Verified Second Amended Complaint, declarations and exhibits filed in this action, and related discovery.

**SPECIAL INTERROGATORY NO. 150:**

IDENTIFY all PERSONS who can support each of YOUR affirmative defenses to the GILLEN DEFENDANTS' AMENDED CROSS-COMPLAINT.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it seeks attorney work product, attorney-client communications, premature witness disclosures, and trial strategy. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks all persons who can support each affirmative defense; is compound; seeks information protected by applicable privileges or protections; seeks premature disclosure of trial evidence, witnesses, expert analysis, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it seeks attorney work product, attorney-client communications, premature witness disclosures, or trial strategy. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, compound, seeks information protected by applicable privileges or protections, seeks premature disclosure of trial evidence, witnesses, expert analysis, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party objects to this interrogatory to the extent it calls for legal conclusions. Subject to and without waiving the foregoing objections, Responding Party responds that persons

who can support Responding Party's affirmative defenses include Barry Shy, Rommy Shy, Scott Gillen, representatives of BOBS LLC, persons acting for 600 Spring LLC, persons involved in the BOBS Loan Agreement and related security documents, persons involved in the Glass Tunnel Transaction and associated PMF financing, escrow and title personnel, the Receiver and his representatives, accountants, forensic accounting professionals, and persons identified in discovery or in the parties' pleadings and declarations. Known represented parties may be contacted through counsel of record.

**SPECIAL INTERROGATORY NO. 151:**

Describe any and all damages YOU allege to have suffered in connection with the causes of action and allegations in the SECOND AMENDED COMPLAINT.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for expert opinion, attorney-client communications, attorney work product, and a final damages computation before discovery is complete. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; is vague and ambiguous as to "any and all damages" and "in connection with"; seeks financial, banking, valuation, title, and private information; seeks premature disclosure of expert analysis, damages analysis, valuation opinions, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party or third parties; and is premature because discovery, expert analysis, and damages analysis are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for expert opinion, attorney-client communications, attorney work product, or a final damages computation before discovery is complete. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, vague and ambiguous as to "any and all damages" or "in connection with," seeks financial, banking, valuation, title, or private information, seeks premature disclosure of expert

analysis, damages analysis, valuation opinions, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party or third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that Plaintiffs have suffered damages including the lost benefit of selling the Glass Tunnel house, impairment of ownership, management, lending, and security rights, clouded title, interference with financing and disposition of the Subject Property, litigation, receivership, title, transaction-related harm, and damages arising from the alleged diversion of funds, refusal to provide accounting information, and the Glass Tunnel Transaction and associated PMF financing. Responding Party's damages investigation, accounting analysis, valuation analysis, and expert analysis are ongoing.

**SPECIAL INTERROGATORY NO. 152:**

State all facts supporting YOUR contention, if any, that YOU are a secured lender in connection with the BOBS LOAN AGREEMENT.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it calls for legal conclusions concerning secured status, priority, enforceability, validity, security interests, and legal effect. Responding Party further objects that the interrogatory is vague and ambiguous as to "secured lender" and "in connection with"; is overbroad, unduly burdensome, and not proportional to the needs of the case because it seeks "all facts"; assumes disputed facts; seeks attorney-client communications, attorney work product, and information protected by applicable privileges or protections; seeks financial, banking, title, and private information; seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, and strategy; seeks information equally or more available to Propounding Party, BOBS, lenders, title companies, escrow holders, or other third parties; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it calls for legal conclusions concerning secured status, priority, enforceability, validity, security interests, or legal effect. Responding Party further objects to the extent the interrogatory is vague and ambiguous as to "secured lender" or "in connection with," is overbroad, assumes disputed facts, seeks attorney-client communications, attorney work product, or information protected by applicable privileges or protections, seeks financial, banking, title, or private information, seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, or strategy, or seeks information equally or more available to Propounding Party, BOBS, lenders, title companies, escrow holders, or other third parties.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that BOBS is a secured lender in connection with the BOBS Loan Agreement. Facts supporting this contention include all loan documents and bank statements, the BOBS Loan Agreement, Promissory Note, Deed of Trust, recorded Deed of Trust, related security documents, loan records, Barry Shy declaration and exhibits, and documents produced or to be produced in this action. Responding Party contends the Deed of Trust secures obligations owed under the BOBS Loan Agreement and Promissory Note.

**SPECIAL INTERROGATORY NO. 153:**

IDENTIFY (including venue and case number) each and every lawsuit in which YOU have been a party in the last twenty (20) years.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is overbroad, unduly burdensome, invades privacy rights, is not proportional to the needs of the case, and seeks information not relevant to the claims or defenses in this action. Responding Party further objects that the interrogatory is not limited to lawsuits involving issues similar to those in this action; is vague and ambiguous as to "party" and "lawsuit"; seeks information equally or more available to

Propounding Party through public records; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is overbroad, unduly burdensome, invades privacy rights, is not proportional to the needs of the case, and seeks information not relevant to the claims or defenses in this action. Responding Party further objects to the extent the interrogatory is not limited to lawsuits involving issues similar to those in this action, is vague and ambiguous as to "party" or "lawsuit," seeks information equally or more available to Propounding Party through public records, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party objects to this interrogatory to the extent it seeks information that is irrelevant to the claims or defenses in this action, overbroad, unduly burdensome, invasive of privacy, and equally available to Propounding Party through public records. Subject to and without waiving the foregoing objections, Responding Party responds that he is not providing a list of lawsuits that are irrelevant to the claims or defenses in this action.

**SPECIAL INTERROGATORY NO. 154:**

IDENTIFY (including venue and case number) each and every lawsuit in which BARRY SHY has been a party in the last twenty (20) years.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is overbroad, unduly burdensome, invades privacy rights of Barry Shy, seeks information about another party, is not proportional to the needs of the case, and seeks information not relevant to the claims or defenses in this action. Responding Party further objects that the interrogatory is not limited to lawsuits involving issues similar to those in this action; is vague and ambiguous as to "party" and

"lawsuit"; seeks information equally or more available to Propounding Party through public records; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is overbroad, unduly burdensome, invades privacy rights of Barry Shy, seeks information about another party, is not proportional to the needs of the case, and seeks information not relevant to the claims or defenses in this action. Responding Party further objects to the extent the interrogatory is not limited to lawsuits involving issues similar to those in this action, is vague and ambiguous as to "party" or "lawsuit," seeks information equally or more available to Propounding Party through public records, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party objects to this interrogatory to the extent it seeks information that is irrelevant to the claims or defenses in this action, overbroad, unduly burdensome, invasive of privacy, and equally available to Propounding Party through public records. Subject to and without waiving the foregoing objections, Responding Party responds that he is not providing a list of lawsuits that are irrelevant to the claims or defenses in this action.

**SPECIAL INTERROGATORY NO. 155:**

How many times have YOU been sued for fraud?

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is overbroad, unduly burdensome, vague and ambiguous as to "sued for fraud," invades privacy rights, and seeks information not relevant to the claims or defenses in this action. Responding Party further objects that the interrogatory is not limited to lawsuits involving issues similar to those in this action; seeks information equally or more available to Propounding Party through public records; seeks

premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is overbroad, unduly burdensome, vague and ambiguous as to "sued for fraud," invades privacy rights, and seeks information not relevant to the claims or defenses in this action. Responding Party further objects to the extent the interrogatory is not limited to lawsuits involving issues similar to those in this action, seeks information equally or more available to Propounding Party through public records, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party objects to this interrogatory to the extent it seeks information that is irrelevant to the claims or defenses in this action, overbroad, unduly burdensome, invasive of privacy, and equally available to Propounding Party through public records. Subject to and without waiving the foregoing objections, Responding Party responds that he does not know how many times he has been sued for fraud, but he has never been convicted of fraud.

**SPECIAL INTERROGATORY NO. 156:**

How many times has BARRY SHY been sued for fraud?

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is overbroad, unduly burdensome, vague and ambiguous as to "sued for fraud," invades privacy rights of Barry Shy, seeks information about another party, and seeks information not relevant to the claims or defenses in this action. Responding Party further objects that the interrogatory is not limited to lawsuits involving issues similar to those in this action; seeks information equally or more available to Propounding Party through public records; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is overbroad, unduly burdensome, vague and ambiguous as to "sued for fraud," invades privacy rights of Barry Shy, seeks information about another party, and seeks information not relevant to the claims or defenses in this action. Responding Party further objects to the extent the interrogatory is not limited to lawsuits involving issues similar to those in this action, seeks information equally or more available to Propounding Party through public records, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party objects to this interrogatory to the extent it seeks information that is irrelevant to the claims or defenses in this action, overbroad, unduly burdensome, invasive of privacy, and equally available to Propounding Party through public records. Subject to and without waiving the foregoing objections, Responding Party responds that he does not know how many times he has been sued for fraud, but he has never been convicted of fraud.

**SPECIAL INTERROGATORY NO. 157:**

How many times have YOU been sued for breach of contract?

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is overbroad, unduly burdensome, vague and ambiguous as to "sued for breach of contract," invades privacy rights, and seeks information not relevant to the claims or defenses in this action. Responding Party further objects that the interrogatory is not limited to lawsuits involving issues similar to those in this action; seeks information equally or more available to Propounding Party through public records; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.



REEDER LLP

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is overbroad, unduly burdensome, vague and ambiguous as to "sued for breach of contract," invades privacy rights, and seeks information not relevant to the claims or defenses in this action. Responding Party further objects to the extent the interrogatory is not limited to lawsuits involving issues similar to those in this action, seeks information equally or more available to Propounding Party through public records, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party objects to this interrogatory to the extent it seeks information that is irrelevant to the claims or defenses in this action, overbroad, unduly burdensome, invasive of privacy, and equally available to Propounding Party through public records. Subject to and without waiving the foregoing objections, Responding Party responds that he is not providing information concerning lawsuits that are irrelevant to the claims or defenses in this action.

**SPECIAL INTERROGATORY NO. 158:**

How many times has BARRY SHY been sued for breach of contract?

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is overbroad, unduly burdensome, vague and ambiguous as to "sued for breach of contract," invades privacy rights of Barry Shy, seeks information about another party, and seeks information not relevant to the claims or defenses in this action. Responding Party further objects that the interrogatory is not limited to lawsuits involving issues similar to those in this action; seeks information equally or more available to Propounding Party through public records; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is overbroad, unduly burdensome, vague and ambiguous as to "sued for breach of contract," invades privacy rights of Barry Shy, seeks information about another party, and seeks information not relevant to the claims or defenses in this action. Responding Party further objects to the extent the interrogatory is not limited to lawsuits involving issues similar to those in this action, seeks information equally or more available to Propounding Party through public records, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party objects to this interrogatory to the extent it seeks information that is irrelevant to the claims or defenses in this action, overbroad, unduly burdensome, invasive of privacy, and equally available to Propounding Party through public records. Subject to and without waiving the foregoing objections, Responding Party responds that he is not providing information concerning lawsuits that are irrelevant to the claims or defenses in this action.

**SPECIAL INTERROGATORY NO. 159:**

How many times has BARRY SHY been sued for negligence and/or construction defects?

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is overbroad, unduly burdensome, vague and ambiguous as to "sued for negligence and/or construction defects," invades privacy rights of Barry Shy, seeks information about another party, and seeks information not relevant to the claims or defenses in this action. Responding Party further objects that the interrogatory is not limited to lawsuits involving issues similar to those in this action; seeks information equally or more available to Propounding Party through public records; seeks premature disclosure of trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is overbroad, unduly burdensome, vague and ambiguous as to "sued for negligence and/or construction defects," invades privacy rights of Barry Shy, seeks information about another party, and seeks information not relevant to the claims or defenses in this action. Responding Party further objects to the extent the interrogatory is not limited to lawsuits involving issues similar to those in this action, seeks information equally or more available to Propounding Party through public records, or seeks premature disclosure of trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party objects to this interrogatory to the extent it seeks information that is irrelevant to the claims or defenses in this action, overbroad, unduly burdensome, invasive of privacy, and equally available to Propounding Party through public records. Subject to and without waiving the foregoing objections, Responding Party responds that he is not providing information concerning lawsuits that are irrelevant to the claims or defenses in this action.

**SPECIAL INTERROGATORY NO. 160:**

Did YOU fund the development/construction of THE CASE PROJECT with YOUR own funds or through loans from other third parties?

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is vague and ambiguous as to "YOUR own funds," "loans from other third-parties," and "fund the development/construction," and calls for legal conclusions concerning the characterization of funds, loans, advances, reimbursement, lending obligations, and legal effect. Responding Party further objects that the interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case; seeks financial, banking, lending, and private information; seeks information equally or more available to BOBS, 600 Spring LLC, lenders, banks, accountants, or other third

parties; seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is vague and ambiguous as to "YOUR own funds," "loans from other third-parties," and "fund the development/construction," and calls for legal conclusions concerning the characterization of funds, loans, advances, reimbursement, lending obligations, or legal effect. Responding Party further objects to the extent the interrogatory is overbroad, unduly burdensome, seeks financial, banking, lending, or private information, seeks information equally or more available to BOBS, 600 Spring LLC, lenders, banks, accountants, or other third parties, or seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party contends that development and construction of the Case Project were funded through the BOBS Loan Agreement, Promissory Note, funding records, draw records, bank records, and other project and lending records, including funds advanced by or through BOBS and related sources. Responding Party is continuing to investigate the characterization and source of all funds used for the Case Project.

**SPECIAL INTERROGATORY NO. 161:**

If YOU funded the development/construction of THE CASE PROJECT through loans from third parties, IDENTIFY each of those loans, including the lender, the date of the loan, the amount of the loan, and the interest rate.

**RESPONSE:**

Responding Party objects to this interrogatory on the grounds that it is overbroad, unduly burdensome, and calls for information that may be in the possession, custody, or control of BOBS, 600 Spring LLC, lenders, financial institutions, banks, accountants, and other third

parties. Responding Party further objects that the interrogatory calls for attorney-client communications, attorney work product, and legal conclusions concerning loan characterization, funding, lending obligations, interest, and legal effect; is vague and ambiguous as to "funded," "development/construction," "through loans," "third parties," and "each of those loans"; seeks financial, banking, lending, and private information; seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, and strategy; and is premature because discovery and investigation are ongoing.

**SUPPLEMENTAL RESPONSE:**

Responding Party objects to this interrogatory to the extent it is overbroad, unduly burdensome, and calls for information that may be in the possession, custody, or control of BOBS, 600 Spring LLC, lenders, financial institutions, banks, accountants, and other third parties. Responding Party further objects to the extent the interrogatory calls for attorney-client communications, attorney work product, or legal conclusions concerning loan characterization, funding, lending obligations, interest, or legal effect, is vague and ambiguous as to "funded," "development/construction," "through loans," "third parties," or "each of those loans," seeks financial, banking, lending, or private information, or seeks premature disclosure of expert analysis, trial evidence, contentions, legal theories, or strategy.

Subject to and without waiving the foregoing objections, Responding Party responds as follows:

Responding Party refers to its response to Special Interrogatory No. 160. Documents and information relevant to this response include the BOBS Loan Agreement, Promissory Note, funding records, draw records, bank records, accounting records, CTBC Bank loan records, lender records, communications concerning funding and draws, and documents produced or to be produced in this action.

Dated: June 25, 2026

Respectfully submitted,

**REEDER LLP**

By: Christopher S. Reeder
Christopher S. Reeder
Marcus L. Tippens

Attorneys for Plaintiffs BOBS LLC, Barry Shy, and Amit Tidhar, as Trustee of the BR Shy Irrevocable Trust

**PROOF OF SERVICE**

**STATE OF CALIFORNIA )**
**COUNTY OF LOS ANGELES ) ss:**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 11766 Wilshire Blvd., Suite 1470, Los Angeles, CA 90025.

On June 25, 2026, I served the foregoing document(s) described as **PLAINTIFF AND CROSS-DEFENDANT BARRY SHY'S SUPPLEMENTAL RESPONSES TO DEFENDANT AND CROSS-COMPLAINANT SCOTT GILLEN'S SPECIAL INTERROGATORIES, SET ONE** on the parties in this action listed below as follows:June 25, 2026

*****SEE ATTACHED SERVICE LIST*****

☐ **BY MAIL:** By placing a true and correct copy of the above-described document(s) in envelope(s), addressed as set forth above, with first class postage pre-paid for delivery to the above-named persons at the above-listed addresses and depositing such envelopes in a US mail collection box.

☐ **BY PERSONAL SERVICE, VIA FIRST LEGAL ATTORNEY SERVICE:** I gave said documents to the firm's regular attorney service with specific instructions to be personally delivered by hand to the offices of the addressee, addressed as set forth above.

☒ **BY ELECTRONIC MAIL:** I transmitted said document(s) to the person(s) shown above by electronic mail to the email addresses shown above.

☐ **COURTESY COPY BY ELECTRONIC MAIL:** I transmitted courtesy copies of said document(s) to the person(s) shown above by electronic mail to the email address shown above.

☒ (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 25, 2026, at Los Angeles, California.

Anthony Reeder

REEDER LLP

**SERVICE LIST**

| | |
|---|---|
| Max N. Wellman<br>Adam M. Weg<br>Bryan Weintrop<br>Allison Nelson<br>Matthew Raber<br>VENABLE LLP<br>2049 Century Park East, Suite 2300<br>Los Angeles, California 90067<br>Telephone: (310) 229-9900<br>Facsimile: (310) 229-9901<br>Email: mwellman@Venable.com<br>amweg@Venable.com<br>bjweintrop@Venable.com<br>acnelson@Venable.com<br>mlraber@Venable.com | Attorney for Defendants<br>Glass Tunnel LLC, Scott Gillen, C64829 LLC and Unvarnished, Inc. |
| Vanessa H. Widener<br>Ali Z. Vaqar<br>ANDERSON MCPHARLIN & CONNERS LLP<br>707 Wilshire Boulevard, Suite 4000<br>Los Angeles, California 90017<br>Email: vhw@amclaw.com<br>azv@amclaw.com | Attorney for Defendant<br>PMF CA REIT, L.L.C. |
| RYAN C. BAKER<br>President & CEO<br>Verax Business Group<br>19200 Von Karman Ave, Suite 400<br>Irvine, CA 92612<br>rbaker@veraxinc.com | Court Appointed Receiver for the Properties |
| Eric S. Pezold<br>epezold@swlaw.com<br>Andrew Still<br>astill@swlaw.com | Counsel for Court Appointed Receiver for the Properties |