# EXHIBIT L

**ROBINS KAPLAN LLP**
Michael A. Geibelson (SBN 179970)
MGeibelson@RobinsKaplan.com
Tommy H. Du (SBN 305117)
TDu@RobinsKaplan.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, CA 90067
Telephone: 310.552.0130
Facsimile: 310.229.5800

Attorneys for Plaintiffs BOBS LLC, Barry Shy, and Amit Tidhar, as Trustee of the BR Shy Irrevocable Trust

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF Los Angeles – West District

| | |
|---|---|
| BOBS LLC, a Nevada limited liability company; AMIT TIDHAR, as Trustee of the BR SHY IRREVOCABLE TRUST and derivatively on behalf of 600 Spring LLC, and BARRY SHY, as Manager of 600 Spring LLC,<br><br>Plaintiffs,<br><br>v.<br><br>GLASS TUNNEL LLC, a California limited liability company; SCOTT GILLEN, an individual; C64829 LLC; UNVARNISHED, INC., a California Corporation; PMF CA REIT, L.L.C.; "ALL PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE, ESTATE, LIEN, OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT ADVERSE TO PLAINTIFF'S TITLE, OR ANY CLOUD UPON PLAINTIFF'S TITLE THERETO"; and DOES 1 through 10, inclusive,<br><br>Defendants, and<br><br>600 Spring LLC,<br>Nominal defendant. | Case No. 25SMCV03160<br><br>[Assigned for all purposes to: Honorable Mark H. Epstein, Dept. I]<br><br>**DECLARATION OF BARRY SHY IN SUPPORT OF PLAINTIFFS' REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION AND APPOINTMENT OF RECEIVER**<br><br><u>Hearing Date</u><br><br>Date: September 3, 2025<br><br>Time: 2:30 p.m.<br><br>Complaint filed: June 20, 2025<br><br>Trial Date: None Set |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**DECLARATION OF BARRY SHY**

I, Barry Shy, declare:

1. I am over the age of 18 and am personally familiar with the facts stated herein and could competently testify thereto if called as a witness.

2. Since 1981, I have been a licensed contractor in California (license number 398912). I have also developed and re-developed numerous residential and commercial properties in Southern California since the 1980s, including numerous luxury homes valued at over $20 Million and converted or renovated numerous high-rise residential buildings in downtown Los Angeles. I am also a consultant to BOBS LLC, which is a lender who lent substantial sums to 600 Spring LLC for the development at issue in this case.

3. In 2017, I, along with C64829 LLC ("C64829") and with Scott Gillen as its only member, formed 600 Spring LLC with an Operating Agreement that appointed Scott Gillen as a manager and identified myself and C64829 as members, each with a 50% membership interest in 600 Spring. Attached hereto as **Exhibit A** is a true and correct copy of the original Operating Agreement.

4. With Gillen's consent, the Operating Agreement of 600 Spring was amended (the "Amended Operating Agreement") to reflect that BR Shy Irrevocable Trust holds a 50% membership interest in 600 Spring instead of myself, and the Amended Operating Agreement appointed me as a manager of 600 Spring in addition to Gillen. Attached hereto as **Exhibit B** is a true and correct copy of the Amended Operating Agreement.

5. It is my understanding that Mr. Gillen now contests that the Operating Agreement was amended with his consent. He has not objected to my designation as a manager of 600 Spring before. In fact, in 2024, 600 Spring secured a loan for which Mr. Gillen signed next to the signature block identifying me as a manager of 600 Spring approximately 20 times. This signing was done in person in front of a notary public that also required the signature of Amit Tidhar (also in person), the Trustee of the BR Shy Irrevocable Trust. Attached hereto as **Exhibit C** is a true and correct copy of the loan documents that Mr. Gillen executed in 2024 as the Manager of

600 Spring right beside the signature block listing me as the Manager of 600 Spring approximately twenty times which I also signed.

6. Under the Operating Agreement and the Amended Operating Agreement, Gillen has been responsible for handling the day-to-day operations of 600 Spring, but was to receive no salary or compensation for his work. His compensation was ultimately to be based upon the sale of the properties.

7. Even though Gillen's compensation was only to be from the sale of the properties under the express terms of the Operating Agreement, Gillen has diverted a substantial portion the amounts drawn to his other company, including amounts described as Unvarnished payroll in amounts greater than $50,000 per week

8. 600 Spring was formed to develop, manage, and ultimately sell a series of five properties in a Malibu development known as The Case Properties including the property located at 24198 Case Court, Malibu, California 90265 (the "Subject Property"). One of the properties already sold. The four others are near completion but encumbered by significant debt held by third parties, including BOBS LLC. These remaining properties include the following: 24198 Case Court, Malibu, California 900265 (the "Subject Property"); 24168 Case Court; 24185 Case Court; and 24188 Case Court (collectively referred to as "The Case Properties")

9. The Case Development, of which the Subject Property is a part, is depicted on Gillen's website for his company Unvarnished, https://unvarnishedco.com/, that includes descriptions of The Case development, and the Subject Property known as the Glass Tunnel, copies of which webpages are attached hereto as **Exhibit D**. I agree that the Case Project properties are unique pieces of real estate, including for their size, location, and views of Malibu.

10. As part of the development process, 600 Spring obtained a promissory note from BOBS LLC in the amount of $260,000,000.00, a true and correct copy of which is attached hereto as **Exhibit E**. The Promissory Note was not prepaid or accelerated and so the Maturity Date for the payment in full of the Promissory Note was at latest March 1, 2024. The Promissory Note was not repaid on that date or since, and still has not been paid."

11. The Promissory Note was part of a series of Loan Documents identified in the Note (at Paragraph 20) that included a Loan Agreement and Deed of Trust. A true and correct copy of the Loan Agreement and Deed of Trust are attached hereto as **Exhibit F and G**.

12. The Promissory Note (at the end of the unnumbered, second paragraph) also required that Gillen personally guarantee the Promissory Note and the Loan Agreement. A true and correct copy of Gillen's Personal Guaranty is attached hereto as **Exhibit H**.

13. Three of the Case Properties also have a mortgage with JPMorgan Chase in the amount of $51 million with monthly payments of $325,000.00. If payment is not made to JPMorgan, there is a serious risk that JPMorgan may foreclose on the properties. In addition, the Case Properties have several insurance policies with monthly payments of approximately $20,000.00. If payment is not made, there is serious risk that the policies will be canceled and the properties will not be insured in the event of a catastrophic loss

14. Throughout the last seven years of developing the properties, including the Subject Property, Gillen submitted written draw requests to BOBS, and BOBS released the loan draws to Gillen. The amount of the remaining, outstanding principal disbursed by BOBS is over $120,000,000.00. The principal of the loan has accrued interest and the amount owed to BOBS is now in excess of $241,000,000, including interest. The carrying costs on the properties are approximately $2 Million per month.

15. There will be irreparable harm to the properties if BOBS is not allowed to take over management of the properties as contemplated by the Loan Agreement. The carrying costs on the properties are approximately $2 Million per month and will continue to accrue.

16. The Landscaping, the cost of which is approximately $15 Million, must be maintained and irrigated and if not is likely to die which not only result in nonrecoverable damages but also impair the ability to market and sell the property for its market value. JP Morgan will foreclose on its loan if the $325,000 per month debt is not paid. The security guards will quit if they are not paid, and the properties are likely to be subjected to vandalism if the security is not maintained. Therefore, it is essential to for the appointment of receiver, including the appointment of a receiver with instructions to appoint BOBS to manage the property, to avoid





ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

neglect of, and damage and waste to the properties. Additionally, there is insurance in place for casualty (including fire) and construction that will be cancelled and not be maintained if the insurance premiums are not paid. We are confident these amounts will not be paid by Gillen or 600 Spring in the absence of a receiver or BOBS' participation in the management of the properties.

17. In approximately May 2025, Gillen requested that I consent to obtaining a hard money loan from PMF CA REIT, L.L.C ("PMF") in the amount of $20,000,000.00 secured by the Subject Property. I informed Gillen that BOBS had sufficient funds to continue financing the project to its completion, that 600 Spring did not need additional financing, that the Subject Property being free of third-party loans was the security for BOBS and in the event of emergency funds being needed, and that we should only consider encumbering the Subject Property if PMF provided a $35,000,000.00 loan. Based upon discussions with Gillen, it was concluded that $20 Million was not enough to complete the construction and pay for carrying costs through the anticipated sale of the properties

18. Gillen told me that he told PMF of my request for a $35,000,000.00 loan and that PMF had declined, and only agreed to provide a loan of $20,000,000.00

19. As a result of my discussions with him, Gillen knew I was out of the country from May 29 through June 12. During this period, we exchanged about a half dozen text messages and in none of them did he mention that he was engaging in a loan transaction or a sale of the Subject Property. Instead, the first time I learned about the transaction related to the Subject Property was when I returned and found the Notice of Transaction in my mailbox on June 12, 2025. Attached hereto as **Exhibit I** is a true and correct copy of that Notice of Transaction. On the same date, I first saw the Grant Deed to Purchase, a true and correct copy of which is attached hereto as **Exhibit J**, that purportedly transferred the Subject Property from 600 Spring to Glass Tunnel. I also obtained a document entitled, Deed of Trust, Assignment of Rents, Security Agreement, and Fixture Filing, a true and correct copy of which is attached hereto as **Exhibit K**.

20. Even though Gillen claims that the Subject Property has been transferred to Glass Tunnel, he continues to make draw requests for work associated with that property, or at a

minimum, that did not segregate work on the Subject Property from the other properties owned by 600 Spring. Attached as **Exhibit L** is a true and correct copy of Gillen's email of July 9, 2025 to which he attached draw requests for work on all the properties, including the Subject Property

21. After this Court issued the TRO, Gillen submitted another draw request for the Case Properties that failed to include any information regarding the date that the work was performed, or when the expenses claimed were incurred, or when payment is owed. Attached hereto as **Exhibit M** is a true and correct copy of the email and attachments. BOBS is willing to pay these amounts if they can be shown to be justified by invoices showing that work was actually performed, and performed on the Case Project Properties, but only as the manager of the Case Project Properties. In light of the past use of funds and the waste of time, BOBS is not willing to pay these amounts through Gillen as a conduit for the funds and on no more than Gillen's word and without a documentary verification of the amounts due and owing. If these amounts are not paid, they are likely to result in additional liens being placed on the property.

22. The amount owed to BOBS in principal and interest related to The Case Project is currently in excess of $241 Million. This amount does not include the tens of millions of dollars lent under the Promissory Note for other projects and LLCs that were being developed with Gillen. Thus, BOBS has already lent the Project far in excess of $260 Million

23. With the addition of the $51 Million owed to JP Morgan, the total indebtedness related to the Case Project is over $292 Million. That amount is substantially greater than the expected, combined sales price of all four properties, each of which is estimated to be valued at approximately $60 Million

24. As a result of these amounts being owed, Gillen has no equity in the Subject Property or the other Case Project properties.

25. At the same time, Gillen has continuously demanded draws to pay for the payroll for his company Unvarnished. While his company's payroll continues(-ed) to be paid, he has little or no incentive to complete the houses because he is not expected to receive any money from the sales under the terms of the Operating Agreement which require that the debt be paid first.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

26. However, continuing to fail to complete the property will result in irreparable damage to the properties and to BOBS, particularly if the PMF loan and the transfer from 600 Spring to Glass Tunnel are not undone because they would impair the security interest BOBS holds in the properties.

27. This imperiling of the security interest is made worse by Gillen allowing more than one million dollars in mechanic's liens to be recorded against the properties, making the properties subject to foreclosure by multiple contractors. Among these, I am informed only the lien against the Glass Tunnel property has been satisfied. These liens must be resolved quickly because litigation must be filed within 90 days of recording the lien. The defense of this litigation will result in a default if it is not managed

28. On or about August 1, 2025, I attempted to access the Case Properties. Upon arriving, the security guards informed me that I was not allowed to access the properties at Gillen's instruction. The security guard then called Scott who arrived and escorted me to two houses, and when I asked to see the Glass Tunnel House, Gillen refused and would not allow me to see it at all, claiming that I have no interest in the house, even though BOBS loan includes that house as security.

29. In addition, upon entering the Case Properties, I only encountered 3 employees of one of the subcontractors working on the Case Properties compared to my prior visits where there were more than 30 employees working at any given time.

30. I have closely monitored the development and construction of the Case Properties and am intimately familiar with those properties including based on my recent visit. With my background and experience in developing custom properties, I have a strong understanding of the amount and expected cost of the work that remains to be done on the Case Properties in order to to obtain a certificate of occupancy for each of the properties and to prepare them for sale. Contrary to Gillen's statements that it will cost approximately $10 Million to complete construction of the Glass Tunnel house and approximately $5 Million to complete the other three houses, based on my background and experience, I estimate that the whole project will cost no

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

more than approximately $5 Million and approximately two to three months to complete, including both the Glass Tunnel House and the Remaining Case Project Properties.

31. Given the remaining work to be done on the Case Properties, if the Receiver appoints BOBS to complete the construction of the Case Properties, BOBS will agree to fund and complete the construction of the Case Properties without reimbursement from 600 Spring for the expense of those costs.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed in Los Angeles, California.

DATED: August 5th 2025

Barry Shy

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

# EXHIBIT A

OPERATING AGREEMENT AS OF 5/22/2017
OF
600 Spring LLC

THE UNDERSIGNED is executing this Operation Agreement **("Agreement")** for the purpose of forming a limited-liability company (the "Company") pursuant to the provisions of the Beverly-Killea Limited Liability Act codified if California Corporations Code Section 17000 et seq. (the "**California Act**"), and docs hereby certify and agree as follows:

1.Name: formation. The name of the Company shall be 600 Spring LLC.

2.Business and Affairs. The Affairs of the Company and the conduct of its business shall be governed by the California Act, as the same may be amended from time to time.

3.Members. The members of the company are as follows:
1) Barry Shy 50%
2) C64829 LLC 50%

4.Managers. Scott Gillen shall be the Manager until he resigns, dies or otherwise is removed from the office by the Member.

5.Capital Contribution. The Members shall contribute such capital as they deem necessary and advisable; provided however, the Members shall not be obligated to make any such capital contributions to the Company. For the Avoidance of doubt, the Member shall not be obligated to make any capital contributions if the balance is such Member's capital account is negative. The Members shall have a one hundred percent (100%) interest in the profits and losses of the Company.

6. Company Obligations. Except as otherwise required under the California Act, the member shall not be personally liable for and debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise.

7. Member Rights and Obligation. Except as otherwise provided herein or in the Articles of Organization of the Company to the contrary, all of the rights, obligations and duties of the Manager and the Member shall be set forth in the California Act.

8. C64829 LLC and Scott Gillen will handle the day to day operations for the company, including but not limited to all aspects of developing and selling the property, they will receive no salary or compensation for this work.

9. Upon selling the property the first portion of the proceeds will be used to pay-off any debt and/or liens against the property, after which the profits will be divided equally between the two partners.

10. Amendments. This Agreement may be amended or modified only by a writing duly executed by the Members.

11. LLC will resolve on December 31, 2027

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

Barry Shy, Member

C64829 LLC, Member
by Scott Gillen it's Manager

Scott Gillen, Manager

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

**Give Form to the requester. Do not send to the IRS.**

Print or type
See Specific Instructions on page 2.

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.
600 Spring LLC

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification; check only **one** of the following seven boxes:
☐ Individual/sole proprietor or single-member LLC ☐ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate
☑ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ S
**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.
☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):
Exempt payee code (if any)
Exemption from FATCA reporting code (if any)
*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.)
600 S. Spring St. Unit OFC

Requester's name and address (optional)
BHI USA

6 City, state, and ZIP code
Los Angeles, CA 90014

7 List account number(s) here (optional)

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number
☐☐☐ - ☐☐ - ☐☐☐☐

or

Employer identification number
8 2 - 1 5 5 3 0 0 3

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here** Signature of U.S. person ▶ [signature] Date ▶ 5/23/17

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

### Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

- Form 1099-INT (interest earned or paid)
- Form 1099-DIV (dividends, including those from stocks or mutual funds)
- Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
- Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
- Form 1099-S (proceeds from real estate transactions)
- Form 1099-K (merchant card and third party network transactions)
- Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
- Form 1099-C (canceled debt)
- Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding? on page 2.*

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),
2. Certify that you are not subject to backup withholding, or
3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and
4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

**Secretary of State**
**Articles of Organization**
Limited Liability Company (LLC)

**LLC-1**

201712510140

**FILED** KM
**Secretary of State**
**State of California**
**MAY 04 2017**

ICC

**IMPORTANT — Read Instructions before completing this form.**

**Filing Fee** – **$70.00**

**Copy Fees** – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00

*Note:* LLCs may have to pay minimum $800 tax to the California Franchise Tax Board each year. For more information, go to *https://www.ftb.ca.gov.*

**This Space For Office Use Only**

1. **Limited Liability Company Name** (See instructions – Must contain an LLC ending such as LLC or L.L.C. "LLC" will be added, if not included.)

600 Spring, LLC

2. **Business Addresses**

| a. Initial Street Address of Designated Office in California - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 600 S. Spring St. "office" | Los Angeles | CA | 90014 |
| b. Initial Mailing Address of LLC, if different than Item 2a | City (no abbreviations) | State | Zip Code |
| | | | |

3. **Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** – Complete Items 3a and 3b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Yaniv | | Aviner | |

| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 600 S. Spring St. unit "Office" | Los Angeles | CA | 90014 |

**CORPORATION** – Complete Item 3c. Only include the name of the registered agent Corporation.

c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 3a or 3b

4. **Management** (Select **only** one box)

The LLC will be managed by:

☑ One Manager ☐ More than One Manager ☐ All LLC Member(s)

5. **Purpose Statement** (Do not alter Purpose Statement)

The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

6. The information contained herein, including in any attachments, is true and correct.

[signature]
Organizer sign here

Yaniv Aviner
Print your name here



2017 California Secretary of State
www.sos.ca.gov/business/be

# EXHIBIT B

OPERATING AGREEMENT AS OF 5/22/2017
OF
600 Spring LLC

THE UNDERSIGNED is executing this Operation Agreement **("Agreement")** for the purpose of forming a limited-liability company (the "Company") pursuant to the provisions of the Beverly-Killea Limited Liability Act codified if California Corporations Code Section 17000 et seq. (the "**California Act**"), and docs hereby certify and agree as follows:

1.Name: formation. The name of the Company shall be 600 Spring LLC.

2.Business and Affairs. The Affairs of the Company and the conduct of its business shall be governed by the California Act, as the same may be amended from time to time.

3.Members. The members of the company are as follows:
1) BR Shy Irrevocable Trust 50%
2) C64829 LLC 50%

4.Managers. Scott Gillen and Barry Shy shall be the Managers until they resign, die or otherwise are removed from the office by the Member.

5.Capital Contribution. The Members shall contribute such capital as they deem necessary and advisable; provided however, the Members shall not be obligated to make any such capital contributions to the Company. For the Avoidance of doubt, the Member shall not be obligated to make any capital contributions if the balance is such Member's capital account is negative. The Members shall have a one hundred percent (100%) interest in the profits and losses of the Company.

6.Company Obligations. Except as otherwise required under the California Act, the member shall not be personally liable for and debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise.

7.Member Rights and Obligation. Except as otherwise provided herein or in the Articles of Organization of the Company to the contrary, all of the rights, obligations and duties of the Manager and the Member shall be set forth in the California Act.

8.C64829 LLC and Scott Gillen will handle the day to day operations for the company, including but not limited to all aspects of developing and selling the property, they will receive no salary or compensation for this work.

9. Upon selling the property the first portion of the proceeds will be used to pay-off any debt and/or liens against the property, after which the profits will be divided equally between the two partners.

10. Amendments. This Agreement may be amended or modified only by a writing duly executed by the Members.

11. LLC will resolve on December 31, 2027

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

Barry Shy, Manager

Barry Shy

Amit Tidhar, Trustee of
the BR Shy Irrevocable Trust

Amit Tidhar

C64829 LLC, Member
by Scott Gillen it's Manager

Scott Gillen, Manager

# Secretary of State
## Articles of Organization
### Limited Liability Company (LLC)

LLC-1

201712510140

FILED KMO
Secretary of State
State of California
MAY 04 2017

ICC

This Space For Office Use Only

**IMPORTANT — Read Instructions before completing this form.**

**Filing Fee** – **$70.00**

**Copy Fees** – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00

*Note:* LLCs may have to pay minimum $800 tax to the California Franchise Tax Board each year. For more information, go to *https://www.ftb.ca.gov.*

**1. Limited Liability Company Name** (See Instructions – Must contain an LLC ending such as LLC or L.L.C. "LLC" will be added, if not included.)

600 Spring, LLC

**2. Business Addresses**

| a. Initial Street Address of Designated Office in California - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 600 S. Spring St. "office" | Los Angeles | CA | 90014 |
| b. Initial Mailing Address of LLC, if different than item 2a | City (no abbreviations) | State | Zip Code |
| | | | |

**3. Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** – Complete Items 3a and 3b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Yaniv | | Aviner | |

| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 600 S. Spring St. unit "Office" | Los Angeles | CA | 90014 |

**CORPORATION** – Complete Item 3c. Only include the name of the registered agent Corporation.

c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 3a or 3b

**4. Management** (Select **only** one box)

The LLC will be managed by:

☑ One Manager ☐ More than One Manager ☐ All LLC Member(s)

**5. Purpose Statement** (Do not alter Purpose Statement)

The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

**6.** The Information contained herein, including in any attachments, is true and correct.

[signature]
Organizer sign here

Yaniv Aviner
Print your name here



2017 California Secretary of State
www.sos.ca.gov/business/be

I hereby certify that the foregoing transcript of / page(s) is a full, true and correct copy of the original record in the custody of the California Secretary of State's office.

MAY 05 2017

Date:

ALEX PADILLA, Secretary of State

# EXHIBIT C

# Closing Instructions

## Closing Method: In-Person Closing

**Lender**

JPMorgan Chase Bank, N.A.
2500 Westfield Dr, Floor 2-1
Elgin, IL 60124

Contact Name: Emily Wang

**Closing Agent**

Fidelity National Title Agency, Inc.
20445 State Hwy 249 Suite 110
Houston, TX 77070

Phone: (281) 671-5530
Email: Shaun.Bor@fnf.com

**Closing Date (Signing Date)**

July 29, 2024

**Reference Number**

[redacted]

**Closing Location:** 20445 State Highway 249 Suite 110, Houston, TX 77070

**Property Address:** 24185 Case Ct, Malibu, CA 90265

**Document Date:** July 29, 2024
**Disbursement Date:** July 30, 2024
**Loan Number:** [redacted]
**Loan Type:** Conventional
**Sales Price:** $0.00

**Loan Amount:** $20,800,000.00
**Interest Rate:** 6.25%
**Term:** 360 Months
**Occupancy:** Secondary Residence

**If the loan does not close or fund as scheduled as indicated above, please notify us immediately.**

**Vesting.** 600 SPRING, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

**Borrower Names and Contact Information.** 600 Spring, LLC and The Brshy Irrevocable Trust; Attn: Barry, [redacted]

**Enclosed Documents.**

- Fair Lending Letter
- Fair Lending Statement
- Lock-In Agreement
- Fannie Mae Freddie Mac 3442 Fixed Adj Note 30 Day SOFR
- Conventional First Deed Of Trust And Subordinate Security Instrument
- Second Home Rider
- PUD (Planned Unit Development) Rider
- Fannie Mae Freddie Mac 3142 Fixed Adj Rider 30 Day SOFR
- Promissory Note Rider - Entity Borrower
- Promissory Note Rider - Guarantor
- Adjustable Rate Mortgage Disclosure Conventional
- W-9 - Request for Taxpayer Identification Number and Certification
- Uniform Residential Loan Application
- Lender Loan Information
- Application for the Chase Automatic Mortgage Payment (ACH) Program
- Homeowner's Insurance Requirement Notice
- Extension Of Credit Notice
- Mailing Address
- Undertaking and Errors and Omissions Form

- Notice to Cosigner Guarantor
- Fair Lending Notice - CA
- Amortization Schedule
- Notice Regarding Furnishing of Negative Information
- Tax Matters Agreement
- Commitment Letter
- Appraisal Fee Disclosure
- Trust Certification
- Entity Certificate
- Guaranty
- Payoff Statement CTBC
- Payoff Statement Bank of Hapoalim

**Additional documents that must be returned fully executed including but not limited to:**

- **Closing Disclosure**
- **Closing Disclosure Addendum**

1. Documents must be signed and dated on scheduled closing date.
2. All documents must be signed exactly as indicated under signature lines.
3. Notify Lender of **Any/All** changes, including changes to sales price and documents.
4. Lender must approve **All** changes, including changes to sales price and documents.
5. Homeowner's and Flood Insurance-Closing Agent must obtain original, valid policy for homeowner's insurance and flood insurance, if applicable, insuring:

| Lender as first lien position: | Lender as second lien position (if applicable): |
|---|---|
| JPMorgan Chase Bank, N.A. | JPMorgan Chase Bank, N.A. |

# Closing Instructions

## Closing Method: In-Person Closing

**Lender**
JPMorgan Chase Bank, N.A.
2500 Westfield Dr, Floor 2-1
Elgin, IL 60124
Contact Name: Emily Wang

**Closing Agent**
Fidelity National Title Agency, Inc.
20445 State Hwy 249 Suite 110
Houston, TX 77070
Phone: (281) 671-5530
Email: Shaun.Bor@fnf.com

**Closing Date (Signing Date)**
July 29, 2024

**Reference Number**
[redacted]

**Closing Location:** 20445 State Highway 249 Suite 110, Houston, TX 77070

**Property Address:** 24185 Case Ct, Malibu, CA 90265

**Document Date:** July 29, 2024
**Disbursement Date:** July 30, 2024
**Loan Number:** [redacted]
**Loan Type:** Conventional
**Sales Price:** $0.00

**Loan Amount:** $20,800,000.00
**Interest Rate:** 6.25%
**Term:** 360 Months
**Occupancy:** Secondary Residence

**If the loan does not close or fund as scheduled as indicated above, please notify us immediately.**

**Vesting.** 600 SPRING, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

**Borrower Names and Contact Information.** 600 Spring, LLC and The Brshy Irrevocable Trust; Attn: Barry [redacted]

**Enclosed Documents.**

- Fair Lending Letter
- Fair Lending Statement
- Lock-In Agreement
- Fannie Mae Freddie Mac 3442 Fixed Adj Note 30 Day SOFR
- Conventional First Deed Of Trust And Subordinate Security Instrument
- Second Home Rider
- PUD (Planned Unit Development) Rider
- Fannie Mae Freddie Mac 3142 Fixed Adj Rider 30 Day SOFR
- Promissory Note Rider - Entity Borrower
- Promissory Note Rider - Guarantor
- Adjustable Rate Mortgage Disclosure Conventional
- W-9 - Request for Taxpayer Identification Number and Certification
- Uniform Residential Loan Application
- Lender Loan Information
- Application for the Chase Automatic Mortgage Payment (ACH) Program
- Homeowner's Insurance Requirement Notice
- Extension Of Credit Notice
- Mailing Address
- Undertaking and Errors and Omissions Form

- Notice to Cosigner Guarantor
- Fair Lending Notice - CA
- Amortization Schedule
- Notice Regarding Furnishing of Negative Information
- Tax Matters Agreement
- Commitment Letter
- Appraisal Fee Disclosure
- Trust Certification
- Entity Certificate
- Guaranty
- Payoff Statement CTBC
- Payoff Statement Bank of Hapoalim

**Additional documents that must be returned fully executed including but not limited to:**

- **Closing Disclosure**
- **Closing Disclosure Addendum**

1. Documents must be signed and dated on scheduled closing date.
2. All documents must be signed exactly as indicated under signature lines.
3. Notify Lender of **Any/All** changes, including changes to sales price and documents.
4. Lender must approve **All** changes, including changes to sales price and documents.
5. Homeowner's and Flood Insurance-Closing Agent must obtain original, valid policy for homeowner's insurance and flood insurance, if applicable, insuring:

| Lender as first lien position: | Lender as second lien position (if applicable): |
|---|---|
| JPMorgan Chase Bank, N.A. | JPMorgan Chase Bank, N.A. |

| | |
|---|---|
| its successors and/or assigns, ATIMA, | its successors and/or assigns, ATIMA, |
| P.O. Box 4465 | 10 South Dearborn FL7, IL1-0063 |
| Springfield, OH 45501 | Chicago, Il 60603-2300 |

6. **The following conditions are outstanding on this loan and must be satisfied in conjunction with the loan closing. Please submit these documents or proof of satisfaction with the closed loan package. Changes are not permitted by the Closing Agent or any other party without the Closer's approval. Any changes must be made in writing and signed by the Lender.**

   1. Signed and dated Extension of Credit form for Barry Shy.
   2. Monthly mortgage payments to be made by auto debit from a JPMorgan Chase Bank, N.A. account owned by the borrower.
   3. Loan to be guaranteed by Barry Shy.
   4. Payoff of existing [redacted] at funding.
   5. Payoff of existing [redacted] at funding.
   6. Certification of trust form for The Brshy Irrevocable Trust.

7. Closing Agent must attach the subject property's legal description and property tax numbers as "Exhibit A" to the Mortgage/Deed of Trust/Security Agreement prior to funding and recording.

**Additional Conditions:**

**Title Policy.**

1. A Title Policy with a liability of $20,800,000.00 insuring JPMorgan Chase Bank, N.A., its successors and/or assigns, ATIMA on subject property as described above.
2. All exceptions, unless otherwise noted, must be cleared prior to closing.
3. All liens must be satisfied.
4. Any subordinated liens must have lender approval.
5. All taxes and assessments must be paid current and cannot be shown as exceptions to title.
6. Vestee name and spelling must match mortgage/deed of trust.
7. The following endorsements are required:

**Title Policy Conditions** - Include the following standard ALTA Endorsements:

- ( ) ALTA Form 4 (if Condominium)
- (X) ALTA Form 5 (if PUD - deMinimis PUD)
- (X) ALTA Form 6 (if VRM - ARM - GPM)
- (X) ALTA Form 8 or 8.1 (Environmental Protection Lien), if applicable
- ( ) ALTA Form 9 (Florida)

**Closing Package Requirements.**

**After Signing, return Loan Documents to:**

Chase Record Center
Warehouse Intake
Mailcode LA 42153
700 Kansas Lane
Monroe, LA 71203

**After Recording, return Documents to:**

Chase Record Center
PB Collateral Trailing Docs
Mailcode LA4-8000, 700 Kansas Ln
Monroe, LA 71203

**The following additional conditions must also be met:**

**Changes are not permitted by the Closing Agent or any other party to the closing instructions, any forms or fees without the Lender's approval. Any changes must be made in writing and signed by the lender. Contact the Lender immediately if changes are required.**

**Thank you for acting on our behalf as the designated Closing Agent for this transaction. In this capacity you will comply with all applicable federal, state and local laws. You may not disburse our funds unless you fully comply with all closing instructions. Any changes to these instructions must be made in writing and signed by the lender. These instructions will cover the fees, loan-specific conditions and documents, and title requirements of this transaction. Your signature is required on page five (5) to certify compliance with these instructions. ***Please contact the lender's closer/funder if you have any questions or require any changes.*****

**If signing in the State of Florida and the signing is for a non-Florida property, you are required to collect the required Florida Documentary Tax Stamps on the Closing Disclosure and remit payment to the Florida Department of Revenue. See Florida Administrative Code Rule 12B-4.003 for further details.**

You must receive funding approval from JPMC before you are authorized to disburse funds.

**REQUIREMENT FOR FUNDING AUTHORIZATION: Scan and send entire signed closing package to PB.MC.FUNDINGS@jpmorgan.com.**

**WITHIN 48-HOURS OF BORROWER(S) EXECUTING ALL DOCUMENTS, Closing Agent must send, by overnight delivery, all documents and evidence of satisfaction of conditions (fully executed and notarized as applicable) to the address of the Lender noted below. The Closing Agent is required to provide the Lender with executed documents not more than 48 hours following the closing.**

Please do not send original documents before the scanned/faxed documents are reviewed and approved by JPMC.

**Recorded Documents and Title Policies must be returned/forwarded to:**

Chase Record Center
PB Collateral Trailing Docs
Mailcode LA4-8000, 700 Kansas Ln
Monroe, LA 71203

**Taxes** - Collect and pay all Real estate taxes that are due within 30 days of the closing date and disclose on the Closing Disclosure.

**Provider of Services** - Provider of Services listed on the Fee Sheet must match the Closing Disclosure.

Loan may not be consummated before July 29, 2024

**WITHIN 24 HOURS OF SETTLEMENT, OR FUNDING FOR ESCROW STATES, return all documents (fully executed, dated, and notarized) to the Lender address noted on Page 1 of these instructions. If no**

**reference is made to the number of copies, then only the original executed document must be returned to the Lender.**

Auto debit form is required to be signed and dated by account holder due to the borrowers discounted rate.

**First Lien Position** - Insure that our Mortgage/Deed of Trust is in first lien position. Schedule A of the title policy must recite full recording data pertinent to the Mortgage/Deed of Trust and applicable Rider/Schedule. Insure all taxes, liens and assessments are paid.

**Second Mortgages** - Any second mortgage(s) must be subordinate to the Lender's first mortgage lien and must be approved by the Lender prior to closing. Schedule A must recite mortgage recording data regarding any approved second mortgage. Any second mortgage may not contain a prepayment penalty clause.

**Legal Description** - Have the full legal description conform precisely as it appears in the Mortgage/Deed of Trust. Closing Agent must verify and attach the legal description of the collateral property to the Mortgage/Deed of Trust.

**Certificate of Occupancy** - A certificate of occupancy and/or completion certificates must cover the structure and all additions to the dwelling. No building violations of record or open building permits for incomplete work or completed work not yet inspected are permitted.

**Survey** - The final title policy is to be issued without a survey exception.

**Power of Attorney** - A Power of Attorney is not permitted without the Lender's and the Title Company's written approval prior to the closing (Lender will make notations on "Schedule A - Conditions To Be Satisfied for Closing"). The Closing Agent must provide a recorded Power of Attorney and evidence that the Title Company is insuring over the Power of Attorney. The Power of Attorney must be a certified true copy, signed by the certifier, and recorded before the Deed or the Mortgage/Deed of Trust. The Power of Attorney must be specific to the transaction. All signatures must conform exactly to the mortgage/deed of trust and the note/bond.

**Homeowner's Association dues,** if any - Insure the Homeowner's Association fees are current.

## Closing Certification

I hereby certify that I have closed this loan in accordance with all of the instructions and conditions contained in these closing instructions.

**Settlement Agent**

"The title company and the persons and entities named in Procedural Rule P-35 are prohibited from executing this document by virtue of Procedural Rule P-35 of the BASIC MANUAL OF RULES, RATES AND FORMS FOR THE WRITING OF TITLE INSURANCE IN THE STATE OF TEXAS and Articles 9.07 and 9.49 of the Texas Insurance Code."

**Shaun B** **Date**

Fidelity National Title Agency, Inc.
20445 State Highway 249 Suite 110
Houston, TX 77070
(281) 671-5580

Date: 07/29/2024
Loan #: [redacted]

Dear Closing Agent,

At J.P. Morgan, it is our policy to provide credit to individuals on sound lending practices. We evaluate each credit application on its merits regardless of the applicant's race, color, national origin, religion, gender, marital or family status, sexual orientation, disability, age, or the fact that the applicant receives public assistance or may have exercised rights under the federal Consumer Credit Protection Act.

Fair lending is the law. More important, fair lending is the ethical and moral obligation of every individual providing services in our industry. It is the right thing to do.

Our policy of fair treatment and equal opportunity extends to every aspect of the credit transaction. This includes advertising, pre-application inquiries and discussions, application taking, processing, underwriting, purchasing, servicing and collecting loans.

As a title agent doing business with J.P. Morgan, we expect you to share our commitment to fair lending. Attached you will find the JPMorgan Chase Bank, N.A. Fair Lending Statement. Please review it and ensure that it is applied to all of our customers.

We look forward to our continued relationship of providing all mortgage applicants equal opportunity and fair treatment. Working together, we can build a business relationship that is sound, profitable, and responsive to customer needs.

Thank you for joining us in this endeavor. If you have any comments or questions about JPMorgan Chase Bank, N.A. 's fair lending policy or practices, please contact us.

Sincerely,

JPMorgan Chase Bank, N.A.

# JPMorgan Chase & Co.

## FAIR LENDING STATEMENT

JPMorgan Chase & Co. (JPMC) is committed to treating all individuals fairly and equitably in the conduct of its lending businesses in all jurisdictions where it conducts its business. This commitment is part of JPMC's fundamental mission of providing quality financial services to existing and prospective customers in accordance with all applicable laws. In the United States, this principle is embodied in fair lending laws such as the Equal Credit Opportunity Act and the Fair Housing Act, as well as applicable state laws. These laws require the equitable treatment of all credit applicants, without regard to race, sex, sexual orientation, color, national origin, religion, age, marital status, disability, familial status, the fact that all or part of the applicant's income derives from a public assistance program, or the fact that the applicant has in good faith exercised any right under the Consumer Credit Protection Act. Denying any person equal access to basic economic opportunities, such as home ownership or credit, based on any of these factors is morally repugnant, has no place in our company and will not be tolerated.

Only through the efforts of all of us at JPMC can we ensure that every applicant for credit receives fair and equitable treatment and that we have helped each member of the communities we serve reach his or her fullest potential.

# Closing Disclosure

*This form is a statement of final loan terms and closing costs. Compare this document with your Loan Estimate.*

**Closing Information**

| | |
|---|---|
| **Date Issued** | 07/26/2024 |
| **Closing Date** | 07/29/2024 |
| **Disbursement Date** | 07/30/2024 |
| **Settlement Agent** | Fidelity National Title Agency, Inc. |
| **File #** | [redacted] |
| **Property** | 24185 Case Ct, Malibu, CA 90265 |
| **Appraised Prop. Value** | $32,000,000.00 |

**Transaction Information**

| | |
|---|---|
| **Borrower** | 600 Spring, LLC<br>Amit Tidhar, Trustee<br>Attn: Barry [redacted] |
| **Lender** | JPMorgan Chase Bank, N.A. |

**Loan Information**

| | |
|---|---|
| **Loan Term** | 30 years |
| **Purpose** | Home Equity |
| **Product** | 7/6 mo. Adjustable Rate |
| **Loan Type** | ☒ Conventional ☐ FHA<br>☐ VA ☐ ________ |
| **Loan ID #** | [redacted] |
| **MIC #** | |

## Loan Terms

| Loan Terms | | Can this amount increase after closing? |
|---|---|---|
| **Loan Amount** | $20,800,000 | **NO** |
| **Interest Rate** | 6.25% | **YES** • Adjusts **every 6 months** starting in year 8<br>• Can go **as high as 11.25%** in year 8<br>• See **AIR Table on page 4** for details |
| **Monthly Principal & Interest**<br>*See Projected Payments below for your Estimated Total Monthly Payment* | $128,069.18 | **YES** • Adjusts **every 6 months** starting in year 8<br>• Can go **as high as $190,031** in year 8 |
| | | **Does the loan have these features?** |
| **Prepayment Penalty** | | **NO** |
| **Balloon Payment** | | **NO** |

## Projected Payments

| Payment Calculation | Years 1-7 | [illegible] | [illegible] | Years 10-30 |
|---|---|---|---|---|
| Principal & Interest | $128,069.18 | $91,632 min<br>$190,031 max | $91,632 min<br>$190,031 max | $91,632 min<br>$190,031 max |
| Mortgage Insurance | + 0.00 | + 0.00 | + 0.00 | + 0.00 |
| Estimated Escrow<br>*Amount can increase over time* | + 0.00 | + 0.00 | + 0.00 | + 0.00 |
| **Estimated Total Monthly Payment** | $128,069.18 | $91,632-<br>$190,031 | $91,632-<br>$190,031 | $91,632-<br>$190,031 |

| | | | |
|---|---|---|---|
| **Estimated Taxes, Insurance & Assessments**<br>*Amount can increase over time*<br>*See page 4 for details* | $49,791.50<br>a month | **This estimate includes**<br>☒ Property Taxes<br>☒ Homeowner's Insurance<br>☒ Other: Homeowner Assn. Dues<br>*See Escrow Account on page 4 for details. You must pay for other property costs separately.* | **In escrow?**<br>NO<br>NO<br>NO |

## Costs at Closing

| | | |
|---|---|---|
| **Closing Costs** | $21,513.97 | Includes $14,109.69 in Loan Costs + $7,404.28 in Other Costs - $0.00 in Lender Credits. *See page 2 for details.* |
| **Cash to Close** | $116,964.58 | Includes Closing Costs. *See Calculating Cash to Close on page 3 for details.*<br>☐ From ☒ To Borrower |

# Closing Cost Details

| Loan Costs | | Borrower-Paid At Closing | Borrower-Paid Before Closing | Paid by Others |
|---|---|---|---|---|
| **A. Origination Charges** | | | | |
| 01 % of Loan Amount (Points) | | | | |
| 02 | | | | |
| 03 | | | | |
| 04 | | | | |
| 05 | | | | |
| 06 | | | | |
| 07 | | | | |
| 08 | | | | |
| **B. Services Borrower Did Not Shop For** | | | | |
| 01 Appraisal Fee | to ASG | $1,600.00 | | |
| 02 Appraisal Re-Inspect Fee | to ASG | $300.00 | | |
| 03 Title - E- Service Fee | to CSC e-recording Services | $4.69 | | |
| 04 Title - Endorsement | to Fidelity National Title Insurance | $25.00 | | |
| 05 Title - Escrow Fee | to Fidelity National Title Agency, Inc. | $550.00 | | |
| 06 Title - Lender's Title Insurance | to Fidelity National Title Insurance | $11,630.00 | | |
| 07 | | | | |
| 08 | | | | |
| 09 | | | | |
| 10 | | | | |
| **C. Services Borrower Did Shop For** | | | | |
| 01 | | | | |
| 02 | | | | |
| 03 | | | | |
| 04 | | | | |
| 05 | | | | |
| 06 | | | | |
| 07 | | | | |
| 08 | | | | |
| **D. TOTAL LOAN COSTS (Borrower-Paid)** | | $14,109.69 | | |
| Loan Costs Subtotals (A + B + C) | | $14,109.69 | $0.00 | |
| **Other Costs** | | | | |
| **E. Taxes and Other Government Fees** | | $281.00 | | |
| 01 Recording Fees | Deed: Mortgage: $206.00 | $281.00 | | |
| 02 | | | | |
| **F. Prepaids** | | | | |
| 01 Homeowner's Insurance Premium ( mo.) | | | | |
| 02 Mortgage Insurance Premium ( mo.) | | | | |
| 03 Prepaid Interest ($3,561.64 per day from 07/30/24 to 08/01/24) | | $7,123.28 | | |
| 04 Property Taxes ( mo.) | | | | |
| 05 | | | | |
| **G. Initial Escrow Payment at Closing** | | | | |
| 01 Homeowner's Insurance | per month for mo. | | | |
| 02 Mortgage Insurance | per month for mo. | | | |
| 03 Property Taxes | per month for mo. | | | |
| 04 | | | | |
| 05 | | | | |
| 06 | | | | |
| 07 | | | | |
| 08 Aggregate Adjustment | | $0.00 | | |
| **H. Other** | | | | |
| 01 | | | | |
| 02 | | | | |
| 03 | | | | |
| 04 | | | | |
| 05 | | | | |
| 06 | | | | |
| 07 | | | | |
| 08 | | | | |
| **I. TOTAL OTHER COSTS (Borrower-Paid)** | | $7,404.28 | | |
| Other Costs Subtotals (E + F + G + H) | | $7,404.28 | | |
| **J. TOTAL CLOSING COSTS (Borrower-Paid)** | | $21,513.97 | | |
| Closing Costs Subtotals (D + I) | | $21,513.97 | $0.00 | |
| Lender Credits | | | | |

## Payoffs and Payments

**Use this table to see a summary of your payoffs and payments to others from your loan amount.**

| TO | [illegible] |
|---|---|
| 01 CTBC Bank FirstPositionMortgageLien | $2,543,373.61 |
| 02 Loan Proceeds to Loan# 1108734873 | $18,118,147.84 |
| 03 | |
| 04 | |
| 05 | |
| 06 | |
| 07 | |
| 08 | |
| 09 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| **K. TOTAL PAYOFFS AND PAYMENTS** | **$20,661,521.45** |

## Calculating Cash to Close

**Use this table to see what has changed from your Loan Estimate.**

| | [illegible] | [illegible] | [illegible] |
|---|---|---|---|
| Loan Amount | $20,800,000 | $20,800,000.00 | **NO** |
| Total Closing Costs (J) | – $47,476 | – $21,513.97 | **YES** • See **Total Loan Costs (D)** and **Total Other Costs (I)** |
| Closing Costs Paid Before Closing | $0 | $0 | **NO** |
| Total Payoffs and Payments (K) | – $28,518,322 | – $20,661,521.45 | **YES** • See **Payoffs and Payments (K)** |
| **Cash to Close** | $7,765,798<br>☒ From ☐ To Borrower | $116,964.58<br>☐ From ☒ To Borrower | Closing Costs Financed (Paid from your Loan Amount) $21,513.97 |

# Additional Information About This Loan

## Loan Disclosures

**Assumption**
If you sell or transfer this property to another person, your lender

- ☐ will allow, under certain conditions, this person to assume this loan on the original terms.
- ☒ will not allow assumption of this loan on the original terms.

**Demand Feature**
Your loan

- ☐ has a demand feature, which permits your lender to require early repayment of the loan. You should review your note for details.
- ☒ does not have a demand feature.

**Late Payment**
If your payment is more than *15* days late, your lender will charge a late fee of *5 percent of the monthly principal and interest payment.*

**Negative Amortization** (Increase in Loan Amount)
Under your loan terms, you

- ☐ are scheduled to make monthly payments that do not pay all of the interest due that month. As a result, your loan amount will increase (negatively amortize), and your loan amount will likely become larger than your original loan amount. Increases in your loan amount lower the equity you have in this property.
- ☐ may have monthly payments that do not pay all of the interest due that month. If you do, your loan amount will increase (negatively amortize), and, as a result, your loan amount may become larger than your original loan amount. Increases in your loan amount lower the equity you have in this property.
- ☒ do not have a negative amortization feature.

**Partial Payments**
Your lender

- ☒ may accept payments that are less than the full amount due (partial payments) and apply them to your loan.
- ☒ may hold them in a separate account until you pay the rest of the payment, and then apply the full payment to your loan.
- ☐ does not accept any partial payments.

If this loan is sold, your new lender may have a different policy.

**Security Interest**
You are granting a security interest in
*the real property located at: 24185 Case Ct, Malibu, CA 90265*

You may lose this property if you do not make your payments or satisfy other obligations for this loan.

**Escrow Account**
***For now,*** your loan

- ☐ will have an escrow account (also called an "impound" or "trust" account) to pay the property costs listed below. Without an escrow account, you would pay them directly, possibly in one or two large payments a year. Your lender may be liable for penalties and interest for failing to make a payment.

| | | |
|---|---|---|
| Escrowed Property Costs over Year 1 | | Estimated total amount over year 1 for your escrowed property costs: |
| Non-Escrowed Property Costs over Year 1 | | Estimated total amount over year 1 for your non-escrowed property costs:<br><br>You may have other property costs. |
| Initial Escrow Payment | | A cushion for the escrow account you pay at closing. See Section G on page 2. |
| Monthly Escrow Payment | | The amount included in your total monthly payment. |

- ☒ will not have an escrow account because ☒ you declined it ☐ your lender does not offer one. You must directly pay your property costs, such as taxes and homeowner's insurance. Contact your lender to ask if your loan can have an escrow account.

| | | |
|---|---|---|
| Estimated Property Costs over Year 1 | $597,498.00 | Estimated total amount over year 1. You must pay these costs directly, possibly in one or two large payments a year. |
| Escrow Waiver Fee | | |

***In the future,***
Your property costs may change and, as a result, your escrow payment may change. You may be able to cancel your escrow account, but if you do, you must pay your property costs directly. If you fail to pay your property taxes, your state or local government may (1) impose fines and penalties or (2) place a tax lien on this property. If you fail to pay any of your property costs, your lender may (1) add the amounts to your loan balance, (2) add an escrow account to your loan, or (3) require you to pay for property insurance that the lender buys on your behalf, which likely would cost more and provide fewer benefits than what you could buy on your own.

## Adjustable Interest Rate (AIR) Table

| | |
|---|---|
| Index + Margin | 30-day average SOFR + 2.75% |
| Initial Interest Rate | 6.25% |
| Minimum/Maximum Interest Rate | 2.75%/11.25% |
| **Change Frequency** | |
| First Change | Beginning of 85th month |
| Subsequent Changes | Every 6 months after first change |
| **Limits on Interest Rate Changes** | |
| First Change | 5% |
| Subsequent Changes | 1% |

## Loan Calculations

| | |
|---|---|
| **Total of Payments.** Total you will have paid after you make all payments of principal, interest, mortgage insurance, and loan costs, as scheduled. | $52,208,781.26 |
| **Finance Charge.** The dollar amount the loan will cost you. | $31,395,226.26 |
| **Amount Financed.** The loan amount available after paying your upfront finance charge. | $20,792,322.03 |
| **Annual Percentage Rate (APR).** Your costs over the loan term expressed as a rate. This is not your interest rate. | 7.137% |
| **Total Interest Percentage (TIP).** The total amount of interest that you will pay over the loan term as a percentage of your loan amount. | 150.936% |

**?** **Questions?** If you have questions about the loan terms or costs on this form, use the contact information below. To get more information or make a complaint, contact the Consumer Financial Protection Bureau at **www.consumerfinance.gov/mortgage-closing**

## Other Disclosures

**Appraisal**
If the property was appraised for your loan, your lender is required to give you a copy at no additional cost at least 3 days before closing. If you have not yet received it, please contact your lender at the information listed below.

**Contract Details**
See your note and security instrument for information about
- what happens if you fail to make your payments,
- what is a default on the loan,
- situations in which your lender can require early repayment of the loan, and
- the rules for making payments before they are due.

**Liability after Foreclosure**
If your lender forecloses on this property and the foreclosure does not cover the amount of unpaid balance on this loan,

☒ state law may protect you from liability for the unpaid balance. If you refinance or take on any additional debt on this property, you may lose this protection and have to pay any debt remaining even after foreclosure. You may want to consult a lawyer for more information.

☐ state law does not protect you from liability for the unpaid balance.

**Refinance**
Refinancing this loan will depend on your future financial situation, the property value, and market conditions. You may not be able to refinance this loan.

**Tax Deductions**
If you borrow more than this property is worth, the interest on the loan amount above this property's fair market value is not deductible from your federal income taxes. You should consult a tax advisor for more information.

## Contact Information

| | | | |
|---|---|---|---|
| **Name** | JPMorgan Chase Bank, N.A. | | Fidelity National Title Agency, Inc. |
| **Address** | 2500 Westfield Dr, Floor 2-1<br>Elgin, IL 60124 | | 20445 State Hwy 249 Suite 110<br>Houston, TX 77070 |
| **NMLS ID** | 399798 | | |
| **CA License ID** | | | 1876657 |
| **Contact** | Bruce Wayne Brewer | | Shaun Bor |
| **Contact NMLS ID** | 514039 | | |
| **Contact CA License ID** | | | 1885901-614192 |
| **Email** | bruce.w.brewer@jpmorgan.com | | shaun.bor@fnf.com |
| **Phone** | (713) 548-6978 | | (281) 671-5530 |

## Confirm Receipt

See Addendum for additional signature information.

By signing, you are only confirming that you have received this form. You do not have to accept this loan because you have signed or received this form.

7-29-24

Amit Tidhar, Trustee of the The Brshy Irrevocable Trust    Date

# Closing Disclosure Addendum

**Date Issued** 07/26/2024

**Borrower**

600 Spring, LLC
Attn: Barry
[redacted]

Amit Tidhar, Trustees of the The Brshy Irrevocable Trust
Attn: Barry
[redacted]

## Confirm Receipt

By signing, you are only confirming that you have received the Closing Disclosure and Closing Disclosure Addendum. You do not have to accept this loan because you have signed or received the Closing Disclosure and Closing Disclosure Addendum.

**600 Spring, LLC**
*a California limited liability company*

7-29-24

Scott Gillen — Date
*Manager*

7-29-24

Barry Shy — Date
*Manager*

7-29-24

Amit Tidhar, Trustee of the The Brshy Irrevocable Trust — Date

# Fixed/Adjustable Rate Note

## (30-day Average SOFR Index (As Published by the Federal Reserve Bank of New York)-Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES I MUST PAY.**

| | | |
|---|---|---|
| July 29, 2024 | Malibu | California |
| [Note Date] | [City] | [State] |

24185 Case Ct, Malibu, CA 90265
[Property Address]

**1. Borrower's Promise to Pay.** In return for a loan in the amount of U.S. $20,800,000.00 (the *"Principal"*) that I have received from JPMorgan Chase Bank, N.A. (the *"Lender"*), I promise to pay the Principal, plus interest, to the order of the Lender. I will make all payments under this Note in U.S. currency in the form of cash, check, money order, or other payment method accepted by Lender.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the *"Note Holder."*

**2. Interest.** Interest will be charged on unpaid Principal until the full amount of the Principal has been paid. I will pay interest at a yearly rate of 6.25%. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. Payments.**

**(A) Time and Place of Payments.** I will pay principal and interest by making a payment every month. This amount is called my *"Monthly Payment."*

I will make my Monthly Payment on the first day of each month beginning on September 1, 2024. I will make these payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each Monthly Payment will be applied as of its scheduled due date and will be applied to interest before the Principal. If, on August 1, 2054, I still owe amounts under this Note, I will pay those amounts on that date, which is called the *"Maturity Date."*

I will make my Monthly Payments at PB Collateral Trailing Docs, Mailcode LA4-8000, 700 Kansas Ln, Monroe, LA 71203 or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments.** Each of my initial Monthly Payments will be in the amount of U.S. $128,069.18. This amount may change. This payment amount does not include any property taxes, insurance, or other charges that I may be required to pay each month.

**(C) Monthly Payment Changes.** Changes in my Monthly Payment will reflect changes in the unpaid Principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my Monthly Payment in accordance with Section 4 of this Note.

**4. Adjustable Interest Rate and Monthly Payment Changes.**

**(A) Change Dates.** The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of August, 2031, and the adjustable interest rate I will pay may change on the first day of the month every 6th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change is called a *"Change Date."*

**(B) The Index.** Beginning with the first Change Date, my adjustable interest rate will be based on an Index that is calculated and provided to the general public by an administrator (the *"Administrator"*). The *"Index"* is a benchmark, known as the 30-day Average SOFR index. The Index is currently published by the Federal Reserve Bank of New York. The most recent Index value available as of the date 45 days before each Change Date is called the *"Current Index,"* provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, it will be replaced in accordance with Section 4(G) below.

**(C) Calculation of Changes.** Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three quarters percentage points (2.750%) (the *"Margin"*) to the Current Index. The Margin may change if the Index is replaced by the Note Holder in accordance with Section 4(G)(2) below. The Note Holder will then round the result of the Margin plus the Current Index to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the Monthly Payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Change Date on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my Monthly Payment.

**(D) Limits on Interest Rate Changes.** The interest rate I am required to pay at the first Change Date will not be greater than 11.25% or less than 2.75%. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.0%) from the rate of interest I have been paying for the preceding 6 months, and will never be greater than 11.25% or less than 2.75%.

**(E) Effective Date of Changes.** My new interest rate will become effective on each Change Date. I will pay the amount of my new Monthly Payment beginning on the first Monthly Payment date after the Change Date until the amount of my Monthly Payment changes again.

**(F) Notice of Changes.** The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my Monthly Payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Replacement Index and Replacement Margin.** The Index is deemed to be no longer available and will be replaced if any of the following events (each, a *"Replacement Event"*) occur: (i) the Administrator has permanently or indefinitely stopped providing the Index to the general public; or (ii) the Administrator or its regulator issues an official public statement that the Index is no longer reliable or representative.

If a Replacement Event occurs, the Note Holder will select a new index (the *"Replacement Index"*) and may also select a new margin (the *"Replacement Margin"*), as follows:

1. If a replacement index has been selected or recommended for use in consumer products, including residential adjustable-rate mortgages, by the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, or a committee endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York at the time of a Replacement Event, the Note Holder will select that index as the Replacement Index.
2. If a replacement index has not been selected or recommended for use in consumer products under Section (G)(1) at the time of a Replacement Event, the Note Holder will make a reasonable, good faith effort to select a Replacement Index and a Replacement Margin that, when added together, the Note Holder reasonably expects will minimize any change in the cost of the loan, taking into account the historical performance of the Index and the Replacement Index.

The Replacement Index and Replacement Margin, if any, will be operative immediately upon a Replacement Event and will be used to determine my interest rate and Monthly Payments on Change Dates that are more than 45 days after a Replacement Event. The Index and Margin could be replaced more than once during the term of my Note, but only if another Replacement Event occurs. After a Replacement Event, all references to the "Index" and "Margin" will be deemed to be references to the "Replacement Index" and "Replacement Margin."

The Note Holder will also give me notice of my Replacement Index and Replacement Margin, if any, and such other information required by applicable law and regulation.

**5. Borrower's Right to Prepay.** I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a *"Prepayment."* When I make a Prepayment, I will notify the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the Monthly Payments then due under this Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my Monthly Payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my Monthly Payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. Loan Charges.** If applicable law sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit, and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. Borrower's Failure to Pay as Required.**

**(A) Late Charges for Overdue Payments.** If the Note Holder has not received the full amount of any Monthly Payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue Monthly Payment. I will pay this late charge promptly but only once on each late payment.

**(B) Default.** If I do not pay the full amount of each Monthly Payment on the date it is due, I will be in default.

**(C) Notice of Default.** If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of unpaid Principal, all the interest that I owe on that amount, and other charges due under this Note (the *"Default Balance"*). That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver by Note Holder.** If I am in default and the Note Holder does not require me to pay the Default Balance immediately as described above, the Note Holder will still have the right to do so if I continue to be in default or if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses.** If the Note Holder has required me to pay the Default Balance immediately as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees and costs.

**8. Giving of Notices.**

**(A) Notice to Borrower.** Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it, or by mailing it by first class mail, to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address. I will promptly notify the Note Holder of any change to my physical address and of any change to my mailing address. Unless applicable law requires otherwise, notice may instead be sent by e-mail or other electronic communication if agreed to by me and the Note Holder in writing and if I have provided the Note Holder with my current e-mail address or other electronic address. If I have agreed with the Note Holder that notice may be given by e-mail or other electronic communication, I will promptly notify the Note Holder of any changes to my e-mail address or other electronic address.

**(B) Notice to Note Holder.** Any notice that I must give to the Note Holder under this Note will be delivered by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. Obligations of Persons Under This Note.** If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. Waivers.** I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. *"Presentment"* means the right to require the Note Holder to demand payment of amounts due. *"Notice of Dishonor"* means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. Uniform Secured Note.** This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Mortgage Deed, Deed of Trust, or Security Deed, as amended by the Fixed/Adjustable Rate Rider (the *"Security Instrument"*), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument also describes how and under what conditions I may be required to make immediate payment of all amounts I owe under this Note. Some of those conditions are described as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Section 19 of the Security Instrument will read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** For purposes of this Section 19 only, *"Interest in the Property"* means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract, or escrow agreement, the intent of which is the transfer of title by Borrower to a purchaser at a future date.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16, within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Section 19 of the Security Instrument described in Section 11(A) above will then cease to be in effect, and Section 19 of the Security Instrument will instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** For purposes of this Section 19 only, *"Interest in the Property"* means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract, or escrow agreement, the intent of which is the transfer of title by Borrower to a purchaser at a future date.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law. Lender also will not exercise this option if (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises this option to require immediate payment in full, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

**Borrower**

**600 Spring, LLC**
*a California limited liability company*

7-29-24

**Scott Gillen** **Date**
*Manager* *Seal*

7-29-24

**Barry Shy** **Date**
*Manager* *Seal*

**Amit Tidhar** *Seal*
*Trustee of the The Brshy Irrevocable Trust*

[Sign Original Only]

Loan Origination Organization: JPMorgan Chase Bank, N.A.

NMLS ID: 399798

Loan Originator: Bruce Wayne Brewer

NMLS ID: 514039

**Recording Requested By:** Fidelity National Title Agency, Inc.

**Return To:** Chase Record Center
PB Collateral Trailing Docs
Mailcode LA4-8000, 700 Kansas Ln
Monroe, LA 71203

**Prepared By:** Emily Wang
J.P. Morgan
2500 Westfield Dr, Floor 1-2
Mail Code IL1-6352
Elgin, IL 60124-7836

**Assessor's Identification Number:** 4458-018-035

**Property Address:**
24185 Case Ct
Malibu, CA 90265

[redacted]

# Deed of Trust

**Definitions.** Words used in multiple sections of this document are defined below and other words are defined under the caption TRANSFER OF RIGHTS IN THE PROPERTY and in Sections 3, 4, 10, 11, 12, 16, 19, 24, and 25. Certain rules regarding the usage of words used in this document are also provided in Section 17.

**Parties**

**(A)** *"Borrower"* is 600 SPRING, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, currently residing at 3464 Sweetwater Mesa Rd, Malibu, CA, 90265-4922. Borrower is the trustor under this Security Instrument.

**(B)** *"Lender"* is JPMorgan Chase Bank, N.A.. Lender is a national bank organized and existing under the laws of the United States of America. Lender's address is 2500 Westfield Dr, Floor 2-1, Elgin, IL 60124. Lender is the beneficiary under this Security Instrument. The term "Lender" includes any successors and assigns of Lender.

**(C)** *"Trustee"* is JPMorgan Chase Bank, NA. Trustee's address is 2500 Westfield Dr, Floor 2-1, Elgin, IL 60124. The term "Trustee" includes any substitute/successor Trustee.

**Documents**

**(D)** *"Note"* means the promissory note dated July 29, 2024, and signed by each Borrower who is legally obligated for the debt under that promissory note, that is in either (i) paper form, using Borrower's written pen and ink signature, or (ii) electronic form, using Borrower's adopted Electronic Signature in accordance with the UETA or E-SIGN, as applicable. The Note evidences the legal obligation of each Borrower who signed the Note to pay Lender Twenty million eight hundred thousand and 00/100 Dollars (U.S. $20,800,000.00) plus interest. Each Borrower who signed the Note has promised to pay this debt in regular monthly payments and to pay the debt in full not later than August 1, 2054.

**(E)** *"Riders"* means all Riders to this Security Instrument that are signed by Borrower. All such Riders are incorporated into and deemed to be a part of this Security Instrument. The following Riders are to be signed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☒ Planned Unit Development Rider | |
| ☒ Second Home Rider | ☐ VA Rider | |

**(F)** *"Security Instrument"* means this document, which is dated July 29, 2024, together with all Riders to this document.

**Additional Definitions**

**(G)** *"Applicable Law"* means all controlling applicable federal, state, and local statutes, regulations, ordinances, and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(H)** *"Community Association Dues, Fees, and Assessments"* means all dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association, or similar organization.

**(I)** *"Default"* means: (i) the failure to pay any Periodic Payment or any other amount secured by this Security Instrument on the date it is due; (ii) a breach of any representation, warranty, covenant, obligation, or agreement in this Security Instrument; (iii) any materially false, misleading, or inaccurate information or statement to Lender provided by Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent, or failure to provide Lender with material information in connection with the Loan, as described in Section 8; or (iv) any action or proceeding described in Section 12(e).

**(J)** *"Electronic Fund Transfer"* means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone or other electronic device capable of communicating with such financial institution, wire transfers, and automated clearinghouse transfers.

**(K)** *"Electronic Signature"* means an "Electronic Signature" as defined in the UETA or E-SIGN, as applicable.

**(L)** *"E-SIGN"* means the Electronic Signatures in Global and National Commerce Act (15 *U.S.C.* § 7001 et seq.), as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.

**(M)** *"Escrow Items"* means: (i) taxes and assessments and other items that can attain priority over this Security Instrument as a lien or encumbrance on the Property; (ii) leasehold payments or ground rents on the Property, if any; (iii) premiums for any and all insurance required by Lender under Section 5; (iv) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 11; and (v) Community Association Dues, Fees, and Assessments if Lender requires that they be escrowed beginning at Loan closing or at any time during the Loan term.

**(N)** *"Loan"* means the debt obligation evidenced by the Note, plus interest, any prepayment charges, costs, expenses, and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(O)** *"Loan Servicer"* means the entity that has the contractual right to receive Borrower's Periodic Payments and any other payments made by Borrower, and administers the Loan on behalf of Lender. Loan Servicer does not include a sub-servicer, which is an entity that may service the Loan on behalf of the Loan Servicer.

**(P)** *"Miscellaneous Proceeds"* means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(Q)** *"Mortgage Insurance"* means insurance protecting Lender against the nonpayment of, or Default on, the Loan.

**(R)** *"Partial Payment"* means any payment by Borrower, other than a voluntary prepayment permitted under the Note, which is less than a full outstanding Periodic Payment.

**(S)** *"Periodic Payment"* means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3.

**(T)** *"Property"* means the property described below under the heading "TRANSFER OF RIGHTS IN THE PROPERTY."

**(U)** *"Rents"* means all amounts received by or due Borrower in connection with the lease, use, and/or occupancy of the Property by a party other than Borrower.

**(V)** *"RESPA"* means the Real Estate Settlement Procedures Act (12 *U.S.C.* § 2601 et seq.) and its implementing regulation, Regulation X (12 *C.F.R.* Part 1024), as they may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter. When used in this Security Instrument, "RESPA" refers to all requirements and restrictions that would apply to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(W)** *"Successor in Interest of Borrower"* means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**(X)** "*UETA*" means the *Uniform Electronic Transactions Act*, as enacted by the jurisdiction in which the Property is located, as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.

**Transfer of Rights in the Property.** This Security Instrument secures to Lender (i) the repayment of the Loan, and all renewals, extensions, and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of Los Angeles:

See Attached Schedule A

Parcel ID Number(s): 4458-018-035

which currently has the address of 24185 Case Ct, Malibu, California 90265 ("*Property Address*");

TOGETHER WITH all the improvements now or subsequently erected on the property, including replacements and additions to the improvements on such property, all property rights, including, without limitation, all easements, appurtenances, Rents, issues and profits thereof, royalties, mineral rights, oil or gas rights or profits, water rights, miscellaneous proceeds, insurance proceeds, and fixtures now or subsequently a part of the property. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER REPRESENTS, WARRANTS, COVENANTS, AND AGREES that: (i) Borrower lawfully owns and possesses the Property conveyed in this Security Instrument in fee simple or lawfully has the right to use and occupy the Property under a leasehold estate; (ii) Borrower has the right to grant and convey the Property or Borrower's leasehold interest in the Property; and (iii) the Property is unencumbered, and not subject to any other ownership interest in the Property, except for encumbrances and ownership interests of record. Borrower warrants generally the title to the Property and covenants and agrees to defend the title to the Property against all claims and demands, subject to any encumbrances and ownership interests of record as of Loan closing.

THIS SECURITY INSTRUMENT combines uniform covenants for national use with limited variations and non-uniform covenants that reflect specific California state requirements to constitute a uniform security instrument covering real property.

**Uniform Covenants.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower will pay each Periodic Payment when due. Borrower will also pay any prepayment charges and late charges due under the Note, and any other amounts due under this Security Instrument. Payments due under the Note and this Security Instrument must be made in U.S. currency. If any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (d) Electronic Fund Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in

Section 16. Lender may accept or return any Partial Payments in its sole discretion pursuant to Section 2.

Any offset or claim that Borrower may have now or in the future against Lender will not relieve Borrower from making the full amount of all payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

## 2. Acceptance and Application of Payments or Proceeds.

**(a) Acceptance and Application of Partial Payments.** Lender may accept and either apply or hold in suspense Partial Payments in its sole discretion in accordance with this Section 2. Lender is not obligated to accept any Partial Payments or to apply any Partial Payments at the time such payments are accepted, and also is not obligated to pay interest on such unapplied funds. Lender may hold such unapplied funds until Borrower makes payment sufficient to cover a full Periodic Payment, at which time the amount of the full Periodic Payment will be applied to the Loan. If Borrower does not make such a payment within a reasonable period of time, Lender will either apply such funds in accordance with this Section 2 or return them to Borrower. If not applied earlier, Partial Payments will be credited against the total amount due under the Loan in calculating the amount due in connection with any foreclosure proceeding, payoff request, loan modification, or reinstatement. Lender may accept any payment insufficient to bring the Loan current without waiver of any rights under this Security Instrument or prejudice to its rights to refuse such payments in the future.

**(b) Order of Application of Partial Payments and Periodic Payments.** Except as otherwise described in this Section 2, if Lender applies a payment, such payment will be applied to each Periodic Payment in the order in which it became due, beginning with the oldest outstanding Periodic Payment, as follows: first to interest and then to principal due under the Note, and finally to Escrow Items. If all outstanding Periodic Payments then due are paid in full, any payment amounts remaining may be applied to late charges and to any amounts then due under this Security Instrument. If all sums then due under the Note and this Security Instrument are paid in full, any remaining payment amount may be applied, in Lender's sole discretion, to a future Periodic Payment or to reduce the principal balance of the Note.

If Lender receives a payment from Borrower in the amount of one or more Periodic Payments and the amount of any late charge due for a delinquent Periodic Payment, the payment may be applied to the delinquent payment and the late charge.

When applying payments, Lender will apply such payments in accordance with Applicable Law.

**(c) Voluntary Prepayments.** Voluntary prepayments will be applied as described in the Note.

**(d) No Change to Payment Schedule.** Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date, or change the amount, of the Periodic Payments.

## 3. Funds for Escrow Items.

**(a) Escrow Requirement; Escrow Items.** Borrower must pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum of money to provide for payment of amounts due for all Escrow Items (the *"Funds"*). The amount of the Funds required to be paid each month may change during the term of the Loan. Borrower must promptly furnish to Lender all notices or invoices of amounts to be paid under this Section 3.

**(b) Payment of Funds; Waiver.** Borrower must pay Lender the Funds for Escrow Items unless Lender waives this obligation in writing, or unless prohibited by Applicable Law. Lender may waive this obligation for any Escrow Item at any time. In the event of such waiver or prohibition, Borrower must pay directly, when and where payable, the amounts due for any Escrow Items and Lender may require Borrower to provide proof of direct payment of those items within such time period as Lender may require. Borrower's obligation to make such timely payments and to provide proof of payment is deemed to be a covenant and agreement of Borrower under this Security Instrument. If Borrower is obligated to pay Escrow Items directly, and Borrower fails to pay timely the amount due for an Escrow Item, Lender may exercise its rights under Section 9 to pay such amount and Borrower will be obligated to repay to Lender any such amount in accordance with Section 9.

Unless prohibited by Applicable Law, Lender may withdraw the waiver as to any or all Escrow Items at any time by giving a notice in accordance with Section 16; upon such withdrawal, Borrower must pay to Lender all Funds for such Escrow Items, and in such amounts, that are then required under this Section 3.

**(c) Amount of Funds; Application of Funds.** Lender may, at any time, collect and hold Funds in an amount up to, but not in excess of, the maximum amount a lender can require under RESPA. Lender will estimate the amount of Funds due in accordance with Applicable Law.

The Funds will be held in an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender will apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender may not charge Borrower for: (i) holding and applying the Funds; (ii) annually analyzing the escrow account; or (iii) verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless Lender and Borrower agree in writing or Applicable Law requires interest to be paid on the Funds, Lender will not be required to pay Borrower any interest or earnings on the Funds. Lender will give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

**(d) Surplus; Shortage and Deficiency of Funds.** In accordance with RESPA, if there is a surplus of Funds held in escrow, Lender will account to Borrower for such surplus. If Borrower's Periodic Payment is delinquent by more than 30 days, Lender may retain the surplus in the escrow account for the payment of the Escrow Items. If there is a shortage or deficiency of Funds held in escrow, Lender will notify Borrower and Borrower will pay to Lender the amount necessary to make up the shortage or deficiency in accordance with RESPA.

Upon payment in full of all sums secured by this Security Instrument, Lender will promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower must pay (a) all taxes, assessments, charges, fines, and impositions attributable to the Property which have priority or may attain priority over this Security Instrument, (b) leasehold payments or ground rents on the Property, if any, and (c) Community Association Dues, Fees, and Assessments, if any. If any of these items are Escrow Items, Borrower will pay them in the manner provided in Section 3.

Borrower must promptly discharge any lien that has priority or may attain priority over this Security Instrument unless Borrower: (aa) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing under such agreement; (bb) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which Lender determines, in its sole discretion, operate to prevent the enforcement of the lien while

those proceedings are pending, but only until such proceedings are concluded; or (cc) secures from the holder of the lien an agreement satisfactory to Lender that subordinates the lien to this Security Instrument (collectively, the *"Required Actions"*). If Lender determines that any part of the Property is subject to a lien that has priority or may attain priority over this Security Instrument and Borrower has not taken any of the Required Actions in regard to such lien, Lender may give Borrower a notice identifying the lien. Within 10 days after the date on which that notice is given, Borrower must satisfy the lien or take one or more of the Required Actions.

**5. Property Insurance.**

**(a) Insurance Requirement; Coverages.** Borrower must keep the improvements now existing or subsequently erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes, winds, and floods, for which Lender requires insurance. Borrower must maintain the types of insurance Lender requires in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan, and may exceed any minimum coverage required by Applicable Law. Borrower may choose the insurance carrier providing the insurance, subject to Lender's right to disapprove Borrower's choice, which right will not be exercised unreasonably.

**(b) Failure to Maintain Insurance.** If Lender has a reasonable basis to believe that Borrower has failed to maintain any of the required insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and at Borrower's expense. Unless required by Applicable Law, Lender is under no obligation to advance premiums for, or to seek to reinstate, any prior lapsed coverage obtained by Borrower. Lender is under no obligation to purchase any particular type or amount of coverage and may select the provider of such insurance in its sole discretion. Before purchasing such coverage, Lender will notify Borrower if required to do so under Applicable Law. Any such coverage will insure Lender, but might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard, or liability and might provide greater or lesser coverage than was previously in effect, but not exceeding the coverage required under Section 5(a). Borrower acknowledges that the cost of the insurance coverage so obtained may significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender for costs associated with reinstating Borrower's insurance policy or with placing new insurance under this Section 5 will become additional debt of Borrower secured by this Security Instrument. These amounts will bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

**(c) Insurance Policies.** All insurance policies required by Lender and renewals of such policies: (i) will be subject to Lender's right to disapprove such policies; (ii) must include a standard mortgage clause; and (iii) must name Lender as mortgagee and/or as an additional loss payee, and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender will have the right to hold the policies and renewal certificates. If Lender requires, Borrower will promptly give to Lender proof of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy must include a standard mortgage clause and must name Lender as mortgagee and/or as an additional loss payee, and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

**(d) Proof of Loss; Application of Proceeds.** In the event of loss, Borrower must give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Any insurance proceeds, whether or not the underlying insurance was required by Lender, will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and determines that Lender's security will not be lessened by such restoration or repair.

If the Property is to be repaired or restored, Lender will disburse from the insurance proceeds any initial amounts that are necessary to begin the repair or restoration, subject to any restrictions applicable to Lender. During the subsequent repair and restoration period, Lender will have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. Lender will not be required to pay Borrower any interest or earnings on such insurance proceeds unless Lender and Borrower agree in writing or Applicable Law requires otherwise. Fees for public adjusters, or other third parties, retained by Borrower will not be paid out of the insurance proceeds and will be the sole obligation of Borrower.

If, in accordance with Applicable Law, Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the insurance proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

**(e) Insurance Settlements; Assignment of Proceeds.** If Borrower abandons the Property, Lender may file, negotiate, and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 26 or otherwise, Borrower is unconditionally assigning to Lender (i) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note and this Security Instrument, and (ii) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, to the extent that such rights are applicable to the coverage of the Property. If Lender files, negotiates, or settles a claim, Borrower agrees that any insurance proceeds may be made payable directly to Lender without the need to include Borrower as an additional loss payee. Lender may use the insurance proceeds either to repair or restore the Property (as provided in Section 5(d)) or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due, in accordance with Applicable Law.

**6. Occupancy.** Borrower must occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and must continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent will not be unreasonably withheld, or unless extenuating circumstances exist that are beyond Borrower's control.

**7. Preservation, Maintenance, and Protection of the Property; Inspections.** Borrower will not destroy, damage, or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower must maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless Lender determines pursuant to Section 5 that repair or restoration is not economically feasible, Borrower will promptly repair the Property if damaged to avoid further deterioration or damage.

If insurance or condemnation proceeds are paid to Lender in connection with damage to, or the taking of, the Property, Borrower will be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower remains obligated to complete such repair or restoration.

Lender may make reasonable entries upon and inspections of the Property. If Lender has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender will give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower will be in Default if, during the Loan application process, Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan, including, but not limited to, overstating Borrower's income or assets, understating or failing to provide documentation of Borrower's debt obligations and liabilities, and misrepresenting Borrower's occupancy or intended occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**

**(a) Protection of Lender's Interest.** If: (i) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (ii) there is a legal proceeding or government order that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien that has priority or may attain priority over this Security Instrument, or to enforce laws or regulations); or (iii) Lender reasonably believes that Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and/or rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions may include, but are not limited to: (I) paying any sums secured by a lien that has priority or may attain priority over this Security Instrument; (II) appearing in court; and (III) paying: (A) reasonable attorneys' fees and costs; (B) property inspection and valuation fees; and (C) other fees incurred for the purpose of protecting Lender's interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, exterior and interior inspections of the Property, entering the Property to make repairs, changing locks, replacing or boarding up doors and windows, draining water from pipes, eliminating building or other code violations or dangerous conditions, and having utilities turned on or off. Although Lender may take action under this Section

9, Lender is not required to do so and is not under any duty or obligation to do so. Lender will not be liable for not taking any or all actions authorized under this Section 9.

**(b) Avoiding Foreclosure; Mitigating Losses.** If Borrower is in Default, Lender may work with Borrower to avoid foreclosure and/or mitigate Lender's potential losses, but is not obligated to do so unless required by Applicable Law. Lender may take reasonable actions to evaluate Borrower for available alternatives to foreclosure, including, but not limited to, obtaining credit reports, title reports, title insurance, property valuations, subordination agreements, and third-party approvals. Borrower authorizes and consents to these actions. Any costs associated with such loss mitigation activities may be paid by Lender and recovered from Borrower as described below in Section 9(c), unless prohibited by Applicable Law.

**(c) Additional Amounts Secured.** Any amounts disbursed by Lender under this Section 9 will become additional debt of Borrower secured by this Security Instrument. These amounts may bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

**(d) Leasehold Terms.** If this Security Instrument is on a leasehold, Borrower will comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title will not merge unless Lender agrees to the merger in writing.

## 10. Assignment of Rents.

**(a) Assignment of Rents.** If the Property is leased to, used by, or occupied by a third party ("*Tenant*"), Borrower is unconditionally assigning and transferring to Lender any Rents, regardless of to whom the Rents are payable. This assignment of Rents constitutes a perfected, absolute and present assignment. Lender grants to Borrower a license to collect, but not prior to accrual, and retain the Rents; however, upon the occurrence and during the continuance of an event of Default, Borrower's license to collect and retain the Rents will immediately terminate. Under this license, Borrower will receive the Rents until (i) Lender has given Borrower notice of Default pursuant to Section 26, and (ii) Lender has given notice to the Tenant that the Rents are to be paid to Lender. This Section 10 constitutes an absolute assignment and not an assignment for additional security only.

**(b) Notice of Default.** If Lender gives notice of Default to Borrower, all of the following will apply, unless prohibited by Applicable Law: (i) all Rents received by Borrower must be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender will be entitled to collect and receive all of the Rents; (iii) Borrower agrees to instruct each Tenant that Tenant is to pay all Rents due and unpaid to Lender upon Lender's written demand to the Tenant; (iv) Borrower will ensure that each Tenant pays all Rents due to Lender and will take whatever action is necessary to collect such Rents if not paid to Lender; (v) unless Applicable Law provides otherwise, all Rents collected by Lender will be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, reasonable attorneys' fees and costs, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments, and other charges on the Property, and then to any other sums secured by this Security Instrument; (vi) Lender, or any judicially appointed receiver, will be liable to account for only those Rents actually received; and (vii) Lender will be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

**(c) Funds Paid by Lender.** If the Rents are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents, any funds paid by Lender for such purposes will become indebtedness of Borrower to Lender secured by this Security Instrument pursuant to Section 9.

**(d) Limitation on Collection of Rents.** Borrower may not collect any of the Rents more than one month in advance of the time when the Rents become due, except for security or similar deposits.

**(e) No Other Assignment of Rents.** Borrower represents, warrants, covenants, and agrees that Borrower has not signed any prior assignment of the Rents, will not make any further assignment of the Rents, and has not performed, and will not perform, any act that could prevent Lender from exercising its rights under this Security Instrument.

**(f) Control and Maintenance of the Property.** Unless required by Applicable Law, Lender, or a receiver appointed under Applicable Law, is not obligated to enter upon, take control of, or maintain the Property before or after giving notice of Default to Borrower. However, Lender, or a receiver appointed under Applicable Law, may do so at any time when Borrower is in Default, subject to Applicable Law.

**(g) Additional Provisions.** Any application of the Rents will not cure or waive any Default or invalidate any other right or remedy of Lender. This Section 10 does not relieve Borrower of Borrower's obligations under Section 6.

This Section 10 will terminate when all the sums secured by this Security Instrument are paid in full.

## 11. Mortgage Insurance.

**(a) Payment of Premiums; Substitution of Policy; Loss Reserve; Protection of Lender.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower will pay the premiums required to maintain the Mortgage Insurance in effect. If Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, and (i) the Mortgage Insurance coverage required by Lender ceases for any reason to be available from the mortgage insurer that previously provided such insurance, or (ii) Lender determines in its sole discretion that such mortgage insurer is no longer eligible to provide the Mortgage Insurance coverage required by Lender, Borrower will pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Borrower will continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use, and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve will be non-refundable, even when the Loan is paid in full, and Lender will not be required to pay Borrower any interest or earnings on such loss reserve, unless required by Applicable Law.

Lender will no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower will pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable

loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 11 affects Borrower's obligation to pay interest at the Note rate.

**(b) Mortgage Insurance Agreements.** Mortgage Insurance reimburses Lender for certain losses Lender may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy or coverage.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. Any such agreements will not: (i) affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan; (ii) increase the amount Borrower will owe for Mortgage Insurance; (iii) entitle Borrower to any refund; or (iv) affect the rights Borrower has, if any, with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 (12 *U.S.C.* § 4901 et seq.), as it may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter (*"HPA"*). These rights under the HPA may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

## 12. Assignment and Application of Miscellaneous Proceeds; Forfeiture.

**(a) Assignment of Miscellaneous Proceeds.** Borrower is unconditionally assigning the right to receive all Miscellaneous Proceeds to Lender and agrees that such amounts will be paid to Lender.

**(b) Application of Miscellaneous Proceeds upon Damage to Property.** If the Property is damaged, any Miscellaneous Proceeds will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and Lender's security will not be lessened by such restoration or repair. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. Unless Lender and Borrower agree in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the Miscellaneous Proceeds will be

applied to the sums secured by this Security Instrument, whether or not then due, unless prohibited by Applicable Law, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

**(c) Application of Miscellaneous Proceeds upon Condemnation, Destruction, or Loss in Value of the Property.** In the event of a total taking, destruction, or loss in value of the Property, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, unless prohibited by Applicable Law, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property (each, a *"Partial Devaluation"*) where the fair market value of the Property immediately before the Partial Devaluation is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the Partial Devaluation, a percentage of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, unless prohibited by Applicable Law, or unless Borrower and Lender otherwise agree in writing. The amount of the Miscellaneous Proceeds that will be so applied is determined by multiplying the total amount of the Miscellaneous Proceeds by a percentage calculated by taking (i) the total amount of the sums secured immediately before the Partial Devaluation, and dividing it by (ii) the fair market value of the Property immediately before the Partial Devaluation. Any balance of the Miscellaneous Proceeds will be paid to Borrower.

In the event of a Partial Devaluation where the fair market value of the Property immediately before the Partial Devaluation is less than the amount of the sums secured immediately before the Partial Devaluation, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not the sums are then due, unless Borrower and Lender otherwise agree in writing.

**(d) Settlement of Claims.** Lender is authorized to collect and apply the Miscellaneous Proceeds either to the sums secured by this Security Instrument, whether or not then due, or to restoration or repair of the Property, if Borrower (i) abandons the Property, or (ii) fails to respond to Lender within 30 days after the date Lender notifies Borrower that the Opposing Party (as defined in the next sentence) offers to settle a claim for damages. *"Opposing Party"* means the third party that owes Borrower the Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to the Miscellaneous Proceeds.

**(e) Proceeding Affecting Lender's Interest in the Property.** Borrower will be in Default if any action or proceeding begins, whether civil or criminal, that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument, unless prohibited by Applicable Law. Borrower can cure such a Default and, if acceleration has occurred, reinstate as provided in Section 20, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower is unconditionally assigning to Lender the proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property, which proceeds will be paid to Lender. All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order that Partial Payments are applied in Section 2(b).

**13. Borrower Not Released; Forbearance by Lender Not a Waiver.** Borrower or any Successor in Interest of Borrower will not be released from liability under this Security Instrument if Lender extends the time for payment or modifies the amortization of the sums secured by this Security Instrument. Lender will not be required to commence proceedings against any Successor in

Interest of Borrower, or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument, by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities, or Successors in Interest of Borrower or in amounts less than the amount then due, will not be a waiver of, or preclude the exercise of, any right or remedy by Lender.

**14. Joint and Several Liability; Signatories; Successors and Assigns Bound.** Borrower's obligations and liability under this Security Instrument will be joint and several. However, any Borrower who signs this Security Instrument but does not sign the Note: (a) signs this Security Instrument to mortgage, grant, and convey such Borrower's interest in the Property under the terms of this Security Instrument; (b) signs this Security Instrument to waive any applicable inchoate rights and any available homestead exemptions, unless prohibited by Applicable Law; (c) signs this Security Instrument to assign any Miscellaneous Proceeds, Rents, or other earnings from the Property to Lender; (d) is not personally obligated to pay the sums due under the Note or this Security Instrument; and (e) agrees that Lender and any other Borrower can agree to extend, modify, forbear, or make any accommodations with regard to the terms of the Note or this Security Instrument without such Borrower's consent and without affecting such Borrower's obligations under this Security Instrument.

Subject to the provisions of Section 19, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, will obtain all of Borrower's rights, obligations, and benefits under this Security Instrument. Borrower will not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.

**15. Loan Charges.**

**(a) Tax and Flood Determination Fees.** Lender may require Borrower to pay (i) a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan, and (ii) either (A) a one-time charge for flood zone determination, certification, and tracking services, or (B) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur that reasonably might affect such determination or certification. Borrower will also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency, or any successor agency, at any time during the Loan term, in connection with any flood zone determinations.

**(b) Default Charges.** If permitted under Applicable Law, Lender may charge Borrower fees for services performed in connection with Borrower's Default to protect Lender's interest in the Property and rights under this Security Instrument, including: (i) reasonable attorneys' fees and costs; (ii) property inspection, valuation, mediation, and loss mitigation fees; and (iii) other related fees.

**(c) Permissibility of Fees.** In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower should not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

**(d) Savings Clause.** If Applicable Law sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then (i) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit, and (ii) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by

reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable Law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**16. Notices; Borrower's Physical Address.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.

**(a) Notices to Borrower.** Unless Applicable Law requires a different method, any written notice to Borrower in connection with this Security Instrument will be deemed to have been given to Borrower when (i) mailed by first class mail, or (ii) actually delivered to Borrower's Notice Address (as defined in Section 16(c) below) if sent by means other than first class mail or Electronic Communication (as defined in Section 16(b) below). Notice to any one Borrower will constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. If any notice to Borrower required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**(b) Electronic Notice to Borrower.** Unless another delivery method is required by Applicable Law, Lender may provide notice to Borrower by e-mail or other electronic communication (*"Electronic Communication"*) if: (i) agreed to by Lender and Borrower in writing; (ii) Borrower has provided Lender with Borrower's e-mail or other electronic address (*"Electronic Address"*); (iii) Lender provides Borrower with the option to receive notices by first class mail or by other non-Electronic Communication instead of by Electronic Communication; and (iv) Lender otherwise complies with Applicable Law. Any notice to Borrower sent by Electronic Communication in connection with this Security Instrument will be deemed to have been given to Borrower when sent unless Lender becomes aware that such notice is not delivered. If Lender becomes aware that any notice sent by Electronic Communication is not delivered, Lender will resend such communication to Borrower by first class mail or by other non-Electronic Communication. Borrower may withdraw the agreement to receive Electronic Communications from Lender at any time by providing written notice to Lender of Borrower's withdrawal of such agreement.

**(c) Borrower's Notice Address.** The address to which Lender will send Borrower notice (*"Notice Address"*) will be the Property Address unless Borrower has designated a different address by written notice to Lender. If Lender and Borrower have agreed that notice may be given by Electronic Communication, then Borrower may designate an Electronic Address as Notice Address. Borrower will promptly notify Lender of Borrower's change of Notice Address, including any changes to Borrower's Electronic Address if designated as Notice Address. If Lender specifies a procedure for reporting Borrower's change of Notice Address, then Borrower will report a change of Notice Address only through that specified procedure.

**(d) Notices to Lender.** Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated in this Security Instrument unless Lender has designated another address (including an Electronic Address) by notice to Borrower. Any notice in connection with this Security Instrument will be deemed to have been given to Lender only when actually received by Lender at Lender's designated address (which may include an Electronic Address). If any notice to Lender required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

(e) **Borrower's Physical Address.** In addition to the designated Notice Address, Borrower will provide Lender with the address where Borrower physically resides, if different from the Property Address, and notify Lender whenever this address changes.

**17. Governing Law; Severability; Rules of Construction.** This Security Instrument is governed by federal law and the law of the State of California. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. If any provision of this Security Instrument or the Note conflicts with Applicable Law (i) such conflict will not affect other provisions of this Security Instrument or the Note that can be given effect without the conflicting provision, and (ii) such conflicting provision, to the extent possible, will be considered modified to comply with Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence should not be construed as a prohibition against agreement by contract. Any action required under this Security Instrument to be made in accordance with Applicable Law is to be made in accordance with the Applicable Law in effect at the time the action is undertaken.

As used in this Security Instrument: (a) words in the singular will mean and include the plural and vice versa; (b) the word "may" gives sole discretion without any obligation to take any action; (c) any reference to *"Section"* in this document refers to Sections contained in this Security Instrument unless otherwise noted; and (d) the headings and captions are inserted for convenience of reference and do not define, limit, or describe the scope or intent of this Security Instrument or any particular Section, paragraph, or provision.

**18. Borrower's Copy.** One Borrower will be given one copy of the Note and of this Security Instrument.

**19. Transfer of the Property or a Beneficial Interest in Borrower.** For purposes of this Section 19 only, *"Interest in the Property"* means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract, or escrow agreement, the intent of which is the transfer of title by Borrower to a purchaser at a future date.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.

**20. Borrower's Right to Reinstate the Loan after Acceleration.** If Borrower meets certain conditions, Borrower will have the right to reinstate the Loan and have enforcement of this Security Instrument discontinued at any time up to the later of (a) five days before any foreclosure sale of the

Property, or (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate. This right to reinstate will not apply in the case of acceleration under Section 19.

To reinstate the Loan, Borrower must satisfy all of the following conditions: (aa) pay Lender all sums that then would be due under this Security Instrument and the Note as if no acceleration had occurred; (bb) cure any Default of any other covenants or agreements under this Security Instrument or the Note; (cc) pay all expenses incurred in enforcing this Security Instrument or the Note, including, but not limited to: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument or the Note; and (dd) take such action as Lender may reasonably require to assure that Lender's interest in the Property and/or rights under this Security Instrument or the Note, and Borrower's obligation to pay the sums secured by this Security Instrument or the Note, will continue unchanged.

Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (aaa) cash; (bbb) money order; (ccc) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (ddd) Electronic Fund Transfer. Upon Borrower's reinstatement of the Loan, this Security Instrument and obligations secured by this Security Instrument will remain fully effective as if no acceleration had occurred.

**21. Sale of Note.** The Note or a partial interest in the Note, together with this Security Instrument, may be sold or otherwise transferred one or more times. Upon such a sale or other transfer, all of Lender's rights and obligations under this Security Instrument will convey to Lender's successors and assigns.

**22. Loan Servicer.** Lender may take any action permitted under this Security Instrument through the Loan Servicer or another authorized representative, such as a sub-servicer. Borrower understands that the Loan Servicer or other authorized representative of Lender has the right and authority to take any such action.

The Loan Servicer may change one or more times during the term of the Note. The Loan Servicer may or may not be the holder of the Note. The Loan Servicer has the right and authority to: (a) collect Periodic Payments and any other amounts due under the Note and this Security Instrument; (b) perform any other mortgage loan servicing obligations; and (c) exercise any rights under the Note, this Security Instrument, and Applicable Law on behalf of Lender. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made, and any other information RESPA requires in connection with a notice of transfer of servicing.

**23. Notice of Grievance.** Until Borrower or Lender has notified the other party (in accordance with Section 16) of an alleged breach and afforded the other party a reasonable period after the giving of such notice to take corrective action, neither Borrower nor Lender may commence, join, or be joined to any judicial action (either as an individual litigant or a member of a class) that (a) arises from the other party's actions pursuant to this Security Instrument or the Note, or (b) alleges that the other party has breached any provision of this Security Instrument or the Note. If Applicable Law provides a time period that must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this Section 23. The notice of Default given to Borrower pursuant to Section 26(a) and the notice of acceleration given to Borrower pursuant to Section 19 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 23.

**24. Hazardous Substances.**

**(a) Definitions.** As used in this Section 24: (i) *"Environmental Law"* means any Applicable Laws where the Property is located that relate to health, safety, or environmental protection; (ii) *"Hazardous Substances"* include (A) those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law, and (B) the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, corrosive materials or agents, and radioactive materials; (iii) *"Environmental Cleanup"* includes any response action, remedial action, or removal action, as defined in Environmental Law; and (iv) an *"Environmental Condition"* means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

**(b) Restrictions on Use of Hazardous Substances.** Borrower will not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower will not do, nor allow anyone else to do, anything affecting the Property that: (i) violates Environmental Law; (ii) creates an Environmental Condition; or (iii) due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects or could adversely affect the value of the Property. The preceding two sentences will not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

**(c) Notices; Remedial Actions.** Borrower will promptly give Lender written notice of: (i) any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (ii) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release, or threat of release of any Hazardous Substance; and (iii) any condition caused by the presence, use, or release of a Hazardous Substance that adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower will promptly take all necessary remedial actions in accordance with Environmental Law. Nothing in this Security Instrument will create any obligation on Lender for an Environmental Cleanup.

**25. Electronic Note Signed with Borrower's Electronic Signature.** If the Note evidencing the debt for this Loan is electronic, Borrower acknowledges and represents to Lender that Borrower: (a) expressly consented and intended to sign the electronic Note using an Electronic Signature adopted by Borrower (*"Borrower's Electronic Signature"*) instead of signing a paper Note with Borrower's written pen and ink signature; (b) did not withdraw Borrower's express consent to sign the electronic Note using Borrower's Electronic Signature; (c) understood that by signing the electronic Note using Borrower's Electronic Signature, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms; and (d) signed the electronic Note with Borrower's Electronic Signature with the intent and understanding that by doing so, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**26. Acceleration; Remedies.**

**(a) Notice of Default.** Lender will give a notice of Default to Borrower prior to acceleration following Borrower's Default, except that such notice of Default will not be sent when Lender exercises its right under Section 19 unless Applicable Law provides otherwise. The notice will specify, in addition to any other information required by Applicable Law: (i) the Default; (ii) the action required to cure the Default; (iii) a date, not less than 30 days (or as otherwise specified by Applicable Law) from the date the notice is given to Borrower, by which the Default must be cured; (iv) that failure to cure the Default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property; (v) Borrower's right to reinstate after acceleration; and (vi) Borrower's right to bring a court action to deny the existence of a Default or to assert any other defense of Borrower to acceleration and sale.

**(b) Acceleration; Power of Sale; Expenses.** If the Default is not cured on or before the date specified in the notice, Lender may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender will be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 26, including, but not limited to: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument.

**(c) Notice of Sale; Sale of Property.** If Lender invokes the power of sale, Lender will execute or cause Trustee to execute a written notice of the occurrence of an event of Default and of Lender's election to cause the Property to be sold. Trustee will cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee will mail copies of the notice as prescribed by Applicable Law to Borrower and to the other required recipients. Trustee will give public notice of sale to the persons and in the manner prescribed by Applicable Law. At a time permitted by, and in accordance with Applicable Law, Trustee, without further demand on Borrower, will sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Unless prohibited by Applicable Law, Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

**(d) Trustee's Deed; Proceeds of Sale.** Trustee will deliver to the purchaser a Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed will be prima facie or conclusive evidence of the truth of the statements made in that deed, in accordance with Section 2924(c) of the *Civil Code of California*. Trustee will apply the proceeds of the sale in the following order: (i) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (ii) to all sums secured by this Security Instrument; and (iii) any excess to the person or persons legally entitled to it.

**27. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender will request Trustee to reconvey the Property and will surrender this Security Instrument and all Notes evidencing the debt secured by this Security Instrument to Trustee. Upon such request, Trustee will reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**28. Substitute Trustee.** Lender may, from time to time appoint a successor trustee to any Trustee appointed under this Security Instrument by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument will contain the name of the original Lender, Trustee, and Borrower, the instrument number or the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee will succeed to all the rights, title, power, and duties conferred upon Trustee in this Security Instrument and by Applicable Law. This procedure for substitution of trustee will govern to the exclusion of all other provisions for substitution.

**29. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the *Civil Code of California*.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider signed by Borrower and recorded with it.

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to Borrower's Notice Address.

**Borrower**

**600 Spring, LLC**
*a California limited liability company*

______________________________ *Seal*
**Scott Gillen**
*Manager*

______________________________ *Seal*
**Barry Shy**
*Manager*

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On 7-29-24, before me, Jacob Alexander, Notary Public, personally appeared, Scott Gillen, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

[signature]
*Notary Public*

Jacob Alexander
*Notary Public Name*

Notary Public's oath and bond filed:
LA.CA

Notary Commission Number:
2490453

My Commission Expires:
6-14-2028

☐ Electronic Seal ID Number:

JACOB ALEXANDER
Notary Public - California
Los Angeles County
Commission # 2490453
My Comm. Expires Jun 14, 2028

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles
On 7-29-24, before me, Jacob Alexander, Notary Public, personally appeared, Barry Shy, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

*Notary Public*

Jacob Alexander
*Notary Public Name*

JACOB ALEXANDER
Notary Public - California
Los Angeles County
Commission # 2490453
My Comm. Expires Jun 14, 2028

Notary Public's oath and bond filed:
LA, CA

Notary Commission Number:
2490453

My Commission Expires:
6-14-2028

☐ Electronic Seal ID Number:

Loan Origination Organization: JPMorgan Chase Bank, N.A.

NMLS ID: 399798

Loan Originator: Bruce Wayne Brewer

NMLS ID: 514039

## SCHEDULE A

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF LOS ANGLES , STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF MALIBU, LN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL NO. I:

A PARCEL OF LAND, IN 7HE CITY OF MALIBU, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, BEING PORTIONS OF WE RANCHO TOPANGA MALIBU SEQUIT, AS CONFIRMED TO MATTHEW KELLER BY PATENT RECORDED IN BOOK 1 PAGES 407 ET SEQ., OF PATENTS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF PARCEL 2 IN THE WESTERLY BOUNDARY OF PARCEL 1 AS DESCRIBED IN DEED PROM MARBLEHEAD LAND COMPANY, TO STATHAM INSTRUMENTS, INC., RECORDED DECEMBER 30, 1957, AS INSTRUMENT NO. 1542 IN DOCK 56175 PAGE 191, OF OFFICIAL RECORDS OF COUNTY OF LOS ANGELES, CALIFORNIA. THENCE ALONG THE SOUTHERLY LINE OF SAID PARCEL 2, NORTHWESTERLY ALONG A TANGENT CURVE (A TANGENT AT SAID CORNER BEARING SOUTH 05 DEGREES 24 MINUTES 30 SECONDS EAST) CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 130 FEET THROUGH A CENTRAL ANGLE OF 90 DEGREES AN ARC DISTANCE OF 204.20 FEET; THENCE TANGENT TO SAID CURVE SOUTH 84 DEGREES 35 MINUTES 30 SECONDS WEST 303.30 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHEASTERLY HAVING A RADIUS OF 25 FEET; THENCE NORTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 90 DEGREES AN ARC DISTANCE OF 39.27 FEET; THENCE NORTH 05 DEGREES 24 MINUTES 30 SECONDS WEST 75.00 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHEASTERLY HAYING A RADIUS OF 25 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 90 DEGREES AN ARC DISTANCE OF 39.27 FEET; THENCE TANGENT TO SAID CURVE NORTH 84 DEGREES 35 MINUTES 30 SECONDS EAST 303.30 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 130 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 90 DEGREES AN ARC DISTANCE OF 204.20 FEET TO A POINT IN THE WESTERLY BOUNDARY OF SAID PARCEL 1; THENCE SOUTH 05 DEGREES 24 MINUTES 30 SECONDS EAST ALONG SAID WESTERLY BOUNDARY 75.00 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND WITHOUT RIGHT OF ENTRY ON THE SURFACE OF SAID LAND, AS CONVEYED TO R.R. ADAMSON, BY DEED RECORDED OCTOBER 5, 1953 IN BOOK 42846 PAGE 432 OFFICIAL RECORDS.

PARCEL NO. 2;

BEGINNING AT A POINT IN THE CENTER LINE OF THE STRIP OF LAND 100 FEET WIDE, KNOWN AS PACIFIC COAST HIGHWAY DESCRIBED IN PARCEL 1 OF WE DEED TO THE STATE OF CALIFORNIA, RECORDED ON MARCH 22, 1944 AS INSTRUMENT NO. 1279 IN BOOK 20743 PAGE 271, OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, SAID POINT BEING IN THAT CERTAIN COURSE DESCRIBED IN SAID DEED AS HAVING A BEARING AND LENGTH OF NORTH 85 DEGREES 35 MINUTES 30 SECONDS EAST 5221.78 FEET AND BEING MARKED BY A BRASS CAP MONUMENT 'SOLSTICE CANON L-8", AS SHOWN IN THE COUNTY OF LOS ANGELES SURVEYOR'S FIELD BOOK 1652 PAGES 67 AND 68 ON FILE IN THE OFFICE OF WE COUNTY SURVEYOR OF SAID COUNTY; THENCE ALONG SAID CENTER LINE NORTH 84 DEGREES 35 MINUTES 30 SECONDS EAST 37032 FEET; THENCE SOUTH 05 DEGREES 24 MINUTES 30 SECONDS EAST 50.00 FEET TO RUN TRUE POINT OF BEGINNING IN THE SOUTHERLY LINE OF SAID 100 FOOT STRIP OF LAND; THENCE CONTINUING SOUTH 5 DEGREES 24 MINUTES 30 SECONDS EAST 437.77 FEET; THENCE SOUTH 31 DEGREES 48 MINUTES 00 SECONDS EAST 119.06 FEET; THENCE SOUTH 38 DEGREES 14 MINUTES 53 SECONDS EAST 249.12 FEET; THENCE SOUTH 18 DEGREES 51 MINUTES 46 SECONDS EAST 71.80 FEET TO THE NORTHEAST CORNER OF THE LAND DESCRIBED IN THE DEED TO CECILE A. TREBAOL, ET AL., RECORDED AUGUST 27, 1943 AS INSTRUMENT NO 705 IN BOOK 20185 PAGE 361 OF SAID OFFICIAL. RECORDS; THENCE ALONG THE NORTHERLY LINE OF THE LAND DESCRIBED IN THE DEED TO MARK R. MILLER AND WIFE, RECORDED NOVEMBER 12, 1943 AS INSTRUMENT NO. 883 IN ROOK 20375 PAGE 377 OF SAID OFFICIAL RECORDS , NORTH 73 DEGREES 42 MINUTES 05 SECONDS EAST 305.76 FEET TO THE NORTHWEST CORNER OF THE LAND DESCRIBED IN THE DEED TO CARL R. HENDERSON AND WIFE RECORDED ON MAY 21, 1943 AS INSTRUMENT NO. 184 IN BOOK 20004 PAGE197 OF SAID OFFICIAL RECORDS; THENCE ALONG THE NORTHERLY LINE OF THE LAND DESCRIBED IN THE LAST MENTIONED DEED AS FOLLOWS: SOUTH 78 DEGREES 21 MINUTES 55 SECONDS EAST 210.16 FEET; NORTH 86 DEGREES 45 MINUTES 34 SECONDS EAST 315.61 FEET AND NORTH 77 DEGREES 35 MINUTES 06 SECONDS EAST 214.39 FEET TO THE SOUTHWEST CORNER OF THE LAND DESCRIBED IN THE DEED TO CLICERIO MINORINI AND WIFE, RECORDED ON FEBRUARY 11, 1942 AS INSTRUMENT NO. 576, IN BOOK 1907, PAGE 101, OFFICIAL RECORDS, SAID SOUTHWEST CORNER BEING A POINT IN THE NORTHERLY LINE OF THE LAND DESCRIBED IN PARCEL 1 OF THE DEED TO THE STATE OF CALIFORNIA RECORDED OCTOBER 2, 1939 AS INSTRUMENT NO. 668, IN BOOK 16845, PAGE 253 OF SAID OFFICIAL RECORDS; THENCE ALONG THE WESTERLY LINE OF THE LAND DESCRIBED IN THE ABOVE MENTIONED DEED TO MINORINI, NORTH 20 DEGREES 00 MINUTES 23 SECONDS WEST 719.46 FEET AND NORTH 14 DEGREES 39 MINUTES 24 SECONDS WEST 118.48 FEET TO THE SOUTHERLY LINE OF SAID MAP OF LAND 100 FEET WIDE, KNOWN AS PACIFIC COAST HIGHWAY; THENCE ALONG SAID PACIFIC COAST HIGHWAY SOUTH 84 DEGREES 35 MINUTES 30 SECONDS WEST 1033.71 FEET TO THE TRUE POINT OF BEGINNING.

EXCEPT THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, WITHOUT RIGHT OF ENTRY ON THE SURFACE OF SAID LAND, AS CONVEYED TO R.R. ADAMSON BY DEED RECORDED OCTOBER 5, 1953 IN BOOK 42846 PAGE 432 OFFICIAL RECORDS.

PARCEL NO. 3:

BEGINNING AT THE NORTHWEST CORNER OF PARCEL 2 ABOVE

DESCRIBED, SAID CORNER BEING IN THE SOUTHERLY LINE OF SAID 100 FOOT STRIP OF LAND, KNOWN AS PACIFIC COAST HIGHWAY; THENCE ALONG SAID SOUTHERLY LINE, SOUTH 84 DEGREES 35 MINUTES 30 SECONDS WEST 433.30 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 25 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 90 DEGREES AN ARC DISTANCE OF 39.27 FEET; THENCE TANGENT TO SAID CURVE, SOUTH 05 DEGREES 24 MINUTES 30 SECONDS EAST 75.00 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHEASTERLY, HAVING A RADIUS OF 25 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 90 DEGREES AN ARC DISTANCE OF 39.27 FEET; THENCE TANGENT TO SAID CURVE, NORTH 84 DEGREES 35 MINUTES 30 SECONDS EAST 303.30 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 130 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 90 DEGREES ARC DISTANCE OF 204.20 FEET TO A POINT IN THE WESTERLY BOUNDARY OF SAID PARCEL 2, DISTANT THEREON SOUTH 05 DEGREES 24 MINUTES 30 SECONDS EAST 255.00 FEET FROM THE NORTHWEST CORNER OF SAID PARCEL; THENCE NORTH 05 DEGREES 24 MINUTES 30 SECONDS WEST 255.00 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, WITHOUT RIGHT OF ENTRY ON THE SURFACE OF SAID LAND, AS CONVEYED TO RR. ADAMSON BY DEED RECORDED OCTOBER 5, 1953, IN 1100K 47446 PAGE 432 OFFICIAL RECORDS.

PARCEL NO. 4:

BEGINNING AT THE SOUTHWEST CORNER OF PARCEL 1 ABOVE DESCRIBED, SAID CORNER BEING THE NORTHEAST CORNER OF THE LAND DESCRIBED IN THE DEED TO CECILE A. TREBAOL, ET AL, RECORDED AUGUST 27, 1943 AS INSTRUMENT NO. 705 IN BOOK 20185 PAGE 361 OFFICIAL RECORDS; THENCE ALONG THE WESTERLY BOUNDARY OF SAID PARCEL 2, NORTH 18 DEGREES 51 MINUTES 46 SECONDS WEST 71.80 FEET; NORTH 38 DEGREES 14 MINUTES 53 SECONDS WEST 249.12 FEET, AND NORTH 31 DEGREES 48 MINUTES 00 SECONDS WEST 119.60 FEET TO AN ANGLE POINT IN SAID WESTERLY BOUNDARY, SAID POINT BEING ALSO IN WE EASTERLY LINE OF THE STRIP OF LAND 60 FEET IN WIDTH, HEREINAFTER DESCRIBED AS PARCEL 4; THENCE ALONG SAID EASTERLY LINE AS FOLLOWS: SOUTHEASTERLY ALONG A CURVE, (A TANGENT AT SAID POINT BEARING NORTH 05 DEGREES 24 MINUTES 30 SECONDS WEST) CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 70 FEET THROUGH A CENTRAL ANGLE OF 14 DEGREES 30 MINUTES 00 SECONDS AN ARC DISTANCE OF 17.72 FEET, TANGENT TO SAID CURVE SOUTH 19 DEGREES 54 NINNIES 30 SECONDS EAST 87.68 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY HAVING A RADIUS OF 160 FEET; SOUTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 79 DEGREES 50 MINUTES 35 SECONDS AN ARC DISTANCE OF 222.96 FEET; TANGENT TO SAID CURVE SOUTH 59 DEGREES 56 MINUTES 05 SECONDS WEST 113.92 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 120 FEET; SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL. ANGLE OF 30 DEGREES 30 MINUTES 00 SECONDS AN ARC DISTANCE OF 63.88 FEET TANGENT TO SAID CURVE SOUTH 29 DEGREES 26 MINUTES 05 SECONDS WEST 16325 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 120 FEET; THENCE SOUTHWESTERLY ALONG

SAID CURVE THROUGH A CENTRAL ANGLE OF 09 DEGREES 28 MINUTES 27 SECONDS AN ARC DISTANCE OF 19.84 FEET; THENCE RADIAL TO SAID CURVE. SOUTH 70 DEGREES 02 MINUTES 22 SECONDS EAST 13.61 FEET TO THE MOST WESTERLY CORNER OF SAID LAND DESCRIBED IN DEED TO CECILE A. TREBAOL, ET AL THENCE NORTH 44 DEGREES 41 MINUTES 05 SECONDS EAST ALONG THE NORTHERLY LINE OF THE LAND DESCRIBED IN SAID DEED 204.39 FEET; THENCE NORTH 82 DEGREES 01 MINUTES 05 SECONDS EAST 355.14 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, WITHOUT RIGHT OF ENTRY ON THE SURFACE OF SAID LAND, AS CONVEYED TO RR. ADAMSON BY DEED RECORDED OCTOBER 5, 1953 IN BOOK 42846 PAGE 432, OF OFFICIAL RECORDS.

PARCEL NO. 5:

AN EASEMENT FOR ROADWAY PURPOSES AND PURPOSES OF INGRESS AND EGRESS OVER A STRIP OF LAND 60 FEET IN WIDTH LYING 30 FEET ON EACH SIDE OF AND PARALLEL WITH THE FOLLOWING DESCRIBED CENTER LINE, TO WIT:

COMMENCING AT A POINT IN THE CENTER LINE OF THE STRIP OF LAND 100 FEET WIDE, KNOWN AS PACIFIC COAST HIGHWAY AS DESCRIBED IN PARCEL 1 OF THIS DESCRIPTION, SAID POINT BEING MARKED BY A BRASS CAP MONUMENT 'SOLSTICE CANON L-8"; THENCE ALONG SAID CENTER LINE SOUTH 84 DEGREES 35 MINUTES 30 SECONDS WEST 11798 FEET; THENCE SOUTH 05 DEGREES 24 MINUTES 30 SECONDS EAST 50.00 FEET TO THE TRUE POINT OF BEGINNING IN THE SOUTHERLY LINE OF SAID 100 FOOT STRIP OF LAND THENCE CONTINUING SOUTH 05 DEGREES 24 MINUTES 30 SECONDS EAST 230.00 FEET; THENCE NORTH 84 DEGREES 35 MINUTES 30 SECONDS EAST 35830 FEET; THENCE SOUTHEASTERLY 157.08 FEET ALONG THE ARC OF A TANGENT CURVE CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 100 FEET; THENCE TANGENT SOUTH 05 DEGREES 24 MINUTES 30 SECONDS EAST 107.77 FEET; THENCE SOUTHEASTERLY 25.31 FEET ALONG THE ARC OF A TANGENT CURVE CONCAVE EASTERLY HAVING A RADIUS OF 100 FEET; THENCE TANGENT SOUTH 19 DEGREES 54 MINUTES 30 SECONDS EAST 87.68 FEET; THENCE SOUTHERLY 181.16 FEET ALONG THE ARC OF A TANGENT CURVE CONCAVE WESTERLY HAVING A RADIUS OF 130 FEET; THENCE TANGENT SOUTH 59 DEGREES 56 MINUTES 05 SECONDS WEST 113.92 FEET; THENCE SOUTHWESTERLY 79.85 FEET ALONG THE ARC OF A TANGENT CURVE CONCAVE SOUTHEASTERLY HAYING A RADIUS OF 150 FEET; THENCE TANGENT SOUTH 29 DEGREES 26 MINUTES 05 SECONDS WEST 163.25 FEET; THENCE SOUTHWESTERLY 41.45 FEET ALONG ME ARC OF A TANGENT CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF ISO FEET THENCE TANGENT SOUTH 13 DEGREES 36 MINUTES 05 SECONDS WEST 122.70 FEET; THENCE SOUTHWESTERLY 129.81 FEET ALONG THE ARC OF A TANGENT CURVE CONCAVE NORTHWESTERLY HAVING A RADIUS OF 125 FEET; THENCE TANGENT SOUTH 73 DEGREES 06 MINUTES 05 SECONDS WEST 154.35 FEET; THENCE SOUTHWESTERLY 27.26 FEET ALONG THE ARC OF TANGENT CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 150 FEET; THENCE TANGENT SOUTH 62 DEGREES 41 MINUTES 19 SECONDS WEST 112.34 FEET; THENCE SOUTHERLY 138.32 FEET ALONG THE ARC OF A TANGENT CURVE CONCAVE EASTERLY HAVING A RADIUS OF 100 FEET; THENCE TANGENT SOMA 16 DEGREES 33 MINUTES 55 SECONDS EAST 18.67 FEET TO A POINT N ME NORTHERLY LINE OF THE 60 FOOT STRIP OF LAND KNOWN AS MALIBU ROAD, SAID POINT BEING SOUTH 73

DEGREES 26 MINUTES 05 SECONDS WEST 1431.32 FEET AND NORTH 16 DEGREES 33 MINUTES 55 SECONDS WEST 30.00 FEET, FROM ENGINEER'S CENTER LINE STATION 903 71.78 B.C. LINE 1, AT ME EASTERLY EXTREMITY OF THAT CERTAIN CENTER LINE COURSE SHOWN ON LOS ANGELES COUNTY SURVEYOR'S MAP F.M. NO. 11698, SHEET 3, AS NORTH 73 DEGREES 29 MINUTES 00 SECONDS EAST.

Parcel ID:4458-018-035

Commonly known as 24185 Case Court, Malibu, CA 90265
However, by showing this address no additional coverage is provided

# Second Home Rider

THIS SECOND HOME RIDER is made this 29th day of July, 2024, and is incorporated into and amends and supplements the Mortgage, Mortgage Deed, Deed of Trust, or Security Deed (the "*Security Instrument*") of the same date given by the undersigned (the "*Borrower,*" whether there are one or more persons undersigned) to secure Borrower's Note to JPMorgan Chase Bank, N.A. (the "*Lender*") of the same date and covering the Property described in the Security Instrument (the "*Property*"), which is located at:

24185 Case Ct, Malibu, CA 90265
[Property Address]

In addition to the representations, warranties, covenants, and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by the following:

**6. Occupancy.** Borrower must occupy and use the Property as Borrower's second home. Borrower will maintain exclusive control over the occupancy of the Property, including short-term rentals, and will not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person or entity any control over the occupancy or use of the Property. Borrower will keep the Property available primarily as a residence for Borrower's personal use and enjoyment for at least one year after the date of this Security Instrument, unless Lender otherwise agrees in writing, which consent will not be unreasonably withheld, or unless extenuating circumstances exist that are beyond Borrower's control.

**8. Borrower's Loan Application.** Borrower will be in Default if, during the Loan application process, Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan, including, but not limited to, overstating Borrower's income or assets, understating or failing to provide documentation of Borrower's debt obligations and liabilities, and misrepresenting Borrower's occupancy or intended occupancy of the Property as Borrower's second home.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Second Home Rider.

**Borrower**

**600 Spring, LLC**
*a California limited liability company*

**Scott Gillen** *Seal*
*Manager*

**Barry Shy** *Seal*
*Manager*

# Planned Unit Development Rider

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 29th day of July, 2024, and is incorporated into and amends and supplements the Mortgage, Mortgage Deed, Deed of Trust, or Security Deed (the *"Security Instrument"*) of the same date, given by the undersigned (the *"Borrower"*) to secure Borrower's Note to JPMorgan Chase Bank, N.A. (the *"Lender"*) of the same date and covering the Property described in the Security Instrument and located at:

24185 Case Ct, Malibu, CA 90265

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in The Case (the *"Declaration"*). The Property is a part of a planned unit development known as

The Case

[Name of Planned Unit Development]

(the *"PUD"*). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the *"Owners Association"*) and the uses, benefits, and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the representations, warranties, covenants, and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**(A) PUD Obligations.** Borrower will perform all of Borrower's obligations under the PUD's Constituent Documents. The *"Constituent Documents"* are the: (i) Declaration; (ii) articles of incorporation, trust instrument, or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower will promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**(B) Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes, winds, and floods, for which Lender requires insurance, then (i) Lender waives the provision in Section 3 for the portion of the Periodic Payment made to Lender consisting of the yearly premium installments for property insurance on the Property, and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower will give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds

payable to Borrower are hereby assigned and will be paid to Lender. Lender will apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**(C) Public Liability Insurance.** Borrower will take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**(D) Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and will be paid to Lender. Such proceeds will be applied by Lender to the sums secured by the Security Instrument as provided in Section 12.

**(E) Lender's Prior Consent.** Borrower will not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents unless the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**(F) Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F will become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts will bear interest from the date of disbursement at the Note rate and will be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

**Borrower**

**600 Spring, LLC**
*a California limited liability company*

______________________________ *Seal*
**Scott Gillen**
*Manager*

______________________________ *Seal*
**Barry Shy**
*Manager*

[redacted]

# Fixed/Adjustable Rate Rider

## (30-day Average SOFR Index (As Published by the Federal Reserve Bank of New York)-Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this 29th day of July, 2024, and is incorporated into and amends and supplements the Mortgage, Mortgage Deed, Deed of Trust, or Security Deed (the *"Security Instrument"*) of the same date given by the undersigned (the *"Borrower"*) to secure Borrower's Fixed/Adjustable Rate Note (the *"Note"*) to JPMorgan Chase Bank, N.A. (the *"Lender"*) of the same date and covering the property described in the Security Instrument and located at:

24185 Case Ct, Malibu, CA 90265
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT THE BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MINIMUM AND MAXIMUM RATES THE BORROWER MUST PAY.**

**Additional Covenants.** In addition to the representations, warranties, covenants, and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. Interest Rate and Monthly Payment Changes.** The Note provides for monthly payments of interest and a portion of the principal (*"Monthly Payment"*) and an initial fixed interest rate of 6.25%. The Note also provides for a change in the initial fixed interest rate to an adjustable interest rate, as follows:

**4. Adjustable Interest Rate and Monthly Payment Changes.**

**(A) Change Dates.** The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of August, 2031, and the adjustable interest rate I will pay may change on the first day of the month every 6th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change is called a *"Change Date."*

**(B) The Index.** Beginning with the first Change Date, my adjustable interest rate will be based on an Index that is calculated and provided to the general public by an administrator (the *"Administrator"*). The *"Index"* is a benchmark, known as the 30-day Average SOFR index. The Index is currently published by the Federal Reserve Bank of New York. The most recent Index value available as of the date 45 days before each Change Date is called the *"Current Index,"* provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate.

If the Index is no longer available, it will be replaced in accordance with Section 4(G) below.

**(C) Calculation of Changes.** Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three quarters percentage points (2.750%) (the *"Margin"*) to the Current Index. The Margin may change if the Index is replaced by the Note Holder in accordance

with Section 4(G)(2) below. The Note Holder will then round the result of the Margin plus the Current Index to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the Monthly Payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Change Date on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my Monthly Payment.

**(D) Limits on Interest Rate Changes.** The interest rate I am required to pay at the first Change Date will not be greater than 11.25% or less than 2.75%. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.0%) from the rate of interest I have been paying for the preceding 6 months, and will never be greater than 11.25% or less than 2.75%.

**(E) Effective Date of Changes.** My new interest rate will become effective on each Change Date. I will pay the amount of my new Monthly Payment beginning on the first Monthly Payment date after the Change Date until the amount of my Monthly Payment changes again.

**(F) Notice of Changes.** The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my Monthly Payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Replacement Index and Replacement Margin.** The Index is deemed to be no longer available and will be replaced if any of the following events (each, a *"Replacement Event"*) occur: (i) the Administrator has permanently or indefinitely stopped providing the Index to the general public; or (ii) the Administrator or its regulator issues an official public statement that the Index is no longer reliable or representative.

If a Replacement Event occurs, the Note Holder will select a new index (the *"Replacement Index"*) and may also select a new margin (the *"Replacement Margin"*), as follows:

1. If a replacement index has been selected or recommended for use in consumer products, including residential adjustable-rate mortgages, by the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, or a committee endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York at the time of a Replacement Event, the Note Holder will select that index as the Replacement Index.
2. If a replacement index has not been selected or recommended for use in consumer products under Section (G)(1) at the time of a Replacement Event, the Note Holder will make a reasonable, good faith effort to select a Replacement Index and a Replacement Margin that, when added together, the Note Holder reasonably expects will minimize any change in the cost of the loan, taking into account the historical performance of the Index and the Replacement Index.

The Replacement Index and Replacement Margin, if any, will be operative immediately upon a Replacement Event and will be used to determine my interest rate and Monthly Payments on Change Dates that are more than 45 days after a Replacement Event. The Index and Margin could

be replaced more than once during the term of my Note, but only if another Replacement Event occurs. After a Replacement Event, all references to the "Index" and "Margin" will be deemed to be references to the "Replacement Index" and "Replacement Margin."

The Note Holder will also give me notice of my Replacement Index and Replacement Margin, if any, and such other information required by applicable law and regulation.

**B. Transfer of the Property or a Beneficial Interest in Borrower.**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Section 19 of the Security Instrument will read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** For purposes of this Section 19 only, *"Interest in the Property"* means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower to a purchaser at a future date.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Section 19 of the Security Instrument described in Section B1 above will then cease to be in effect, and the provisions of Section 19 of the Security Instrument will be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** For purposes of this Section 19 only, *"Interest in the Property"* means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower to a purchaser at a future date.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law. Lender also will not exercise this option if (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee, and (b) Lender

reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises this option to require immediate payment in full, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

**Borrower**

**600 Spring, LLC**
*a California limited liability company*

**Scott Gillen** *Seal*
*Manager*

**Barry Shy** *Seal*
*Manager*

# Promissory Note Rider - Guarantor

This rider (the "Rider") is made this **29th** day of **July, 2024** and is incorporated into and shall be deemed to amend and supplement that certain a promissory note ("Note") in the amount of $20,800,000.00 given by **600 Spring, LLC and The Brshy Irrevocable Trust** (the "Borrower") to JPMorgan Chase Bank, N.A. (the "Lender") dated of even date herewith and encumbering the property known as **24185 Case Ct, Malibu, CA 90265** (the "Property"). Such Note is secured by a mortgage, deed of trust, or security agreement (the "Security Instrument").

As a condition of entering into the Note and Security Instrument with Borrower, Lender required the Guarantor (as defined in the Guaranty) to execute a guaranty ("Guaranty") pursuant to which Guarantor unconditionally and irrevocably guaranteed to Lender (a) performance and observance of every agreement and condition contained in the Note or Security Instrument to be performed or observed by the Borrower, and (b) payment of all sums now owing or which may in the future be owing by the Borrower under the Note as more specifically set forth in the Guaranty.

In addition to the covenants and agreements made in the Note, Borrower and Lender further covenant and agree as follows:

If Guarantor dies or, if Guarantor is an entity, dissolves or for any reason ceases to be in existence or shall merge or consolidate, or if there is a change in the direct or indirect beneficial ownership of the Guarantor, Lender may by notice to the Borrower, declare the unpaid principal amount of the promissory Note, accrued interest thereon and all other amounts payable under the promissory Note due and payable whereupon the same shall be due and payable without presentment, demand, protest, notice of acceleration or intention to accelerate or further notice of any kind, all of which are hereby expressly waived by the Borrower.

Except as expressly provided in this Rider, the Note and Security Instrument shall remain unchanged and in full force and effect. In the event any provision of this Rider shall conflict with any portion of the Note or Security Instrument, the provisions of this Rider shall prevail. Borrower agrees that a failure to comply with the terms and conditions of this Rider shall constitute a default under the Security Instrument and entitle Lender to exercise any and all remedies as may be available. This Rider shall be deemed to be effective on and as of the date first above written and shall be governed by and construed in accordance with Applicable Law. This Rider may be executed in one or more counterparts, and each of which, when so executed, shall be an original, but all such counterparts shall constitute one and the same instrument.

**Borrower**

**600 Spring, LLC**
*a California limited liability company*

| | | | |
|---|---|---|---|
| [signature] | 7-29-24 | [signature] | 7-29-24 |
| **Scott Gillen** *Manager* | **Date** | **Barry Shy** *Manager* | **Date** |

| | |
|---|---|
| [signature] | 7-28-24 |
| **Amit Tidhar, Trustee of the The Brshy Irrevocable Trust** | **Date** |

# Promissory Note Rider - Entity Borrower

This rider (the "Rider") is made this **29th** day of **July, 2024**, and is incorporated into and shall be deemed to amend and supplement that certain promissory note in the amount of **$20,800,000.00** given by **600 Spring, LLC and The Brshy Irrevocable Trust** (the "Borrower") to JPMorgan Chase Bank, N.A. (the "Lender") dated of even date herewith and encumbering the property known as **24185 Case Ct, Malibu, CA 90265** (the "Property"). The Note is secured by a mortgage, deed of trust, or security agreement (the "Security Instrument").

In addition to the covenants and agreements made in the Note and Security Instrument, Borrower and Lender further covenant and agree as follows:

If Borrower dissolves or for any reason ceases to be in existence or shall merge or consolidate, or if there is a change in the direct or indirect beneficial ownership of the Borrower, Lender may by notice to the Borrower, declare the unpaid principal amount of the promissory Note, accrued interest thereon and all other amounts payable under the promissory Note due and payable whereupon the same shall be due and payable without presentment, demand, protest, notice of acceleration or intention to accelerate or further notice of any kind, all of which are hereby expressly waived by the Borrower.

Except as expressly provided in this Rider, the Note and Security Instrument shall remain unchanged and in full force and effect. In the event any provision of this Rider shall conflict with any portion of the Note or Security Instrument, the provisions of this Rider shall prevail. Borrower agrees that a failure to comply with the terms and conditions of this Rider shall constitute a default under the Security Instrument and entitle Lender to exercise any and all remedies as may be available. This Rider shall be deemed to be effective on and as of the date first above written and shall be governed by and construed in accordance with Applicable Law. This Rider may be executed in one or more counterparts, and each of which, when so executed, shall be an original, but all such counterparts shall constitute one and the same instrument.

**Borrower**

**600 Spring, LLC**
*a California limited liability company*

7-29-24

**Scott Gillen** **Date**
*Manager*

7-29-24

**Barry Shy** **Date**
*Manager*

7-28-24

**Amit Tidhar, Trustee of the The Brshy Irrevocable Trust** **Date**

# Adjustable Rate Mortgage Disclosure

**(This is neither a contract nor a commitment to lend.)**

**Lender**

JPMorgan Chase Bank, N.A.
2500 Westfield Dr, Floor 2-1
Elgin, IL 60124

**Borrower**

600 Spring, LLC
Amit Tidhar, Trustee,
Trustee(s) of the The Brshy Irrevocable Trust
Attn: Barry
[redacted]

**Date:** July 25, 2024

**Loan Number:** [redacted]

**Adjustable Rate Mortgage (ARM) Program:** 7Y/6M ARM

This disclosure describes the features of the ARM loan you are considering. Information on other ARM programs is available upon request.

## How Your Interest Rate and Payment Are Determined

- Your interest rate will be based on an index plus a margin. Your initial interest rate will not be based on the index used for later adjustments.
- Ask us whether our current interest rate has a discount or premium and if so, the amount of discount or premium.
- Your payment will be based on the interest rate, loan balance and remaining loan term.
- The index used to determine your interest rate and/or all adjustments is: *30-day Average Secured Overnight Financing Rate ("SOFR" or the "Index").*
- Information about the index *is published by the Federal Reserve Bank of New York (www.newyorkfed.org).*
- Ask us for our current interest rate and margin.

## How Your Interest Rate Can Change

- Your interest rate can change on the 85th month, and every 6 months thereafter.
- Your interest rate cannot increase or decrease more than 5 percentage point(s) at the initial adjustment.
- Your interest rate cannot increase or decrease more than 1 percentage point(s) at each periodic adjustment.
- Your interest rate cannot increase by more than 5 percentage point(s) over the term of the loan.
- Your interest rate will never be less than the margin.
- Your interest rate will be rounded to the nearest 1/8 of 1% at each adjustment.

## How Your Payment Can Change

- Your first payment change will be effective with the 85th monthly payment of your loan.
- Your monthly payments may be subject to change every six month(s) thereafter, and may increase or decrease substantially depending on changes in the interest rate.
- You will be notified at least 60, but no more than 120 days before the first payment at the adjusted level is due after any interest rate adjustment resulting in a corresponding payment change. This notice will contain information about the adjustment, including the interest rate, payment amount, and loan balance.
- Any increase in interest will take the form of a higher payment amount.
- The following examples are based on a $10,000 loan with a 30 Year Term and an initial interest rate from September 2023. Ask us whether our current interest rate has a discount or premium and if so, the amount of the premium or discount.

**7y/6m ARM Example at Discount Interest Rate:** For a loan with an initial interest rate of 6.625% the maximum amount the interest rate can rise under this program is 5 percentage points to 11.625%, and the monthly payment can


© 2014 Wolters Kluwer Financial Services, Inc.
All rights reserved.

rise from an initial payment of $64.03 to a maximum of $94.37 in the 85th month. To see what your initial payment would be divide your mortgage amount by $10,000; then multiply the initial payment by that amount. (For example, the initial payment for a mortgage amount of $500,000 would be: $500,000 ÷ $10,000 = 50, 50 x $64.03 = $3,201.50 per month).

I/We hereby acknowledge receipt of this ARM disclosure and a copy of the *Consumer Handbook on Adjustable Rate Mortgages* on the date indicated below.

**Borrower**

**600 Spring, LLC**
*a California limited liability company*

7-29-24

**Scott Gillen** **Date**
*Manager*

7-29-24

**Barry Shy** **Date**
*Manager*

7-29-24

**Amit Tidhar, Trustee of the The Brshy Irrevocable Trust** **Date**


© 2014 Wolters Kluwer Financial Services, Inc.
All rights reserved.

Form **W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the requester. Do not send to the IRS.**

Print or type
See Specific Instructions on page 3.

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.
600 Spring, LLC

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only one of the following seven boxes:

☐ Individual/sole proprietor or single-member LLC ☐ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate

☒ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ ____________

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):
Exempt payee code (if any) ____
Exemptions from FATCA reporting code (if any) ____________
*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.) See instructions.
[redacted]

6 City, state, and ZIP code
[redacted]

7 List account number(s) here (optional)
[redacted]

Requester's name and address (optional).
JPMorgan Chase Bank, N.A.
2500 Westfield Dr, Floor 2-1
Elgin, IL 60124

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN,* later.

**Note.** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number
N/A

or

Employer identification number
[redacted]

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here** Signature of U.S. person ▶ [signature] Date ▶ 7-29-24

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9.*

### Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

- Form 1099-INT (interest earned or paid)
- Form 1099-DIV (dividends, including those from stocks or mutual funds)
- Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
- Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
- Form 1099-S (proceeds from real estate transactions)
- Form 1099-K (merchant card and third party network transactions)
- Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
- Form 1099-C (canceled debt)
- Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding.* See *What is backup withholding,* later.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting,* later, for further information.

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

- An individual who is a U.S. citizen or U.S. resident alien;
- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;
- An estate (other than a foreign estate); or
- A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States:

- In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;
- In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust; and
- In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items.

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.
2. The treaty article addressing the income.
3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.
4. The type and amount of income that qualifies for the exemption from tax.
5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

***Example.*** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

## Backup Withholding

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 24% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,
2. You do not certify your TIN when required (see the instructions for Part II for details),
3. The IRS tells the requester that you furnished an incorrect TIN,
4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or
5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code*, later, and the separate Instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships*, earlier.

## What is FATCA reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code*, later, and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account; for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

# Specific Instructions

### Line 1

You must enter one of the following on this line; **do not** leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account (other than an account maintained by a foreign financial institution (FFI)), list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9. If you are providing Form W-9 to an FFI to document a joint account, each holder of the account that is a U.S. person must provide a Form W-9.

a. **Individual.** Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

**Note. ITIN applicant:** Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040/1040A/1040EZ you filed with your application.

b. **Sole proprietor or single-member LLC.** Enter your individual name as shown on your 1040/1040A/1040EZ on line 1. You may enter your business, trade, or "doing business as" (DBA) name on line 2.

c. **Partnership, LLC that is not a single-member LLC, C Corporation, or S Corporation.** Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

d. **Other entities.** Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on line 2.

e. **Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulations section 301.7701-2(c)(2)(iii). Enter the owner's name on line 1. The name of the entity entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2, "Business name/disregarded entity name." If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

### Line 2

If you have a business name, trade name, DBA name, or disregarded entity name, you may enter it on line 2.

### Line 3

Check the appropriate box in line 3 for the U.S. federal tax classification of the person whose name is entered on line 1. Check only one box in line 3.

| IF the entity/person on line 1 is a(n)... | THEN check the box for... |
|---|---|
| • Corporation | Corporation |
| • Individual<br>• Sole proprietorship, or<br>• Single-member limited liability company (LLC) owned by an individual and disregarded for U.S. federal tax purposes. | Individual/sole proprietor or single-member LLC |
| • LLC treated as a partnership for U.S. federal tax purposes,<br>• LLC that has filed Form 8832 or 2553 to be taxed as a corporation, or<br>• LLC that is disregarded as an entity separate from its owner but the owner is another LLC that is not disregarded for U.S. federal tax purposes. | Limited liability company and enter the appropriate tax classification. (P= Partnership; C= C corporation; or S= S corporation) |
| • Partnership | Partnership |
| • Trust/estate | Trust/estate |

### Line 4, Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the appropriate space on line 4 any code(s) that may apply to you.

**Exempt payee code.**

- Generally, individuals (including sole proprietors) are not exempt from backup withholding.
- Except as provided below, corporations are exempt from backup withholding for certain payments, including interest and dividends.
- Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.
- Corporations are not exempt from backup withholding with respect to attorneys' fees or gross proceeds paid to attorneys, and corporations that provide medical or health care services are not exempt with respect to payments reportable on Form 1099-MISC.

The following codes identify payees that are exempt from backup withholding. Enter the appropriate code in the space in line 4.

1-An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2-The United States or any of its agencies or instrumentalities

3-A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

4-A foreign government or any of its political subdivisions, agencies, or instrumentalities

5-A corporation

6-A dealer in securities or commodities required to register in the United States, the District of Columbia, or a U.S. commonwealth or possession

7-A futures commission merchant registered with the Commodity Futures Trading Commission

8-A real estate investment trust

9-An entity registered at all times during the tax year under the Investment Company Act of 1940

10-A common trust fund operated by a bank under section 584(a)

11-A financial institution

12-A middleman known in the investment community as a nominee or custodian

13-A trust exempt from tax under section 664 or described in section 4947

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000 [1] | Generally, exempt payees 1 through 5[2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney reportable under section 6045(f), and payments for services paid by a federal executive agency.

**Exemption from FATCA reporting code.** The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements. A requester may indicate

that a code is not required by providing you with a Form W-9 with "Not Applicable" (or any similar indication) written or printed on the line for a FATCA exemption code.

A-An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B-The United States or any of its agencies or instrumentalities

C-A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

D-A corporation the stock of which is regularly traded on one or more established securities markets, as described in Regulations section 1.1472-1(c)(1)(i)

E-A corporation that is a member of the same expanded affiliated group as a corporation described in Regulations section 1.1472-1(c)(1)(i)

F-A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G-A real estate investment trust

H-A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I-A common trust fund as defined in section 584(a)

J-A bank as defined in section 581

K-A broker

L-A trust exempt from tax under section 664 or described in section 4947(a)(1)

M-A tax exempt trust under a section 403(b) plan or section 457(g) plan

**Note.** You may wish to consult with the financial institution requesting this form to determine whether the FATCA code and/or exempt payee code should be completed.

### Line 5

Enter your address (number, street, and apartment or suite number). This is where the requester of this Form W-9 will mail your information returns. If this address differs from the one the requester already has on file, write NEW at the top. If a new address is provided, there is still a chance the old address will be used until the payor changes your address in their records.

### Line 6

Enter your city, state, and ZIP code.

## Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN.

If you are a single-member LLC that is disregarded as an entity separate from its owner, enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note.** See *What Name and Number To Give the Requester*, later, for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local SSA office or get this form online at *www.SSA.gov*. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/Businesses* and clicking on Employer Identification Number (EIN) under Starting a Business. Go to *www.irs.gov/Forms* to view, download, or print Form W-7 and/or Form SS-4. Or, you can go to *www.irs.gov/OrderForms* to place an order and have Form W-7 and/or SS-4 mailed to you within 10 business days.

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note.** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, or 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see *Exempt payee code* earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

1. **Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

2. **Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

3. **Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

4. **Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

5. **Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), ABLE accounts (under section 529A), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) other than an account maintained by an FFI | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Two or more U.S. persons (joint account maintained by an FFI) | Each holder of the account |
| 4. Custodial account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 5. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 6. Sole proprietorship or disregarded entity owned by an individual | The owner [3] |
| 7. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulations section 1.671-4(b)(2)(i)(A)) | The grantor* |

| For this type of account: | Give name and EIN of: |
|---|---|
| 8. Disregarded entity not owned by an individual | The owner |
| 9. A valid trust, estate, or pension trust | Legal entity[4] |
| 10. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 11. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 12. Partnership or multi-member LLC | The partnership |
| 13. A broker or registered nominee | The broker or nominee |
| 14. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 15. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulations section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or DBA name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules for partnerships*, earlier.

* Note. Grantor also must provide a Form W-9 to trustee of trust.

**Note.** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records from Identity Theft

Identity theft occurs when someone uses your personal information such as your name, SSN, or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

- Protect your SSN,
- Ensure your employer is protecting your SSN, and
- Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Pub. 5027, Identity Theft Information for Taxpayers.

Victims of identity theft who are experiencing economic harm or a systemic problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

***Protect yourself from suspicious emails or phishing schemes.*** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to *phishing@irs.gov*. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration (TIGTA) at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at: *spam@uce.gov* or report them at *www.ftc.gov/complaint*. You can contact the FTC at *www.ftc.gov/idtheft* or 877-IDTHEFT (877-438-4338). If you have been the victim of identity theft, see *www.IdentityTheft.gov* and Pub. 5027.

Visit *www.irs.gov/IdentityTheft* to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

Form **W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the requester. Do not send to the IRS.**

See Specific Instructions on page 3. Print or type

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.
The Brshy Irrevocable Trust

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only one of the following seven boxes:

☐ Individual/sole proprietor or single-member LLC ☐ C Corporation ☐ S Corporation ☐ Partnership ☒ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ ____________

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):
Exempt payee code (if any) ____
Exemptions from FATCA reporting code (if any) ____
*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.) See instructions.
[redacted]

6 City, state, and ZIP code
[redacted]

7 List account number(s) here (optional)
[redacted]

Requester's name and address (optional).
JPMorgan Chase Bank, N.A.
2500 Westfield Dr, Floor 2-1
Elgin, IL 60124

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note.** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number
N/A

or

[redacted]

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here** Signature of U.S. person ▶ [signature] Date ▶ 7-29-24

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

### Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

- Form 1099-INT (interest earned or paid)
- Form 1099-DIV (dividends, including those from stocks or mutual funds)
- Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
- Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
- Form 1099-S (proceeds from real estate transactions)
- Form 1099-K (merchant card and third party network transactions)
- Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
- Form 1099-C (canceled debt)
- Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting*, later, for further information.

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

- An individual who is a U.S. citizen or U.S. resident alien;
- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;
- An estate (other than a foreign estate); or
- A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States:

- In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;
- In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust; and
- In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items.

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.
2. The treaty article addressing the income.
3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.
4. The type and amount of income that qualifies for the exemption from tax.
5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

***Example.*** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

## Backup Withholding

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 24% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,
2. You do not certify your TIN when required (see the instructions for Part II for details),
3. The IRS tells the requester that you furnished an incorrect TIN,
4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or
5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code*, later, and the separate Instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships*, earlier.

## What is FATCA reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code*, later, and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account; for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

# Specific Instructions

## Line 1

You must enter one of the following on this line; **do not** leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account (other than an account maintained by a foreign financial institution (FFI)), list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9. If you are providing Form W-9 to an FFI to document a joint account, each holder of the account that is a U.S. person must provide a Form W-9.

a. **Individual.** Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

**Note. ITIN applicant:** Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040/1040A/1040EZ you filed with your application.

b. **Sole proprietor or single-member LLC.** Enter your individual name as shown on your 1040/1040A/1040EZ on line 1. You may enter your business, trade, or "doing business as" (DBA) name on line 2.

c. **Partnership, LLC that is not a single-member LLC, C Corporation, or S Corporation.** Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

d. **Other entities.** Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on line 2.

e. **Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulations section 301.7701-2(c)(2)(iii). Enter the owner's name on line 1. The name of the entity entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2, "Business name/disregarded entity name." If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

## Line 2

If you have a business name, trade name, DBA name, or disregarded entity name, you may enter it on line 2.

## Line 3

Check the appropriate box in line 3 for the U.S. federal tax classification of the person whose name is entered on line 1. Check only one box in line 3.

| IF the entity/person on line 1 is a(n)... | THEN check the box for... |
|---|---|
| • Corporation | Corporation |
| • Individual<br>• Sole proprietorship, or<br>• Single-member limited liability company (LLC) owned by an individual and disregarded for U.S. federal tax purposes. | Individual/sole proprietor or single-member LLC |
| • LLC treated as a partnership for U.S. federal tax purposes,<br>• LLC that has filed Form 8832 or 2553 to be taxed as a corporation, or<br>• LLC that is disregarded as an entity separate from its owner but the owner is another LLC that is not disregarded for U.S. federal tax purposes. | Limited liability company and enter the appropriate tax classification. (P= Partnership; C= C corporation; or S= S corporation) |
| • Partnership | Partnership |
| • Trust/estate | Trust/estate |

## Line 4, Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the appropriate space on line 4 any code(s) that may apply to you.

**Exempt payee code.**

- Generally, individuals (including sole proprietors) are not exempt from backup withholding.
- Except as provided below, corporations are exempt from backup withholding for certain payments, including interest and dividends.
- Corporations are not exempt from backup withholding for payments made [redacted]f payment card or third party network transactions.
- Corporations are not exempt from backup withholding with respect to attorneys' fees or gross proceeds paid to attorneys, and corporations that provide medical or health care services are not exempt with respect to payments reportable on Form 1099-MISC.

The following codes identify payees that are exempt from backup withholding. Enter the appropriate code in the space in line 4.

1-An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2-The United States or any of its agencies or instrumentalities

3-A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

4-A foreign government or any of its political subdivisions, agencies, or instrumentalities

5-A corporation

6-A dealer in securities or commodities required to register in the United States, the District of Columbia, or a U.S. commonwealth or possession

7-A futures commission merchant registered with the Commodity Futures Trading Commission

8-A real estate investment trust

9-An entity registered at all times during the tax year under the Investment Company Act of 1940

10-A common trust fund operated by a bank under section 584(a)

11-A financial institution

12-A middleman known in the investment community as a nominee or custodian

13-A trust exempt from tax under section 664 or described in section 4947

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000 [1] | Generally, exempt payees 1 through 5 [2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney reportable under section 6045(f), and payments for services paid by a federal executive agency.

**Exemption from FATCA reporting code.** The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements. A requester may indicate

that a code is not required by providing you with a Form W-9 with "Not Applicable" (or any similar indication) written or printed on the line for a FATCA exemption code.

A-An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B-The United States or any of its agencies or instrumentalities

C-A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

D-A corporation the stock of which is regularly traded on one or more established securities markets, as described in Regulations section 1.1472-1(c)(1)(i)

E-A corporation that is a member of the same expanded affiliated group as a corporation described in Regulations section 1.1472-1(c)(1)(i)

F-A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G-A real estate investment trust

H-A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I-A common trust fund as defined in section 584(a)

J-A bank as defined in section 581

K-A broker

L-A trust exempt from tax under section 664 or described in section 4947(a)(1)

M-A tax exempt trust under a section 403(b) plan or section 457(g) plan

**Note.** You may wish to consult with the financial institution requesting this form to determine whether the FATCA code and/or exempt payee code should be completed.

### Line 5

Enter your address (number, street, and apartment or suite number). This is where the requester of this Form W-9 will mail your information returns. If this address differs from the one the requester already has on file, write NEW at the top. If a new address is provided, there is still a chance the old address will be used until the payor changes your address in their records.

### Line 6

Enter your city, state, and ZIP code.

## Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN.

If you are a single-member LLC that is disregarded as an entity separate from its owner, enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note.** See *What Name and Number To Give the Requester*, later, for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local SSA office or get this form online at *www.SSA.gov*. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/Businesses* and clicking on Employer Identification Number (EIN) under Starting a Business. Go to *www.irs.gov/Forms* to view, download, or print Form W-7 and/or Form SS-4. Or, you can go to *www.irs.gov/OrderForms* to place an order and have Form W-7 and/or SS-4 mailed to you within 10 business days.

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note.** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, or 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see *Exempt payee code* earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

1. **Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

2. **Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

3. **Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

4. **Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

5. **Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), ABLE accounts (under section 529A), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) other than an account maintained by an FFI | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Two or more U.S. persons (joint account maintained by an FFI) | Each holder of the account |
| 4. Custodial account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 5. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee[1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 6. Sole proprietorship or disregarded entity owned by an individual | The owner[3] |
| 7. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulations section 1.671-4(b)(2)(i)(A)) | The grantor* |

| For this type of account: | Give name and EIN of: |
|---|---|
| 8. Disregarded entity not owned by an individual | The owner |
| 9. A valid trust, estate, or pension trust | Legal entity[4] |
| 10. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 11. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 12. Partnership or multi-member LLC | The partnership |
| 13. A broker or registered nominee | The broker or nominee |
| 14. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 15. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulations section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or DBA name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules for partnerships*, earlier.

* **Note.** Grantor also must provide a Form W-9 to trustee of trust.

**Note.** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records from Identity Theft

Identity theft occurs when someone uses your personal information such as your name, SSN, or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

- Protect your SSN,
- Ensure your employer is protecting your SSN, and
- Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Pub. 5027, Identity Theft Information for Taxpayers.

Victims of identity theft who are experiencing economic harm or a systemic problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to *phishing@irs.gov*. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration (TIGTA) at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at: *spam@uce.gov* or report them at *www.ftc.gov/complaint*. You can contact the FTC at *www.ftc.gov/idtheft* or 877-IDTHEFT (877-438-4338). If you have been the victim of identity theft, see *www.IdentityTheft.gov* and Pub. 5027.

Visit *www.irs.gov/IdentityTheft* to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

*To be completed by the Lender:*
Lender Loan No./Universal Loan Identifier 1108734962 Agency Case No. ____________

# Uniform Residential Loan Application

**Verify and complete the information on this application.** If you are applying for this loan with others, each additional Borrower must provide information as directed by your Lender.

## Section 1: Borrower Information.

This section asks about your personal information and your income from employment and other sources, such as retirement, that you want considered to qualify for this loan.

### 1a. Personal Information

**Name** *(First, Middle, Last, Suffix)*
600 Spring, LLC

**Alternate Names -** *List any names by which you are known or any names under which credit was previously received (First, Middle, Last, Suffix)*

**Social Security Number** [redacted]
*(or Individual Taxpayer Identification Number)*

**Date of Birth** *(mm/dd/yyyy)* ____________

**Citizenship**
☐ U.S. Citizen
☐ Permanent Resident Alien
☐ Non-Permanent Resident Alien

**Type of Credit**
☒ I am applying for **individual credit.**
☐ I am applying for **joint credit.** Total Number of Borrowers: ____
Each Borrower intends to apply for joint credit. **Your initials:** ____

**List Name(s) of Other Borrower(s) Applying for this Loan**
*(First, Middle, Last, Suffix) - Use a separator between names*
1. The Brshy Irrevocable Trust

**Marital Status**
☐ Married
☐ Separated
☐ Unmarried
*(Single, Divorced, Widowed, Civil Union, Domestic Partnership, Registered Reciprocal Beneficiary Relationship)*

**Dependents**
*(not listed by another Borrower)*
Number ____
Ages ____________

**Contact Information**
**Home** phone [redacted]
**Cell** phone ____________
**Work** phone ____________ **Ext.** ____________
**Email** ____________

**Current Address**
Street [redacted] Unit # ____________
City [redacted] State CA ZIP [redacted] Country ____________

How long at Current Address 0 Years 0 Months **Housing** ☐ No primary housing expense ☐ Own ☐ Rent ($ ____ /month)

**Mailing Address -** *if different from Current Address* ____ ☐ ***Does not apply***
Street Attn: Barry, [redacted] Unit # ____________
City [redacted] State CA ZIP [redacted] Country ____________

### 1b. Current Employment/Self Employment and Income

☒ ***Does not apply*** ***See PFS on File with Lender***

### 1c. IF APPLICABLE, Complete Information for Additional Employment/Self Employment and Income

***See PFS on File with Lender***
☒ ***Does not apply***

### 1d. IF APPLICABLE, Complete Information for Previous Employment/Self-Employment and Income

***See PFS on File with Lender***
☒ ***Does not apply***

**Provide at least 2 years of current and previous employment and income.**

*See PFS on File with Lender*

**1e. Income from Other Sources** ☒ *Does not apply*

**Include income from other sources below. Under Income Source, choose from the sources listed here:**

- Alimony
- Automobile Allowance
- Boarder Income
- Capital Gains
- Child Support
- Disability
- Foster Care
- Housing or Parsonage
- Interest and Dividends
- Mortgage Credit Certificate
- Mortgage Differential Payments
- Notes Receivable
- Public Assistance
- Retirement *(e.g. Pension, IRA)*
- Royalty Payments
- Separate Maintenance
- Social Security
- Trust
- Unemployment Benefits
- VA Compensation
- Other

**NOTE:** *Reveal alimony, child support, separate maintenance, or other income ONLY IF you want it considered in determining your qualification for this loan.*

# Section 2: Financial Information - Assets and Liabilities.

This section asks about things you own that are worth money and that you want considered to qualify for this loan. It then asks about your liabilities (or debts) that you pay each month, such as credit cards, alimony, or other expenses.

*See PFS on File with Lender*

**2a. Assets – Bank Accounts, Retirement, and Other Accounts You Have**

**Include all accounts below. Under Account Type, choose from the types listed here:**

- Checking
- Savings
- Money Market
- Certificate of Deposit
- Mutual Fund
- Stocks
- Stock Options
- Bonds
- Retirement *(e.g. 401k, IRA)*
- Bridge Loan Proceeds
- Individual Development Account
- Trust Account
- Cash Value of Life Insurance *(used for the transaction)*

**Provide TOTAL Amount Here** | $

*See PFS on File with Lender*

**2b. Other Assets and Credits You Have** ☒ *Does not apply*

**Include all other assets and credits below. Under Asset or Credit Type, choose from the types listed here:**

*Assets*

- Proceeds from Real Estate Property to be sold on or before closing
- Proceeds from Sale of Non-Real Estate Asset
- Secured Borrowed Funds
- Unsecured Borrowed Funds
- Other

*Credits*

- Earnest Money
- Employer Assistance
- Lot Equity
- Relocation Funds
- Rent Credit
- Sweat Equity
- Trade Equity

*See PFS on File with Lender*

**2c. Liabilities – Credit Cards, Other Debts, and Leases that You Owe** ☒ *Does not apply*

**List all liabilities below (except real estate) and include deferred payments. Under Account Type, choose from the types listed here:**

- Revolving *(e.g., credit cards)*
- Installment *(e.g., car, student, personal loans)*
- Open 30-Day *(balance paid monthly)*
- Lease *(not real estate)*
- Other

*See PFS on File with Lender*

**2d. Other Liabilities and Expenses** ☒ *Does not apply*

**Include all other liabilities and expenses below. Choose from the types listed here:**

- Alimony
- Child Support
- Separate Maintenance
- Job Related Expenses
- Other

# Section 3: Financial Information - Real Estate.

This section asks you to list all properties you currently own and what you owe on them.

☐ ***I do not own any real estate***

**3a. Property You Own** *See PFS on File with Lender*

*See PFS on File with Lender*

**3b. IF APPLICABLE, Complete Information for Additional Property** ☒ *Does not apply*

**Borrower Name:** 600 Spring, LLC

## Section 4: Loan and Property Information.

This section asks about the loan's purpose and the property you want to purchase or refinance.

### 4a. Loan and Property Information

**Loan Amount** $ 20,800,000.00 **Loan Purpose** ☐ Purchase ☒ Refinance ☐ Other *(specify)* ______

**Property Address** Street 24185 Case Ct Unit # ______

City Malibu State CA ZIP 90265 County Los Angeles

Number of Units 1 **Property Value $** 32,000,000.00

**Occupancy** ☐ Primary Residence ☒ Second Home ☐ Investment Property **FHA Secondary Residence** ☐

1. **Mixed-Use Property.** If you will occupy the property, will you set aside space within the property to operate your own business? *(e.g., daycare facility, medical office, beauty/barber shop)* ☒ NO ☐ YES

2. **Manufactured Home.** Is the property a manufactured home? *(e.g., a factory built dwelling built on a permanent chassis)* ☒ NO ☐ YES

### 4b. Other New Mortgage Loans on the Property You are Buying or Refinancing

☒ ***Does not apply***

### 4c. Rental Income on the Property You Want to Purchase

**For Purchase Only** ______ ☒ ***Does not apply***

### 4d. Gifts or Grants You Have Been Given or Will Receive for This Loan

☒ ***Does not apply***

**Include all gifts and grants below. Under Source, choose from the sources listed here:**

- Community Nonprofit
- Employer
- Federal Agency
- Local Agency
- Relative
- Religious Nonprofit
- State Agency
- Unmarried Partner
- Lender
- Other

**Borrower Name:** 600 Spring, LLC

## Section 5: Declarations.

This section asks you specific questions about the property, your funding, and your past financial history.

### 5a. About this Property and Your Money for this Loan

| | |
|---|---|
| **A.** Will you occupy the property as your primary residence? | ☐ NO ☐ YES |
| If YES, have you had an ownership interest in another property in the last three years? | ☐ NO ☐ YES |
| If YES, complete (1) and (2) below: | |
| (1) What type of property did you own: primary residence (PR), FHA secondary residence (SR), second home (SH), or investment property (IP)? | ________ |
| (2) How did you hold title to the property: by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | ________ |
| **B.** If this is a Purchase Transaction: Do you have a family relationship or business affiliation with the seller of the property? | ☐ NO ☐ YES |
| **C.** Are you borrowing any money for this real estate transaction *(e.g., money for your closing costs or down payment)* or obtaining any money from another party, such as the seller or realtor, that you have not disclosed on this loan application? | ☐ NO ☐ YES |
| If YES, what is the amount of this money? | $ ________ |
| **D.** 1. Have you or will you be applying for a mortgage loan on another property (not the property securing this loan) on or before closing this transaction that is not disclosed on this loan application? | ☒ NO ☐ YES |
| 2. Have you or will you be applying for any new credit *(e.g., installment loan, credit card, etc.)* on or before closing this loan that is not disclosed on this application? | ☒ NO ☐ YES |
| **E.** Will this property be subject to a lien that could take priority over the first mortgage lien, such as a clean energy lien paid through your property taxes *(e.g., the Property Assessed Clean Energy Program)*? | ☒ NO ☐ YES |

### 5b. About Your Finances

| | |
|---|---|
| **F.** Are you a co-signer or guarantor on any debt or loan that is not disclosed on this application? | ☐ NO ☐ YES |
| **G.** Are there any outstanding judgments against you? | ☐ NO ☐ YES |
| **H.** Are you currently delinquent or in default on a Federal debt? | ☐ NO ☐ YES |
| **I.** Are you a party to a lawsuit in which you potentially have any personal financial liability? | ☐ NO ☐ YES |
| **J.** Have you conveyed title to any property in lieu of foreclosure in the past 7 years? | ☒ NO ☐ YES |
| **K.** Within the past 7 years, have you completed a pre-foreclosure sale or short sale, whereby the property was sold to a third party and the Lender agreed to accept less than the outstanding mortgage balance due? | ☒ NO ☐ YES |
| **L.** Have you had property foreclosed upon in the last 7 years? | ☐ NO ☐ YES |
| **M.** Have you declared bankruptcy within the past 7 years? | ☐ NO ☐ YES |
| If YES, identify the type(s) of bankruptcy: ☐ Chapter 7 ☐ Chapter 11 ☐ Chapter 12 ☐ Chapter 13 | |

**Borrower Name:** 600 Spring, LLC

## Section 6: Acknowledgments and Agreements.

This section tells you about your legal obligations when you sign this application.

**Acknowledgments and Agreements**

**Definitions:**
- *"Lender"* includes the Lender's agents, service providers, and any of their successors and assigns.
- *"Other Loan Participants"* includes (i) any actual or potential owners of a loan resulting from this application (the *"Loan"*), (ii) acquirers of any beneficial or other interest in the Loan, (iii) any mortgage insurer, (iv) any guarantor, (v) any servicer of the Loan, and (vi) any of these parties' service providers, successors or assigns.

**I agree to, acknowledge, and represent the following:**

**(1) The Complete Information for this Application**
- The information I have provided in this application is true, accurate, and complete as of the date I signed this application.
- If the information I submitted changes or I have new information before closing of the Loan, I must change and supplement this application, including providing any updated/supplemented real estate sales contract.
- For purchase transactions: The terms and conditions of any real estate sales contract signed by me in connection with this application are true, accurate, and complete to the best of my knowledge and belief. I have not entered into any other agreement, written or oral, in connection with this real estate transaction.
- The Lender and Other Loan Participants may rely on the information contained in the application before and after closing of the Loan.
- Any intentional or negligent misrepresentation of information may result in the imposition of:
  (a) civil liability on me, including monetary damages, if a person suffers any loss because the person relied on any misrepresentation that I have made on this application, and/or
  (b) criminal penalties on me including, but not limited to, fine or imprisonment or both under the provisions of Federal law (18 U.S.C. §§ 1001 *et seq.*).

**(2) The Property's Security**
The Loan I have applied for in this application will be secured by a mortgage or deed of trust which provides the Lender a security interest in the property described in this application.

**(3) The Property's Appraisal, Value, and Condition**
- Any appraisal or value of the property obtained by the Lender is for use by the Lender and Other Loan Participants.
- The Lender and Other Loan Participants have not made any representation or warranty, express or implied, to me about the property, its condition, or its value.

**(4) Electronic Records and Signatures**
- The Lender and Other Loan Participants may keep any paper record and/or electronic record of this application, whether or not the Loan is approved.
- If this application is created as (or converted into) an "electronic application", I consent to the use of "electronic records" and "electronic signatures" as the terms are defined in and governed by applicable Federal and/or state electronic transactions laws.
- I intend to sign and have signed this application either using my:
  (a) electronic signature; or
  (b) a written signature and agree that if a paper version of this application is converted into an electronic application, the application will be an electronic record, and the representation of my written signature on this application will be my binding electronic signature.
- I agree that the application, if delivered or transmitted to the Lender or Other Loan Participants as an electronic record with my electronic signature, will be as effective and enforceable as a paper application signed by me in writing.

**(5) Delinquency**
- The Lender and Other Loan Participants may report information about my account to credit bureaus. Late payments, missed payments, or other defaults on my account may be reflected in my credit report and will likely affect my credit score.
- If I have trouble making my payments I understand that I may contact a HUD-approved housing counseling organization for advice about actions I can take to meet my mortgage obligations.

**(6) Authorization for Use and Sharing of Information**
By signing below, in addition to the representations and agreements made above, I expressly authorize the Lender and Other Loan Participants to obtain, use, and share with each other (i) the loan application and related loan information and documentation, (ii) a consumer credit report on me, and (iii) my tax return information, as necessary to perform the actions listed below, for so long as they have an interest in my loan or its servicing:
  (a) process and underwrite my loan;
  (b) verify any data contained in my consumer credit report, my loan application and other information supporting my loan application;
  (c) inform credit and investment decisions by the Lender and Other Loan Participants;
  (d) perform audit, quality control, and legal compliance analysis and reviews;
  (e) perform analysis and modeling for risk assessments;
  (f) monitor the account for this loan for potential delinquencies and determine any assistance that may be available to me; and
  (g) other actions permissible under applicable law.

**California Civil Code 1812.30(j) requires we notify you that if you, the applicant, are married, you may apply for a separate account.**

**600 Spring, LLC**
*a California limited liability company*

[signature] 07-29-2024

Scott Gillen
*Manager*

Date (mm/dd/yyyy)

**Borrower Name:** 600 Spring, LLC

Barry Shy (signature) 7-29-24

Barry Shy
*Manager*

Date (mm/dd/yyyy)

## Section 7: Military Service.

This section asks questions about your (or your deceased spouse's) military service.

**Military Service of Borrower**

**Military Service -** Did you (or your deceased spouse) ever serve, or are you currently serving, in the United States Armed Forces? ☒ **NO** ☐ **YES**

*If YES, check all that apply:*

- ☐ Currently serving on active duty with projected expiration date of service/tour ______________ *(mm/dd/yyyy)*
- ☐ Currently retired, discharged, or separated from service
- ☐ Only period of service was as a non-activated member of the Reserve or National Guard
- ☐ Surviving spouse

**Borrower Name:** 600 Spring, LLC

# Section 8: Demographic Information.

This section asks about your ethnicity, sex, and race.

## Demographic Information of Borrower

**The purpose of collecting this information** is to help ensure that all applicants are treated fairly and that the housing needs of communities and neighborhoods are being fulfilled. For residential mortgage lending, Federal law requires that we ask applicants for their demographic information (ethnicity, sex, and race) in order to monitor our compliance with equal credit opportunity, fair housing, and home mortgage disclosure laws. You are not required to provide this information, but are encouraged to do so. You may select one or more designations for "Ethnicity" and one or more designations for "Race." **The law provides that we may not discriminate** on the basis of this information, or on whether you choose to provide it. However, if you choose not to provide the information and you have made this application in person, Federal regulations require us to note your ethnicity, sex, and race on the basis of visual observation or surname. The law also provides that we may not discriminate on the basis of age or marital status information you provide in this application. If you do not wish to provide some or all of this information, please check below.

**Ethnicity:** *Check one or more*

☐ Hispanic or Latino
- ☐ Mexican ☐ Puerto Rican ☐ Cuban
- ☐ Other Hispanic or Latino - *Print origin:* ____________________

  *For example: Argentinean, Colombian, Dominican, Nicaraguan, Salvadoran, Spaniard, and so on.*

☐ Not Hispanic or Latino
☐ I do not wish to provide this information

**Sex**

☐ Female
☐ Male
☐ I do not wish to provide this information

**Race:** *Check one or more*

☐ American Indian or Alaska Native - *Print name of enrolled or principal tribe:* ____________________
☐ Asian
- ☐ Asian Indian ☐ Chinese ☐ Filipino
- ☐ Japanese ☐ Korean ☐ Vietnamese
- ☐ Other Asian - *Print Race:* ____________________

  *For example: Hmong, Laotian, Thai, Pakistani, Cambodian, and so on.*

☐ Black or African American
☐ Native Hawaiian or Other Pacific Islander
- ☐ Native Hawaiian ☐ Guamanian or Chamorro ☐ Samoan
- ☐ Other Pacific Islander - *Print race:* ____________________

  *For example: Fijian, Tongan, and so on.*

☐ White
☐ I do not wish to provide this information

**To Be Completed by Financial Institution** *(for application taken in person):*

| | | |
|---|---|---|
| Was the ethnicity of the Borrower collected on the basis of visual observation or surname? | ☐ NO | ☐ YES |
| Was the sex of the Borrower collected on the basis of visual observation or surname? | ☐ NO | ☐ YES |
| Was the race of the Borrower collected on the basis of visual observation or surname? | ☐ NO | ☐ YES |

**The Demographic Information was provided through:**

☐ Face-to-Face Interview (*includes Electronic Media w/ Video Component*) ☐ Telephone Interview ☐ Fax or Mail ☐ Email or Internet

**Borrower Name:** 600 Spring, LLC

## Section 9: Loan Originator Information. To be completed by your Loan Originator.

**Loan Originator Information**

Loan Originator Organization Name JPMorgan Chase Bank, N.A.
Address 2500 Westfield Dr, Floor 2-1, Elgin, IL 60124
Loan Originator Organization NMLSR ID# 399798 State License ID#
Loan Originator Name CLIFTON R KOCHINSKY
Loan Originator NMLSR ID# 1229746 State License ID# NA
Email CLIFTON.R.KOCHINSKY@JPMORGAN.COM Phone (713) 216-8004

CLIFTON R KOCHINSKY Date (mm/dd/yyyy)

**Borrower Name:** 600 Spring, LLC

*To be completed by the Lender:*
Lender Loan No./Universal Loan Identifier 1100784862 Agency Case No. ____

# Uniform Residential Loan Application

**Verify and complete the information on this application.** If you are applying for this loan with others, each additional Borrower must provide information as directed by your Lender.

## Section 1: Borrower Information.

This section asks about your personal information and your income from employment and other sources, such as retirement, that you want considered to qualify for this loan.

### 1a. Personal Information

**Name** *(First, Middle, Last, Suffix)*
Amit Tidhar, Trustee of the The Brshy Irrevocable Trust, a/an California Trust

**Alternate Names -** *List any names by which you are known or any names under which credit was previously received (First, Middle, Last, Suffix)*

**Social Security Number** [redacted]
*(or Individual Taxpayer Identification Number)*

**Date of Birth** *(mm/dd/yyyy)* ____

**Citizenship**
☐ U.S. Citizen
☐ Permanent Resident Alien
☐ Non-Permanent Resident Alien

**Type of Credit**
☒ I am applying for **individual credit.**
☐ I am applying for **joint credit.** Total Number of Borrowers: ____
Each Borrower intends to apply for joint credit. **Your initials:** ____

**List Name(s) of Other Borrower(s) Applying for this Loan**
*(First, Middle, Last, Suffix) - Use a separator between names*
1. 600 Spring, LLC

**Marital Status**
☐ Married
☐ Separated
☐ Unmarried
*(Single, Divorced, Widowed, Civil Union, Domestic Partnership, Registered Reciprocal Beneficiary Relationship)*

**Dependents**
*(not listed by another Borrower)*
Number ____
Ages ____

**Contact Information**
**Home** phone [redacted]
**Cell** phone ____
**Work** phone [redacted] **Ext.** ____
**Email** [redacted]

**Current Address**
Street [redacted] Unit # ____
City [redacted] State CA ZIP [redacted] Country ____
How long at Current Address 0 Years 0 Months **Housing** ☐ No primary housing expense ☐ Own ☐ Rent ($ ____ /month)

**Mailing Address -** *if different from Current Address* ____ ☐ ***Does not apply***
Street Attn: Barry [redacted] Unit # ____
City [redacted] State CA ZIP [redacted] Country ____

***See PFS on File with Lender***

### 1b. Current Employment/Self Employment and Income

☒ ***Does not apply***

***See PFS on File with Lender***

### 1c. IF APPLICABLE, Complete Information for Additional Employment/Self Employment and Income

☒ ***Does not apply***

***See PFS on File with Lender***

### 1d. IF APPLICABLE, Complete Information for Previous Employment/Self-Employment and Income

☒ ***Does not apply***

**Provide at least 2 years of current and previous employment and income.**

*See PFS on File with Lender*

**1e. Income from Other Sources** ☐ *Does not apply*

**Include income from other sources below. Under Income Source, choose from the sources listed here:**

- Alimony
- Automobile Allowance
- Boarder Income
- Capital Gains
- Child Support
- Disability
- Foster Care
- Housing or Parsonage
- Interest and Dividends
- Mortgage Credit Certificate
- Mortgage Differential Payments
- Notes Receivable
- Public Assistance
- Retirement *(e.g. Pension, IRA)*
- Royalty Payments
- Separate Maintenance
- Social Security
- Trust
- Unemployment Benefits
- VA Compensation
- Other

**NOTE:** *Reveal alimony, child support, separate maintenance, or other income ONLY IF you want it considered in determining your qualification for this loan.*

| **Income Source** - *use list above* | **Monthly Income** |
|---|---|
| | $ |
| **Provide TOTAL Amount Here** | $ |

## Section 2: Financial Information - Assets and Liabilities.

This section asks about things you own that are worth money and that you want considered to qualify for this loan. It then asks about your liabilities (or debts) that you pay each month, such as credit cards, alimony, or other expenses.

*See PFS on File with Lender*

**2a. Assets – Bank Accounts, Retirement, and Other Accounts You Have**

**Include all accounts below. Under Account Type, choose from the types listed here:**

- Checking
- Savings
- Money Market
- Certificate of Deposit
- Mutual Fund
- Stocks
- Stock Options
- Bonds
- Retirement *(e.g. 401k, IRA)*
- Bridge Loan Proceeds
- Individual Development Account
- Trust Account
- Cash Value of Life Insurance *(used for the transaction)*

| | |
|---|---|
| **Provide TOTAL Amount Here** | $ |

*See PFS on File with Lender*

**2b. Other Assets and Credits You Have** ☒ *Does not apply*

**Include all other assets and credits below. Under Asset or Credit Type, choose from the types listed here:**

*Assets*
- Proceeds from Real Estate Property to be sold on or before closing
- Proceeds from Sale of Non-Real Estate Asset
- Secured Borrowed Funds
- Unsecured Borrowed Funds
- Other

*Credits*
- Earnest Money
- Employer Assistance
- Lot Equity
- Relocation Funds
- Rent Credit
- Sweat Equity
- Trade Equity

*See PFS on File with Lender*

**2c. Liabilities – Credit Cards, Other Debts, and Leases that You Owe** ☒ *Does not apply*

**List all liabilities below (except real estate) and include deferred payments. Under Account Type, choose from the types listed here:**

- Revolving *(e.g., credit cards)*
- Installment *(e.g., car, student, personal loans)*
- Open 30-Day *(balance paid monthly)*
- Lease *(not real estate)*
- Other

*See PFS on File with Lender*

**2d. Other Liabilities and Expenses** ☒ *Does not apply*

**Include all other liabilities and expenses below. Choose from the types listed here:**

- Alimony
- Child Support
- Separate Maintenance
- Job Related Expenses
- Other

**Borrower Name:** The Brshy Irrevocable Trust

## Section 3: Financial Information - Real Estate.

This section asks you to list all properties you currently own and what you owe on them.

☐ ***I do not own any real estate***

**3a. Property You Own** — ***See PFS on File with Lender***

**3b. IF APPLICABLE, Complete Information for Additional Property** — ☒ ***Does not apply*** — ***See PFS on File with Lender***

## Section 4: Loan and Property Information.

This section asks about the loan's purpose and the property you want to purchase or refinance.

**4a. Loan and Property Information**

**Loan Amount** $ 20,800,000.00 **Loan Purpose** ☐ Purchase ☒ Refinance ☐ Other *(specify)* ______

**Property Address** Street 24185 Case Ct Unit # ______

City Malibu State CA ZIP 90265 County Los Angeles

Number of Units 1 **Property Value $** 32,000,000.00

**Occupancy** ☐ Primary Residence ☒ Second Home ☐ Investment Property **FHA Secondary Residence** ☐

1. **Mixed-Use Property.** If you will occupy the property, will you set aside space within the property to operate your own business? *(e.g., daycare facility, medical office, beauty/barber shop)* ☒ NO ☐ YES

2. **Manufactured Home.** Is the property a manufactured home? *(e.g., a factory built dwelling built on a permanent chassis)* ☒ NO ☐ YES

**4b. Other New Mortgage Loans on the Property You are Buying or Refinancing** ☒ ***Does not apply***

**4c. Rental Income on the Property You Want to Purchase** **For Purchase Only** ______ ☒ ***Does not apply***

**4d. Gifts or Grants You Have Been Given or Will Receive for This Loan** ☒ ***Does not apply***

**Include all gifts and grants below. Under Source, choose from the sources listed here:**

- Community Nonprofit
- Employer
- Federal Agency
- Local Agency
- Relative
- Religious Nonprofit
- State Agency
- Unmarried Partner
- Lender
- Other

**Borrower Name:** The Brshy Irrevocable Trust

## Section 5: Declarations.

This section asks you specific questions about the property, your funding, and your past financial history.

### 5a. About this Property and Your Money for this Loan

| | |
|---|---|
| **A.** Will you occupy the property as your primary residence? | ☐ NO ☐ YES |
| If YES, have you had an ownership interest in another property in the last three years? | ☐ NO ☐ YES |
| If YES, complete (1) and (2) below: | |
| (1) What type of property did you own: primary residence (PR), FHA secondary residence (SR), second home (SH), or investment property (IP)? | ______ |
| (2) How did you hold title to the property: by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | ______ |
| **B.** If this is a Purchase Transaction: Do you have a family relationship or business affiliation with the seller of the property? | ☐ NO ☐ YES |
| **C.** Are you borrowing any money for this real estate transaction *(e.g., money for your closing costs or down payment)* or obtaining any money from another party, such as the seller or realtor, that you have not disclosed on this loan application? | ☐ NO ☐ YES |
| If YES, what is the amount of this money? | $ ______ |
| **D.** 1. Have you or will you be applying for a mortgage loan on another property (not the property securing this loan) on or before closing this transaction that is not disclosed on this loan application? | ☒ NO ☐ YES |
| 2. Have you or will you be applying for any new credit *(e.g., installment loan, credit card, etc.)* on or before closing this loan that is not disclosed on this application? | ☒ NO ☐ YES |
| **E.** Will this property be subject to a lien that could take priority over the first mortgage lien, such as a clean energy lien paid through your property taxes *(e.g., the Property Assessed Clean Energy Program)*? | ☒ NO ☐ YES |

### 5b. About Your Finances

| | |
|---|---|
| **F.** Are you a co-signer or guarantor on any debt or loan that is not disclosed on this application? | ☐ NO ☐ YES |
| **G.** Are there any outstanding judgments against you? | ☐ NO ☐ YES |
| **H.** Are you currently delinquent or in default on a Federal debt? | ☐ NO ☐ YES |
| **I.** Are you a party to a lawsuit in which you potentially have any personal financial liability? | ☐ NO ☐ YES |
| **J.** Have you conveyed title to any property in lieu of foreclosure in the past 7 years? | ☒ NO ☐ YES |
| **K.** Within the past 7 years, have you completed a pre-foreclosure sale or short sale, whereby the property was sold to a third party and the Lender agreed to accept less than the outstanding mortgage balance due? | ☒ NO ☐ YES |
| **L.** Have you had property foreclosed upon in the last 7 years? | ☐ NO ☐ YES |
| **M.** Have you declared bankruptcy within the past 7 years? | ☐ NO ☐ YES |
| If YES, identify the type(s) of bankruptcy: ☐ Chapter 7 ☐ Chapter 11 ☐ Chapter 12 ☐ Chapter 13 | |

**Borrower Name:** The Brshy Irrevocable Trust

# Section 6: Acknowledgments and Agreements.

This section tells you about your legal obligations when you sign this application.

## Acknowledgments and Agreements

**Definitions:**

- *"Lender"* includes the Lender's agents, service providers, and any of their successors and assigns.
- *"Other Loan Participants"* includes (i) any actual or potential owners of a loan resulting from this application (the *"Loan"*), (ii) acquirers of any beneficial or other interest in the Loan, (iii) any mortgage insurer, (iv) any guarantor, (v) any servicer of the Loan, and (vi) any of these parties' service providers, successors or assigns.

**I agree to, acknowledge, and represent the following:**

**(1) The Complete Information for this Application**

- The information I have provided in this application is true, accurate, and complete as of the date I signed this application.
- If the information I submitted changes or I have new information before closing of the Loan, I must change and supplement this application, including providing any updated/supplemented real estate sales contract.
- For purchase transactions: The terms and conditions of any real estate sales contract signed by me in connection with this application are true, accurate, and complete to the best of my knowledge and belief. I have not entered into any other agreement, written or oral, in connection with this real estate transaction.
- The Lender and Other Loan Participants may rely on the information contained in the application before and after closing of the Loan.
- Any intentional or negligent misrepresentation of information may result in the imposition of:
  (a) civil liability on me, including monetary damages, if a person suffers any loss because the person relied on any misrepresentation that I have made on this application, and/or
  (b) criminal penalties on me including, but not limited to, fine or imprisonment or both under the provisions of Federal law (18 U.S.C. §§ 1001 *et seq.*).

**(2) The Property's Security**

The Loan I have applied for in this application will be secured by a mortgage or deed of trust which provides the Lender a security interest in the property described in this application.

**(3) The Property's Appraisal, Value, and Condition**

- Any appraisal or value of the property obtained by the Lender is for use by the Lender and Other Loan Participants.
- The Lender and Other Loan Participants have not made any representation or warranty, express or implied, to me about the property, its condition, or its value.

**(4) Electronic Records and Signatures**

- The Lender and Other Loan Participants may keep any paper record and/or electronic record of this application, whether or not the Loan is approved.
- If this application is created as (or converted into) an "electronic application", I consent to the use of "electronic records" and "electronic signatures" as the terms are defined in and governed by applicable Federal and/or state electronic transactions laws.
- I intend to sign and have signed this application either using my:
  (a) electronic signature; or
  (b) a written signature and agree that if a paper version of this application is converted into an electronic application, the application will be an electronic record, and the representation of my written signature on this application will be my binding electronic signature.
- I agree that the application, if delivered or transmitted to the Lender or Other Loan Participants as an electronic record with my electronic signature, will be as effective and enforceable as a paper application signed by me in writing.

**(5) Delinquency**

- The Lender and Other Loan Participants may report information about my account to credit bureaus. Late payments, missed payments, or other defaults on my account may be reflected in my credit report and will likely affect my credit score.
- If I have trouble making my payments I understand that I may contact a HUD-approved housing counseling organization for advice about actions I can take to meet my mortgage obligations.

**(6) Authorization for Use and Sharing of Information**

By signing below, in addition to the representations and agreements made above, I expressly authorize the Lender and Other Loan Participants to obtain, use, and share with each other (i) the loan application and related loan information and documentation, (ii) a consumer credit report on me, and (iii) my tax return information, as necessary to perform the actions listed below, for so long as they have an interest in my loan or its servicing:
(a) process and underwrite my loan;
(b) verify any data contained in my consumer credit report, my loan application and other information supporting my loan application;
(c) inform credit and investment decisions by the Lender and Other Loan Participants;
(d) perform audit, quality control, and legal compliance analysis and reviews;
(e) perform analysis and modeling for risk assessments;
(f) monitor the account for this loan for potential delinquencies and determine any assistance that may be available to me; and
(g) other actions permissible under applicable law.

**California Civil Code 1812.30(j) requires we notify you that if you, the applicant, are married, you may apply for a separate account.**

[signature] 7-29-24

Amit Tidhar, Trustee of the The Brshy Irrevocable Trust — Date (mm/dd/yyyy)

**Borrower Name:** The Brshy Irrevocable Trust

## Section 7: Military Service.

This section asks questions about your (or your deceased spouse's) military service.

Military Service of Borrower

**Military Service -** Did you (or your deceased spouse) ever serve, or are you currently serving, in the United States Armed Forces? ☒ NO ☐ YES

*If YES, check all that apply:*
- ☐ Currently serving on active duty with projected expiration date of service/tour ________ *(mm/dd/yyyy)*
- ☐ Currently retired, discharged, or separated from service
- ☐ Only period of service was as a non-activated member of the Reserve or National Guard
- ☐ Surviving spouse

**Borrower Name:** The Brshy Irrevocable Trust

## Section 8: Demographic Information.

This section asks about your ethnicity, sex, and race.

### Demographic Information of Borrower

**The purpose of collecting this information** is to help ensure that all applicants are treated fairly and that the housing needs of communities and neighborhoods are being fulfilled. For residential mortgage lending, Federal law requires that we ask applicants for their demographic information (ethnicity, sex, and race) in order to monitor our compliance with equal credit opportunity, fair housing, and home mortgage disclosure laws. You are not required to provide this information, but are encouraged to do so. You may select one or more designations for "Ethnicity" and one or more designations for "Race." **The law provides that we may not discriminate** on the basis of this information, or on whether you choose to provide it. However, if you choose not to provide the information and you have made this application in person, Federal regulations require us to note your ethnicity, sex, and race on the basis of visual observation or surname. The law also provides that we may not discriminate on the basis of age or marital status information you provide in this application. If you do not wish to provide some or all of this information, please check below.

**Ethnicity:** *Check one or more*
- ☐ Hispanic or Latino
  - ☐ Mexican ☐ Puerto Rican ☐ Cuban
  - ☐ Other Hispanic or Latino - *Print origin:* ______________________

    *For example: Argentinean, Colombian, Dominican, Nicaraguan, Salvadoran, Spaniard, and so on.*
- ☐ Not Hispanic or Latino
- ☐ I do not wish to provide this information

**Sex**
- ☐ Female
- ☐ Male
- ☐ I do not wish to provide this information

**Race:** *Check one or more*
- ☐ American Indian or Alaska Native - *Print name of enrolled or principal tribe:* ______________________
- ☐ Asian
  - ☐ Asian Indian ☐ Chinese ☐ Filipino
  - ☐ Japanese ☐ Korean ☐ Vietnamese
  - ☐ Other Asian - *Print Race:* ______________________

    *For example: Hmong, Laotian, Thai, Pakistani, Cambodian, and so on.*
- ☐ Black or African American
- ☐ Native Hawaiian or Other Pacific Islander
  - ☐ Native Hawaiian ☐ Guamanian or Chamorro ☐ Samoan
  - ☐ Other Pacific Islander - *Print race:* ______________________

    *For example: Fijian, Tongan, and so on.*
- ☐ White
- ☐ I do not wish to provide this information

**To Be Completed by Financial Institution (for application taken in person):**

| | | |
|---|---|---|
| Was the ethnicity of the Borrower collected on the basis of visual observation or surname? | ☐ NO | ☐ YES |
| Was the sex of the Borrower collected on the basis of visual observation or surname? | ☐ NO | ☐ YES |
| Was the race of the Borrower collected on the basis of visual observation or surname? | ☐ NO | ☐ YES |

**The Demographic Information was provided through:**

☐ Face-to-Face Interview (*includes Electronic Media w/ Video Component*) ☐ Telephone Interview ☐ Fax or Mail ☐ Email or Internet

**Borrower Name:** The Brshy Irrevocable Trust

## Section 9: Loan Originator Information. To be completed by your Loan Originator.

**Loan Originator Information**

Loan Originator Organization Name JPMorgan Chase Bank, N.A.
Address 2500 Westfield Dr, Floor 2-1, Elgin, IL 60124
Loan Originator Organization NMLSR ID# 399798 State License ID#
Loan Originator Name CLIFTON R KOCHINSKY
Loan Originator NMLSR ID# 1229746 State License ID# NA
Email CLIFTON.R.KOCHINSKY@JPMORGAN.COM Phone (713) 216-8004

CLIFTON R KOCHINSKY Date (mm/dd/yyyy)

**Borrower Name:** The Brshy Irrevocable Trust

*To be completed by the Lender:*
Lender Loan No./Universal Loan Identifier [illegible] Agency Case No.

# Uniform Residential Loan Application - Lender Loan Information

This section is completed by your Lender.

## L1. Property and Loan Information

**Community Property State**
☒ At least one borrower lives in a community property state.
☒ The property is in a community property state.

**Transaction Detail**
☐ Conversion of Contract for Deed or Land Contract
☐ Renovation
☐ Construction-Conversion/Construction-to-Permanent
  ☐ Single-Closing ☐ Two-Closing
Construction/Improvement Costs $ ____________
Lot Acquired Date ____________ *(mm/dd/yyyy)*
Original Cost of Lot $ ____________

**Refinance Type**
☐ No Cash Out
☐ Limited Cash Out
☒ Cash Out

**Refinance Program**
☒ Full Documentation
☐ Interest Rate Reduction
☐ Streamlined without Appraisal
☐ Other ____________

**Energy Improvement**
☐ Mortgage loan will finance energy-related improvements.
☐ Property is currently subject to a lien that could take priority over the first mortgage lien, such as a clean energy lien paid for through property taxes *(e.g., the Property Assessed Clean Energy Program)*.

**Project Type** ☐ Condominium ☐ Cooperative ☒ Planned Unit Development (PUD) ☐ Property is not located in a project

## L2. Title Information

Title to the Property **Will** be Held in What Name(s):
600 SPRING, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

**Estate Will be Held in**
☐ Fee Simple
☐ Leasehold Expiration Date ____________ *(mm/dd/yyyy)*

**Manner in Which Title Will be Held**
☐ Sole Ownership ☐ Joint Tenancy with Right of Survivorship
☐ Life Estate ☐ Tenancy by the Entirety
☐ Tenancy in Common ☒ Other

**For Refinance:** Title to the Property is **Currently** Held in What Name(s):
600 Spring, LLC

**Trust Information**
☐ Title Will be Held by an *Inter Vivos (Living)* Trust
☐ Title Will be Held by a Land Trust

**Indian Country Land Tenure**
☐ Fee Simple On a Reservation
☐ Individual Trust Land *(Allotted/Restricted)*
☐ Tribal Trust Land On a Reservation
☐ Tribal Trust Land Off Reservation
☐ Alaska Native Corporation Land

## L3. Mortgage Loan Information

**Mortgage Type Applied For**
☒ Conventional ☐ USDA-RD
☐ FHA ☐ VA ☐ Other: ____________

**Terms of Loan**
Note Rate 6.250 %
Loan Term 360 *(months)*

**Mortgage Lien Type**
☒ First Lien
☐ Subordinate Lien

**Amortization Type**
☐ Fixed Rate ☐ Other *(explain)*: ____________
☒ Adjustable Rate
**If Adjustable Rate:**
Initial Period Prior to First Adjustment 84 *(months)*
Subsequent Adjustment Period 6 *(months)*

**Loan Features**
☐ Balloon / Balloon Term ______ *(months)*
☐ Interest Only / Interest Only Term ______ *(months)*
☐ Negative Amortization
☐ Prepayment Penalty / Prepayment Penalty Term ______ *(months)*
☐ Temporary Interest Rate Buydown / Initial Buydown Rate ______ %
☒ Other *(explain)*: 7/6m SO 30 5/1/5

**Proposed Monthly Payment for Property**

| | |
|---|---|
| First Mortgage *(P & I)* | $ 128,069.18 |
| Subordinate Lien(s) *(P & I)* | $ |
| Homeowner's Insurance | $ 9,458.17 |
| Supplemental Property Insurance | $ |
| Property Taxes | $ 33,333.33 |
| Mortgage Insurance | $ |
| Association/Project Dues *(Condo, Co-Op, PUD)* | $ 7,000.00 |
| Other | $ 0.00 |
| **TOTAL** | $ **177,860.68** |

**Borrower Name(s):** 600 Spring, LLC, The Brshy Irrevocable Trust

## L4. Qualifying the Borrower – Minimum Required Funds or Cash Back

| | |
|---|---|
| **DUE FROM BORROWER(S)** | |
| **A.** Sales Contract Price | $ |
| **B.** Improvements, Renovations, and Repairs | $ 0.00 |
| **C.** Land *(if acquired separately)* | $ |
| **D.** For Refinance: Balance of Mortgage Loans on the Property to be paid off in the Transaction *(See Table 3a. Property You Own)* | $ |
| **E.** Credit Cards and Other Debts Paid Off *(See Table 2c. Liabilities - Credit Cards, Other Debts, and Leases that You Owe)* | [redacted] |
| **F.** Borrower Closing Costs *(including Prepaid and Initial Escrow Payments)* | $ 21,513.97 |
| **G.** Discount Points | $ 0.00 |
| **H. TOTAL DUE FROM BORROWER(s)** ***(Total of A thru G)*** | [redacted] |
| **TOTAL MORTGAGE LOANS** | |
| **I.** Loan Amount<br>Loan Amount Excluding Financed Mortgage Insurance *(or Mortgage Insurance Equivalent)* $ 20,800,000.00<br>Financed Mortgage Insurance *(or Mortgage Insurance Equivalent)* Amount $ 0.00 | $ 20,800,000.00 |
| **J.** Other New Mortgage Loans on the Property the Borrower(s) is Buying or Refinancing *(See Table 4b. Other New Mortgage Loans on the Property You are Buying or Refinancing)* | $ 0.00 |
| **K. TOTAL MORTGAGE LOANS** ***(Total of I and J)*** | **$ 20,800,000.00** |
| **TOTAL CREDITS** | |
| **L.** Seller Credits *(Enter the amount of Borrower(s) costs paid by the property seller)* | $ 0.00 |
| **M.** Other Credits *(Enter the sum of all other credits - Borrower Paid Fees, Earnest Money, Employer Assisted Housing, Lease Purchase Fund, Lot Equity, Relocation Funds, Sweat Equity, Trade Equity, Other)* | $ 0.00 |
| **N. TOTAL CREDITS** ***(Total of L and M)*** | **$ 0.00** |
| **CALCULATION** | |
| TOTAL DUE FROM BORROWER(s) *(Line H)* | [redacted] |
| LESS TOTAL MORTGAGE LOANS *(Line K)* AND TOTAL CREDITS *(Line N)* | **- $ 20,800,000.00** |
| **Cash From/To the Borrower** ***(Line H minus Line K and Line N)***<br>**NOTE: This amount does not include reserves or other funds that may be required by the Lender to be verified.** | [redacted] |

**Borrower Name(s):** 600 Spring, LLC, The Brshy Irrevocable Trust

*To be completed by the Lender:*
Lender Loan No./Universal Loan Identifier 1108734862 Agency Case No.

# Uniform Residential Loan Application - Lender Loan Information

This section is completed by your Lender.

## L1. Property and Loan Information

**Community Property State**
☒ At least one borrower lives in a community property state.
☒ The property is in a community property state.

**Transaction Detail**
☐ *Conversion of Contract for Deed or Land Contract*
☐ Renovation
☐ Construction-Conversion/Construction-to-Permanent
☐ Single-Closing ☐ Two-Closing
Construction/Improvement Costs $ ______
Lot Acquired Date ______ *(mm/dd/yyyy)*
Original Cost of Lot $ ______

**Refinance Type**
☐ No Cash Out
☐ Limited Cash Out
☒ Cash Out

**Refinance Program**
☒ Full Documentation
☐ Interest Rate Reduction
☐ Streamlined without Appraisal
☐ Other ______

**Energy Improvement**
☐ Mortgage loan will finance energy-related improvements.
☐ Property is currently subject to a lien that could take priority over the first mortgage lien, such as a clean energy lien paid for through property taxes *(e.g., the Property Assessed Clean Energy Program).*

**Project Type** ☐ Condominium ☐ Cooperative ☒ Planned Unit Development (PUD) ☐ Property is not located in a project

## L2. Title Information

Title to the Property **Will** be Held in What Name(s):
600 SPRING, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

**For Refinance:** Title to the Property is **Currently** Held in What Name(s):
600 Spring, LLC

**Estate Will be Held in**
☐ Fee Simple
☐ Leasehold Expiration Date ______ *(mm/dd/yyyy)*

**Manner in Which Title Will be Held**
☐ Sole Ownership ☐ Joint Tenancy with Right of Survivorship
☐ Life Estate ☐ Tenancy by the Entirety
☐ Tenancy in Common ☒ Other

**Trust Information**
☐ Title Will be Held by an *Inter Vivos (Living)* Trust
☐ Title Will be Held by a Land Trust

**Indian Country Land Tenure**
☐ Fee Simple On a Reservation
☐ Individual Trust Land *(Allotted/Restricted)*
☐ Tribal Trust Land On a Reservation
☐ Tribal Trust Land Off Reservation
☐ Alaska Native Corporation Land

## L3. Mortgage Loan Information

**Mortgage Type Applied For**
☒ Conventional ☐ USDA-RD
☐ FHA ☐ VA ☐ Other: ______

**Terms of Loan**
Note Rate 6.250 %
Loan Term 360 *(months)*

**Mortgage Lien Type**
☒ First Lien
☐ Subordinate Lien

**Amortization Type**
☐ Fixed Rate ☐ *Other (explain):* ______
☒ Adjustable Rate
**If Adjustable Rate:**
Initial Period Prior to First Adjustment 84 *(months)*
Subsequent Adjustment Period 6 *(months)*

**Loan Features**
☐ Balloon / Balloon Term ______ *(months)*
☐ Interest Only / Interest Only Term ______ *(months)*
☐ Negative Amortization
☐ Prepayment Penalty / Prepayment Penalty Term ______ *(months)*
☐ Temporary Interest Rate Buydown / Initial Buydown Rate ______ %
☒ Other *(explain)*: 7/6m SO 30 5/1/5

**Proposed Monthly Payment for Property**

| | |
|---|---|
| First Mortgage *(P & I)* | $ 128,069.18 |
| Subordinate Lien(s) *(P & I)* | $ |
| Homeowner's Insurance | $ 9,458.17 |
| Supplemental Property Insurance | $ |
| Property Taxes | $ 33,333.33 |
| Mortgage Insurance | $ |
| Association/Project Dues *(Condo, Co-Op, PUD)* | $ 7,000.00 |
| Other | $ 0.00 |
| **TOTAL** | **$ 177,860.68** |

**Borrower Name(s):** 600 Spring, LLC, The Brshy Irrevocable Trust

## L4. Qualifying the Borrower – Minimum Required Funds or Cash Back

| | | |
|---|---|---|
| **DUE FROM BORROWER(S)** | | |
| **A.** Sales Contract Price | $ | |
| **B.** Improvements, Renovations, and Repairs | $ | 0.00 |
| **C.** Land *(if acquired separately)* | $ | |
| **D.** For Refinance: Balance of Mortgage Loans on the Property to be paid off in the Transaction *(See Table 3a. Property You Own)* | $ | |
| **E.** Credit Cards and Other Debts Paid Off *(See Table 2c. Liabilities - Credit Cards, Other Debts, and Leases that You Owe)* | [redacted] | |
| **F.** Borrower Closing Costs *(including Prepaid and Initial Escrow Payments)* | $ | 21,513.97 |
| **G.** Discount Points | $ | 0.00 |
| **H. TOTAL DUE FROM BORROWER(s)** ***(Total of A thru G)*** | [redacted] | |
| **TOTAL MORTGAGE LOANS** | | |
| **I.** Loan Amount<br>Loan Amount Excluding Financed Mortgage Insurance *(or Mortgage Insurance Equivalent)* $ 20,800,000.00<br>Financed Mortgage Insurance *(or Mortgage Insurance Equivalent)* Amount $ 0.00 | $ | 20,800,000.00 |
| **J.** Other New Mortgage Loans on the Property the Borrower(s) is Buying or Refinancing *(See Table 4b. Other New Mortgage Loans on the Property You are Buying or Refinancing)* | $ | 0.00 |
| **K. TOTAL MORTGAGE LOANS** ***(Total of I and J)*** | **$** | **20,800,000.00** |
| **TOTAL CREDITS** | | |
| **L.** Seller Credits *(Enter the amount of Borrower(s) costs paid by the property seller)* | $ | 0.00 |
| **M.** Other Credits *(Enter the sum of all other credits - Borrower Paid Fees, Earnest Money, Employer Assisted Housing, Lease Purchase Fund, Lot Equity, Relocation Funds, Sweat Equity, Trade Equity, Other)* | $ | 0.00 |
| **N. TOTAL CREDITS** ***(Total of L and M)*** | **$** | **0.00** |
| **CALCULATION** | | |
| TOTAL DUE FROM BORROWER(s) *(Line H)* | [redacted] | |
| LESS TOTAL MORTGAGE LOANS *(Line K)* AND TOTAL CREDITS *(Line N)* | **- $** | **20,800,000.00** |
| **Cash From/To the Borrower** ***(Line H minus Line K and Line N)***<br>**NOTE: This amount does not include reserves or other funds that may be required by the Lender to be verified.** | [redacted] | |

**Borrower Name(s):** 600 Spring, LLC, The Brshy Irrevocable Trust

# J.P. Morgan: Extension of Credit

J.P.Morgan

**A. Type of Credit Extension**

Please check one of the following options:

☐ **Joint** - We are applying for a joint extension of credit or to act as joint guarantors for the indebtedness of another party.

☐ **Individual/Own Income and Assets** - I am applying for an individual extension of credit or to act as individual guarantor for the indebtedness of another party and am relying on my own income or assets and the income or assets of another party as the basis for repayment of the credit requested.

☒ **Individual/Other Income** - I am applying for an individual extension of credit and will be relying on income from alimony, child support, or separate maintenance or on the income or assets of another individual as the basis for repayment of the extension of credit requested. The attached Personal Financial Statement provides information about the individual upon whose alimony, support, or maintenance payments, income or assets I am relying.

**Note:** Income derived from child support, alimony, or separate maintenance does not need to be disclosed if you do not want it considered in determining creditworthiness.

☐ **Annual Review** - I have an existing extension of credit with J.P. Morgan. **Note:** Do not check this box if you are applying for a new extension of credit or renewing existing credit.

**B. Required Documents**

1. Completed J.P. Morgan: Extension of Credit form
2. Personal Financial Statement and Supporting Schedules **Note:** If you choose to provide a non-J.P. Morgan Personal Financial Statement, please provide with your completed Extension of Credit form
3. Most recent two years of personal tax returns complete with schedules and K-1s **Note:** If the current tax return is on extension, please provide proof of extension and copies of available supporting documents (e.g., W2, K-1s)
4. Brokerage and bank statements for significant assets held away from J.P. Morgan
5. Schedule of contingent liabilities including unfunded capital commitments to private equity funds
6. Schedule of restricted stock/deferred compensation

**C. Acknowledgement and Signature(s)**

The information contained in this statement is provided for the purpose of obtaining or maintaining an extension of credit with the J.P. Morgan affiliate to whom you have submitted this statement on behalf of the undersigned, or persons, firms, or corporations in whose behalf the undersigned may either severally, or jointly with others, execute a guaranty in favor of J.P. Morgan. Each undersigned understands that J.P. Morgan is relying on the information provided herein, or otherwise provided to J.P. Morgan, in deciding to grant or continue an extension of credit. Each undersigned represents and warrants that the information provided, whether herein or otherwise, is true and complete and that J.P. Morgan may consider this statement as continuing to be true and correct until a written notice of a change is given to J.P. Morgan by the undersigned. J.P. Morgan is authorized to make all inquiries it deems necessary, including the obtaining of a credit bureau report, to verify the accuracy of the statements made herein or otherwise, and to determine your credit worthiness, now and on an ongoing basis. You understand and agree that from time to time J.P. Morgan may receive information about you from third parties (including statements, confirmation or electronic access). J.P. Morgan may share the information it obtains through these inquiries and any credit bureau report with other J.P. Morgan affiliates to the extent necessary or advisable to provide J.P. Morgan Private Banking products or services. J.P. Morgan is authorized to answer questions about its credit experience with you.

By signing below I (or we) agree to apply for individual extension of credit, joint extension of credit or as a guarantor for the indebtedness.

**Guarantor**

Barry Shy 7-29-24

**Barry Shy** **Date**

JPMorgan Chase Bank, N.A., 2500 Westfield Dr, Floor 2-1, Elgin, IL 60124 Loan No.: [redacted]

# MAILING ADDRESS

**TO LENDER:** JPMorgan Chase Bank, N.A., 2500 Westfield Dr, Floor 2-1, Elgin, IL 60124

**BORROWER'S NAME:** Amit Tidhar, Trustee

**BORROWER'S PHONE NUMBER:** [redacted]

**Please sign below and select ONE of the following mailing addresses listed to be used for billing and other notifications.**

**Borrower's Current Address:**

Street Address: [redacted]
City: [redacted] State: CA
Zip: 90265-4922

Mail Here ☐

**Property Address:**

Street Address: 24185 Case Ct
City: Malibu State: CA
Zip: 90265

Mail Here ☐

**If other, please specify:**

Street Address: [redacted]
City: [redacted] State: CA
Zip:

Mail Here ☒

**Borrower**

**The Brshy Irrevocable Trust**

[signature] 7-29-24
**Amit Tidhar, Trustee** **Date**

JPMorgan Chase Bank, N.A., 2500 Westfield Dr, Floor 2-1, Elgin, IL 60124 Loan No.: [redacted]

# MAILING ADDRESS

**TO LENDER:** JPMorgan Chase Bank, N.A., 2500 Westfield Dr, Floor 2-1, Elgin, IL 60124

**BORROWER'S NAME:** 600 Spring, LLC

**BORROWER'S PHONE NUMBER:** [redacted]

**Please sign below and select ONE of the following mailing addresses listed to be used for billing and other notifications.**

**Borrower's Current Address:**

Street Address: [redacted]

City: [redacted] State: CA
Zip:

Mail Here ☐

**Property Address:**

Street Address: 24185 Case Ct

City: Malibu State: CA
Zip: 90265

Mail Here ☐

**If other, please specify:**

Street Address: [redacted]

City: [redacted] State: CA
Zip:

Mail Here ☒

**Borrower**

**600 Spring, LLC, a California Limited Liability Company**

| | | | |
|---|---|---|---|
| **Scott Gillen**<br>*Manager* | 7-29-2024<br>**Date** | **Barry Shy**<br>*Manager* | 7-29-24<br>**Date** |

Lender: JPMorgan Chase Bank, N.A.

**Date:** July 29, 2024 **Loan Number:** [redacted]

# NOTICE TO COSIGNER/GUARANTOR

Borrower(s): 600 Spring, LLC
Amit Tidhar, Trustee
Trustee(s) of the The Brshy Irrevocable Trust

Property Address: 24185 Case Ct, Malibu, CA 90265

You are being asked to guarantee for this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility. You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount. The lender can collect this debt from you without trying to collect from the borrower. The lender can use the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become a part of your credit record. This notice is not the contract that makes you liable for the debt.

**Guarantor**

Barry Shy 7-29-24

**Barry Shy** **Date**

Lender: JPMorgan Chase Bank, N.A.

Date: July 25, 2024
Loan #: [redacted]

# The Housing Financial Discrimination Act of 1977

## Fair Lending Notice

**Borrower**

600 Spring, LLC
Amit Tidhar, Trustee

Property Address: 24185 Case Ct. Malibu, CA 90265

**IT IS ILLEGAL TO DISCRIMINATE IN THE PROVISION OF OR IN THE AVAILABILITY OF FINANCIAL ASSISTANCE BECAUSE OF THE CONSIDERATION OF:**

1. **TRENDS, CHARACTERISTICS OR CONDITIONS IN THE NEIGHBORHOOD OR GEOGRAPHIC AREA SURROUNDING A HOUSING ACCOMMODATION, UNLESS THE FINANCIAL INSTITUTION CAN DEMONSTRATE IN THE PARTICULAR CASE THAT SUCH CONSIDERATION IS REQUIRED TO AVOID AN UNSAFE AND UNSOUND BUSINESS PRACTICE; OR**
2. **RACE, COLOR, RELIGION, SEX, GENDER, GENDER IDENTITY, GENDER EXPRESSION, SEXUAL ORIENTATION, MARITAL STATUS, NATIONAL ORIGIN, ANCESTRY, FAMILIAL STATUS, SOURCE OF INCOME, DISABILITY, VETERAN OR MILITARY STATUS, OR GENETIC INFORMATION.**

**IT IS ILLEGAL TO CONSIDER THE RACIAL, ETHNIC, RELIGIOUS OR NATIONAL ORIGIN COMPOSITION OF A NEIGHBORHOOD OR GEOGRAPHIC AREA SURROUNDING A HOUSING ACCOMMODATION OR WHETHER OR NOT SUCH COMPOSITION IS UNDERGOING CHANGE, OR IS EXPECTED TO UNDERGO CHANGE, IN APPRAISING A HOUSING ACCOMMODATION OR IN DETERMINING WHETHER OR NOT, OR UNDER WHAT TERMS AND CONDITIONS, TO PROVIDE FINANCIAL ASSISTANCE.**

**THESE PROVISIONS GOVERN FINANCIAL ASSISTANCE FOR THE PURPOSE OF THE PURCHASE, CONSTRUCTION, REHABILITATION OR REFINANCING OF ONE TO FOUR UNIT FAMILY RESIDENCES OCCUPIED BY THE OWNER AND FOR THE PURPOSE OF THE HOME IMPROVEMENT OF ANY ONE TO FOUR UNIT FAMILY RESIDENCE.**

**IF YOU HAVE ANY QUESTIONS ABOUT YOUR RIGHTS, OR IF YOU WISH TO FILE A COMPLAINT, CONTACT THE MANAGEMENT OF THIS FINANCIAL INSTITUTION OR:**

**Consumer Financial Protection Bureau**
**1700 G Street NW,**
**Washington DC 20006**

**California Department of Financial Protection and Innovation**
**Consumer Services Office**
**2101 Arena Boulevard**
**Sacramento, CA 95834**

ACKNOWLEDGMENT OF RECEIPT

I/WE RECEIVED A COPY OF THIS NOTICE.

**Borrower**

**600 Spring, LLC, a California Limited Liability Company**

7-29-24 | 7-29-24

**Scott Gillen** **Date**
*Manager*

**Barry Shy** **Date**
*Manager*

**CALIFORNIA CIVIL RIGHTS ACT**
**CALIFORNIA EMPLOYMENT AND HOUSING ACT**

CALIFORNIA LAW PROHIBITS A LENDER FROM DISCRIMINATING AGAINST AN APPLICANT FOR FINANCIAL ASSISTANCE BASED ON THE APPLICANT'S SEXUAL ORIENTATION, SOURCE OF INCOME, DISABILITY, FAMILIAL STATUS OR AGE.

Lender: JPMorgan Chase Bank, N.A.

Date: July 25, 2024
Loan #: [redacted]

# The Housing Financial Discrimination Act of 1977

## Fair Lending Notice

**Borrower**

600 Spring, LLC
Amit Tidhar, Trustee

Property Address: 24185 Case Ct, Malibu, CA 90265

**IT IS ILLEGAL TO DISCRIMINATE IN THE PROVISION OF OR IN THE AVAILABILITY OF FINANCIAL ASSISTANCE BECAUSE OF THE CONSIDERATION OF:**

1. **TRENDS, CHARACTERISTICS OR CONDITIONS IN THE NEIGHBORHOOD OR GEOGRAPHIC AREA SURROUNDING A HOUSING ACCOMMODATION, UNLESS THE FINANCIAL INSTITUTION CAN DEMONSTRATE IN THE PARTICULAR CASE THAT SUCH CONSIDERATION IS REQUIRED TO AVOID AN UNSAFE AND UNSOUND BUSINESS PRACTICE; OR**
2. **RACE, COLOR, RELIGION, SEX, GENDER, GENDER IDENTITY, GENDER EXPRESSION, SEXUAL ORIENTATION, MARITAL STATUS, NATIONAL ORIGIN, ANCESTRY, FAMILIAL STATUS, SOURCE OF INCOME, DISABILITY, VETERAN OR MILITARY STATUS, OR GENETIC INFORMATION.**

**IT IS ILLEGAL TO CONSIDER THE RACIAL, ETHNIC, RELIGIOUS OR NATIONAL ORIGIN COMPOSITION OF A NEIGHBORHOOD OR GEOGRAPHIC AREA SURROUNDING A HOUSING ACCOMMODATION OR WHETHER OR NOT SUCH COMPOSITION IS UNDERGOING CHANGE, OR IS EXPECTED TO UNDERGO CHANGE, IN APPRAISING A HOUSING ACCOMMODATION OR IN DETERMINING WHETHER OR NOT, OR UNDER WHAT TERMS AND CONDITIONS, TO PROVIDE FINANCIAL ASSISTANCE.**

**THESE PROVISIONS GOVERN FINANCIAL ASSISTANCE FOR THE PURPOSE OF THE PURCHASE, CONSTRUCTION, REHABILITATION OR REFINANCING OF ONE TO FOUR UNIT FAMILY RESIDENCES OCCUPIED BY THE OWNER AND FOR THE PURPOSE OF THE HOME IMPROVEMENT OF ANY ONE TO FOUR UNIT FAMILY RESIDENCE.**

**IF YOU HAVE ANY QUESTIONS ABOUT YOUR RIGHTS, OR IF YOU WISH TO FILE A COMPLAINT, CONTACT THE MANAGEMENT OF THIS FINANCIAL INSTITUTION OR:**

**Consumer Financial Protection Bureau**
**1700 G Street NW,**
**Washington DC 20006**

**California Department of Financial Protection and Innovation**
**Consumer Services Office**
**2101 Arena Boulevard**
**Sacramento, CA 95834**

**ACKNOWLEDGMENT OF RECEIPT**

I/WE RECEIVED A COPY OF THIS NOTICE.

**Borrower**

**The Brshy Irrevocable Trust**

[signature] 7-29-24
**Amit Tidhar, Trustee** **Date**

**CALIFORNIA CIVIL RIGHTS ACT**
**CALIFORNIA EMPLOYMENT AND HOUSING ACT**

CALIFORNIA LAW PROHIBITS A LENDER FROM DISCRIMINATING AGAINST AN APPLICANT FOR FINANCIAL ASSISTANCE BASED ON THE APPLICANT'S SEXUAL ORIENTATION, SOURCE OF INCOME, DISABILITY, FAMILIAL STATUS OR AGE.

# Amortization Schedule

| | | | |
|---|---|---|---|
| LOAN AMOUNT | 20,800,000.00 | INTEREST RATE | 6.250% |
| ANNUAL PERCENTAGE RATE | 7.137% | CLOSING DATE | 07/29/2024 |

| PAYMENT NO | PAYMENT DATE | PAYMENT | PRINCIPAL | INTEREST | MI | BALANCE |
|---|---|---|---|---|---|---|
| 01 | 09/01/2024 | 128,069.18 | 19,735.85 | 108,333.33 | 0.00 | 20,780,264.15 |
| 02 | 10/01/2024 | 128,069.18 | 19,838.64 | 108,230.54 | 0.00 | 20,760,425.51 |
| 03 | 11/01/2024 | 128,069.18 | 19,941.96 | 108,127.22 | 0.00 | 20,740,483.55 |
| 04 | 12/01/2024 | 128,069.18 | 20,045.83 | 108,023.35 | 0.00 | 20,720,437.72 |
| YEAR | 2024 | 512,276.72 | 79,562.28 | 432,714.44 | 0.00 | |
| 05 | 01/01/2025 | 128,069.18 | 20,150.23 | 107,918.95 | 0.00 | 20,700,287.49 |
| 06 | 02/01/2025 | 128,069.18 | 20,255.18 | 107,814.00 | 0.00 | 20,680,032.31 |
| 07 | 03/01/2025 | 128,069.18 | 20,360.68 | 107,708.50 | 0.00 | 20,659,671.63 |
| 08 | 04/01/2025 | 128,069.18 | 20,466.72 | 107,602.46 | 0.00 | 20,639,204.91 |
| 09 | 05/01/2025 | 128,069.18 | 20,573.32 | 107,495.86 | 0.00 | 20,618,631.59 |
| 10 | 06/01/2025 | 128,069.18 | 20,680.47 | 107,388.71 | 0.00 | 20,597,951.12 |
| 11 | 07/01/2025 | 128,069.18 | 20,788.18 | 107,281.00 | 0.00 | 20,577,162.94 |
| 12 | 08/01/2025 | 128,069.18 | 20,896.46 | 107,172.72 | 0.00 | 20,556,266.48 |
| 13 | 09/01/2025 | 128,069.18 | 21,005.29 | 107,063.89 | 0.00 | 20,535,261.19 |
| 14 | 10/01/2025 | 128,069.18 | 21,114.69 | 106,954.49 | 0.00 | 20,514,146.50 |
| 15 | 11/01/2025 | 128,069.18 | 21,224.67 | 106,844.51 | 0.00 | 20,492,921.83 |
| 16 | 12/01/2025 | 128,069.18 | 21,335.21 | 106,733.97 | 0.00 | 20,471,586.62 |
| YEAR | 2025 | 1,536,830.16 | 248,851.10 | 1,287,979.06 | 0.00 | |
| 17 | 01/01/2026 | 128,069.18 | 21,446.33 | 106,622.85 | 0.00 | 20,450,140.29 |
| 18 | 02/01/2026 | 128,069.18 | 21,558.03 | 106,511.15 | 0.00 | 20,428,582.26 |
| 19 | 03/01/2026 | 128,069.18 | 21,670.31 | 106,398.87 | 0.00 | 20,406,911.95 |
| 20 | 04/01/2026 | 128,069.18 | 21,783.18 | 106,286.00 | 0.00 | 20,385,128.77 |
| 21 | 05/01/2026 | 128,069.18 | 21,896.63 | 106,172.55 | 0.00 | 20,363,232.14 |
| 22 | 06/01/2026 | 128,069.18 | 22,010.68 | 106,058.50 | 0.00 | 20,341,221.46 |
| 23 | 07/01/2026 | 128,069.18 | 22,125.32 | 105,943.86 | 0.00 | 20,319,096.14 |
| 24 | 08/01/2026 | 128,069.18 | 22,240.55 | 105,828.63 | 0.00 | 20,296,855.59 |
| 25 | 09/01/2026 | 128,069.18 | 22,356.39 | 105,712.79 | 0.00 | 20,274,499.20 |
| 26 | 10/01/2026 | 128,069.18 | 22,472.83 | 105,596.35 | 0.00 | 20,252,026.37 |
| 27 | 11/01/2026 | 128,069.18 | 22,589.88 | 105,479.30 | 0.00 | 20,229,436.49 |
| 28 | 12/01/2026 | 128,069.18 | 22,707.53 | 105,361.65 | 0.00 | 20,206,728.96 |
| YEAR | 2026 | 1,536,830.16 | 264,857.66 | 1,271,972.50 | 0.00 | |
| 29 | 01/01/2027 | 128,069.18 | 22,825.80 | 105,243.38 | 0.00 | 20,183,903.16 |


© 2015 Wolters Kluwer Financial Services, Inc.
All rights reserved.
[redacted]

# Amortization Schedule

| | | | |
|---|---|---|---|
| LOAN AMOUNT | 20,800,000.00 | INTEREST RATE | 6.250% |
| ANNUAL PERCENTAGE RATE | 7.137% | CLOSING DATE | 07/29/2024 |

| PAYMENT NO | PAYMENT DATE | PAYMENT | PRINCIPAL | INTEREST | MI | BALANCE |
|---|---|---|---|---|---|---|
| 30 | 02/01/2027 | 128,069.18 | 22,944.68 | 105,124.50 | 0.00 | 20,160,958.48 |
| 31 | 03/01/2027 | 128,069.18 | 23,064.19 | 105,004.99 | 0.00 | 20,137,894.29 |
| 32 | 04/01/2027 | 128,069.18 | 23,184.31 | 104,884.87 | 0.00 | 20,114,709.98 |
| 33 | 05/01/2027 | 128,069.18 | 23,305.07 | 104,764.11 | 0.00 | 20,091,404.91 |
| 34 | 06/01/2027 | 128,069.18 | 23,426.45 | 104,642.73 | 0.00 | 20,067,978.46 |
| 35 | 07/01/2027 | 128,069.18 | 23,548.46 | 104,520.72 | 0.00 | 20,044,430.00 |
| 36 | 08/01/2027 | 128,069.18 | 23,671.11 | 104,398.07 | 0.00 | 20,020,758.89 |
| 37 | 09/01/2027 | 128,069.18 | 23,794.39 | 104,274.79 | 0.00 | 19,996,964.50 |
| 38 | 10/01/2027 | 128,069.18 | 23,918.32 | 104,150.86 | 0.00 | 19,973,046.18 |
| 39 | 11/01/2027 | 128,069.18 | 24,042.90 | 104,026.28 | 0.00 | 19,949,003.28 |
| 40 | 12/01/2027 | 128,069.18 | 24,168.12 | 103,901.06 | 0.00 | 19,924,835.16 |
| YEAR | 2027 | 1,536,830.16 | 281,893.80 | 1,254,936.36 | 0.00 | |
| 41 | 01/01/2028 | 128,069.18 | 24,294.00 | 103,775.18 | 0.00 | 19,900,541.16 |
| 42 | 02/01/2028 | 128,069.18 | 24,420.53 | 103,648.65 | 0.00 | 19,876,120.63 |
| 43 | 03/01/2028 | 128,069.18 | 24,547.72 | 103,521.46 | 0.00 | 19,851,572.91 |
| 44 | 04/01/2028 | 128,069.18 | 24,675.57 | 103,393.61 | 0.00 | 19,826,897.34 |
| 45 | 05/01/2028 | 128,069.18 | 24,804.09 | 103,265.09 | 0.00 | 19,802,093.25 |
| 46 | 06/01/2028 | 128,069.18 | 24,933.28 | 103,135.90 | 0.00 | 19,777,159.97 |
| 47 | 07/01/2028 | 128,069.18 | 25,063.14 | 103,006.04 | 0.00 | 19,752,096.83 |
| 48 | 08/01/2028 | 128,069.18 | 25,193.68 | 102,875.50 | 0.00 | 19,726,903.15 |
| 49 | 09/01/2028 | 128,069.18 | 25,324.89 | 102,744.29 | 0.00 | 19,701,578.26 |
| 50 | 10/01/2028 | 128,069.18 | 25,456.79 | 102,612.39 | 0.00 | 19,676,121.47 |
| 51 | 11/01/2028 | 128,069.18 | 25,589.38 | 102,479.80 | 0.00 | 19,650,532.09 |
| 52 | 12/01/2028 | 128,069.18 | 25,722.66 | 102,346.52 | 0.00 | 19,624,809.43 |
| YEAR | 2028 | 1,536,830.16 | 300,025.73 | 1,236,804.43 | 0.00 | |
| 53 | 01/01/2029 | 128,069.18 | 25,856.63 | 102,212.55 | 0.00 | 19,598,952.80 |
| 54 | 02/01/2029 | 128,069.18 | 25,991.30 | 102,077.88 | 0.00 | 19,572,961.50 |
| 55 | 03/01/2029 | 128,069.18 | 26,126.67 | 101,942.51 | 0.00 | 19,546,834.83 |
| 56 | 04/01/2029 | 128,069.18 | 26,262.75 | 101,806.43 | 0.00 | 19,520,572.08 |
| 57 | 05/01/2029 | 128,069.18 | 26,399.53 | 101,669.65 | 0.00 | 19,494,172.55 |
| 58 | 06/01/2029 | 128,069.18 | 26,537.03 | 101,532.15 | 0.00 | 19,467,635.52 |
| 59 | 07/01/2029 | 128,069.18 | 26,675.25 | 101,393.93 | 0.00 | 19,440,960.27 |
| 60 | 08/01/2029 | 128,069.18 | 26,814.18 | 101,255.00 | 0.00 | 19,414,146.09 |
| 61 | 09/01/2029 | 128,069.18 | 26,953.84 | 101,115.34 | 0.00 | 19,387,192.25 |


© 2015 Wolters Kluwer Financial Services, Inc.
All rights reserved.
[redacted]

# Amortization Schedule

| | | | |
|---|---|---|---|
| LOAN AMOUNT | 20,800,000.00 | INTEREST RATE | 6.250% |
| ANNUAL PERCENTAGE RATE | 7.137% | CLOSING DATE | 07/29/2024 |

| PAYMENT NO | PAYMENT DATE | PAYMENT | PRINCIPAL | INTEREST | MI | BALANCE |
|---|---|---|---|---|---|---|
| 62 | 10/01/2029 | 128,069.18 | 27,094.22 | 100,974.96 | 0.00 | 19,360,098.03 |
| 63 | 11/01/2029 | 128,069.18 | 27,235.34 | 100,833.84 | 0.00 | 19,332,862.69 |
| 64 | 12/01/2029 | 128,069.18 | 27,377.19 | 100,691.99 | 0.00 | 19,305,485.50 |
| YEAR | 2029 | 1,536,830.16 | 319,323.93 | 1,217,506.23 | 0.00 | |
| 65 | 01/01/2030 | 128,069.18 | 27,519.78 | 100,549.40 | 0.00 | 19,277,965.72 |
| 66 | 02/01/2030 | 128,069.18 | 27,663.11 | 100,406.07 | 0.00 | 19,250,302.61 |
| 67 | 03/01/2030 | 128,069.18 | 27,807.19 | 100,261.99 | 0.00 | 19,222,495.42 |
| 68 | 04/01/2030 | 128,069.18 | 27,952.02 | 100,117.16 | 0.00 | 19,194,543.40 |
| 69 | 05/01/2030 | 128,069.18 | 28,097.60 | 99,971.58 | 0.00 | 19,166,445.80 |
| 70 | 06/01/2030 | 128,069.18 | 28,243.94 | 99,825.24 | 0.00 | 19,138,201.86 |
| 71 | 07/01/2030 | 128,069.18 | 28,391.05 | 99,678.13 | 0.00 | 19,109,810.81 |
| 72 | 08/01/2030 | 128,069.18 | 28,538.92 | 99,530.26 | 0.00 | 19,081,271.89 |
| 73 | 09/01/2030 | 128,069.18 | 28,687.56 | 99,381.62 | 0.00 | 19,052,584.33 |
| 74 | 10/01/2030 | 128,069.18 | 28,836.97 | 99,232.21 | 0.00 | 19,023,747.36 |
| 75 | 11/01/2030 | 128,069.18 | 28,987.16 | 99,082.02 | 0.00 | 18,994,760.20 |
| 76 | 12/01/2030 | 128,069.18 | 29,138.14 | 98,931.04 | 0.00 | 18,965,622.06 |
| YEAR | 2030 | 1,536,830.16 | 339,863.44 | 1,196,966.72 | 0.00 | |
| 77 | 01/01/2031 | 128,069.18 | 29,289.90 | 98,779.28 | 0.00 | 18,936,332.16 |
| 78 | 02/01/2031 | 128,069.18 | 29,442.45 | 98,626.73 | 0.00 | 18,906,889.71 |
| 79 | 03/01/2031 | 128,069.18 | 29,595.80 | 98,473.38 | 0.00 | 18,877,293.91 |
| 80 | 04/01/2031 | 128,069.18 | 29,749.94 | 98,319.24 | 0.00 | 18,847,543.97 |
| 81 | 05/01/2031 | 128,069.18 | 29,904.89 | 98,164.29 | 0.00 | 18,817,639.08 |
| 82 | 06/01/2031 | 128,069.18 | 30,060.64 | 98,008.54 | 0.00 | 18,787,578.44 |
| 83 | 07/01/2031 | 128,069.18 | 30,217.21 | 97,851.97 | 0.00 | 18,757,361.23 |
| 84 | 08/01/2031 | 128,069.18 | 30,374.59 | 97,694.59 | 0.00 | 18,726,986.64 |
| 85 | 09/01/2031 | 150,107.75 | 23,310.44 | 126,797.31 | 0.00 | 18,703,676.20 |
| 86 | 10/01/2031 | 150,107.75 | 23,468.28 | 126,639.47 | 0.00 | 18,680,207.92 |
| 87 | 11/01/2031 | 150,107.75 | 23,627.18 | 126,480.57 | 0.00 | 18,656,580.74 |
| 88 | 12/01/2031 | 150,107.75 | 23,787.15 | 126,320.60 | 0.00 | 18,632,793.59 |
| YEAR | 2031 | 1,624,984.44 | 332,828.47 | 1,292,155.97 | 0.00 | |
| 89 | 01/01/2032 | 150,107.75 | 23,948.21 | 126,159.54 | 0.00 | 18,608,845.38 |
| 90 | 02/01/2032 | 150,107.75 | 24,110.36 | 125,997.39 | 0.00 | 18,584,735.02 |
| 91 | 03/01/2032 | 150,107.75 | 24,273.61 | 125,834.14 | 0.00 | 18,560,461.41 |


© 2015 Wolters Kluwer Financial Services, Inc.
All rights reserved.

# Amortization Schedule

| | | | |
|---|---|---|---|
| LOAN AMOUNT | 20,800,000.00 | INTEREST RATE | 6.250% |
| ANNUAL PERCENTAGE RATE | 7.137% | CLOSING DATE | 07/29/2024 |

| PAYMENT NO | PAYMENT DATE | PAYMENT | PRINCIPAL | INTEREST | MI | BALANCE |
|---|---|---|---|---|---|---|
| 92 | 04/01/2032 | 150,107.75 | 24,437.96 | 125,669.79 | 0.00 | 18,536,023.45 |
| 93 | 05/01/2032 | 150,107.75 | 24,603.42 | 125,504.33 | 0.00 | 18,511,420.03 |
| 94 | 06/01/2032 | 150,107.75 | 24,770.01 | 125,337.74 | 0.00 | 18,486,650.02 |
| 95 | 07/01/2032 | 150,107.75 | 24,937.72 | 125,170.03 | 0.00 | 18,461,712.30 |
| 96 | 08/01/2032 | 150,107.75 | 25,106.57 | 125,001.18 | 0.00 | 18,436,605.73 |
| 97 | 09/01/2032 | 150,107.75 | 25,276.57 | 124,831.18 | 0.00 | 18,411,329.16 |
| 98 | 10/01/2032 | 150,107.75 | 25,447.71 | 124,660.04 | 0.00 | 18,385,881.45 |
| 99 | 11/01/2032 | 150,107.75 | 25,620.01 | 124,487.74 | 0.00 | 18,360,261.44 |
| 100 | 12/01/2032 | 150,107.75 | 25,793.48 | 124,314.27 | 0.00 | 18,334,467.96 |
| YEAR | 2032 | 1,801,293.00 | 298,325.63 | 1,502,967.37 | 0.00 | |
| 101 | 01/01/2033 | 150,107.75 | 25,968.12 | 124,139.63 | 0.00 | 18,308,499.84 |
| 102 | 02/01/2033 | 150,107.75 | 26,143.95 | 123,963.80 | 0.00 | 18,282,355.89 |
| 103 | 03/01/2033 | 150,107.75 | 26,320.97 | 123,786.78 | 0.00 | 18,256,034.92 |
| 104 | 04/01/2033 | 150,107.75 | 26,499.18 | 123,608.57 | 0.00 | 18,229,535.74 |
| 105 | 05/01/2033 | 150,107.75 | 26,678.60 | 123,429.15 | 0.00 | 18,202,857.14 |
| 106 | 06/01/2033 | 150,107.75 | 26,859.24 | 123,248.51 | 0.00 | 18,175,997.90 |
| 107 | 07/01/2033 | 150,107.75 | 27,041.10 | 123,066.65 | 0.00 | 18,148,956.80 |
| 108 | 08/01/2033 | 150,107.75 | 27,224.19 | 122,883.56 | 0.00 | 18,121,732.61 |
| 109 | 09/01/2033 | 150,107.75 | 27,408.52 | 122,699.23 | 0.00 | 18,094,324.09 |
| 110 | 10/01/2033 | 150,107.75 | 27,594.10 | 122,513.65 | 0.00 | 18,066,729.99 |
| 111 | 11/01/2033 | 150,107.75 | 27,780.93 | 122,326.82 | 0.00 | 18,038,949.06 |
| 112 | 12/01/2033 | 150,107.75 | 27,969.03 | 122,138.72 | 0.00 | 18,010,980.03 |
| YEAR | 2033 | 1,801,293.00 | 323,487.93 | 1,477,805.07 | 0.00 | |
| 113 | 01/01/2034 | 150,107.75 | 28,158.41 | 121,949.34 | 0.00 | 17,982,821.62 |
| 114 | 02/01/2034 | 150,107.75 | 28,349.06 | 121,758.69 | 0.00 | 17,954,472.56 |
| 115 | 03/01/2034 | 150,107.75 | 28,541.01 | 121,566.74 | 0.00 | 17,925,931.55 |
| 116 | 04/01/2034 | 150,107.75 | 28,734.26 | 121,373.49 | 0.00 | 17,897,197.29 |
| 117 | 05/01/2034 | 150,107.75 | 28,928.81 | 121,178.94 | 0.00 | 17,868,268.48 |
| 118 | 06/01/2034 | 150,107.75 | 29,124.68 | 120,983.07 | 0.00 | 17,839,143.80 |
| 119 | 07/01/2034 | 150,107.75 | 29,321.88 | 120,785.87 | 0.00 | 17,809,821.92 |
| 120 | 08/01/2034 | 150,107.75 | 29,520.41 | 120,587.34 | 0.00 | 17,780,301.51 |
| 121 | 09/01/2034 | 150,107.75 | 29,720.29 | 120,387.46 | 0.00 | 17,750,581.22 |
| 122 | 10/01/2034 | 150,107.75 | 29,921.52 | 120,186.23 | 0.00 | 17,720,659.70 |
| 123 | 11/01/2034 | 150,107.75 | 30,124.12 | 119,983.63 | 0.00 | 17,690,535.58 |


© 2015 Wolters Kluwer Financial Services, Inc.
All rights reserved.

# Amortization Schedule

| | | | |
|---|---|---|---|
| LOAN AMOUNT | 20,800,000.00 | INTEREST RATE | 6.250% |
| ANNUAL PERCENTAGE RATE | 7.137% | CLOSING DATE | 07/29/2024 |

| PAYMENT NO | PAYMENT DATE | PAYMENT | PRINCIPAL | INTEREST | MI | BALANCE |
|---|---|---|---|---|---|---|
| 124 | 12/01/2034 | 150,107.75 | 30,328.08 | 119,779.67 | 0.00 | 17,660,207.50 |
| YEAR | 2034 | 1,801,293.00 | 350,772.53 | 1,450,520.47 | 0.00 | |
| 125 | 01/01/2035 | 150,107.75 | 30,533.43 | 119,574.32 | 0.00 | 17,629,674.07 |
| 126 | 02/01/2035 | 150,107.75 | 30,740.17 | 119,367.58 | 0.00 | 17,598,933.90 |
| 127 | 03/01/2035 | 150,107.75 | 30,948.30 | 119,159.45 | 0.00 | 17,567,985.60 |
| 128 | 04/01/2035 | 150,107.75 | 31,157.85 | 118,949.90 | 0.00 | 17,536,827.75 |
| 129 | 05/01/2035 | 150,107.75 | 31,368.81 | 118,738.94 | 0.00 | 17,505,458.94 |
| 130 | 06/01/2035 | 150,107.75 | 31,581.21 | 118,526.54 | 0.00 | 17,473,877.73 |
| 131 | 07/01/2035 | 150,107.75 | 31,795.04 | 118,312.71 | 0.00 | 17,442,082.69 |
| 132 | 08/01/2035 | 150,107.75 | 32,010.32 | 118,097.43 | 0.00 | 17,410,072.37 |
| 133 | 09/01/2035 | 150,107.75 | 32,227.05 | 117,880.70 | 0.00 | 17,377,845.32 |
| 134 | 10/01/2035 | 150,107.75 | 32,445.26 | 117,662.49 | 0.00 | 17,345,400.06 |
| 135 | 11/01/2035 | 150,107.75 | 32,664.94 | 117,442.81 | 0.00 | 17,312,735.12 |
| 136 | 12/01/2035 | 150,107.75 | 32,886.11 | 117,221.64 | 0.00 | 17,279,849.01 |
| YEAR | 2035 | 1,801,293.00 | 380,358.49 | 1,420,934.51 | 0.00 | |
| 137 | 01/01/2036 | 150,107.75 | 33,108.77 | 116,998.98 | 0.00 | 17,246,740.24 |
| 138 | 02/01/2036 | 150,107.75 | 33,332.95 | 116,774.80 | 0.00 | 17,213,407.29 |
| 139 | 03/01/2036 | 150,107.75 | 33,558.64 | 116,549.11 | 0.00 | 17,179,848.65 |
| 140 | 04/01/2036 | 150,107.75 | 33,785.86 | 116,321.89 | 0.00 | 17,146,062.79 |
| 141 | 05/01/2036 | 150,107.75 | 34,014.62 | 116,093.13 | 0.00 | 17,112,048.17 |
| 142 | 06/01/2036 | 150,107.75 | 34,244.92 | 115,862.83 | 0.00 | 17,077,803.25 |
| 143 | 07/01/2036 | 150,107.75 | 34,476.79 | 115,630.96 | 0.00 | 17,043,326.46 |
| 144 | 08/01/2036 | 150,107.75 | 34,710.23 | 115,397.52 | 0.00 | 17,008,616.23 |
| 145 | 09/01/2036 | 150,107.75 | 34,945.24 | 115,162.51 | 0.00 | 16,973,670.99 |
| 146 | 10/01/2036 | 150,107.75 | 35,181.85 | 114,925.90 | 0.00 | 16,938,489.14 |
| 147 | 11/01/2036 | 150,107.75 | 35,420.06 | 114,687.69 | 0.00 | 16,903,069.08 |
| 148 | 12/01/2036 | 150,107.75 | 35,659.89 | 114,447.86 | 0.00 | 16,867,409.19 |
| YEAR | 2036 | 1,801,293.00 | 412,439.82 | 1,388,853.18 | 0.00 | |
| 149 | 01/01/2037 | 150,107.75 | 35,901.33 | 114,206.42 | 0.00 | 16,831,507.86 |
| 150 | 02/01/2037 | 150,107.75 | 36,144.42 | 113,963.33 | 0.00 | 16,795,363.44 |
| 151 | 03/01/2037 | 150,107.75 | 36,389.14 | 113,718.61 | 0.00 | 16,758,974.30 |
| 152 | 04/01/2037 | 150,107.75 | 36,635.53 | 113,472.22 | 0.00 | 16,722,338.77 |
| 153 | 05/01/2037 | 150,107.75 | 36,883.58 | 113,224.17 | 0.00 | 16,685,455.19 |


© 2015 Wolters Kluwer Financial Services, Inc.
All rights reserved.

# Amortization Schedule

| | | | |
|---|---|---|---|
| LOAN AMOUNT | 20,800,000.00 | INTEREST RATE | 6.250% |
| ANNUAL PERCENTAGE RATE | 7.137% | CLOSING DATE | 07/29/2024 |

| PAYMENT NO | PAYMENT DATE | PAYMENT | PRINCIPAL | INTEREST | MI | BALANCE |
|---|---|---|---|---|---|---|
| 154 | 06/01/2037 | 150,107.75 | 37,133.31 | 112,974.44 | 0.00 | 16,648,321.88 |
| 155 | 07/01/2037 | 150,107.75 | 37,384.74 | 112,723.01 | 0.00 | 16,610,937.14 |
| 156 | 08/01/2037 | 150,107.75 | 37,637.86 | 112,469.89 | 0.00 | 16,573,299.28 |
| 157 | 09/01/2037 | 150,107.75 | 37,892.70 | 112,215.05 | 0.00 | 16,535,406.58 |
| 158 | 10/01/2037 | 150,107.75 | 38,149.27 | 111,958.48 | 0.00 | 16,497,257.31 |
| 159 | 11/01/2037 | 150,107.75 | 38,407.57 | 111,700.18 | 0.00 | 16,458,849.74 |
| 160 | 12/01/2037 | 150,107.75 | 38,667.62 | 111,440.13 | 0.00 | 16,420,182.12 |
| YEAR | 2037 | 1,801,293.00 | 447,227.07 | 1,354,065.93 | 0.00 | |
| 161 | 01/01/2038 | 150,107.75 | 38,929.43 | 111,178.32 | 0.00 | 16,381,252.69 |
| 162 | 02/01/2038 | 150,107.75 | 39,193.02 | 110,914.73 | 0.00 | 16,342,059.67 |
| 163 | 03/01/2038 | 150,107.75 | 39,458.39 | 110,649.36 | 0.00 | 16,302,601.28 |
| 164 | 04/01/2038 | 150,107.75 | 39,725.55 | 110,382.20 | 0.00 | 16,262,875.73 |
| 165 | 05/01/2038 | 150,107.75 | 39,994.53 | 110,113.22 | 0.00 | 16,222,881.20 |
| 166 | 06/01/2038 | 150,107.75 | 40,265.33 | 109,842.42 | 0.00 | 16,182,615.87 |
| 167 | 07/01/2038 | 150,107.75 | 40,537.95 | 109,569.80 | 0.00 | 16,142,077.92 |
| 168 | 08/01/2038 | 150,107.75 | 40,812.43 | 109,295.32 | 0.00 | 16,101,265.49 |
| 169 | 09/01/2038 | 150,107.75 | 41,088.76 | 109,018.99 | 0.00 | 16,060,176.73 |
| 170 | 10/01/2038 | 150,107.75 | 41,366.97 | 108,740.78 | 0.00 | 16,018,809.76 |
| 171 | 11/01/2038 | 150,107.75 | 41,647.06 | 108,460.69 | 0.00 | 15,977,162.70 |
| 172 | 12/01/2038 | 150,107.75 | 41,929.04 | 108,178.71 | 0.00 | 15,935,233.66 |
| YEAR | 2038 | 1,801,293.00 | 484,948.46 | 1,316,344.54 | 0.00 | |
| 173 | 01/01/2039 | 150,107.75 | 42,212.94 | 107,894.81 | 0.00 | 15,893,020.72 |
| 174 | 02/01/2039 | 150,107.75 | 42,498.76 | 107,608.99 | 0.00 | 15,850,521.96 |
| 175 | 03/01/2039 | 150,107.75 | 42,786.51 | 107,321.24 | 0.00 | 15,807,735.45 |
| 176 | 04/01/2039 | 150,107.75 | 43,076.21 | 107,031.54 | 0.00 | 15,764,659.24 |
| 177 | 05/01/2039 | 150,107.75 | 43,367.87 | 106,739.88 | 0.00 | 15,721,291.37 |
| 178 | 06/01/2039 | 150,107.75 | 43,661.51 | 106,446.24 | 0.00 | 15,677,629.86 |
| 179 | 07/01/2039 | 150,107.75 | 43,957.13 | 106,150.62 | 0.00 | 15,633,672.73 |
| 180 | 08/01/2039 | 150,107.75 | 44,254.76 | 105,852.99 | 0.00 | 15,589,417.97 |
| 181 | 09/01/2039 | 150,107.75 | 44,554.40 | 105,553.35 | 0.00 | 15,544,863.57 |
| 182 | 10/01/2039 | 150,107.75 | 44,856.07 | 105,251.68 | 0.00 | 15,500,007.50 |
| 183 | 11/01/2039 | 150,107.75 | 45,159.78 | 104,947.97 | 0.00 | 15,454,847.72 |
| 184 | 12/01/2039 | 150,107.75 | 45,465.55 | 104,642.20 | 0.00 | 15,409,382.17 |
| YEAR | 2039 | 1,801,293.00 | 525,851.49 | 1,275,441.51 | 0.00 | |


© 2015 Wolters Kluwer Financial Services, Inc.
All rights reserved.

# Amortization Schedule

| | | | |
|---|---|---|---|
| LOAN AMOUNT | 20,800,000.00 | INTEREST RATE | 6.250% |
| ANNUAL PERCENTAGE RATE | 7.137% | CLOSING DATE | 07/29/2024 |

| PAYMENT NO | PAYMENT DATE | PAYMENT | PRINCIPAL | INTEREST | MI | BALANCE |
|---|---|---|---|---|---|---|
| 185 | 01/01/2040 | 150,107.75 | 45,773.39 | 104,334.36 | 0.00 | 15,363,608.78 |
| 186 | 02/01/2040 | 150,107.75 | 46,083.32 | 104,024.43 | 0.00 | 15,317,525.46 |
| 187 | 03/01/2040 | 150,107.75 | 46,395.34 | 103,712.41 | 0.00 | 15,271,130.12 |
| 188 | 04/01/2040 | 150,107.75 | 46,709.47 | 103,398.28 | 0.00 | 15,224,420.65 |
| 189 | 05/01/2040 | 150,107.75 | 47,025.74 | 103,082.01 | 0.00 | 15,177,394.91 |
| 190 | 06/01/2040 | 150,107.75 | 47,344.14 | 102,763.61 | 0.00 | 15,130,050.77 |
| 191 | 07/01/2040 | 150,107.75 | 47,664.70 | 102,443.05 | 0.00 | 15,082,386.07 |
| 192 | 08/01/2040 | 150,107.75 | 47,987.43 | 102,120.32 | 0.00 | 15,034,398.64 |
| 193 | 09/01/2040 | 150,107.75 | 48,312.34 | 101,795.41 | 0.00 | 14,986,086.30 |
| 194 | 10/01/2040 | 150,107.75 | 48,639.46 | 101,468.29 | 0.00 | 14,937,446.84 |
| 195 | 11/01/2040 | 150,107.75 | 48,968.79 | 101,138.96 | 0.00 | 14,888,478.05 |
| 196 | 12/01/2040 | 150,107.75 | 49,300.35 | 100,807.40 | 0.00 | 14,839,177.70 |
| YEAR | 2040 | 1,801,293.00 | 570,204.47 | 1,231,088.53 | 0.00 | |
| 197 | 01/01/2041 | 150,107.75 | 49,634.15 | 100,473.60 | 0.00 | 14,789,543.55 |
| 198 | 02/01/2041 | 150,107.75 | 49,970.22 | 100,137.53 | 0.00 | 14,739,573.33 |
| 199 | 03/01/2041 | 150,107.75 | 50,308.56 | 99,799.19 | 0.00 | 14,689,264.77 |
| 200 | 04/01/2041 | 150,107.75 | 50,649.19 | 99,458.56 | 0.00 | 14,638,615.58 |
| 201 | 05/01/2041 | 150,107.75 | 50,992.12 | 99,115.63 | 0.00 | 14,587,623.46 |
| 202 | 06/01/2041 | 150,107.75 | 51,337.38 | 98,770.37 | 0.00 | 14,536,286.08 |
| 203 | 07/01/2041 | 150,107.75 | 51,684.98 | 98,422.77 | 0.00 | 14,484,601.10 |
| 204 | 08/01/2041 | 150,107.75 | 52,034.93 | 98,072.82 | 0.00 | 14,432,566.17 |
| 205 | 09/01/2041 | 150,107.75 | 52,387.25 | 97,720.50 | 0.00 | 14,380,178.92 |
| 206 | 10/01/2041 | 150,107.75 | 52,741.96 | 97,365.79 | 0.00 | 14,327,436.96 |
| 207 | 11/01/2041 | 150,107.75 | 53,099.06 | 97,008.69 | 0.00 | 14,274,337.90 |
| 208 | 12/01/2041 | 150,107.75 | 53,458.59 | 96,649.16 | 0.00 | 14,220,879.31 |
| YEAR | 2041 | 1,801,293.00 | 618,298.39 | 1,182,994.61 | 0.00 | |
| 209 | 01/01/2042 | 150,107.75 | 53,820.55 | 96,287.20 | 0.00 | 14,167,058.76 |
| 210 | 02/01/2042 | 150,107.75 | 54,184.96 | 95,922.79 | 0.00 | 14,112,873.80 |
| 211 | 03/01/2042 | 150,107.75 | 54,551.83 | 95,555.92 | 0.00 | 14,058,321.97 |
| 212 | 04/01/2042 | 150,107.75 | 54,921.19 | 95,186.56 | 0.00 | 14,003,400.78 |
| 213 | 05/01/2042 | 150,107.75 | 55,293.06 | 94,814.69 | 0.00 | 13,948,107.72 |
| 214 | 06/01/2042 | 150,107.75 | 55,667.44 | 94,440.31 | 0.00 | 13,892,440.28 |
| 215 | 07/01/2042 | 150,107.75 | 56,044.35 | 94,063.40 | 0.00 | 13,836,395.93 |


© 2015 Wolters Kluwer Financial Services, Inc.
All rights reserved.

# Amortization Schedule

| | | | |
|---|---|---|---|
| LOAN AMOUNT | 20,800,000.00 | INTEREST RATE | 6.250% |
| ANNUAL PERCENTAGE RATE | 7.137% | CLOSING DATE | 07/29/2024 |

| PAYMENT NO | PAYMENT DATE | PAYMENT | PRINCIPAL | INTEREST | MI | BALANCE |
|---|---|---|---|---|---|---|
| 216 | 08/01/2042 | 150,107.75 | 56,423.82 | 93,683.93 | 0.00 | 13,779,972.11 |
| 217 | 09/01/2042 | 150,107.75 | 56,805.86 | 93,301.89 | 0.00 | 13,723,166.25 |
| 218 | 10/01/2042 | 150,107.75 | 57,190.48 | 92,917.27 | 0.00 | 13,665,975.77 |
| 219 | 11/01/2042 | 150,107.75 | 57,577.71 | 92,530.04 | 0.00 | 13,608,398.06 |
| 220 | 12/01/2042 | 150,107.75 | 57,967.55 | 92,140.20 | 0.00 | 13,550,430.51 |
| YEAR | 2042 | 1,801,293.00 | 670,448.80 | 1,130,844.20 | 0.00 | |
| 221 | 01/01/2043 | 150,107.75 | 58,360.04 | 91,747.71 | 0.00 | 13,492,070.47 |
| 222 | 02/01/2043 | 150,107.75 | 58,755.19 | 91,352.56 | 0.00 | 13,433,315.28 |
| 223 | 03/01/2043 | 150,107.75 | 59,153.01 | 90,954.74 | 0.00 | 13,374,162.27 |
| 224 | 04/01/2043 | 150,107.75 | 59,553.53 | 90,554.22 | 0.00 | 13,314,608.74 |
| 225 | 05/01/2043 | 150,107.75 | 59,956.75 | 90,151.00 | 0.00 | 13,254,651.99 |
| 226 | 06/01/2043 | 150,107.75 | 60,362.71 | 89,745.04 | 0.00 | 13,194,289.28 |
| 227 | 07/01/2043 | 150,107.75 | 60,771.42 | 89,336.33 | 0.00 | 13,133,517.86 |
| 228 | 08/01/2043 | 150,107.75 | 61,182.89 | 88,924.86 | 0.00 | 13,072,334.97 |
| 229 | 09/01/2043 | 150,107.75 | 61,597.15 | 88,510.60 | 0.00 | 13,010,737.82 |
| 230 | 10/01/2043 | 150,107.75 | 62,014.21 | 88,093.54 | 0.00 | 12,948,723.61 |
| 231 | 11/01/2043 | 150,107.75 | 62,434.10 | 87,673.65 | 0.00 | 12,886,289.51 |
| 232 | 12/01/2043 | 150,107.75 | 62,856.83 | 87,250.92 | 0.00 | 12,823,432.68 |
| YEAR | 2043 | 1,801,293.00 | 726,997.83 | 1,074,295.17 | 0.00 | |
| 233 | 01/01/2044 | 150,107.75 | 63,282.42 | 86,825.33 | 0.00 | 12,760,150.26 |
| 234 | 02/01/2044 | 150,107.75 | 63,710.90 | 86,396.85 | 0.00 | 12,696,439.36 |
| 235 | 03/01/2044 | 150,107.75 | 64,142.28 | 85,965.47 | 0.00 | 12,632,297.08 |
| 236 | 04/01/2044 | 150,107.75 | 64,576.57 | 85,531.18 | 0.00 | 12,567,720.51 |
| 237 | 05/01/2044 | 150,107.75 | 65,013.81 | 85,093.94 | 0.00 | 12,502,706.70 |
| 238 | 06/01/2044 | 150,107.75 | 65,454.01 | 84,653.74 | 0.00 | 12,437,252.69 |
| 239 | 07/01/2044 | 150,107.75 | 65,897.18 | 84,210.57 | 0.00 | 12,371,355.51 |
| 240 | 08/01/2044 | 150,107.75 | 66,343.36 | 83,764.39 | 0.00 | 12,305,012.15 |
| 241 | 09/01/2044 | 150,107.75 | 66,792.56 | 83,315.19 | 0.00 | 12,238,219.59 |
| 242 | 10/01/2044 | 150,107.75 | 67,244.80 | 82,862.95 | 0.00 | 12,170,974.79 |
| 243 | 11/01/2044 | 150,107.75 | 67,700.11 | 82,407.64 | 0.00 | 12,103,274.68 |
| 244 | 12/01/2044 | 150,107.75 | 68,158.49 | 81,949.26 | 0.00 | 12,035,116.19 |
| YEAR | 2044 | 1,801,293.00 | 788,316.49 | 1,012,976.51 | 0.00 | |
| 245 | 01/01/2045 | 150,107.75 | 68,619.98 | 81,487.77 | 0.00 | 11,966,496.21 |


© 2015 Wolters Kluwer Financial Services, Inc.
All rights reserved.
[redacted]

# Amortization Schedule

| | | | |
|---|---|---|---|
| LOAN AMOUNT | 20,800,000.00 | INTEREST RATE | 6.250% |
| ANNUAL PERCENTAGE RATE | 7.137% | CLOSING DATE | 07/29/2024 |

| PAYMENT NO | PAYMENT DATE | PAYMENT | PRINCIPAL | INTEREST | MI | BALANCE |
|---|---|---|---|---|---|---|
| 246 | 02/01/2045 | 150,107.75 | 69,084.60 | 81,023.15 | 0.00 | 11,897,411.61 |
| 247 | 03/01/2045 | 150,107.75 | 69,552.36 | 80,555.39 | 0.00 | 11,827,859.25 |
| 248 | 04/01/2045 | 150,107.75 | 70,023.29 | 80,084.46 | 0.00 | 11,757,835.96 |
| 249 | 05/01/2045 | 150,107.75 | 70,497.40 | 79,610.35 | 0.00 | 11,687,338.56 |
| 250 | 06/01/2045 | 150,107.75 | 70,974.73 | 79,133.02 | 0.00 | 11,616,363.83 |
| 251 | 07/01/2045 | 150,107.75 | 71,455.29 | 78,652.46 | 0.00 | 11,544,908.54 |
| 252 | 08/01/2045 | 150,107.75 | 71,939.10 | 78,168.65 | 0.00 | 11,472,969.44 |
| 253 | 09/01/2045 | 150,107.75 | 72,426.19 | 77,681.56 | 0.00 | 11,400,543.25 |
| 254 | 10/01/2045 | 150,107.75 | 72,916.57 | 77,191.18 | 0.00 | 11,327,626.68 |
| 255 | 11/01/2045 | 150,107.75 | 73,410.28 | 76,697.47 | 0.00 | 11,254,216.40 |
| 256 | 12/01/2045 | 150,107.75 | 73,907.33 | 76,200.42 | 0.00 | 11,180,309.07 |
| YEAR | 2045 | 1,801,293.00 | 854,807.12 | 946,485.88 | 0.00 | |
| 257 | 01/01/2046 | 150,107.75 | 74,407.74 | 75,700.01 | 0.00 | 11,105,901.33 |
| 258 | 02/01/2046 | 150,107.75 | 74,911.54 | 75,196.21 | 0.00 | 11,030,989.79 |
| 259 | 03/01/2046 | 150,107.75 | 75,418.76 | 74,688.99 | 0.00 | 10,955,571.03 |
| 260 | 04/01/2046 | 150,107.75 | 75,929.40 | 74,178.35 | 0.00 | 10,879,641.63 |
| 261 | 05/01/2046 | 150,107.75 | 76,443.51 | 73,664.24 | 0.00 | 10,803,198.12 |
| 262 | 06/01/2046 | 150,107.75 | 76,961.10 | 73,146.65 | 0.00 | 10,726,237.02 |
| 263 | 07/01/2046 | 150,107.75 | 77,482.19 | 72,625.56 | 0.00 | 10,648,754.83 |
| 264 | 08/01/2046 | 150,107.75 | 78,006.81 | 72,100.94 | 0.00 | 10,570,748.02 |
| 265 | 09/01/2046 | 150,107.75 | 78,534.98 | 71,572.77 | 0.00 | 10,492,213.04 |
| 266 | 10/01/2046 | 150,107.75 | 79,066.72 | 71,041.03 | 0.00 | 10,413,146.32 |
| 267 | 11/01/2046 | 150,107.75 | 79,602.07 | 70,505.68 | 0.00 | 10,333,544.25 |
| 268 | 12/01/2046 | 150,107.75 | 80,141.04 | 69,966.71 | 0.00 | 10,253,403.21 |
| YEAR | 2046 | 1,801,293.00 | 926,905.86 | 874,387.14 | 0.00 | |
| 269 | 01/01/2047 | 150,107.75 | 80,683.67 | 69,424.08 | 0.00 | 10,172,719.54 |
| 270 | 02/01/2047 | 150,107.75 | 81,229.96 | 68,877.79 | 0.00 | 10,091,489.58 |
| 271 | 03/01/2047 | 150,107.75 | 81,779.96 | 68,327.79 | 0.00 | 10,009,709.62 |
| 272 | 04/01/2047 | 150,107.75 | 82,333.67 | 67,774.08 | 0.00 | 9,927,375.95 |
| 273 | 05/01/2047 | 150,107.75 | 82,891.14 | 67,216.61 | 0.00 | 9,844,484.81 |
| 274 | 06/01/2047 | 150,107.75 | 83,452.38 | 66,655.37 | 0.00 | 9,761,032.43 |
| 275 | 07/01/2047 | 150,107.75 | 84,017.43 | 66,090.32 | 0.00 | 9,677,015.00 |
| 276 | 08/01/2047 | 150,107.75 | 84,586.29 | 65,521.46 | 0.00 | 9,592,428.71 |
| 277 | 09/01/2047 | 150,107.75 | 85,159.01 | 64,948.74 | 0.00 | 9,507,269.70 |


© 2015 Wolters Kluwer Financial Services, Inc.
All rights reserved.
[redacted]

# Amortization Schedule

| | | | |
|---|---|---|---|
| LOAN AMOUNT | 20,800,000.00 | INTEREST RATE | 6.250% |
| ANNUAL PERCENTAGE RATE | 7.137% | CLOSING DATE | 07/29/2024 |

| PAYMENT NO | PAYMENT DATE | PAYMENT | PRINCIPAL | INTEREST | MI | BALANCE |
|---|---|---|---|---|---|---|
| 278 | 10/01/2047 | 150,107.75 | 85,735.61 | 64,372.14 | 0.00 | 9,421,534.09 |
| 279 | 11/01/2047 | 150,107.75 | 86,316.11 | 63,791.64 | 0.00 | 9,335,217.98 |
| 280 | 12/01/2047 | 150,107.75 | 86,900.54 | 63,207.21 | 0.00 | 9,248,317.44 |
| YEAR | 2047 | 1,801,293.00 | 1,005,085.77 | 796,207.23 | 0.00 | |
| 281 | 01/01/2048 | 150,107.75 | 87,488.93 | 62,618.82 | 0.00 | 9,160,828.51 |
| 282 | 02/01/2048 | 150,107.75 | 88,081.31 | 62,026.44 | 0.00 | 9,072,747.20 |
| 283 | 03/01/2048 | 150,107.75 | 88,677.69 | 61,430.06 | 0.00 | 8,984,069.51 |
| 284 | 04/01/2048 | 150,107.75 | 89,278.11 | 60,829.64 | 0.00 | 8,894,791.40 |
| 285 | 05/01/2048 | 150,107.75 | 89,882.60 | 60,225.15 | 0.00 | 8,804,908.80 |
| 286 | 06/01/2048 | 150,107.75 | 90,491.18 | 59,616.57 | 0.00 | 8,714,417.62 |
| 287 | 07/01/2048 | 150,107.75 | 91,103.88 | 59,003.87 | 0.00 | 8,623,313.74 |
| 288 | 08/01/2048 | 150,107.75 | 91,720.73 | 58,387.02 | 0.00 | 8,531,593.01 |
| 289 | 09/01/2048 | 150,107.75 | 92,341.76 | 57,765.99 | 0.00 | 8,439,251.25 |
| 290 | 10/01/2048 | 150,107.75 | 92,966.99 | 57,140.76 | 0.00 | 8,346,284.26 |
| 291 | 11/01/2048 | 150,107.75 | 93,596.45 | 56,511.30 | 0.00 | 8,252,687.81 |
| 292 | 12/01/2048 | 150,107.75 | 94,230.18 | 55,877.57 | 0.00 | 8,158,457.63 |
| YEAR | 2048 | 1,801,293.00 | 1,089,859.81 | 711,433.19 | 0.00 | |
| 293 | 01/01/2049 | 150,107.75 | 94,868.19 | 55,239.56 | 0.00 | 8,063,589.44 |
| 294 | 02/01/2049 | 150,107.75 | 95,510.53 | 54,597.22 | 0.00 | 7,968,078.91 |
| 295 | 03/01/2049 | 150,107.75 | 96,157.22 | 53,950.53 | 0.00 | 7,871,921.69 |
| 296 | 04/01/2049 | 150,107.75 | 96,808.28 | 53,299.47 | 0.00 | 7,775,113.41 |
| 297 | 05/01/2049 | 150,107.75 | 97,463.75 | 52,644.00 | 0.00 | 7,677,649.66 |
| 298 | 06/01/2049 | 150,107.75 | 98,123.66 | 51,984.09 | 0.00 | 7,579,526.00 |
| 299 | 07/01/2049 | 150,107.75 | 98,788.04 | 51,319.71 | 0.00 | 7,480,737.96 |
| 300 | 08/01/2049 | 150,107.75 | 99,456.92 | 50,650.83 | 0.00 | 7,381,281.04 |
| 301 | 09/01/2049 | 150,107.75 | 100,130.33 | 49,977.42 | 0.00 | 7,281,150.71 |
| 302 | 10/01/2049 | 150,107.75 | 100,808.29 | 49,299.46 | 0.00 | 7,180,342.42 |
| 303 | 11/01/2049 | 150,107.75 | 101,490.85 | 48,616.90 | 0.00 | 7,078,851.57 |
| 304 | 12/01/2049 | 150,107.75 | 102,178.03 | 47,929.72 | 0.00 | 6,976,673.54 |
| YEAR | 2049 | 1,801,293.00 | 1,181,784.09 | 619,508.91 | 0.00 | |
| 305 | 01/01/2050 | 150,107.75 | 102,869.86 | 47,237.89 | 0.00 | 6,873,803.68 |
| 306 | 02/01/2050 | 150,107.75 | 103,566.37 | 46,541.38 | 0.00 | 6,770,237.31 |
| 307 | 03/01/2050 | 150,107.75 | 104,267.60 | 45,840.15 | 0.00 | 6,665,969.71 |


© 2015 Wolters Kluwer Financial Services, Inc.
All rights reserved.

# Amortization Schedule

| | | | |
|---|---|---|---|
| LOAN AMOUNT | 20,800,000.00 | INTEREST RATE | 6.250% |
| ANNUAL PERCENTAGE RATE | 7.137% | CLOSING DATE | 07/29/2024 |

| PAYMENT NO | PAYMENT DATE | PAYMENT | PRINCIPAL | INTEREST | MI | BALANCE |
|---|---|---|---|---|---|---|
| 308 | 04/01/2050 | 150,107.75 | 104,973.58 | 45,134.17 | 0.00 | 6,560,996.13 |
| 309 | 05/01/2050 | 150,107.75 | 105,684.34 | 44,423.41 | 0.00 | 6,455,311.79 |
| 310 | 06/01/2050 | 150,107.75 | 106,399.91 | 43,707.84 | 0.00 | 6,348,911.88 |
| 311 | 07/01/2050 | 150,107.75 | 107,120.33 | 42,987.42 | 0.00 | 6,241,791.55 |
| 312 | 08/01/2050 | 150,107.75 | 107,845.62 | 42,262.13 | 0.00 | 6,133,945.93 |
| 313 | 09/01/2050 | 150,107.75 | 108,575.82 | 41,531.93 | 0.00 | 6,025,370.11 |
| 314 | 10/01/2050 | 150,107.75 | 109,310.97 | 40,796.78 | 0.00 | 5,916,059.14 |
| 315 | 11/01/2050 | 150,107.75 | 110,051.10 | 40,056.65 | 0.00 | 5,806,008.04 |
| 316 | 12/01/2050 | 150,107.75 | 110,796.24 | 39,311.51 | 0.00 | 5,695,211.80 |
| YEAR | 2050 | 1,801,293.00 | 1,281,461.74 | 519,831.26 | 0.00 | |
| 317 | 01/01/2051 | 150,107.75 | 111,546.42 | 38,561.33 | 0.00 | 5,583,665.38 |
| 318 | 02/01/2051 | 150,107.75 | 112,301.68 | 37,806.07 | 0.00 | 5,471,363.70 |
| 319 | 03/01/2051 | 150,107.75 | 113,062.06 | 37,045.69 | 0.00 | 5,358,301.64 |
| 320 | 04/01/2051 | 150,107.75 | 113,827.58 | 36,280.17 | 0.00 | 5,244,474.06 |
| 321 | 05/01/2051 | 150,107.75 | 114,598.29 | 35,509.46 | 0.00 | 5,129,875.77 |
| 322 | 06/01/2051 | 150,107.75 | 115,374.22 | 34,733.53 | 0.00 | 5,014,501.55 |
| 323 | 07/01/2051 | 150,107.75 | 116,155.40 | 33,952.35 | 0.00 | 4,898,346.15 |
| 324 | 08/01/2051 | 150,107.75 | 116,941.86 | 33,165.89 | 0.00 | 4,781,404.29 |
| 325 | 09/01/2051 | 150,107.75 | 117,733.66 | 32,374.09 | 0.00 | 4,663,670.63 |
| 326 | 10/01/2051 | 150,107.75 | 118,530.81 | 31,576.94 | 0.00 | 4,545,139.82 |
| 327 | 11/01/2051 | 150,107.75 | 119,333.37 | 30,774.38 | 0.00 | 4,425,806.45 |
| 328 | 12/01/2051 | 150,107.75 | 120,141.35 | 29,966.40 | 0.00 | 4,305,665.10 |
| YEAR | 2051 | 1,801,293.00 | 1,389,546.70 | 411,746.30 | 0.00 | |
| 329 | 01/01/2052 | 150,107.75 | 120,954.81 | 29,152.94 | 0.00 | 4,184,710.29 |
| 330 | 02/01/2052 | 150,107.75 | 121,773.77 | 28,333.98 | 0.00 | 4,062,936.52 |
| 331 | 03/01/2052 | 150,107.75 | 122,598.28 | 27,509.47 | 0.00 | 3,940,338.24 |
| 332 | 04/01/2052 | 150,107.75 | 123,428.38 | 26,679.37 | 0.00 | 3,816,909.86 |
| 333 | 05/01/2052 | 150,107.75 | 124,264.09 | 25,843.66 | 0.00 | 3,692,645.77 |
| 334 | 06/01/2052 | 150,107.75 | 125,105.46 | 25,002.29 | 0.00 | 3,567,540.31 |
| 335 | 07/01/2052 | 150,107.75 | 125,952.53 | 24,155.22 | 0.00 | 3,441,587.78 |
| 336 | 08/01/2052 | 150,107.75 | 126,805.33 | 23,302.42 | 0.00 | 3,314,782.45 |
| 337 | 09/01/2052 | 150,107.75 | 127,663.91 | 22,443.84 | 0.00 | 3,187,118.54 |
| 338 | 10/01/2052 | 150,107.75 | 128,528.30 | 21,579.45 | 0.00 | 3,058,590.24 |
| 339 | 11/01/2052 | 150,107.75 | 129,398.55 | 20,709.20 | 0.00 | 2,929,191.69 |


© 2015 Wolters Kluwer Financial Services, Inc.
All rights reserved.

# Amortization Schedule

| | | | |
|---|---|---|---|
| LOAN AMOUNT | 20,800,000.00 | INTEREST RATE | 6.250% |
| ANNUAL PERCENTAGE RATE | 7.137% | CLOSING DATE | 07/29/2024 |

| PAYMENT NO | PAYMENT DATE | PAYMENT | PRINCIPAL | INTEREST | MI | BALANCE |
|---|---|---|---|---|---|---|
| 340 | 12/01/2052 | 150,107.75 | 130,274.68 | 19,833.07 | 0.00 | 2,798,917.01 |
| YEAR | 2052 | 1,801,293.00 | 1,506,748.09 | 294,544.91 | 0.00 | |
| 341 | 01/01/2053 | 150,107.75 | 131,156.75 | 18,951.00 | 0.00 | 2,667,760.26 |
| 342 | 02/01/2053 | 150,107.75 | 132,044.79 | 18,062.96 | 0.00 | 2,535,715.47 |
| 343 | 03/01/2053 | 150,107.75 | 132,938.84 | 17,168.91 | 0.00 | 2,402,776.63 |
| 344 | 04/01/2053 | 150,107.75 | 133,838.95 | 16,268.80 | 0.00 | 2,268,937.68 |
| 345 | 05/01/2053 | 150,107.75 | 134,745.15 | 15,362.60 | 0.00 | 2,134,192.53 |
| 346 | 06/01/2053 | 150,107.75 | 135,657.49 | 14,450.26 | 0.00 | 1,998,535.04 |
| 347 | 07/01/2053 | 150,107.75 | 136,576.00 | 13,531.75 | 0.00 | 1,861,959.04 |
| 348 | 08/01/2053 | 150,107.75 | 137,500.74 | 12,607.01 | 0.00 | 1,724,458.30 |
| 349 | 09/01/2053 | 150,107.75 | 138,431.73 | 11,676.02 | 0.00 | 1,586,026.57 |
| 350 | 10/01/2053 | 150,107.75 | 139,369.03 | 10,738.72 | 0.00 | 1,446,657.54 |
| 351 | 11/01/2053 | 150,107.75 | 140,312.67 | 9,795.08 | 0.00 | 1,306,344.87 |
| 352 | 12/01/2053 | 150,107.75 | 141,262.71 | 8,845.04 | 0.00 | 1,165,082.16 |
| YEAR | 2053 | 1,801,293.00 | 1,633,834.85 | 167,458.15 | 0.00 | |
| 353 | 01/01/2054 | 150,107.75 | 142,219.17 | 7,888.58 | 0.00 | 1,022,862.99 |
| 354 | 02/01/2054 | 150,107.75 | 143,182.12 | 6,925.63 | 0.00 | 879,680.87 |
| 355 | 03/01/2054 | 150,107.75 | 144,151.58 | 5,956.17 | 0.00 | 735,529.29 |
| 356 | 04/01/2054 | 150,107.75 | 145,127.60 | 4,980.15 | 0.00 | 590,401.69 |
| 357 | 05/01/2054 | 150,107.75 | 146,110.24 | 3,997.51 | 0.00 | 444,291.45 |
| 358 | 06/01/2054 | 150,107.75 | 147,099.53 | 3,008.22 | 0.00 | 297,191.92 |
| 359 | 07/01/2054 | 150,107.75 | 148,095.51 | 2,012.24 | 0.00 | 149,096.41 |
| 360 | 08/01/2054 | 150,105.92 | 149,096.41 | 1,009.51 | 0.00 | 0.00 |
| YEAR | 2054 | 1,200,860.17 | 1,165,082.16 | 35,778.01 | 0.00 | |


© 2015 Wolters Kluwer Financial Services, Inc.
All rights reserved.

# Notice of Negative Information (Pre-sharing)

**Lender**

JPMorgan Chase Bank, N.A.
2500 Westfield Dr, Floor 2-1
Elgin, IL 60124

**Borrower**

600 Spring, LLC
Amit Tidhar, Trustee
Attn: Barry
[redacted]

**Guarantor**

Barry Shy
[redacted]

**Date:** July 29, 2024

**Loan Number:** [redacted]

Federal law requires us to provide the following notice to customers before any "negative information" may be furnished to a nationwide consumer reporting agency. "Negative information" means information concerning delinquencies, late payments, insolvency, or any form of default. This notice does not mean that we will be reporting such information about you, only that we may report such information about customers that have not done what they are required to do under our agreement.

After providing this notice, additional negative information may be submitted without providing another notice.

**We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.**


© 2014 Wolters Kluwer Financial Services, Inc.
All rights reserved.

# Notice of Negative Information (Pre-sharing)

**Lender**

JPMorgan Chase Bank, N.A.
2500 Westfield Dr, Floor 2-1
Elgin, IL 60124

**Borrower**

600 Spring, LLC
Amit Tidhar, Trustee
Attn: Barry
[redacted]

**Guarantor**

Barry Shy
[redacted]

**Date:** July 29, 2024

**Loan Number:** [redacted]

Federal law requires us to provide the following notice to customers before any "negative information" may be furnished to a nationwide consumer reporting agency. "Negative information" means information concerning delinquencies, late payments, insolvency, or any form of default. This notice does not mean that we will be reporting such information about you, only that we may report such information about customers that have not done what they are required to do under our agreement.

After providing this notice, additional negative information may be submitted without providing another notice.

**We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.**


© 2014 Wolters Kluwer Financial Services, Inc.
All rights reserved.

# Notice of Negative Information (Pre-sharing)

**Lender**

JPMorgan Chase Bank, N.A.
2500 Westfield Dr, Floor 2-1
Elgin, IL 60124

**Borrower**

600 Spring, LLC
Amit Tidhar, Trustee
[redacted]

**Guarantor**

Barry Shy
[redacted]

**Date:** July 29, 2024

**Loan Number:** [redacted]

Federal law requires us to provide the following notice to customers before any "negative information" may be furnished to a nationwide consumer reporting agency. "Negative information" means information concerning delinquencies, late payments, insolvency, or any form of default. This notice does not mean that we will be reporting such information about you, only that we may report such information about customers that have not done what they are required to do under our agreement.

After providing this notice, additional negative information may be submitted without providing another notice.

**We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.**


© 2014 Wolters Kluwer Financial Services, Inc.
All rights reserved.

# TAX MATTERS AGREEMENT

J.P.Morgan

By signing this document, you agree to take on the responsibilities described below in connection with your mortgage payments. The terms "Loan" and "Lender" used in this agreement are defined in the Mortgage dated 07/29/2024, with respect to the property located at 24185 Case Ct, Malibu, CA 90265.

- You will make all payments under the Loan without withholding for any tax except as required by law;
- If you withhold any tax as required by law:
  - You will make timely payment(s) in the required amount to the applicable governmental authority.
  - The payment you are required to make to the Lender (with the exception of net income taxes, but including penalties and interest) will be increased as necessary so that the Lender will receive an amount equal to what it would have received (including any additional withholding amounts payable that may be applicable under this agreement) if there had been no withholding.
- You will provide us with satisfactory evidence of your payment of withholding tax to the governmental authority;
- You will compensate the Lender for:
  - Any liability or expense incurred in the event you do not pay these taxes, regardless of whether the taxes were correctly or legally imposed; and
  - Any transfer, documentary and value-added taxes, and assessments or charges that are imposed at any time in connection with the Loan, including all interest and penalties.

**Borrower**

**600 Spring, LLC**
*a California limited liability company*

7-29-2024
**Scott Gillen** **Date**
*Manager*

7-29-24
**Barry Shy** **Date**
*Manager*

7-29-24
**Amit Tidhar, Trustee of the The Brshy Irrevocable Trust** **Date**

Lender: JPMorgan Chase Bank, N.A.

Date: 07/25/2024
Loan #: [redacted]

# COMMITMENT LETTER

Borrower(s): 600 Spring, LLC
The Brshy Irrevocable Trust

Property Address: 24185 Case Ct, Malibu, CA 90265

We are pleased to inform you that your loan application has been approved subject to the terms and conditions set forth below.

## A. LOAN TERMS

The TYPE of loan for which you have applied is a: 7/6 mo. Adjustable Rate

Disclosures regarding your loan have been provided to you earlier.

The PURPOSE of the loan for which you have applied is:

- ☐ Purchase, with a contract price of $0.00. Any change to your sales contract must be approved by us.
- ☐ Refinance with no cash proceeds to you
- ☒ Refinance with cash proceeds to you
- ☐ Modification of construction loan to permanent financing. We will modify the construction loan terms to permanent financing subject to the terms and conditions set forth herein.

The AMOUNT of your loan is $20,800,000.00.

The TERM of your loan is 30 years.

The estimated PRINCIPAL AND INTEREST payment is $128,069.18. This estimated payment is based on market rates at the time you applied and may not be your locked-in rate. Please see "Interest Rate and Discount Points" section below for further details.

☐ If checked, in addition to the monthly payments of principal and interest, we will require you to include with each monthly payment a sum for all estimated annual (i) taxes, (ii) municipal water charges (if any), (iii) sewer rents (if any), (iv) private mortgage insurance premiums (if any), (v) hazard insurance premiums, (vi) flood insurance premiums (if any), and (vii) assessments (collectively, the "Escrow Items").

If you applied for a loan with Initial Interest Only payments, the estimated INTEREST ONLY payment is $________. This estimated payment is based on market rates at the time you applied and may not be your locked-in rate. Please see "Interest Rate and Discount Points" section below for further details. In addition to the monthly payments of interest only, and later of principal and interest, we may require you to include with each monthly payment a sum for all Escrow Items.

The INTEREST RATE AND DISCOUNT POINTS of your loan is determined by the option you have selected as indicated below. If you have selected the auto debit option, the rates listed below already reflect the 1/8% discount on your rate. If you have not selected the auto debit option, and you would like to sign up to receive the 1/8% discount, please contact your Mortgage Specialist.

☒ IF CHECKED, YOU HAVE ELECTED TO LOCK-IN YOUR INTEREST RATE. Your credit has been approved at your locked interest rate of 6.250% and total points of __________% which are guaranteed until 8/12/24. If you do not close by this date, your rate will be the greater of the locked-in rate or the current market rate established by us.

☐ IF CHECKED, YOU HAVE ELECTED TO LOCK-IN YOUR INTEREST RATE WITH A FLOAT DOWN OPTION. Your credit has been approved at __________% and total points of __________% which are guaranteed until __________. If you do not close by this date, your rate will be the greater of the locked-in rate or the current market rate established by us.

☐ IF CHECKED, YOU HAVE ELECTED NOT TO LOCK-IN YOUR INTEREST RATE AT THIS TIME. Your credit has been approved at an assumed interest rate of __________%. You are not guaranteed this rate. The interest rate, discount points, and fees will be determined when you lock-in, which must be done at least three (3) business days before closing.

**Important Information**

The useful life of the appraisal used in connection with this approval is 120 days from the appraisal date. If the closing date exceeds 120 days from the appraisal date, a new appraisal will be required. This could result in additional costs and / or other impacts, including your ineligibility for the loan.

The Points and Fees explained above may change based on the following terms of your mortgage: Property Type, Occupancy Type, Loan Product, Loan Amount, and Loan to Value. These fees are disclosed on your Loan Estimate and payment of these additional fees is required as part of this Commitment.

**B. LOAN COMMITMENT EXPIRATION**

This Commitment Letter and our obligation to fund your loan will expire on 8/3/24 ("Commitment Termination"). If your loan does not close and fund prior to the Commitment Termination, the terms and conditions of this Commitment Letter may change, and your application may need to be re-underwritten. This could result in additional costs and/or other requirements, or your ineligibility for the loan.

**C. CLOSING COSTS**

You have been provided with a "Loan Estimate" of closing costs and expenses. You will be responsible at the time the loan is closed for the closing costs and expenses incurred in connection with this loan, as estimated in the Loan Estimate.

**D. GENERAL CLOSING REQUIREMENTS**

The following closing requirements, together with any other conditions itemized in this Commitment Letter and in Schedule A must be satisfied before your loan can be scheduled for closing. Please review all information thoroughly and call us if you have any questions.

1. Closing Documents. Our closing documents are available for examination at your request.
2. We may verify the information, appraisal and documents used in processing this loan. You hereby authorize release of information to us or our designee by your employer, bank, accountant, mortgage lender, creditors and other sources to verify the accuracy of documents and credit information we used in deciding whether to approve the loan.

☒ If checked, the Subject Property is Real Property and the following applies:

You authorize us to order title insurance for the Premises including, among other things, departmental, judgment and financing statement searches, insuring our interest as first mortgagee. You authorize us to obtain, if required by us, a copy of the Certificate of Occupancy for the Premises AS IT CURRENTLY EXISTS, and a Survey for the Premises AS IT CURRENTLY EXISTS, which Certificate of Occupancy and Survey must be acceptable to us. (Surveys are not required for Condominiums). You will pay the cost of the title insurance and any title continuations, Survey, Certificate of Occupancy, and any required fees. The title insurance report, Survey and Certificate of Occupancy must be received by us for our review and approval at least one week prior to scheduling of the closing. If you are refinancing, a title continuation will be required both at closing and at funding. The title insurance policy must name as mortgagee: JPMorgan Chase Bank, N.A. its Successors and/or Assigns. We require a final title insurance policy, in a form satisfactory to us, at closing. You must deliver to us copies of all legal documents that affect the premises.

All matters affecting the sufficiency and status of title to the premises must be satisfactory to us prior to closing. Additionally, we require payment or proof of payment, no later than 3 days prior to scheduling the closing, for any real estate taxes on the Premises that create a title exception.

☐ If checked, the Subject Property is a Cooperative Unit and the following applies:

1. UCC-1/Lien Searches.
We will record a UCC-1 Financing Statement for each co-op unit.

You authorize us to order the lien searches JPMorgan Chase requires against you, the seller and the premises. The lien searches will be conducted for each cooperative unit being financed. The lien searches will include a search of County UCC, judgment, federal and state tax liens, bankruptcy, lis pendens, in rem actions, mechanic's liens, environmental control board liens (ECB's), environmental control board fire liens (ECF's), and sidewalk violations. JPMorgan Chase will also require for each unit that a continuation search be ordered prior to funding (for purchase transactions, funding is the day of closing). **IN ADDITION, JPMORGAN CHASE WILL REQUIRE THAT AT CLOSING THE TITLE AGENCY PERFORMING THE LIEN SEARCHES PROVIDE CHASE WITH LIABILITY INSURANCE IN AN AMOUNT OF NO LESS THAN $50,000 FOR EACH UNIT.**

You authorize us to order a continuation search for each unit. The continuation search will be ordered 48 hours prior to closing. For refinance transactions, the continuation search will be ordered 48 hours prior to funding. The continuation search must be in writing and sent to us or we will call for a verbal report. JPMorgan Chase will not accept a verbal report made to the borrower's attorney.

The lien searches **AND THE CONTINUATION SEARCH** must show that the Premises are free from any outstanding liens and encumbrances except for JPMorgan Chase's lien against the Premises securing this loan to you. All matters affecting the sufficiency and status of title to the Premises must be satisfactory to us prior to the closing. You will pay the cost of the initial lien search, the continuation search and any required filing or other fees.

2. Recognition Agreement.
You will receive three (3) copies of a recognition agreement for each unit. At or prior to the closing, the cooperative apartment corporation shall (i) execute the recognition agreements by having them signed by an officer of the cooperative corporation and including the corporate seal, and (ii) execute a letter stating that all maintenance charges and assessments for each co-op unit have been paid in full to the date of closing. These documents must be sent to us.

3. Copy of the Proprietary Leases and Stock Certificates for each of the co-op units must be acceptable to us, as to form, content and term. The term of the Proprietary Leases must be at least equal to the term of the contemplated co-op loan.

**E. YOU MUST BE READY FOR SETTLEMENT**

1. POWER OF ATTORNEY - You must arrange with Lender in advance if any of you will not be at settlement. We do not accept powers of attorney in every jurisdiction and we require a specific power of attorney in any event. You must provide us with the proposed power of attorney (completely executed) at least 15 days before settlement. We reserve the right to refuse to settle your loan if the power of attorney is not, in our judgment, satisfactory.

2. This paragraph does not apply for Cooperative Apartment or Condominium loans.

   HAZARD INSURANCE POLICY - You must provide an original hazard insurance (fire and extended coverage) policy and paid receipt for one (1) year from an insurance company acceptable to Lender. A binder is not acceptable unless required by law. The fire and extended insurance coverage must be in an amount not less than 100% of the replacement value of the improvements.

   The policy must have the following mortgagee clause:

   JPMorgan Chase Bank, N.A., Its Successors and/or Assigns, ATIMA
   P.O. Box 4465, Springfield, OH 45501

   Loan #: [redacted]

3. If the property is appraised as a Cooperative Unit or Condominium, you must provide an acceptable certificate of insurance showing Lender as insured mortgagee on the master hazard insurance policy.

4. ☐ If checked, FLOOD INSURANCE IS REQUIRED. You must submit a flood insurance policy, in the lesser amount equaling the mortgage amount, 100% of the insurable value of the improvements as established by the insurer or replacement cost coverage (or similar language), or the maximum amount available through the National Flood Insurance Administration, with a paid receipt for the first year premium. The mortgagee clause must be the same as indicated for hazard policy above. Please be aware that loans made (closed) on or after January 1, 2016 will be required to maintain an escrow account for the life of the loan that will be used to pay flood insurance premiums to the insurance provider. An escrow account also may be required to pay other items, such as real estate taxes and homeowners insurance.

5. The following name(s) will appear on the closing documents and mortgage/deed of trust as follows:
   600 Spring, LLC
   The Brshy Irrevocable Trust

   If this is not correct, please advise us immediately so that your loan documents will be prepared correctly.

6. PROOF OF IDENTITY. In addition to the verification procedures performed at the time of application, Lender will require that you provide proof of identity at closing. You must bring either a photo identification (e.g. driver license) or two alternative forms of proof of identification (e.g., Social Security card, major credit card).

**F. REFINANCE TRANSACTIONS**

Special Rules for Refinance Transactions:

If the subject property is your primary residence, you have the right to cancel. You can cancel your loan transaction within three (3) business days after settlement. For this reason, loan proceeds will not be disbursed until the fourth (4th) business day after settlement.

**G. LENDER CAN CANCEL THIS COMMITMENT LETTER FOR CERTAIN REASONS**

Lender reserves the right to cancel this Commitment Letter for any of the following reasons:

- There is any change in who the borrower(s) is (are)
- Any statement which you have made to us in your application or otherwise is found to be false in any material way
- Prior to funding, your financial condition or employment status or that of any party granting support for your loan, adversely changes from that presented in your application or in any statement submitted to Lender
- There is any change in the property or in our information about the property after time of appraisal
- You fail to comply with any of the conditions contained in this commitment
- There is an interest rate increase which adversely affects your ability to qualify for the loan amount requested or, in our opinion, to afford monthly payments at the higher interest rate
- A Certificate of Occupancy is not issued by the closing date on new construction
- Pre-closing review shows a material change in the plans and specifications provided at application or a material alteration is completed by the builder without our prior consent
- Any of the conditions outlined on Schedule A to this Commitment Letter are not met
- If Lender determines that the loan is a high cost loan
- There is any change in our information about the borrower(s) after the date of this Commitment Letter

## H. IMPORTANT GENERAL TERMS

1. Your loan must be secured by a valid first lien on the property
2. This Commitment Letter is not transferable to any other property or person
3. This Commitment Letter replaces all previous Commitment Letters
4. The terms and conditions of this Commitment Letter may not be altered by you in any way
5. No secondary financing is permitted without the express written approval of Lender

## I. CONDITIONS TO COMMITMENT - SCHEDULE A

Lender has implemented a risk-based global Anti-Money Laundering ("AML") Compliance Program ("AML Program") designed to comply with AML laws and regulations in the United States, including the Bank Secrecy Act as amended by the USA PATRIOT Act of 2001, as amended, and other applicable laws and regulations relating to the prevention of money laundering and terrorist financing in those jurisdictions where Lender operates. As part of Lender's AML Program, all borrowers, associated parties and parties to closing documents, may be subject to identification and verification procedures including background screening, to meet Lender's regulatory obligations to "Know Your Client". This Commitment Letter is contingent upon Lender's successful completion of such "Know Your Client" requirements.

The conditions on the attached Schedule A must be met to Lender's satisfaction. In addition, at settlement you will be required to sign and agree to the documents which we reasonably require for your type of loan program and property. Your seller (if this is not a refinance loan) may also have to provide certain additional items which we require. Unless otherwise stated, all certifications and items listed on the attached Schedule A must be current and in our office no less than THIRTY (30) days prior to the Commitment Termination. If you should have any questions about these conditions, please give us a call.

## J. ACKNOWLEDGEMENT AND ACCEPTANCE

We are pleased to have this opportunity to meet your home financing needs. Please do not hesitate to call us if you have any questions about this Commitment Letter.

By signing below, you accept the terms and conditions of this Commitment Letter, Schedule A and any Addendum incorporated herein. If you sign this Commitment Letter, and you do not close this loan in accordance with the described terms, you may lose some or all of the fees or charges you have paid.

To effect this Commitment Letter we need to receive (1) a copy of this Commitment Letter with your signature and (2) your Commitment Fee, if required, within 10 days of the date of this Commitment Letter.

By signing below, you acknowledge receipt of the APPLICATION DISCLOSURE, a YOUR HOME LOAN Toolkit, a LOAN ESTIMATE, and for Adjustable Rate loans only, a CONSUMER HANDBOOK ON ADJUSTABLE RATE MORTGAGES, among other documents.

ACCEPTED BY:

*Bruce Wayne Brewer*

LENDER: Bruce Wayne Brewer
JPMorgan Chase Bank, N.A.
2500 Westfield Dr, Floor 2-1
Elgin, IL 60124
NMLS ID: 514039

**Borrower**

**600 Spring, LLC**
*a California limited liability company*

7-29-2024

**Scott Gillen** **Date**
*Manager*

7-29-24

**Barry Shy** **Date**
*Manager*

7.29.24

**Amit Tidhar, Trustee of the The Brshy Irrevocable Trust** **Date**

**CONDITIONS TO COMMITMENT LETTER - SCHEDULE A**

The following conditions must be met to our satisfaction ***prior to your closing:***

None

The following conditions must be met to our satisfaction ***at closing:***

1. Signed and dated Extension of Credit form for Barry Shy.
2. Monthly mortgage payments to be made by auto debit from a JPMorgan Chase Bank, N.A. account owned by the borrower.
3. Loan to be guaranteed by Barry Shy.
4. Payoff of existing [redacted]t funding.
5. Payoff of existing [redacted]at funding.
6. Certification of trust form for The Brshy Irrevocable Trust.

J.P.Morgan

# CERTIFICATION OF TRUST

**Definitions and Terms Used:**

- **"Loan"** refers to the making of a loan or an assumption of a loan.
- **"Trustees"** refers to the Trustees signing this certification, whether one or more in number.
- **"Trustors"** refers to Settlors, Grantors, or Trustors of the Trust, whether one or more in number.
- **"Lender"** refers to JPMorgan Chase Bank, N.A., its affiliates and/or subsidiaries.
- **"Property"** refers to the property offered as security for the loan.
- **"Trust"** refers to the Trust Agreement, Declaration of Trust or comparable document establishing the Trust, together with all addenda and amendments.

STATE OF CA )
: SS
COUNTY OF Los Angeles )

Being first duly sworn upon oath, the Undersigned deposes and says as follows:

1. The Trust is known as: THE BRSHY IRREVOCABLE TRUST and was created pursuant to a Trust Agreement memorialized on December 1, 1997, and executed January 2, 1998 (the "Trust").

2. The identity of the Trustors and each currently acting Trustee of the Trust are set forth below:

   A. All Trustor Name: [redacted]

   B. All Currently Acting Trustees Name: Amit Tidhar

The person(s) named above has accepted his or her appointment as Trustee of the Trust.

   C. All Currently Acting Trustees Address:

[redacted]

3. The Trustee may enter into any agreements of any nature with the Lender, and those agreements will bind the Trust. Specifically, the powers of the Trustee(s) include the power

   I. To (i) obtain one or more extensions of credit, open and maintain credit facilities, borrow and otherwise incur indebtedness of any nature whatsoever of Trust to Lender, (ii) guaranty the repayment of debt of third parties to Lender, now or hereafter (together with (i), the "Indebtedness"), and (iii) obtain any and all extensions, rearrangements or renewals of the Indebtedness. The Trustee has considered the value to Trust of incurring the Indebtedness, and the Trustee represents to Lender that Trust is benefited by doing so.

   II. To mortgage, pledge, transfer, endorse, hypothecate, or otherwise encumber and deliver to Lender any property now or hereafter belonging to Trust or in which Trust now or hereafter may have an interest, including without limitation all of Trust's real property and all of Trust's personal property (tangible or intangible), as security for the payment of any Indebtedness of Trust to Lender at any time owing, however the same may be evidenced (collectively, the "Security"). Such Security may be mortgaged, pledged, transferred, endorsed, hypothecated or encumbered at the time the Indebtedness is obtained or incurred, or at any other time or times, and may be either in addition to or in lieu of any property theretofore mortgaged, pledged, transferred, endorsed, hypothecated or encumbered. The Trustee has considered the value to Trust of lending collateral

J.P.Morgan

in support of the Indebtedness, and the Trustee represents to Lender that Trust is benefited by doing so.

III. To execute and deliver to Lender (i) any promissory note, any credit agreement or any other or further documents, instruments and agreements to evidence the Indebtedness, (ii) any mortgage, deed of trust, pledge agreement, hypothecation agreement, and other security agreements and financing statements which and which shall evidence the terms and conditions under and pursuant to which the Security is given, and (iii) any other written instrument of any kind or nature which Lender may deem reasonable, necessary or appropriate in connection with or pertaining to the Indebtedness or the Security.

IV. To do and perform such other acts and things and to execute and deliver such other documents and agreements as the Trustee may in his or her discretion deem reasonable, necessary or appropriate in order to carry into effect the provisions of this Certificate.

4. The Trust is ☐ Revocable or ☒ Irrevocable ***(select one)***. If revocable, the name of the person(s) holding the power to revoke it is/are: N/A.

5. The identifying number of the Trust is: [redacted] his number is: ☐ the social security number of ______________________________ or ☒ the tax identification number of the Trust ***(select one)***.

6. The Trust was established under the laws of the State of California.

7. The Trustee(s) understand and acknowledge that the recipient of this Certification of Trust may make a good faith request of the Trustee(s) to furnish copies of those excerpts from the original Trust, and amendments thereto, that designate the Trustee(s) and confer upon the Trustee(s) the Power to act in the pending transaction.

8. This Trust has not been revoked, modified or amended in any manner which would cause the representations in this Certification of Trust to be incorrect or inaccurate. This Certificate of Trust is being signed by all currently acting as Trustees of the Trust. (For North Carolina, Ohio, Virginia, Washington, and West Virginia trusts any Trustee may sign this certification. For all other states all Trustees must sign the certification).

9. The Trustee will promptly notify Lender in writing at Lender's address as shown in the security instrument or such address as Lender may designate from time to time prior to any (A) change in Trust's name; (B) change in Trust's assumed business name(s); (C) change in the Trustees of the Trust; (D) change in the authorized signers; (E) change in Trust's state of organization; (F) conversion of Trust to a new or different type of business entity; or (G) Change in any other aspect of Trust that directly or indirectly relates to any new agreements between Trust and Lender. No change in Trust's name or state of organization will take effect until after Lender has received notice.

10. The person(s) named above is duly appointed and acting Trustee of Trust and is duly authorized to act on behalf of Trust in the manner described above; we are familiar with the purpose of the Indebtedness and the nature of the Security; the Indebtedness proceeds are, and the granting of the Security is, to be used for a legitimate trust purpose and for the benefit of the Trust and its beneficiaries.

11. This Certificate shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown in the security instrument or such address as Lender may designate from time to time. Any such notice shall not affect any of Trust's agreements or commitments in effect at the time notice is given.

J.P.Morgan

IN TESTIMONY WHEREOF, I have hereunto set my hand and attest that the signature set opposite the name listed above is his or her genuine signature.

I have read all the provisions of this Certificate, and personally and on behalf of Trust certify that all statements and representations made in this Certificate are true and correct

Dated as of 7-29-24.

[signature]
Amit Tidhar, Trustee

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

On this 29 day of July in the year 2024 before me a Notary Public for the State of CA personally appeared Amit Tidhar

known or identified to me to be the person(s) whose name(s) is/are subscribed to within the instrument as Trustee(s) and acknowledged to me that he/she/they executed the instrument as such Trustee(s).

[signature]

Notary Public for State of CA
Commission Expires: 6-14-2028

JACOB ALEXANDER
Notary Public - California
Los Angeles County
Commission # 2490453
My Comm. Expires Jun 14, 2028

J.P.Morgan

# LIMITED LIABILITY COMPANY CERTIFICATE

The undersigned, constituting all of the Members and Managers of the limited liability company registered as

600 SPRING LLC,

(the "Company"), duly organized under the laws of the State of California,
HEREBY CERTIFY, REPRESENT AND WARRANT to JPMORGAN CHASE BANK, N.A. ("Lender") AND TO ANY TITLE INSURANCE COMPANY issuing a policy on the Property (as defined below) ("Insurer")

That the following individuals, signing individually ("Signatory"), each have full power to act for and represent the Company for all purposes and to execute any and all instruments, notes, drafts, pledges, guarantees and other documents for and on behalf of the Company, it being understood that any of us may provide you with specimen signatures of such person:

SCOTT GILLEN, MANAGER
BARRY SHY, MANAGER

That Signatory, be and hereby is authorized and directed to do any and all things Signatory deems necessary or advisable and in the best interest of the Company in connection with obtaining an extension of credit in the principal amount of $20,800,000.00 (the "Credit") from Lender or such other amount as may be approved by the Company, and any and all extensions, rearrangements, modifications or renewals thereof, which Credit shall be secured by a mortgage, deed of trust or other security instrument on premises located at 24185 Case Court, Malibu, California 90265 (the "Property").

That Signatory be, and hereby is, authorized and directed to execute and deliver all required and appropriate documents and instruments in the name of the Company in favor of the Lender to evidence and secure the Credit, and to execute and deliver a promissory note or credit agreement, a mortgage, deed of trust or other security agreement encumbering the Property, and all instruments, documents, certificates and agreements in this connection required by Lender.

That Signatory is authorized to (a) sign, execute, certify to, verify and acknowledge, deliver, accept, file and record any and all instruments and documents, and (b) take, or cause to be taken, any and all such action, in the name and on behalf of the Company, as, in Signatory's judgment, is necessary, desirable or appropriate in order to consummate the transactions contemplated by, or otherwise to effect the purposes of, the foregoing resolutions.

That all actions heretofore taken by Signatory or any of the undersigned with respect to the Credit be, and the same hereby are, ratified and approved.

That the transactions contemplated by the foregoing are reasonably expected to benefit the Company, both directly and indirectly.

Lender and Insurer are authorized to act on all instruments signed in accordance with the terms of this Certificate and Authorization without inquiry to the circumstances of issue or the disposition of the proceeds even though drawn to the individual order of the signer thereof or tendered by him or her for deposit or to his or her credit or in payment of his or her individual obligation.

To induce Lender and Insurer to act and/or to rely hereon, (1) I/we agree, on behalf of the Company, that notwithstanding any modification or termination of the power of Signatory to represent the Company or any dissolution or termination of the Company, whether by expiration of the certificate of formation, by death or resignation of any members or managers, or

otherwise, this authority shall continue and all acts heretofore taken by Signatory or any of the undersigned with respect to the Credit are hereby ratified and approved and all acts performed hereunder shall be binding upon the Company, its successors and assigns, until Notice (as hereafter defined) shall have been received by you, which Notice shall not affect the Company's obligation with regard to acts done and performed hereunder prior to your receipt of such Notice; (2) I/we certify that the operating agreement provided (i) is the only operating agreement adopted; (ii) has not been further amended since April 11, 2024; and, (iii) no other operating agreement(s) has been adopted, whether oral or written; (3) I/we certify that the undersigned are all the members and managers of the Company and that the Company's operating agreement provides for the management of the Company by the undersigned managers; (4) I/we certify that the trust member is in full force and effect and that the trustee named is the current and only acting trustee of the trust and has authority to execute this certification; (5) I/we certify that the entity member is in full force and effect and that the officer signing below has authority to execute this certification; and (6) I/we agree that you may rely upon the validity and effectiveness of the foregoing unless and until you actually receive a written notice issued by or at the direction of the Company, signed by one or more of the undersigned ("Notice") or its lawful successors that these powers have been revoked or modified.

Dated as of 7-29-24.

Signatures of the Members and Managers
(Type or print names below signature)

Scott Gillen, Manager

Barry Shy, Manager

C64829 LLC,
a California limited liability company, Member

By:
Scott Gillen, it's Manager

THE BRSHY IRREVOCABLE TRUST, Member

By:
Amit Tidhar, as Trustee

J.P.Morgan

# GUARANTY

**GUARANTY** dated as of the date set forth below, made by the undersigned **(individually, or if more than one, collectively, the "Guarantor"),** having a principal residence in *California* in favor of JPMorgan Chase Bank, N.A., and/or any of its subsidiaries or affiliates (individually or collectively, as the context may require, the "Bank").

**PRELIMINARY STATEMENTS:** The Bank has entered, or may from time to time enter, into agreements or arrangements with **600 SPRING, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY AND THE BRSHY IRREVOCABLE TRUST** (together, the "Borrower") providing for credit extensions or financial accommodation to the Borrower of any kind whatsoever including, without limitation, the making of loans, advances or overdrafts, whether or not secured, discount or purchase of notes, securities or other instruments or property, creation of acceptances, issuance or confirmation of letters of credit, guaranties or indemnities, entering into foreign exchange or precious metals contracts or interest rate or currency swap or protection agreements, entering into any other derivative transactions under any ISDA Master Agreement or similar agreements between the Bank and the Borrower, or any other kind of lease, contract or agreement under which the Borrower may be indebted to the Bank in any manner (all of the foregoing agreements or arrangements being the "Facilities" and any writing or record evidencing, supporting, securing, or delivered in connection with a Facility, including but not limited to this Guaranty, and including as may subsequently be renewed, extended, amended, modified, substituted and/or replaced, being a "Facility Document").

**THEREFORE**, in order to induce the Bank to extend credit or give financial accommodation under the Facilities, the Guarantor agrees (and if more than one, jointly and severally agrees) as follows:

**Guaranty of Payments**. For value received and in consideration of the Facilities extended by the Bank the Guarantor unconditionally and irrevocably guarantees to the Bank (a) performance and observance of every agreement and condition contained in any Facility Document to be performed or observed by the Borrower, and (b) payment of all sums now owing or which may in the future be owing by the Borrower under the Facilities, when the same are due and payable, whether on demand, at stated maturity, by acceleration or otherwise, and whether for principal, interest, fees, expenses, indemnification or otherwise (the "Liabilities"). The Liabilities include, without limitation, interest accruing after the commencement of a proceeding under bankruptcy, insolvency or similar laws of any jurisdiction at the rate or rates provided in the Facility Documents.

This Guaranty is a guaranty of payment and performance and not of collection only. The Bank shall not be required to exhaust any right or remedy or take any action against the Borrower or any other person or entity or any collateral. The Guarantor agrees that, as between the Guarantor and the Bank, the Liabilities may be declared to be due and payable for the purposes of this Guaranty notwithstanding any stay, injunction or other prohibition which may prevent, delay or vitiate any declaration as regards the Borrower and that in the event of a declaration or attempted declaration, the Liabilities shall immediately become due and payable by the Guarantor for the purposes of this Guaranty.

**Guaranty Absolute**. The Guarantor guarantees that the Liabilities shall be performed and paid strictly in accordance with the terms of the Facilities. The liability of the Guarantor under this Guaranty is absolute and unconditional irrespective of: (a) any change in the amount, time, manner or place of payment of, or in any other term of, all or any of the Facility Documents or Liabilities, or any other amendment or waiver of or any consent to departure from any of the terms of any Facility Document or Liability; (b) any release or amendment or waiver of, or consent to departure from, any other guaranty or support document, or any exchange, release or non-perfection of any collateral, for all or any of the Facility Documents or Liabilities; (c) any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of any Facility Document or Liability; (d) without being limited by the foregoing, any lack of validity or enforceability of any Facility Document or Liability; and (e) any other defense, setoff or counterclaim whatsoever (in any case, whether based on contract, tort or any other theory) with respect to the Facility Documents or the transactions contemplated thereby which might constitute a legal or equitable defense available to, or discharge of, the Borrower or a guarantor.

**Guaranty Irrevocable**. This Guaranty is a continuing guaranty of all Liabilities now or hereafter existing under the Facilities and shall remain in full force and effect until payment in full of all Liabilities and other amounts payable under this Guaranty and until the Facilities are no longer in effect or, if earlier, when the Guarantor has given the Bank written

notice that this Guaranty has been revoked; provided that any notice under this Section shall not release the Guarantor from any Liability, absolute or contingent, existing prior to such notice. Such notice shall be effective only after the Bank's actual receipt of the notice at its address set forth below, and the Bank shall have had a reasonable time to act upon such notice at each of its offices or departments responsible for the Facilities.

**Reinstatement**. This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Liabilities is rescinded or must otherwise be returned by the Bank on the insolvency, bankruptcy or reorganization of the Borrower or otherwise, all as though the payment had not been made.

**Subrogation**. The Guarantor shall not exercise any rights against the Borrower which it may acquire by way of subrogation, by any payment made under this Guaranty or otherwise, until all the Liabilities have been paid in full and the Facilities are no longer in effect. If any amount is paid to the Guarantor on account of subrogation rights under this Guaranty at any time when all the Liabilities have not been paid in full, the amount shall be held in trust for the benefit of the Bank and shall be promptly paid to the Bank to be credited and applied to the Liabilities, whether matured or unmatured or absolute or contingent, in accordance with the terms of the Facilities.

**Subordination**. Without limiting the Bank's rights under any other agreement, any liabilities owed by the Borrower to the Guarantor in connection with any extension of credit or financial accommodation by the Guarantor to or for the account of the Borrower, including but not limited to interest accruing at the agreed contract rate after the commencement of a bankruptcy or similar proceeding, are hereby subordinated to the Liabilities, and such liabilities of the Borrower to the Guarantor, if the Bank so requests, shall be collected, enforced and received by the Guarantor as trustee for the Bank and shall be paid over to the Bank on account of the Liabilities but without reducing or affecting in any manner the liability of the Guarantor under the other provisions of this Guaranty.

**Representations and Warranties**. The Guarantor represents and warrants that:

(a) this Guaranty constitutes the legal, valid and binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms, except as the enforcement hereof and thereof may be limited by bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights generally and subject to the applicability of general principles of equity;

(b) the execution, delivery and performance by the Guarantor of this Guaranty and all other documents contemplated hereby or thereby, do not and will not (i) conflict with or constitute a breach of, or default under, or require any consent under, or result in the creation of any lien, charge or encumbrance upon the property or assets of the Guarantor pursuant to any other agreement or instrument (other than any pledge of or security interest granted in any collateral pursuant to any Facility Document) to which the Guarantor is a party or is bound or by which its properties may be bound or affected; or (ii) violate any provision of any law, rule, regulation (including, without limitation, Regulation U of the Federal Reserve Board), order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to the Guarantor; (c) no consent, approval or authorization of, or registration, declaration or filing with, any governmental authority or other person or entity is required as a condition to or in connection with the due and valid execution, delivery and performance by the Guarantor of this Guaranty;

(d) there are no actions, suits, investigations or proceedings pending or threatened at law, in equity, in arbitration or by or before any other authority involving or affecting: (i) the Guarantor that, if adversely determined, are likely to have a material adverse effect on the prospects or condition of the Guarantor; (ii) any material part of the assets or properties of the Guarantor or any part of the collateral (if any) under any Facility Document; or (iii) any of the transactions contemplated in this Guaranty. There are currently no material judgments entered against the Guarantor and the Guarantor is not in default with respect to any judgment, writ, injunction, order, decree or consent of any court or other judicial authority, which default is likely to have or has had a material adverse effect on the prospects or condition of the Guarantor;

(e) in executing and delivering this Guaranty, the Guarantor has (i) without reliance on the Bank or any information received from the Bank and based upon such documents and information it deems appropriate, made an independent investigation of the transactions contemplated hereby and the Borrower, the Borrower's business, assets, operations, prospects and condition, financial or otherwise, and any circumstances which may bear upon such transactions, the Borrower or the obligations and risks undertaken herein with respect to the Liabilities; (ii) adequate means to obtain from the Borrower on a continuing basis information concerning the Borrower and the Bank has no duty to provide to the Guarantor any such information; (iii) full and complete access to the Facility Documents and any other documents executed in connection with the Facility Documents; (iv) not relied and will not rely upon any representations or warranties of the Bank not

embodied herein or any acts heretofore or hereafter taken by the Bank (including but not limited to any review by the Bank of the affairs of the Borrower), and (v) determined that this Guaranty will benefit the Guarantor directly or indirectly;

(f) in the event that the Guarantor is/are trustee(s) on behalf of a trust, the trustees of the Guarantor also represents and warrant that (i) the trust is a duly constituted and validly existing trust, (ii) the execution, delivery and performance by the Guarantor of the Guaranty and all other documents contemplated hereby or thereby, do not and will not violate any provision of the trust agreement pursuant to which the Guarantor has been organized, (iii) the trustees of the Guarantor that are signing this Guaranty have the legal capacity and full power and authority (even if less than all of the trustees of the Guarantor are signing this Guaranty) to execute, deliver, and perform their obligations under, and to bind the Guarantor to perform its obligations under, this Guaranty, and to execute and deliver any and all documents and instruments in connection herewith, (iv) if the Bank or any affiliate of the Bank is serving as trustee of the Guarantor, such documentation as the Bank may require in its sole discretion has been delivered to the Bank on or before the date of this Guaranty and (v) if parties other than the Bank or any affiliate of the Bank are serving as trustee(s) of the Guarantor, the Guarantor has delivered to the Bank on or before the date of this Guaranty, a duly completed trust certificate acceptable to the Bank in all respects and, if requested by the Bank in its sole discretion, a true, complete and accurate copy of the trust agreement pursuant to which the Guarantor has been organized (and all amendments and modifications thereto) and/or a legal opinion acceptable to the Bank in its sole discretion. ; and (g) the Guarantor's principal residence or jurisdiction of organization, as the case may be, is in the state listed as such in the first paragraph of this Guaranty.

**Certain Waivers.**

(a) The Guarantor waives and agrees not to assert: (1) any right to require the Bank to marshal assets in favor of the Borrower, the Guarantor, any other guarantor or any other person or entity, to proceed against the Borrower, any other Guarantor or guarantor or any other person or entity, to proceed against or exhaust any of the collateral for the Liabilities, to give notice of the terms, time and place of any public or private sale of personal property security constituting the collateral for the Liabilities or comply with any other provisions of Section 9504 of the Uniform Commercial Code (or any equivalent provision of any other applicable law) or to pursue any other right, remedy, power or privilege of the Bank whatsoever; (2) the defense of the statute of limitations in any action hereunder or for the collection or performance of the Liabilities; (3) any defense arising by reason of any lack of corporate, limited liability company, trust or other authority or any other defense of the Borrower, the Guarantor or any other person or entity; (4) any defense based upon the Bank's errors or omissions in the administration of the Liabilities; and (5) any rights to set-offs and counterclaims;

(b) The Guarantor waives and agrees not to assert: (1) any defense based upon an election of remedies (including, if available, an election to proceed by nonjudicial foreclosure) which destroys or impairs the subrogation rights of the Guarantor or the right of the Guarantor to proceed against the Borrower or any other obligor of the Liabilities for reimbursement, and (2) without limiting the generality of the foregoing provisions of this sentence or the preceding paragraph, to the fullest extent permitted by law, any defenses or benefits that may be derived from or afforded by applicable law limiting the liability of or exonerating guarantors or sureties, or which may conflict with the terms of this Guaranty, including any and all benefits that otherwise might be available to the Guarantor under California Civil Code Sections 1432, 2809, 2810, 2815, 2819, 2839, 2845, 2848, 2849, 2850, 2899 and 3433 and California Code of Civil Procedure Sections 580a, 580b, 580d and 726 or similar provision of law in any other jurisdiction. Accordingly, the Guarantor waives all rights and defenses that the Guarantor may have because the Borrower's debt is secured by real property. This means, among other things: (A) the Bank may collect from the Guarantor without first foreclosing on any real or personal property collateral pledged by the Borrower for the Liabilities; and (B) if the Bank forecloses on any real property collateral pledged by the Borrower for the Liabilities: (1) the amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (2) the Bank may collect from the Guarantor even if the Bank, by foreclosing on the real property collateral, has destroyed any right the Guarantor may have to collect from the Borrower. This is an unconditional and irrevocable waiver of any rights and defenses the Guarantor may have because the Borrower's debt is secured by real property. These rights and defenses include, but are not limited to, any rights of defenses based upon Sections 580a, 580b, 580d or 726 of the California Code of Civil Procedure or similar provision of law in any other jurisdiction.

(c) The Guarantor understands that, but for the waivers contained in the preceding paragraphs, the Guarantor may have defenses against the enforcement of this Guaranty by the Bank with regard to any deficiency resulting from the Bank's collection efforts against the Borrower in the event that (1) the Liabilities include purchase money obligations for the purchase of certain types of residential real property or (2) the Bank proceeds against any real property security by means of nonjudicial foreclosure. Such defenses would include the Guarantor's loss of rights to seek reimbursement from the Borrower by subrogation or otherwise. The Guarantor understands that pursuant to the waivers in the preceding paragraphs the Guarantor waives such defenses including any rights or benefits which the Guarantor might have under California Code of Civil Procedure Sections 580a and 726 (limiting the amount of any deficiency judgment to the difference between the amount of any

indebtedness owed and the greater of the fair value of the security or the amount for which the security was actually sold), 580b (barring deficiencies with respect to real property purchase money obligations), and 580d (barring recovery of a deficiency judgment after real property security is sold under a power of private sale) as from time to time amended. In particular the Guarantor understands that the Guarantor is waiving all rights and defenses arising out of an election of remedies by the Bank, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Guarantor's rights of subrogation and reimbursement against the Borrower by operation of Section 580d of the Code of Civil Procedure or otherwise.

**Independent Obligations**. The obligations of the Guarantor hereunder are independent of and separate from the obligations of the Borrower and any other Guarantor or guarantor and upon the occurrence and during the continuance of any Event of Default, a separate action or actions may be brought against the Guarantor, whether or not the Borrower or any such other Guarantor or guarantor is joined therein or a separate action or actions are brought against the Borrower or any such other Guarantor or guarantor.

**Financial Condition of the Borrower.** The Guarantor shall not have any right to require the Bank to obtain or disclose any information with respect to: (i) the financial condition or character of the Borrower or the ability of the Borrower to pay and perform the Liabilities; (ii) the Liabilities; (iii) the collateral for the Liabilities; (iv) the existence or nonexistence of any other guarantees of all or any part of the Liabilities; (v) any action or inaction on the part of the Bank or any other Person or entity; or (vi) any other matter, fact or occurrence whatsoever.

**Remedies Generally**. The rights, powers and remedies granted to the Bank in this Guaranty are cumulative and in addition to any rights, powers and remedies to which the Bank may be entitled either by operation of law or in equity or pursuant to any other document or instrument delivered or from time to time to be delivered to the Bank in connection with the Facilities.

**Setoff**. The Guarantor agrees that, in addition to (and without limitation of) any right of setoff, banker's lien or counterclaim the Bank may otherwise have, the Bank shall be entitled, at its option, to offset balances (general or special, time or demand, provisional or final) held by it for the account of the Guarantor at any of the Bank's offices, in U.S. dollars or in any other currency, against any amount payable by the Guarantor under this Guaranty which is not paid when due (regardless of whether such balances are then due to the Guarantor), in which case it shall promptly notify the Guarantor thereof; provided that the Bank's failure to give such notice shall not affect the validity thereof.

**Formalities**. The Guarantor waives presentment, notice of dishonor, protest, notice of acceptance of this Guaranty or incurrence of any Liability and to the extent not prohibited by applicable law any other formality with respect to any of the Liabilities or this Guaranty.

**Amendments and Waivers**. No amendment or waiver of any provision of this Guaranty, nor consent to any departure by the Guarantor therefrom, shall be effective unless it is in writing and signed by the Bank, and then the waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No failure on the part of the Bank to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver or preclude any other or further exercise thereof or the exercise of any other right.

**Expenses**. The Guarantor shall reimburse the Bank on demand for all costs, expenses and charges (including without limitation fees and charges of external legal counsel for the Bank and costs allocated by its internal legal department) incurred by the Bank in connection with the preparation, performance or enforcement of this Guaranty. The obligations of the Guarantor under this Section shall survive the termination of this Guaranty.

**Assignment**. This Guaranty shall immediately be binding on, and shall inure to the benefit of the Guarantor, the Bank and their respective heirs, successors and assigns; provided that the Guarantor may not assign or transfer its rights or obligations under this Guaranty.

**Captions**. The headings and captions in this Guaranty are for convenience only and shall not affect the interpretation or construction of this Guaranty.

**Governing Law, Etc.** **THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES, AND WITH THE LAWS OF THE UNITED STATES OF AMERICA AS APPLICABLE. THE GUARANTOR CONSENTS TO THE NONEXCLUSIVE JURISDICTION AND VENUE OF THE STATE OR FEDERAL COURTS LOCATED IN ANY DISTRICT IN CALIFORNIA SERVICE OF PROCESS BY THE BANK IN CONNECTION WITH ANY SUCH DISPUTE SHALL BE BINDING ON THE GUARANTOR IF SENT TO THE GUARANTOR BY REGISTERED MAIL AT THE ADDRESS SPECIFIED BELOW OR AS OTHERWISE SPECIFIED BY THE GUARANTOR FROM TIME TO TIME. THE GUARANTOR WAIVES ANY RIGHT THE GUARANTOR MAY HAVE TO JURY TRIAL IN ANY ACTION RELATED TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND FURTHER WAIVES ANY RIGHT TO INTERPOSE ANY COUNTERCLAIM RELATED TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY IN ANY SUCH ACTION. TO THE EXTENT THAT THE GUARANTOR HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER FROM SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OF A JUDGMENT, EXECUTION OR OTHERWISE), THE GUARANTOR HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS GUARANTY.**

**Notices.** Unless otherwise agreed in writing, notices shall be given to the Bank and the Guarantor at their facsimile numbers, email addresses or mailing addresses as set forth on the signature page of this Agreement, or such other facsimile number, email address or mailing address communicated in writing by either such party to the other. Notices sent by hand or overnight courier, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except, that, if not given during normal business hours, shall be deemed to have been given at the opening of business on the next Banking Day, "Banking Day" shall have the meaning ascribed to the term "Banking Day or the term "Business Day", as applicable, in the Facility Documents). Notices and other communications sent to an email address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgement), provided, that, if such notice, email or other communication is not sent during normal business hours, such notice or communication shall be deemed to have been sent at the opening of business on the next Banking Day.

**Integration; Effectiveness.** This Guaranty alone sets forth the entire understanding of the Guarantor and the Bank relating to the guarantee of the Liabilities and constitutes the entire contract between the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Guaranty shall become effective when it shall have been executed and delivered by the Guarantor to the Bank. This Guaranty, any amendment to this Guaranty, and any agreement, notice or other communication required by this Guaranty to be "written" or "in writing" may be executed in any number of counterparts, including counterparts that are executed on paper and counterparts that are electronic records and are executed using electronic signatures generated through the electronic execution process provided by the Bank or such other electronic execution process acceptable to the Bank in its sole discretion. Each counterpart of such document, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same document. Delivery of a manually executed counterpart of a signature page of such document by emailed PDF or JPEG from the Guarantor's e-mail address on file with the Bank or any other electronic means acceptable to the Bank in its sole discretion that reproduces an image of such manually executed signature page, shall each be effective as delivery of a manually executed counterpart of such document; provided, that, the Bank, in its sole discretion, can require subsequent delivery of the manually executed counterpart of a signature page. Any counterpart may be converted from paper to electronic form, or from electronic form to paper, at the discretion of the Bank, and such converted counterpart shall be deemed an original.

**Execution and Use of Electronic Records and Signatures.** If the Guarantor has received and reviewed this Guaranty electronically, then the Guarantor agrees that this Guaranty may be in the form of an electronic record and may be executed using electronic signatures generated through the electronic execution process provided by the Bank or such other electronic execution process acceptable to the Bank in its sole discretion. Any electronic signature on or associated with this Guaranty and accepted by the Bank shall be valid and binding on the signer to the same extent as a manual signature and upon application thereof, this Guaranty will constitute a legal valid, and binding obligation enforceable in accordance with its terms to the same extent as if manually executed. Notwithstanding any other provision of this Guaranty, at the Bank's option and in the Bank's sole discretion, any agreement, amendment, notice or other communication required by this Guaranty to be "written" or "in writing" may be in the form of an electronic record and may be executed using electronic signatures generated through the electronic execution process provided by the Bank or such other electronic execution process acceptable to the Bank in its sole discretion.

THIS WRITTEN GUARANTY REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**IN WITNESS WHEREOF,** the Guarantor has caused this Guaranty to be duly executed and delivered as of the date written below.

Dated as of 7-29-24.

**SIGNATURE OF THE GUARANTOR:**

Barry Shy

**Address for notices to the Bank:**

JPMorgan Chase Bank, N.A.
2500 Westfield Dr, Floor 2-1
Mail Code - IL1-2600
Elgin, IL, 60124-7836
*Attn: Clifton R Kochinsky*
Telephone: (713) 216-8004
E-Mail: CLIFTON.R.KOCHINSKY@JPMORGAN.COM

**Address for notices to the Guarantor:**

Barry Shy
[redacted]

*****************************************************

## NOTICE TO CO-SIGNER

**You are being asked to guarantee the Borrower's debts. Regulation AA (promulgated by the Federal Reserve Board) requires that we provide you with this notice to ensure that you understand the nature and extent of your liability. This notice is not the contract that makes you liable for the Borrower's debts.**

**If the Borrower fails to pay its/his/her debts, you will be responsible for making payment, up to an unlimited amount of principal. You may also be responsible for paying interest due and for any collection costs, permissible fees and other legal expenses that the Borrower may owe to us. We are entitled to collect all of these amounts from you before trying to collect them from the Borrower. We may also apply the same collection methods to you that we can apply to the Borrower, such as suing you and garnishing your wages. Additionally, any default by you may become a part of your credit record.**

**Please read the terms of the guaranty preceding this notice carefully to make sure that you want to accept this responsibility and that you are in a financial position to make any payments.**

*****************************************************

**CTBC BANK**

**LOAN SERVICES DEPARTMENT**
17851-A3 Colima Road, City of Industry, CA 91748
TEL: 424-277-4844 FAX: 626-965-3429

# Updated PAYOFF DEMAND

**600 SPRING, LLC**
**600 S SPRING ST, UNIT OFFICE**
**LOS ANGELES CA 90014**

Date: **7/8/2024**
Loan #: [redacted]
Escrow #: N/A
Borrower: **600 SPRING, LLC**
Property Address: 24198 CASE COURT
MALIBU, CA 90265
UCC: N/A

UNPAID PRINCIPAL BALANCE
Interest Accrual to: **7/8/2024**
Demand Fee: 5/9/24
Updated Demand Fee: 7/5/24
Updated Demand Fee: 7/8/24
Forwarding Fee
Reconveyance Recording Fee

[redacted]

**Total**

Plus interest on the sum of [redacted]
at $572.84 per day from and including
**7/8/2024** to date your funds reach our
office during regular business hours.

Borrower is expected to continue making the regularly scheduled payments on the loan until this Payoff Demand has been processed and full repayment of the loan has been received as detailed above. Late fees will be assessed and added to the Total Payoff amount for any missed payments.

While payoff is in process, for the above referenced loan, in addition to the fees set out above you will add **$25.00** for each amended payoff we furnish you. Processing fee must be paid even if your payoff is canceled. We are to be at no expense in connection with your escrow. This payoff demand statement is good for **30 days** as long as the above balance remains the same. CTBC Bank Corp. (USA) shall have the right at its option to declare all sums secured hereby due and payable. CTBC Bank Corp. (USA) reserves the right to amend or cancel its instructions at any time prior to payment of this demand.

Upon receipt of good funds by CTBC Bank Corp. (USA), CTBC Bank Corp. (USA) will execute & deliver to:
**600 SPRING, LLC**
all documents reasonably requested, to evidence CTBC Bank Corp. (USA)'s release and termination of its lien(s) and security interest in the collateral for the loan. **We will forward the executed release document(s) for your recording unless a recording fee is collected as indicated above.**

Wire remittance must be received by 2:00 P.M. Standard Local Time to be processed the same day. When payment is made by Cashier's Check, the check must be received before 4:00 P.M.Standard Local Time to be considered payment on the same day ("Payment Day"). If check is received after 4:00 P.M., the check is considered received on the next business day and payment is effective on that payment day. The total payoff amount as shown only reflects accrued interest up to date of this letter; interest of additional day(s), including banking holiday(s), Saturdays and Sundays, to Payment Day shall be added to the payoff amount.

**Note:** Confirmation of figures prior to payoff is required. Please call Loan Services Department / Andrew Wang at (424) 277-4844 or fax at (626) 965-3429 for the confirmation.

**Note:** Payment of Funds should be wired to **CTBC Bank Corp. (USA), ABA#122210406, further credit to** [redacted] Please include the Borrower's name, CTBC Bank Corp. (USA) **Loan Number**, and the name & address of the Originator on the wire instructions.

**CTBC Bank Corp. (USA)**

By: [signature] 7/8/2024
**Agnes Hsu, FVP & Loan Services Manager**

By: [signature] 7/8/24
**Brian Liu, VP & Portfolio Manager**

Lender: JPMorgan Chase Bank, N.A.

Date: 07/29/2024
Loan #: [redacted]

Respond To: JPMorgan Chase Bank, N.A.
2500 Westfield Dr, Floor 2-1
Elgin, IL 60124

# LOCK-IN AGREEMENT

Borrower(s): 600 Spring, LLC
Amit Tidhar, Trustee

Property Address: 24185 Case Ct, Malibu, CA 90265

LOAN AMOUNT: $20,800,000.00

LOAN TERM: 30 years

PRODUCT/PROGRAM: 7/6 mo. Adjustable Rate

---

**PLEASE READ THE TERMS AND CONDITIONS OF THIS AGREEMENT CAREFULLY.** In this Agreement "I", "me", "my" means all of the applicants who sign below. The word "Lender" indicates JPMorgan Chase Bank, N.A.

☐ I. **FLOAT OPTION: MY RESPONSIBILITY I DO NOT WANT** to lock-in my interest rate, discount points and fees at this time. I understand that interest rates, discount points and fees are subject to change and that it is my responsibility to monitor Lender's loan terms during the period in which I choose to float. Before my loan can close, I must lock-in an interest rate, discount points, and fees. I may lock-in at any time during the term of my float, but this lock-in MUST be received at least three business days prior to closing.

To lock-in my interest rate, discount points and fees, I will contact my Mortgage Specialist.

☒ II. **LOCK-IN OPTION I DO WANT** to lock-in my interest rate, discount points and fees at this time.

I HAVE ELECTED THE LOCK-IN OPTION FOR 170 DAYS AS DETAILED BELOW.

**The rate and points stated in this agreement are based on several factors, including but not limited to: loan amount, documentation type, loan type, occupancy type, property type, credit score and loan to value (which is your loan amount compared to your property value). The final rate and points may be higher or lower based on information relating to factors such as those listed above, which may be determined after the date of this agreement.**

| **INTEREST RATE:** 6.250% | **%** | **Days** | **Fee Amount** | **Fee Collected** |
|---|---|---|---|---|
| **DISCOUNT POINTS AND ORIGINATION FEES:** | | | | |
| ORIGINATION FEE: Paid at Closing | | | $________ | $0.00 |
| DISCOUNT POINTS: Paid at Closing | | | | $0.00 |
| **RATE LOCK EXPIRATION DATE:** 08/12/24 | | | | |
| **PREMIUM RATE LOCK FEE:** | | | $0.00 | $0.00 |
| **FORWARD RATE LOCK FEE:** | 0.000% | | | $0.00 |
| **RATE LOCK EXTENSION FEE:** | 0.000% | | | $0.00 |

Total Fees Collected as of 07/29/2024 (date of this LIA) $0.00

TOTAL FEE(s) TO BE COLLECTED $0.00

**DEBIT MY LENDER ACCOUNT #** [redacted]

## SELECT A LOCK-IN OPTION

☐ **STANDARD RATE LOCK:** I have selected the Standard Rate Lock Option which allows me to lock in for 60 days at the interest rate specified above for no additional fee. If the interest rate and/or points for the loan program and lock period I have selected decrease prior to my loan closing (but no later than 72 business hours prior), I may exercise my one-time Float Down at no additional charge; however, rate differences and float down maximums apply and the original rate lock expiration date does not change.

☐ **PREMIUM RATE LOCK:** I have selected the Premium Rate Lock Option which allows me to lock in for 60 days at the Lock-in Fee specified above. If the interest rate and/or points for the loan program and lock period I have selected decrease prior to my loan closing (but no later than 72 business hours prior), then I may exercise a Float Down twice in the period prior to closing. The original rate lock Expiration Date does not change.

☒ **FORWARD RATE LOCK:** I understand that if I request a forward rate lock there will be an associated Lock-in Fee depending on the amount of days selected as stated above. Terms available: 90, 120, 150, 180, 210, 240, 270, 300, 330, 360, 450, 540, 600, and 720 days.

☐ **CONSTRUCTION PROPERTY-PERMANENT MORTGAGE FORWARD RATE LOCK:** I understand that if I request a Construction Forward Rate Lock there will be an associated Lock-in Fee specified in the box above. Terms available: 90, 120, 150, 180, 210, 240, 270, 300, 330, 360, 450, 540, 600, and 720 days.

☐ **RATE LOCK EXTENSION:** I understand that if I request a rate lock extension there will be an associated Lock-in Fee depending on the amount of days selected as stated above. Terms available: 30, 60, 90, 120, 150, 180, 210, 240, 270, 300, 330, 360, 450, 540, 600, and 720 days.

## IMPORTANT INFORMATION

**EXPIRATION DATE:** If the Expiration Date falls on a weekend or Lender observed holiday, the Expiration Date will extend to the next business day. If my loan does not close and fund by the Expiration Date, my interest rate, discount points and fees **will be** renegotiated by Lender at the current market value.

**STANDARD AND PREMIUM RATE LOCKS:** If I change products during the life of the lock, my new rate/points will be the published rate of the new product at the time of the change. If I change products at the time of "float down," the rules in the float down notice below will apply. If rate/points decrease during the lock period I may exercise my one-time or two-time option, depending on selection lock option, to "float down" to the lower rate/points before my closing date, but no less than 72 business hours prior. My new rate/points will be based on the 60 day pricing at the time of float down. My lock Expiration Date will not change.

**FLOAT DOWN NOTICE**: To exercise my **one-time** Float Down option for Standard Rate Lock or **two-time** Float Down option for Premium Rate Lock, I will contact my Mortgage Specialist. I understand that I will be responsible for monitoring Lender's interest rates, discount points and fees in connection with these float down options.

**CONSTRUCTION PROPERTY-PERMANENT MORTGAGE FORWARD RATE LOCK:** If I am financing new construction, I may convert my existing Forward Rate Lock to a Construction Property-Permanent Mortgage Forward Rate Lock. To qualify for a Construction Property-Permanent Mortgage Forward Rate Lock, I must have, or open, a securities-based line of credit ("SBL") with Lender and draw on the SBL between the date of my mortgage application and funding of my permanent loan. To convert from a Forward Rate Lock to a Construction Property-Permanent Mortgage Forward Rate Lock I will contact my Mortgage Specialist, who will verify that a qualifying SBL draw has been made.

## FEE INFORMATION

**PREMIUM RATE LOCK, FORWARD RATE LOCK and RATE LOCK EXTENSION FEES (together "Lock-In Fees"):** I agree to pay Lock-In Fees in the amount(s) stated above to lock-in my interest rate, discount points and fees. I understand that these Lock- In Fees may be subject to change if I change the amount of the loan for which I applied. **Payment of Lock-In Fees must be received by the Lender with the return of this executed Lock-In Agreement. The Lender may (but shall not be obligated to) debit the amount of any Lock-In Fee that is not made when due to my account with the Lender provided above.**

**CONSTRUCTION PROPERTY-PERMANENT MORTGAGE FORWARD RATE LOCK FEE:** If I convert my Forward Rate Lock to a Construction Property-Permanent Mortgage Forward Rate Lock, the Lock-In Fee I paid at the time of Forward Rate Lock will apply to the fee for a Construction Property-Permanent Mortgage Forward Rate Lock. If I have not paid the Lock-In Fee at the time of conversion, I will pay the Lock-In Fee as set forth above.

## REFUND INFORMATION

**REFUNDABILITY OF PREMIUM RATE LOCK, FORWARD RATE LOCK AND RATE LOCK EXTENSION FEES**: The Lock-In Fees may be refunded to me if my loan application is denied for credit reasons. The Lock-In Fees will **NOT** be refunded to me if I withdraw my application; my loan does not close and fund by the Expiration Date of this Agreement; if I supply incomplete or inaccurate information; or, unless approved in writing by Lender, I change the type, term, property or amount of the loan for which I applied. The Premium Lock Fee will not be refunded if I fail to exercise the float down option(s).

**REFUNDABILITY OF CONSTRUCTION PROPERTY-PERMANENT MORTGAGE FORWARD RATE LOCK FEES:** The Construction Property-Permanent Mortgage Forward Rate Lock Fee will be refunded to me upon closing of my permanent loan with Lender. In addition, the Construction Property-Permanent Mortgage Forward Rate Lock Fee may be refunded if the permanent loan does not close due to credit denial. The Construction Property-Permanent Mortgage Forward Rate Lock Fees will **NOT** be refunded to me if I withdraw my application; my loan does not close and fund by the Expiration Date of this Agreement; if I supply incomplete or inaccurate information; or, unless approved in writing by Lender, I change the type, term, property or amount of the loan for which I applied.

I understand that this Agreement is not a loan approval or a commitment to make a loan. Lender will make a good faith effort to process my loan application and, if approved, to close and fund my loan prior to the Expiration Date. I may not

assign this Agreement to any other person. This Lock-In is subject to verification of all information provided to Lender in my application. The locked interest rate, fees and points may be subject to change if my credit standing changes; or unless approved in writing by Lender, I change the type, term, property or amount of the loan for which I applied, or in the event any information I have provided to Lender in my application or otherwise is found to be false or incorrect in any way or if my loan-to-value ratio changes by date of closing. I shall not be entitled to any interest that may accrue on the Lock-In Fee whether or not the Lock-In Fee is refunded to me. If I have any questions or comments I will address them to my Mortgage Specialist.

**Borrower**

**600 Spring, LLC**
*a California limited liability company*

7-29-2024 | 7-29-24

**Scott Gillen** **Date** | **Barry Shy** **Date**
*Manager* | *Manager*

7-29-2024

**Amit Tidhar, Trustee of the The Brshy Irrevocable Trust** **Date**

**JPMorgan Chase Bank, N.A.**
2500 Westfield Dr, Floor 2-1
Elgin, IL 60124

J.P.Morgan

## APPRAISAL NOTICE

**07/29/2024**

**Lender:** JPMorgan Chase Bank, N.A.

**Borrower and property information**

**Loan Number** [redacted]

**Borrower(s):** 600 Spring, LLC
Amit Tidhar, Trustee

**Property Address:** 24185 Case Ct, Malibu, CA 90265

To ensure that the property (the "Property") proposed as collateral in connection with your loan application has sufficient value to secure your loan, J.P. Morgan Chase Bank, N.A. ("J.P. Morgan") will arrange an appraisal of the Property.

- **What you need to know**
  - You will be required to cover the cost of the appraisal.
  - If your application is withdrawn, the appraisal fee may not be refunded to you, unless otherwise required by applicable law.
  - J.P. Morgan engages independent appraisers and property valuation companies to prepare written appraisals and/or valuation reports.
  - When an appraisal or other written property valuation report is developed in connection with your application for credit, we will provide you with a copy at least three days prior to loan closing.
  - Appraisals/valuation reports are not conducted for the purpose of ensuring that an individual is making a prudent investment. As such, you should not rely on it to determine the property value or as a substitute for a property inspection or similar report. You may wish to have a separate appraisal conducted at your own expense.
  - **Please note:** Your loan must close within 120 days from the date that the last appraisal was accepted by J.P. Morgan. If your loan does not close within this time period, we may require another appraisal, which could result in an additional cost to you. J.P. Morgan is required to send out additional disclosures in the event that another appraisal is required.

- **Action required**

Please sign, date and return this document to your J.P. Morgan Mortgage Specialist.

- **For more information**

If you have any questions, please contact your J.P. Morgan Mortgage Specialist.

**Acknowledgement**

By signing below, I/we hereby acknowledge receipt of this Appraisal Notice prior to the payment of any appraisal fee and further acknowledge that I/we understand its provisions.

**Borrower**

**600 Spring, LLC**
*a California limited liability company*

7-29-2024 | 7-29-24

**Scott Gillen** **Date** | **Barry Shy** **Date**
*Manager* | *Manager*

7-29-24

**Amit Tidhar, Trustee of the The Brshy Irrevocable Trust** **Date**

Lender name: JPMorgan Chase Bank, N.A.

**J.P. Morgan**

# JPMorgan Chase Automatic Mortgage Payment Program

**Please note** Your interest rate is inclusive of a 0.125% discount for making automatic payments from a JP Morgan checking account. If you wish to use a different JP Morgan account than what is outlined below, please write-in any changes and initial. Note that accounts at third party institutions are ineligible to be used for the 0.125% discount that is included in your interest rate.

Borrower name: 600 Spring, LLC, Amit Tidhar
Property address: 24185 Case Ct, Malibu, CA 90265

Loan number: [redacted]
Home phone: [redacted]
Work phone:

**Please note:** When you sign up for automatic payments, you should continue to make your loan payments (by mail, online, in a branch or by phone) until you receive a letter from us stating that the automatic payment program has been set up. This letter will include the first withdrawal date and amount.

## Bank account information

Banking institution name: JP Morgan Chase
Account number: [redacted]

Bank account holder name 1: 600 SPRING LLC
Banking Routing number: [redacted]
(9-digit number beginning with 0, 1, 2 or 3)

Bank account holder name 2:

Account type:

☒ Checking account
☐ Savings account

YOUR BANK — Your Bank, 123 East Main Street, Anytown, US 12345-6789
MEMO:
|:012345678 | :456155525465|"
Routing # Accounting #

## Automatic payment amount

The amount of transfer shall be the monthly mortgage loan payment that I/we are obligated to make or have elected to pay for the above-referenced loan.

Additional Principal per Draft $: 0.00

## Automatic payment withdrawal date

☒ *You request and authorize us to electronically withdraw monthly payments plus any additional principal you authorize from your personal bank* account on the withdrawal date you choose. If you do not choose a date, or if you choose a withdrawal date that is not permitted, we will withdraw the payment on the payment due date.

Generally payments are due on the first day of each month. The withdrawal date may be up to 15 days past your due date. **Refer to your loan agreement for your specific due date and grace period.**

Please select the day of the month we should withdraw your payment:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ 1 | ☐ 2 | ☐ 3 | ☐ 4 | ☒ 5 | ☐ 6 | ☐ 7 | ☐ 8 |
| ☐ 9 | ☐ 10 | ☐ 11 | ☐ 12 | ☐ 13 | ☐ 14 | ☐ 15 | ☐ 16 |

## Please review these terms and conditions

- You understand that this agreement authorizes the transfer of funds to make payments on the loan. Borrower will remain liable for all loan payments due as well as any charges, according to the promissory note, if funds are not properly transferred. The obligation under the promissory note and other loan documents is independent of this agreement. If you are not the Borrower, you acknowledge that you have had full and complete access to the loan documents, and have determined that the authorized withdrawals will benefit you directly or indirectly.
- You can cancel or change automatic payments online at jpmorgan.com or by calling us at the number below. Requests for changes or cancellations must be made three business days in advance of the payment date.
- You agree to have money in your account to cover the payment as required under your loan document. If not, we may charge a fee. We may also assess a late charge if you do not subsequently make your payment within your grace period, and you are still liable for the payment, according to your promissory note. You authorize us to change the amount of your payment as needed if there is an increase or decrease in escrow or optional products amounts. Note that additional escrow payments are not permitted.
- An automatic payment transaction that falls on a non-business day will be processed on the following business day. Saturday is considered a business day for automatic payment purposes.
- For interest-only loans, you agree that payments may vary if you have made any additional payment that was directly applied to the principal.
- If your loan is delinquent, we can suspend automatic payments, and you will have to make your payments directly to us.
- If you, a co-borrower, or anyone on the title to the property that secures the loan files for bankruptcy, we will cancel your automatic payments upon receiving notice of the bankruptcy filing.
- We may change terms or fees or cancel the automatic payment program at any time. If notice is required, we will tell you in writing.
- U.S. or Ohio law covers this agreement.

**I hereby acknowledge that I have read this agreement and agree to its terms. I agree to retain a copy for my records. Please sign here:**

[signature] 2-29-2024
**600 SPRING LLC** **Date**

Borrower (if not bank account holder): ______________________ Date ____________

For changes, questions or cancellations, please contact us at 866-312-7534.

Loan Number: [redacted]
Date: July 29, 2024

# PROPERTY INSURANCE REQUIREMENTS FOR YOUR HOME LOAN

Thank you for choosing JPMorgan Chase Bank, N.A.(Chase) as your lender. We require hazard insurance on your home and, if your home is in a high-risk flood area, you're required to maintain flood insurance as well.

**We set minimum coverage requirements. Talk with your insurance agent or company right away about our insurance requirements to determine the right coverage and amounts for your home. You must have insurance coverage in place in order to close your loan and we cannot schedule your closing until we have a policy or policy declarations page showing your insurance meets our minimum coverage requirements.**

The insurance we require must be maintained throughout your loan. The section below entitled "Lender-placed Insurance" explains the consequences of not maintaining the required insurance.

**Notice to borrowers:** You or your homeowners association can choose an insurance agent or company to buy insurance that meets our requirements. Your choice does not affect our credit decision or terms. However, your insurance and insurance company must meet our requirements.

**Please provide a copy of this summary of our insurance requirements to your insurance agent. We reserve the right to change any insurance requirements upon notifying you.**

## GENERAL INSURANCE REQUIREMENTS

| **Single Family Residential Dwellings, Condominiums, Townhouses and Co-operatives (1 to 4 units)** | **Multi-Unit Dwellings, Condominiums, Townhouses, Co-operatives, Commercial Buildings and Course of Construction Properties (5 or more units)** |
|---|---|
| All policies must show an effective date that is the same as the loan funding date or earlier. We will accept a policy or a policy declarations page from an authorized insurer if it contains the information that we require. We may also accept other forms of proof of insurance at our discretion.<br><br>A **Mortgagee Clause/Lender's Loss Payable Endorsement** must be included with your insurance policy and must require that the insurance company notify us at least ten (10) days prior to the cancellation of insurance. The mortgagee clause should read exactly as follows:<br><br>JPMorgan Chase Bank, N.A.<br>ISAOA, ATIMA<br>P.O. Box 4465<br>Springfield, OH 45501<br>[redacted] | All policies must show an effective date that is the same as the loan funding date or earlier. We require that you provide us with a complete copy of the master hazard insurance policy for the multi-family development. We may also accept other forms of proof of insurance at our discretion.<br><br>In the case of an individual policy, a **Mortgagee Clause/ Lender's Loss Payable Endorsement** must be included and must require that the insurance company notify us at least ten (10) days prior to the cancellation of insurance. The mortgagee clause should read exactly as follows:<br><br>JPMorgan Chase Bank, N.A.<br>ISAOA, ATIMA<br>P.O. Box 4465<br>Springfield, OH 45501<br>[redacted] |
| Each policy must be written through a company having a current Best's Key Rating Guide rating of "A" in Class II, "B" in Class III, or better. Carriers rated by Demotech, Inc., must have an "A" or better rating in *Demotech's Hazard Insurance Financial Stability Ratings*. | Each policy must be written through a company having a current Best's Key Rating Guide rating of "A" in Class V. Carriers rated by Demotech, Inc., must have an "A" or better rating in *Demotech's Hazard Insurance Financial Stability Ratings*. |
| **The insurer must be licensed or authorized by law to do business in the state where the property is located.** | **The insurer must be licensed or authorized by law to do business in the state where the property is located.** |
| **State-sponsored plans:** Policies from a FAIR Plan Association, Joint Underwriting Association or government-endorsed programs are acceptable. | **State-sponsored plans:** Policies from a FAIR Plan Association, Joint Underwriting Association or government-endorsed programs are acceptable. |

## HAZARD INSURANCE

We require you, your homeowners association or co-op corporation to maintain the following minimum hazard insurance requirements on your home:

| Single Family Residential Dwellings, Condominiums, Townhouses and Co-operatives (1 to 4 units) | Multi-Unit Dwellings, Condominiums, Townhouses, Co-operatives, Commercial Buildings and Course of Construction Properties (5 or more units) |
|---|---|
| Your hazard insurance coverage must be at minimum a one (1) year fire, wind, hail and extended coverage policy in an amount equal to the full insurable value of the dwelling and insurable improvements.<br><br>In the case of a co-operative unit, the co-op corporation's hazard policy must cover the entire building and the common areas. You also may want to have your own hazard policy covering your unit's walls and fixtures, as these may not be covered by the co-op corporation's policy.<br><br>Wind/hail must be covered risks. In certain states, hurricane coverage also is required. Discuss this with your insurance agent. You may be able to add endorsements to your policy for any of these that are required but not included in your standard policy. | **For a condominium, PUD or townhouse**<br>In the case of a condominium, Planned Unit Development (PUD) or townhouse with detached units, we will not be able to close your loan unless we receive a copy of the master hazard insurance policy for the building or the declarations page of the policy. The master policy must cover fire and other hazards covered by a standard extended-coverage endorsement. The master policy must cover all of the common elements and must specify the number of units in the building.<br><br>If your condominium association does not provide coverage for interior structural repairs to your unit, a unit owner's policy must be purchased to cover the reconstruction of the interior of the condominium unit (called "walls-in" coverage). Walls-in coverage is usually available to borrowers through a separate HO-6 (or similar policy). The walls-in policy must provide coverage for the value of the improvements and provide for repairs on a replacement cost value basis in the event of a claim.<br><br>**For a residential co-operative**<br>In the case of a co-operative unit, the master policy must meet all of the requirements above, plus cover the replacement cost of the project improvements (including the individual unit) and property (including machinery and equipment) that is owned by the co-op corporation. |
| The dwelling deductible may not exceed 5% of the face amount of the insurance policy, unless otherwise required by applicable law. | The dwelling deductible may not exceed 5% of the face amount of the insurance policy, unless otherwise required by applicable law. |

## FLOOD INSURANCE

**We'll notify you if flood insurance is required for your home.**

We require all customers in an area designated as a Special Flood Hazard Area(SFHA) by the Federal Emergency Management Agency (FEMA) to meet minimum flood insurance requirements. You or your homeowners association must maintain adequate flood insurance coverage until you pay off your loan or we receive evidence from FEMA that your home is no longer located in an SHFA. Please be aware that most loans made, increased, extended or renewed on or after January 1, 2016 will be required to have an escrow account at Chase to pay flood insurance premiums and fees to the insurance provider.

**If we notify you that flood insurance is required,** you can buy coverage through the National Flood Insurance Program (NFIP) by calling 1-888-379-9531 or visiting FloodSmart.gov. You may also be able to buy flood insurance through a private insurance company or a state plan.

| Single Family Residential Dwellings, Condominiums and Townhouses (1 to 4 units) | Multi-Unit Residential Dwellings, Condominiums, Townhouses, Co-operatives and Commercial Buildings (5 or more units) |
|---|---|
| If we notify you that flood insurance is required, the coverage amount needed to meet our minimum requirements must equal the lowest of either:<br>1. The outstanding principal balance of the first lien loan, plus (a) the unpaid principal balance of any other loan secured by the same property and (b) the total credit amount of any line of credit secured by the same property;<br>2. 100% of the full insurable value of the dwelling and insurable improvements (the replacement cost value); or<br>3. The maximum amount of insurance coverage available through the NFIP, which is currently $250,000.*<br><br>The policy deductible may not exceed $10,000. The policy must be written for the same risk zone as indicated on your Special Flood Hazard Determination Form.<br><br>If your home is located in Massachusetts, we will be sending you a separate flood insurance notice that applies in addition to this information. In the event of a conflict, the Massachusetts notice applies.<br><br>**Important: Talk to your agent about protecting your home for its full insurable value.**<br>If you buy insurance that covers less than 100% of the value of your home, you may not have enough coverage to repair your home after a flood. It's in your best interest to maintain flood insurance equal to your home's maximum insurable value, even if we don't require it. Having an insufficient coverage amount may also result in the use of a less advantageous method of settling losses under the terms of the policy.<br><br>*The maximum coverage available is reduced if your community is part of an Emergency Program; check with your insurance agent. | **For a condominium**<br>The unit must be covered by the condominium association's Residential Condominium Building Association Policy (RCBAP) or an acceptable private policy covering the entire building.<br><br>The coverage amount needed to meet our minimum requirements must equal the lowest of either:<br>1. The maximum coverage available per unit under the NFIP, which is currently $250,000*; or<br>2. The replacement cost value of the building, divided by the number of units in the building.<br><br>The policy deductible for an RCBAP may not exceed $25,000. The policy must be written for the same risk zone as indicated on your Special Flood Hazard Determination Form.<br><br>**For a PUD or townhouse**<br>The homeowners association must have a master flood policy in effect that covers all common elements and the property, as well as each individual unit in the building. The master flood policy must provide the same coverage amount as required for multi-family condominiums.<br><br>**For a residential co-operative**<br>The co-op corporation must have at least the amount of coverage available through the General Property Form under the NFIP. The maximum coverage available for residential buildings other than condominiums is currently $500,000.<br><br>**For commercial buildings**<br>The maximum coverage available under the NFIP is currently $500,000.<br><br>**Ask your homeowners association for the required information as soon as possible to avoid a delay in your closing.**<br><br>*The maximum coverage available is reduced if your community is part of an Emergency Program; check with your insurance agent. |

**Private Flood Insurance Policies:** For all property types, flood insurance that provides coverage similar to a standard flood insurance policy under the NFIP may be available from private insurers that don't participate in the NFIP.

You should compare the flood insurance coverage, deductibles, exclusions, conditions and premiums associated with flood insurance policies issued on behalf of the NFIP and on behalf of private insurance companies. Ask your insurance agent about the availability, cost and comparisons of available flood insurance coverage.

**Detached structures on your property:** Unless we tell you otherwise, you're not required to maintain flood insurance on a structure that is detached from the primary residential structure and does not serve as a residence (e.g., a tool shed or boathouse). For detached structures, please consider the following important information that the Federal Government has asked us to provide to you:

*Although you may not be required to maintain flood insurance on all structures, you may still wish to do so, and your mortgage lender may still require you to do so to protect the collateral securing the mortgage. If you choose to not maintain flood insurance on a structure, and it floods, you are responsible for all flood losses relating to that structure.*

**Non-participating communities:** We reserve the right to not accept your loan request if your home is in a Special Flood Hazard Area and your community doesn't participate in the NFIP.

## LENDER-PLACED INSURANCE

**Why it's important to maintain insurance that meets our requirements.**

If you or your homeowners association fails to maintain insurance required by us, we may buy insurance for you, called lender-placed insurance, that meets our standards at your expense. We may buy lender-placed insurance if (1) you or the homeowners association allows the insurance covering your home to expire or be canceled; or (2) the amount of insurance falls below our requirements. We will not accept as adequate any lender coverage provided to us only under your insurance policy after the date that your coverage expired or was canceled.

**Lender-placed insurance is different than a policy you buy on your own and may not adequately protect your interests.**
It may only cover improvements on your property and may only be for the amount required to protect our interest in the property. Lender-placed insurance may differ from your insurance in the following ways:

- The coverage amount or type may be less than your prior policy and may only protect our interest in the property;
- It may not cover your interest or equity in the property;
- The deductible may be higher or lower than the deductible on your prior policy; and/or
- There isn't coverage for personal property/contents, personal liability, living expenses or special risk coverage.

**Lender-placed insurance is likely to be significantly more expensive than insurance you buy through your agent. You're obligated under the terms of your security agreement to pay for any lender-placed insurance that we buy for you.**
If we obtain lender-placed insurance, the policy effective date will be backdated to the expiration date of your policy. We'll cancel a lender-placed policy when you have insurance that is acceptable to us. While lender-placed insurance may be canceled, you'll be charged for the insurance premiums due for any time period that you failed to have acceptable coverage. You may also have to pay any non-refundable fees assessed by the insurer or state-sponsored plan. If a lender-placed policy is canceled, you may be entitled to a prorated refund of the premiums paid, as determined by the insurance company.

**Borrower's Agreement:** I understand and agree to comply with the insurance requirements contained in this disclosure, including using my best efforts to have the homeowners association (or other entity responsible for providing insurance on my dwelling or building) comply with the requirements that apply to them. I understand that I am solely responsible for making sure that my home is properly insured and that complying with Chase's insurance requirements may not protect my equity in the property or meet all my insurance needs.

**Borrower**

**600 Spring, LLC**
*a California limited liability company*

[signature] 7-29-2024
**Scott Gillen** **Date**
*Manager*

[signature] 7-29-24
**Barry Shy** **Date**
*Manager*

[signature] 7-29-24
**Amit Tidhar, Trustee of the The Brshy Irrevocable Trust** **Date**

**Please provide a copy of your insurance policy declaration page and/or complete the following agent information:**

**Homeowners Insurance Company:** ______________________

Agent Name: ______________________ Agency Phone Number: ______________________

**Flood Insurance Company:** ______________________

Agent Name: ______________________ Agency Phone Number: ______________________

**If property is a Condominium or a Co-Operative, please complete the following information:**

Management/Association Name: ______________________

Contact Name: ______________________ Contact Phone Number: ______________________

# UNDERTAKING AND ERRORS AND OMISSIONS FORM

Obligor(s): 600 Spring, LLC and Amit Tidhar, Trustee

Property Address: 24185 Case Ct Malibu, CA 90265

Loan Number: [redacted] Loan Amount: $20,800,000.00

In consideration of the Mortgage/Co-op loan (the "Loan") made by JPMorgan Chase Bank, N.A. its successors and/or assigns (the "Lender") to 600 Spring, LLC and Amit Tidhar, Trustee (the "Obligor(s)") on the 29th day of July, 2024, and to induce the Lender to make said Loan, the Obligor(s) do represent and promise as follows:

1. Upon request by or on behalf of the Lender, the Obligor(s) will execute any document as is reasonable to provide assurance to Lender:

(A) that the Obligations undertaken by the Obligor(s) in connection with the Loan will be faithfully performed;
(B) that any and all documents and instruments signed by Obligor(s) in connection with the Loan are accurate statements as to the truth of the matters set forth in them and constitute binding Obligations upon the Obligor(s) according to their tenor; or
(C) as to the amount of the Loan outstanding from time to time, and the date and amount of payments in respect of the Loan.

2. Upon request by or on behalf of the Lender, the Obligor(s) will execute any document or instrument that ought to have been signed at or before closing of the Loan, or will re-execute any document or instrument incorrectly completed and/or signed in connection with the Loan, or, in the alternative, Obligor(s) hereby grant Lender or Lender's attorney a power of attorney so that Lender's authorized representative or Lender's attorney may act my/our place and instead in the way in which I/we myself/ourselves could do, if I/we were personally present, for the sole purpose of executing or re-executing said document or instrument on the Obligor(s)' behalf, without prior notice. This limited power of attorney shall be irrevocable during the term of the loan and this power of attorney shall not be affected by the subsequent disability or incompetence of the principal(s).

3. Upon request by or on behalf of Lender, the Obligor(s) will pay any fee or charge that ought to have been paid by Obligor and collected by Lender at or before closing of the Loan but was not collected by Lender.

4. Obligor(s) shall fully cooperate and comply with all such requests as set forth in Paragraphs 1, and/or 2 and/or 3 within seven (7) days of receipt of said request. Failure to do so shall constitute an event of default as defined in the Loan documents and shall entitle Lender to the remedies available for default under the Loan documents.

In Witness Whereof I have hereunto signed my name this 29th day of July, 2024.

**Obligors**

**600 Spring, LLC, a California Limited Liability Company**

7-29-2024

**By: Scott Gillen, its Manager** **Date**
*Seal*

7-29-24

**By: Barry Shy, its Manager** **Date**
*Seal*

**The Brshy Irrevocable Trust**

7-29-24

**Amit Tidhar, Trustee** **Date**
*Seal*

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles
On 7-29-24, before me, Jacob Alexander, Notary Public, personally appeared, Scott Gillen, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

*Notary Public*

Jacob Alexander
*Notary Public Name*

Notary Public's oath and bond filed: LA, CA

JACOB ALEXANDER
Notary Public - California
Los Angeles County
Commission # 2490453
My Comm. Expires Jun 14, 2028

Notary Commission Number: 2490453

My Commission Expires: 6-14-2028

☐ Electronic Seal ID Number:

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles
On 7-29-24, before me, Jacob Alexander, Notary Public, personally appeared, Barry Shy, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

*Notary Public*

Jacob Alexander
*Notary Public Name*

Notary Public's oath and bond filed: LA. CA

JACOB ALEXANDER
Notary Public - California
Los Angeles County
Commission # 2490453
My Comm. Expires Jun 14, 2028

Notary Commission Number: 2490453

My Commission Expires: 6-14-2028

☐ Electronic Seal ID Number:

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles
On 7-29-24, before me, Jacob Alexander, Notary Public, personally appeared, Amit Tidhar, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

*Notary Public*

Jacob Alexander
*Notary Public Name*

JACOB ALEXANDER
Notary Public - California
Los Angeles County
Commission # 2490453
My Comm. Expires Jun 14, 2028

Notary Public's oath and bond filed:
LA, CA

Notary Commission Number:
2490453

My Commission Expires:
6-14-2028

☐ Electronic Seal ID Number:

**Interest Payment Calculation**

**Accrual Details:**

---

**Loan#** [redacted]

| From Date | To Date | Applicable Balance | Period Days | Rate | Amount |
|---|---|---|---|---|---|
| 23rd JUNE 2024 | 31st JUL 2024 | $34,500,000.00 | 38 | 9.5% | $345,958.34 |
| | | | | Total | $345,958.34 |

**Loan# 414261**

| From Date | To Date | Applicable Balance | Period Days | Rate | Amount |
|---|---|---|---|---|---|
| 23rd JUNE 2024 | 31st JUL 2024 | $4,000,000.00 | 38 | 9.5% | $40,111.12 |
| | | | | Total | $40,111.12 |

Please wire payoff funds to:

| | |
|---|---|
| Bank Name: | Bank Hapoalim B.M. New York |
| Address: | 1120 Avenue of Americas, New York NY 10036 |
| [redacted] | |
| Reference: | 600 SPRING LLC |

If you have any questions regarding the above, please use the following contact information:

Brian Jurczak

Phone: 323.792.2753
Email: BJurczak@bhiusa.com

BHI
Bank Hapoalim B.M
New York Branches
1120 Avenue of the Americas
New York, NY 10036

Date: 15th July 2024

To: 600 SPRING LLC

Attn: Rommy Shy
Phone: [redacted]
Fax:
Email:

Re: ACQUSITION LOAN
[redacted]
USD 38,500,000.00
Effective as of 28 June 2017

**Payoff Letter Effective 31th JULY, 2024:**

---

This is to advise you that a payment on your Loan will be due as shown below. Please remit payment by the due date indicated below.

Borrower: 600 SPRING LLC
Customer Account Number: [redacted]
Facility-Loan Number:
Principal Amount: USD 38,500,000.00
Due Date: 31th July 2024

**Payment Due:**

---

**Payoff Date: 31th JULY 2024**
**Total Amount Due: $38,886,069.46**

| Loan# | Principal Balance | Period Days | Rate | Interest Payoff | Per Diem (est) | Total P&I |
|---|---|---|---|---|---|---|
| [redacted] | $34,500,000.00 | 38 | 9.5% | $345,958.34 | $9,104.16 | $34,845,958.34 |
| | $4,000,000.00 | 38 | 9.5% | $40,111.12 | $1,055.56 | $4,040,111.12 |
| **Total** | | | | | | **$38,886,069.46** |

1220 Avenue of the America, New York, New York 10036-2790
[redacted]

# EXHIBIT D




There is no place in the world like Malibu and there is no place in Malibu like The Case. Five Mid-Century Modern estates sit on 24 acres of California's most coveted land. Each home is its own bluff top sanctuary set on a massive lot, featuring round the clock security, unrivaled views and private concierge service. Just minutes from Nobu and Soho House, The Case is the most exclusive residential development in the country.

## MALIBU'S MOST COVETED OCEANFRONT BLUFF





## EXPLORE THE HOMES



THE CANTILEVER HOUSE



> EXPLORE THIS HOME
> REQUEST A PRIVATE TOUR

## THE / BUTTERFLY HOUSE

10,727 SQFT | 5 BR | 7 BA

> EXPLORE THIS HOME
> REQUEST A PRIVATE TOUR





## THE / EDGE

10,527 SQFT | 5 BR | 8 BA

> EXPLORE THIS HOME
> REQUEST A PRIVATE TOUR

## THE / FLAT HOUSE

10,555 SQFT | 4 BR | 7 BA

> EXPLORE THIS HOME
> REQUEST A PRIVATE TOUR





## THE / GLASS TUNNEL

11,927 SQFT | 5 BR | 9 BA

> EXPLORE THIS HOME
> REQUEST A PRIVATE TOUR

**In 2017, I took a leap of faith, broke records and dropped $50 million on a plot of land overlooking Malibu Colony and the Pacific Ocean, knowing that there would be buyers for The Case, a gated enclave consisting of five of the most luxurious single-family homes ever built.**

Scott Gillen DESIGN

UNVARNISHED

Keep Me Informed
EMAIL ADDRESS

THE NEW CASTLE / THE CASE / The Cantilever House The Butterfly House The Edge The Flat House **The Glass Tunnel**






The Case, an extraordinary work of Scott Gillen design, features five spectacular Mid-Century Modern inspired homes. Located within an exclusive 24-acre guard-gated community on the coveted Malibu Bluffs, The Glass Tunnel is a true masterpiece. Idyllic water features, enclosed light-filled courtyards, an expansive great room, oversized pool, and separate guest house complete this 6-acre estate. Designed with Gillen's distinct and warm minimalist style that emphasizes clean lines and panoramic, awe-inspiring ocean views, this home is the crown jewel of The Case.

REQUEST A PRIVATE TOUR

MORE INFORMATION

| SQUARE FOOTAGE | LOT SIZE | POOL SIZE |
|---|---|---|
| 11,927 | 259,132 | 127X30 |
| **BEDROOMS** | **FULL BATHS** | **HALF BATHS** |
| 5 | 5 | 4 |




NEIGHBORHOOD INFORMATION

At the end of the Malibu Canyon, the Case Court community offers private walking trails winding through 24 acres of bluff top, proximity to Pepperdine University, Surfrider Beach, Malibu Lagoon and premier shopping, dining and entertainment in Malibu Country Mart and Malibu Colony.

# DISCOVER THE GLASS TUNNEL





"The sun passes right through the glass great room and invites everyone out from the separate wings of the house to gather and marvel at the beauty."

Scott Gillen DESIGN



## GLASS GREAT ROOM

The glass-enclosed great room acts as a natural hub that connects the two separate wings of the house. Enjoy natural light streaming in from sunrise to sunset and indulge in the feeling of warmth on your skin year-round.



# ELEMENTAL DESIGN

Enjoy views of the Pacific Ocean and custom water features from every part of the home. Each expertly designed pool emphasizes the elementally focused Malibu lifestyle and adds an aura of calm and serenity.





# PRIVATE WINGS

Retire to one of the private wings of bedrooms that flank either side of the all glass, great room to find recluse and private, quiet views during the day.

# REQUEST A PRIVATE TOUR



SCOTT GILLEN

DESIGNER / THINKER / CREATOR

> GET IN TOUCH

# EXHIBIT E

# PROMISSORY NOTE

**Loan Amount: $260,000,000.00 (Two Hundred Sixty Million Dollars)**

**March 1, 2021**
**Los Angeles, California**

FOR VALUE RECEIVED, the undersigned, **23800 MALIBU CREST LLC**, a California Limited Liability Company, **600 SPRING LLC**, a California Limited Liability Company, **THE BU HOUSES LLC**, a California Limited Liability Company, **CLIFFSIDE DUME** LLC, a California Limited Liability Company, **Malibu Road #3**, a California Limited Liability Company and **GREENMILK LLC** (all LLC's above shall be jointly and collectively referred to as "Borrower") enters into this Promissory Note. Borrower promises to pay all indebtedness as hereinafter provided to BOBS, LLC, a Nevada Limited Liability Company ("Lender"), in lawful money of the United States of America, the aggregate principal sum of **TWO HUNDRED SIXTY MILLION DOLLARS ($260,000,000.00)** or such much thereof as shall be advanced or accrued; this amount hereinafter referred to as ("Loan") in accordance with the terms described below. The Parties agree that all previous Notes shall be extinguished in favor of the merger and consolidation of all outstanding amounts owed by Borrower into this new Promissory Note and ancillary Loan Documents. The aforementioned outstanding amounts are evidenced by the 7 attached ledgers in Exhibit A to this Note. Also included is the ledger for MLR Malibu LLC and although the collateralized property has been sold, the deficiency balance remaining on that account has been included into Loan. Borrower has not had the opportunity to review the Exhibit A ledgers thoroughly and reserves the right to verify the amounts shown on the ledgers and to require correction of any inaccuracies in the ledgers an amount owed by Borrower to Lender. Borrower has been aware from the commencement of the relationship with Lender that Barry Shy, Harpro LLC and BR Shy Irrevocable Trust are Lender's closely affiliated entities.

All 6 entities above shall be jointly and severally liable and as security for this debt shall pledge the properties referred to below and in the Deed of Trust and its attached Legal Description which are dated the same date as this Note. These real properties shall be cross-collateralized to secure indebtedness to Lender so that if one of the above entities cannot pay its debt in full then all the other entities shall be jointly and severally liable for it. Over the last several years, Lender (or its predecessors) has funded the above entities and now desires to consolidate all outstanding balances into one Note and extend the maturity date of all outstanding balances. This Note shall re-affirm Borrower's commitment to cross-collateralize all secured properties referenced below and in the deed of trust accompanying this Note and furthermore to secure the indebtedness, all beneficial interest of Scott Gillen, an ultimate beneficiary of Borrower, who will sign a Personal Guaranty affirming such.

Now, to secure the indebtedness Borrower shall sign a Deed of Trust of the same date as this Note hereby granting Lender the following security interests:

- A First (1st) Priority Deed of Trust on land and improvements known as "Malibu Castle" located at 23800 Malibu Crest Dr. Malibu, CA 90265 (APN 4458-024-038 in Los Angeles County)

- A Second (2nd) Priority Deed of Trust junior only to Bank Hapoalim loan on land and improvements located at APNs 4458-018-039, 4458-018-037, 4458-018-038, 4458-018-906, 4458-018-035, 4458-018-041, 4458-018-036, 4458-018-907 in Los Angeles County.

- A First (1st) Priority Deed of Trust on APN 081-021-005 in San Luis Obispo County and any other land and improvements in the vicinity owned by The BU Houses LLC

- A First (1st) Priority Deed of Trust on land and improvements known as "Malibu Road 3" located at 24266 Pacific Coast Highway, Malibu, CA 90265 (APNs 4458-011-010 and 4458-011-011)

- A First (1st) Priority Deed of Trust on land and improvements known as "Cliffside Dume" located at 29215 Cliffside Dr. Malibu, CA 90265 (APN #4468-003-005)

- A First (1st) Position Deed of Trust on the "Greenmilk Property" (APN 080-021-005) in San Luis Obispo County.

This Note is drafted in consideration of the funds Borrower has already received from Lender or its predecessors. This Note consolidates the previous notes given for such funds, which are cancelled. Original lenders **Spring7 Loft LLC** and Royalty Equity Lending, LLC assigned their loan receivables due from Borrower to their successor entity BOBS LLC, the current Lender. Borrower warrants, acknowledges and agrees that any funds from entities other than BOBS that have been advanced to any of the 6 entities comprising Borrower have since been assigned to BOBS. These entities include but are not limited to Spring 7 Loft LLC and Royalty Equity Lending LLC.

1. Maturity Date: As used herein, Maturity Date shall mean the earlier to occur of: (i) the date Borrower prepays the entire Note pursuant to Section 3, below; (ii) the date the Note is accelerated, pursuant to its terms; OR (iii) on March 1, 2024.

2. Payment:

2.01 Principal: The Principal Amount due shall be defined as the sum of **TWO HUNDRED SIXTY MILLION DOLLARS ($260,000,000.00)** or so much thereof has been advanced or accrued, and shall be due and payable on or before the Maturity Date, as provided herein. Although as of March 1, 2021 the total amount of principal and interest owed to Lender is $237,270,541.00 as evidenced by the aggregate of the ledgers in Exhibit A, to allow for ongoing accrual of interest and possible future advances that the Borrower may draw, the Note amount has been set at $260,000,000.00. Borrower shall be responsible for all principal advanced and all interest accrued until Loan is paid off. All principal and interest shall be due on or before the Maturity Date.

Interest: The term Interest shall mean a sum accruing on the outstanding Principal balance at the rate of twelve percent (12%) per year which shall be compounded daily. Borrower acknowledges and agrees that this rate has been calculated from the date all entities comprising Borrower first received funds from Lender and interest shall be compounded daily at a rate of 12% per year for all funds Borrower has received from Lender and the compounded interest will continue to accrue at the same rate going forward until loan has totally been repaid in full. As has been the case since the commencement of all loans advanced to Borrower, all funds sent to Borrower will be subject to compounded interest which is the addition of **interest** to the principal sum of a loan or deposit, or in other words, **interest** on **interest**. It is the result of reinvesting **interest**, rather than paying it out, so that **interest** in the next period is then earned on the principal sum plus previously accumulated **interest**. The interest shall be compounded since Borrower is not required to make periodic interest or principal/interest Note payments at any point during the course of this loan term.

2.02 Payment: All Principal and Interest shall be due and payable by Borrower on the Maturity Date described above. All payments hereunder shall be made to Lender at 600 S. Spring St, #106, Los Angeles, CA 90014.

**3. Payment Dates.**

3.01 Generally. Except as otherwise provided in this Note, all Principal and all accrued, but unpaid Interest shall be paid on or before the Maturity Date.

3.02 Monthly Note Payments. There shall be no monthly Note payments due under this Note.

3.03 Optional Prepayment. Borrower shall have the absolute and unilateral right, at any time from the date of this Note through the Maturity Date, to satisfy all, or any part of the entire indebtedness evidenced by this Note by payment of the entire Principal balance (including accrued interest added to principal), or any portion thereof. Upon prepayment of the entire Principal balance, plus all accrued and unpaid Interest as provided above, this Note will be satisfied and paid in full and of no further force and effect.

3.04 Revolving Line of Credit: The loan evidenced by this Note shall be a revolving line of credit. As has been the case from the commencement of the Loan, from time to time, Lender will make advances to Borrower upon Borrower's written draw request. Lender reserves the right to approve/deny draw requests at Lender's sole discretion.

4. Application of Payments: Payments, including optional prepayments set forth in section 3.03 above, shall be credited and applied first against any costs, fees or expenses then due, costs of collection and enforcement including attorney fees; second against any default interest then due; and third against outstanding Principal (since the loan accrues compounded interest, any interest accrued compounds itself into the accrued loan principal balance).

4 Default/Acceleration: Upon the occurrence of any event of default or failure by Borrower to pay or perform any of its obligations under this Note, the entire Principal together with all accrued Interest and other charges, if any, due hereunder shall immediately become due and payable at the option of Lender. Borrower and Lender shall work together in good faith to effectuate such an assignment.

4.1 Events of Default:

**Each of the following shall constitute an event of default (Event of Default") under this Note:**

**Payment Default.** Borrower fails to make any payment when due under this Note; including, but not limited to all principal, extension fees and the payment due on Maturity Date, which is not cured within five (5) days after Lender delivers notice of the failure to Borrower.

a) **Other Defaults in Obligations to Lender.** Borrower fails to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or in any other agreement between Lender and Borrower, which is not cured within thirty (30) days after Lender delivers notice of the default or event of default to Borrower, or if the default or Event of Default cannot reasonably be cured within thirty (30) days, then such longer period as may be necessary to cure it as long as Borrower is proceeding with due diligence to cure.

b) **Event of Default Under Related Documents.** A default or event of default occurs under the terms of any promissory note, deed of trust, loan agreement, personal guaranty, pledge agreement, security agreement or other agreement ("Related Documents"), which is not cured within thirty (30) days after Lender delivers notice of the default or event of default to Borrower, or if the default or Event of

Default cannot reasonably be cured within thirty (30) days, then such longer period as may be necessary to cure it as long as Borrower is proceeding with due diligence to cure.

c) **False Statement.** Any statement, representation or warranty which Borrower makes to Lender or is made on Borrower's behalf with respect to this Note or the Loan Documents as defined in the Trust Deed of even date as "Related Documents" is false or misleading in any material respect either when made or at any time thereafter. Borrower shall promptly disclose circumstances which make the statement false or misleading.

d) **Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any of the secured property including, for example, a garnishment of any of Borrower's accounts with Lender or others. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and Borrower gives Lender written notice of the proceeding and deposits with Lender monies or a surety bond in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

e) **Intentionally Omitted.**

f) **Death or Insolvency.** The death of Borrower or, if Borrower is an entity, the dissolution or the termination of its right to do business or the cessation of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout or the commencement by Borrower of any proceeding under any bankruptcy or insolvency laws or the commencement of such proceedings by a creditor not dismissed within thirty (30) days.

Should an Event of Default occur, from and after the date of notice by Lender to Borrower of the occurrence of the Event of Default until it is cured, the compounded interest rate shall increase to 15% (Fifteen percent) per annum compounded daily.

5 Waivers: Borrower waives all demands for payment, presentment, notice of intention to accelerate maturity, notice of acceleration of maturity, protests, and notices of protest, to the extent permitted by law. The pleading of any statute of limitations as a defense to the obligations evidenced by this Note is hereby waived by Borrower to the fullest extent permissible by law.

6 Severability: If any provision of this Note, or the application of such provision to any person or circumstance, shall at any time be held invalid, the remainder of this Note or the application of such provision to persons or circumstances other than those to which it is held invalid, shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

7 Security: This Note is secured by various pledge agreements listed on Schedule "A" attached hereto and made a part hereof by reference.

8 Assignment and Binding Effect: Except as otherwise provided, this Note is binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors

and assigns. Notwithstanding the foregoing, Borrower shall at all times remain liable for the obligations contained herein.

9 Representations and Warranties of Maker. Borrower hereby unconditionally represents and warrants to Borrower and its heirs, successors, and assigns that (a) this Note is the legal, valid and binding obligation of Borrower, and (b) the execution, delivery and performance by Borrower under this Note does not and shall not violate any law, order, judgment, agreement, or undertaking affecting Borrower or its assets.

10 Heading: The section titles and subtitles contained herein are solely for convenience.

11 No Waiver of Default: Failure by any party to this Note to enforce or demand performance of any provisions of this Note or to seek a remedy for breach thereof, shall not operate to waive or excuse any default of any other provisions nor any further or subsequent default of the same provisions, nor shall such failure be deemed a waiver of any such rights or remedies with respect to any other or subsequent defaults.

12 Attorneys Fees: Borrower agrees to pay immediately upon demand all costs, expenses, witness fees and attorneys fees paid or incurred by Lender or adjudged by a Court in connection with (a) the collection and/or enforcement of this Note, whether or not suit is filed; or (b) any action to enforce payment of this Note or any part of it.

13 Notices: Any request, notice, or demand which shall be required or permitted by law or any provision of this Note shall be in writing and if the same is to be served upon Lender, may be personally delivered to Lender or shall be deposited in the United States mail, certified, return receipt requested, postage prepaid, addressed to Lender at 600 S. Spring St, #106, Los Angeles, CA 90014. If such request, notice, or demand is to be served on Borrower, the same may be personally delivered to Borrower or shall be deposited in the United States mail, certified, return receipt requested, postage prepaid, addressed to Borrower at 3806 Cross Creek Road, Suite C, Malibu, CA 90265.

14 Construction: This Note shall be construed and enforced in accordance with the laws of the State of California. Any rule of construction to the effect that ambiguities are to be construed against the drafting party (including, without limitation, California Civil Code Section 1654) shall not apply in interpreting this Note.

15 Invalidity: In the event any one or more of the provisions contained in this Note, or the application thereof to any person or circumstance, shall to any extent be held to be invalid, illegal or unenforceable, the remainder of this Note, or the application of such term to persons or circumstances or to the extent other than to which it has been held invalid or unenforceable, shall not be affected thereby, shall be valid and enforceable to the fullest extent permitted by law.

16 Joint and Several Liability: This Note shall be the joint and several obligation of Borrower and any and all sureties, guarantors, and endorsers.

17 Time of the Essence: Time is of the essence of this Note and the performance of each of the covenants and agreements contained herein.

18 Waiver of Jury Trial: To the extent permitted by applicable law, Borrower hereby waives the right to a trial by jury in any proceeding or action relating to this Note.

19 Collateral and Pledge Agreements: A new deed of trust with the same date as this Note will be notarized by Borrower. As additional security for this loan and as material inducement to Lender, Managing Member of Borrower and Guarantor Scott Gillen have pledged their equity shares in several other partnerships which shall be evidenced by the Pledge Agreements detailed below and attached which shall collectively be referred to as "Exhibit B".

(a) the Membership Interest Pledge Agreement of even date herewith made by Scott Gillen to Lender of all Gillen's interest in 23800 Malibu Crest LLC (the **"23800 Malibu Crest Company Membership Pledge"**).

(b) the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in 600 Spring LLC (the **"600 Spring LLC Membership Pledge"**).

(c) the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in the BU Houses, LLC (the **"BU Houses LLC Membership Pledge"**).

(d) the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in Greenmilk LLC (the **"Greenmilk Membership Pledge"**).

(e) the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in Cliffside Dume LLC (the **"Cliffside Dume LLC"**).

(f) the Membership Interest Pledge Agreement of even date herewith made by Gillen to Lender of all Gillen's interest in The Malibu Road #3 LLC" (the **"Malibu Road #3 LLC"**).

20 Loan Documents as a Whole : Included within the Loan Documents shall be this Note, Deed of Trust, Equity Pledge Agreements, Loan Agreement and any other Exhibits referenced herein

**IN WITNESS WHEREOF,** the undersigned has executed this Note as of the date first written above and hereby agrees and acknowledges that all equity and real and personal ownership interests of the below companies shall serve as Lender's collateral for Loan mentioned above:

BORROWER:

23800 Malibu Crest LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

600 Spring LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

Cliffside Dume LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interes

The Malibu Road #3 LLC by Scott Gillen (C64829 LLC) who holds an undivided 25% beneficial ownership interest

The BU Houses LLC by Scott Gillen (C64829 LLC) who holds an undivided 40% beneficial ownership interest

Green Milk LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial interest

This Note consists of 7 (SEVEN) pages total

**CALIFORNIA ACKNOWLEDGMENT** **CIVIL CODE § 1189**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On March 15 2021 before me, Sarah Fabela, Notary Public,
*Date* *Here Insert Name and Title of the Officer*

personally appeared Scott Gillen
*Name(s) of Signer(s)*
Green Milk LLC,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

SARAH FABELA
Notary Public - California
Los Angeles County
Commission # 2334264
My Comm. Expires Sep 25, 2024

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature [signature]
*Signature of Notary Public*

*Place Notary Seal and/or Stamp Above*

**OPTIONAL**

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: __________

Document Date: __________ Number of Pages: __________

Signer(s) Other Than Named Above: __________

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name: | Signer's Name: |
| ☐ Corporate Officer – Title(s): | ☐ Corporate Officer – Title(s): |
| ☐ Partner – ☐ Limited ☐ General | ☐ Partner – ☐ Limited ☐ General |
| ☐ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian or Conservator | ☐ Trustee ☐ Guardian or Conservator |
| ☐ Other: | ☐ Other: |
| Signer Is Representing: | Signer Is Representing: |

©2018 National Notary Association

**CALIFORNIA ACKNOWLEDGMENT** **CIVIL CODE § 1189**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On March 15 2021 before me, Sarah Fabela Notary public
*Date* *Here Insert Name and Title of the Officer*

personally appeared Scott Gillen
*Name(s) of Signer(s)*
The BU Houses LLC,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

SARAH FABELA
Notary Public - California
Los Angeles County
Commission # 2334264
My Comm. Expires Sep 25, 2024

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature [signature]
*Signature of Notary Public*

*Place Notary Seal and/or Stamp Above*

**OPTIONAL**

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: ______

Document Date: ______ Number of Pages: ______

Signer(s) Other Than Named Above: ______

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: ______
☐ Corporate Officer – Title(s): ______
☐ Partner – ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: ______
Signer is Representing: ______

Signer's Name: ______
☐ Corporate Officer – Title(s): ______
☐ Partner – ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: ______
Signer is Representing: ______

©2018 National Notary Association

**CALIFORNIA ACKNOWLEDGMENT** **CIVIL CODE § 1189**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California }
County of Los Angeles }

On March 15 2021 before me, Sarah Fabela, Notary Public,
*Date* *Here Insert Name and Title of the Officer*

personally appeared Scott Gillen
*Name(s) of Signer(s)*

The Malibu Road #3 LLC,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

SARAH FABELA
Notary Public - California
Los Angeles County
Commission # 2334264
My Comm. Expires Sep 25, 2024

*Place Notary Seal and/or Stamp Above*

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature [signature]
*Signature of Notary Public*

**OPTIONAL**

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: ______

Document Date: ______ Number of Pages: ______

Signer(s) Other Than Named Above: ______

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: ______
☐ Corporate Officer – Title(s): ______
☐ Partner – ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: ______
Signer is Representing: ______

Signer's Name: ______
☐ Corporate Officer – Title(s): ______
☐ Partner – ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: ______
Signer is Representing: ______

©2018 National Notary Association

**CALIFORNIA ACKNOWLEDGMENT** **CIVIL CODE § 1189**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On March 15 2021 before me, Sarah Fabela, Notary Public,
*Date* *Here Insert Name and Title of the Officer*

personally appeared Scott Gillen
*Name(s) of Signer(s)*
Cliffside Dume LLC,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

SARAH FABELA
Notary Public - California
Los Angeles County
Commission # 2334264
My Comm. Expires Sep 25, 2024

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature ____________________
*Signature of Notary Public*

*Place Notary Seal and/or Stamp Above*

**OPTIONAL**

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: ____________________

Document Date: ____________________ Number of Pages: ________

Signer(s) Other Than Named Above: ____________________

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: ____________________
☐ Corporate Officer – Title(s): ____________
☐ Partner – ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: ____________________
Signer is Representing: ____________________

Signer's Name: ____________________
☐ Corporate Officer – Title(s): ____________
☐ Partner – ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: ____________________
Signer is Representing: ____________________

©2018 National Notary Association

**CALIFORNIA ACKNOWLEDGMENT** **CIVIL CODE § 1189**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On March 15 2021 before me, Sarah Fabela, Notary Public,
*Date* *Here Insert Name and Title of the Officer*

personally appeared Scott Gillen
*Name(s) of Signer(s)*

600 Spring LLC,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

SARAH FABELA
Notary Public - California
Los Angeles County
Commission # 2334264
My Comm. Expires Sep 25, 2024

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature [signature]
*Signature of Notary Public*

*Place Notary Seal and/or Stamp Above*

**OPTIONAL**

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: ______

Document Date: ______ Number of Pages: ______

Signer(s) Other Than Named Above: ______

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name: ______ | Signer's Name: ______ |
| ☐ Corporate Officer – Title(s): ______ | ☐ Corporate Officer – Title(s): ______ |
| ☐ Partner – ☐ Limited ☐ General | ☐ Partner – ☐ Limited ☐ General |
| ☐ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian or Conservator | ☐ Trustee ☐ Guardian or Conservator |
| ☐ Other: ______ | ☐ Other: ______ |
| Signer is Representing: ______ | Signer is Representing: ______ |

©2018 National Notary Association

**CALIFORNIA ACKNOWLEDGMENT** **CIVIL CODE § 1189**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On March 15 2021 before me, Sarah Fabela, Notary Public,
*Date* *Here Insert Name and Title of the Officer*

personally appeared Scott Gillen
*Name(s) of Signer(s)*
23800 Malibu Crest LLC,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

SARAH FABELA
Notary Public - California
Los Angeles County
Commission # 2334264
My Comm. Expires Sep 25, 2024

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature [signature]
*Signature of Notary Public*

*Place Notary Seal and/or Stamp Above*

**OPTIONAL**

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: ____________

Document Date: ____________ Number of Pages: ______

Signer(s) Other Than Named Above: ____________

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: ____________
☐ Corporate Officer – Title(s): ____________
☐ Partner – ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: ____________
Signer is Representing: ____________

Signer's Name: ____________
☐ Corporate Officer – Title(s): ____________
☐ Partner – ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: ____________
Signer is Representing: ____________

©2018 National Notary Association

# EXHIBIT F

# LOAN AGREEMENT

**$260,000,000.00**

A. A. This Loan Agreement is made in Los Angeles, CA on March 1, 2021 by and between BOBS LLC, a Nevada Limited Liability Company (Lender) on the one hand, and the undersigned, **MLR MALIBU, LLC**, an Oregon Limited Liability Company, **23800 MALIBU LLC**, a California Limited Liability Company, **600 SPRING LLC**, a California Limited Liability Company, **THE BU HOUSES LLC**, a California Limited Liability Company, **CLIFFSIDE DUME** LLC, a California Limited Liability Company, **Malibu Road #3**, a California Limited Liability Company and **Paradise Cove Malibu LLC** (all LLC's above shall be jointly and collectively referred to as "Borrower") with reference to the following facts:

B. Borrower has requested Lender to lend to the Borrower money as the proceeds of which Borrower presently intends will be used solely and exclusively by Borrower for commercial and/or investment purposes.

C. Lender has agreed to make a loan (hereinafter called "Loan") to Borrower in the principal amount of **Two Hundred Fifty Million ($260,000,000)** (hereinafter called "Loan Amount"), which Loan will be evidenced by a Secured Promissory Note executed concurrently herewith (hereinafter called "Note").

D. The Note will be secured by **1)** A First (1st) Priority Deed of Trust on land and improvements located at 23800 Malibu Crest Dr. Malibu, CA 90265 (APN 4458-024-038 in Los Angeles County) **2)** A Second (2nd) Priority Deed Of Trust junior only to Bank Hapoalim loan on land and improvements located at APNs 4458-018-039, 4458-018-037, 4458-018-038, 4458-018-906, 4458-018-035, 4458-018-041, 4458-018-036, 4458-018-907 in Los Angeles County **3)** A First (1st) Priority Deed of Trust on APN 081-021-005 in San Luis Obispo County and any other land and improvements in the vicinity owned by The BU Houses LLC **4)** A First (1st) Priority Deed of Trust on land and improvements located at 24689 Pacific Coast Highway, Malibu, CA 90265 (APN 4458-041-004) **5)** A Second (2nd) Priority Deed of Trust on land and improvements located at 27724 Pacific Coast Highway, Malibu, CA 90265 (APN 4460-031-012) **6)** A First (1st) Priority Deed of Trust on land and improvements located at 29215 Cliffside Dr. Malibu, CA 90265 **7)** A First (1st) Priority Deed of Trust on land and improvements located at 24266 Malibu Rd. Malibu, CA 90265 reaffirming the Deed of Trust already securing Lender's position which was recorded at the Los Angeles County Recorder on 5/21/2020 as Instrument #20200560367.

Documents evidencing or securing the Loan will be hereinafter referred to as the "Loan Documents." Any capitalized term not specifically defined herein shall have the meaning assigned to it in the Deeds of Trust.

E. The Note shall be further secured by a Continuing Guaranty executed and delivered to Lender concurrent with loan documents and executed by Scott Gillen, an Individual; per the terms and conditions contained therein.

NOW, THEREFORE, in consideration of the foregoing promises and other good and valuable consideration receipt of which is hereby acknowledged, the parties hereto, hereby agree as follows:

## ARTICLE 1 – COVENANTS OF BORROWER.

1.1 **Title to Properties**. Borrower warrants and covenants that they hold title to the properties at the close of escrow with no liens or encumbrances against the Properties except as disclosed in the Preliminary Title Report.

1.2 **Delinquent Property Taxes**. Borrowers warrant and covenant that they shall pay all delinquent property taxes, due or past due, including penalties and interest on the Properties from the proceeds of this Loan.

1.3 Maintenance and Preservation of the Properties. Borrower agrees (a) to keep the Properties in good condition and repair; (b) not to commit or permit any waste or deterioration of the Properties: (c) not to commit or permit any removal, demolition or substantial alteration of those Properties except for such alterations as maybe required by any law, ordinance, rule, regulation or order of any governmental authority having jurisdiction over the Properties; (d) to complete in good and workman like manner any construction or restoration which may be performed on the Properties; (e) to promptly restore any portion of the Properties which may be damaged or destroyed; (f) not to permit any mechanics' or material men's liens against the Properties; (g)not to initiate or acquiesce in any change of zoning or other land classification which affects the Properties without Lender's prior written consent; and (h) to perform each of the obligations set forth in the Note.

1.4 No Violation. Borrower shall not commit, permit or allow to exist any violation of any law, ordinance, rule, regulation or order of any governmental authority having jurisdiction over the Properties or the Collateral or any other matter of record affecting the Property or the Collateral.

1.5 Insurance.

Insurance Policies. Borrower shall, at all times, provide, maintain and keep in force insurance against fire, lightning and windstorm, vandalism, malicious mischief and such other hazards commonly covered by "extended coverage" or "all risks" policies for Borrower, The Properties, the Improvements and the collateral. All policies shall provide full replacement cost coverage, without coinsurance, but in no event less than the aggregate for the Improvements on the Land and shall be with such companies and on such forms as have been approved by Lender. Lender shall be named as an additional insured mortgagee/loss payee on all such policies. Borrower shall also provide, maintain, and keep in force earthquake insurance in an amount equal to the replacement value of the Property, the Improvements, and the collateral, and with a deductible no greater than five percent (5.00%), on which policy Lender shall be named as the mortgagee/ loss payee/ additional insured.

Evidence of Coverage. Borrower shall furnish to Lender an original certificate of each insurance policy as to the Properties and Borrower, and, at least thirty (30) days prior to expiration of any such policy, proof of issuance of a policy continuing in force the coverage provided by the expiring policy. If Borrower shall fail to maintain the insurance coverage required by the Loan Documents, Lender may (but shall be under no obligation to) take out the required policies of insurance and pay the premiums on the same and provide for payment thereof; and all amounts so advanced therefore by Lender shall become an additional obligation of Borrower to Lender, which amount, together with interest thereon from the date of payment at the Interest Rate then in effect (as defined and provided for in the Note). Borrower agrees to pay all such amounts within five (5) days of demand by Lender.

Casualty Notice. After the happening of any casualty or event insured against as required by the Deed of Trust, Borrower shall give prompt written notice thereof to Lender.

Assignment of Proceeds. Borrower hereby absolutely and unconditionally assigns to Lender all insurance proceeds which Borrower may be entitled to receive. All such proceeds shall be delivered to and held by Lender to be applied to Lender's expenses in settling, prosecuting or defending any insurance claim, and then, subject to the satisfaction of all of the conditions set forth below, to the restoration of any portion of the Properties and/or the Collateral that has been damaged or destroyed to the same condition, character and value as existed prior to such damage or destruction. The conditions to such use are: (a) an event which is, or with notice or the passage of time or both would constitute, an Event of Default shall not have occurred; (b) Lenders security is not materially impaired, as determined by Lender; (c) all in come from the Properties (from sales, leases, insurance or otherwise) required to pay all debt service and operating expenses of the Properties after such restoration will be equal to or greater than the income which was required to pay such debt service and operating expenses prior to the casualty; (d) Borrower provides evidence satisfactory to Lender that the insurance required to be maintained hereunder will be available to Borrower during restoration and thereafter; (e) Lender shall have

approved the plans and specifications for such restoration; and (f) if, in Lender's sole judgment, the insurance proceeds are not sufficient to accomplish restoration,: Borrower deposits with Lender, within five days of demand by Lender, the additional amounts necessary to accomplish restoration. Proceeds disbursed for restoration will be released to Borrower under the procedures of Lender's then current customary disbursement procedures. If any of the conditions set forth above are not satisfied or if Borrower fails to commence restoration of the Properties within thirty (30) days after receipt of such proceeds by Lender, or if Borrower fails to diligently pursue such restoration to completion, then Lender shall have the option to either apply the insurance proceeds upon any indebtedness secured hereby in such order as Lender may determine or release such proceeds to Borrower without such release being deemed a payment of any indebtedness secured hereby, rather than to apply such proceeds to the restoration of the Properties and/or the Collateral. Such application or release shall not cure or waive any Default or Event of Default or notice of default hereunder or invalidate any act done pursuant to such notice. If the Properties and/or the Collateral is restored at a cost less than the available insurance proceeds, if there are then no amounts due and payable under the Loan Documents, and if Borrower is not then in Default under the Loan Documents, then such excess proceeds shall be paid over to Borrower. Lender may commence, appear in, defend or prosecute any assigned claim or action, and may adjust, compromise, settle and collect all claims, proceeds and awards assigned to Lender, but shall not be responsible for any failure to collect any claim, proceeds or award, regardless of the cause of the failure. As used in this Section, the term "Lender" shall be deemed to include any parent company of Lender and/or its affiliates or subsidiaries.

(a) <u>Transfer of Policy.</u> In the event of the foreclosure of the Deed of Trust or other transfer of the title to the Properties in extinguishment, in whole or in part, of the indebtedness secured by the Deed of Trust, all right, title and interest of Borrower in and to any insurance policy then in force shall pass to the purchaser or grantee.

1.6 <u>Use of Proceeds.</u> Loan proceeds are intended to be used for business and commercial purposes and are not intended to be used for personal, family, or household purposes or in any manner which may result in the loan transaction not being exempt from Truth in Lending Act (TIL A) <u>15U.S.C.A. § 1602(h)</u> or any similar or applicable consumer lending laws.

## <u>ARTICLE 2 - IMPOUNDS, REIMBURSEMENTS AND MISCELLANEOUS.</u>

2.1 <u>Impounds.</u> Upon demand by Lender, Borrower shall pay to Lender on the first day of each month, together with and in addition to the regular installments of principal and interest due under the Note, until the indebtedness secured hereby is paid in full, an amount equal to one-twelfth (1/12) of the yearly taxes and assessments, insurance premiums, ground lease rentals and other similar charges as estimated by Lender to be sufficient to enable Lender to pay at least thirty (30) days before they become due, all taxes, assessments, insurance premiums, ground lease rentals and other similar charges against the Properties. Lender shall not be obligated to pay interest on any such sums. Upon demand of Lender, Borrower shall deliver to Lender such additional sums as are necessary to enable Lender to pay such taxes, assessments, insurance premiums and similar charges.

2.2 <u>Reimbursement</u>. Borrower shall pay immediately, without demand, after expenditure, all sums expended or expenses incurred by Trustee and/or Lender in acting under any of the terms of this Loan Agreement, the Deed of Trust or any other Loan Document, including, without limitation, any fees and expenses (including reasonable attorneys, fees) incurred in connection with any reconveyance of the
: Properties or any portion thereof, or to compel payment of the Note or any portion of the indebtedness evidence there by or in connection with any default thereunder, including without limitation attorneys, fees incurred in any bankruptcy or judicial or nonjudicial foreclosure proceeding, with interest from date of expenditure at the default rate provided for in the Note, and said sums shall be secured by the Deed of Trust.

2.3 <u>Lender's Statement Fee:</u> Borrower shall pay the amount demanded by Lender or its authorized Servicing agent for any statement regarding the obligations secured by the Deed of Trust; provided, however, that such amount

may not exceed the maximumamountallowed by law at the timerequest for the statement is made.

## ARTICLE 3 - CONDEMNATION.

3.1 Condemnation. If the Properties, the Collateral or any part thereof, is taken or damaged by reason of any public improvement or condemnation proceeding, or in any other manner, Lender shall be entitled to all compensation, awards and other payment or relief therefore to which Borrower shall be entitled, and shall be entitled at its option to commence, appear in and prosecute in its own name any action or proceeding or to make any compromise or settlement in connection with such taking or damage to the extent of the interests of Borrower therein, but Lender shall not be responsible for any failure to collect any claim or award, regardless of the cause of the failure. Borrower hereby absolutely and unconditionally assigns to Lender all such compensation, awards, damages, rights of action and proceeds to which Borrower shall been titled (the "Condemnation Proceeds"), and Lender shall, after deducting therefrom all itsreasonable expenses, including attorneys' fees, apply or release the Condemnation Proceeds with the same effect and as provided in Section 1.5(d) above, with respect to disposition of insurance proceeds; provided, however, that if there are any excess Condemnation Proceeds after application thereof to the restoration of the Properties or the Collateral, as applicable, Lender shall be entitled to apply such excess to the reduction of the principal balance due under the Note without any adjustment in the dollar amount of the regular installments due under the Note. Borrower agrees to execute such further assignments of the Condemnation Proceeds as Lender or Trustee may require. Nothing herein contained shall prevent the accrual of interest as provided in the Note on any portion of the Condemnation Proceeds to be applied to the principal balance due under the Note until the Condemnation Proceeds are received by Lender.

## ARTICLE 4 - PROTECTION OF PROPERTIES.

4.1 Preservation of Lien; Borrower shall do any and all acts which, from the character or use of the Properties or the Collateral, maybe reasonably necessary to protect and preserve the lien, the priority of the lien and the security of Lender granted by the Deed of Trust, the specific enumerations herein not excluding the general. All equipment and personal property, fixtures and other property subject to the lien of the Deed of Trust shall be fully paid for by Borrower and no security interest, Lien or other encumbrance other than the permitted exceptions, shall exist thereon.

4.2 Compliance with Properties Restrictions. Borrower will faithfully perform each and every covenant to be performed by Borrower under any lien or encumbrance upon or affecting the Properties or the Collateral, including, without limiting the generality hereof, mortgages, deeds of trust, Leases, declarations of covenants, easements, conditions and/or Restrictions (as defined below) and other agreements which affect the Properties, in law or in equity. A breach of or a default under any such lien or encumbrance shall constitute a default under the Deed of Trust.

## ARTICLE 5 - RESTRICTIONS ON TRANSFER.

5.1 Restrictions Upon Transfer and Further Encumbrance. In the event that the interest of Borrower in the Properties or the Collateral, or any part thereof, or any interest therein, is sold, agreed to be sold, conveyed, encumbered, alienated or otherwise transferred by Borrower, whether by operation of law or otherwise, the Note, irrespective of the maturity dates expressed therein, at the option of Lender, and without demand or notice, shall immediately become due and payable. In the event that Lender does not elect to declare the Note immediately due and payable, then, unless indicated otherwise in writing by Lender, Borrower shall nevertheless remain primarily liable for the obligations hereunder and under the Note and any other instrument securing the Note. This provision shall apply to each and every sale, transfer, encumbrance or conveyance, regardless whether or not Lender has consented to, or waived, Lender's rights hereunder, whether by action or non-action, in connection with any previous sale, transfer or conveyance. For the purposes hereof, a change in ownership of any portion of the beneficial interests of Borrower without the prior written consent of Lender shall be deemed a sale hereunder.

## ARTICLE 6 - EVENTS OF DEFAULT.

6.1 Payment Borrower fails to make any payment when due under this Note; including, but not limited to all principal, extension fees and the payment due on Maturity Date.

6.2 Other Defaults in Obligations to the Lender. Borrower fails to perform any other term, obligation, covenant, or condition contained in this Note or in any of the related documents or in any other agreement between Lender and Borrower.

6.3 Event of Default Under Related Documents. A default or event of default occurs under the terms of any promissory note, deed of trust; loan agreement; Personal Guaranty, pledge agreement; security agreement or other agreement ("Related Documents").

6.4 False Statement. Any statement, representation, or warranty which Borrower makes to Lender or is made on Borrower's behalf with respect to this Note or the Loan Documents as defined in the Trust Deed of even date as "Related Documents" is false or misleading in any material respect either when made or at any time thereafter. Borrower shall promptly disclose circumstances which make the statement false or misleading.

6.5 Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any of the secured property including, for example, a garnishment of any of Borrower's accounts with Lender or others. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and Borrower gives Lender written notice of the proceeding and deposits with Lender monies or a surety bond in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

6.6 Events Affecting Guarantor. Any of the preceding events of default occur with respect to any guarantor, endorser, surety or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

6.7 Death or Insolvency. The death of Borrower or, if Borrower is an entity, the dissolution or the termination of its right to do business or the cessation of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout or the commencement by Borrower of any proceeding under any bankruptcy or insolvency laws or the commencement of such proceedings by a creditor not dismissed within thirty (30) days.

Should an Event of Default occur, the compounded interest rate shall increase to fifteen percent (15%) per annum, compounded daily.

## ARTICLE 7-REPRESENTATIONS AND WARRANTIES.

7.1 Restrictions and Contracts. Borrower is familiar with all zoning matters, covenants, conditions, restrictions, easements, and all other matters affecting the title or use of the Properties (collectively the "Restrictions") that affectthe Properties and the contemplated us of the Properties. Borrower has obtained, or will be able to obtain,all permits, approvals, consents and other authorizations necessary under the Restrictions forsuch use. There is no violation or asserted violation of any Restrictions concerning any of the Properties or the existing or contemplated use thereof. Borrower is not aware of any action or proceeding pending or threatened before any court or governmental agency with respect to the validity of any such Restrictions or any of such authorizations or permits.

7.2 **Non-Foreign Entity;** Tax Identification Number. Section 1445 of the Internal Revenue Code of 1986, as amended (the "Code"), provides that a transferee of a real property interest in the United States must withhold tax if the transfer or is a foreign person. To inform Lender that the withholding of tax will not be required in the event of a disposition of the Properties pursuant to the terms of this Agreement and the Deed of Trust, Borrower hereby certifies that Borrower is not a foreign person, foreign corporation, foreign partnership, foreign trust or foreign estate (as such terms are defined in the Code and the regulations promulgated thereunder) and that its principal place of business is at the address set forth for notices to Borrower below. Lender may disclose the contents of this certification to the Internal Revenue Service.

7.3 **Commercial Purpose.** Borrower intends to use the Loan proceeds solely for business or commercial proposes and does not presently intend to use any *portion* of the loan proceeds for personal, family or household purposes. The Properties are not occupied by the Borrower as the Borrower's principal residence. The extension of the loan contemplated by this Loan Agreement does not constitute *"Consumer credit"* as said tenns defined in 12 CFR Ch. II PART 226—TRUTH IN LENDING (REGULATION Z).

**ARTICLE 8 – MISCELLANEOUS.**

8.1 **Loan Fees, Costs and Prepaid Interest**. Interest rate shall be 12% (Twelve Percent) per annum, compounded daily. Compounded interest is the addition of interest to the principal sum of a loan or deposit, or in other words, interest on interest. It is the result of reinvesting interest, rather than paying it out, so that interest in the next period is then earned on the principal sum plus previously accumulated interest. As Borrower will be making periodic draw requests, Borrower shall only be responsible for paying interest on actual money borrowed. Lender reserves the right to deny draw if draw does not match draw schedule.

8.2 **Successors in Interest and Interpretation**. This Loan Agreement applies to, inures to the benefit of, and binds all parties here to, their heirs, legatees, devisees administrators, executors, successors and assigns. The term "Lender" shall mean the owner and holder, including pledgees, of the Note, now or hereafter and whether or not named as Lender herein. In this Loan Agreement, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural the word "person" shall include corporation, partnership or other form of association. Any reference in this Loan Agreement to any document, instrument or agreement creating or evidencing an obligation secured hereby shall include such document, instrument or agreement both as originally executed and as it may from time to time be modified.

8.3 **Severability.** If any provision hereof should be held unenforceable or void, then such provision shall be deemed separable from the remaining provisions and shall in no way affect the validity of this Loan Agreement.

8.4 **Notices.** All notices and demands expressly provided hereunder to be given by Lender to Borrower and all notices, demands and other communications of any kind or nature whatever which Borrower may be required or may desire to give to or serve on Lender shall be in writing, shall be addressed to the appropriate address set forth in this section, or at such other place as Borrower. Lender or Trustee, as the case may be, may from time to time designate in writing by ten (10) days prior written notice and shall be (a) hand- delivered, effective upon receipt, (b) sent by United States Express Mail or by private Overnight courier, effective upon receipt, or (c) served by certified mail, return receipt requested, deposited in the United States mail. with postage thereon fully prepaid and addressed to the party so to be served and shall be deemed effective on the day of actual delivery as shown by the addressee's return receipt or the expiration of three (3) business days after the date of mailing, whichever is the earlier in time. The addresses of the parties are as follows:

To Borrower: ____________________________

____________________________

____________________________

To Lender: BOBS LLC
600 S. Spring St. #106
Los Angeles, CA 90014

8.5 **Obligations of Borrower Joint and Several**. If more than one person or entity has executed this Loan Agreement as "Borrower", the obligations of all such persons/entities hereunder shall be joint and several.

8.6 **Representative Capacity**. If Borrower is an entity other than an individual, the person signing on behalf of the entity warrants and represents that they have the full authority to execute the Loan Documents on behalf of the entity and that no other consent or permission is required from any other person or entity to bind the Borrower. The signator hereby agrees to defend, indemnify, and hold harmless the Lender from any and all claims, demands, costs or expenses, including attorney's fees, which may be incurred as the result of a claim by a third party that the signator lacked the authority to sign the Loan Documents on behalf of the Borrower.

8.7 **Further Assurances and further Execution and Delivery of Documents.** Borrower agrees to execute, acknowledge and deliver such documents and take such action as Lender shall determine at any time to be necessary or desirable to further evidence, perfect or continue the perfection and/or the priority of any lien or security interest granted by Borrower or to carry out the intent of any of the provisions of the Loan Documents

8.8 **Title Exceptions:** Borrower shall not impose any restrictive covenants, easements, rights of way or encumbrances upon the Properties without the prior written consent of Lender.

8.9 **Provide Notices**

(a) **Injunction Defense and Notice:** If any proceedings are filed seeking to enjoin or otherwise prevent or declare invalid or unlawful the construction of any Improvements or the occupancy, maintenance or operation of the Properties or the Improvements or any portion thereof, Borrower will give prompt written notice thereof to Lender and will cause such proceedings to be vigorously contested in good faith and, in the event of any adverse ruling or decision, prosecute all allowable appeals.

(b) **Notices Received:** Borrower shall comply with and promptly furnish to Lender true and complete copies of any notices by any Governmental Agency which exercises jurisdiction over Borrower or the Properties which notices, or the conditions described therein could adversely affect the Properties or Improvements. Borrower shall promptly notify Lender of any fire or other casualty causing a loss of $10.000 or more or any notice of taking or eminent domain proceeding, affecting any Properties. Borrower shall promptly notify Lender of any action, proceeding or investigation of the nature described in Section 8.8 (a) above of which it acquires notice.

**Permits and Warranties:** Promptly upon request by Lender, Borrower shall furnish Lender with true and complete copies of all licenses, permits, approvals, exemptions and other authorizations required in connection with any Properties and (b) all warranties and guaranties received from any party furnishing labor, materials, equipment, fixtures or furnishings in connection with any Properties.

8.10 **Attorneys' Fees**. Upon election of either Lender or Trustee so to do, employment of an attorney is authorized, and payment by Borrower of all attorneys' fees, costs and expenses in connection with any action or actions (including the cost of evidence or search of title) which may be brought for the foreclosure of the Deed of Trust, for possession of the Properties covered hereby, for the appointment of a receiver, and/or for the enforcement of any covenant or right in the Deed of Trust or any other Loan Document contained as hereinafter provided, shall be the obligation of Borrower and shall be secured by the Deed of Trust.

8.11 **Headings.** The headings of each paragraph are for convenience only and shall be disregarded in construing this Loan Agreement

8.12 **No Partnership; Indemnity.** Lender shall not be deemed *to* be a partner, joint venturer,. alter-ego, manager, controlling person or other business associate or participant of any kind of or with Borrower or any other Partnership in connection with the Loan or any action taken under this Loan Agreement. Lender's activities in connection with the Loan shall not be "outside the scope of the activities of a lender of money" within the meaning of California Civil Code section 3434, as modified or recodified from time to time, and Lender does not intend to ever assume any responsibility to any person for the quality or safety of the Properties or the Improvements. Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of Borrower. Borrower shall indemnify, hold Lender harmless and defend Lender from and against any and all loss, cost, damage, expense or liability, including reasonable attorneys' fees, arising out of or resulting from the Properties or Improvements The provisions of this Sections shall survive payment of the Loan.

8.13 **Governing Law.** This Loan Agreement shall be construed and enforced in accordance with the laws of the State of California. Any and all disputes between the parties which may arise pursuant to this Loan Agreement shall be heard and determined pursuant to the Arbitration Agreement being executed by the parties concurrently with this Loan Agreement. The parties hereto acknowledge that the Arbitrator bas the jurisdiction to interpret and enforce the provisions of *this* Loan Agreement, and the parties waive any and all objections that they may have as to jurisdiction or venue.

8.14 **Waiver of Jury Trial.** In the event of a dispute between the Parties hereto or their representatives concerning any provision of this Agreement or the rights and duties of any person or entity hereunder, the Parties knowing and intentionally waive their right to a jury trial to the extent permissible under California law.

8.15 **Entire Agreement** This Loan Agreement, together with the other Loan Documents constitute the parties' entire agreement with respect to the subject matter hereof and supersede all agreements, representations, warranties, statements, promises, and understandings, whether oral or written, with respect to the subject matter herewith. None of the Loan Documents may be amended, altered, or modified except by a writing signed by Lender, or its assigns, and then only to the extent therein specially set forth.

**Properties Condition Assessment Report**. As a condition precedent to Lender's obligation to make the initial disbursement of the Loan proceeds, Lender shall have received a property condition assessment report satisfactory to Lender prepared by an independent third party.

8.16 **Representation by Counsel.** Borrower acknowledges and represents that they have been advised to seek the advice of counsel of their choosing to advise them and/or represent them with regard to this transaction and any decision not to seek counsel is being made of tileir own personal volition.

8.17 **Execution of Further Documentation** Borrower acknowledges and agrees, upon reasonable notice from Lender, to execute and deliver any and all additional documents reasonably required by Lender relating in any way to the Loan and the Loan Documents at anytime throughout the term of this Loan and at any time while balances remain due and outstanding under the Loan and the Loan Documents.

## ARTICLE 9- LENDER'S FURTHER CONDITIONS PRECEDENT TO FUNDING

9.1 **Conditions.** The effectiveness of this Agreement shall be subject to the following conditions precedent being met to Lender's satisfaction, or Lender's waiver in writing of any such conditions precedent that remain unsatisfied. Each condition is for the exclusive benefit of Lender, and only may be waived by Lender, but any waiver must be in writing and signed by Lender in order to be effective. The "effective date" of this Agreement shall be the date all of the conditions set forth in this paragraph are met to Lender's satisfaction or waived in writing by Lender.

(a) The Loan Documents shall have been duly executed by Borrower and delivered to Lender.

(b) The Continuing Guaranty shall have been executed by Guarantors and delivered to Lender.

(c) Borrower's delivery of written verification satisfactory to Lender that they are noting default of any of the notes and loan documents relative to loans which are secured by liens against the Properties superior to the Lender's lien.

(d) Lender shall have received an ALTA Lender's Policy issued to Lender insuring the priority of the Deed of Trust (the "Title Policy"), which Policy must be acceptable in form and content to Lender and which policy must provide Lender with assurance that there are no liens or encumbrances against the Properties that are not permitted pursuant to the Title Policy which have not otherwise been approved in writing by Lender. Said Title Policy shall provide that Lender's liens shall be superior to any and all mechanics liens.

(e) Lender shall have received satisfactory confirmation that it has been named mortgage holder/loss payee on Borrower's property and casualty policy.

**SIGNATURES ON NEXT PAGE:**

**BORROWER:**

23800 Malibu Crest LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

690 Spring LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

Cliffside Dume LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial interest

The Malibu Road #3 LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

The BU Houses LLC by Scott Gillen (C64829 LLC) who holds an undivided 40% beneficial ownership interest

Green Milk LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial interest

# EXHIBIT G

# DEED OF TRUST

This Deed of Trust, made this 1st day of March 2021, among the Trustor, **23800 MALIBU CREST LLC**, a California Limited Liability Company, **600 SPRING LLC**, a California Limited Liability Company, **THE BU HOUSES LLC**, a California Limited Liability Company, **CLIFFSIDE DUME** LLC, a California Limited Liability Company, **Malibu Road #3 LLC**, a California Limited Liability Company and **GREENMILK LLC** (herein jointly and collectively referred to as "Borrower"), BOBS, LLC, a Nevada Limited Liability Company as to an undivided 100.000% Interest (herein "Lender") and BOBS, LLC, a Nevada Limited Liability Company (herein "Trustee").

The beneficiaries (or assignees) of this deed of trust have agreed in writing to be governed by the desires of the holders of more than 50% of the record beneficial interest therein with respect to actions to be taken on behalf of all holders in the event of default or foreclosure or for matters that require direction or approval of the holders, including designation of the broker, servicing agent, or other person acting on their behalf, and the sale, encumbrance or lease of real property owned by the holders resulting from foreclosure or receipt of a deed in lieu of foreclosure.

**GRANT IN TRUST**

BORROWER, in consideration of the indebtedness herein recited and the trust herein created as evidenced by Promissory Note of even date as this Deed of Trist, irrevocably grants, transfers, conveys and assigns to Trustee, in trust, with power of sale, a Deed with security that is cross-collateralized by:

1) A FIRST (1ST) Position Deed of Trust on 23800 Malibu Crest Dr. Malibu, CA 90265 (APN 4458-024-038 in Los Angeles County).

2) A SECOND (2ND) Position Deed of Trust on the "Case Properties" comprising APNs 4458-018-039, 4458-018-037, 4458-018-038, 4458-018-906, 4458-018-035, 4458-018-041, 4458-018-036, 4458-018-907 in Los Angeles County.

3) A FIRST (1ST) Position Deed of Trust on the "Bu House Properties" (APN 081-021-005) in San Luis Obispo County.

4) A FIRST (1ST) Position Deed of Trust on 29215 Cliffside Dr. Malibu, CA 90265 (APN 4468-003-005)

5) A FIRST (1ST) Position Deed of Trust on 24266 Malibu Rd. Malibu, CA 90265 comprising APNs 4458-011-010 and 4458-011-011

6) A FIRST (1ST) Position Deed of Trust on the "Greenmilk Property" (APN 080-021-005) in San Luis Obispo County.

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents (subject however to the rights and authorities given herein to Lender to collect and apply such rents), royalties, mineral, oil and gas rights and profits, water, and water rights, and water stock, and all fixtures now or hereafter attached to the property, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the property covered by this Deed of Trust; and all of the foregoing, together with said property (or the leasehold estate if this Deed of Trust is on a leasehold) are herein referred to as the "Property". **THIS DEED OF TRUST IS MADE TO SECURE TO LENDER:** a) the repayment of the indebtedness evidenced by Borrower's note (herein "Note") dated the same date as this Deed of Trust, in the principal sum of U.S. **Two Hundred Sixty Million Dollars ($260,000,000.00)**, with payment of interest thereon, the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Deed of Trust: the performance of the covenants and agreements of Borrower herein contained: and (b) repayment of any future advances, with interest thereon, made to the Borrower by Lender pursuant to paragraph 19 hereof (herein "Future Advances"); and in addition (c) this Deed of Trust shall provide the same security on behalf of the Lender, to cover extensions, modifications or renewals, including without limitation, extensions, modifications or renewals of the Note at a different rate of interest; and the performance of the covenants and assessments, if any) which may attain priority over this Deed of Trust, and ground rents on the Property, if any, , all as reasonably estimated initially and from time to time by Lender on the basis of assessments and

bills and reasonable estimates thereof. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional Lender.

If Borrower pays Funds to Lender, the Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a Federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay said taxes, assessments, insurance premiums and ground rents. Lender may not charge for so holding and applying the Funds, analyzing said account or verifying and compiling said assessments and bills, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing at the time of execution of this Deed of Trust that interest on the Funds shall be paid to Borrower, and unless such an agreement is made or applicable law requires such interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Deed of Trust.

If the amount of Funds held by Lender, together with the future monthly installments of Funds payable prior to the due dates of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents, such excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly installments of Funds. If the amount of the Funds held by Lender shall not be sufficient to pay taxes, assessments, insurance premiums and ground rents as they fall due, Borrower shall pay to Lender any amount necessary to make up the: deficiency in one or more payments as Lender may require.

Upon payment in full of all sums secured by this Deed of Trust, Lender shall promptly refund to Borrower any Funds held by Lender. If under Paragraph 18 hereof the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Deed of Trust.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, if applicable, then to interest payable on the Note, then to the principal of the Note, and then to interest and principal on any Future Advances.

**4. Prior Mortgages and Deeds of Trust; Liens.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid, at least 10 days before delinquency, all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Deed of Trust, and leasehold payments or ground rents, if any.

**5. Hazard Insurance.** Borrower agrees to provide, maintain and deliver to Lender fire insurance satisfactory and with loss payable to Lender. The amount collected under any fire or other insurance policy may be applied by Lender upon any indebtedness secured hereby and in such order as Lender may determine, or at option of Lender the entire amount so collect, or any part thereof may be released to the Borrower. Such application or release shall not cure or waive any Default or Notice of Default hereunder or invalidate any act done pursuant to such notice.

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust.

In the event of a loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is abandoned by Borrower, or if Borrower rails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply their insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Deed of Trust.

If Borrower obtains earthquake, flood or any other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by the Lender, then such insurance shall: (i) name the Lender as loss payee thereunder, and (ii) be subject to all of the provisions of this paragraph 5.

**6. Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Deed of Trust is on a leasehold. If this Deed of Trust is on a unit in a condominium or a planned unit development,

Borrower shall perform all of Borrower's obligations under the declaration of covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

**7. Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Deed of Trust, or if any action or proceeding is commenced which affects Lender's interest in the Property, including but not limited to proceedings by the Lender to obtain relief from stay in any bankruptcy proceeding which would prohibit Lender enforcing its rights under she Deed of Trust, then Lender, at Lender's option, may make such appearances, disburse such sums, including reasonable attorney's fees, and take such action as is necessary to protect Lender's interest. If Lender required mortgage insurance as a condition of making the loan secured by this Deed of Trust, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with the Borrower's and Lender's written agreement or applicable law.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, including but not limited to payment of delinquent taxes and assessments, insurance premiums due, and delinquent amounts owed to prior lien holders, shall become additional indebtedness of Borrower secured by this Deed of Trust. Such amounts as are disbursed by Lender shall be payable, upon notice from Lender to Borrower requesting payment thereof, and shall bear interest from the date of disbursement at the rate payable on the Note. Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.

**8. Inspection.** Lender may make or cause to be made reasonable entries upon and inspection of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefore related to Lender's interest in the Property.

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in conjunction with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust.

**10. Borrower Not Released.** At any time or from time to time, without liability therefore and without notice upon written request of Lender and presentation of this Deed and said Note for endorsement, and without affecting the personal liability of any person for payment of the indebtedness secured hereby, Trustee may: reconvey any part of said property; consent to the making of any map or plat thereof, join in granting any easement thereon; or join in any extension agreement or any agreement subordinating the lien or charge thereof. Trustee may, but shall be under no obligation or duty to, appear in or defend any action or proceeding purporting to affect said property or the title thereto, or purporting to affect the security heretofore the rights or powers of Lender or Trustee.

**11. Forbearance by Lender Not a Waiver.** Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy. The procurement of insurance or the payment of taxes or other liens or charges by Lender shall not be a waiver of Lender's right to accelerate the maturity of the indebtedness secured by this Deed of Trust.

**12. Remedies Cumulative.** All remedies provided in this Deed of Trust are distinct and cumulative to any other or remedy under this Deed of Trust or afforded by law or equity, and may be exercised concurrently, independently or successively.

**13. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 18 hereof. All covenants and agreements of Borrower shall be joint and several.

**14. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Deed of Trust shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower or the Property at 3806 Cross Creek Road, Suite C, Malibu, CA 90265 or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail to Lender, in care of Lender's Servicing Agent ("Agent"), BOBS LLC, LLC located at 600 S. Spring St. Unit Office Los Angeles CA 90014 or to such other address as Lender or Agent may designate by notice to Borrower as provided herein. Any notice provided for in this Deed of Trust shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**15. This Deed of Trust shall be governed by the Laws of the State or California.** In the event that any provision or clause of this Deed of Trust or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Deed of Trust or the Note which can be given effect without the conflicting provision, and to this end the provisions of the Deed of Trust are declared to be severable.

**16. Intentionally Deleted.**

**BORROWER AND LENDER FURTHER COVENANT AND AGREE AS FOLLOWS:**

**17. Assignment of Rents; Appointment of Receiver; Lender In Possession.** As additional security hereunder, and without regard to the adequacy of any security for the indebtedness hereby secured, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under

paragraph 18 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 18 hereof or abandonment of the Property, Lender, in person, by Agent or by judicially appointed receiver shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorney's fees, and then to the sums secured by this Deed of Trust. Lender and the receiver shall be liable to account only for those rents actually received.

**18. Default.** Upon an Event of Default under the Loan Agreement of even date between Borrower and Lender, Lender may declare all sums secured hereby immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written Notice of Default and of election to cause to be sold said property, which notice Trustee shall cause to be filed for record. Trustee shall be entitled to rely upon the correctness of such notice. Lender also shall deposit with Trustee this Deed, said Note and all documents evidencing expenditures secured hereby. After the lapse of such time as then may be required by law following the recordation of said Notice of Default and Notice of Sale having been given as then required by law, Trustee, without demand on Trustor, shall sell said property at the time and place fixed by it in said Notice of Sale, either as a whole or in separate parcels and in such order as it may determine (but subject to any statutory right of Trustor to direct the order in which said property, if consisting of several lots or parcels, shall be sold), at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of said property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement. Trustee shall deliver to such purchaser its deed conveying the property to sold, but without any covenant or warranty, expressed or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person including Trustor, Trustee, or Beneficiary as hereinafter defined, may purchase at such sale.

After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of, all sums expended under the terms hereof, not then repaid, with accrued interest at the rate prescribed in the Note; all other sums then secured thereby; and the remainder, if any, to the person or persons legally entitled thereto.

**19. Future Advances.** Upon request of Borrower, Lender, at Lender's option prior to full reconveyance of the Property by Trustee to Borrower, may make Future Advances to Borrower. Such advances with interest thereon shall be secured by this Deed of Trust when evidenced by promissory notes stating that said notes are secured hereby.

**20. Reconveyance.** Upon written request of Lender stating that all sums secured hereby have been paid, and upon surrender of this Deed and said Note to Trustee for cancellation and retention and upon payment of its fees, Trustee shall reconvey, without warranty, the property then held hereunder. The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof. The grantee in such reconveyance may be described as "the person or persons legally entitled thereto." The Trustee may destroy said Note, this Deed of Trust (and any other documents related thereto) upon the first to occur of the following: 5 years after issuance of a full reconveyance; or, recordation of the Note and Deed of Trust in a form or medium which permits their reproduction for 5 years following issuance of a full reconveyance.

**21. Substitution of Trustee.** Lender, at Lender's option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon the Trustee herein and by applicable law.

**22. Request for Notices.** Borrower requests that copies of the notice of sale and notice of default be sent to Borrower's address which is the Property Address.

**23. Statement of Obligation.** Lender may collect a fee, not to exceed the maximum amount permitted by law, for furnishing the statement of obligations as provided by Section 2943 of the Civil Code of California.

**24. MISCELLANEOUS PROVISIONS:**

**0.** **Construction or Home Improvement Loan.** If the loan secured by this Deed of Trust is a construction or home improvement loan, Borrower is required to perform according to the terms and conditions of each agreement contained in any building, home improvement or similar agreement between the Borrower and Lender.

**1.** **Acceptance by Lender or a Partial Payment After Notice of Default.** By accepting partial payment (payments which do not satisfy a default or delinquency in full) of any sums secured by this Deed of Trust after a Notice of Default has been recorded, or by accepting late performance of any obligation secured by this Deed of Trust, or by adding any payment so made to the loan secured by this Deed of Trust, whether or not such payments are made pursuant to a court order, the Lender does not waive its right either to require prompt payment when due of all other sums so secured or to declare default for failure to make any such prompt payment or to perform any such act. No exercise of any right or remedy of the Lender or Trustee under this Deed of Trust shall constitute a waiver of any other right or remedy contained in this Deed of Trust or provided by law.

**2.** **Partial Reconveyance. Borrower shall have the right to sell or refinance each collateralized property separately and receive partial reconveyance by Lender of those properties.**

3. **NO RECORDATION. This Deed of Trust shall not be recorded**

IN WITNESS WHEREOF, BORROWER HAS EXECUTED THIS DEED OF TRUST

BORROWER:

23800 Malibu Crest LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

600 Spring LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

Cliffside Dume LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial interest

The Malibu Road #3 LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial ownership interest

The BU Houses LLC by Scott Gillen (C64829 LLC) who holds an undivided 40% beneficial ownership interest

Green Milk LLC by Scott Gillen (C64829 LLC) who holds an undivided 50% beneficial interest

**CALIFORNIA ACKNOWLEDGMENT** **CIVIL CODE § 1189**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On 3/15/2021 before me, Sarah Fabela, Notary Public,
*Date* *Here Insert Name and Title of the Officer*

personally appeared Scott Grillen
*Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

SARAH FABELA
Notary Public - California
Los Angeles County
Commission # 2334264
My Comm. Expires Sep 25, 2024

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature [signature]
*Signature of Notary Public*

*Place Notary Seal and/or Stamp Above*

**OPTIONAL**

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: ____

Document Date: ____ Number of Pages: ____

Signer(s) Other Than Named Above: ____

**Capacity(ies) Claimed by Signer(s)**

| Signer 1 | Signer 2 |
|---|---|
| Signer's Name: ____ | Signer's Name: ____ |
| ☐ Corporate Officer – Title(s): ____ | ☐ Corporate Officer – Title(s): ____ |
| ☐ Partner – ☐ Limited ☐ General | ☐ Partner – ☐ Limited ☐ General |
| ☐ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian or Conservator | ☐ Trustee ☐ Guardian or Conservator |
| ☐ Other: ____ | ☐ Other: ____ |
| Signer is Representing: ____ | Signer is Representing: ____ |

©2018 National Notary Association

# EXHIBIT H

# CONTINUING GUARANTY

THIS CONTINUING GUARANTY ("Guaranty"), dated as of August 25th, 2020 is made by **Scott Gillen** (referred to herein as "Guarantor") in favor of Bobs LLC, a Nevada Limited Liability Company ("Lender"). All Guarantors shall be jointly and severably liable for all obligations in these Loan Documents.

## RECITALS:

A. MLR MALIBU, LLC, an Oregon Limited Liability Company, 23800 MALIBU LLC, a California Limited Liability Company, 600 SPRING LLC, a California Limited Liability Company, THE BU HOUSES LLC, a California Limited Liability Company, CLIFFSIDE DUME LLC, a California Limited Liability Company, Malibu Road #3, a California Limited Liability Company and **Paradise Cove Malibu LLC** (all LLC's above shall be jointly and collectively referred to as "Borrower") has borrowed from Lender's revolving line of credit the amount of $250,000,000 (Two Hundred Fifty Million Dollars) hereinafter referred to as ("Loan") to finance various construction and land acquisition ventures. The Loan will be evidenced by a Promissory Note ("Note") dated as of the same date as this Guaranty and executed by Borrower in favor of Lender which loan will be secured by, among other security and documents, a Deed of Trust and Assignment of Rents, dated as of the same date as this Guaranty (referred to herein as "Deed of Trust"), executed by Borrower in favor of Lender, and covering all real property described in the Note and Deed of Trust and UCC-1 filings to be recorded describing personal property (referred to herein as "Property"). Collectively, all such documents signed by Borrower to secure the above described indebtedness are to be known as the ("Loan Documents").

B. As a condition to making the Loan, Lender has required that Guarantors execute and deliver this Guaranty.

NOW, THEREFORE, in order to induce Lender to enter into the Loan Agreement and to make the Loan, and in consideration thereof, Guarantors hereby agrees as follows:

### Section 1. Guaranty

Guarantors absolutely and unconditionally guarantee the punctual payment when due, whether at stated maturity, by acceleration, or otherwise, of all obligations of Borrower now or later existing under the Loan Documents (defined in the Deed of Trust) whether for principal, interest, fees, expenses, or otherwise including, without limitation, all real property taxes and assessments affecting the Property, all costs and expenses, including insurance premiums, of maintaining in full force all policies of insurance required pursuant to the Deed of Trust, and all costs and expenses, including repair and maintenance costs, required in order to maintain the Property in the condition required under the Deed of Trust ("Obligations"). The terms "indebtedness" and "obligations" are used in their most comprehensive sense and include all debts, obligations, and liabilities of Borrower incurred or created, with or without notice to Guarantors, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, whether Borrower is liable individually or jointly with others, and whether recovery on any indebtedness or obligations is now or later becomes barred by any statute of limitations or is or later becomes otherwise unenforceable.

### Section 2. Guaranty Absolute.

(a) Guarantors guarantee that the Obligations will be paid and performed strictly in

accordance with the terms of the Loan Documents, regardless of any law, regulation, or order now or later in effect in any jurisdiction affecting any of the terms or the rights of Lender with respect to that. The liability of Guarantors under this Guaranty will be absolute and unconditional irrespective of:

(i) any lack of validity or enforceability of any of the Loan Documents (or any other agreement or instrument relating to the Loan Documents);

(ii) any change in the time, manner, or place of payment of, or in any other term of, any of the Obligations, or any other amendment or waiver of or any consent to departure from any of the Loan Documents, including, without limitation, changes in the terms of disbursement of the Loan proceeds or repayment, modifications, extensions (including extensions beyond and after the original term), or renewals of payment dates, changes in interest rate, or the advancement of additional funds by Lender in its discretion;

(iii) any exchange, release, or non-perfection of any collateral, or any release or amendment or waiver of or consent to departure from any other guaranty, for any of the Obligations; or

(iv) any other circumstance that might otherwise constitute a defense available to, or a discharge of, Borrower in respect of the Obligations of Guarantors under this Guaranty.

(b) Regardless of any termination of this Guaranty or the cancellation of the Note or any other agreement evidencing the Obligations, if at any time any payment of any of the Obligations (from any source) is rescinded, repaid, or must otherwise be returned by Lender due to the insolvency, bankruptcy, or reorganization of Borrower or Guarantors, or for any other circumstance, this Guaranty will continue to be effective or be reinstated, as the case may be, as though that payment had not been made.

**Section 3. Guaranty Independent; Waivers.**

(a) Guarantors agrees that:

(i) the obligations under this Guaranty are joint and several and are independent of and in addition to the undertakings of Borrower pursuant to the Loan Documents, any evidence of indebtedness issued in connection with the Loan, any deed of trust or security agreement given to secure the Loan, any other guarantees given in connection with the Loan, and any other obligations of Guarantors to Lender;

(ii) a separate action may be brought to enforce the provisions of this Guaranty whether Borrower is a party in any action or not;

(iii) Lender may at any time, or from time to time, in its sole discretion:

(A) extend or change the time of payment or performance or the manner, place, or terms of payment or performance of any of the Obligations;

(B) exchange, release, or surrender any of the collateral security, or any part of it, by whomever deposited, which is now or may later be held by Lender in connection with any of the

Obligations;

(C) sell or purchase any of the collateral at public or private sale, or at any broker's board, in the manner permitted by law, and after all costs and expenses of every kind for collection, sale, or delivery, the net proceeds of any sale may be applied by Lender on any of the Obligations; and

(D) settle or compromise with Borrower, or any other person liable, any of the Obligations, or subordinate the payment of it, or any part of it, to the payment of any other debts or claims, that may at any time be due or owing to Lender or any other person or corporation; and

(iv) Lender will be under no obligation to marshal any assets in favor of Guarantors or in payment of any of the Obligations.

(b) Guarantors waive:

(i) presentment, demand, protest, notice of acceptance, notice of dishonor, notice of nonperformance, and any other notice with respect to any of the Obligations and this Guaranty, and promptness in commencing suit against any party, or in giving any notice to or making any claim or demand on Guarantors;

(ii) any right to require Lender to proceed against Borrower, proceed against or exhaust any security held from Borrower, or pursue any remedy in Lender's power;

(iii) any defense based on any legal disability or other defense of Borrower, any other guarantors, or other person or by reason of the cessation or limitation of the liability of Borrower from any cause other than full payment of all sums payable under the Note and the performance of the other Obligations;

(iv) any defense based on any lack of authority of the officers, directors, partners, or agents purporting to act on behalf of Borrower or any principal of Borrower or any defect in the formation of Borrower or any principal of Borrower;

(v) to the fullest extent permitted by law; all rights and benefits under Civ. Code §2809 purporting to reduce a guarantors' obligations in proportion to the principal obligation;

(vi) any defense based on the application by Borrower of the proceeds of the Loan for purposes other than the purposes represented by Borrower to Lender or intended or understood by Lender or Guarantors;

(vii) any defense it may acquire by reason of Lender's election of any remedy against it or Borrower or both, including, without limitation, election by Lender to exercise its rights under the power of sale in the Deed of Trust and the consequent loss by Guarantors of the right to recover any deficiency from Borrower;

(viii) any defense based on Lender's failure to disclose to Guarantors any information concerning Borrower's financial condition or any other circumstances bearing on Borrower's ability to pay all sums payable under the Note or any of the other Obligations;

(ix) any defense based on any statute or rule of law that provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal;

(x) any defense based on Lender's election, in any proceeding instituted under the Federal Bankruptcy Code, of the application of Section 1111 subd. (b)(2) of the Federal Bankruptcy Code or any successor statute;

(xi) any defense based on any borrowing or any grant of a security interest under §364 of the Federal Bankruptcy Code;

(xii) any right of subrogation, contribution, or reimbursement against Borrower, any right to enforce any remedy that Lender has or may in the future have against Borrower, any other right that Lender may now or later acquire against Borrower that arises from the existence or performance of Guarantors' obligations under this Guaranty or would arise with respect to the Obligations, and any benefit of, and any right to participate in, any security for the Obligations now or in the future held by Lender;

(xiii) the benefit of any statute of limitations affecting the liability of Guarantors or the enforcement of the Guaranty, including, without limitation, any rights arising under Code Civ. Proc. §359.5; and

(xiv) to the fullest extent permitted by law, all rights and benefits under Code Civ. Proc. §580a, purporting to limit the amount of any deficiency judgment that might be recoverable following the occurrence of a trustee's sale under a deed of trust; Code Civ. Proc. §580b, stating that no deficiency may be recovered on a real property purchase money obligation; and Code Civ. Proc. §580d, stating that no deficiency may be recovered on a note secured by a deed of trust on real property in case the real property is sold under the power of sale contained in the deed of trust, if those statutory sections have any application.

Guarantors agree that the payment of all sums payable under the Note or any of the other Obligations or any other act that tolls any statute of limitations applicable to the Note or the other Obligations will similarly operate to toll the statute of limitations applicable to Guarantors' liability. Without limiting the generality of the foregoing or any other provision of this Guaranty, Guarantors expressly waive all benefits that might otherwise be available to Guarantors under Civ. Code §§2809, 2810, 2819, 2839, 2845, 2849, 2850, 2899, and 3433, Code Civ. Proc. §§580a, 580b, 580d, and 726, or similar sections.

(c) Guarantors waives all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Guarantors' rights of subrogation and reimbursement

against the principal by the operation of Code Civ. Proc. §580d or otherwise. Furthermore, Guarantors understand and acknowledge that if Lender forecloses judicially or nonjudicially against any real property security for the Loan, that foreclosure could impair or destroy any ability that Guarantors may have to seek reimbursement, contribution, or indemnification from Borrower or others based on any right Guarantors may have of subrogation, reimbursement, contribution, or indemnification for any amounts paid by Guarantors under this Guaranty. Guarantors further understand and acknowledge that in the absence of this provision, the potential impairment or destruction of Guarantors' rights, if any, may entitle Guarantors to assert a defense to this Guaranty based on Code Civ. Proc. §580d, as interpreted in Union Bank v. Gradsky, 265 Cal. App. 2d 40, 71 Cal. Rptr. 64 (2d Dist. 1968). By executing this Guaranty, Guarantors freely, irrevocably, and unconditionally:

(i) waives and relinquishes that defense, and agrees that Guarantors will be fully liable under this Guaranty even though Lender may foreclose judicially or nonjudicially against any real property security for the Loan;

(ii) agrees that Guarantors will not assert that defense in any action or proceeding that Lender may commence to enforce this Guaranty;

(iii) acknowledges and agrees that the rights and defenses waived by Guarantors under this Guaranty include any right or defense the Guarantors may have or be entitled to assert based upon or arising out of any one or more of Code Civ. Proc. §§580a, 580b, 580d, or 726, or Civ. Code §2848; and

(iv) acknowledges and agrees that Lender is relying on this waiver in making the Loan, and that this waiver is a material part of the consideration that Lender is receiving for making the Loan.

**Section 4. Does Not Supersede Other Guarantees.**

The obligations of Guarantors will be in addition to any obligations of Guarantors under any other guarantees of the Obligations or any obligations of Borrower or any other persons or entities previously given or later to be given to Lender, and this Guaranty will not affect or invalidate any other guarantees. The liability of Guarantors to Lender will at all times be deemed to be the aggregate liability of Guarantors under the terms of this Guaranty and of any other guarantees previously or later given by Guarantors to Lender.

**Section 5. Representations and Warranties.**

Guarantors represents and warrants as follows:

(a) Power and Authority.

(i) Each Guarantor has the requisite power and authority to execute and deliver this Guaranty, and thus, even if the guaranty is not enforceable as a contract, it may be enforceable on a theory of equitable estoppel.

(ii) This Guaranty, when delivered to Lender, will constitute a legal, valid, and

binding obligation enforceable against Guarantors in accordance with its terms.

(c) Financial Statements.

(i) All financial statements and data that have been given to Lender by Guarantors with respect to Guarantors:

(A) are complete and correct in all material respects as of the date given;

(B) accurately present the financial condition of Guarantors on each date as of which and the results of Guarantors' operations for the periods for which they have been furnished; and

(C) have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods covered.

(ii) All balance sheets and the notes that Guarantors furnished to Lender disclose all material liabilities of Guarantors, fixed and contingent, as of their respective dates.

(iii) There has been no adverse change in the financial condition or operations of Guarantors since:

(A) the date of the most recent financial statement given to Lender with respect to Guarantors; or

(B) the date of the financial statement given to Lender immediately prior to the date of this Guaranty, other than changes in the ordinary course of business, none of which have been materially adverse individually or in the aggregate.

(d) Other Arrangements. Guarantors are not a party to any agreement or instrument materially and adversely affecting Guarantors' present or proposed business, properties, or assets, or operations or conditions (whether financial or otherwise); and Guarantors are not in default in the performance, observance, or fulfillment of any of the material obligations, covenants, or conditions in any agreement or instrument to which Guarantors are a party.

(e) Other Information. All other reports, papers, and written data and information given to Lender by Guarantors with respect to Guarantors are accurate and correct in all material respects and complete insofar as completeness may be necessary to give Lender a true and accurate knowledge of the subject matter.

(f) Litigation. There is not now pending against or affecting Guarantors, nor to the knowledge of Guarantors are there threatened, any action, suit, or proceeding at law or in equity or by or before any administrative agency that, if adversely determined, would materially impair or affect the financial condition or operations of Guarantors.

(g) Taxes. Guarantors have filed all federal, state, provincial, county, municipal, and other income tax returns required to have been filed by Guarantors and have paid all taxes that have become due

pursuant to the returns or pursuant to any assessments received by Guarantors, and Guarantors do not know of any basis for any material additional assessment against it in respect of those taxes.

**Section 6. Affirmative Covenants.**

Guarantors covenant and agree that, so long as any part of the Indebtedness (defined in the Deed of Trust) remains unpaid, Guarantors will do the following, unless Lender otherwise consents in writing:

(a) Taxes Affecting Guarantors. File all federal, state, provincial, county, municipal, and other income tax returns required to be filed by it and pay, before they become delinquent, all taxes that become due pursuant to those returns or pursuant to any assessments received by it.

(b) Compliance with Law. Promptly and faithfully comply with all laws, ordinances, rules, regulations, and requirements, both present and future, of every governmental authority or agency having jurisdiction that may be applicable to it.

(c) Books and Records. Maintain complete books of accounts and other records reflecting the results of its operations, in a form reasonably satisfactory to Lender, and furnish to Lender any information about the financial condition of Guarantors that Lender reasonably requests, including, but not limited to, the following information, which will be furnished without request:

(i) immediately on availability, but in any case not later than sixty (60) days after the close of each fiscal year of Guarantors:

(A) a balance sheet of Guarantors as at the close of the fiscal year of each Guarantor, and

(B) statements of income and expense and change in financial condition of Guarantors for the fiscal year (each will set forth in comparable form the corresponding figures of the previous period, will be in reasonable detail, and will be certified by the chief financial officer of Guarantors); and

(ii) any other information or data that Lender may reasonably request.

Lender will have the right, at all reasonable times and on reasonable notice, to audit (at Guarantors' sole cost and expense) Guarantors' books of account and records, all of which will be made available to Lender or Lender's representatives for that purpose, from time to time, on Lender's request.

**Section 7. Amendments or Waiver.**

No amendment or waiver of any provision of this Guaranty or consent to any departure from any provision by Guarantors will be effective unless it is in writing and signed by Lender, and then the waiver or consent will be effective only in the specific instance and for the specific purpose for which it is given. Any such amendment or waiver must treat both Guarantors equally and Lender cannot amend or waive any term as to any one Guarantor without equally amending and waiving such term as to both Guarantors. No notice to or demand on Guarantors will in any case entitle it to any other or further notice or

demand in similar or other circumstances.

**Section 8. Notices.**

All notices that may be required or otherwise provided for or contemplated under the terms of this Guaranty for any party to serve on or give to any other, will, whether so stated, be in writing, and if not in writing, will not be deemed to have been given, and be either personally served or sent with return receipt requested by registered or certified mail with postage prepaid (including registration or certification charges) in a securely enclosed and sealed envelope, sent to the following addresses:

If to Guarantor: Scott Gillen

______________________

______________________

If to Lender: BOBS, LLC
600 S. Spring St. Suite106
Los Angeles, CA 90014

These addresses may be changed from time to time by written notice to the other parties given in the same manner. Any matter served on or sent to Guarantors or Lender in this manner will be deemed sufficiently given for all purposes on the date three (3) days following the date it was deposited in a United States Post Office, except that notices of changes of address will not be effective until actual receipt.

**Section 9. No Waiver; Remedies.**

No failure on the part of Lender to exercise and no delay in exercising any right or remedy will operate as a waiver; nor will Lender be estopped to exercise any right or remedy at any future time because of any failure or delay; nor will any single or partial exercise of any right or remedy preclude any other or further exercise or the exercise of any other right or remedy. The remedies provided are cumulative and not exclusive of any remedies provided by law.

**Section 10. Right of Setoff.**

Lender is authorized at any time and from time to time, without notice to Guarantors (any notice being expressly waived by Guarantors), to set off and apply all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by Lender to or for the credit or the account of Guarantors against any of the obligations of Guarantors now or later existing under this Guaranty. Lender agrees promptly to notify Guarantors after any setoff and application, provided that the failure to give notice will not affect the validity of the setoff and

application. The rights of Lender under this section are in addition to other rights and remedies (including, without limitation, other rights of setoff) that Lender may have.

**Section 11. Continuing Guaranty; Transfer of Note.**

This Guaranty is a continuing guaranty and will:

(a) subject to the provisions of section 2(b), remain in full force and effect until payment in full of the indebtedness and the Obligations and all other amounts payable under this Guaranty;

(b) be binding on Guarantors; and

(c) inure to the benefit of and be enforceable by Lender and its successors, transferees, and assigns.

Without limiting the generality of the subsection I I(c), Lender may assign or otherwise transfer the Loan Documents to any other Person (defined in the Deeds of Trust), and that other Person will become vested with all the rights granted to Lender.

**Section 12. Subordination.**

Any indebtedness of Borrower now or later held by Guarantors is subordinated to the indebtedness of Borrower to Lender, and any indebtedness of Borrower to Guarantors will, if Lender requests, be collected, enforced, and received by Guarantors as trustee for Lender and be paid over to Lender, but without reducing or limiting in any manner the liability of Guarantors under the other provisions of this Guaranty.

**Section 13. No Duty.**

Guarantors assume the responsibility for keeping informed of the financial condition of Borrower and of all other circumstances bearing on the risk of nonpayment of the Obligations and agrees that Lender will have no duty to advise Guarantors of any information known to Lender regarding any financial condition or circumstances.

**Section 14. Bankruptcy of Borrower or Guarantor.**

Regardless of any modification, discharge, or extension of the Obligations or any amendment, modification, stay, or cure of Lender's rights that may occur in any bankruptcy or reorganization case or proceeding concerning Borrower, whether permanent or temporary and whether assented to by Lender, Guarantors agrees that it will be obligated to pay and perform the Obligations and discharge its other obligations in accordance with the terms of the Obligations and the terms of this Guaranty in effect on the date of this Guaranty. Guarantors understand and acknowledge that by virtue of this Guaranty, it has specifically assumed all risks of a bankruptcy or reorganization case or proceeding with respect to Borrower. As an example, and not in any way of limitation, a subsequent modification of the Obligations in any reorganization case concerning Borrower will not affect the obligation of Guarantors to perform the Obligations in accordance with their original terms.

In the event of a bankruptcy filing by Guarantor Scott Gillen, or any legal entity under his control, with the exception of Borrower, this Guaranty shall become null and void and unenforceable by Lender

against Guarantor Scott Gillen.

**Section 15. Entire Agreement.**

This Guaranty is intended as a final expression of this agreement of guaranty and is intended also as a complete and exclusive statement of the terms of this agreement. No course of prior dealings between Guarantors and Lender, no usage of the trade, and no parole or extrinsic evidence of any nature will be used or will be relevant to supplement, explain, contradict, or modify the terms or provisions of this Guaranty.

**Section 16. Governing Law; Venue.**

This Guaranty will be governed by and construed in accordance with the laws of California. The parties hereto agree that any action arising out of this Guaranty shall be brought in Los Angeles County Superior Court.

**Section 17. Attorneys' Fees.**

Guarantors agrees to pay all costs, including, without limitation, attorneys' fees and expenses, incurred by Lender in enforcing the terms of this Guaranty, whether or not suit is filed. Guarantors agree to indemnify and hold Lender harmless from all liability, loss, damage, or expense (including, without limitation, attorneys' fees) that it may incur under this Guaranty, or in connection with the making of any of the loans or financial arrangements guaranteed by this Guaranty, the enforcement of any of Lender's rights or remedies, any action taken by Lender under this Guaranty, or by reason or in defense of any claims and demands that may be asserted against Lender arising out of the Collateral.

**Section 18. Miscellaneous.**

(a) Time is of the essence.

(b) The obligations and promises will be joint and several undertakings of each of the Persons executing this Guaranty, and Lender may proceed against any one or more of those Persons without waiving its right to proceed against any of the others.

(c) Any married person who signs this instrument expressly agrees that recourse may be had against his or her separate property for all of her or his obligations under this Guaranty.

(d) If any term, provision, covenant, or condition or any application is held by a court of competent jurisdiction to be invalid, void, or unenforceable, all provisions, covenants, and conditions and all applications not held invalid, void, or unenforceable will continue in full force and will in no way be affected.

(e) This Guaranty may be executed in any number of counterparts and by different parties in separate counterparts, each of which when executed and delivered will be deemed to be an original, and all counterparts taken together will constitute one and the same instrument.

(f) Section headings in this Guaranty are included for convenience of reference only and do not constitute a part of this Guaranty for any other purpose.

NEXT PAGE SIGNATURE PAGE

IN WITNESS WHEREOF, the undersigned has executed and delivered this Guaranty as of the date first above written.

Guarantor:

By: Scott Gillen

3/15/21
Date

**CALIFORNIA ACKNOWLEDGMENT** **CIVIL CODE § 1189**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

On 3/15/2021 before me, Sarah Fabela, Notary Public,
*Date* *Here Insert Name and Title of the Officer*

personally appeared Scott Gillen
*Name(s) of Signer(s)*

______________________________________,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

SARAH FABELA
Notary Public - California
Los Angeles County
Commission # 2334264
My Comm. Expires Sep 25, 2024

*Place Notary Seal and/or Stamp Above*

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature [signature]
*Signature of Notary Public*

**OPTIONAL**

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: ______________________

Document Date: ______________________ Number of Pages: ________

Signer(s) Other Than Named Above: ______________________

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: ______________________
☐ Corporate Officer – Title(s): ______________________
☐ Partner – ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: ______________________
Signer is Representing: ______________________

Signer's Name: ______________________
☐ Corporate Officer – Title(s): ______________________
☐ Partner – ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
☐ Other: ______________________
Signer is Representing: ______________________

©2018 National Notary Association

# EXHIBIT I

600 SPRING LLC
PO BOX 2833
Malibu CA 90265

June 5, 2025

Mr. Barry Shy
23800 Malibu Crest Dr
Malibu CA 90265

Re: Notice of Transaction – 600 Spring LLC

Dear Barry:

I am writing to provide you with notice of a transaction 600 Spring LLC will be taking.

BACKGROUND

First, I want to take a moment to clearly explain my perspective regarding the current status of the project. As you know, I've been deeply involved for the past seven years, dedicating a significant portion of my time and effort to its success. Over this period, I've faced a number of considerable challenges, including the wildfires that impacted the region, the unprecedented disruption of the COVID-19 pandemic, significant supply chain issues, rising interest rates, and various other unforeseen hurdles. Through each of these, I believe I have persevered and continued to move the project forward.

It, therefore, has been disheartening for me to feel that the feedback I've received regarding my work has consistently centered on complaints. While I appreciate your acknowledgement that I have done my best, the repeated criticisms, insults, and what I perceive as demeaning conversations have unfortunately taken a toll on my overall mindset and my enthusiasm for the project. In addition, my health has suffered, as you are aware.

In light of these circumstances, I want to inform you that I have taken decisive action based on the authority explicitly granted to me in the operating agreement of the LLC. I have moved forward with the sale of house five. Paragraph 8 of the Operating Agreement as of 5/22/2017 of 600 Spring LLC (the "Operating Agreement") provides that C64829 LLC and I "will handle the day to day operations for the company, including but not limited to all aspects of developing and selling the property . . . ." (Emphasis added.)

This was not a decision I made lightly, but rather one driven by a need to protect the LLC. I am increasingly concerned that my extensive efforts and the significant time I have invested in this development may not ultimately result in a tangible return for the LLC, especially given the current dynamic.

My sincere hope is that we can find a way to work together to reach a mutually agreeable resolution. Perhaps now is the appropriate time to consider a division of the remaining assets. I want to reiterate my willingness and ability to complete the entire project, as I have a substantial

600 SPRING LLC
PO BOX 2833
Malibu CA 90265

seven-year investment in seeing it through to a successful conclusion. However, I must express my disagreement with the concept of attempting to cut corners or reduce costs at this stage. My fear is that pursuing a cheaper approach, as you have advocated, will not yield the desired outcome and may, in fact, lead to further complications and potential financial losses, ultimately leaving the LLC with nothing to show for my years of dedication.

TRANSACTION

Glass Tunnel LLC will be purchasing the property located at 24198 Case Court, Malibu, CA 90265, for $50,000,000. The sale will be made pursuant to seller carry-back financing in the full amount of the purchase price. The financing will accrue interest at 6.2% and will have a one year term with two six month extension rights. All principal and interest will be paid as a balloon payment on the maturity date. The proceeds from the sale will be split 50%-50% between C64829 LLC/Scott Gillen and Barry Shy, i.e., $25,000,000, plus interest, for C64829 LLC and Scott Gillen and $25,000,000, plus interest, for Barry Shy. This transaction is being taken pursuant to the above-referenced paragraph 8 of the Operating Agreement. As noted, that section provides me with sole authority to take this action on behalf of the LLC.

In our recent discussions, you told me that the property should be sold for $50,000,000, and that is the price being paid. I will be completing this transaction on behalf of the LLC by June 05, 2025.

CONCLUSION

I hope to resolve this current situation with an amicable solution for both of us. Regardless, as I have said, I will continue to work on behalf of the LLC to complete the project accordingly.

____________________ Date: 6-5-25

C64829 LLC, Member
by Scott Gillen its Manager

____________________ Date: 6-5-25

Scott Gillen, Manager 600 Spring LLC

# EXHIBIT J

**This page is part of your document - DO NOT DISCARD**

**20250376771**

Pages:
0004

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**06/05/25 AT 08:00AM**

| | |
|---|---|
| FEES: | 28.00 |
| TAXES: | 55,000.00 |
| OTHER: | 0.00 |
| PAID: | 55,028.00 |

LEADSHEET

202506050160039

**00025542188**

015343303

**SEQ:**
**02**

SECURE - 8:00AM

**THIS FORM IS NOT TO BE DUPLICATED**

E502868

3910121-05940, 0910125-

RECORDING REQUESTED BY:

600 Spring, LLC

AND WHEN RECORDED,
MAIL DOCUMENT AND TAX
STATEMENTS TO:

Glass Tunnel LLC
23838 Pacific Coast Highway #2833
Malibu, Ca. 90265

(Space Above for Recorder's Use)

APN: 4458-018-039 Order 3910121-05940

**THE CASE**

**GRANT DEED TO PURCHASER**

THE UNDERSIGNED GRANTOR DECLARES:

Documentary Transfer Tax is $ 55,000.00
☒ Computed on full value of the interest or property conveyed, or
☐ Computed on full value less value of liens or encumbrances remaining at time of sale
☐ Unincorporated Area ☒ City of Malibu

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, 600 Spring, LLC, a California limited liability company ("Grantor"), hereby grants to Glass Tunnel LLC, a California limited liability company, that certain real property situated in the County of Los Angeles, State of California, described on Exhibit "A" attached hereto, together with, all and singular, the rights, privileges, tenements, hereditaments, easements, rights-of-way, entitlements, and appurtenances belonging or in anywise appertaining to the same.

Grantor has caused this Grant Deed to be duly executed on 6-3-, ~~2024~~. 2025

See Attached Exhibit "A"
Legal Description

"Grantor"

600 Spring, LLC,
a California ~~limited liability~~ company

By: ______________________
Scott Gillen, Manager

Name: Scott Gillen
Title: Manager

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA )
)
COUNTY OF LOS ANGELES )

On June 03, 2025, before me, J. Briddell, a Notary Public, personally appeared Scott Gillen, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/~~are~~ subscribed to the within instrument, and acknowledged to me that he/~~she/they~~ executed the same in his/~~her/their~~ authorized capacity(ies), and that by his/~~her/their~~ signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Notary Public

J. BRIDDELL
Notary Public - California
Los Angeles County
Commission # 2440160
My Comm. Expires Feb 28, 2027

ORDER NO. 3910121-05940

**EXHIBIT "A"**

**LOT 5 OF TRACT NO. 70038, IN THE CITY OF MALIBU, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 1405, PAGES 31 THROUGH 35, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, AND AMENDED BY CERTIFICATE OF CORRECTION RECORDED FEBRUARY 5, 2019 AS INSTRUMENT NO. 20190105449, OF OFFICIAL RECORDS.**

**EXCEPT THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND WITHOUT RIGHT OF ENTRY ON THE SURFACE OF SAID LAND, AS CONVEYED TO R.R. ADAMSON, BY DEED RECORDED OCTOBER 5, 1953 IN BOOK 42846, PAGE 432, OF OFFICIAL RECORDS.**

*****END OF LEGAL DESCRIPTION*****

# EXHIBIT K

**This page is part of your document - DO NOT DISCARD**

**20250376772**

Pages: 0021

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**06/05/25 AT 08:00AM**

| | |
|---|---|
| FEES: | 124.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 124.00 |

LEADSHEET

202506050160039

**00025542189**

015343303

**SEQ: 03**

SECURE - 8:00AM

**THIS FORM IS NOT TO BE DUPLICATED**

E502868

3910121-05940, 0910125-

RECORDING REQUESTED BY
EQUITY TITLE

AND WHEN RECORDED MAIL DOCUMENT TO:

NAME PMF CA REIT LLC

STREET ADDRESS
23586 CALABASAS RD STE 100

CITY, STATE & ZIP CODE
CALABASAS CA 91302

THIS SPACE FOR RECORDER'S USE ONLY:

# DEED OF TRUST

Title of Document

**Pursuant to Assembly Bill 1466 – Restrictive Covenant (GC Code Section 27388.2), effective January 1, 2022, a fee of two dollars ($2) for recording the first page of every instrument, paper, or notice required or permitted by law to be recorded per each single transaction per parcel of real property, except those expressly exempted from payment of recording fees, as authorized by each county's board of supervisors and in accordance with applicable constitutional requirements.**

**Pursuant to Senate Bill 2 – Building Homes and Jobs Act (GC Code Section 27388.1), effective January 1, 2018, a fee of seventy-five dollars ($75.00) shall be paid at the time of recording of every real estate instrument, paper, or notice required or permitted by law to be recorded, except those expressly exempted from payment of recording fees, per each single transaction per parcel of real property. The fee imposed by this section shall not exceed two hundred twenty-five dollars ($225.00).**

- [x] **Exempt from fee per GC 27388.1(a)(2) and 27388.2 (b); recorded in connection with a transfer subject to the imposition of documentary transfer tax (DTT).**
- [ ] **Exempt from fee per GC 27388.1(a)(2) and 27388.2 (b); recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier.**
- [ ] **Exempt from fee per GC 27388.1 (a) (1); fee cap of $225.00 reached.**
- [ ] **Exempt from the fee per GC 27388.1 (a) (1); not related to real property.**

**THIS COVER SHEET ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION**
**($3.00 Additional Recording Fee Applies)**

**RECORDING REQUESTED BY**

EQUTIY TITLE

AND WHEN RECORDED MAIL TO

NAME PMF CA REIT LLC

ADDRESS 23586 CALABASAS RD STE 100

CITY/STATE/ZIP CALABASAS CA 91302

SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

**TITLE(S)**

# DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING

Recording Requested by
EQUITY TITLE COMPANY
3910125.04020

*RECORDING REQUESTED BY*
*AND WHEN RECORDED MAIL TO:*

PMF CA REIT, L.L.C.
23586 Calabasas Road
Suite 100
Calabasas, CA 91302
Attn: Mark Kanter/Ed Fischer

Tax Parcel Number(s): **4458-018-039**

Space Above for Recorder's Use

# DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING

**(CALIFORNIA)**

**ATTENTION COUNTY RECORDER: THIS INSTRUMENT IS INTENDED TO BE EFFECTIVE AS A FINANCING STATEMENT FILED AS A FIXTURE FILING PURSUANT TO SECTION 9502 OF THE CALIFORNIA COMMERCIAL CODE. PORTIONS OF THE GOODS COMPRISING A PART OF THE MORTGAGED PROPERTY ARE OR ARE TO BECOME FIXTURES RELATED TO THE LAND DESCRIBED IN EXHIBIT "A" HERETO. THIS INSTRUMENT IS TO BE FILED FOR RECORD IN THE RECORDS OF THE COUNTY WHERE DEEDS OF TRUST ON REAL PROPERTY ARE RECORDED AND SHOULD BE INDEXED AS BOTH A DEED OF TRUST AND AS A FINANCING STATEMENT COVERING FIXTURES. THE MAILING ADDRESSES OF BORROWER (DEBTOR) AND LENDER (SECURED PARTY) ARE SPECIFIED IN RECITAL I OF THIS INSTRUMENT.**

**I.** THIS DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this "**Instrument**") is dated as of **June 2, 2025**, and is given by **GLASS TUNNEL LLC, a California limited liability company**, whose address is **23838 Pacific Coast Highway, #2833, Malibu, CA 90265**, as trustor ("**Borrower**"), to **CALIFORNIA TD SPECIALISTS, a California corporation**, as trustee ("**Trustee**"), for the benefit of **PMF CA REIT, L.L.C., a Delaware limited liability company**, whose address is **23586 Calabasas Road, Suite 100, Calabasas, CA 91302, Attn: Mark Kanter/Ed Fischer**, as beneficiary ("**Lender**"). **GLASS TUNNEL LLC's** organizational identification number is **B20250128646.**

**II.** Borrower in consideration of the Indebtedness and the trust created by this Instrument, irrevocably grants, conveys and assigns to Trustee, in trust, with power of sale, the Mortgaged Property, including the Land located in **Los Angeles** County, State of **California** and described in Exhibit "A" attached to this Instrument.


**© GoDocs® All Rights Reserved.**

III. TO SECURE TO LENDER the repayment of the Indebtedness evidenced by Borrower's Promissory Note payable to Lender, dated as of the date of this Instrument, and maturing on the earlier of (i) **July 1, 2026**, and (ii) the date on which the unpaid principal balance of the Note becomes due and payable by acceleration or otherwise pursuant to the Loan Documents or the exercise by Lender of any right or remedy under any Loan Document (the **"Maturity Date"**), in the principal amount of **TWENTY MILLION AND 00/100 DOLLARS (US $20,000,000.00)**, and all renewals, extensions and modifications of the Indebtedness, the payment of all sums advanced by or on behalf of Lender to protect the security of this Instrument under section G below, and the performance of the covenants and agreements of Borrower contained in the Loan Documents (other than the Environmental Indemnity and any guaranty).

IV. Borrower states that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered, except as shown on the Schedule of Title Exceptions. Borrower covenants that Borrower will warrant and defend generally the title to the Mortgaged Property against all claims and demands, subject to any easements and restrictions listed in the Schedule of Title Exceptions.

**Covenants.** In consideration of the mutual promises set forth in this Instrument, Borrower and Lender, covenant and agree as follows:

**A. DEFINITIONS.** The following terms, when used in this Instrument (including when used in the above recitals), shall have the following meanings, and any capitalized term not specifically defined in this Instrument shall have the meaning ascribed to that term in the Loan Agreement:

**"Assignment"** means, collectively, the provisions of sections C and D of this Instrument relating to the assignment of rents and leases affecting the Mortgaged Property.

**"Attorneys' Fees and Costs"** means (a) fees and out-of-pocket costs of Lender's and Loan Servicer's attorneys, as applicable (whether or not any lawsuit or other proceeding is instituted), including costs of Lender's and Loan Servicer's allocable costs of in-house counsel, support staff costs, costs of preparing for litigation, computerized research, telephone and facsimile transmission expenses, mileage, deposition costs, postage, duplicating, process service, videotaping and similar costs and expenses; (b) costs and fees of expert witnesses, including appraisers; and (c) investigatory fees. As used in this Instrument and in the Note, "Attorneys' Fees and Costs" shall include those awarded by an appellate court.

**"Borrower"** means all Persons identified as "Borrower" in Recital I of this Instrument, together with their successors and permitted assigns.

**"Collateral Agreement"** has the definition given such term in the Loan Agreement.

**"Environmental Indemnity"** means the provisions of section D.7 of the Loan Agreement.

**"Fixtures"** means all property owned by Borrower which is so attached to the Land or the Improvements as to constitute a fixture under applicable law, including: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; and exercise equipment.


© GoDocs® All Rights Reserved.

**"Governmental Authority"** means the government of the United States, any state or other political subdivision thereof, and any Person exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to such government, in each case that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property or over Borrower.

**"Hazardous Materials"** means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any Governmental Authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

**"Hazardous Materials Laws"** means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments, that relate to Hazardous Materials or the protection of human health or the environment and apply to Borrower or to the Mortgaged Property. Hazardous Materials Laws include, but are not limited to, the Federal Water Pollution Control Act, 33 U.S.C. Section 1251 *et seq.*, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et seq.*, as amended by the Superfund Amendments Reauthorization Act of 1986, the Materials Transportation Act, 49 U.S.C. Section 1801 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*, the Toxic Substance Control Act, 15 U.S.C. Section 2601, *et seq.*, the Clean Water Act, 33 U.S.C. Section 1251, *et seq.*, the Emergency Planning and Community Right-to-Know Act of 1986, as amended, the Solid Waste Disposal Act, as amended, the Clean Air Act, as amended, the Safe Drinking Water Act, as amended, the Occupational Safety and Health Act, as amended, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, and their state analogs.

**"Improvements"** means the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

**"Indebtedness"** means the principal of, interest on, and all other amounts due at any time under, the Note, the Loan Agreement (other than the Environmental Indemnity), this Instrument or any other Loan Document (other than any guaranty), including late charges, default interest, and advances to protect the security of this Instrument under section G of this Instrument or any other applicable provision of the Loan Agreement, this Instrument or any other Loan Document or as permitted by law.

**"Land"** means the land described in Exhibit "A".

**"Leases"** means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property, and all modifications, extensions or renewals.

**"Lender"** means the Person or Persons identified as "Lender" in Recital I of this Instrument, or any subsequent holder of the Note.

**"Loan"** means the loan evidenced by the Note and secured by this Instrument.

**"Loan Agreement"** means the Loan Agreement executed by Borrower and Lender and dated as of the date of this Instrument, as such agreement may be amended from time to time.

**"Loan Documents"** means the Note, this Instrument, the Assignment, the Loan Agreement, all guaranties, all indemnity agreements, all Collateral Agreements, O&M Plans, and any other documents now or in the future


© GoDocs® All Rights Reserved.

executed by Borrower, any Guarantor or any other Person in connection with the Loan, as such documents may be amended from time to time.

"**Loan Servicer**" means the Person or Persons that from time to time is designated by Lender to collect payments and deposits and receive notices under the Note, this Instrument and any other Loan Document, and otherwise to service the Loan for the benefit of Lender. Unless otherwise specified in section B of the Note, or unless Borrower receives notice to the contrary, the Loan Servicer means the Person or Persons identified as "Lender" in Recital I of this Instrument.

"**Mortgaged Property**" means all of Borrower's present and future right, title and interest in and to all of the following: (1) the Land; (2) the Improvements; (3) the Fixtures; (4) the Personalty; (5) all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated; (6) all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirement; (7) all awards, payments and other compensation made or to be made by any Governmental Authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof; (8) all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations; (9) all proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds; (10) all Rents and Leases; (11) all earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Loan; (12) all funds on deposit pursuant to any separate agreement between Borrower and Lender (including, without limitation, all Imposition Deposits) for the purpose of establishing replacement reserves for the Mortgaged Property, to fund any water and sewer charges, premiums for fire or other hazard insurance, rent loss insurance or other insurance required by Lender, taxes, assessments, vault rentals, or other charges or expenses required by Lender to protect the Mortgaged Property, establishing a fund to assure the completion of repairs or improvements specified in that agreement, or assuring reduction of the outstanding principal balance of the Indebtedness if the occupancy of or income from the Mortgaged Property does not increase to a level specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account; (13) all refunds or rebates of Impositions by any Governmental Authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Instrument is dated); (14) all tenant security deposits which have not been forfeited by any tenant under any Lease and any bond or other security in lieu of such deposits; and (15) all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property.

"**Mortgaged Property UCC Collateral**" means any of the Mortgaged Property which, under applicable law, may be subjected to a security interest under the Uniform Commercial Code, whether such Mortgaged Property is owned now or acquired in the future, and all products and cash and non-cash proceeds thereof.

"**Note**" means the Promissory Note described in Recital III of this Instrument, including all schedules, riders, allonges and addenda, as such Promissory Note may be amended from time to time.


© GoDocs® All Rights Reserved.

**"Person"** means any natural person, sole proprietorship, corporation, general partnership, limited partnership, limited liability company, limited liability partnership, limited liability limited partnership, joint venture, association, joint stock company, bank, trust, estate, unincorporated organization, any Governmental Authority, endowment fund or any other form of entity.

**"Personalty"** means all: (1) accounts (including deposit accounts); (2) equipment and inventory owned by Borrower which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements, including furniture, furnishings, machinery, building materials, appliances, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software); (3) other tangible personal property (other than Fixtures) which are used now or in the future in connection with the ownership, management or operation of the Land or the Improvements or are located on the Land or in the Improvements; (4) any operating agreements relating to the Land or the Improvements; (5) any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements; (6) all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land or the Improvements and including subsidy or similar payments received from any sources, including a Governmental Authority; and (7) any rights of Borrower in or under letters of credit.

**"Property Jurisdiction"** means the jurisdiction in which the Land is located.

**"Rents"** means all rents, revenues and other income of the Land or the Improvements, whether now due, past due, or to become due, and deposits forfeited by tenants.

**"Schedule of Title Exceptions"** means title exceptions approved by Lender and shown in the schedule of exceptions to coverage in the title policy issued to Lender contemporaneously with the recordation of this Instrument and insuring Lender's interest in the Mortgaged Property.

**"Taxes"** means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a lien, on the Land or the Improvements.

**"Uniform Commercial Code"** or **"UCC"** means the Uniform Commercial Code as in effect in the Property Jurisdiction; *provided* that, to the extent perfection or the effect of perfection or non-perfection or the priority of any security interest in any collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the Property Jurisdiction, **"Uniform Commercial Code"** or **"UCC"** means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

**B. UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.** This Instrument is also a security agreement under the Uniform Commercial Code for the Mortgaged Property UCC Collateral, and Borrower, as debtor, hereby grants to Lender, as secured party, a security interest in the Mortgaged Property UCC Collateral. Borrower hereby authorizes Lender to prepare and file financing statements, continuation statements and financing statement amendments in such form as Lender may require to perfect or continue the perfection of this security interest and Borrower agrees, if Lender so requests, to execute and deliver to Lender such financing statements, continuation statements and amendments. Without limiting the generality of the foregoing, Borrower authorizes Lender to file any financing statement that describes the collateral as "all assets" of Borrower, or words to similar effect. Borrower shall pay all filing costs and all costs and expenses of any record searches for financing statements and/or amendments that Lender may require. Without the prior written consent of Lender, Borrower shall not create or permit to exist any other lien or security interest in any of the Mortgaged Property UCC Collateral. Unless Borrower gives notice to Lender within 30 days after the occurrence of any of the following, and executes and delivers to Lender modifications


© GoDocs® All Rights Reserved.

or supplements of this Instrument (and any financing statement which may be filed in connection with this Instrument) as Lender may require, Borrower shall not (a) change its name, identity, structure or jurisdiction of organization; (b) change the location of its place of business (or chief executive office if more than one place of business); or (c) add to or change any location at which any of the Mortgaged Property UCC Collateral is stored, held or located. If an Event of Default has occurred which, if it is amenable to cure, has not been timely cured, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Instrument or existing under applicable law. In exercising any remedies, Lender may exercise its remedies against the Mortgaged Property UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies. This Instrument constitutes a financing statement with respect to any part of the Mortgaged Property that is or may become a Fixture, if permitted by applicable law.

**C. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.**

**C.1.** As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Promptly upon request by Lender, Borrower agrees to execute and deliver such further assignments as Lender may from time to time require. Borrower and Lender intend this assignment of Rents to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the "Mortgaged Property" as that term is defined in section A above. However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the Property Jurisdiction, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Instrument.

**C.2.** After the occurrence of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender. However, until the occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under the other Loan Documents, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred which, if it is amenable to cure, has not been timely cured, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Instrument. From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license to collect Rents shall automatically terminate and Lender shall without notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid. Borrower shall pay to Lender upon demand all Rents to which Lender is entitled. At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender, no tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts which are actually paid to Lender in response to such a notice. Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit. Borrower shall not interfere with and shall cooperate with Lender's collection of such Rents. Lender shall be permitted to apply all Rents received in any manner Lender deems appropriate.


© GoDocs® All Rights Reserved.

**C.3.** Borrower states that Borrower has not executed any prior assignment of Rents (other than an assignment of Rents securing indebtedness that will be paid off and discharged with the proceeds of the Loan), that Borrower has not performed, and Borrower covenants and agrees that it will not perform, any acts and has not executed, and shall not execute, any instrument which would prevent Lender from exercising its rights under this section C, and that at the time of execution of this Instrument there has been no anticipation or prepayment of any Rents for more than two (2) months prior to the due dates of such Rents. Borrower shall not collect or accept payment of any Rents more than two (2) months prior to the due dates of such Rents.

**D. ASSIGNMENT OF LEASES; LEASES AFFECTING THE MORTGAGED PROPERTY.**

**D.1.** As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all of Borrower's right, title and interest in, to and under the Leases, including Borrower's right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all of Borrower's right, title and interest in, to and under the Leases. Borrower and Lender intend this assignment of the Leases to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of the Leases, and for no other purpose, the Leases shall not be deemed to be a part of the "Mortgaged Property" as that term is defined in section A above. However, if this present, absolute and unconditional assignment of the Leases is not enforceable by its terms under the laws of the Property Jurisdiction, then the Leases shall be included as a part of the Mortgaged Property and it is the intention of Borrower that in this circumstance this Instrument create and perfect a lien on the Leases in favor of Lender, which lien shall be effective as of the date of this Instrument.

**D.2.** Until Lender gives notice to Borrower of Lender's exercise of its rights under this section D, Borrower shall have all rights, power and authority granted to Borrower under any Lease (except as otherwise limited by this section D or any other provision of this Instrument), including the right, power and authority to modify the terms of any Lease or extend or terminate any Lease. Upon the occurrence of an Event of Default, the permission given to Borrower pursuant to the preceding sentence to exercise all rights, power and authority under Leases shall automatically terminate. Borrower shall comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits.

**D.3.** Borrower acknowledges and agrees that the exercise by Lender, either directly or by a receiver, of any of the rights conferred under this section D shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and the Improvements. The acceptance by Lender of the assignment of the Leases pursuant to section D.1 above shall not at any time or in any event obligate Lender to take any action under this Instrument or to expend any money or to incur any expenses. Lender shall not be liable in any way for any injury or damage to person or property sustained by any Person in or about the Mortgaged Property. Prior to Lender's actual entry into and taking possession of the Mortgaged Property, Lender shall not (a) be obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease); (b) be obligated to appear in or defend any action or proceeding relating to the Lease or the Mortgaged Property; or (c) be responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property. The execution of this Instrument by Borrower shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking of possession.

**D.4.** Upon delivery of notice by Lender to Borrower of Lender's exercise of Lender's rights under this section D at any time after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, Lender immediately shall have all rights, powers and


© GoDocs® All Rights Reserved.

authority granted to Borrower under any Lease, including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.

**D.5.** Borrower shall, promptly upon Lender's request, deliver to Lender an executed copy of each Lease then in effect. All Leases shall be on forms approved by Lender, shall be for initial terms of at least six (6) months and not more than two (2) years, and shall not include options to purchase.

**D.6.** Borrower shall not receive or accept Rent under any Lease for more than two (2) months in advance.

**E. PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS.** Borrower shall pay the Indebtedness when due in accordance with the terms of the Note and the other Loan Documents and shall perform, observe and comply with all other provisions of the Note and the other Loan Documents.

**F. APPLICATION OF PAYMENTS.** If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, then Lender may apply that payment to amounts then due and payable in any manner and in any order determined by Lender, in Lender's discretion. Neither Lender's acceptance of an amount which is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Instrument and the Note shall remain unchanged.

**G. PROTECTION OF LENDER'S SECURITY.**

**G.1.** If Borrower fails to perform any of its obligations under this Instrument or any other Loan Document, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, disburse such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including (a) payment of fees and out-of-pocket expenses of attorneys, accountants, inspectors and consultants, (b) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (c) procurement of the insurance required by section D.2 of the Loan Agreement (as outlined in section G.3 below), (d) payment of amounts which Borrower has failed to pay under sections D.1 and D.6 of the Loan Agreement, and (e) advances made by Lender to pay, satisfy or discharge any obligation of Borrower for the payment of money that is secured by a pre-existing mortgage, deed of trust or other lien encumbering the Mortgaged Property (a "**Prior Lien**").

**G.2.** Any amounts disbursed by Lender under this section G, or under any other provision of this Instrument that treats such disbursement as being made under this section G, shall be added to, and become part of, the principal component of the Indebtedness, shall be immediately due and payable and shall bear interest from the date of disbursement until paid at the "**Default Rate**", as defined in the Note.

**G.3. Force Place Insurance Provision:** In the event that (1) Borrower fails to procure and/or maintain all required insurance coverage(s) as set forth in sections D.1, D.2 and/or D.6 of the Loan Agreement, and/or (2) Borrower fails to pay the required insurance premiums for such required insurance coverage(s) at least thirty (30) days in advance of the date when such payments are due to be paid in compliance with the Loan Agreement, then (i) Lender may, but is not obligated to, procure such required insurance coverage(s), and (ii) Borrower shall pay to Lender during the term hereof, upon receipt of an invoice therefor, the premiums for any such required insurance coverage(s) obtained by Lender pursuant to this section.

(a) Lender is hereby authorized by Borrower to secure such required insurance coverage as provided in the preceding provisions of this section (1) without providing prior notice to Borrower, any contractor, or any other party, and (2) solely for the purpose of protecting Lender's interests in the Mortgaged Property and shall


© GoDocs® All Rights Reserved.

not be obligated to protect the interests of Borrower and/or any other party. Borrower also agrees to re-pay to Lender any and all amounts for such required insurance coverage(s) within 10 days of Borrower receiving an invoice for such charges from Lender. Borrower's failure to make such re-payment for any required insurance coverage(s) procured by Lender shall constitute an Event of Default at Lender's sole discretion.

(b) In addition, if any claim, event, or loss occurs during the policy period which will or may decrease the aggregate amount of any insurance coverage(s) available under any required policy(ies), then Borrower immediately shall secure additional coverage sufficient to provide total aggregate limits at least equal to the amount(s) set forth in sections D.1, D.2 and/or D.6 of the Loan Agreement on a going forward basis. Borrower represents and warrants that Borrower shall not commit any physical, intentional waste on the Mortgaged Property or intentionally take any actions that will invalidate any required insurance coverage(s) to be obtained and maintained on the Mortgaged Property pursuant to the Loan Documents.

**G.4.** Nothing in this section G shall require Lender to incur any expense or take any action.

**H. EVENTS OF DEFAULT.** An Event of Default under the Loan Agreement shall constitute an Event of Default under this Instrument.

**I. REMEDIES CUMULATIVE.** Each right and remedy provided in this Instrument is distinct from all other rights or remedies under this Instrument or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order. Lender's exercise of any particular right or remedy will not in any way prevent Lender from exercising any other right or remedy available to Lender. Lender may exercise any such remedies from time to time and as often as Lender chooses.

**J. WAIVER OF STATUTE OF LIMITATIONS, OFFSETS, AND COUNTERCLAIMS.** Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to enforce any Loan Document. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or otherwise to offset any obligations to make the payments required by the Loan Documents. No failure by Lender to perform any of its obligations under this Instrument will be a valid defense to, or result in any offset against, any payments that Borrower is obligated to make under any of the Loan Documents.

**K. WAIVER OF MARSHALING.** Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Instrument, the Note, any other Loan Document or applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Instrument waives any and all right to require the marshaling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Instrument.

**L. FURTHER ASSURANCES.** Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Instrument and the Loan Documents.

**M. GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.**

**M.1.** This Instrument, and any Loan Document which does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the Property Jurisdiction.


© GoDocs® All Rights Reserved.

**M.2.** Borrower agrees that any controversy arising under or in relation to the Note, this Instrument, or any other Loan Document may be litigated in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have non-exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any security for the Indebtedness, or any other Loan Document. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue or defense to venue to which it might be entitled by virtue of domicile, habitual residence, inconvenient forum or otherwise.

**N. NOTICE.** Except as otherwise specified by the laws of the Property Jurisdiction, all notices, demands and other communications required or permitted to be given pursuant to this Instrument shall be given in accordance with section H.3 of the Loan Agreement.

**O. SUCCESSORS AND ASSIGNS BOUND.** This Instrument shall bind, and the rights granted by this Instrument shall inure to, the respective successors and permitted assigns of Lender and Borrower. However, a Transfer not permitted by section E.1 of the Loan Agreement shall constitute an Event of Default.

**P. JOINT AND SEVERAL LIABILITY.** If more than one Person signs this Instrument as Borrower, the obligations of such Persons under this Instrument, the Note and other Loan Documents shall be joint and several.

**Q. RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARY.**

**Q.1.** The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Instrument shall create any other relationship between Lender and Borrower.

**Q.2.** No creditor of any party to this Instrument and no other Person shall be a third party beneficiary of this Instrument or any other Loan Document. Without limiting the generality of the preceding sentence, (a) any arrangement (a "**Servicing Arrangement**") between Lender and any Loan Servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (b) Borrower shall not be a third party beneficiary of any Servicing Arrangement, and (c) no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness.

**R. SEVERABILITY; ENTIRE AGREEMENT; AMENDMENTS.** The parties intend that the provisions of this Instrument and all other Loan Documents shall be legally severable. If any term or provision of this Instrument, or any other Loan Document, to any extent, be determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Instrument or of such other Loan Document shall not be affected thereby, and each term and provision shall be valid and be enforceable to the fullest extent permitted by law. This Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Instrument. This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

**S. CONSTRUCTION.** The captions and headings of the Sections of this Instrument are for convenience only and shall be disregarded in construing this Instrument. Any reference in this Instrument to an "Exhibit" or a "Section" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Instrument or to a Section of this Instrument. All Exhibits attached to or referred to in this Instrument are incorporated by reference into this Instrument. Any reference in this Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time. Use of the singular in this Instrument includes the plural and use of the plural includes the singular. As used in this Instrument, the term "including" means "including, but not limited to" and the term "includes" means "includes without limitation." The use of one gender includes the other gender, as the context may require. Unless the context requires otherwise, (1) any definition of or reference to any agreement, instrument or other document in this Instrument shall be construed


© GoDocs® All Rights Reserved.

as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in this Instrument or any other Loan Document), and (2) any reference in this Instrument to any Person shall be construed to include such Person's successors and permitted assigns.

**T. SUBROGATION.** If, and to the extent that, the proceeds of the Loan, or subsequent advances under section G above, are used to pay, satisfy or discharge a Prior Lien, such Loan proceeds or advances shall be deemed to have been advanced by Lender at Borrower's request, and Lender shall automatically, and without further action on its part, be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by the Prior Lien, whether or not the Prior Lien is released.

**U. BUSINESS PURPOSE.** Borrower acknowledges and agrees that the Loan is for business purposes and not for personal, family or household purposes.

**V. ACCELERATION; REMEDIES.**

**V.1.** If an Event of Default has occurred, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by California law or provided in this Instrument, the Loan Agreement or any other Loan Document. Borrower acknowledges that the power of sale granted in this Instrument may be exercised by Lender without prior judicial hearing. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including Attorneys' Fees and Costs, and costs of documentary evidence, abstracts and title reports.

**V.2.** If the power of sale is invoked, Lender shall execute a written notice of the occurrence of an Event of Default and of Lender's election to cause the Mortgaged Property to be sold and shall cause the notice to be recorded in each county in which the Mortgaged Property or some part of the Mortgaged Property is located. Trustee shall give notice of default and notice of sale and shall sell the Mortgaged Property according to California law. Trustee may sell the Mortgaged Property at the time and place and under the terms designated in the notice of sale in one or more parcels and in such order as Trustee may determine. Trustee may postpone the sale of all or any part of the Mortgaged Property by public announcement at the time and place of any previously scheduled sale. Lender or Lender's designee may purchase the Mortgaged Property at any sale and Lender or such designee will have the right to credit bid all or any part of the Indebtedness toward the purchase price at such sale.

**V.3.** Within a reasonable time after the sale, Trustee shall deliver to the purchaser at the sale, a deed conveying the Mortgaged Property so sold without any express or implied covenant or warranty. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Trustee shall apply the proceeds of the sale in the following order: (a) to all costs and expenses of the sale, including Trustee's fees not to exceed the statutory maximum therefor, Attorneys' Fees and Costs, including the cost of any trustee's sale guarantee policy and any other evidence of title; (b) to the Indebtedness in such order as Lender, in Lender's discretion, directs; and (c) the excess, if any, to the Person or Persons legally entitled to the excess.

**V.4.** Notwithstanding anything in this section V or elsewhere in the Loan Documents to the contrary, each permitted action, right and/or remedy of Lender (including any servicer and/or third-party agent) and/or Trustee, as applicable, set forth therein in connection with foreclosure of the lien of the Mortgage (each a, "**Foreclosure Action**") shall at all times comply with the applicable law governing each such Foreclosure Action. If any court determines that any specific law governing a Foreclosure Action, whether considered separately or together with other rights and/or remedies of Lender (including those of any servicer and/or third-party agent) and/or Trustee, as applicable, provides for any specific, additional and/or alternative action, including without limitation any additional notice or other procedure, be followed with respect to such Foreclosure Action, the Loan Documents shall be deemed reformed and otherwise amended to eliminate any violation of such law without the necessity of the execution of any new documents.


© GoDocs® All Rights Reserved.

**W. RECONVEYANCE.** Upon payment of the Indebtedness, Lender shall request Trustee to reconvey the Mortgaged Property and shall surrender this Instrument and the Note to Trustee. Trustee shall reconvey the Mortgaged Property without warranty to the Person or Persons legally entitled to the Mortgaged Property. Such Person or Persons shall pay Trustee's reasonable costs incurred in so reconveying the Mortgaged Property.

**X. SUBSTITUTE TRUSTEE.** Lender, at Lender's option, may from time to time, by a written instrument, appoint a successor trustee, which instrument, when executed and acknowledged by Lender and recorded in the office of the Recorder of the county or counties where the Mortgaged Property is situated, shall be conclusive proof of proper substitution of the successor trustee. The successor trustee shall, without conveyance of the Mortgaged Property, succeed to all the title, power and duties conferred upon the Trustee in this Instrument and by California law. The instrument of substitution shall contain the name of the original Lender, Trustee and Borrower under this Instrument, the book and page where this Instrument is recorded, and the name and address of the successor trustee. The procedure provided for substitution of trustee in this Instrument shall govern to the exclusion of all other provisions for substitution, statutory or otherwise.

**Y. STATEMENT OF OBLIGATION.** Lender may collect a fee not to exceed the maximum allowed by applicable law for furnishing the statement of obligation as provided in Section 2943 of the California Civil Code.

**Z. SPOUSE'S SEPARATE PROPERTY.** Each Borrower who is a married person expressly agrees that recourse may be had against his or her separate property.

**AA. FIXTURE FILING.** This Instrument is also a fixture filing under the Uniform Commercial Code of California.

**BB. WAIVER OF HOMESTEAD.** If applicable, Borrower hereby releases, relinquishes and waives, to the fullest extent allowed by law, all rights and benefits, if any, under and by virtue of homestead exemption laws. Notwithstanding the foregoing, to the extent this waiver is applicable and otherwise enforceable under the laws of the Property Jurisdiction, Borrower represents and warrants that the Mortgaged Property is not subject to, nor during the term of the Loan will Borrower claim in connection with the Mortgaged Property, any rights and benefits provided under and by virtue of homestead exemption laws, including any business homestead exemption laws.

**CC. ADDITIONAL PROVISION REGARDING APPLICATION OF PAYMENTS.** In addition to the provisions of section F above, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives its right under California Civil Code Section 2822(a), to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

**DD. WAIVER OF MARSHALING; OTHER WAIVERS.** To the extent permitted by law, Borrower waives (1) the benefit of all present or future laws providing for any appraisement before sale of any portion of the Mortgaged Property, (2) all rights of redemption, valuation, appraisement, stay of execution, notice of election to mature or declare due the whole of the Indebtedness and marshaling in the event of foreclosure of the lien created by this Instrument, (3) all rights and remedies which Borrower may have or be able to assert by reason of the laws of the State of California pertaining to the rights and remedies of sureties, (4) the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to enforce the Note or any other obligation secured by this Instrument, and (5) any rights, legal or equitable, to require marshaling of assets or to require upon foreclosure sales in a particular order, including any rights under California Civil Code Sections 2899 and 3433. Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided by this Instrument. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of the remedies provided by this Instrument. By signing this Instrument, Borrower does not waive its rights under Section 2924c of the California Civil Code.


© GoDocs® All Rights Reserved.

**EE. INTERPRETATION.** It is the intention of Borrower and Lender that if any provision of this Instrument or any other Loan Document is capable of two (2) constructions, one of which would render the provision void, and the other of which would render the provision valid, then the provision shall have the meaning which renders it valid. Borrower acknowledges that Lender has attempted in good faith to assure that this Instrument, the Note and all other Loan Documents are in compliance with applicable laws of the Property Jurisdiction and federal laws. Nevertheless, in the event that any provision of this Instrument, the Note or any other Loan Document is not in compliance with any such laws, then the non-complying provision shall be deemed to be deleted or modified to the extent necessary to assure legal compliance. Similarly, in the event any language or disclosure required by applicable laws of the Property Jurisdiction is not contained in the Loan Documents, then the Loan Documents shall be deemed to have been supplemented to add such language or disclosure, or, at Lender's option, Lender may provide such additional language or disclosure. In either event, such legal requirement shall thereby be satisfied and such noncompliance shall be deemed to have been cured for all purposes. Within ten (10) days after written request by Lender, Borrower agrees to execute such documentation as Lender may require to cure any legal compliance issues or deficiencies in the Loan Documents.

**FF. FUTURE ADVANCES.** In addition to the Indebtedness, this Instrument shall (to the extent allowed by applicable law) also secure payment of the principal, interest and other charges due on all other future loans or advances made by Lender to Borrower (or any successor in interest to Borrower as the owner of all or any part of the Mortgaged Property) when the promissory note evidencing such loan or advance specifically states that it is secured by this Instrument ("**Future Advances**"), including all extensions, renewals and modifications of any such Future Advances.

**GG. EXECUTION IN COUNTERPARTS.** This Instrument may be executed in multiple counterparts, and the separate signature pages and notary acknowledgments may then be combined into a single original document for recordation.

**HH. CALIFORNIA LAW PROVISIONS RELATING TO INSURANCE COVERAGE.** Borrower acknowledges that Borrower is aware of the following provision of Subdivision (a) of Section 2955.5 of the California Civil Code, which provides as follows:

> "No lender shall require a borrower, as a condition of receiving or maintaining a loan secured by real property, to provide hazard insurance coverage against risks to the improvements on that real property in an amount exceeding the replacement value of the improvements on the property."

**II. BALLOON PAYMENT NOTICE.** The Note secured hereby provides for a balloon payment of the entire Indebtedness upon the Maturity Date of the Note.

**JJ. NON-OWNER OCCUPIED PROPERTY.** Throughout the term of the Loan, Borrower shall not occupy any portion of the Mortgaged Property in any manner. If Borrower is an entity other than a natural person, any persons with a direct or indirect ownership interest in Borrower shall not occupy any portion of the Mortgaged Property in any manner throughout the term of the Loan.

**KK. DOCUMENT IMAGING.** Lender shall be entitled, in its sole discretion, to image or make copies of all or any selection of the agreements, instruments, documents, items and records governing, arising from or relating to any of Borrower's loans, including, without limitation, this Instrument and the other Loan Documents, and Lender may destroy or archive the paper originals. Borrower waives (1) any right to insist or require that Lender produce paper originals, (2) agrees that such images shall be accorded the same force and effect as the paper originals, (3) agrees that Lender is entitled to use such images in lieu of destroyed or archived originals for any purpose, including as admissible evidence in any demand, presentment or other proceedings, and (4) further agrees that any executed facsimile (faxed), scanned, or other imaged copy of this Instrument or any other Loan Document shall be deemed to be of the same force and effect as the original manually executed document.


© GoDocs® All Rights Reserved.

LL. **SCOPE OF SECURED OBLIGATIONS.** For the avoidance of doubt, this Instrument secures only the Indebtedness and not any amounts due under the Environmental Indemnity or any guaranty.

**ATTACHED EXHIBIT.** The following Exhibit is attached to this Instrument:

Exhibit "A" Description of the Land

THIS DEED OF TRUST SECURES A FIXED RATE PROMISSORY NOTE. THIS DEED OF TRUST IS A FIRST DEED OF TRUST. NO FURTHER ENCUMBRANCES MAY BE RECORDED AGAINST THE MORTGAGED PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF LENDER. FAILURE TO COMPLY WITH THIS PROVISION SHALL CONSTITUTE AN EVENT OF DEFAULT AND AT LENDER'S OPTION THE LOAN SHALL IMMEDIATELY BECOME DUE AND PAYABLE. CONSENT TO ONE FURTHER ENCUMBRANCE SHALL NOT BE DEEMED TO BE A WAIVER OF THE RIGHT TO REQUIRE SUCH CONSENT TO FUTURE OR SUCCESSIVE ENCUMBRANCES.

**IN WITNESS WHEREOF,** Borrower has signed and delivered this Instrument under seal (where applicable) or has caused this Instrument to be signed and delivered by its duly authorized representative under seal (where applicable). Where applicable law so provides or allows, Borrower intends that this Instrument shall be deemed to be signed and delivered as a sealed instrument.

**SIGNATURE(S) ON FOLLOWING PAGE(S)**


© GoDocs® All Rights Reserved.

**BORROWER:**

**GLASS TUNNEL LLC,**
**a California limited liability company**

By: ______________________
**SCOTT GILLEN,**
Manager

SCOTT GILLEN


© GoDocs® All Rights Reserved.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California ) ss.

County of Los Angeles )

On June 03, **2025,** before me, J. Briddell, Notary Public, personally appeared **SCOTT GILLEN,**

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/~~are~~ subscribed to the within instrument and acknowledged to me that he/~~she/they~~ executed the same in his/~~her/their~~ authorized capacity(ies), and that by his/~~her/their~~ signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

J. BRIDDELL
Notary Public - California
Los Angeles County
Commission # 2440160
My Comm. Expires Feb 28, 2027

WITNESS my hand and official seal.

Signature [signature]
Signature of Notary Public

Place Notary Seal Above

**EXHIBIT "A"**
**DESCRIPTION OF THE LAND**

THE LAND REFERRED TO HEREIN IS SITUATED IN LOS ANGELES COUNTY, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

Legal description attached hereto and made a part thereof Exhibit A

APN: 4458-018-039

PROPERTY ADDRESS: 24198 CASE COURT, MALIBU, CA 90265


© GoDocs® All Rights Reserved.

ORDER NO: 3910121-05940

**EXHIBIT "A"**

**LOT 5 OF TRACT NO. 70038, IN THE CITY OF MALIBU, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 1405, PAGES 31 THROUGH 35, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, AND AMENDED BY CERTIFICATE OF CORRECTION RECORDED FEBRUARY 5, 2019 AS INSTRUMENT NO. 20190105449, OF OFFICIAL RECORDS.**

**EXCEPT THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND WITHOUT RIGHT OF ENTRY ON THE SURFACE OF SAID LAND, AS CONVEYED TO R.R. ADAMSON, BY DEED RECORDED OCTOBER 5, 1953 IN BOOK 42846, PAGE 432, OF OFFICIAL RECORDS.**

*****END OF LEGAL DESCRIPTION*****

# EXHIBIT L

[redacted]

From: **Scott Gillen** □scottgillen□ unvarnishedco.com□
Date: Wed, □ul 9, 2025 at 5:25 AM
Subject: Fwd: 600 Spring Draw request 07/08/2025
To: Rommy Shy □rshy.realty□ gmail.com□, Barry Shy □barry90014□ gmail.com□, Roya Bahrami □roya□ laloftrental.com□

Please find enclosed draw.

Attached:

- 600 Spring LLC 310k 063025
- 600 Spring LLC 1,210,000 0708202
- Case AP Barry -1,210,000.00

--

Confidentiality Notice
This email message and any attached or accompanying files are intended for the sole use of the addressee only and may contain information that is privileged and/or confidential. If the reader of this message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited.
Disclaimer
Any views or comments expressed within this message are not representable by this company. If you have received this email in error, please notify the sender by replying to the email message and deleting it from your computer immediately.

**Confidentiality Notice**
This email message and any attached or accompanying files are intended for the sole use of the addressee only and may contain information that is privileged and/or confidential. If the reader of this message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited.

**Disclaimer**
Any views or comments expressed within this message are not representable by this company. If you have received this email in error, please notify the sender by replying to the email message and deleting it from your computer immediately.

SCOTT GILLEN
UNVARNISHED
DIRECTOR, BUILDER, THINKER, CREATOR

07/08/2025

To: 600 Spring, LLC.

Please wire to Bank Of America

Account number: [redacted]
Routing number [redacted] wires
Bank Name: Bank of America
Bank Address: Malibu

**TOTAL: $1,210,000.00**

PO Box 2833 Malibu CA 90265

SCOTT GILLEN
UNVARNISHED
DIRECTOR, BUILDER, THINKER, CREATOR

06/30/2025

To: 600 Spring, LLC.

Please wire to Bank Of America

Account number: [redacted]
Routing number [redacted] wires
Bank Name: Bank of America
Bank Address: Malibu

**TOTAL: $310,000.00**

PO Box 2833 Malibu CA 90265

| | |
|---|---|
| M. Preciado Pool Plastering Inc | 35,000.00 |
| Alfonso Marino | 1,326.00 |
| Dennis O. Escobar | 1,242.00 |
| Edgar Gonzalez Merino | 689.79 |
| Edgar Mendez | 698.54 |
| Francisco Ovando | 1,331.58 |
| Giovanni Urbano Cruz | 740.00 |
| Jose Gonzalez | 1,815.00 |
| Luis Rodolfo Velasco Palacios | 400.00 |
| Miguel A. Lopez | 1,458.60 |
| Mike Bonafede | 450.00 |
| Sergio Marino | 2,091.00 |
| Walter Gonzalez | 1,920.00 |
| Unvarnished Payroll | 51,527.56 |
| Alfonso Marino | 1,222.00 |
| Dennis O. Escobar | 1,269.00 |
| Francisco Ovando | 1,348.50 |
| Jose Gonzalez | 1,056.00 |
| Miguel A. Lopez | 1,115.40 |
| Sergio Marino | 1,558.00 |
| Walter Gonzalez | 1,880.00 |
| Business Card | 29,194.66 |
| Conner Elward | 375.00 |
| Cristobal Villatoro | 375.00 |
| Diego Mazariegos | 375.00 |
| Ed Dominguez | 375.00 |
| Greg Van Abelar | 375.00 |
| Jerdenys Cabrera | 375.00 |
| Luis Balaguer | 375.00 |
| Rick Sachs Welding | 3,357.50 |
| Rodger Perez | 375.00 |
| Montelongo, Inc. | 108.63 |
| Montelongo, Inc. | 3,362.96 |
| Elite Property Inspection | 3,650.00 |
| Luis Rodolfo Velasco Palacios | 5,000.00 |
| American Safety Security, Inc | 9,192.00 |
| Edgar Gonzalez Merino | 816.67 |
| Edgar Mendez | 551.25 |

| | |
|---|---|
| Giovanni Urbano Cruz | 864.88 |
| Rick Sachs Welding | 3,400.00 |
| The Case Homeowners Association | 10,890.44 |
| 3806 Cross Creek Road, LLC | 5,700.00 |
| Business Card | 23,239.80 |
| Unvarnished Payroll | 49,856.64 |
| Action Messenger Service | 357.40 |
| AIRGAS USA, LLC | 985.58 |
| Blue Shield of California | 4,252.23 |
| Esparza Design & Landscape, Inc | 38,850.00 |
| Guardian | 229.72 |
| JMBM Attorneys at Law | 13,471.10 |
| JULIE FRIEDRICHSEN DESIGN, LLC | 1,000.00 |
| National Construction Rentals | 1,546.44 |
| Orkin Services of California Inc. | 500.00 |
| Pham Law Group, Inc. | 4,875.00 |
| Pool Leak Inspections, Inc | 1,300.00 |
| Private Client Select Insurance Services | 11,000.00 |
| Southern CA Edison | 706.05 |
| Adita Tafolla | 1,820.00 |
| ICW Insurance Company of the West | 20,697.22 |
| First Choice Coring, Inc | 600.00 |
| Atlas Locations, Inc | 6,250.00 |
| Alfonso Marino | 1,014.00 |
| Dennis O. Escobar | 864.00 |
| Edgar Gonzalez Merino | 262.50 |
| Francisco Ovando | 928.00 |
| Giovanni Urbano Cruz | 277.50 |
| Jose Gonzalez | 1,056.00 |
| Luis Rodolfo Velasco Palacios | 1,100.00 |
| Miguel A. Lopez | 1,115.40 |
| Mike Bonafede | 450.00 |
| Randy Elward | 375.00 |
| Rick Sachs Welding | 2,040.00 |
| Rodolfo Sanchez | 375.00 |
| Roy Sanchez | 375.00 |
| Sergio Marino | 1,599.00 |

| | |
|---|---|
| Sylvester Rubio | 375.00 |
| Walter Gonzalez | 960.00 |
| Architectural Glass & Design | 28,176.00 |
| Architectural Glass & Design | 13,416.13 |
| Anawalt Lumber Co. | 3,101.12 |
| Anawalt Lumber Co. | 3,077.17 |
| Anawalt Lumber Co. | 2,873.34 |
| Anawalt Lumber Co. | 477.77 |
| Bellis Steel Co., Inc. | 5,270.63 |
| Cedar Valley Plumbing Supply | 3,630.18 |
| Caltime Metals Inc. | 590.00 |
| Diversified Minerals, Inc | 10,524.77 |
| Ferguson Enterprises, Inc. | 2,837.77 |
| Ferguson Enterprises, Inc. | 4,113.36 |
| Ferguson Enterprises, Inc. | 3,845.54 |
| Ferguson Enterprises, Inc. | 457.80 |
| McMaster Carr | 385.41 |
| Brandt Construction Company | 5,103.00 |
| Brandt Construction Company | 17,334.00 |
| Brandt Construction Company | 25,434.00 |
| Brandt Construction Company | 4,685.85 |
| Brandt Construction Company | 1,701.00 |
| Funtime Cabinet Factory | 7,011.88 |
| Funtime Cabinet Factory | 2,045.52 |
| Funtime Cabinet Factory | 2,817.19 |
| Psomas | 8,776.85 |
| So Cal Storm Water Monitorning, LLC | 3,750.00 |
| Thor Electric | 1,463.00 |
| Thor Electric | 12,040.00 |
| Thor Electric | 4,872.00 |
| Prime Aire, Inc. | 18,000.00 |
| Prime Aire, Inc. | 17,611.20 |
| Prime Aire, Inc. | 31,005.00 |
| Alfonso Marino | 1,222.00 |
| Dennis O. Escobar | 1,266.75 |
| Diego Mazariegos | 375.00 |
| Edgar Gonzalez Merino | 700.00 |

| | |
|---|---|
| Francisco Ovando | 1,360.58 |
| Giovanni Urbano Cruz | 869.50 |
| Greg Van Abelar | 375.00 |
| Humberto Juarez | 375.00 |
| Jose Gonzalez | 1,320.00 |
| Jose H. Sandoval | 375.00 |
| Kevin Sanchez | 375.00 |
| Luis Rodolfo Velasco Palacios | 1,000.00 |
| Miguel A. Lopez | 1,344.20 |
| Mike Bonafede | 900.00 |
| Randy Elward | 375.00 |
| Rick Sachs Welding | 2,720.00 |
| Rodolfo Sanchez | 750.00 |
| Roger Perez | 750.00 |
| Roy Sanchez | 750.00 |
| Sergio Marino | 1,927.00 |
| Walter Gonzalez | 1,600.00 |
| Atlas Locations, Inc | 6,250.00 |
| Unvarnished Payroll | 52,053.90 |
| Adita Tafolla | 1,520.00 |
| Edgar Mendez | 541.04 |
| AT & T | 1,322.25 |
| Atlas Locations, Inc | 6,250.00 |
| AIRGAS USA, LLC | 528.25 |
| American Safety Security, Inc | 9,802.00 |
| JULIE FRIEDRICHSEN DESIGN, LLC | 1,600.00 |
| LA County Waterworks Districts | 675.59 |
| LightGabler | 187.50 |
| National Construction Rentals | 1,092.34 |
| Waste Management | 986.30 |
| Unvarnished Payroll | 49,598.29 |
| DECO DRYWALL & PLASTER, LLC. | 648.00 |
| Alfonso Marino | 1,037.83 |
| Dennis O. Escobar | 1,080.00 |
| Edgar Gonzalez Merino | 700.00 |
| Edgar Mendez | 560.00 |
| Francisco Ovando | 1,348.50 |

| | |
|---|---|
| Giovanni Urbano Cruz | 740.00 |
| Jose Gonzalez | 1,320.00 |
| Miguel A. Lopez | 1,315.60 |
| Sergio Marino | 1,886.00 |
| Walter Gonzalez | 1,600.00 |
| Pacific Glassworks, Inc. | 312,000.00 |
| Dennis O. Escobar | 864.00 |
| Francisco Ovando | 928.00 |
| Jose Gonzalez | 1,056.00 |
| Miguel A. Lopez | 1,139.23 |
| Walter Gonzalez | 1,280.00 |
| Unvarnished Payroll | 53,599.42 |
| Business Card | 18,220.69 |
| Marco A. Lizarraga Caravantes | 375.00 |
| CANDLELIGHT SYSTEMS | 6,069.56 |
| Marco A. Lizarraga Caravantes | 375.00 |
| New Horizons Stone and Tile Group Inc | 14,175.66 |
| | 1,205,815.00 |

# EXHIBIT M

[redacted]

From: **Scott Gillen** □scottgillen□ unvarnishedco.com□
Date: Fri, Aug 1, 2025 at 1:31 PM
Subject: Fwd: Draw request CASE
To: Rommy Shy □rshy.realty□ gmail.com□, Barry Shy □barry90014□ gmail.com□, Roya Bahrami □roya□ laloftrental.com□

Please find the draw enclosed. I need your approval to disburse funds for House Five. The remaining amounts are allocated to the other homes at the Case, and there is a clear distinction between them. As you know, we cannot proceed with the job without these funds.

Please find attached a Draw request for construction at the Case Common Area H1, H2, H4.
Please review the bills to be paid for 24198 Case Ct. H5

- 600 Spring LLC 1,310,000.00 080125
    - Case AP 073025
- H5 073025

--

--
Thank □ou,

Scott Gillen
Cell: (310) 980-5665

Unvarnished

Office: (310) 263-1111

Unvarnished, Inc.
PO Box 2833, Malibu CA 90265

**Confidentiality Notice**
This email message and any attached or accompanying files are intended for the sole use of the addressee only and may contain information that is privileged and/or confidential. If the reader of this message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited.
**Disclaimer**
Any views or comments expressed within this message are not representable by this company. If you have received this email in error, please notify the sender by replying to the email message and deleting it from your computer immediately.

**Confidentiality Notice**
This email message and any attached or accompanying files are intended for the sole use of the addressee only and may contain information that is privileged and/or confidential. If the reader of this message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited.

**Disclaimer**
Any views or comments expressed within this message are not representable by this company. If you have received this email in error, please notify the sender by replying to the email message and deleting it from your computer immediately.

SCOTT GILLEN
UNVARNISHED
DIRECTOR, BUILDER, THINKER, CREATOR

08/01/2025

To: 600 Spring, LLC.

Please wire to Bank Of America

Account number: [redacted]
Routing number [redacted]

Bank Name: Bank of America
Bank Address: Malibu

**TOTAL: $1,310,000.00**

PO Box 2833 Malibu CA 90265

| Name | Amount |
|---|---|
| | |
| H5 24198 Case Ct | |
| Amazon.com | 189.76 |
| Anawalt Lumber | 1,734.65 |
| Anawalt Lumber | -158.69 |
| Anawalt Lumber | -330.58 |
| Anawalt Lumber | 396.73 |
| Anawalt Lumber | 22.04 |
| Anawalt Lumber | 176.98 |
| Anawalt Lumber | 850.19 |
| Anawalt Lumber | 59.52 |
| Anawalt Lumber | 61.32 |
| Anawalt Lumber | 92.51 |
| Anawalt Lumber | 85.93 |
| Atlas Locations | 6,250.00 |
| Barrett Engineered Pumps | 29,657.25 |
| Brandt Construction | 50,710.00 |
| Brandt Construction | -5,071.00 |
| Caltime Metals | 1,309.00 |
| Cedar Valley Plumbing Supply | 309.76 |
| Cedar Valley Plumbing Supply | 126.71 |
| Central Restaurant Products | 407.82 |
| Channel Islands Roofing | 2,860.00 |
| Channel Islands Roofing | -286 |
| Channel Islands Roofing | 4,250.00 |
| Channel Islands Roofing | -425 |
| Channel Islands Roofing | 10,416.00 |
| Channel Islands Roofing | -1,041.60 |
| Conejo Hardwoods | 207.43 |
| COX PAINT. | 1,956.21 |
| Danny Chavez Concrete Pumping | 600 |
| Danny Chavez Concrete Pumping | 384 |
| Danny Chavez Concrete Pumping | 400 |
| Deco Drywall & Plaster | 839.44 |
| Deco Drywall & Plaster | -83.94 |
| Deco Drywall & Plaster | 1,110.00 |
| Deco Drywall & Plaster | -111 |
| Deco Drywall & Plaster | 7,680.00 |
| Deco Drywall & Plaster | -768 |
| Diversified Minerals | 1,596.42 |

| | |
|---|---|
| Embers West | -1,313.53 |
| Embers West | 13,135.34 |
| FCI Lender Services | 162,500.00 |
| FR & Associates | 4,390.00 |
| FR & Associates | 15,365.00 |
| Franchise Tax Board | 800 |
| Goldbrecht | -3,888.89 |
| Goldbrecht | 38,888.89 |
| GYP - FILL ENTERPRISE | 2,660.00 |
| Holdenwater | 2,760.00 |
| OJ Insulation | -2,000.00 |
| OJ Insulation | 20,000.00 |
| Private Client Select Insurance | 11,000.00 |
| Rex Collingwood | 1,600.00 |
| Simply Breakers | 4,230.92 |
| The Case Homeowners Association | 5,150.00 |
| The Case Homeowners Association | 7,872.61 |
| The Case Homeowners Association | -5,150.00 |
| The Case Homeowners Association | 7,872.61 |
| Thor Electric | 800 |
| Thor Electric | 3,200.00 |
| Thor Electric | 4,860.00 |
| U & M Waterproofing | 20,608.00 |
| Unilight Wholesale Electric | 4,833.66 |
| Unilight Wholesale Electric | 399.94 |
| Unilight Wholesale Electric | 182.16 |
| Unilight Wholesale Electric | 233.63 |
| Unvarnished Payroll | 5,045.34 |
| Unvarnished Payroll | 5,738.36 |
| Unvarnished Payroll | 4,849.18 |
| Unvarnished Payroll | 3,642.88 |
| Unvarnished Payroll | 15,257.04 |
| Unvarnished Payroll | 18,758.50 |
| Villa Pacific Contractors | 13,616.00 |
| Vista Growers | 37,981.13 |
| White Cap | 2,778.30 |
| Anawalt | 7.61 |
| Caltime Metals | 539.00 |
| Psomas | 17,500.00 |
| Coast Door and Hardware | 652.00 |
| Diversified Minerals | 2,213.61 |
| Unilight Wholesale Electric | 233.63 |
| Danny Chavez Concrete Pumping INC. | 534.00 |

| | |
|---|---|
| Bellis Reinforcing Steel Company | 1,517.70 |
| Diversified Minerals | 3,036.74 |
| JULIE FRIEDRICHSEN DESIGN | 1,000.00 |
| OJ | 92,904.00 |
| Embers West | 3,022.50 |
| Goldbrecth | 33,846.11 |
| U&M | 173,255.00 |
| Private Select | 11,000.00 |
| Unvarnished Payroll | 17,441.66 |
| | 903,824.49 |
| | |

| Name | | Open Balance |
|---|---|---|
| Bills Owed for Case Common, H1, H2, H4 | | |
| Scott Gillen deposited | | 52,558.84 |
| DECO DRYWALL & PLASTER | | 1,512.00 |
| DECO DRYWALL & PLASTER | | 11,919.30 |
| Psomas | | 5,425.00 |
| Funtime Cabinet Factory | | 17,953.50 |
| GLASS QUEEN | | 1,423.80 |
| Diversified Minerals | | 3,209.38 |
| New Horizons Stone and Tile | | 4,774.00 |
| New Horizons Stone and Tile | | 5,765.00 |
| Anawalt Lumber | | 72.72 |
| Anawalt Lumber | | 144.47 |
| Unilight Wholesale Electric | | 329.45 |
| American Safety Security | | 9,066.00 |
| Caltime Metals | | 1,023.00 |
| Anawalt Lumber | | 640.02 |
| AIRGAS USA | | 512.35 |
| National Construction Rentals | | 1,092.34 |
| Psomas | | 115 |
| Psomas | | 9,692.50 |
| National Construction Rentals | | 454.1 |
| Brandt Construction | | 44,522.50 |
| Danny Chavez Concrete Pumping | | 604 |
| Site Fuel | | 1,264.26 |
| Unvarnished Payroll | | 23,905.83 |
| Business Card | | 2,716.42 |
| So Cal Storm Water Monitorning | | 1,650.00 |
| GLASS QUEEN | | 1,680.00 |
| West Coast Sand & Gravel | | 1,074.94 |
| Perez Disposal | | 705 |
| Anawalt Lumber | | 266.69 |
| Private Client Select Insurance | | 9,720.40 |
| American Safety Security | | 8,620.00 |
| White Cap | | 531.71 |
| White Cap | | -531.71 |
| Perez Disposal | | 1,062.85 |
| Caltime Metals | | 221 |
| Caltime Metals | | 842 |
| Anawalt Lumber | | 16.53 |
| Precision Cable | | 2,887.00 |
| White Cap | | -640.98 |
| Perez Disposal | | 1,248.63 |

| | | |
|---|---|---|
| Perez Disposal | | 705 |
| Perez Disposal | | 1,107.40 |
| Anawalt Lumber | | 126.68 |
| Danny Chavez Concrete Pumping | | 1,620.00 |
| Unvarnished Payroll | | 20,290.20 |
| Danny Chavez Concrete Pumping | | 480 |
| Diversified Minerals | | 3,509.26 |
| Paul Brodie Electric | | 43,944.97 |
| Paul Brodie Electric | | 20,900.25 |
| Ferguson Enterprises | | 937.39 |
| Southern CA Edison | | 149.8 |
| Southern CA Edison | | 241.35 |
| M. Preciado Pool Plastering | | 2,750.00 |
| Powerfull Electric | | 14,972.90 |
| Powerfull Electric | | 10,203.63 |
| Powerfull Electric | | 32,717.30 |
| Powerfull Electric | | 1,800.00 |
| Powerfull Electric | | 234 |
| Powerfull Electric | | 3,467.78 |
| So Cal Storm Water Monitorning | | 1,650.00 |
| COX PAINT | | 600.58 |
| Caltime Metals | | 1,160.00 |
| White Cap | | 713.42 |
| White Cap | | 669.12 |
| White Cap | | 2,482.97 |
| White Cap | | 1,939.61 |
| DECO DRYWALL & PLASTER | | 2,127.60 |
| DECO DRYWALL & PLASTER | | 13,743.00 |
| PDQ Rental Center | | 2,608.89 |
| White Cap | | 3,385.27 |
| DECO DRYWALL & PLASTER | | 7,771.68 |
| DECO DRYWALL & PLASTER | | 16,567.20 |
| So Cal Storm Water Monitorning | | 3,150.00 |
| Leighton and Associates | | 5,650.00 |
| So Cal Storm Water Monitorning | | 1,650.00 |
| Quinn | | 1,141.94 |
| James H. Cowan | | -4,600.00 |
| James H. Cowan | | 31,500.00 |
| James H. Cowan | | 10,800.00 |
| James H. Cowan | | 58,500.00 |
| James H. Cowan | | 1,714.50 |
| James H. Cowan | | -1,450.00 |
| James H. Cowan | | 6,705.00 |

| | | |
|---|---|---|
| James H. Cowan | | 27,867.32 |
| James H. Cowan | | 36,000.00 |
| James H. Cowan | | 9,000.00 |
| Pacific Rim Grading | | 17,175.00 |
| Metal Tech Sheet Metal | | 65,955.20 |
| Channel Islands Roofing | | 146.69 |
| Channel Islands Roofing | | 1,973.48 |
| Channel Islands Roofing | | 3,068.39 |
| Channel Islands Roofing | | 21,191.76 |
| Channel Islands Roofing | | 4,269.26 |
| Channel Islands Roofing | | 3,531.96 |
| U & M Waterproofing | | 3,747.57 |
| U & M Waterproofing | | 22,697.57 |
| U & M Waterproofing | | 38,690.82 |
| U & M Waterproofing | | 10,368.00 |
| OJ Insulation | | 2,011.50 |
| OJ Insulation | | 1,733.40 |
| Embers West | | 11,292.36 |
| U & M Waterproofing | | 3,523.50 |
| U & M Waterproofing | | 5,318.10 |
| Metal Tech Sheet Metal | | 9,816.17 |
| Metal Tech Sheet Metal | | 10,378.80 |
| Metal Tech Sheet Metal | | 9,072.00 |
| Metal Tech Sheet Metal | | 98,582.40 |
| Metal Tech Sheet Metal | | 7,057.80 |
| Prime Aire | | 32,535.00 |
| Metal Tech Sheet Metal | | 37,800.00 |
| Brandt Construction | | 8,351.20 |
| Brandt Construction | | 10,756.80 |
| Brandt Construction | | 10,154.91 |
| DECO DRYWALL & PLASTER | | 1,785.60 |
| DECO DRYWALL & PLASTER | | 7,992.00 |
| DECO DRYWALL & PLASTER | | 2,376.00 |
| Waste Management | | 418.61 |
| Waste Management | | 409.72 |
| D Payne & Sons | | -2,025.00 |
| DECO DRYWALL & PLASTER | | 1,188.00 |
| DECO DRYWALL & PLASTER | | 5,454.00 |
| DECO DRYWALL & PLASTER | | 1,800.00 |
| DECO DRYWALL & PLASTER | | 5,427.00 |
| Psomas | | 4,444.27 |
| 3806 Cross Creek Road, LLC | | 5,700.00 |
| The Case Homeowners Association | | 2,722.61 |

| | | |
|---|---|---|
| The Case Homeowners Association | | 2,722.61 |
| The Case Homeowners Association | | 2,722.61 |
| Diversified Minerals, Inc | | 2,320.90 |
| Anawalt Lumber Co. | | 56.21 |
| PDQ Rental Center | | 861.68 |
| Anawalt Lumber Co. | | 587.16 |
| Unilight Wholesale Electric | | 255.02 |
| Unvarnished Payroll | | 23,151.78 |
| Below are checks waiting on draw - no money to pay | | |
| CANDLELIGHT SYSTEMS | | 6,069.56 |
| Unvarnished Payroll | | 31,078.88 |
| Unvarnished Payroll | | 35,714.73 |
| Unvarnished Payroll | | 28,852.25 |
| Esparza Design & Landscape, Inc | | 12,165.98 |
| Unilight Wholesale Electric | | 42.43 |
| Unilight Wholesale Electric | | 3,717.52 |
| Danny Chavez | | 2,132.00 |
| Danny Chavez | | 1,020.00 |
| Danny Chavez | | 948.00 |
| Credit Card | | 5,187.52 |
| Credit Card | | 1,565.53 |
| Miguel A. Lopez | | 1,344.20 |
| Alfonso Marino | | 1,215.50 |
| Sergio Marino | | 1,927.00 |
| Dennis O. Escobar | | 1,080.00 |
| Francisco Ovando | | 1,160.00 |
| Jose Gonzalez | | 1,056.00 |
| Walter Gonzalez | | 1,600.00 |
| Rick Sachs Welding | | 3,400.00 |
| Edgar Gonzalez Merino | | 800.63 |
| Giovanni Urbano Cruz | | 851 |
| Jorge Pineda | | 1,880.00 |
| Greg Van Abelar | | 375 |
| Marco A. Lizarraga Caravantes | | 375 |
| Mike Bonafede | | 450 |
| Randy Elward | | 375 |
| Roy Sanchez | | 375 |
| | | 1,301,585.00 |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

# PROOF OF SERVICE

STATE OF CALIFORNIA )
) ss.
COUNTY OF LOS ANGELES )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 2121 Avenue of the Stars, Suite 2800, Los Angeles, California 90067-5052.

On August 5, 2025, I served the foregoing documents described as **DECLARATION OF BARRY SHY IN SUPPORT OF PLAINTIFFS' REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION AND APPOINTMENT OF RECEIVER** in this action by placing a true and correct copy thereof enclosed in a sealed envelope addressed as follows:

| | |
|---|---|
| Kevin H. Brogan<br>Hill Farrer<br>515 South Flower St., 7th Floor<br>Los Angeles, California 90071<br>Email: kbrogan@hfbllp.com | Attorney for Defendants<br>Glass Tunnel LLC, Scott Gillen,<br>C64829 LLC and Unvarnished, Inc. |
| Vanessa H. Widener<br>Anderson McPharlin & Conners LLP<br>707 Wilshire Boulevard, Suite 4000<br>Los Angeles, California 90017<br>Email: vhw@amclaw.com | Attorney for Defendant<br>PMF CA REIT, L.L.C. |

**[X]** **BY ELECTRONIC SERVICE**: I electronically filed the documents described above with the Clerk of the Court using One Legal Online Court Services, and electronically served the foregoing upon the attorney(s) of record for each party in the case at the e-mail address(es) registered for such service through One Legal Online Court Services.

[] BY ELECTRONIC SERVICE: I caused the document(s) to be sent to the persons at the e-mail addresses listed on the attached service list. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful. My electronic notification address is *ezyalyukova@robinskaplan.com*.

**[X]** **(State)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on August 5, 2025, at Los Angeles, California.

*Elena Zyalyukova*

Elena Zyalyukova

# EXHIBIT M

**From:** Rommy Shy <rshy.realty@gmail.com>
**Subject: Tract 2162 Phase 2C Final Map Review and COA Compliance**
**Date:** February 2, 2026 at 4:04:40 PM PST
**To:** dpplanning@outlook.com

Hello Drew,

I am in communication with Jeremy Freund in the Planning Dept and he provided me with your info as I am now taking over this project on the ownership side. He send over the attached which lists items that need to be completed for Phase 2 and I would appreciate if you could let me know what the status is on each of these items, what remains to be done and any guidance you can provide in accomplishing the same.

Please send over any documentation for this file you may have. Thank you

Best Regards,

Rommy Shy
SB Properties
15760 Ventura Blvd. Suite 680
Encino, CA 91403
Tel: (818) 274-2655
Fax: (213) 891-1953

# EXHIBIT N

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| 1. | DEFINITIONS | 1 |
| 2. | CONTRACT INTERPRETATION | 2 |
| 3. | CONTRACT DOCUMENTS | 3 |
| 4. | SCOPE OF WORK | 3 |
| 5. | COMMENCEMENT AND PROSECUTION OF THE WORK | 4 |
| 6. | INSPECTION AND TESTING | 5 |
| 7. | COST OF THE WORK | 5 |
| 8. | CHANGES IN THE WORK | 6 |
| 9. | UNFORESEEN CONDITIONS | 7 |
| 10. | TERMS OF PAYMENT | 7 |
| 11. | INDEMNIFICATION | 8 |
| 12. | SAFETY | 8 |
| 13. | COORDINATION | 8 |
| 14. | CERTIFICATE OF FINAL ACCEPTANCE | 9 |
| 15. | WARRANTY | 9 |
| 16. | TIME FOR COMPLETION | 9 |
| 17. | SUSPENSION / TERMINATION | 10 |
| 18. | NOTICES | 11 |
| 19. | INSURANCE | 12 |
| 20. | CLAIMS/DISPUTE RESOLUTION | 12 |
| 21. | SOLE AGREEMENT | 14 |
| 22. | MISCELLANEOUS | 14 |
| 23. | GOVERNING LAW | 14 |

**Exhibit A**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL NO. 1:

A PARCEL OF LAND, IN THE CITY OF MALIBU, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, BEING PORTIONS OF THE RANCHO TOPANGA MALIBU SEQUIT, AS CONFIRMED TO MATTHEW KELLER BY PATENT RECORDED IN )BOOK 1 PAGES 407 ET SEQ., OF PATENTS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF PARCEL 2 IN THE WESTERLY BOUNDARY OF PARCEL 1 AS DESCRIBED IN DEED FROM MARBLEHEAD LAND COMPANY, TO STATHAM INSTRUMENTS, INC., RECORDED DECEMBER 30, 1957, AS INSTRUMENT NO. 1542 IN BOOK 56325 PAGE 391., OF OFFICIAL RECORDS OF COUNTY OF LOS ANGELES, CALIFORNIA, THENCE ALONG THE SOUTHERLY LINE OF SAID PARCEL 2, NORTHWESTERLY ALONG A TANGENT CURVE (A TANGENT AT SAID CORNER BEARING SOUTH 05 DEGREES 24 MINUTES 30 SECONDS EAST) CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 130 FEET THROUGH A CENTRAL ANGLE OF 90 DEGREES AN ARC DISTANCE OF 204.20 FEET; THENCE TANGENT TO SAID CURVE SOUTH 84 DEGREES 35 MINUTES 30 SECONDS WEST 303.30 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHEASTERLY HAVING A RADIUS OF 25 FEET; THENCE NORTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 90 DEGREES AN ARC DISTANCE OF 39.27 FEET; THENCE NORTH 05 DEGREES 24 MINUTES 30 SECONDS WEST 75.00 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHEASTERLY HAVING A RADIUS OF 25 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 90 DEGREES AN ARC DISTANCE OF 39.27 FEET; THENCE TANGENT TO SAID CURVE NORTH 84 DEGREES 35 MINUTES 30 SECONDS EAST 303.30 FEET TO ME BEGINNING OF A TANGENT CURVE CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 130 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 90 DEGREES AN ARC DISTANCE OF 204.20 FEET TO A POINT IN THE WESTERLY BOUNDARY OF SAID PARCEL 1; THENCE SOUTH 05 DEGREES 24 MINUTES 30 SECONDS EAST ALONG SAID WESTERLY BOUNDARY 75.00 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND WITHOUT RIGHT OF ENTRY ON THE SURFACE OF SAID LAND, AS CONVEYED TO R.R. ADAMSON, BY DEED RECORDED OCTOBER 5, 1953 IN BOOK 42846 PAGE 432 OFFICIAL RECORDS.

PARCEL NO. 2:

BEGINNING AT A POINT IN THE CENTER LINE OF THE STRIP OF LAND 100 FEET WIDE, KNOWN AS PACIFIC COAST HIGHWAY DESCRIBED IN PARCEL 1 OF THE DEED TO THE STATE OF

10.3.3. If Owner disputes any item on a payment application, Owner shall promptly notify Contractor in writing of such dispute, who shall respond with verification or an explanation of the disputed item, or a revised payment application. If Owner and Contractor are unable to resolve a disputed item in the Payment Application, the undisputed amount shall be paid to Contractor and any disputed amounts shall be submitted for dispute resolution in accordance with Section 20.

10.3.4. Owner may withhold from any amounts otherwise due to Contractor an amount not exceeding one and one-half (1½) times the amount of any mechanic's lien filed against the Project property.

## 11. INDEMNIFICATION

11.1. To the fullest extent permitted by law, Contractor shall defend, indemnify and hold the Indemnified Parties harmless from and against any and all claims, damages, losses and expenses arising out of or resulting from the negligence of Contractor in the performance of the Work, to the extent covered by the insurance required to be maintained by Contractor, excepting only such injury or harm as may be caused solely and exclusively by the fault or negligence of, or by the willful misconduct of, one or more of the Indemnified Parties. Such indemnity shall extend to claims, demands, or liability for injuries occurring after completion of the Project, as well as during the construction of the Project.

11.2. To the fullest extent permitted by law, Owner shall defend, indemnify and hold Contractor harmless from and against any and all claims, damages, losses and expenses arising out of or resulting from the negligence of one or more of the Indemnified Parties.

## 12. SAFETY

12.1. Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs among its employees in connection with the performance of the Work.

12.2. In performing the Work, Contractor shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent their respective employees from causing damage, injury or loss to:

12.2.1. Employees on the job site and other persons who may be affected thereby;

12.2.2. The Work and materials and equipment to be incorporated therein, whether in storage on or off the site; and

12.2.3. Other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

## 13. COORDINATION

13.1. Contractor acknowledges that if Owner seeks to carry out other works on the Project site concurrently with the Work, it is of paramount importance that all such work be coordinated as appropriate under the circumstances. Accordingly, Contractor shall:

13.1.1. Take all reasonable steps to ensure that the Work is coordinated with the construction of such other works including, if necessary, the preparation of reasonable coordination drawings and specifications;

CALIFORNIA, RECORDED ON MARCH 22, 1944 AS INSTRUMENT NO. 1279 IN BOOK 20743 PAGE 271, OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, SAID POINT BEING IN THAT CERTAIN COURSE DESCRIBED IN SAID DEED AS HAVING A BEARING AND LENGTH OF NORTH 85 DEGREES 35 MINUTES 30 SECONDS EAST 5221.78 FEET AND BEING MARKED BY A BRASS CAP MONUMENT "SOLSTICE CANON L-8", AS SHOWN IN THE COUNTY OF LOS ANGELES SURVEYOR'S FIELD BOOK 1652 PAGES 67 AND 68 ON FILE IN THE OFFICE OF THE COUNTY SURVEYOR OF SAID COUNTY; THENCE ALONG SAID CENTER LINE NORTH 84 DEGREES 35 MINUTES 30 SECONDS EAST 370.32 FEET; THENCE SOUTH 05 DEGREES 24 MINUTES 30 SECONDS EAST 50.00 FEET TO THE TRUE POINT OF BEGINNING IN THE SOUTHERLY LINE OF SAID 100 FOOT STRIP OF LAND; THENCE CONTINUING SOUTH 5 DEGREES 24 MINUTES 30 SECONDS EAST 437.77 FEET; THENCE SOUTH 31 DEGREES 48 MINUTES 00 SECONDS EAST 119.06 FEET, THENCE SOUTH 38 DEGREES 14 MINUTES 53 SECONDS EAST 249.12 FEET; THENCE SOUTH 18 DEGREES 51 MINUTES 46 SECONDS EAST 71.80 FEET TO THE NORTHEAST CORNER OF THE LAND DESCRIBED IN THE DEED TO CECILE A. TREBAOL, ET AL., RECORDED AUGUST 27, 1943 AS INSTRUMENT NO. 705 IN BOOK 20185 PAGE 361, OF SAID OFFICIAL RECORDS; THENCE ALONG THE NORTHERLY LINE OF THE LAND DESCRIBED IN THE DEED TO MARK R. MILLER AND WIFE, RECORDED NOVEMBER 12, 1943 AS INSTRUMENT NO. 883 IN BOOK 20375 PAGE 377 OF SAID OFFICIAL RECORDS , NORTH 73 DEGREES 42 MINUTES 05 SECONDS EAST 305.76 FEET TO THE NORTHWEST CORNER OF THE LAND DESCRIBED IN THE DEED TO CARL R. HENDERSON AND WIFE RECORDED ON MAY 21, 1943 AS INSTRUMENT NO. 184 IN BOOK 20004 PAGE 197 OF SAID OFFICIAL RECORDS; THENCE ALONG THE NORTHERLY LINE OF THE LAND DESCRIBED IN THE LAST MENTIONED DEED AS FOLLOWS: SOUTH 78 DEGREES 21 MINUTES 55 SECONDS EAST 210.16 FEET; NORTH 86 DEGREES 45 MINUTES 34 SECONDS EAST 315.61 FEET AND NORTH 77 DEGREES 35 MINUTES 06 SECONDS EAST 214.39 FEET TO THE SOUTHWEST CORNER OF THE LAND DESCRIBED IN THE DEED TO CLICERIO MINORINI AND WIFE, RECORDED ON FEBRUARY 11, 1942 AS INSTRUMENT NO. 576, IN BOOK 19075 PAGE 301, OFFICIAL RECORDS, SAID SOUTHWEST CORNER BEING A POINT IN THE NORTHERLY LINE OF THE LAND DESCRIBED IN PARCEL 1 OF THE DEED TO THE STATE OF CALIFORNIA RECORDED OCTOBER 2, 1939 AS INSTRUMENT NO. 668, IN BOOK 16845 PAGE 253, OF SAID OFFICIAL RECORDS; THENCE ALONG THE WESTERLY LINE OF THE LAND DESCRIBED IN THE ABOVE MENTIONED DEED TO MINORINI NORTH 20 DEGREES 00 MINUTES 23 SECONDS WEST 719.46 FEET AND NORTH 14 DEGREES 39 MINUTES 24 SECONDS WEST 118.48 FEET TO THE SOUTHERLY LINE OF SAID STRIP OF LAND 100 FEET WIDE, KNOWN AS PACIFIC COAST HIGHWAY; THENCE ALONG SAID PACIFIC COAST HIGHWAY SOUTH 84 DEGREES 35 MINUTES 30 SECONDS WEST 1033.71 FEET TO THE TRUE POINT OF BEGINNING.

EXCEPT THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, WITHOUT RIGHT OF ENTRY ON THE SURFACE OF SAID LAND, AS CONVEYED TO R.R. ADAMSON BY DEED RECORDED OCTOBER 5, 1953 IN BOOK 42846 PAGE 432, OFFICIAL RECORDS.

PARCEL NO. 3:

BEGINNING AT THE NORTHWEST CORNER OF PARCEL 2 ABOVE DESCRIBED, SAID CORNER BEING IN THE SOUTHERLY LINE OF SAID 100 FOOT STRIP OF LAND, KNOWN AS PACIFIC COAST HIGHWAY; THENCE ALONG SAID SOUTHERLY LINE, SOUTH 84 DEGREES 35 MINUTES 30 SECONDS WEST 433.30 FEET TO THE BEGINNING OF A

TANGENT CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 25 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 90 DEGREES AN ARC DISTANCE OF 39.27 FEET; THENCE TANGENT TO SAID CURVE, SOUTH 05 DEGREES 24 MINUTES 30 SECONDS EAST 75.00 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHEASTERLY, HAVING A RADIUS OF 25 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 90 DEGREES AN ARC DISTANCE OF 39.27 FEET; THENCE TANGENT TO SAID CURVE, NORTH 84 DEGREES 35 MINUTES 30 SECONDS EAST 303.30 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHWESTERLY , HAVING A RADIUS OF 130 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 90 DEGREES ARC DISTANCE OF 204.20 FEET TO A POINT IN THE WESTERLY BOUNDARY OF SAID PARCEL 2, DISTANT THEREON SOUTH 05 DEGREES 24 MINUTES 30 SECONDS EAST 255.00 FEET FROM THE NORTHWEST CORNER OF SAID PARCEL; THENCE NORTH 05 DEGREES 24 MINUTES 30 SECONDS WEST 255.00 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, WITHOUT RIGHT OF ENTRY ON THE SURFACE OF SAID LAND, AS CONVEYED TO R.R. ADAMSON BY DEED RECORDED OCTOBER 5, 1953, IN BOOK 42846 PAGE 432, OFFICIAL RECORDS.

PARCEL NO. 4:

BEGINNING AT THE SOUTHWEST CORNER OF PARCEL 1 ABOVE DESCRIBED, SAID CORNER BEING THE NORTHEAST CORNER OF THE LAND DESCRIBED IN THE DEED TO CECILE A. TREBAOL, ET AL., RECORDED AUGUST 27, 1943 AS INSTRUMENT NO. 705 IN ROOK 20185 PAGE 361, OFFICIAL RECORDS; THENCE ALONG THE WESTERLY BOUNDARY OF SAID PARCEL 2, NORTH 18 DEGREES 51 MINUTES 46 SECONDS WEST 71.80 FEET; NORTH 38 DEGREES 14 MINUTES 53 SECONDS WEST 249.12 FEET, AND NORTH 31 DEGREES 48 MINUTES 00 SECONDS WEST 119.60 FEET TO AN ANGLE POINT IN SAID WESTERLY BOUNDARY, SAID POINT BEING ALSO IN THE EASTERLY LINE OF THE STRIP OF LAND 60 FEET LN WIDTH, HEREINAFTER DESCRIBED AS PARCEL 4; THENCE ALONG SAID EASTERLY LINE AS FOLLOWS: SOUTHEASTERLY ALONG A CURVE, (A TANGENT AT SAID POINT BEARING NORTH 05 DEGREES 24 MINUTES 30 SECONDS WEST) CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 70 FEET THROUGH A CENTRAL ANGLE OF 14 DEGREES 30 MINUTES 00 SECONDS AN ARC DISTANCE OF 17.72 FEET, TANGENT TO SAID CURVE SOUTH 19 DEGREES 54 MINUTES 30 SECONDS EAST 87.68 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY HAVING A RADIUS OF 160 FEET; SOUTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 79 DEGREES 50 MINUTES 35 SECONDS AN ARC DISTANCE OF 222.96 FEET; TANGENT TO SAID CURVE SOUTH 59 DEGREES 56 MINUTES 05 SECONDS WEST 113.92 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 120 FEET; SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 30 DEGREES 30 MINUTES 00 SECONDS AN ARC DISTANCE OF 63.88 FEET TANGENT TO SAID CURVE SOUTH 29 DEGREES 26 MINUTES 05 SECONDS WEST 163.25 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 120 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 09 DEGREES 28 MINUTES 27 SECONDS AN ARC DISTANCE OF 19.84 FEET; THENCE RADIAL TO SAID CURVE, SOUTH 70 DEGREES 02 MINUTES 22 SECONDS EAST 13.61 FEET TO THE MOST WESTERLY CORNER OF

SAID LAND DESCRIBED LN DEED TO CECILE A. TREBAOL, ET AL, THENCE NORTH 44 DEGREES 41 MINUTES 05 SECONDS EAST ALONG THE NORTHERLY LINE OF THE LAND DESCRIBED IN SAID DEED 204.39 FEET; THENCE NORTH 82 DEGREES 01 MINUTES 05 SECONDS EAST 355.14 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM ALL MINERALS, OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, WITHOUT RIGHT OF ENTRY ON THE SURFACE OF SAID LAND, AS CONVEYED TO R.R. ADAMSON BY DEED RECORDED OCTOBER 5, 1953 IN BOOK 42846 PAGE 432, OF OFFICIAL RECORDS.

SAID FOUR PARCELS ABOVE MENTIONED OF LAND IS SHOWN ON CERTIFICATE OF COMPLIANCE RECORDED OCTOBER 31, 1985 AS INSTRUMENT NO. 85-1293123.

PARCEL NO. 5:

AN EASEMENT FOR ROADWAY PURPOSES AND PURPOSES OF INGRESS AND EGRESS OVER A STRIP OF LAND 60 FEET IN WIDTH LYING 30 FEET ON EACH SIDE OF AND PARALLEL WITH THE FOLLOWING DESCRIBED CENTER LINE, TO WIT:

COMMENCING AT A POINT IN THE CENTER LINE OF THE STRIP OF LAND 100 FEET WIDE, KNOWN AS PACIFIC COAST HIGHWAY AS DESCRIBED IN PARCEL 1 OF THIS DESCRIPTION, SAID POINT BEING MARKED BY A BRASS CAP MONUMENT "SOLSTICE CANON L-8"; THENCE ALONG SAID CENTER LINE SOUTH 84 DEGREES 35 MINUTES 30 SECONDS WEST 117.98 FEET; THENCE SOUTH 05 DEGREES 24 MINUTES 30 SECONDS EAST 50.00 FEET TO THE TRUE POINT OF BEGINNING IN THE SOUTHERLY LINE OF SAID 100 FOOT STRIP OF LAND THENCE CONTINUING SOUTH 05 DEGREES 24 MINUTES 30 SECONDS EAST 230.00 FEET; THENCE NORTH 84 DEGREES 35 MINUTES 30 SECONDS EAST 358.30 FEET; THENCE SOUTHEASTERLY 157.08 FEET ALONG THE ARC OF A TANGENT CURVE CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 100 FEET; THENCE TANGENT SOUTH 05 DEGREES 24 MINUTES 30 SECONDS EAST 107.77 FEET, THENCE SOUTHEASTERLY 25.31 FEET ALONG THE ARC OF A TANGENT CURVE CONCAVE EASTERLY HAVING A RADIUS OF 100 FEET; THENCE TANGENT SOUTH 19 DEGREES 54 MINUTES 30 SECONDS EAST 87.68 FEET; THENCE SOUTHERLY 181.16 FEET ALONG THE ARC OF A TANGENT CURVE CONCAVE WESTERLY HAVING A RADIUS OF 130 FEET; THENCE TANGENT SOUTH 59 DEGREES 56 MINUTES 05 SECONDS WEST 113.92 FEET; THENCE SOUTHWESTERLY 79.85 FEET ALONG THE ARC OF A TANGENT CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 150 FEET; THENCE TANGENT SOUTH 29 DEGREES 26 MINUTES 05 SECONDS WEST 163.25 FEET; THENCE SOUTHWESTERLY 41.45 FEET ALONG THE ARC OF A TANGENT CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 150 FEET THENCE TANGENT SOUTH 13 DEGREES 36 MINUTES 05 SECONDS WEST 122.70 FEET; THENCE SOUTHWESTERLY 129.81 FEET ALONG THE ARC OF A TANGENT CURVE CONCAVE NORTHWESTERLY HAVING A RADIUS OF 125 FEET; THENCE TANGENT SOUTH 73 DEGREES 06 MINUTES 05 SECONDS WEST 154.35 FEET; THENCE SOUTHWESTERLY 27.26 FEET ALONG THE ARC OF TANGENT CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 150 FEET; THENCE TANGENT SOUTH 62 DEGREES 41 MINUTES 19 SECONDS WEST 112.34 FEET; THENCE SOUTHERLY 138.32 FEET ALONG THE ARC OF A TANGENT CURVE CONCAVE EASTERLY HAVING A RADIUS OF 100 FEET; THENCE TANGENT SOUTH 16 DEGREES 33 MINUTES 55 SECONDS EAST 18.67 FEET TO A POINT IN THE NORTHERLY LINE OF THE 60 FOOT STRIP OF LAND KNOWN AS MALIBU ROAD, SAID POINT BEING SOUTH 73

DEGREES 26 MINUTES 05 SECONDS WEST 1431.32 FEET AND NORTH 16 DEGREES 33 MINUTES 55 SECONDS WEST 30.00 FEET, FROM ENGINEER'S CENTER LINE STATION 903 71.78 B.C. LINE 1, AT THE EASTERLY EXTREMITY OF THAT CERTAIN CENTER LINE COURSE SHOWN ON LOS ANGELES COUNTY SURVEYOR'S MAP F.M. NO. 11698, SHEET 3, AS NORTH 73 DEGREES 29 MINUTES 00 SECONDS EAST.

Parcel ID:4458-018-036

Commonly known as 24168 Case Court, Malibu 90265
However, by showing this address no additional coverage is provided